United States District Court
For the Northern District of California

1

2

3

4

5            UNITED STATES DISTRICT COURT

6            NORTHERN DISTRICT OF CALIFORNIA

7

8    DOUGLAS O'CONNOR, *et al.*,                    No. C-13-3826 EMC

9              Plaintiffs,

10        v.                                        **ORDER GRANTING IN PART AND
                                                    DENYING IN PART DEFENDANTS'
11   UBER TECHNOLOGIES, INC., *et al.*,             MOTION TO DISMISS**

12             Defendants.                          **(Docket No. 39)**

13   _____/

14

15        Plaintiffs Douglas O'Connor and Thomas Colopy seek to represent a nationwide class of

16   drivers who provide passenger car service for customers who hail them through Defendant Uber

17   Technologies, Inc.'s mobile phone application.  They allege that Uber discourages passengers from

18   tipping by falsely advertising that gratuity is included in the fare, even though the full gratuity is not

19   passed along to the drivers.  Plaintiffs allege various California statutory and common law causes of

20   action against Uber and its president and vice president, Travis Kalanick and Ryan Graves:

21   statutory employee reimbursement violation, statutory gratuity violation, breach of implied-in-fact

22   contract, unjust enrichment/*quantum meruit*, tortious interference with contractual and economic

23   relations, and unfair business practices.  Pending before the Court is Defendants' Motion to dismiss

24   all of these claims, to dismiss non-California putative class members, and to dismiss the individually

25   named Defendants.

26        Having considered the parties' briefs and accompanying submissions, as well as the oral

27   argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Uber's motion.

28

**United States District Court**
For the Northern District of California

## I.  FACTUAL BACKGROUND

Plaintiffs are California drivers participating in the Uber service who bring this action on behalf of a putative class of "Uber drivers anywhere in the United State (other than Massachusetts)." Compl. ¶¶ 1, 4–5.  Uber provides a mobile phone application permitting customers to hail a driver participating in the car service "on demand."  *Id.* ¶¶ 11–12.  Plaintiffs allege that Uber advertises on its website and in marketing materials that gratuity is included in the total cost of the service to passengers and that there is no need to tip the driver.  *Id.* ¶ 14.  In some instances, Uber has advertised that the gratuity is a set amount, such as 20 percent, which is customary in the car service industry.  *Id.* ¶¶ 17, 19.  In other instances, Plaintiffs allege that Uber does not specify a percentage or amount.  *Id.* ¶ 18.  Plaintiffs allege that Uber does not remit the entirety of the gratuity to drivers in violation of various California statutes and common law.  *Id.* at ¶¶ 15–16.

The drivers operate under a Licensing Agreement with Uber.  Def.'s Mot., Ex. 1.[1]  The agreement includes a choice-of-law clause designating that California law governs the agreement. *Id.* at 11.  It also refers to drivers as "independent contractors" and disclaims the creation of an employment relationship.  *Id.* at 7, 8, iii.  It sets forth the general terms by which fares will be collected and disbursed to drivers after Uber extracts its fee, *id.* at 5–6, and does not mention the handling of gratuities.

Plaintiffs allege that they have been misclassified as independent contractors and are actually employees because they are required to follow a "litany of detailed requirements imposed on them by Uber," and because "[t]he drivers' services are fully integrated" into Uber's business of "providing car service to customers."  Compl. ¶¶ 22–24.  As such, they should be reimbursed for their employment-related expenses pursuant to California Labor Code § 2802.  *Id.*  They also bring a claim for violation of California Labor Code § 351, for failing to remit full gratuities to the drivers.

---

[1] Defendants request that the Court take judicial notice of the Software License and Online Services Agreement and Driver Addendum (Exhibit 1 to Defendants' Motion; collectively the "Licensing Agreement").  Def.'s Mot., RJN.  Plaintiffs do not object or challenge its authenticity. When "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint" the court may consider that document when deciding a Rule 12(b)(6) motion.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

United States District Court

For the Northern District of California

1   *Id.* at ¶ 39.  They further allege Uber's breach of an implied-in-fact contract between themselves and

2   Uber requiring Uber to remit tip revenue to the drivers in full, and/or breach of an implied-in-fact

3   contract between Uber and customers to which the drivers are third-party beneficiaries.  *Id.* at ¶ 38.

4   Plaintiffs also seek restitution under *quantum meruit*, and allege Uber's tortious interference with

5   drivers' contractual and/or advantageous economic relations with passengers.  *Id.* at ¶¶ 36, 37.

6   Finally, Plaintiffs claim violation of California's Unfair Competition Law (UCL), alleging that the

7   above violations constitute "unlawful, unfair, or fraudulent business acts or practices."  *Id.* at ¶ 41.

## II.   DISCUSSION

A.   Legal Standard

10          Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the

11   failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to

12   dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks*

13   *Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court

14   must take all allegations of material fact as true and construe them in the light most favorable to the

15   nonmoving party, although "conclusory allegations of law and unwarranted inferences are

16   insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

17   2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough

18   facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when

19   the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

20   defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see*

21   *also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to

22   a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted

23   unlawfully."  *Iqbal*, 556 U.S. at 678.  If the Court determines that the plaintiff has failed to state a

24   claim under Rule 12(b)(6), the court "should grant the plaintiff leave to amend if the complaint can

25   possibly be cured by additional factual allegations."  *Somers v. Apple, Inc.*, 729 F.3d 953, 960 (9th

26   Cir. 2013) (citing *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995)).  Conversely, "[d]ismissal

27   without leave to amend is proper if it is clear that the complaint could not be saved by amendment."

28   *Id.* (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008)).

**United States District Court**
For the Northern District of California

B.     Dormant Commerce Clause: Applying California Law to Non-California Drivers

Uber first argues that the dormant Commerce Clause prevents the application of California law to drivers outside of California who are members of the putative class, and therefore those drivers should be dismissed from the suit.  Plaintiffs respond that Uber and its associated drivers contractually agreed to resolve their disputes arising out of their Licensing Agreement in California courts, applying California law.  Uber responds that the choice-of-law provision only extends to adjudicating the terms of the agreement, not to all disputes between Uber and drivers.

"A state law violates the [dormant] Commerce Clause if its practical effect is to control conduct beyond the boundaries of the state."  *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003) (quoting *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989)).  Nonetheless, applying a state's law to conduct for which parties have chosen to be bound by that state's law *through contract* does not violate the Commerce Clause.  *See id.*

Plaintiffs assert a number of California statutory and common law violations based on Uber's alleged practices of misleading passengers into believing that gratuity is included in the price of the service and then failing to remit that gratuity in full to the drivers, as well as failing to reimburse drivers for expenses because they have been misclassified as independent contractors.  Compl. ¶¶ 21, 22, 24.  The essential question is whether these claims fall within the purview of the choice-of-law clause in the Licensing Agreement between Uber and drivers.

The choice-of-law clause reads as follows:

> This Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction, and any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Service or Software shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California.

Def.'s Mot., Ex. 1 at 11.  The scope of the choice-of-law clause is a matter of contract interpretation, which is governed by the law of the jurisdiction chosen by the parties to govern their agreement.  *See Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010) ("California . . . ordinarily examines the scope of a choice-of-law provision in a contract under the law designated in that contract.");  *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 469 (1992) ("[T]he question of whether [the

1    choice-of-law] clause is ambiguous as to its scope . . . is a question of contract interpretation that in

2    the normal course should be determined pursuant to [the choice-of-law clause jurisdiction's] law.").

3    Thus, California law determines the reach of the choice-of-law clause since that clause selects

4    California law to govern the agreement.

5        In *Nedlloyd Lines*, the choice-of-law clause provided, "This agreement shall be governed by

6    and construed in accordance with Hong Kong law." 3 Cal. 4th at 463. The California Supreme

7    Court, applying California choice-of-law rules,[2] held that the choice-of-law clause, "which provides

8    that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes

9    of action *arising from or related to that agreement*, regardless of how they are characterized,

10    including tortious breaches of duties emanating from the agreement or the legal relationships it

11    creates." 3 Cal. 4th at 470 (emphasis added). Accordingly, the Court applied Hong Kong law

12    agreement – to claims alleging breach of contract and tort law violations arising from contractual

13    relationships, as well as breaches of fiduciary duties. *Id.* at 463. Although fiduciary duties from one

14    party to another were not explicitly identified in the agreement between those parties, the Court

15    reasoned that the agreement created the relationship giving rise to the fiduciary duties. *Id.* at 469.

