United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, *et al.*, | No. C-13-3826 EMC |
| Plaintiffs, | |
| v. | **AMENDED ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION** |
| UBER TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | **[Revision in green highlight]** |
| _____/ | **(Docket No. 79)** |

## I. INTRODUCTION

Plaintiffs Douglas O' Connor and Thomas Colopy ("Plaintiffs") filed a class-action complaint against defendants Uber Technologies, Inc. ("Uber") and two of its executives, Travis Kalanick and Ryan Graves, alleging violations of statutory employee reimbursement and California Business and Profession Code § 17200 *et seq.*, and other causes of action for unremitted gratuity.

Before the Court is Uber's Motion for Reconsideration (the "Motion") of the Court's order (the "Order") granting in part Plaintiffs' Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses. The Court **DENIES** Uber's Motion for Reconsideration for the reasons set forth below.

Also before the Court are the parties' proposed corrective notices submitted pursuant to the Order. The parties shall submit revised proposed corrective notices consistent with this order, as set forth below.

///

///

## II.     FACTUAL & PROCEDURAL BACKGROUND

Uber licenses a software application (the "Uber App" or "App") used by drivers and riders to facilitate an "on demand" car service. Complaint ("Compl.") ¶ 1. Riders and drivers begin by downloading the App to their mobile phones. Riders can request rides via the Uber App and the fare is assigned to the first driver within the geographic area to respond to the rider's request via the App. Hearing Transcript (Docket No. 56) at 35-37.

Plaintiffs are former drivers and users of the Uber App. They allege that Uber advertises to riders that gratuity is included in the total cost of the service, but does not remit the full amount of gratuity it receives from riders to the drivers. Compl. ¶¶ 14-16. Plaintiffs seek to recover the full amount of gratuity they believe they are owed.

Prior to the instant case, Uber drivers in Massachusetts filed a similar class action lawsuit alleging unremitted gratuities. *See* Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses ("Renewed Motion") at 6 n. 11 (citing *Lavitman v. Uber Technologies, Inc.*, Mass. Super. Ct. (Suffolk), C.A. No. 12-4490). Uber riders in Illinois also filed a class action lawsuit (subsequently brought before this Court, *Ehret v. Uber, Technologies, Inc.*, 14-cv-0113-EMC)[1] similarly alleging that Uber misrepresented the nature of the "gratuity." *See id.*

On July 22, 2013, while the Massachusetts and Illinois lawsuits were pending, Uber informed drivers that they would receive within two weeks an electronic notification asking them to approve three new agreements. Opposition to Renewed Motion, Colman Declaration ("Colman Decl.") (Docket No. 36-2) ¶ 10. Continued use of the Uber App was conditioned on approval of these agreements. *Id.* One of the agreements was a Software Licensing and Online Services Agreement (the "Licensing Agreement"). *See id.* Exh. A. The Licensing Agreement was emailed to Uber drivers; drivers were instructed that they could accept the Licensing Agreement by swiping a button on their cell phones. Renewed Motion at 3. The Licensing Agreement governs the relationship between Uber and a driver. *See* Licensing Agreement. On pages 11 through 15 of the Licensing Agreement is an arbitration provision. *See id.* The arbitration provision requires all

---

[1] The Illinois court dismissed the action based on a forum selection clause in Uber's terms and conditions. *See* 14-cv-0113-EMC, Docket No. 1.

disputes to be resolved through binding arbitration instead of in a court of law, effectively requiring drivers to waive their right to participate in litigation, including any class action. *Id.* ¶ 14.3.i.

Drivers are given thirty (30) days to opt out of the arbitration provision. *Id.* ¶ 14.3.viii. However, opting out requires drivers to hand deliver or send via overnight mail to Uber's general counsel, a letter clearly indicating an intent to opt out. *Id*. Otherwise, drivers are bound by the arbitration provision, prohibiting them from bringing suit against Uber.

