United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOUGLAS O'CONNOR, *et al.*,

      Plaintiffs,

    v.

UBER TECHNOLOGIES, INC., *et al.*,

      Defendants.

_____/

No. C-13-3826 EMC

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**(Docket No. 116)**

Plaintiffs Douglas O'Connor ,Thomas Colopy, David Khan, Matthew Manahan, Wilson Rolle, Jr., and William Anderson ("Plaintiffs") seek to represent a nationwide class of drivers who provide passenger car service for customers who hail them through Defendant Uber Technologies, Inc.'s mobile phone application.  They allege that Uber discourages passengers from tipping by falsely advertising that gratuity is included in the fare, even though the full gratuity is not passed along to the drivers.  Plaintiffs allege various California statutory and common law causes of action against Uber, specifically breach of implied-in-fact contract, unfair business practices, and interference with prospective economic advantage.  This Court has previously granted-in-part and denied-in-part Uber's motion to dismiss, and afforded Plaintiffs leave to amend.  An amended complaint was filed, and Uber has moved for judgment on the pleading as to most of the claims in the first amended complaint.

      Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Uber's motion.

**United States District Court**
For the Northern District of California

## I.   FACTUAL BACKGROUND

The following allegations are contained in Plaintiffs' first amended complaint.  Plaintiffs are drivers from California, Georgia, and Washington who have participated in the Uber service who bring this action on behalf of a putative class of "Uber drivers anywhere in the United States (other than Massachusetts)."  First Amended Complaint ("FAC") ¶¶ 1, 4-9.  Uber provides a service that gives consumers the ability to hail a participating car service driver "on demand"  using their mobile phone.  *Id.* ¶¶ 14-15. Plaintiffs allege that Uber advertises on its website (and in its marketing materials) that a gratuity is included in the total cost of the car service and that the customer does not need to provide a tip to the driver.  *Id.* ¶ 16.  Sometimes, Uber has advertised the gratuity is a set amount (such as 20%) of the fair charged, while in other instances, the amount of the gratuity is not specified.  *Id.* ¶¶ 19-20.[1]  Notwithstanding these representations, Plaintiffs allege that Uber does not provide its drivers with the total proceeds of the gratuity, but rather retains a portion of it for itself. *Id.* ¶¶ 17-18.  This failure to provide the full amount of the gratuity, Plaintiffs allege, violates various California statutes and common law principles.  *Id.* ¶¶ 22-23.

Uber drivers, including Plaintiffs, operate under a Licensing Agreement with Uber.[2]  Docket No. 39-2.  The Licensing Agreement contains a "Governing Law and Jurisdiction" section which provides, in relevant part:

> This Agreement shall be governed by California law, without regard to the choice of conflicts of law provisions of any jurisdiction, and any disputes, actions, claims or causes of action arising out of or in connection with the Agreement of the Uber Service or Software shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California.

*Id.* at 11.  Substantively, the Licensing Agreement refers to the drivers as "independent contractors" and not employees.  *See id.* a 7-8.  The Licensing Agreement generally describes how the fares and

---

[1] For these latter instances, Plaintiffs allege that it is "customary in the car service industry for customers to leave approximately a 20% gratuity for drivers" and, as a result, where the amount of gratuity was not specified by Uber, a reasonable customer would have assumed the gratuity was "in the range of 20% of the total fair."  *Id.* ¶ 21.

[2] This Court has previously granted Uber's motion to take judicial notice of the Software License and Online Services Agreement with Driver Addendum.  *See O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6354534, at *1 n.1 (N.D. Cal. Dec. 5, 2013)

fees will be calculated and disbursed, and does not contain any reference to gratuities.  *Id.* at 5-6.
Notwithstanding the "independent contractor" label in the Licensing Agreement, Plaintiffs allege
they are, in fact, employees as evidenced by the "litany of detailed requirements imposed on them by
Uber" and the fact they are "graded, and are subject to termination, based on their failure to adhere
to these requirements."  FAC ¶ 24.  Included in these requirements are ones regarding their conduct
with customers, the cleanliness of their vehicles, the timeliness with which they pick up and deliver
customers, and what they are permitted to say to customers.  *Id.*  Additionally, Plaintiffs allege that
their services are "fully integrated" into Uber's business of "providing car service to customers."  *Id.*
¶ 25.  Accordingly, as employees, Plaintiffs allege that they are entitled to reimbursed for
employment related expenses under California law.  *Id.* ¶¶ 26.

Plaintiffs assert five causes of action in their FAC.

- First, Plaintiffs allege in Count 1 that Uber has tortiously interfered with the
  prospective economic relationship between drivers and Uber customers by (1)
  failing to remit all of the collected gratuities to drivers; and (2) informing
  customers that  there was no need to tip drivers.  *Id.* ¶ 38.

- Second, Count 2 asserts that Uber had an implied-in-fact contract with its
  customers pursuant to which the customers agreed to pay gratuity for the
  benefit of the drivers and that, by failing to pay the drivers their full gratuity,
  Uber has violated this agreement.  *Id.* ¶ 39.

- The third cause of action is entitled "Statutory Gratuity Violation (Enforced
  Through UCL) and alleges that Uber had failed to remit all gratuities to the
  drivers and therefore violated California Labor Code Section 351, enforceable
  pursuant to "UCL § 17200."  *Id.* ¶ 40.

- Fourth, in Count 4 Plaintiffs assert that Uber's misclassification of drivers as
  independent contractors and failure to reimburse them for incurred expenses
  violates California Labor Code Section 2802.  *Id.* ¶ 41.

- Finally, Count 5 alleges unfair competition in violation of California Business
  and Professions Code § 17200.  Specifically Plaintiffs allege that Uber has

**United States District Court**

For the Northern District of California

engaged in "unlawful or fraudulent business acts or practices" by (1) committing the tort of breach of tortious interference with prospective economic advantage; (2) breaching an implied-in-fact contract between Uber and its customers for which the drivers were third-party beneficiaries; and (3) violating California Labor Codes Sections 351 and 2802. *Id.* ¶ 42.