16    In support of this holding, the Court appealed to "common sense and commercial reality":

> When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship. We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship.

23    *Id.* (emphasis original).

---

[2] Although the choice-of-law clause in *Nedlloyd Lines* designated Hong Kong's law, the court determined the *scope* of the clause under California law because the parties did not request judicial notice of Hong Kong law on this question of contract interpretation or brief the court on that law. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 469 n.7 (1992). Therefore, this case is controlling authority on how to determine the scope of choice-of-law provision under California law.

United States District Court

For the Northern District of California

The choice-of-law language in the Uber Licensing Agreement is essentially the same as that in the *Nedlloyd Lines* case: "This Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction . . . ." Def.'s Mot., Ex. 1 at 11. Here, as in *Nedlloyd Lines*, Plaintiffs' claims are all based upon the relationship between drivers and Uber that was created by the agreement. As in *Nedlloyd Lines*, "common sense and commercial reality" leads to "the logical conclusion is that [Uber] intended that law to apply to *all* disputes arising out of the transaction or relationship." *Id.* Because the parties agreed that the conduct giving rise to these claims is to be governed by California law, and the California laws that Plaintiffs seek to apply "regulate[] contractual relationships in which at least one party is located in California," *Gravquick*, 323 F.3d at 1224, it would not violate the dormant Commerce Clause for non-California drivers to form part of the putative class.

Defendants rely on *Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010), for the proposition that claims that do not arise directly out of contract are not governed by a contract's choice-of-law clause. But this reliance is misplaced because the Ninth Circuit was applying Texas law to determine the scope of the choice-of-law clause because that was the jurisdiction selected in the clause. *See id.* at 898. California has a much broader rule on the scope of choice-of-law clauses, as expressed in *Nedlloyd Lines*.

Defendants also argue the extraterritorial application of the laws in question is unlawful under California law. *See Gravquick*, 323 F.3d at 1223 ("When a law contains geographical limitations on its application . . . courts will not apply it to parties falling outside those limitations, even if the parties stipulate that the law should apply."). However, Defendants do not point to any *express* geographical limitations in the laws at issue which would preclude the parties' agreement to apply California law extraterritorially. Instead, they argue that California laws *presumptively* do not apply extraterritorially, unless such intent was clearly expressed or reasonably inferred from the language of the statute, or the statute's purpose, subject matter or history – citing *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011), and *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036 (1999). While those cases note there is a presumption against extraterritorial application of California law, neither addresses the question at bar – whether parties stipulated *through contract*

**United States District Court**

For the Northern District of California

1    that California law would govern their relationship notwithstanding that presumption.  In the

2    absence of an express statutory limit, *Gravquick* holds that the presumption against extraterritorial

3    application of a law is rebutted when there is a choice-of-law clause governing the parties'

4    relationship.  *See id.* at 1221.  Such is the case here.

5         The application of California law to non-California putative class members who are parties

6    to the Uber Licensing Agreement does not violate the Dormant Commerce Clause.  There is no

7    showing that the statutory and common law causes of action alleged contain territorial limitations

8    that would trump the parties' choice of California law.  Thus, Uber's motion to dismiss the non-

9    California putative class members is denied.

10   C.    Employer-Employee Relationship and Employee Reimbursement

11        Next, Uber seeks to dismiss Plaintiffs' claim for reimbursement for employment-related

12   expenses under section 2802 of the California Labor Code because the factual allegations in the

13   Complaint are insufficient to establish that the putative class members are employees.  Plaintiffs

14   argue that determining whether a person is an employee is a fact-intensive inquiry and that their

15   allegations are sufficient.

16        Plaintiffs' ability to assert a violation of section 2802 and seek reimbursement requires that

17   they be considered employees under California law, rather than independent contractors.  *See* Cal.

18   Lab. Code § 2802 ("An employer shall indemnify his or her employee for all necessary expenditures

19   or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . .");

20   *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10 (2007) (applying common law

21   test for employment relationship as a prerequisite for applying section 2802).  Under California law,

22   "[t]he key factor to consider in analyzing whether an entity is an employer is 'the right to control

23   and direct the activities of the person rendering service, or the manner and method in which the

24   work is performed.'" *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009) (quoting

25   *Serv. Employees Int'l Union v. County of L.A.*, 225 Cal. App. 3d 761, 769 (1990)).  "A finding of the

26   right to control employment requires . . . a comprehensive and immediate level of 'day-to-day'

27   authority over employment decisions."  *Vernon v. State*, 116 Cal. App. 4th 114, 127–28 (2004).

28

United States District Court

For the Northern District of California

1    "The parties' label is not dispositive and will be ignored if their actual conduct establishes a

2    different relationship." *Estrada*, 154 Cal. App. 4th at 10–11.

3            The California courts have looked at a number of other factors as well:

4                [Apart from "control of details,"] there are a number of additional
                 factors in the modern equation, including (1) whether the worker is
5                engaged in a distinct occupation or business, (2) whether, considering
                 the kind of occupation and locality, the work is usually done under the
6                principal's direction or by a specialist without supervision, (3) the skill
                 required, (4) whether the principal or worker supplies the
7                instrumentalities, tools, and place of work, (5) the length of time for
                 which the services are to be performed, (6) the method of payment,
8                whether by time or by job, (7) whether the work is part of the
                 principal's regular business, and (8) whether the parties believe they
9                are creating an employer-employee relationship.

10   *Estrada* at 10.

11           Defendants cite to *Wal-Mart Stores*, in which the Ninth Circuit found that the allegations in

12   the complaint were insufficient to establish an employment relationship and upheld the district

13   court's dismissal for failure to state a claim under Rule 12(b)(6). 572 F.3d at 685. There, Plaintiffs

14   were employees of foreign suppliers of Wal-Mart, seeking relief for substandard working conditions

15   at their places of employment under the theory that Wal-Mart was essentially their joint employer.

16   *Id.* at 679–80. The plaintiffs alleged that the defendant "exercised control over their day-to-day

17   employment," which the court found to be a mere legal conclusion, not a factual allegation that the

18   court could take as true at the motion to dismiss phase. *Id.* at 683. Plaintiffs further alleged that

19   Wal-Mart exercised indirect control because it "contracted with suppliers regarding deadlines,

20   quality of products, materials used, prices, and other common buyer-seller contract terms" and that it

21   monitored suppliers' working conditions pursuant to working standards set forth in agreements

22   between Wal-Mart and the suppliers. *Id.* But the court held that these contractual terms did not

23   constitute an "immediate level of day-to-day control," and the monitoring of working conditions was

24   undertaken "to determine whether suppliers were meeting their contractual obligations, not to direct

25   the daily work activity of the suppliers' employees." *Id.*

26           Unlike in *Wal-Mart Stores*, however, Plaintiffs' allegations regarding the type of supervision

27   that Uber undertakes amount to more than the mere legal conclusion that Uber exercised day-to-day

28   control over their work. Plaintiffs allege:

> [Drivers] are required to follow a litany of detailed requirements imposed on them by Uber and they are graded, and are subject to termination, based on their failure to adhere to these requirements (such as rules regarding their conduct with customers, the cleanliness of their vehicles, their timeliness in picking up customers and taking them to their destination, what they are allowed to say to customers, etc.)[.]

Compl. ¶ 22.  Moreover, unlike *Wal-Mart*, Plaintiffs here allege *direct* regulation of drivers' activities, not indirect regulation as with Wal-Mart's monitoring of Plaintiffs' employers.

Defendants alternatively argue that the terms of the Licensing Agreement between Uber and drivers negate the allegations in the Complaint that there is day-to-day control because the agreement (1) identifies drivers as independent contractors and not employees, (2) disclaims the creation of an employment relationship, (3) specifically disclaims Uber's control over drivers, and (4) affirms that the drivers' transportation companies exercise control.  But labels do not control on the determination of the drivers' relationship to Uber.  *See Estrada*, 154 Cal. App. 4th at 10–11 (employment relationship found despite similar disclaimers).  At most, the contractual terms disclaiming an employment relationship go to but one of the eight factors above for an employment determination: "whether the parties believe they are creating an employer-employee relationship." *Id.* at 10.  Counterpoised against that factor are the specific factual allegations of control as well as Plaintiffs' allegations that "Uber is in the business of providing car service to customers" and that "[t]he drivers' services are fully intergrated into [that] business," Compl. ¶ 23, factors which inform "whether the work is part of the principal's regular business." *Estrada*, 154 Cal. App. 4th at 10.