Plaintiffs filed the current action on August 16, 2013. They seek to represent "all drivers who have worked for Uber anywhere in the country, except in Massachusetts." Compl. ¶ 25. Plaintiffs filed the Renewed Motion[2] shortly after filing the Complaint. In the Renewed Motion, Plaintiffs sought to strike the arbitration clause in the Licensing Agreement, or, alternatively, to require Uber to (1) give notice of the current pending class action to its drivers; (2) explain that opting out of the arbitration provision is necessary to participate in the putative class; (3) extend the opt-out period beyond 30 days; and (4) provide a less onerous means of opting out. Renewed Motion at 4.

The Court granted Plaintiffs' Renewed Motion in part. The Court held:

> Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration provision within 30 days of the notice. These requirements shall apply to new drivers (prospectively) and past and current drivers (retrospectively). As for arbitration provisions which have already been distributed after the filing of the complaint in this action (August 16, 2013) to past and current drivers who have approved the arbitration provision without opting out (or for whom approval during the 30 day notice period has begun to run but is still pending), Uber must seek approval of the arbitration provision for these drivers anew, giving them 30 days to accept or opt out from the date of the revised notice.

Order (Docket No. 60) at 11. As to arbitration agreements distributed before the filing of this suit, the Court denied relief. *Id*. at 10. The Court ordered the parties to meet and confer "to discuss and stipulate to the appropriate form, content, and procedures of the corrective notices," for the Court's

---

[2] Plaintiffs initially filed an filed an Emergency Motion for Protective Order to Strike Arbitration Clauses, but it was denied because they had not yet served the defendants. Docket Nos. 4, 14.

3

approval. *Id*. at 12. The Court forbade Uber from "issui[ng] to Uber drivers or prospective drivers the Licensing Agreement or any other agreement containing an arbitration provision which waives putative class members rights," until revised notices and procedures were approved by the Court. *Id*. at 12.

On December 20, 2013, the parties submitted separate proposed corrective notices (Docket Nos. 64, 66), as they could not come to an agreement, but simultaneously submitted a stipulated request that the Court postpone issuing any corrective notice, so that the parties might engage in mediation. Docket No. 65. The Court granted the request, requiring the parties to submit by March 31, 2014 a report on the status of the mediation. Docket No. 67. It also granted Uber leave to file a motion for reconsideration of the Order. *Id*. The parties reported that mediation would take place on April 1, 2014. Docket No. 82. Evidently, this suit was not resolved in mediation. Hearing for this Motion and a case management conference were held on April 18, 2014.

In the Motion, Uber requests the Court to reconsider the Order to the extent that it applies to prospective drivers. In practical effect, these are individuals who have downloaded (or will download) the Uber App but have not yet driven for Uber. Uber believes the Court exceeded its authority under Federal Rule of Civil Procedure 23(d) by regulating communications with prospective drivers who are not currently members of the putative class.

### III.   DISCUSSION

A.   Legal Standard: A Court's Powers Under Rule 23(d)

Federal Rule of Civil Procedure 23(d) provides that "the court may issue orders" that "require – to protect class members and fairly conduct the action – giving appropriate notice to some or all class members of any step in the action," "impose conditions on the representative parties," or "deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1). "Subdivision (d) is concerned with the fair and efficient conduct of the action . . . ." Fed. R. Civ. P., Adv. Comm. Notes.

"Because of the potential for abuse [presented by class actions], a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). In particular, a district court has the power to "limit[] communications between parties and potential

1   class members." *Id*. at 101. *Gulf Oil* noted the "obvious potential for confusion" and adverse effect
2   on the "administration of justice" that misleading communications may cause. *Id*. at 100 n. 12
3   (quoting *Waldo v. Lakeshore Estates, Inc.*, 433 F.Supp. 782 (E.D.La.1977)). The prophylactic
4   power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the
5   purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but
6   to safeguard generally the administering of justice and the integrity of the class certification process.

> A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class. Certainly communications that seek or threaten to influence the choice of remedies are . . . within a district court's discretion to regulate.

*In re Sch. Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988). In *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S.Ct. 74 (2011), the Ninth Circuit similarly noted, "Rule 23(d) gives district courts the power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation." *Cf. Soskel v. Texaco, Inc.*, 94 F.R.D. 201, 203 (S.D.N.Y. 1982) (the court exercised its power to disapprove a settlement with the named plaintiffs in order to protect the other putative class members).