## II. DISCUSSION

A. Legal Standard

Under Federal Rule of Civil Procedure 12(c), "[j]udgment on the pleadings is properly granted when there is no material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009)). "Rule 12(c) is 'functionally identical' to Rule 12(b)(6) and . . . 'the same standard of review' applies to motions brought under either rule." *Cafasso, U.S. ex rel. v. Gen. Dynamics Cf Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2001). Accordingly, in considering such a motion a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid" dismissal. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.*; *see also Lewis v. City & County of San Francisco,* No. C 11–5273 PJH, 2012 WL 909801, at *1 (N.D. Cal. Mar. 2012) (stating that to survive a Rule 12(c) motion, a plaintiff must allege "'enough facts to state a claim to relief that is plausible on its face.'" (citation omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

In the context of ruling on both a Rule 12(b)(6) and Rule 12(c), motion, the Court is generally limited to the contents of the complaint. However, in addition, the Court may consider

United States District Court

For the Northern District of California

1  "documents referenced extensively in the complaint, documents that form the basis of plaintiff's

2  claims, and matters of judicial notice when determining whether the allegations of the complaint

3  state a claim upon which relief can be granted." *Mendelsohn v. Intalco Aluminum Corp.,* No.

4  C06–0190RSL, 2006 WL 1148559, at *1 (W.D.Wash. Apr. 21, 2006); *see also United States v.*

5  *Ritchie,* 342 F.3d 903, 908–09 (9th Cir.2003).

6  B.    <u>Uber's Motion for Judgment on the Pleadings Is Not an Impermissible Motion for</u>

7       <u>Reconsideration</u>

8       Plaintiffs argue that the motion for judgment on the pleadings is no more than a disguised

9  motion for reconsideration of this Court's prior order granting-in-art and denying-in-pat Uber's

10  motion to dismiss Plaintiff's original complaint.  Specifically, they contend that Uber's motion

11  either raises identical arguments already rejected by the Court in reviewing the original complaint or

12  contains arguments that Uber could have, but did not, raise against the original complaint.  Because

13  Uber has purportedly failed to meet the standard governing motions for reconsideration (N.D. Civ.

14  Local R. 7-9), Plaintiffs urge to deny Uber's motion on this ground.  The Court disagrees.

15       Uber's motion is not one for reconsideration.  To be sure, the motion raises arguments that

16  Uber clearly could have made against the Plaintiffs' original complaint.  Further, as will be

17  discussed below, in places the arguments raised are identical.  However, Plaintiffs' argument ignores

18  the fact that they have filed an amended complaint, thus "superced[ing] the original complaint and

19  render[ing] it without legal effect." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 927 (9th Cir. 2012) (en

20  banc).  On this basis, a number of courts have permitted defendants to move to challenge the *entire*

21  amended complaint – including those causes of action the court had previously found sufficient.  *See*

22  *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F.

23  Supp. 2d 1077 (S.D. Cal. 2010), ("When Plaintiffs filed the FACC, it superseded their previous

24  complaint, and Sony was therefore free to move again for dismissal."); *Turner v. Tierney*, No.C12-

25  6231 MMC, 2013 WL 2156264 (N.D. Cal. May 17, 2013), (defendant did "not violate[] Civil Local

26  Rule 7-9(c), as [defendant's] motion to dismiss the FAC is not a motion for reconsideration of the

27  Court's prior order, but, rather, a new motion addressing a newly filed complaint"); *Bruton v.*

28  *Gerber Products Company*, No. 12-cv-02412-LHK, 2014 WL 172111 (N.D. Cal. Jan. 15, 2014),

United States District Court

For the Northern District of California

1   (Defendant "is not seeking reconsideration of the Court's prior Order, but rather is responding to

2   [plaintiff's] new complaint.").[3]

3       In light of the above, Uber's motion for judgment on the pleadings is not a motion for

4   reconsideration and the Court will neither deny the motion on this ground nor apply the more

5   stringent motion for reconsideration standard in evaluating Uber's arguments.

6   C.   <u>Plaintiffs Have Failed to State a Claim for Interference with Prospective Economic</u>

7        <u>Advantage</u>

8       In its prior order regarding Uber's motion to dismiss, the Court set forward the essential

9   elements for the tort of interference with prospective economic advantage under California law.

10  Specifically, Plaintiffs must properly allege (1) an economic relationship between the plaintiff and

11  some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's

12  knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the

13  relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

14  proximately caused by the defendant's acts.  *See Reeves v. Hanlon*, 95 P.3d 513, 519 n.6 (Cal.

15  2004).  In addition, Plaintiffs must allege that the defendant "engaged in an independently wrongful

16  act in disrupting the relationship." *Id.* at 520.  An act is "independently wrongful" if it is "'unlawful,

17  that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other

18  determinable legal standard.'" *Id.* (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d

19  937, 954 (Cal. 2003)).

20      Uber challenges Plaintiffs' tortious interference claim on a number of bases.  First, they

21  allege that Plaintiffs have failed to allege an "independently wrongful act."  Second, they assert that

22  there was no existing economic relationship with which Uber could have interfered.  Finally, Uber

23  contends that because it was not a "stranger" to the relationship between Plaintiffs and Uber

24  customers, it could not, as a matter of law, have tortiously interfered.  For the following reasons, the

25

26      [3] Of course, as Judge Koh recognized in *Bruton*, to the extent a defendant simply chooses to rehash arguments the court had previously rejected, it is likely they will "fare little better" than they did when originally raised.  *Id.*  In light of this, it will be a rare case where it will be an efficient use of an attorneys' time – not to mention his client's money – to raise identical arguments already rejected.

27

28

1    Court finds that Plaintiffs have failed to allege interference with an existing economic relationship.

2    Accordingly, the Court need not reach Uber's other arguments.

3        In its prior order, the Court rejected Uber's argument that Plaintiffs had failed to state a

4    tortious interference claim due to their failure to allege interference with an "existing relationship."