Generally, the employee determination is a question of fact that depends on the evidence presented.  *Id.* at 11.  Here, the Complaint contains sufficient allegations about control to make the existence of an employment relationship plausible on its face.  Further, some of the *Estrada* factors favor finding an employment relationship.  To be sure, a number of factors weigh against finding an employment relationship, including the fact that the drivers supply the instrumentalities of work – their vehicles – and are paid by the job.  *Estrada*, 154 Cal. App. 4th at 10.  Perhaps potentially even more persuasive, counsel for Defendants represented at oral argument that Uber has no control over the drivers' hours, which geographic area they target for pickups, or even whether they choose to accept a passenger's request for a ride.  If this proves to be the case, Plaintiffs' assertion of an

**United States District Court**
For the Northern District of California

1  employment relationship would appear to be problematic.  Nonetheless, no such allegations are

2  contained in the Complaint, and based on the allegations of the Complaint, Plaintiffs have stated a

3  plausible claim for purposes of the motion to dismiss.

4      Accordingly, Uber's motion to dismiss Plaintiffs' claim for reimbursement under section

5  2802 of the California Labor Code is denied.  This is without prejudice, of course, to revisiting the

6  issue via motion(s) for summary judgment.

7  D.   Statutory Gratuity Violation Under California Labor Code § 351

8      Uber also seeks to dismiss Plaintiffs' claim that Uber violated section 351 of the California

9  Labor Code by failing to remit passenger tips to the drivers in full.  Uber claims that there is no

10  private right of action for such a violation, and moreover, Plaintiffs have failed to state a claim for

11  relief because they have not alleged that Uber has collected any "gratuities" from passengers that the

12  company would be required to remit.

13      Plaintiffs admit that there is no private right of action under section 351.  *See Lu v. Hawaiian*

14  *Gardens Casino, Inc.*, 50 Cal. 4th 592, 601 (2010).  But they assert Uber's alleged violation of

15  section 351 as the predicate "unlawful" activity to their claim under section 17200 of the California

16  Business and Professional Code (the "Unfair Competition Law" or "UCL").  *See Aryeh v. Canon*

17  *Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196 (2013) ("The UCL affords relief from unlawful, unfair,

18  or fraudulent acts; moreover, under the unlawful prong, the UCL borrows violations of other laws

19  and treats them as unlawful practices that the unfair competition law makes independently

20  actionable." (citations omitted)).

21      Accordingly, to the extent that the Complaint asserts an *independent* claim for relief under

22  section 351, Defendants' motion to dismiss is granted with prejudice.  But for the reasons stated

23  below, Plaintiffs can proceed to allege Defendants' violation of section 351 as the predicate

24  unlawful activity for their claim under the UCL.

25      Uber argues that even this UCL claim should be dismissed because the gratuities that the

26  plaintiff drivers allege they were entitled to do not meet the statutory definition of gratuities, and

27  therefore Uber could not have violated section 351.  The Labor Code defines "gratuity" as follows:

28

United States District Court

For the Northern District of California

1

2

3

> "Gratuity" includes any tip, gratuity, money, or part thereof that has been paid or given to or left for an employee by a patron of a business ***over and above the actual amount due the business*** for services rendered or for goods, food, drink, or articles sold or served to the patron.

4   Cal. Lab. Code § 350(e) (emphasis added).  Uber contends that the language "over and above the

5   actual amount due" implies Uber does not collect any gratuities as defined by the Labor Code

6   because, as alleged in the Complaint, the putative gratuity is mandatory and "included in the total

7   cost of the car service."  Compl. ¶ 17.  Therefore, the customers have not paid anything "over and

8   above the actual amount due," which Uber must then remit to the drivers.  In further support of its

9   interpretation, Uber refers to a Frequently Asked Questions document published by the California

10   Division of Labor Standards Enforcement ("DLSE"), which notes that a "mandatory service charge"

11   does not qualify as gratuity.  Def.'s Mot., Ex. 2.[3]  Uber argues that because the Complaint alleges

12   that customers were required to pay a certain amount, any so-called "tip" or "gratuity" included in

13   that charge is essentially a mandatory service charge.

14          Plaintiffs respond that Uber's interpretation of "gratuities" would violate the purpose of

15   section 351, which is to "ensure that gratuities are not used by an employer to satisfy wage

16   ───────────────────────

17          [3] Plaintiffs contend that the DLSE document does not deserve any deference from the Court, citing *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994).  While that case deals with

18   deference to *federal* agencies regarding *federal* statutes, it is also true, that under California law "the interpretation of a statute is a legal question for the courts to decide, and an administrative agency's

19   interpretation is not binding."  *Sara M. v. Superior Court*, 36 Cal. 4th 998, 1011 (2005). Nonetheless, agency interpretations of the statutes enforced by those agencies are due some

20   deference, depending on the circumstances.  *Harlick v. Blue Shield of California*, 686 F.3d 699, 716-17 (9th Cir. 2012) (citing *Yamaha Corp. of Am. v. State Bd. of Equalization*, 19 Cal. 4th 1 (1998)).

21   The level of deference a court should accord is "fundamentally situational" and "turns on a legally informed, commonsense assessment of [its] contextual merit."  *Id.* at 717 (quoting *Yamaha*, 19 Cal.

22   4th at 12, 14).  A court should consider factors indicating that the agency has a "comparative interpretive advantage" over the courts – "for example, if the subject matter of the statute is

23   especially technical or complex, or if the agency is interpreting its own regulation."  *Id.*  The court should also consider factors "indicating that the interpretation in question is probably correct" – for

24   example, "when the interpretation has gone through formal notice-and-comment rulemaking, when there are indications of careful consideration by senior agency officials, or when the agency has

25   maintained a consistent interpretation over time."  *Id.* (internal quotation marks omitted).  Here, the interpretation of the Labor Code's definition of "gratuities" is not particularly technical or complex,

26   and the agency is interpreting a statute, not its own regulation.  Additionally, Defendants have provided no evidence suggesting that the DLSE's Frequently Asked Questions document has gone

27   through an administrative procedure or careful consideration of any kind.  As such, the interpretations contained in the DLSE document are "entitled to some consideration by the Court,"

28   but will not assume unwarranted weight.  *Yamaha*, 19 Cal. 4th at 15.  The Court notes that in its reply, Uber does not address Plaintiffs' argument that the DLSE document deserves no deference.

1    obligations," *Garcia v. Four Points Sheraton LAX*, 188 Cal. App. 4th 364, 375 (2010).  By not

2    treating as "gratuities" money that customers intend for drivers because "gratuity is included" in the

3    price of the car service, Plaintiffs argue that Uber is subsidizing its "wage obligations" (or in this

4    case, fare-remittance obligations) to drivers with money that is intended for and belongs to drivers.

5    They also argue that it is possible to read the "over and above" clause as modifying "money" or

6    "part thereof," and not the words "tip" and "gratuity;" "tip" and "gratuity" are standalone, self-

7    evident terms that are not limited to payments that go beyond what is owed for the services

8    rendered.  Finally, Plaintiffs contend that Uber's strict construction of the definition of "gratuity"

9    would lead to the nonsensical result in which a restaurant that automatically charges gratuity on the

10   bill for large parties would not be required to remit that gratuity to its servers because the charge was

11   mandatory and therefore not "over and above the actual amount due."

12            California courts have enunciated the basic principles of statutory interpretation:

13                 The primary duty of a court when interpreting a statute is to give effect
                   to the intent of the Legislature, so as to effectuate the purpose of the
14                 law. . . . To determine intent, courts turn first to the words themselves,
                   giving them their ordinary and generally accepted meaning. . . . If the
15                 language permits more than one reasonable interpretation, the court
                   then looks to extrinsic aids, such as the object to be achieved and the
16                 evil to be remedied by the statute, the legislative history, public policy,
                   and the statutory scheme of which the statute is a part. . . . Ultimately,
17                 the court must select the construction that comports most closely with
                   the apparent intent of the Legislature, with a view to promoting rather
18                 than defeating the general purpose of the statute, and it must avoid an
                   interpretation leading to absurd consequences.