B.   Uber's Motion for Reconsideration

   Uber seeks reconsideration of the Order to the extent that it prohibits issuing arbitration agreements to individuals who have not yet used the Uber App to drive for Uber. Were the Order not in place, the arbitration agreements would be issued to individuals when they download the App; they would be bound by the Licensing Agreement (and its arbitration provision) before they actually drive for Uber. Since these individuals are not drivers at the time they receive the communication and bind themselves to the Licensing Agreement, Uber reasons they are not "putative class members" at the time they receive the communication.[3] Uber thus asserts that "Rule 23 provides no

---

[3] The Court uses the term "putative class member" to refer to an individual who satisfies the definition of the class as stated in the Complaint: "all drivers who have worked for Uber anywhere in the country, except in Massachusetts." Compl. ¶ 6. The "putative" merely refers to the fact that the class has not yet been certified.

5

basis for 'correcting' or restricting communications with persons who are not putative class members at the time of communication." Mot. at 7. The Court disagrees.

As noted, Rule 23(d) grants a court "broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties" so that it may ensure "fair . . . conduct of the action" and "protect the integrity of the class and the administration of justice." *Gulf Oil*, 452 U.S. at 100; Fed. R. Civ. P., Adv. Comm. Notes; *In re Sch. Asbestos Litig.*, 842 F.2d at 683. The scope of the Court's authority – though certainly not unlimited, as *Gulf Oil* explains – is not confined by the wooden approach advocated by Uber. Such an approach ignores the broad purpose of Rule 23(d). *See Gulf Oil*, 452 U.S. at 102 ("the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23 . . .") (quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977), cert. denied, 434 U.S. 985 (1977)); *id.* at 99 ("the question for decision is whether the limiting order entered in this case is consistent with the general policies embodied in Rule 23"). Consistent with that purpose, the Supreme Court has recognized that a court's authority over communications under Rule 23(d) extends beyond "actual class members" to "potential class members" because "the possibility of abuses in class-action litigation . . . may implicate communications with potential class members." *Id.* at 104.

Uber does not claim that "potential class members," as used in *Gulf Oil*, are restricted to current putative class members. Nothing in *Gulf Oil* indicates the Court intended such a limitation. Significantly, courts have regulated pre-certification communications that were not confined to putative class members. *See, e.g.*, *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1002, 1007 (11th Cir. 1997) (holding that the district court abused its discretion in allowing the plaintiffs to "publish notices of the ongoing litigation in publications nationwide and solicit information about potential class members and their alleged experiences with discrimination at Motel 6 motels," when the "communications would be nationwide in scope and would cause serious and irreparable injury to the defendant, when a decision on class certification was not imminent, and when [one of the proposed classes] was clearly not certifiable"); *Recinos-Recinos v. Express Forestry, Inc.*, 2006 WL 197030, *11 (E.D. La. Jan. 24, 2006) (entering protective order restraining defendants from contacting, among others, families of potential class members in an attempt to obtain the class

member's contact information and warn of adverse consequences, were the potential class member to join the suit). Furthermore, classes may be defined to include future class members. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010) ("The inclusion of future class members in a class is not itself unusual or objectionable.") (citing *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir.1986), which upheld class certification of a class "consisting of all male certified employees who were . . . , are or will be employed in positions entitling them to membership in STRS . . ." (quotation marks omitted)).[4]

        The Court has authority to regulate communications which jeopardize the fairness of the litigation even if those communications are made to future and potential putative class members. To constrain the authority of the court under Rule 23(d) to regulating only communications between an employer and current class or putative class members, to the exclusion of future class members, would undermine the court's ability to insure the "fair . . . conduct of the action," and "protect the integrity of the class and the administration of justice." Fed. R. Civ. P., Adv. Comm. Notes; *In re Sch. Asbestos Litig.*, 842 F.2d at 683. It would also undermine the court's ability to control communications which "threaten to influence the choice of remedies" in class actions. *In re Sch. Asbestos Litig.*, 842 F.2d at 683. Under Uber's proposed rule, defendants could unilaterally limit the size and scope of the class to be certified without being subject to court supervision. For instance, what if after the commencement of a class action alleging an unlawful company-wide employment practice brought on behalf of all current and future employees, the employer required all job applicants to sign a waiver agreeing to arbitration and prohibiting participation in the lawsuit in a conscious effort to limit the size of the class and truncate the scope of the class to preclude all future employees? What if the employer included in its employment application a distorted and misleading characterization of the pending lawsuit and sternly warned job applicants against joining the lawsuit? Would the court be powerless to respond and regulate such communications under Rule