5    The Court concluded that the single case upon which Uber relied – *Pardi v. Kaiser Foundation*

6    *Hospitals*, 389 F.3d 840 (9th Cir. 2004) – did "not stand for the proposition that an economic

7    relationship must exist at the time of the interference."  *O'Connor*, 2013 WL 6354534, at *15.  In

8    response to the Court's order, Uber has now, in connection with the instant motion, cited a number

9    of additional California cases.

10       These newly cited cases, unlike *Pardi*, do expressly note that the "relationship" that forms

11   the basis of the intentional interference tort must have existed at the time of the allegedly tortious

12   conduct.  In *Roth v. Rhodes*, 25 Cal. App. 4th 530 (1994), the California Court of Appeal noted that

13   while the relationship in question "need not be a contractual relationship, an existing relationship is

14   required."  *Id.* at 546; *see also Halton Co. v. Streivor, Inc.*, No. C10-0655 WHA, 2010 WL 2077203,

15   at *5 (N.D. Cal. May 21, 2010) ("[I]t is well settled in California that a plaintiff must establish an

16   existing economic relationship or a protected expectancy with a third person, not merely a hope of

17   future transactions.  Such an *existing* relationship must be pleaded to state a claim for intentional

18   interference with prospective economic advantage." (citation omitted)).  Thus, in *Silicon Labs*

19   *Integration, Inc. v. Melman*, No. C08-04030-RMW, 2010 WL 890140 (N.D. Cal. Mar. 8, 2010), the

20   court noted that this requirement "precludes application of the [tort] to hypothetical relationships not

21   developed at the time of the allegedly tortious acts" and, as a result, plaintiffs must prove that they

22   "had a relationship with and expected to receive an economic benefit from a specific third party."

23   *Id.* at *2; *see also Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013

24   WL 5694452 (N.D. Cal. Oct. 18, 2013) ("Alleged relationships with 'potential customers' are

25   insufficient because they are nothing more than speculative economic relationships.").

26       In the primary case relied upon by Uber, *Westside Center Associates v. Safeway Stores 23,*

27   *Inc.*, 42 Cal. App. 4th 507 (1996), plaintiff owned an interest in several small stores in a local

28   neighborhood shopping center.  The shopping center's anchor building was leased by Safeway for a

United States District Court

For the Northern District of California

supermarket. Fifteen months prior to the expiration of its 20-year lease, Safeway closed its supermarket, removed all fixtures, and disclaimed any intent to reopen. Nonetheless, it chose to exercise its option to renew its lease for five years. *Id.* at 510. Closure of the store resulted in a substantial decrease in business at the shopping center and, eventually, plaintiff sold its interest in the center at a substantial loss. *Id.* Plaintiff alleged Safeway took its actions as part of a conspiracy to drive down the value of the shopping center, permitting it to purchase the property on advantageous terms. Plaintiffs further alleged that Safeway's activities "interfered in its relationship with the class of all potential buyers for its property" and therefore interfered with plaintiff's opportunity to sell the property for its "true value." *Id.* at 523. The California Court of Appeal rejected this argument. It noted that the "interference tort applies to interference with *existing* noncontractual relations which hold the promise of future economic advantage. In other words, it protects the expectation that the relationship will yield desired benefit not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise." *Id.* at 524 (emphasis in original).

In *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303 (N.D. Cal. 1997), plaintiff – a company that created video game software – entered into a contract with defendant in which defendant agreed to fund the production of a certain game in exchange for publication rights. *Id.* at 1306. The relationship apparently soured and, at a certain point, plaintiff alleged that defendant made "false, misleading and commercially disparaging statements about [plaintiff's] technical abilities and [its] involvement in the creation and development" of the game to multiple parties in the video game industry. *Id.* at 1307. Plaintiff sued, alleging causes of action including, *inter alia*, intentional interference with prospective economic relationship. As to this cause of action, plaintiff alleged that defendant's assertions that plaintiff was technically incompetent and unable to timely create software "induced and/or caused customers and potential customers not to purchase video game software and related products from [plaintiff], and induced and/or caused other software publishers not to deal with [plaintiff] regarding video game software development." *Id.* at 1312. The court concluded that plaintiffs had failed to allege disruption of "an actual economic relationship by means of alleged defamatory statements." *Id.* Specifically:

United States District Court

For the Northern District of California

> The complaint does not allege that Silicon Knights was in the midst of negotiations with 3DO, Microsoft, or any other publisher, and that the third party pulled out of the negotiations or awarded business to another because of these alleged acts by Defendants.  Moreover, allegations that Defendants' undisclosed statements caused potential customers not to buy Silicon Knights' video game software asserts the type of speculative economic relationship disapproved of in *West*[*side*].

*Id.*  The court then found that "[e]ven if interference with potential customers" was a legitimate basis for the tort, plaintiff's allegations were wholly conclusory.  *Id.*

Thus, interference with potential customers with whom the plaintiff did not have an existing relationship generally is not sufficient to state a claim.  To be sure, in some ways, the instant action is distinguishable from the cases cited above.  *Westside* and *Silicon Knights* involved situations where the defendants did not have any knowledge of any prospective relationships and, as a result, the interfering conduct went out to an undefined, undifferentiated market that may have included some of the plaintiffs' potential customers.  In the case at bar, Plaintiffs suggest the alleged interfering conduct – representations made that gratuities were included in the cost of Uber's service – were directed at a defined universe – Uber app users.  However, even if such a scenario would satisfy the existing relationship requirement (construed to encompass relationships of one defined group to another), the advertising in this case was in fact directed at the market generally and was not confined to those who had already signed up for the Uber app.