19

20   *Woodland Park Mgmt., LLC v. City of E. Palo Alto Rent Stabilization Bd.*, 181 Cal. App. 4th 915,

21   920 (2010) (internal citations omitted).

22            The Court first turns to the text of the statute.  Plaintiffs' textual construction stretches the

23   bounds of reasonable statutory interpretation.  Construing the "over and above" limiting clause as

24   *only* applying to "money" or "part thereof" and not "any tip" or "gratuity" would lead to an illogical

25   result.  It would mean that the Labor Code defines the word "gratuity" as "money," with no

26   limitation; or alternatively, that "gratuity" could be defined tautologically as simply "gratuity."  The

27

28

1   logical and better construction of this definition – one adopted by the California DLSE[4] – is that the

2   phrase "over and above the actual amount due" in section 350(e)  modifies every noun listed at the

3   beginning of the definition.

4          But this does not answer the question of how to interpret the phrase "over and above the

5   actual amount due the business."  Here, the text is ambiguous.  Defendants are correct that this

6   phrase *could* be read as precluding money that customers are *required* to pay Uber as part of the

7   fare, regardless of whether it is labeled "gratuity."  Under this interpretation, any charge a customer

8   is required to pay is part of the "actual amount due," and therefore if a mandatory gratuity is

9   included in that charge, it cannot meet the statute's definition of being "over and above" the amount

10   due to the business.  However, Plaintiffs are correct that such an interpretation would "lead[] to

11   absurd consequences."  *See Woodland Park Mgmt.*, 181 Cal. App. 4th at 920.  It would allow

12   businesses in industries where tipping is customary, such as restaurants, to avoid remitting tips to

13   their service professionals simply by placing gratuity on a patron's bill, thereby making it part of the

14   required payment.  No reasonable patron would expect that by simply putting the customary tip on

15   the bill – while still labeling it as a tip – a restaurant has transformed that tip into a revenue source

16   for itself rather than a source of income for its servers.

17          Uber's interpretation would also contravene the purpose of the statute.  The purpose of the

18   Labor Code's regulation of gratuities is twofold.  It is "to prevent fraud on the public in connection

19   with the practice of tipping,"  Cal. Lab. Code § 356, and to protect workers by "ensur[ing] that

20   gratuities are not used by an employer to satisfy wage obligations."  *Garcia*, 188 Cal. App. 4th at

21   375.  The statute's text bolsters this second purpose, expressing that a gratuity is "the sole property

22   of the employee or employees to whom it was paid, given, or left for."  Cal. Lab. Code § 351.

23          There is a better reading of the statute's definition that avoids this result but still gives full

24   effect to the phrase "actual amount due the business."  "Actual amount due the business" can be

25   construed to mean the sum that the business tells customers is the amount charged for the service

26

27          [4] *See* Def.'s Mot., Ex. 2 ("A tip is money a customer leaves for an employee over the amount
    due for the goods sold or services rendered.").  Again, this interpretation is not binding, but
28   nonetheless is due some consideration.

13

1    rendered or items sold by the business.  Any discernible amount above that, even if mandatory,

2    would be a "gratuity."  Under this reading, for example, the "actual amount due the business" for a

3    large dinner party whose total bill is $118 after a mandatory 18-percent gratuity was added would be

4    $100.  Therefore, the servers responsible for those diners would be entitled, under the California

5    Labor Code, to the $18 provided as gratuity, despite the fact that the diners were required to pay a

6    bill that included gratuity.  The $18 is "over and above the *actual amount due* the business for

7    services rendered," which the check made clear to be $100.  This would avoid the "absurd

8    consequence" that the servers would not be entitled to the $18 tacked on to the bill *for gratuity*

9    simply because the customer was required to pay it.  It would also comport with the statute's

10   purpose of "prevent[ing] fraud on the public in connection with the practice of tipping," Cal. Lab.

11   Code § 356, which would arguably occur because any reasonable patron would assume that

12   something labeled as a "gratuity" on the bill is intended to benefit the server.

13          Where the amount designated for the service or item is a sum certain, the "actual amount due

14   the business" is clear.  Thus, if Uber communicated to passengers that the gratuity included in its

15   fares was 20 percent, that amounts to a sum certain for gratuity in excess of the "actual amount due"

16   for the car service.  For example, if a passenger who received this communication and paid a total

17   fare to Uber of $30, the actual amount due would be $25, and the gratuity to which the driver would

18   be entitled is $5 (or 20 percent of $25).  Consistent with California's rules of statutory interpretation,

19   this interpretation of section 350(e) gives full effect to the language "actual amount due," while

20   promoting the general purpose of the statute (preventing fraud on the public and protecting workers'

21   property interest in their tips) and avoiding the absurd consequences of a stricter construction.  *See*

22   *Woodland Park Mgmt.*, 181 Cal. App. 4th at 920.

23          A closer question is presented where Uber made no representations regarding the specific

24   amount of gratuity included in the fare.  *See* Compl. ¶ 18 ("In other instances, Uber has not specified

25   the amount of the gratuity.").  While in that situation, no sum certain would be designated as

26   payment for the service (the ride), Uber nonetheless indicates that gratuity is included as part of the

27   charge, and Plaintiffs contend it is customary in the industry to tip drivers.  Thus, as a matter of

28   custom and consumer expectation, where Uber expressly states the charge includes gratuity for the

driver, a discrete (though not precisely quantified) portion of the charge is for payment over and above Uber's charge for the ride itself.  Without development of the factual record, this Court is reluctant to dismiss this as part of the claim under section 351 at this early Rule 12(b)(6) stage.

The Court rejects Defendants' argument that the included gratuity charged by Uber is the equivalent of a mandatory "service charge," which the court in *Garcia* found not to be a gratuity within the meaning of the Labor Code.  188 Cal. App. 4th 364.  *Garcia* addressed a hotel practice of adding a charge onto the bill for banquet service, room service, and porterage, and denominating the charge as a "service charge," "delivery charge," or some other phrase communicating that it is a charge for the service provided by the hotel workers.  *Id.* at 376.  The court found that a service charge did not fall within the statute's definition of gratuity because it was part of the amount due the business for services rendered.  *Id.* at 377.  The court then held the Labor Code did not preclude or preempt a local jurisdiction from enacting ordinances more protective of employees; this holding did not depend on its finding that the service charges at issue were not gratuities under the Labor Code.  Hence, that finding was not essential to *Garcia*'s holding and is dicta.  Even if it were not dicta, the hotel service charges in *Garcia* are distinguishable from Uber's inclusion of "gratuities" in its charges.  The hotel charges were for amounts actually due to the hotel for actual services rendered by the hotel.  Here, by stating a portion of the charges includes gratuity, Uber conveys to customers that such portion of the charge is not for amount due to the business for the service provided (*i.e.*, ride), but constitutes an amount over and above that charge, for the benefit of the driver.

The DLSE arguably defines "mandatory service charge" more broadly than the court in *Garcia*: "an amount that a patron is required to pay based on a contractual agreement or a specified required service amount listed on the menu of an establishment."  Def.'s Mot., Ex. 2.  But the example the agency provides in the definition is that of a contractual agreement with a banquet service in which the contract provides that a 10- or 15-percent service charge shall be added to the cost of the banquet.  *Id.*  This example indicates that the "mandatory service charge" as defined by the DLSE is also distinguishable from Uber's alleged "included gratuity," for the same reason as above:  the "service charge" is part of an agreement to pay an establishment for services rendered

1    and indicates it is due *to the business*, perhaps to pay for, *e.g.*, additional labor necessary to serve a

2    large banquet crowd; in contrast, the use of the word "gratuity" by Uber signals it is a charge

3    intended *for the worker providing* the service.  In any event, the DLSE's interpretation is entitled to

4    little weight.  *See Yamaha*, 19 Cal. 4th at 15 and note 3, *supra*.

5          Accordingly, where Plaintiffs are alleging that Uber communicated an amount certain for

6    gratuity included in the fare, Defendants' motion to dismiss the UCL claim using violation of

7    section 351 as the predicate unlawful act is denied.