---

[4] To the extent Uber argues that the class definition in the instant case is limited to those who have already driven for Uber, Plaintiffs have clarified that their class definition was intended to include all those who have driven through the time of class certification – *i.e.*, it includes future drivers. Hence, this case encompasses not only current drivers but future drivers, at least through class certification.

23(d) simply because the recipients are job applicants and not yet employees? Moreover, why should the precise timing and sequence of events leading up to employment of future drivers of Uber matter as Uber argues? What difference does it make whether an individual swipes the button on her cell phone (thereby accepting the Licensing Agreement) one minute before rather than at the same time she starts to drive her first customer? Uber's attempt to place dispositive significance on the precise sequence of events in the employment of new drivers makes no practical or policy sense in light of the broad purpose of Rule 23(d).

The Court further notes that in affirming its power to regulate communications herein, it is not ruling on the conscionability of the arbitration provision or its general enforceability as a matter of substantive law. It is merely treating the Licensing Agreement promulgated to current and future class members as a communication subject to regulation under *Gulf Oil* – the Court has evaluated whether that communication is so misleading or coercive that it threatens the fair and efficient administration of this class action lawsuit. As discussed in the prior Order and below, the issue before the Court is not enforceability or singling out of arbitration under *AT&T Mobility LLC v. Concepcion,* 131 S.Ct. 1740 (2011), or *American Express, Co. v. Italian Colors Restaurant*, 133 S.Ct. 594 (2012), but regulation of communications with the class under Rule 23(d) as interpreted by *Gulf Oil* and its progeny.

Uber relies on *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005), appeal granted, order amended, 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005) and *Balasanyan v. Nordstrom, Inc*., 294 F.R.D. 550, 573 (S.D. Cal. 2013) to establish the contrary. In both cases, arbitration agreements were promulgated after litigation commenced, and in both cases, the courts held that the agreements were not enforceable as to those who were putative class members before the agreements were promulgated, but not enforceable as to those who were not. However, neither case is persuasive.

In *In re Currency*, the plaintiffs were credit card holders, who sued banks for allegedly price fixing currency conversion fees for foreign transactions made with credit cards. The court held:

> When arbitration clauses were included in the credit card agreements for these categories of cardholders, they were not putative class members. As a result, they had no rights in this litigation. . . . [T]here

> is no basis for restricting a defendant from communicating with persons who are not putative class members. *Cf. Kahan*, 424 F.2d at 169 (noting that a putative class members' rights in a litigation are protected as of the filing date of the complaint). Accordingly, this Court holds that because the non-putative class members agreed to arbitration before they became putative class members in this litigation, the arbitration clauses in their cardholder agreements can be enforced.

*In re Currency*, 361 F. Supp. 2d at 258. The court provided no clear legal basis for its conclusion that "there is no basis for restricting a defendant from communicating with persons who are not putative class members." *Id*. *Kahan*, cited by the court, merely noted that a putative class member has rights in a litigation even before certification, an uncontroversial proposition. *Kahan* did not say that those who became putative class members after litigation commenced had no rights in the litigation, nor did it say that a court has no authority to communicate with future class members.

In *Balasanyan*, the plaintiffs were Nordstrom employees, who sued Nordstrom alleging violations of federal and state labor laws by failing to adequately compensate them for non-commission-producing activities. *Balasanyan* likewise provided no legal basis for its conclusion. Its analysis was conclusory:

> Nordstrom cites no authority that would permit a defendant to reduce their liability by having new potential Class Members sign arbitration agreements. Nevertheless, the court concedes that Nordstrom was engaging in a standard practice that many companies engage in when hiring new employees. Accordingly, the court holds that new employees who signed the DRA [Dispute Resolution Agreement] upon becoming employed by Nordstrom may be properly excluded from the class.