*Louisiana Pacific Corp. v. James Hardie Building Products, Inc.*, No. C-12-3433 SC, 2012 WL 5520394 (N.D. Cal. Nov. 14, 2012), is instructive.  There, the plaintiffs alleged that the defendant tortiously interfered with its economic advantage by paying Google to direct consumers to defendant's website whenever consumers performed an internet search for plaintiff's trademarks.  *Id.* at *1.  Plaintiffs contended that it had an existing relationship with "consumers who visit its website to purchase goods and services."  *Id.* at *2.  The court rejected this argument finding: "There is a possibility that consumers who search for Plaintiff through Google will choose to purchase Plaintiff's goods or services at some point in the future; however, such consumers do not have an existing business relationship with Plaintiff merely because they perform an internet search."  *Id.* Thus, the court concluded that the plaintiff had not show the "requisite '*promise* of future economic

United States District Court

For the Northern District of California

1  advantage'" necessary to plead its tortious interference claim. *See id.* (quoting *Google Inc. v. Am.*

2  *Blind & Wallpaper Factory, Inc.*, No. C03-05340 JF, 2005 WL 832398 (N.D. Cal. Mar. 30, 2005)).

3        As in *Louisiana Pacific*, at the time of the interfering conduct in this case – the alleged

4  misrepresentations regarding the payment of gratuities to drivers – the Plaintiffs did not have an

5  "existing relationship" with their customers.  Rather, they had a "speculative economic relationship"

6  or a "hope of future transactions." *Rheumatology Diagnostics Lab.*, 2013 WL 5694452, at *2*;*

7  *Halton Co. v. Streivor, Inc.*, No. C10-0655 WHA, 2010 WL 2077203, at *5 (N.D. Cal. May 21,

8  2010).  The alleged representations went out to the market as a whole, including those who had not

9  downloaded the Uber app.  Those who encountered the representations may or may not have chosen

10  to download Uber's application, and those who chose to download the application may or may not

11  have chosen to use the application to use the service, an act necessary to create an economic

12  relationship with a driver.  While the hope and expectations for future relationships may not have

13  been as speculative as those at issue in *Westside* or many of the other cases that have applied the

14  "existing relationship" standard, Plaintiffs did not have an "existing" relationship with potential

15  Uber customers at the time those potential Uber customers encountered Uber's allegedly misleading

16  advertising and marketing materials.

17        At the hearing, the Plaintiffs asserted that the alleged act of interference could be construed

18  not simply as making the misrepresentation, but Uber's failure to remit the gratuities once the

19  customers' payments were made.  This act, unquestionably, occurred after the relationship between

20  customer and driver had been formed.  The alleged interference in this case can be seen as a

21  transitional act – it started with the misrepresentation and was consummated with the failure to remit

22  the entire gratuity to the driver.  However, without the alleged representation (which occurred before

23  the relationship was created), the withholding of the alleged "gratuities" would not have been

24  wrongful.  Therefore, in this case, an *essential element* of the alleged interference occurred prior to

25  the creation of any business relationship; it is also the focal point of Plaintiffs' interference claim,

26  and that is the act by which the timing of the interference should be measured.

27        Because this relationship did not exist at the time of the alleged interference, Plaintiffs'

28  tortious interference claim must be **DISMISSED**.

**United States District Court**
For the Northern District of California

D.     Plaintiffs Have Failed to State an Implied-in-Fact Claim

As this Court previously recognized, a "contract implied in fact 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.'"  *Retired Employees Ass'n of Orange Cnty., Inc. v. Cnty of Orange*, 52 Cal. 4th 1171, 1178 (2011) (quoting *Silva v. Providence Hospital of Oakland*, 14 Cal.2d 762, 773 (1939)).  "'[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." *Lance Campter Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996).

Plaintiffs' breach of implied-in-fact contract cause of action is based on allegations that Uber had an implied-in-fact contract with its customers "pursuant to which the customers pay gratuity for the benefit of the drivers" – a contract that was breached when Uber failed to remit to the drivers the total gratuity amount.  FAC ¶ 39.  Plaintiffs further allege that they, and the other Uber drivers, are third-party beneficiaries of this contract and have suffered as a result of Uber's breach of this contract.  *Id.*  In its prior order, this Court found that Plaintiffs had adequately spelled out the "circumstances upon which it is plausible that the parties intended Uber to collect passenger gratuities through fare payments and that the parties intended the drivers to be third-party beneficiaries of the gratuities."  *O'Connor*, 2013 WL 6354534, at *12.  Significant for purposes of the instant motion, however, the Court made the observation that there were "no allegations or judicially noticed evidence in the record of an express contract between Uber and customers covering this subject matter, which could preclude a finding of implied contractual intent to benefit the third-party drivers."  *Id.* at *11.  This finding distinguished the Court's treatment of this claim from Plaintiff's now-dismissed implied-contract claim revolving around the relationship between Uber and the drivers.  For *that* implied contract claim, the Court had granted the motion to dismiss finding the presence of an express agreement covering the subject matter – the Licensing Agreement – precluded an implied contract claim.  *See id.*

Uber now contends, however, that there is "judicially noticed evidence in the record" of an express contract between Uber and customers covering this subject matter – namely, the "User Terms and Conditions" to which customers agreed prior to using the Uber application – and that

11

these Terms and Conditions foreclose implied contractual relief.  Uber asserts that three aspects of the Terms and Conditions are relevant.  First, the Terms and Conditions contain a "Payment terms" section which provides, in relevant part:

> Any fees which the Company may charge you for the Software or Service are due immediately and are non-refundable.  This no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Software or Service either planned, accidental or intentional, or any reason whatsoever.  The Company reserves the right to determine final prevailing pricing – Please note the pricing information published on the website may not reflect the prevailing pricing.
>
> . . . The Company may change the fees for our Service or Software as we deem necessary for our business.  We encourage you to check back at our website periodically if you are interested about how we charge for the Service of [sic] Software.