8    E.    Breach of Implied-in-fact Contract[5]

9          Uber contends that Plaintiffs' implied contract claim should be dismissed because such a

10   claim is precluded by a written express contract covering the same subject matter, and because

11   Plaintiffs have failed to allege facts sufficient to establish such a claim.  Plaintiffs respond that other

12   jurisdictions have allowed such claims to proceed despite the existence of an express contract, and

13   alternatively, that they are third-party beneficiaries of an implied contract between Uber and its

14   customers.

15         1.    Implied Contract Between Drivers and Uber

16         "A contract is either express or implied. . . . [A] contract implied in fact 'consists of

17   obligations arising from a mutual agreement and intent to promise where the agreement and promise

18   have not been expressed in words.'"  *Retired Employees Assn. of Orange Cnty., Inc. v. Cnty. of*

19   *Orange*, 52 Cal. 4th 1171, 1178 (2011) (quoting *Silva v. Providence Hospital of Oakland*, 14 Cal. 2d

20   762, 773 (1939)).  "[I]t is well settled that an action based on an implied-in-fact or quasi-contract

21   cannot lie where there exists between the parties a valid express contract covering the same subject

22   matter."  *Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996).

23   There is no dispute among the parties that the Licensing Agreement is an existing, valid, express

24
_____

25         [5] Plaintiffs do not specify in their Complaint that their third cause of action is for breach of
     implied-in-fact contract, only that it is for breach of "implied contract,"  Compl. ¶ 38, which could
26   be interpreted as a claim for implied-in-fact contract or implied-in-law contract (also known as
     quasi-contract).  But in their opposition to the Motion to Dismiss, Plaintiffs indicate that they are
27   proceeding under an implied-in-fact theory rather than quasi-contract.  *See* Pl.'s Opp'n at 15.  Their
     second cause, denominated in this Order as *quantum meruit* and discussed *infra*, is based on quasi-
28   contract.  *See* Compl. ¶ 37.

United States District Court
For the Northern District of California

1    contract between Uber and the drivers.  Therefore, to the extent that the contract covers the "same

2    subject matter" as the alleged implied contract, the implied-in-fact contract claim must fail.

3            The subject matter of the claim, broadly, is the amount of payment that Uber owes drivers

4    after a customer pays Uber for a ride.  This subject matter is clearly covered by the Licensing

5    Agreement, which describes how fares will be calculated, that fares will be processed through a

6    "third party payment processor," that Uber will retain a percentage of the fare as its fee, and that the

7    remainder of the fare will be remitted to the driver's Transportation Company.  *See* Def.'s Mot., Ex.

8    1 at 5–6.  Plaintiffs allege that Uber advertises that gratuity is included *in the price of the fare* and

9    that the problem arises when Uber fails to remit the gratuity in full to the drivers.  But the Licensing

10   Agreement covers how that fare will be collected and remitted to the transportation companies

11   (minus Uber's fee deduction).  Since Plaintiffs allege that the tips are included in the fare and the

12   contract covers the handling of the fare, there is nothing Plaintiffs allege in their implied-in-fact

13   contract claim that the express contract does not cover.

14           Plaintiffs' argument that other jurisdictions applying other states' contract law have allowed

15   such claims to proceed despite the existence of an express contract is not persuasive.  They have

16   failed to cite any California cases or cases interpreting California contract law in support of this

17   theory.  Moreover, in the two cases Plaintiffs cite for allowing implied contract claims to proceed

18   despite the existence of an express contract, the claims that survived were not claims of implied

19   contract between the two parties among whom an express contract existed, but instead were claims

20   asserting third-party beneficiary status of implied-in-fact contracts between customers and the

21   defendants; the implied contract claims as to the plaintiffs and defendants were either dismissed or

22   abandoned for being preempted by law or an existing agreement.  *See Wadsworth v. KSL Grant*

23   *Wailea Resort, Inc.*, 818 F. Supp. 2d 1240, 1253–54 (D. Haw. 2010) (addressing claims by food and

24   beverage servers at a vacation resort that by including services charges on customers' bills and

25   failing to remit those charges to servers in full, the resort violated Hawaiian gratuity and unfair

26   competition laws and Hawaiian common law regarding implied-in-fact contract, unjust enrichment,

27   and tortious interference); *Kyne v. Ritz-Carlton Hotel Co., L.L.C.*, 835 F. Supp. 2d 914, 928, 932 (D.

28   Haw. 2011) (same).

**United States District Court**
For the Northern District of California

1    Accordingly, Defendants' motion to dismiss is granted for Plaintiffs' claim of breach of

2    implied-in-fact contract between Uber and the drivers, with prejudice.

3           2.    <u>Third-Party Beneficiary of Implied Contract Between Customers and Uber</u>

4          With respect to Plaintiff's alternative theory that Uber had an implied contract with

5    customers regarding tips to which the drivers were third-party beneficiaries, Uber argues that

6    Plaintiffs have failed to allege sufficient facts to make such a claim plausible.  Plaintiffs respond that

7    their allegations of (1) a custom in the industry by which drivers receive a gratuity, (2) Uber's

8    representation to customers that gratuity is included in the fare, and (3) customers' reasonable

9    expectations that the gratuity would be paid to the drivers are sufficient to demonstrate an implied

10   contract with customers to provide that gratuity to drivers.

11         There are no allegations or judicially noticed evidence in the record of an express contract

12   between Uber and customers covering this subject matter, which could preclude a finding of implied

13   contractual intent to benefit the third-party drivers.  *See Lance Camper*, 44 Cal. App. 4th at 203.

14   Therefore, the third-party beneficiary analysis assumes an implied contract between Uber and its

15   customers.

16         Under California law, "[a]n implied contract is one, the existence and terms of which are

17   manifested by conduct."  Cal. Civ. Code § 1621.  "Although an implied in fact contract may be

18   inferred from the conduct, situation or mutual relation of the parties, the very heart of this kind of

19   agreement is an intent to promise. . . . Accordingly, a contract implied in fact consists of obligations

20   arising from a mutual agreement and intent to promise where the agreement and promise have not

21   been expressed in words." *Gorlach v. Sports Club Co.*, 209 Cal. App. 4th 1497, 1507–08 (2012)

22   (internal quotation marks and citations omitted).  "In order to plead a cause of action for implied

23   contract, 'the facts from which the promise is implied must be alleged.' . . . A course of conduct can

24   show an implied promise." *California Emergency Physicians Med. Grp. v. PacifiCare of

25   California*, 111 Cal. App. 4th 1127, 1134 (2003) (quoting *Youngman v. Nevada Irr. Dist.*, 70 Cal. 2d

26   240, 247 (1969)).

27         Under a third-party beneficiary theory, "[a] contract, made expressly for the benefit of a third

28   person, may be enforced by him at any time before the parties thereto rescind it."  Cal. Civil Code §

United States District Court
For the Northern District of California

1559.  "The intent of the contracting parties to benefit expressly that third party must appear from

the terms of the contract. . . . Nevertheless, the third person need not be named or identified

individually to be an express beneficiary."  *Kaiser Eng'rs v. Grinnell Fire Prot. Sys. Co.*, 173 Cal.

App. 3d 1050, 1055 (1985) (internal citations omitted).  Ascertaining the intent to benefit a third

party is a "question of ordinary contract interpretation."  *Hess v. Ford Motor Co.*, 27 Cal. 4th 516,

524 (2002).  Such intent can be manifested by "the circumstances under which [the contract] was

made, and the matter to which it relates. . . . In determining intent to benefit a third party, the

contracting parties' practical construction of a contract, as shown by their actions, is important

evidence of their intent."  *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th

1004, 1024 (2009) (citations omitted).  "While intent is pivotal, there is no requirement that both of

the contracting parties must intend to benefit the third party. . . . Rather, it is sufficient that the

promisor must have understood that the promisee had such intent."  *Id.* at 1023 (citations omitted);

*cf.* Cal. Civ. Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it

must be interpreted in the sense in which the promisor believed, at the time of making it, that the

promisee understood it."); *Buckley v. Terhune*, 441 F.3d 688, 695 (9th Cir. 2006) ("The inquiry

considers not the subjective belief of the promisor but, rather, the 'objectively reasonable'

expectation of the promisee." (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1265

(1992))).