*Balasanyan*, 294 F.R.D. at 573-74.

Neither *In re Currency* nor *Balasanyan* confronted the question why communications with "potential class members" who are future but not yet putative class members cannot be regulated under Rule 23(d) where those communications threaten the integrity of the class action and the fair administration of justice.

Moreover, the Court notes that *Balasanyan* is distinguishable on its facts. There, as noted by the court, Nordstrom's implementation of the DRA for new employees was consistent with a "standard practice that many companies engage in when hiring new employees." Hence, it may be

inferred that the implementation of the DRA in that case was for normal business purposes, and not an attempt to thwart the pending class action lawsuit. In the instant case, as this Court previously noted, the timing of the promulgation of the Licensing Agreement by Uber and the inexplicably onerous nature of the opt out option strongly suggests the Agreement was motivated as a response to the class action suit filed in Massachusetts. Furthermore, the *Balasanyan* court ruled on the enforceability of the DRA; it did not address the prophylactic power of the court to regulate prospective communication with future employees under Rule 23(d), which is arguably less intrusive than invalidating an existing agreement between the parties.[5]

The Court concludes it has authority to regulate under Rule 23(d) communications with future class members. Thus, the Court DENIES Uber's Motion for Reconsideration.

C.   The Proposed Corrective Notices

During the hearing, the parties reported that mediation had been unfruitful. Therefore, the Court lifts its stay to permit the issuance of a corrective notice (*see* Docket No. 67) and now considers the corrective notices proposed by each party.

   1.   Legal Standard: Limits on Communications Under Rule 23(d)

The Supreme Court has provided guidance for limiting communications:

> [A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Gulf Oil*, 452 U.S. at 101-02.

Courts have limited communications that encourage potential class members not to join the suit. *See, e.g., Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985) (holding

---

[5] As to those current Uber drivers who were already part of the putative class who received the Licensing Agreement after this suit was filed, *In re Currency* and *Balasanyan* are on point. The Court undoubtedly has the power to deem those communications coercive and misleading and issue corrective relief.

10

that the district court had authority under Rule 23(d) to forbid the defendant bank from soliciting exclusion requests from potential class members); *Hampton Hardware, Inc. v. Cotter & Co., Inc.*, 156 F.R.D. 630, 632-33 (N.D. Tex. 1994) (holding that letters from the defendant to potential class members warning of potential costs of litigation and advising not to participate in the suit were an improper "attempt to prevent member participation in the class action").

Courts have also found procuring waiver, settlement, or arbitration agreements without providing adequate information about the pending class action are misleading communications which the court may limit. *See Gonzalez v. Preferred Freezer Services*, LBF, LLC, 2012 WL 4466605, *1 (C.D. Cal. 2012) (finding that a communication procuring a waiver was misleading, where it only mentioned that a former employee had brought a lawsuit against the defendants, and did not provide further information about the pending action that would "provide the potential plaintiffs with adequate notice of this case in order to make an informed decision regarding waiver of their rights"); *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 763 (N.D. Ohio 2010) (finding that a communication procuring a settlement was misleading, where the defendant did not inform putative class members that they were possibly giving up participation in the pending putative class action); *In re Currency*, 361 F. Supp. 2d at 251-52 (finding that communication of an arbitration agreement to putative class members was misleading, where the defendant omitted the "critical information" that there was ongoing litigation and that "by failing to reject the arbitration clause, they were forfeiting their rights as potential plaintiffs").

Courts may require corrective notices to remedy improper communications already made. *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 518 (N.D. Cal. 2010) (invalidating opt-out forms obtained through coercion and requiring corrective notice that gave notice of the class action, the invalidation of the opt-outs, and the law prohibiting retaliation against them by the defendant employer); *Goody v. Jefferson County*, 2010 WL 3834025, *1, *3 (D. Idaho 2010) (finding corrective notice was necessary "to ensure that all putative plaintiffs know about their right to join the collective action," based on the plaintiff's confusion about whether he could join the suit, following a letter and check sent by the defendant, which stated the payment was to ensure the plaintiff had been "adequately paid" in "compliance with all State and federal laws").