Docket No. 117-2, at 3.  Second, the Terms and Conditions contain a "Limitation of Liability" section which provides, in relevant part:

> THE COMPANY AND/OR ITS LICENSORS SHALL NOT BE LIABLE FOR ANY LOSS, DAMAGE OR INJURY WHICH MAY BE INCURRED BY YOU, INCLUDING BY [sic] NOT LIMITED TO . . . ANY RELIANCE PLACED BY YOU ON THE COMPLETENESS, ACCURACY OR EXISTENCE OF ANY ADVERTISING

*Id.* at 5.  Finally, the Terms and Conditions have an integration clause which provides: "This Agreement[] comprises the entire agreement between you and the Company and supersedes all prior or contemporaneous negotiations, discussions or agreements, whether written or oral, between the parties regarding the subject matter contained herein."  *Id.* at 7.[4]

---

[4] Uber requests that this Court take judicial notice of three versions of the Terms and Conditions, representing the versions that were in force during the class period.  Uber additionally relies on the "incorporation by reference" doctrine which holds that when a "plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do  not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint, the court may consider that document when ruling on a motion to dismiss or motion for judgment on the pleadings.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Plaintiffs failed to object to Uber's request for judicial notice, and, in their opposition, made arguments based on the substance of the Terms and Conditions.  At the hearing, Plaintiffs continued to state that they had no reason to dispute the authenticity of the documents but appeared to argue

United States District Court

For the Northern District of California

The Court finds that, as alleged, Plaintiffs have failed to state a claim for breach of implied-in-fact contract. Plaintiffs' claim rests on the argument that by misrepresenting in advertising to customers that Uber would remit gratuities to the Drivers, Uber had created an implied in fact contract that they would, in fact, do so. However, such a claim would be in direct conflict with the waiver of reliance on advertising expressly contained in the Terms and Conditions.[5] *Cf. Kurcharczyk v. Regents of Univ. of Cal.*, 946 F. Supp. 1419 (N.D. 1996) ("[T]erms that conflict with an express written contract cannot be implied in a written contract."); *see also Tollesfson v. Roman Catholic Bishop*, 219 Cal. App. 3d 843, 855 (1990) ("[T]here simply cannot exist a valid express contract on one hand and an implied contract on the other, each embracing the identical subject but requiring different results and treatment.").

Accordingly, the purported implied contract encompasses the same subject (Uber's advertising) and requires a result contrary to that required by the Terms and Conditions of the express contract – a result not allowed by California law of contracts. *See Tollesfson*, 219 Cal. App. 3d at 855 Because the third party beneficiary claim is predicated on the asserted implied-in-fact contract, that claim must fail. Third party beneficiaries cannot claim any rights greater than that held by the direct parties to the contract. *See Marina Tenants Ass'n v. Deauville Marine Dev. Co., Ltd.*, 181 Cal. App. 3d 122, 132 (1986).

Uber's motion for judgment on the pleadings as to Plaintiffs' implied-in-fact contract claim is **GRANTED**.

E.   <u>Plaintiffs' Failure to Allege Actual Reliance Is Fatal to Their UCL Claim Under the "Fraudulent" Prong but Does Not Affect Its "Unlawful" Prong Claim</u>

Plaintiffs base their UCL claim under the UCL's "unlawful" and "fraud" prongs. Specifically, Plaintiffs allege:

---

that the Court should not consider them at the motion to dismiss. Given the availability of the Terms and Conditions on Uber's website, and Plaintiffs' failure to timely object to or oppose the request for judicial notice or challenge the authenticity of the documents, the Court will **GRANT** the request for judicial notice and consider the Terms and Conditions documents.

[5] Plaintiffs have not argued that the terms of the waiver are a valid part of the contract between Uber and its customers.

United States District Court

For the Northern District of California

> Defendant's conduct constitutes unlawful or fraudulent business acts or practices, in that Defendant has committed the tort of tortious interference with prospective economic advantage, breached implied-in-fact contracts with customers for whom the drivers are third party beneficiaries, and have violated California Labor Code Sections 351 and 2802.

FAC ¶ 42.  Uber seeks to have the UCL claim dismissed to the extent it is based on alleged misrepresentations insofar as Plaintiffs has failed to properly allege reliance.  Docket No. 116, at 6; *see also* Docket No. 128, at 10 ("In its opening memorandum, Defendant argued that the FAC failed to state a UCL claim under the 'fraudulent' prong or, to the extent predicated on alleged misrepresentations in Defendant's advertising, under the 'unlawful' prong because Plaintiffs did not and could plead their own reliance on the alleged misrepresentations.").

The fraudulent prong of the UCL does not require a plaintiff to establish the elements of the common law tort of fraud; rather, a "fraudulent business practice is one that is likely to deceive members of the public."  *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1235 (2009).  Before a court can evaluate the substance of a plaintiff's claim, however, it must ensure that the plaintiff has standing under the UCL.  Proposition 64, codified at Cal. Bus. & Prof. Code § 17204, amended the UCL to limit standing to those individuals who had "suffered injury in fact and has lost money or property as a result of the unfair competition."  Relevant to this action, the California Supreme Court has interpreted this standing provision – specifically the "as a result of the unfair competition language" – as "impos[ing] an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong."  *Id.* at 326; *see also Morgan*, 177 Cal. App. 4th at 1257 (2009) ("In *Tobacco II*, the Supreme Court held that this standing requirement . . . imposes an actual reliance requirement on named plaintiffs seeking relief under the fraudulent prong of the UCL."  (citation omitted)); *Rosado v. eBay*, — F. Supp. 2d — , 2014 WL 2945774, at *5 (N.D. Cal. June 30, 2014) (noting that *Tobacco II* held "that for a fraudulent business practices claim, the UCL mandates that plaintiff demonstrate 'actual reliance' upon the defendant's misrepresentation or omission").