Taken together, California's rules for finding an implied-in-fact contract and establishing

third-party beneficiary status require the following in this case: (1) facts and/or circumstances

implying Uber's intent to collect gratuity from passengers as part of the service for which passengers

are paying; and (2) facts and/or circumstances demonstrating the intent of Uber and the passengers

to benefit the drivers, or the intent of passengers to benefit the drivers which Uber must have

understood.

Uber argues that the factual allegations fail to demonstrate an intent to enter into an implied

agreement to remit tips to drivers, and that the allegations actually demonstrate the opposite because

the Complaint alleges that it was Uber's practice not to tender the full amount of gratuities to

Plaintiffs.  *See* Compl. ¶ 19.  Such a practice *could* demonstrate a lack of intent to enter into an

1    agreement, or it could instead manifest a *breach* of an implied agreement, the existence of which is

2    evidenced by Plaintiffs' allegations.

3         The Complaint spells out the circumstances upon which it is plausible that the parties

4    intended Uber to collect passenger gratuities through fare payments and that the parties intended the

5    drivers to be the third-party beneficiaries of the gratuity payments.  It is already clear that Uber and

6    passengers have an agreement for passengers to use the Uber application to hail drivers and to

7    provide payment through the same application.  Plaintiffs allege that Uber communicates to

8    passengers that tip is included in the cost of the service and there is no need to tip the driver directly.

9    Compl. ¶ 14.  Plaintiffs also allege that it is customary in the car service industry for passengers to

10   tip drivers approximately 20 percent, that "reasonable customers would assume" that this is the

11   amount of gratuity included in their fare, and that "reasonable customers would have expected" the

12   drivers to receive such tips.  *Id.* ¶¶ 19, 20.  All of these are circumstances surrounding the alleged

13   contract formation manifesting passengers' intent that the tips included in their fares would benefit

14   drivers.  Meanwhile, Uber's alleged statements to passengers that "gratuity is included," combined

15   with tipping customs and the expectations of passengers, likewise demonstrate Uber's intent to

16   collect passenger tips and to do so for the benefit of drivers.  Indeed, the use of the term "gratuity"

17   plausibly indicates that that portion of the fare – however much it amounted to – was for the benefit

18   of the driver and not Uber.  Even if Uber did not subjectively intend for the gratuity to benefit the

19   drivers, the company "must have understood that the promisee [passengers] had such intent,"

20   *Spinks*, 171 Cal. App. 4th at 1023, and the "objectively reasonable expectation of the promisee

21   [passengers]" would be that Uber intended to give the gratuity to the drivers, *Buckley*, 441 F.3d at

22   695.

23        Plaintiffs' factual allegations are sufficient, at this stage, to make it plausible that Uber and

24   its passengers entered into an agreement from which third-party drivers were intended to benefit.

25   Accordingly, Uber's motion to dismiss Plaintiffs' claim for breach of implied-in-fact contract under

26   the third-party beneficiary theory is denied.

27

28

F.      *Quantum Meruit*

Uber next argues that Plaintiffs' claim captioned as "Unjust Enrichment/*Quantum Meruit*" should also be dismissed, again because there is an express contract governing compensation. Plaintiffs respond that the Licensing Agreement does not specifically cover the handling of gratuities intended for drivers, and courts in other jurisdictions have permitted *quantum meruit* claims to go forward despite the existence of an express contract.

"A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. . . . However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation." *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1419 (1996); *accord Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012) ("A plaintiff may not . . . pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter.").

The Court's analysis for the first implied-in-fact contract claim applies here as well. Because Plaintiffs allege that the "gratuities" Uber collects are part of the fare paid by customers, and the Licensing Agreement governs how fares will be divvied up between drivers and Uber, the agreement covers the subject matter of a *quantum meruit* claim: compensation for services rendered. Plaintiffs have failed to cite any binding authority holding otherwise.

Therefore, Uber's motion to dismiss the *quantum meruit* claim is granted with prejudice.

G.      Tortious Interference

Plaintiffs also allege that, because Uber advertises that tips are included and therefore discourages tipping of drivers, Uber has interfered with drivers' contractual or economically advantageous relationship with customers – a relationship that otherwise would have involved customers tipping their drivers. Uber moves to dismiss this claim as deficient, arguing that Plaintiffs cannot allege a contractual relationship between drivers and customers for the payment of optional gratuities, that Plaintiffs cannot demonstrate that they had an economic relationship with passengers prior to the interference, and that Plaintiffs have not alleged the required wrongful conduct under tortious interference with economic relations. Plaintiffs respond that their allegations are sufficient

United States District Court

For the Northern District of California

1   and that courts in other jurisdictions, under similar fact situations, have found that a claim for

2   tortious interference can proceed based upon a company's misrepresentations leading customers to

3   believe that service providers are receiving sufficient gratuity.

4        Plaintiffs are really alleging two separate (yet related) torts under California law:  tortious

5   interference with contract and tortious interference with prospective economic advantage, which

6   have slightly different elements and therefore require separate analysis.  *See Reeves v. Hanlon*, 33

7   Cal. 4th 1140, 1152 (2004).

8        1.     <u>Tortious Interference with Contract</u>

9        The elements of a tortious interference with contractual relations claim are  (1) a valid

10  contract between plaintiff and a third party, (2) defendant's knowledge of this contract, (3)

11  defendant's intentional acts designed to induce a breach or disruption of the contractual relationship,

12  (4) actual breach or disruption of the contractual relationship, and (5) resulting damage.  *Id.* at 1148.

13       Uber is correct that Plaintiffs cannot meet the first element of the tort because there can be no

14  valid contract for the payment of voluntary gratuities.  An illusory agreement, in which no obligation

15  is assumed by at least one of the parties, is not an enforceable contract under California law.  *See*

16  *Asmus v. Pac. Bell*, 23 Cal. 4th 1, 16, 999 P.2d 71, 79 (2000) ("[A]n unqualified right to modify or

17  terminate the contract is not enforceable."); *see also* 1 Witkin, Summary of California Law (10th ed.

18  2005) Contracts, § 225 ("The doctrine of mutuality of obligation requires that the promises on each

19  side be *binding obligations* in order to be consideration for each other.").  If the passenger always

20  reserves the right to tip or not to tip the driver, then there can be no valid contract.  Even if it is

21  "customary" practice to tip in the car service industry, Compl. ¶ 19, Plaintiffs have not, and cannot,

22  allege that passengers were obligated to tip so as to create a valid contract with which Uber

23  interfered.  Moreover, Plaintiffs have not even alleged the existence of a contract between drivers

24  and passengers.

25       Accordingly, Defendants' motion to dismiss the tortious interference with contract claim is

26  granted with prejudice.

27

28

2.      Tortious Interference with Prospective Economic Advantage

Interference with a prospective economic advantage is "a tort that similarly compensates for the loss of an advantageous economic relationship but does not require the existence of a legally binding contract." *Reeves*, 33 Cal. 4th at 1152. To plead a claim for intentional interference with prospective economic advantage in California, a plaintiff must allege (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts. *Reeves*, 33 Cal. 4th at 1152 n.6 (citing *Youst v. Longo*, 43 Cal. 3d 64, 71 n.6 (1987)). And unlike a claim for tortious interference with contract, for this claim a plaintiff must also plead "that the defendant engaged in an independently wrongful act in disrupting the relationship. . . . [A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1152 (internal citations and quotation marks omitted).

Uber attacks the sufficiency of the Complaint by arguing that the drivers had no relationship with passengers with the probability of future economic benefit at the time that the alleged interference took place. Citing the allegations in the Complaint, Uber notes that "Plaintiffs only provided driving services for the passengers *after* Plaintiffs received the transportation request via the Uber application – i.e., after the passengers already understood from communications from Uber that there was no need to provide a gratuity for the transportation." Def.'s Reply at 13. Therefore, there was not yet an economic relationship at the time that Uber allegedly interfered by communicating that tip was included; and because of this communication, by the time drivers and passengers came together, there could have been no "probability of future economic benefit" in the form of gratuities where passengers have been discouraged from tipping. Moreover, Defendants argue, there was no way for Uber to have knowledge of or to intentionally disrupt an economic relationship that did not yet exist at the time of the alleged disruption. Plaintiffs respond that, in situations where tipping is customary, it does not matter when the alleged interference occurs.