2. <u>Uber's Proposed Corrective Notice</u>

   a. <u>Uber's Proposal to Disallow Opt Out</u>

The Court previously ordered:

> Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration provision within 30 days of the notice. These requirements shall apply to new drivers (prospectively) and past and current drivers (retrospectively). As for arbitration provisions which have already been distributed after the filing of the complaint in this action (August 16, 2013) to past and current drivers who have approved the arbitration provision without opting out (or for whom approval during the 30 day notice period has begun to run but is still pending), Uber must seek approval of the arbitration provision for these drivers anew, giving them 30 days to accept or opt out from the date of the revised notice.

Order at 11.

Uber has submitted a proposed corrective notice ("Uber's Proposed Corrective Notice") and a new Licensing Agreement ("New Licensing Agreement") it intends to issue in conjunction with its corrective notice. Setting aside adjustments to the language that might be needed, Uber's New Licensing Agreement complies with the Court's Order in that gives clear notice of the arbitration provision at the beginning of the document, and gives notice later within the arbitration provision itself, that agreeing to the arbitration provision precludes participation in any lawsuit against Uber. *See* Docket No. 66-2 at 10 of 28. The Proposed Corrective Notice gives notice of that a New Licensing Agreement will ensue, that actions against Uber are pending before the Court and in Massachusetts, and that assenting to the New Licensing Agreement precludes participation in these or any other lawsuits against Uber. *See id.* at 5 of 28.

However, the Licensing Agreement does not comply with the Court's Order in that it does not give any means of opting out. Contrary to the prior Licensing Agreement that gave 30 days to opt out of the arbitration provision (by hand delivery or overnight mail), the New Licensing Agreement allows no opt out. The New Licensing Agreement provides: "IF YOU CHOOSE NOT TO ACCEPT THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISIONS SET FOR IN SECTION 14.3), YOU WILL NO LONGER HAVE ACCESS TO THE UBER SERVICES AND SOFTWARE." Docket 66-2 at 10 of 28. Uber's Proposed Corrective Notice essentially states the

same. Uber proposes to issue the New Licensing Agreement to all drivers 30 days after issuing Uber's Proposed Corrective Notice. It would apply to all claims, going forward. *See* Docket No. 66-2 at 5 of 28.

Uber argues that conditioning access to its services and software on accepting the arbitration provision is "perfectly lawful," citing cases which held that an arbitration agreement was enforceable despite being a condition of employment. Docket No. 66 at 9. While it may be that employment can be conditioned on assenting to an arbitration agreement, the considerations are different when arbitration agreements are imposed in the midst of a pending class action in an attempt to limit participation in the suit. Conditioning use of its App on accepting the arbitration provision is clearly an attempt to discourage participation in the class action. It imposes on drivers a stark choice: participate in the suit or forego working for or with Uber. This is an improper communication. *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d at 1203; *Hampton Hardware, Inc. v. Cotter & Co., Inc*., 156 F.R.D. at 632-33. While this class action remains pending, Uber must allow reasonable means for opting out of the arbitration provision (thereby allowing drivers to participate in the suit as putative class members should they so choose), as the Court previously ordered.

Uber also argues that providing drivers who already agreed to the arbitration agreement a further opportunity to opt out "would run afoul of the Federal Arbitration Action, which provides in part that arbitration agreements are 'irrevocable.'" Docket No. 66 at 3 n.4. This, of course, assumes that the initial communication of the arbitration agreement was proper. However, the Court previously found that it was not:

> it would be particularly inappropriate to insulate the subject communications from review under Rule 23(d) where, as here, there is a distinct possibility that the arbitration provision and class waiver imposed by Uber was motivated at least in part by the pendency of class action lawsuits which preceded the new Licensing Agreement. Suspicion that the new Licensing Agreement's arbitration provision was intended by Uber as a means to thwart existing class action litigation is heightened by the misleading nature of the communication and the unusually onerous procedures for opting out discussed *infra*.