In light of this precedent, courts have recognized that UCL fraud plaintiffs must allege their *own* reliance – not the reliance of third parties – to have standing under the UCL.  For example, in

United States District Court

For the Northern District of California

*ZL Technologies v. Gartner, Inc.*, No. CV 09-02393 JF (RS), 2009 WL 3706821 (N.D. Cal. Nov. 4, 2009), the court agreed with defendant's argument that the plaintiff "lack[ed] standing to bring a UCL claim sounding in fraud because [plaintiff] alleges not its own reliance upon the Alleged Defamatory Statements, but that of third parties – potential [plaintiff] customers – resulting in a loss of profits and injury to [plaintiff]." *Id.* at *11. Similarly, in *Jent v. Northern Trust Corp.*, No. C13-01684 WBS CKD, 2013 WL 5806024 (E.D. Cal. Oct. 28, 2013), the court found that plaintiff had failed to allege actual reliance on an allegedly fraudulent notice of default. Rather, the plaintiff had alleged that "the financial institutions which plaintiffs sought an extension of credit relied on the NOD." *Id.* at *3, *4; *see also U.S. Legal Support, Inc. v. Hofioni*, No. S-13-01770 LKK/AC, 2013 WL 6844756, at *15 (N.D. Cal. Dec. 20, 2013).[6]

At the hearing, Plaintiffs clarified that they do not seek to assert "fraud" as an independent basis for liability under the UCL, but that Uber's misrepresentations form the basis of their tortious interference with prospective economic advantage claim as the misrepresentations constitute the "independent wrongful act" required by that tort. Accordingly, Plaintiffs appear to be asserting that the tortious interference claim also forms the basis for a UCL claim under the fraudulent (as well as unlawful) prong.

This claim is problematic. First, the Court has dismissed Plaintiffs' tortious interference claim, rending this argument moot. Second, even if the tortious interference claim still existed, it would be a claim that "sounded in fraud;" it would therefore require pleading "actual reliance" whether asserted under the fraudulent prong under the UCL or as predicate unlawfulness under the unlawful prong. Courts have recognized that *Tobacco II*'s "actual reliance" requirement "applies equally to the 'unlawful' prong of the UCL *when the predicate unlawfulness is misrepresentation and deception.*" *See Swearingen v. Pacific Foods of Oregon, Inc.*, No. 13-cv-04157-JD, 2014 WL 3767052, at *2 (N.D. Cal. July 31, 2014) (internal quotation marks omitted) (emphasis added). Plaintiffs have failed to allege such reliance. The FAC plausibly alleges facts suggesting that Uber's

---

[6] The same principle governs normal fraud-based claims (*i.e.*, claims asserting fraud outside the confines of the UCL). *See, e.g., City & County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130 (N.D. Cal 1997) ("[A] fraud action cannot be maintained based on a third party's reliance.").

15

United States District Court

For the Northern District of California

1   alleged misrepresentations regarding their gratuity practices harmed the Plaintiffs.  However,

2   Plaintiffs have not alleged *their own* reliance on Uber's misrepresentations.  Rather, the clear import

3   of the FAC is that Uber's *customers* relied on the alleged misrepresentations.  This third-party

4   reliance is insufficient to establish standing under the fraud prong of the UCL.

5        For the foregoing reasons, the Court will **DISMISS** Count 5 to the extent it purports to assert

6   a claim under the fraudulent prong of the UCL.

7        The Court finds, however, that the lack of pleading "actual" reliance does not affect

8   Plaintiffs' ability to state a UCL claim under the "unlawful" prong as to those unlawful acts not

9   predicated on misrepresentation.  Here, Plaintiffs have disclaimed any intention of relying on alleged

10  misrepresentations as the basis for an unlawfulness claim and Plaintiffs' remaining predicate claims

11  (besides, *e.g.*, the tortious interference claim which is based on fraud) allege statutory Labor Code

12  violations.  Accordingly, the remaining UCL unlawful claim does not sound in fraud and, therefore,

13  does not require a showing of actual reliance.  While Plaintiffs' UCL claim under the fraudulent

14  prong will be dismissed, this does not affect Plaintiffs' claim under the "unlawful" prong based on

15  statutory violations.

16  F.   <u>The California Laws Upon Which Plaintiffs Rely Do Not Apply Extra-Territorially</u>

17       Finally, Uber seeks to have Plaintiffs' FAC dismissed to the extent that it seeks to apply

18  California law to Plaintiffs Rolle and Anderson or any putative class members who reside and

19  provide transportation services outside California.  Docket No. 116, at 26.  Plaintiffs oppose Uber's

20  motion on this ground, asserting that (1) the California laws at issue in this case do not contain

21  geographical limitations and (2) any presumption against extraterritorial application of these laws is

22  overcome by the presence of a California choice-of-law provision in the Licensing Agreement.

23  Docket No. 126, at 27.  This Court previously considered, and rejected, Uber's arguments against

24  extra-territorial application of California law in this action, finding that the Ninth Circuit's decision

25  in *Gravquick A/S v. Trimble Nav. Int'l Ltd.*, 323 F.3d 1219, 1223 (9th Cir. 2003), established that the

26  "the presumption against extraterritorial application of a law is rebutted when there is a choice-of-

27  law clause governing the parties' relationship.  *O'Connor*, 2013 WL 6354534, at *4.  For the

28

1    reasons discussed below, the Court now concludes that its earlier holding was in error, and that the

2    California statutes involved in this action do not apply extra-territorially.

3         Under California law, a presumption exists against the extraterritorial application state law.

4    In *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011), the California Supreme Court stated:

5             However far the Legislature's power may theoretically extend, we
                 presume the Legislature did not intend a statute to be "operative, with
6             respect to occurrences outside the state, . . . unless such intention is
                 clearly expressed or reasonably to be inferred from the language of the
7             act or from its purpose, subject matter or history."

8    *Id.* at 1207 (quoting *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059

9    (1999)).  In its prior order in this matter, the Court rejected Uber's arguments and found that

10   extraterritorial application of California law was proper in this action.  While noting the presumption

11   against extraterritorial application, the Court found (1) that there were no "*express* geographical

12   limitations in the laws at issue which would preclude the parties' agreement to apply California law

13   extraterritorially" and (2) that the Ninth Circuit's decision in *Gravquick* established that the "the

14   presumption against extraterritorial application of a law is rebutted when there is a choice-of-law

15   clause governing the parties' relationship.  *O'Connor*, 2013 WL 6354534, at *4.