United States District Court
For the Northern District of California

1   Because it is customary to tip car service drivers, passengers would have likely tipped the Uber

2   drivers had it not been for the communications from Uber discouraging them from tipping.

3          Uber cites *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840 (9th Cir. 2004) for the

4   proposition that an economic relationship must have existed at the time of the alleged interference.

5   But *Pardi* is inapposite.  There, the Ninth Circuit upheld the dismissal of the tortious interference

6   claim because the future economic benefit for the plaintiff was merely speculative, not probable; and

7   it was a ruling on summary judgment after some factual development.  *Id.* at 852–53.  The plaintiff

8   was a former employee of a hospital who, after a dispute with his employer, agreed to resign in

9   exchange for a monetary settlement.  *Id.* at 844–46. When he applied for a job with another

10  employer, the hospital did not respond to the prospective employer's requests for employment

11  verification – inaction that the plaintiff alleged to have interfered with his "probable" employment.

12  *Id.* at 847.  The court reasoned that the plaintiff "was a job applicant with merely a 'speculative

13  expectation that a potentially beneficial relationship will arise.'" *Id.* at 852 (citing *Korea Supply Co.

14  v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158 (2003)).  Thus, *Pardi* does not stand for the

15  proposition that an economic relationship must exist at the time of the interference.  Rather, it

16  merely holds that the prospective economic advantage cannot be speculative.  Here, the allegations

17  in the Complaint relying on customary practice of tipping drivers in the car service industry

18  establishes the "probability of future economic benefit" necessary to state a tortious interference

19  claim.

20         Plaintiffs cite to two District of Massachusetts cases in support of their tortious interference

21  theory that are factually similar to this case.  Those cases dealt with airport skycaps who alleged that

22  by instituting a new policy requiring skycaps to collect $2 baggage handling fees when they took

23  airline passengers' bags (which the skycaps had to turn in to the airline), the airline was tortiously

24  interfering with their relationship with passengers that would have normally resulted in a tip they

25  could keep.  *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14 (D. Mass. 2010); *DiFiore v. Am. Airlines,

26  Inc.*, 483 F. Supp. 2d 121 (D. Mass. 2007).  The *Overka* case is inapposite because the issue before

27  the court was predominance of common questions for class certification under Federal Rule of Civil

28  Procedure 23(b)(3).  265 F.R.D. 14.  But the court in *DiFiore* did deny the defendant's motion to

1    dismiss the tortious interference claim, reasoning that "the skycaps may be able to establish that

2    American intentionally and maliciously interfered with their enjoyment of an expectancy of tips

3    from passengers."  483 F. Supp. 2d at 128.

4              Like with the skycaps, Plaintiffs allege that it is customary to tip drivers in the car service

5    industry, giving rise to an inference that it was probable that Uber drivers would have received tips

6    but for Uber's interference.  It is of no consequence that the alleged interference took place before

7    the passengers engaged the drivers because, if it was customary that drivers receive tips, Uber

8    plausibly knew that this would be a benefit accruing to the drivers at the time it discouraged tipping

9    by telling passengers tipping is included in the fare.  Again, *DiFiore* is apt to the instant case

10   because it demonstrates that tortious interference could occur even if the interfering acts preceded

11   the formation of a relationship between the employee and the customer.  To hold otherwise would

12   create a perverse result; a tortfeasor could avoid liability for interference with prospective economic

13   advantage simply be broadly announcing his wrongful intent and thereby unilaterally alter the

14   parties' expectations.  It also defies the nature of the tort – interference with *prospective* economic

15   advantage.

16             Uber also argues that Plaintiffs have failed to allege the final element of tortious interference

17   with prospective economic advantage – that an "independently wrongful act" disrupted the

18   relationship.  Such an act must be "proscribed by some constitutional, statutory, regulatory, common

19   law, or other determinable legal standard."  *Reeves*, 33 Cal. 4th at 1152.  Uber contends that it

20   cannot be unlawful to advertise to customers that they do not need to tip their driver because saying

21   so is reiterating the obvious fact that tipping is optional.  Plaintiffs respond that Uber's alleged

22   statements to customers (*e.g.*, that gratuity is included) are misrepresentations because they deceived

23   customers into believing that the drivers are receiving gratuity already.  These allegations of

24   misrepresentation and deception – which the Complaint can be fairly read as asserting a claim for

25   fraudulent business practices under section 17200 of the California Business and Professions Code –

26   are sufficient to state an independent unlawful act for purposes of the claim of tortious inference

27   with prospective economic advantage.

28

United States District Court

For the Northern District of California

1    Because Plaintiffs have plausibly alleged the elements of tortious interference with

2    prospective economic advantage, Defendants' motion to dismiss that claim is denied.

3    H.    Unfair Competition Law (UCL)

4          As described above, Plaintiffs have made a claim under California's Unfair Competition

5    Law, or California Business and Professions Code § 17200 ("UCL").  To establish a violation of the

6    UCL, a plaintiff may plead a violation under any one of three substantive prongs of the law:  the

7    "unlawful" prong, which requires the allegation of violation of some underlying law as a predicate

8    act; the "unfair" prong, which requires a plaintiff to meet one of three tests for unfairness described

9    below; and the "fraudulent" prong, which alleges a business act that is likely to deceive members of

10   the public.  *Perez v. Wells Fargo Bank, N.A.*, 929 F. Supp. 2d 988, 1003 (N.D. Cal. 2013).

11         Plaintiffs allege that Defendants engaged in "unlawful, unfair, or fraudulent business acts or

12   practices, in that Defendants have committed the tort of interference with contractual and/or

13   advantageous relations, unjustly enriched themselves, breached implied contracts with the drivers

14   and with customers for whom the drivers are third party beneficiaries, and have violated California

15   Labor Code Sections 351 and 2802."  Compl. ¶ 41.  This clearly states a claim of "unlawful business

16   practices" under the UCL, alleging California statutory and common law violations as predicate

17   unlawful acts for the UCL claims.  Defendants argue that, as a derivative claim, the UCL claim

18   should be dismissed where its predicate claims have been dismissed.  Defendants are correct.  *See*

19   *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1182 (9th Cir. 2003).  Consequently, Plaintiffs' allegations

20   under the UCL claim are stricken to the extent they assert and rely upon the following predicate acts:

21   implied-in-fact contract between Uber and drivers, *quantum meruit*, and tortious interference with

22   contractual relations.  Since the remaining claims survive, they also survive as predicate acts under

23   the UCL claim.

24         Defendants also argue that the UCL claim is *entirely* derivative, in that it fails to assert a

25   standalone, non-derivative claim for liability under the UCL, which would fall under the "unfair" or

26   "fraudulent" prongs of the UCL.

27         Because the California Supreme Court has not established a definitive test to determine

28   whether a business practice is unfair, "a split of authority developed among the Courts of Appeal,

1  which have applied three different tests for unfairness in consumer cases." *Drum v. San Fernando*

2  *Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256 (2010).  The court in *Drum* described these tests:

3
>The test applied in one line of cases . . . requires that the public policy
>which is a predicate to a consumer unfair competition action under the
4  >"unfair" prong of the UCL must be tethered to specific constitutional,
>statutory, or regulatory provisions.

5
. . . .

6
>The test applied in a second line of cases is whether the alleged
7  >business practice is immoral, unethical, oppressive, unscrupulous or
>substantially injurious to consumers and requires the court to weigh
8  >the utility of the defendant's conduct against the gravity of the harm to
>the alleged victim.

9
. . . .

10
>The test applied in a third line of cases draws on the definition of
11 >"unfair" in section 5 of the Federal Trade Commission Act (15 U.S.C.
>§ 45, subd. (n)), and requires that (1) the consumer injury must be
12 >substantial; (2) the injury must not be outweighed by any
>countervailing benefits to consumers or competition; and (3) it must be
13 >an injury that consumers themselves could not reasonably have
>avoided.

14

15 *Id.* at 256-57 (omitting internal citations).  Plaintiffs have asserted no specific allegations or

16 advanced any specific argument establishing they have stated a claim of "unfair" business practice

17 as defined above.