Order at 7. Thus, the Court may exercise its authority to order corrective notices to remedy these prior improper communications. *See Guifu Li v. A Perfect Day Franchise, Inc*., 270 F.R.D. at 518;

*Goody v. Jefferson County*, 2010 WL 3834025 at *1, *3. Uber must provide these drivers a renewed opportunity to opt out of the arbitration provision that the Court approves, as the Court previously ordered.

As for Uber's allusions to *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) and *American Exp. Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304 (2013) during the hearing, the Court already addressed their relevancy in the Order. *See* Order at 5-6. As noted above, the issue here is not enforceability of an arbitration agreement in the face of state law on unconscionability. Instead, the question is whether the communication in the context of a class action was misleading or coercive so as to be regulable under *Gulf Oil*.

          b.        <u>Affirmation of the Court's Order</u>

Lest there be any doubt, Uber must comply with the Order. The Order imposes limitations narrowly tailored so that communications of the arbitration agreements do not mislead – by omitting material information necessary to make an informed decision about whether to join the suit or waive the right (*see Friedman v. Intervet Inc.*, 730 F. Supp. 2d at 763; *Gonzalez v. Preferred Freezer Services*, LBF, LLC, 2012 WL 4466605 at *1; *In re Currency*, 361 F. Supp. 2d at 251-52) or by improperly discouraging participation in this suit. The Order applies to prospective drivers.

        3.        <u>Plaintiffs' Proposed Corrective Notice</u>

Plaintiffs' Proposed Corrective Notice is also problematic. The Supreme Court has specifically noted that communications that "'drum up' participation in the proceeding" are among the "potential abuses associated with communications to class members." *Gulf Oil*, 452 U.S. at 101 n.12 (quoting *Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 782 (E.D. La.1977)). "The Court's primary purpose in supervising communications is . . . to ensure that potential class members receive accurate and impartial information regarding the status, purposes and effects of the class action." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011) (citing *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d at 1203).

Plaintiffs' Proposed Corrective Notice tends more to urge participation rather than provide impartial information. First, the statement that begins Plaintiffs' Proposed Corrective Notice takes a partial tone: "**IMPORTANT INFORMATION ABOUT YOUR RIGHT TO CLAIM THAT**

**YOU SHOULD HAVE BEEN PAID TIPS AND REIMBURSEMENT FOR GAS AND OTHER VEHICLE EXPENSES AS AN UBER DRIVER**." Second, the statements about the Court's rulings may give the impression that the class is likely to prevail, which is far from certain at this time. Third, it is inappropriate to include the website address www.uberlawsuit.com, the contents of which the Court will not oversee. Finally, the proposed method of opting out, "**you can 'opt out' of the arbitration clause by CLICKING HERE or responding to this e-mail with the words, 'I opt out**,'" may, as Uber notes, require Uber to expend undue resources to engineer, which the Court is unwilling to order.

The parties are ordered as below to submit a revised proposed corrective notice. The revised corrective notice may follow language along the lines of Uber's proposed notice but must contain a fair opt out procedure. Such a procedure should provide the same kind of clarity and facility as an effective opt out provision in a Rule 23(b)(3) class action.

## IV.    CONCLUSION

The Court **DENIES** Uber's Motion for Reconsideration.

With regard to the proposed corrective notices, the Court orders as follows:

(a) The parties shall meet and confer within seven (7) days of this order to discuss and stipulate to the appropriate form, content, and procedures of the corrective notices consistent with this order. If the parties are unable to agree on a proposed corrective notice, they shall notify the Court by submitting their respective proposed notices and procedures for review and decision by the Court within fourteen (14) days of this order.

///
///
///
///
///
///
///

(b)  Until revised notices and procedures are approved by the Court and sent to drivers, Uber shall not issue to Uber drivers or prospective drivers the Licensing Agreement or any other agreement containing an arbitration provision which waives potential class members' rights herein.

This order disposes of Docket No. 79.

IT IS SO ORDERED.

Dated: May 2, 2014

_____
EDWARD M. CHEN
United States District Judge