16        The Court's prior order rested on a fundamental mis-reading of *Gravquick*.  The relevant

17   portion of the *Gravquick* held:

18            *If* a state law does not have limitations on its geographical scope,
                 courts will apply it to a contract governed by that state's laws, even if
19            parts of the contract are performed outside the state.  When a law
                 contains geographical limitations on its application, however, courts
20            will not apply it to parties falling outside those limitations, *even if the
                 parties stipulate that the law should apply*.

21

22   *Gravquick*, 323 F.3d at 1223 (emphases added).  It is thus apparent that the court in *Gravquick* did

23   *not* hold that a California choice of law provision can overcome the presumption against extra-

24   territorial application of California law.  Instead, the court recognized that parties' agreement to

25   apply California law must yield in those circumstances where the law in question contains

26   "geographical limitations."  While *Gravquick* makes clear one such circumstance is where the

27   legislation contains an explicit limitation, there is no logical reason to reach a different result where

28   that limitation is implicit, especially when the California Supreme Court has made clear that such

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

limitations are *presumed to be present* unless the legislature's contrary intention "is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history." *Sullivan v. Oracle Corp.*, 51 Cal. 4th at 1207[7]; *see also North Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 6 (1916) ("[T]here is nothing in the act which, by express words or clear implication, manifests an intent to have it operate extraterritorially, and . . . settled rules of interpretation prohibit our giving it any such effect."); *cf. Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 248 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none.").[8]

Moreover, a contractual choice of law provision that incorporates California law presumably incorporates *all* of California law – including California's presumption against extraterritorial application of its law. *See Wright v. Adventures Rolling Cross Country, Inc.*, No. 12-cv-0982-EMC, Docket No. 22, at 6 (N.D. Cal. May 3, 2012) ("[E]ven if the provision identified by Plaintiffs were a choice-of-law provision, there is nothing to indicate that the parties intended to incorporate only

---

[7] While *Gravquick* upheld the extra-territorial application of the California Equipment Dealers Act ("CEDA") through a contract that contained a California choice-of-law provision, it did so on the ground that (1) there was no "express geographical limitation" in the CEDA and (2) there was "significant evidence" that the California legislature intended to permit extra-territorial application of the CEDA. Specifically, the Court found significant the fact that the bill that eventually became CEDA had originally defined "equipment dealers" to only encompass those "in this state." This language was removed, and the court found that the "removal is a strong indication that the legislature did not intend strictly to limit the CEDA's application to dealers located in California." *Id.* at 1223. As discussed in the text below, the California Labor Code sections at issue do not evidence a similar legislative intent to permit extraterritorial application.

Further, in previously addressing this question, this Court noted the lack of "any *express* geographical limitations in the laws at issue which preclude the parties' agreement to apply California law extraterritorially." *O'Connor*, 2013 WL 6354534, at *4. This Court placed too much emphasis on the lack of any *express* indication by the legislature disclaiming extra-territorial application This Court did not sufficiently credit the California's Supreme Court articulation of a presumption against extra-territoriality – including in decisions which came after *Gravquick*. *See Sullivan*, 51 Cal. 4th at 1207.

[8] Plaintiffs cite the recent opinion from the Supreme Judicial Court of Massachusetts in which the court, relying on *Gravquick* stated: "Given that the parties agreed to construe the contract in accordance with Massachusetts law, that there is no express limitation on the territorial reach of the Massachusetts independent contractor statute, and that there is no apparent reason to disregard the parties' choice of law, we conclude that the Massachusetts independent contractor statute applies to the plaintiffs' misclassification claim." *Taylor v. Eastern Connection Operating, Inc.*, 988 N.E.2d 408, 414 (Mass. 2013). First, the Court disagrees with the Supreme Judicial Court's reading of *Gravquick* for the reasons discussed in this opinion. Second, as *Taylor* was interpreting and applying Massachusetts law, it is not binding on this Court interpreting California law.

**United States District Court**
For the Northern District of California

portions of California law and exclude the incorporation of California law's presumption against extraterritoriality."); *see also Cotter v. Lyft, Inc.*, — F. Supp. 2d — , 2014 WL 3884416, at *4 (N.D. Cal. Aug. 7, 2014) ("Even if the choice of law provision were intended to confer upon out-of-state drivers a cause of action for violation of California's wage and hour laws, it could not do so. An employee cannot create by contract a cause of action that California law does not provide.").

Accordingly, the Court concludes that the choice-of-law provision in the Licensing Agreement does not overcome the presumption against extra-territorial application of California law absent an indication that such a presumption does not apply. The relevant question, therefore, is whether there is a discernible legislative intent not to have "geographic limitations" in the statutes relied upon by the Plaintiffs – specifically Cal. Labor Code Sections 351 (covering gratuities) and 2802 (covering reimbursement for employment related expenses). The Court finds there is no such intent.

Here, there are indications in the legislative history of the Labor Code which support a finding that the California legislature did not intend Sections 351 or 2802 to apply extraterritorially. First, California's presumption against extraterritorial application of its laws dates back to at least 1916. In *North Alaska Salmon Co. v. Pillsbury*, the California Supreme Court expressly spoke of the "presumption that [the legislature] did not intend to give its statutes any extraterritorial effect." 174 Cal. at 4. It further stated the rule that has since been consistently applied by California courts ever since – "The intention to make the act operative, with respect to occurrences outside the state, will not be declared to exist unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history.'" *Id.* Despite this clear standard, in originally enacting Labor Code Sections 351 and 2802 in 1937, the California legislature failed to specify that either provision should be applied extra-territorially.