18      To state a claim under the UCL's fraudulent prong based on false advertising or promotional

19 practices "it is necessary only to show that members of the public are likely to be deceived." *In re*

20 *Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (citing *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951

21 (2002)).  The standard for finding a likelihood of deception is that of a "reasonable consumer who is

22 neither the most vigilant and suspicious of advertising claims nor the most unwary and

23 unsophisticated, but instead is 'the ordinary consumer within the target population.'" *Chapman v.*

24 *Skype Inc.*, 220 Cal. App. 4th 217, 226 (2013) (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal.

25 App. 4th 496, 509–510 (2003)).   UCL claims premised on fraudulent conduct trigger the heightened

26 pleading standard of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to state that the

27 circumstances constituting fraud (or the claim "sound[ing] in fraud") "with particularity." *Kearns v.*

28 *Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  Pleadings must "be specific enough to give

27

United States District Court

For the Northern District of California

1   defendants notice of the particular misconduct so that they can defend against the charge and not just

2   deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106

3   (9th Cir. 2003) (internal citations and quotations omitted).

4       The Complaint alleges the following:  Uber advertises "on its website and in marketing

5   materials, that gratuity is included and there is no need to tip the driver," reasonable customers

6   would expect that drivers would receive that gratuity, Uber does not remit the entirety of the gratuity

7   to drivers, and as such, Uber's statements are "deceptive and misleading."  These allegations make it

8   plausible that a reasonable consumer would likely be deceived to the detriment of drivers.  Plaintiffs

9   also allege with sufficient particularity the circumstances of the misrepresentations that would

10  satisfy the heightened pleading standards of Rule 9(b).

11      Accordingly, Defendants' motion to dismiss a standalone UCL claim for unfair or fraudulent

12  business practices is granted in part, but denied in part.[6]

13  I.   Individual Defendants

14      Finally, Uber seeks to dismiss Travis Kalanick and Ryan Graves, Uber's President and Vice

15  President, respectively, from the Complaint, arguing that the Complaint is insufficient as to them in

16  that it merely alleges that they are "responsible for the pay practices and employment policies of

17  Uber."  Compl. ¶¶ 8–9.  Uber notes that there are no specific factual allegations as to how either of

18  these individuals interfered with any alleged contract, entered into any express or implied contract,

19  or entered into any employment relationship with Plaintiffs.  Plaintiffs respond that the specifics of

20  their involvement will have to await the discovery process and that the allegation that they were

21  responsible for the policies leading to the alleged liability is sufficient at this stage.  Plaintiffs also

22  cite to two cases demonstrating that individuals can be personally liable for violating the UCL and

23  for tortious interference with contract in connection with their role in a corporation: *E Clampus*

24  *Vitus v. Steiner*, No. 2:12-CV-01381-TLN, 2013 WL 4431992, at *6 (E.D. Cal. Aug. 16, 2013), and

25  *Klein v. Oakland Raiders, Ltd.*, 211 Cal. App. 3d 67, 80–81 (1989), respectively.  However, the

26  *Steiner* case is inapposite because the court's individual liability analysis was in regard to a

27  _____

28      [6] The Court does not address the available scope of monetary relief, if any, under the UCL in
    this case.

28

**United States District Court**

For the Northern District of California

1   trademark infringement claim and not to any claim involved here.  *See* 2013 WL 4431992, at *6.

2   And *Klein* involved individual liability under a partnership structure rather than a corporation.

3   Nonetheless, that case does cite California authority holding that individual officers of a corporation

4   can be held liable for tortious interference with contract.  *See* 211 Cal. App. 3d at 81 (citing *Golden*

5   *v. Anderson*, 256 Cal. App. 2d 714, 719–20 (1967)).

6          Under California law, the corporate form insulates the corporation's officers, like Kalanick

7   and Graves, from certain (but not all) liability in their role with the corporation.  "The legal fiction

8   of the corporation as an independent entity – and the special benefit of limited liability permitted

9   thereby – is intended . . . to insulate officers from liability for corporate contracts; the corporate

10  fiction, however, was never intended to insulate officers from liability for their own tortious

11  conduct."  *Frances T. v. Vill. Green Owners Assn.*, 42 Cal. 3d 490, 507–08 (1986).  "Directors are

12  jointly liable with the corporation and may be joined as defendants if they personally directed or

13  participated in the tortious conduct."  *Id.* at 504.  But "[d]irectors or officers of a corporation do not

14  incur personal liability for torts of the corporation merely by reason of their official position, unless

15  they participate in the wrong or authorize or direct that it be done."  *United States Liab. Ins. Co. v.*

16  *Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 595 (1970).  Additionally, "an owner or officer of a

17  corporation may be individually liable under the UCL if he or she actively and directly participates

18  in the unfair business practice."  *Bradstreet v. Wong*, 161 Cal. App. 4th 1440, 1458 (2008),

19  *abrogated on other grounds by Martinez v. Combs*, 49 Cal. 4th 35 (2010).

20         Plaintiffs allege simply that the individual defendants were responsible, as the executive

21  officers of Uber, for the company's employment policies and pay practices.  As noted above, this

22  cannot make them liable for any claim based upon Uber's alleged breach of contract or, relatedly, its

23  failure to reimburse employees under section 2802 of the California Labor Code.  Plaintiffs have

24  cited no authority establishing that individual officers of a corporation may be held liable under

25  section 2802.  Accordingly, Defendants' motion to dismiss the individual directors is granted with

26

27

28

United States District Court

For the Northern District of California

1  prejudice as to the remaining breach of implied-in-fact contract claim and the claim under section

2  2802.[7]

3          As for the surviving tortious interference with prospective economic advantage claim and the

4  remaining UCL claims, even though the corporate form does not shield the officers from liability,

5  Plaintiffs have failed to allege enough specific allegations showing that Kalanick and Graves

6  "personally directed or participated in the tortious conduct." *See Frances T.*, 42 Cal. 3d at 504.

7  Neither have they sufficiently alleged that they "actively and directly participate[d] in [any] unfair

8  business practice[s]." *See Bradstreet*, 161 Cal. App. 4th at 1458.  Identifying their roles in the

9  corporation and alleging that they were "responsible" for pay practices and employment policies

10  does not make it plausible that they were personally liable, any more so than it would make any

11  officer responsible for the torts allegedly committed by their corporation.  California law does not

12  impose liability on corporate officers merely for their role in the corporation, but only for wrongful

13  acts in which they have been personally involved. *United States Liab. Ins. Co.*, 1 Cal. 3d at 595.

14  Accordingly, Defendants' motion to dismiss Kalanick and Graves from Plaintiffs' claims for tortious

15  interference and unfair business practices is granted.  Recognizing that this claim could " possibly be

16  cured by additional factual allegations" establishing the requisite personal involvement in the

17  alleged wrongful acts of the Corporation, these claims against the individual defendants are

18  dismissed without prejudice. *See Somers*, 729 F.3d at 960.

19  ###  III.    CONCLUSION

20          For the foregoing reasons, the Court **GRANTS**, with prejudice, Defendants' motion to

21  dismiss the following claims:

22          •       standalone statutory gratuity violation;

23          •       breach of implied-in-fact contract between Uber and drivers;

24          •       *quantum meruit*;

25          •       tortious interference with contractual relations;

26

27

28          [7] Should Plaintiffs discover relevant authority or individual liability under section 2802, they
may move for reconsideration.

United States District Court
For the Northern District of California

1  • UCL claim for "unlawful" business practices predicated on the above claims, except
2  for the statutory gratuity violation; and
3  • claims against the individual Defendants for the statutory reimbursement claim and as
4  third-party beneficiary of the implied-in-fact contract.
5  The Court **GRANTS**, without prejudice, Defendants' motion to dismiss the following
6  claims:
7  • UCL claim for "unfair" business practices; and
8  • claims against individual Defendants for the tortious interference with prospective
9  economic advantage and surviving UCL claims.
10  The Court **DENIES** Uber's motion to dismiss the following claims:
11  • statutory employee reimbursement violation;
12  • breach of implied-in-fact contract under the third-party beneficiary theory;
13  • tortious interference with prospective economic advantage;
14  • UCL claim for "unlawful" business practices predicated on the above three (3)
15  claims;
16  • UCL claim for "fraudulent" business practices; and
17  • non-California putative class members from the surviving claims.
18
19  This order disposes of Docket No. 39.
20
21  IT IS SO ORDERED.
22
23  Dated:  December 5, 2013
24  _____
EDWARD M. CHEN
25  United States District Judge
26
27
28

31