Second, the legislature has, in other Labor Code provisions, expressly provided for extra-territorial application. For example, in *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal. 4th 557 (1996), the California Supreme Court noted that "[i]n some circumstances, state employment law explicitly governs employment outside the state's territorial boundaries." *Id.* at 578. The court cited two statutes in the worker's compensation realm – Cal. Labor Code § 3600.5 (providing

19

protection for injuries suffered by employees who were hired or regularly worked in California but was injured out of state) and § 5305 (providing the Division of Workers' Compensation with jurisdiction over such claims. *See Tidewater*, 14 Cal. 4th at 578; *see also Cotter*, 2014 WL 3884416, at *3 ("[W]here the legislature has intended a Labor Code provision to apply to a broader range of people, it has said so explicitly."). Where it so desired, the California legislature provided for extraterritorial applications; the California legislature did not so provide with respect to Sections 351 and 2802. The structure and history of the Labor Code, therefore, reinforce the presumption against extraterritoriality. This distinguishes this case from *Gravquick*, where the Ninth Circuit found evidence in the legislative history of the California Equipment Dealers' Act suggesting that the California legislature intended the Act to appear extraterritorially. *See Gravquick*, 323 F.3d at 1223.

Accordingly, the Court concludes that the Labor Code violations upon which Plaintiffs rely do not apply extraterritorially and, therefore, cannot apply to those Plaintiffs or unnamed class members who worked in states other than California. *See, e.g.*, *Cotter*, 2014 WL 3884416, at *3 ("[P]laintiffs propose to represent class members who are residents of other states, who drive for Lyft exclusively in those states, and who apparently never set foot in California . . . . The California wage and hour laws at issue here do not create a cause of action for people who fit this description, even if they work for a California-based company that makes all employment-related decisions in California."); *Campagna v. Language Line Servs., Inc.*, No. 5:08-CV-02488-EJD, 2012 WL 1565229 (N.D. Cal. May 2, 2012) ("None of the cases read California's wage and hour laws to cover out-of-state work performed by nonresidents who primarily work outside California."); *Sarviss v. General Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 900 (C.D. Cal. 2009) ("Although the cases discussing the extraterritorial application of California's wage and hour law are sparse, those decisions that *do* discuss it have tended to find that California wage and hour provisions do not apply to non-resident Californians who work primarily outside of California.").

The Court reaches a similar result with regards to Plaintiffs' UCL claim. As the California Supreme Court held in *Sullivan*, "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially.

United States District Court

For the Northern District of California

1    Accordingly, the presumption against extraterritoriality applies to the UCL in full force." *Id.* at

2    1207.  Thus, the court addressed the applicability of a UCL claim predicated on alleged violations of

3    the Fair Labor Standards Act.  The Court noted that while the "failure to pay legally required

4    overtime compensation certainty is an unlawful business act or practice" under the UCL, and,

5    therefore, the "UCL might conceivably apply to plaintiffs claims if their wages were paid (or

6    underpaid) in California," the facts did not reveal where the wages were paid.  *Id.* at 1208.  It further

7    held that the UCL "does not apply to overtime work performed outside California for a California-

8    based employer by out-of-state plaintiffs . . . based solely on the employer's failure to comply with

9    the overtime provisions of the FLSA."  *Id.* at 1209.  This reasoning is conclusive here, as well.  The

10   Court concludes that the UCL does not apply to work performed outside California by out-of-state

11   Plaintiffs based on the employer's failure to reimburse the Plaintiffs for employment related

12   expenses or to pay them gratuities they were owed.[9]

13   G.    Plaintiffs' "Statutory Gratuity Violation" Claim (Count III) Will Be Dismissed

14         Plaintiff's third cause of action is entitled "Statutory Gratuity Violation" and provides, in its

15   entirety: "Defendant's conduct, as set forth above, in failing to remit all gratuities to the Uber drivers

16   constitutes a violation of California Labor Code Section 351.  This violation is enforceable pursuant

17   to UCL § 17200.  Plaintiffs previously conceded, and this Court held, that "there is no private right

18   of action under section 351."  *O'Connor*, 2013 WL 6354534, at *7.  However, the Court agreed with

19   Plaintiff that violation of this section could form the predicate needed for an "unlawfulness" UCL

20   claim.  *See id.* ("Plaintiffs can proceed to allege Defendants' violation of section 351 as the predicate

21   unlawful activity for their claim under the UCL.").

22

23   _____

24         [9] Because the only remaining claims in this suit are those that apply only within California
     (the California statutory claims and the UCL claims predicated thereon), the Court recognizes this
25   could limit the scope of the Court's order regulating Uber's ability to communicate with class
     members (Docket Nos. 60, 99).  However, because this order has been appealed, the Court does not
26   have jurisdiction to consider any modification of it.  *Cf. Small v. Operative Plasterers' & Cement
     Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 495 (9th Cir. 2010) ("Because '[t]he filing of a notice
27   of appeal . . . confers jurisdiction on the court of appeals and divests the district court of its control
     over those aspects of the case involved in the appeal,' we conclude that the district court lacked
28   jurisdiction to modify the injunction." (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S.
     56, 58 (1982) (per curiam)).

United States District Court

For the Northern District of California

In the FAC, Plaintiffs' UCL cause of action expressly states that it is based, in part, on the fact that Uber had "violated California Labor Code Sections 351 and 2802" and that, as a result, Plaintiffs suffered, *inter alia*, a "loss of gratuities to which they were entitled and customers expected them to receive." FAC ¶ 42. In light of this allegation under Count 5, having a separate count entitled "Statutory Gratuity Violation (Enforced Through UCL)," Count 3 is redundant. Accordingly, Plaintiffs' third cause of action is **DISMISSED** with the understanding that dismissal of this separately captioned claim (Count 3) does not bar Plaintiffs from predicating their UCL claim on alleged violations of Section 351.

### III.   CONCLUSION

For the foregoing reasons, Uber's motion for judgment on the pleadings is **GRANTED**. Plaintiffs' implied contract and tortious interference with prospective economic advantage claims are **DISMISSED** with prejudice. Plaintiffs' "Statutory Gratuity Violation" cause of action is **DISMISSED** with prejudice as superfluous. Plaintiff's claim under the UCL is **DISMISSED** with prejudice to the extent it is based on the UCL's fraudulent prong.

This order disposes of Docket No. 116.


IT IS SO ORDERED.


Dated: September 4 , 2014

_____
EDWARD M. CHEN
United States District Judge