1  MORGAN, LEWIS & BOCKIUS LLP
   ROBERT JON HENDRICKS (SBN 179751)
2  STEPHEN L. TAEUSCH (SBN 247708)
   CAITLIN V. MAY (SBN 293141)
3  One Market, Spear Street Tower
   San Francisco, CA  94105-1126
4  Tel:    415.442.1000
   Fax:    415.442.1001
5  rhendricks@morganlewis.com
   staeusch@morganlewis.com
6  cmay@morganlewis.com

7  Attorneys for Defendant
   UBER TECHNOLOGIES, INC.
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  DOUGLAS O'CONNOR, THOMAS              Case No. 13-03826-EMC
    COLOPY, MATTHEW MANAHAN, and
13  ELIE GURFINKEL, individually and on behalf    **NOTICE OF MOTION AND MOTION
    of all others similarly situated,            OF DEFENDANT UBER
14                                               TECHNOLOGIES, INC. FOR
                     Plaintiffs,                 SUMMARY JUDGMENT;
15                                               MEMORANDUM OF POINTS AND
              vs.                                AUTHORITIES IN SUPPORT
16                                               THEREOF**
    UBER TECHNOLOGIES, INC.,
17                                               Date:        January 29, 2015
                     Defendant.                  Time:        1:30 p.m.
18                                               Location:    Courtroom 5
                                                 Judge:       The Honorable Edward M. Chen
19

20

21        REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

22

23

24

25

26

27

28

MORGAN, LEWIS &
 BOCKIUS LLP
ATTORNEYS AT LAW
 SAN FRANCISCO

1

### NOTICE OF MOTION AND MOTION

2 **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

3       **PLEASE TAKE NOTICE THAT** on January 29, 2015, at 1:30 p.m., in Courtroom 5 of

4 this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California, Defendant

5 Uber Technologies, Inc. ("Defendant" or "Uber") will, and hereby does, move the Court pursuant

6 to Federal Rule of Civil Procedure 56 for summary judgment in favor of Defendant and against

7 Plaintiffs Douglas O'Connor ("O'Connor"), Thomas Colopy ("Colopy"), Matthew Manahan

8 ("Manahan"), and Elie Gurfinkel ("Gurfinkel") (collectively "Plaintiffs").

9       This motion is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure on the

10 ground that Plaintiffs' claims have no merit because they are not Defendant's employees under

11 California law.  The evidence submitted demonstrates that there is no triable issue as to any

12 material fact and that Defendant is entitled to judgment as a matter of law as to both claims for

13 relief asserted in Plaintiffs' Second Amended Complaint.  This Motion is based on this Notice of

14 Motion and Motion, the Memorandum of Points and Authorities included herein, the Declarations

15 of Robert Jon Hendricks and Michael Colman filed herewith, the putative class member

16 declarations filed herewith, all pleadings and papers on file in this action, any matters of which

17 the Court may or must take judicial notice, and such additional evidence or argument as may be

18 presented at or prior to the time of the hearing.

19

20

21

22

23

24

25

26

27

28

DEF'S MOTION FOR SUMMARY
JUDGMENT 13-0826-EMC

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF ARGUMENT ................................................................................ 1

II.   RELEVANT PROCEDURAL BACKGROUND......................................................... 2

III.  STATEMENT OF UNDISPUTED FACTS .............................................................. 3

      A.    The Uber App. ................................................................................................. 3

      B.    The Plaintiffs. ................................................................................................. 5

      C.    The Parties' Written Agreements........................................................................ 8

            1.    The Software License and Online Services Agreement and the
                  Driver Addendum Related to Uber Services.............................................. 8

            2.    The Rasier, LLC Transportation Service Agreement. ............................. 10

      D.    Plaintiffs Have Conceded That, Consistent With The Relevant Agreements,
            Defendant Did Not Control The Manner In Which They Performed
            Transportation Services Booked Via The Uber App. ........................................... 11

      E.                              REDACTED                                  ......... 13

      F.    Other Drivers Agree That Defendant Provides Them With A Service And
            Does Not Control The Manner In Which They Provide Transportation
            Services. ...................................................................................................... 14

      G.    The Labor Commissioner Has Likewise Determined That A Driver's Use
            Of The Uber App Does Not Give Rise To An Employment Relationship. .......... 15

IV.   LEGAL ARGUMENT ........................................................................................ 15

      A.    Summary Judgment Standard. ........................................................................... 15

      B.    Plaintiffs Are Not Defendant's Employees As A Matter Of Law. ...................... 16

            1.    Plaintiffs Are Not Defendant's Employees Because They Do Not
                  Provide Services To Defendant.............................................................. 16

            2.    Even If Plaintiffs Could Be Considered To Have Provided A
                  Service To Defendant, They Did So As Independent Contractors—
                  Not Employees—Under California Law.................................................... 18

                  a.    Defendant Has No Right To Exercise "Authoritative
                        Control" Over Plaintiffs' Provision Of Transportation
                        Services. ...................................................................................... 19

                  b.    The *Borello* Secondary Factors Also Support A Finding
                        That Plaintiffs Were Independent Contractors............................... 22

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEF'S MOTION FOR SUMMARY
JUDGMENT 13-0826-EMC

# TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | (1) | Plaintiffs And Defendant Could Terminate Their Agreement. | 23 |
| | (2) | Plaintiffs Engage In A Distinct Occupation Or Business. | 23 |
| | (3) | Plaintiffs Drove Passengers Without Supervision By Defendant. | 24 |
| | (4) | Plaintiffs' Occupation Requires Skill. | 25 |
| | (5) | Plaintiffs Supplied Their Own Instrumentalities For Transporting Passengers. | 25 |
| | (6) | The Indefinite Duration Of The Parties' Contracts Does Not Support Employment Status. | 25 |
| | (7) | Plaintiffs' Work Was Not Part Of Defendant's Regular Business. | 26 |
| | (8) | Plaintiffs Were Paid Not By The Hour But Per Trip. | 27 |
| | (9) | Plaintiffs Stated Their Intent To Enter Into An Independent Contractor Relationship. | 27 |
| 3. | Defendant Is Not A "Joint Employer" Of O'Connor Or Colopy. | | 28 |
| | a. | Defendant Did Not Exercise Control Over Plaintiffs' Wages, Hours, Or Working Conditions. | 28 |
| | b. | Defendant Did Not Suffer Or Permit Plaintiffs To Work. | 29 |
| V. | CONCLUSION | | 30 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ali v. U.S.A. Cab Ltd.*,
  176 Cal.App.4th 1333 (2009).................................................................................. 19

*Arnold v. Mut. of Omaha Ins. Co.*,
  202 Cal.App.4th 580 (2011)............................................................................. passim

*Ayala v. Antelope Valley Newspapers, Inc.*,
  59 Cal.4th 522 (2014) ........................................................................................... 19

*Beaumont-Jacques v. Farmers Grp., Inc.*,
  217 Cal.App.4th 1138 (2013)........................................................................... 23, 27

*Braboy v. Staples, Inc.*,
  No. C 09-4534 PJH, 2011 WL 743139 (N.D. Cal. Feb. 24, 2011) ........................ 28

*DeSimone v. Allstate Ins. Co.*,
  2000 WL 1811385 (N.D. Cal. Nov. 7, 2000)......................................................... 23

*Fowler v. Varian*,
  196 Cal.App.3d 34 (1987)..................................................................................... 22

*Futrell v. Payday Cal., Inc.*,
  190 Cal.App.4th 1419 (2010)................................................................... 28, 29, 30

*Gilchrist v. Div. of Emp. Sec.*,
  137 A.2d 29 (N.J. Super. Ct. 1957)....................................................................... 17

*Golden Shear Barber Shop v. Morgan*,
  481 P.2d 624 (Or. 1971)........................................................................................ 17

*Grant v. Woods*,
  71 Cal.App.3d 647 (1977)..................................................................................... 19

*Harris v. Vector Mktg. Corp.*,
  656 F.Supp.2d 1128 (N.D. Cal. 2009) ...................................................... 23, 24, 27

*Hennighan v. Insphere Ins. Solutions, Inc.*,
  Case No. 13-cv-00638, 2014 WL 1600034 (N.D. Cal. April 21, 2014) ........... passim

*Kruger v. Mammoth Mountain Ski Area, Inc.*,
  873 F.2d 222 (9th Cir. 1989).................................................................................. 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEF'S MOTION FOR SUMMARY
JUDGMENT 13-0826-EMC

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Kubinec v. Top Cab Dispatch, Inc.*,
   Case No. SUCV201203082BLS1, 2014 WL 3817016 (Super. Ct. Mass. June 25,
   2014) .................................................................................................................... 17, 18, 26

*Martinez v. Combs*,
   49 Cal.4th 35 (2010) ......................................................................................... 28, 29, 30

*McDonald v. Shell Oil Co.*,
   44 Cal.2d 785 (1955) ..................................................................................................... 19

*Millsap v. Fed. Express Corp.*,
   227 Cal.App.3d 425 (1991) ........................................................................................... 19

*Mission Insurance Co. v. Workers' Compensation Appeals Board*,
   123 Cal.App.3d 211 (1981) ("*Mission*") .............................................................. 21, 24, 27

*Murray v. Principal Fin. Grp., Inc.*,
   613 F.3d 943 (9th Cir. 2010) ......................................................................................... 22

*Prachasaisoradej v. Ralph's Grocery Co.*,
   42 Cal.4th 217 (2007) .................................................................................................... 16

*Rabanal v. Rideshare Port Mgmt. LLC*,
   Case No. B239708, 2013 WL 6020340 (Cal. Ct. App., Nov. 14, 2013) ....................... passim

*Rosales v. El Rancho Farms*,
   2011 WL 6153276 (E.D. Cal. Dec. 12, 2011) ............................................................... 29

*S.G. Borello & Sons, Inc. v. Dept. of Ind. Relations*,
   48 Cal.3d 341 (1989) ......................................................................................... 16, 19, 22, 27

*Sahinovic v. Consolidated Delivery & Logistics, Inc.*,
   Case No. C 02-4966 SBA, 2004 WL 5833528 (N.D. Cal. Sept. 13, 2004) ................... 21, 25

*State Comp. Ins. Fund v. Brown*,
   32 Cal.App.4th 188 (1995) ("*Brown*") ............................................................... 21, 23, 26, 27

*Tieberg v. Unemp't Ins. App. Bd.*,
   2 Cal.3d 943 (1970) ............................................................................................... 16, 19

*Turner v. City and County of San Francisco*,
   892 F.Supp.2d 1188 (N.D. Cal. 2012) (Chen, J.) ......................................................... 16

*Varisco v. Gateway Science and Engineering, Inc.*,
   166 Cal.App.4th 1099 (2008) ................................................................................. 16, 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*,
    226 Cal.App.3d 1288 (1991) ................................................................................... 17

*Yellow Taxi Co. of Minneapolis v. NLRB*,
    721 F.2d 366 (D. D.C. 1983) ................................................................................... 22

**STATUTES**

Cal. Business & Professions Code
    § 17200 ("UCL") .......................................................................................................... 3

Cal. Lab. Code
    § 351 ........................................................................................................................... 16
    § 2802 ................................................................................................................... 16, 19

**RULES AND REGULATIONS**

Fed. R. Civ. P. 56(a) ......................................................................................................... 15

**OTHER AUTHORITIES**

*Restatement (Second) of Agency* ..................................................................................... 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.      SUMMARY OF ARGUMENT**

Defendant developed and licenses a mobile application (the "Uber App") that transportation providers can use to receive trip requests from a pool of potential passengers. Plaintiffs and Defendant are not in an employment relationship.  Instead, as the undisputed facts make clear, Defendant is in a *commercial* relationship with Plaintiffs and other transportation providers where, on agreed terms, Defendant conveys trip requests from passengers to them via the Uber App and processes payments for any trips they agree to provide.  Transportation providers may use the Uber App as much or as little as they like, while continuing to service their regular clients or passengers acquired from any *other* source — including from competing services like Sidecar and Lyft and, in some instances, through street hails and taxi dispatch services.  Plaintiffs pay *Defendant* for access to leads via the Uber App and to benefit from Defendant's marketing efforts and payment processing.  *Like passengers, Plaintiffs and other drivers are <u>customers</u> who receive a service from Defendant.*  Precisely because drivers are not employees subject to its control, Defendant must promote the benefits of the Uber App to them and incentivize its use, just as Defendant markets and promotes the Uber App to passengers.  The law is clear that the inquiry into Plaintiffs' purported employment status should end with the determination that Defendant provides Plaintiffs with a service, and the Court accordingly need not evaluate the factors courts consider when determining whether an individual who actually has "provided services" is an employee or an independent contractor.

Even if the Court were to conclude that Plaintiffs provide a service to Defendant, the outcome would be no different.  The primary test of an employment relationship in California is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the desired result.  The contracts that governed Plaintiffs' access to the Uber App, which should serve as the primary evidence of Defendant's right of control, required only that Plaintiffs provide high-quality transportation services to any passengers whose trip requests they chose to accept but provided Defendant with no right to control the manner in which Plaintiffs provided those services or, indeed, to exercise any meaningful, employment-type control over

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

Plaintiffs.[1]  Consistent with those contracts, Defendant never set Plaintiffs' schedules, never required them to log into the Uber App for any minimum amount of time, never required them to accept any particular trip request received via the Uber App, never assigned them a territory, never restricted them from engaging in another occupation or business, and (significantly) never restricted Plaintiffs from *simultaneous use* of *competitors'* lead generation services (*e.g.,* Lyft, Sidecar) — which Manahan admits to doing on a regular basis.  Defendant did not supply Plaintiffs with any transportation tools or equipment (including, notably, the vehicles that are central to the transportation service they provide), never provided them with any employment benefits, and never reported their earnings on a Form W-2.  Plaintiffs acknowledge that their interactions with Defendant's employees were minimal, and                REDACTED

REDACTED

Tellingly, other drivers who use the Uber App affirm that they are in a commercial and not an employment relationship with Defendant, under which Defendant provides them with a lead generation service but has no right to control the manner in which they provide transportation services to passengers or conduct their independent businesses.  In light of these undisputed facts, it should come as no surprise that the Division of Labor Standards Enforcement, when presented with a wage claim by a putative class member in this case, concluded after a hearing that the plaintiff performed services not as an employee but as an independent contractor.

All of the foregoing facts, which are not in dispute, establish as a matter of law that Plaintiffs were not in an employment relationship with Defendant.  Because Plaintiffs are not Defendant's employees, this Court should enter summary judgment for Defendant.

## II.     RELEVANT PROCEDURAL BACKGROUND

On August 16, 2013, O'Connor and Colopy filed the initial Complaint in this matter, in which they asserted six claims for relief, all but one of which sought tips Plaintiffs alleged were

---

[1] While Plaintiffs will attempt to characterize suggestions Defendant provides regarding ways to provide quality service to passengers and to maximize income via the Uber App as the dictates of an employer, Plaintiffs have themselves admitted that they are free to accept or reject those suggestions without repercussions.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

due them.  Dkt. 1.  On September 25, 2013, Defendant and the then individually named

defendants filed a Motion to Dismiss, which the Court granted in part and denied in part.  Dkt. 39,

58.  Although the Court declined to dismiss Plaintiffs' employment-based claims in light of

various allegations in the Complaint, the Court observed:

> Perhaps potentially even more persuasive, counsel for Defendant represented at
> oral argument that Uber has no control over the drivers' hours, which geographic
> area they target for pickups, or even whether they choose to accept a passenger's
> request for a ride.  If this proves to be the case, Plaintiffs' assertion of an
> employment relationship would appear to be problematic.

Dkt. 58 at 9:25-10:1.[2]  Plaintiffs then filed a First Amended Complaint (the "FAC"), which

conformed the pleading to the Court's Order and added additional named plaintiffs.  On July 9,

2014, Defendant filed a Motion for Judgment on the Pleadings as to each claim asserted in the

FAC, with the exception of Plaintiffs' Labor Code claims and their Business & Professions Code

§ 17200 ("UCL") claim to the extent predicated on those claims.  Dkt. 116.  The Court granted

the motion in its entirety.  Dkt. 136.  The Court later granted Plaintiffs leave to file a Second

Amended Complaint (the "SAC"), solely for the purpose of adding Gurfinkel as a named

plaintiff.  Dkt. 193.  Plaintiffs filed the SAC on November 12, 2014.  Dkt. 199; *see also* Dkt. 201.

Each of Plaintiffs' remaining claims is predicated on their threshold allegation that they are or

were Defendant's employees.  Dkt. 199, 201.

## III.  STATEMENT OF UNDISPUTED FACTS

### A.  The Uber App.

The Uber App allows transportation providers to receive trip requests from members of

the public, and provides electronic payment processing for trips booked through the App.

Colman ¶¶ 3-6.[3]  In order to book transportation services via the Uber App, passengers must first

download the passenger version of the application to a smartphone and create an account with

---

[2] At the July 10, 2014 Case Management Conference, the Court again observed that Plaintiffs' claim of employment status seemed precarious.  *See* Dkt. 125 at 12:12-18 ("When one looks at it at first, it's not obvious why they're employees.  I mean, that's the first instinct.  I'm not prejudging this, but . . . this is not an obvious case where the threshold requirement is met . . .").

[3] Declarations are cited as follows: "[Declarant's Last Name] ¶__."  Deposition testimony is cited as follows: "[Deponent's Last Name] Tr. [page]:[line]."  All deposition excerpts and exhibits are attached to the Declaration of Robert Jon Hendricks.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

3

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1    Defendant. *Id.* ¶ 5.  As part of that process, passengers place a credit card on file with Defendant,

2    which eliminates the need for cash payments and permits Defendant to satisfy its payment

3    processing obligation to transportation providers. *Id.*  When a passenger requests transportation

4    via the Uber App, Defendant conveys the request to the nearest driver who is signed in to the

5    Uber App and not already providing transportation booked via the application.[4] *Id.* ¶ 8.  If the

6    driver declines the request or does not accept it within 15 seconds, the request is forwarded to the

7    next closest driver. *Id.*  The more drivers who decline a request, the longer the passenger waits to

8    receive the requested transportation. *Id.*  As a result, Defendant encourages drivers who are not

9    actually available to receive trip requests to simply log out of the Uber App until they become

10   available again. *Id.*; *see also* O'Connor Tr. at 238:19-240:7.

11          After a trip is complete, the passenger can rate the driver's services between one and five

12   stars (with five being the highest), and the driver also can rate the passenger.  Colman ¶ 9.

13   Defendant reserves the right to deactivate the accounts of drivers who fall below Defendant's

14   quality standards, based on the average rating they have received from passengers or a pattern of

15   serious complaints from passengers.[5] *Id.*   To avoid that outcome, however, Defendant

16   periodically sends drivers common-sense suggestions about how to achieve 5-star ratings from

17   passengers, by, for example, meeting or exceeding the estimated arrival time, dressing

18   professionally, opening doors for passengers, using GPS or following passengers' requested

19   routes, and having bottled water available for passengers.[6] *Id.*, Ex. 5.  Defendant also markets the

20   Uber App to drivers by providing them with estimates of their increased earnings had they logged

---

21   [4] Defendant has no obligation under its contracts with passengers to provide them with
22   transportation services or to ensure that they receive such services from third-party providers.
     The contracts provide that Defendant will introduce passengers to third-party transportation
23   providers via the Uber App, but they specifically state that Defendant does not provide
     transportation services and that any transportation services scheduled via the Uber App are solely
24   the responsibility of the third-party providers. *Id.* ¶¶ 5-6, Exs. 1-4.

25   [5] As with drivers, Defendant reserves the right to deactivate the accounts of passengers whose
     ratings from drivers fall below Defendant's quality standards. *Id.* ¶ 9.

26   [6] Defendant has no authority to dictate compliance with these suggestions and takes no steps to
     determine whether drivers accept or reject them. *Id.* ¶ 9.  *See also* Gurfinkel Tr. at 95:8-97:14,
27   126:2-128:7, 168:14-22, 266:19-267:22; Colopy Tr. at 205:10-208:9; O'Connor Tr. at 217:12-
     220:7, 228:14-229:2, 230:23-231:10; Manahan Tr. at 173:16-174:1, 228:15-19, 258:10-18.
28   Defendant's only insight into the quality of service provided by drivers comes from passengers, in
     the form of star ratings or comments.  Colman ¶ 9.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1  in to the Uber App during recent busy periods and with information regarding upcoming events

2  that are likely to create high demand for transportation services (concerts, sporting events, etc.).

3  *Id*. ¶ 10, Ex. 6.  Because Defendant has no right to require drivers to log in to the Uber App at any

4  time or for any amount of time, Defendant also incentivizes use of the Uber App by increasing

5  rates during periods of peak demand ("surge pricing").  *Id*. ¶ 11.  If they like, drivers can choose

6  to accept trip requests only in locations where surge pricing is prevalent (*e.g*., in San Francisco's

7  Financial District) or when rates have "surged" to a level they deem acceptable.  *Id*.

8      **B.      The Plaintiffs.**

9      **O' Connor.**  O'Connor had access to the Uber App between September 2012 and

10 February 2014 by virtue of his work with three independent transportation companies.[7]

11 O'Connor Tr. at 116:11-16.  Between September and December 2012 and again from April to

12 October 2013, O'Connor worked as a driver for SF Bay (first as an employee and later as an

13 independent contractor); from January to April 2013, he worked as a driver for Bay Network

14 Limo; and from November 2013 until February 2014, he worked for a company doing business as

15 SF Best.  *Id*. at 118:12-24, 120:18-21, 121:25-122:15, 122:17-123:3, 142:17-21, 145:16-18.

16 O'Connor learned of the openings with SF Bay and Bay Network Limo through advertisements

17 on Craigslist.  *Id*. at 116:17-18, 131:19-24.  Defendant had no involvement whatsoever in

18 determining the financial arrangements O'Connor reached with these companies.  Colman ¶ 13.

19      After interviewing for the SF Bay position, O'Connor reached an agreement with SF Bay

20 under which he received 60% of the revenue it derived from trips booked through the Uber App,

21 and SF Bay paid all expenses O'Connor incurred, including gas.  O'Connor Tr. at 117:8-24,

22 124:9-125:5, 125:18-23.  SF Bay paid O'Connor by check, provided him with pay statements,

23 and reported his earnings on a W-2.  *Id*. at 125:6-12, 151:3-9.  SF Bay set O'Connor's work

24 schedule (Thursday through Monday from 6:00 p.m. to 6:00 a.m.).  *Id*. at 132:15-133:4.  SF Bay

---

[7] O'Connor's access to the Uber App was discontinued in February 2014, when he declined to provide Defendant with a copy of his driver's license and also refused to undergo a background check mandated by the California Public Utility Commission ("CPUC").  *Id*. at 73:2-16, 74:12-14, 75:19-76:14, 162:11-163:3.  Since losing access to the Uber App, O'Connor has continued to work as a limousine driver.  *Id*. at 92:5-93:6, 229:19-24.  Colopy's, Manahan's, and Gurfinkel's accounts remain active.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

also required him to remain logged in to the Uber App while working and to "work as much as you can." *Id*. at 132:8-19.  O'Connor left SF Bay in December 2012 due to illness.[8]  *Id*. at 133:20-24.  When he was ready to return to work, instead of returning to SF Bay, O'Connor applied for a position with Bay Network Limo because he preferred an arrangement that would permit him unfettered access to a vehicle seven days a week.  *Id*. at 131:19-132:13, 134:19-135:3. He reached an agreement with Bay Network Limo under which he paid the company $735 per week for unrestricted use of one of the company's vehicles, which he could use as he saw fit for business or personal purposes.  *Id*. at 135:4-136:3.  Bay Network Limo did not assign him any specific schedule, and O'Connor was free to decide for himself when and whether to provide transportation services.  *Id*. at 137:13-138:21.  Bay Network Limo reported O'Connor's earnings on a Form 1099.  *Id*. at 151:10-12.  Under the agreement O'Connor later negotiated with SF Best, he received 60% of the revenue SF Best earned from trips he provided.  *Id*. at 146:12-24.  Some of the trips O'Connor provided while affiliated with SF Best were booked via the Uber App, and others were booked via other means.  *Id*. at 207:3-16.

**Colopy.**  Colopy began working as a driver for LS Worldwide Transportation ("LS") in February or early March 2012, after submitting an application and resume in response to an advertisement on Craigslist.  Colopy Tr. at 49:15-50:1, 51:9-11, 53:15-23.  At the time, he had never heard of Defendant or used the Uber App.  *Id*. at 51:14-18, 58:21-24.  After interviewing Colopy for the position, LS extended him an offer to work as a driver for LS, "[a] limo company that had conventional limo contracts with existing technology companies in the Bay Area such as Apple and Seagate."  *Id*. at 55:18-25, 56:12-17, 57:17-23, 58:4-11, 59:5-7.  LS paid Colopy by the job for trips he provided to existing clients like Apple and Seagate, which were scheduled in advance and not booked via the Uber App.  *Id*. at 59:16-60:16.  LS provided Colopy with the Lincoln Town Car he used to provide transportation services.  *Id*. at 63:20-24, 107:17-20, 110:25-111:2.  Colopy had no set schedule with LS, but LS told him that "if I don't work enough, you

---

[8] During his second stint with SF Bay (from April to October 2013), O'Connor agreed to pay SF Bay $500 per week in exchange for access, for business or personal use, to one of the company's limousines seven days a week between the hours of 6:00 p.m. and 6:00 a.m.  *Id*. at 143:7-144:5. SF Bay reported O'Connor's earnings during this period on a Form 1099.  *Id*. at 151:13-17.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1  know, they don't want me to work for them.  They expect me to work."  *Id*. at 63:4-9, 64:13-17.

2  LS paid Colopy by check on a regular basis.  *Id*. at 70:20-71:7, 97:11-15.  Under Colopy's

3  agreement with LS, Colopy received 48% of each fare paid by a passenger who booked Colopy's

4  services via the Uber App.  *Id*. at 98:24-99:15.  LS paid all of Colopy's business-related expenses,

5  with the exception of gasoline.  *Id*. at 102:8-22.

6       Colopy decided to leave LS because he "wished to work full-time" and at LS he "wasn't

7  allowed enough hours to work."  *Id*. at 81:5-8.  He had requested more hours from LS but was

8  told: "We can only give you what we can give you, there is [sic] other drivers."  *Id*. at 81:9-14.  In

9  April 2012, Colopy began working with Cherifi Limousine.  *Id*. at 81:2-4.  Colopy interviewed

10  with the owner of the company, who told Colopy that he had an "extremely high expectation that

11  all of his drivers have very good ratings," and that "[he] expect[ed] [Colopy] to work a lot."  *Id*. at

12  125:22-126:6, 126:10-24.  Under Colopy's agreement with Cherifi Limousine, he received 60%

13  of the monies Cherifi Limousine earned for trips Colopy provided that were booked via the Uber

14  App.  *Id*. at 127:3-129:4. Cherifi Limousine reported Colopy's earnings on a Form 1099.  *Id*. at

15  148:15-18, Ex. 20.  As with O'Connor, Defendant had no involvement whatsoever in determining

16  the financial arrangements Colopy reached with LS or Cherifi Limousine.  Colman ¶ 13.

17       **Manahan.**  Manahan, a self-employed screenwriter in Los Angeles, began using the

18  Sidecar mobile application in February 2013 in order to provide peer-to-peer ridesharing services.

19  Manahan Tr. at 71:3-6, 76:1-3.  Manahan explained at his deposition that peer-to-peer ridesharing

20  is "using an app to connect people that are already on the road to people that need rides…"  *Id*. at

21  78:9-17 ("It's essentially a glorified carpool."); *see also id*. at 205:5-9 ("Uber is a marketplace

22  that connects people that want rides with people…that drive.  Want to give the rides.  And so is

23  eBay.  You know, eBay is good for sales.  Airbnb, same kind of thing.").  At the suggestion of a

24  Sidecar passenger, Manahan signed up for access to the Uber App in March 2013 in order to

25  obtain additional ridesharing leads through the uberX platform.  *Id*. at 57:10-12, 108:20-21,

26  127:5-17.  Shortly thereafter, Manahan also signed up for access to the Lyft mobile ridesharing

27  application.  *Id*. at 92:13-21.  Manahan determined for himself which application to use based on

28  his "[g]eneral mood on the day."  *Id*. at 110:25-111:23 (Uber passengers "wanted less chitchat"

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1  and Lyft passengers "wanted to share their life story" — "So depending on my mood.").

2  Manahan could and did run the Lyft or Sidecar application and the Uber App simultaneously to

3  obtain ridesharing leads, and his personal practice was to accept whichever request he received

4  first. *Id*. at 112:7-113:10, 195:14-196:10, 198:3-22. Manahan acknowledged that he pays

5  Defendant a fee for the service Defendant provides him. *Id*. at 162:2-14 ("Paying a commission,

6  like a finders fee.").

7      **Gurfinkel.** Gurfinkel signed up for access to the uberX platform via the Uber App in

8  May 2013 while still employed full time with ADL Embedded Solutions ("ADL") as a fulfillment

9  and project manager after he became aware that ADL had had begun downsizing. Gurfinkel Tr.

10  at 40:19-41:6, 42:25-43:13, 57:14-16, 129:23-130:1. He initially logged in to the Uber App only

11  in the evenings, after finishing his full-time work for ADL. *Id*. at 58:10-59:18, 60:21-61:7.

12  Although acknowledging that he could freely use other lead generation services simultaneously

13  with the Uber App and that others did so, Gurfinkel states that he chose not to do so because he

14  "[d]idn't want to drive for anybody else." *Id*. at 133:14-134:6 ("Why would I? If I'm driving for

15  the best, why would I want to drive for anyone else?"). Gurfinkel decided for himself when and

16  where to log in to the Uber App, choosing to log in near his home and not to drive late at night for

17  family reasons, because he preferred not to interact with passengers who had been drinking, and

18  because he is a "morning person." *Id*. at 61:3-7, 61:14-62:5, 137:20-139:10, 147:17-23, 163:17-

19  164:6, 165:3-25.

20      **C.**     **The Parties' Written Agreements.**

21          **1.**     **The Software License and Online Services Agreement and the Driver Addendum Related to Uber Services.**

22

23      O'Connor's and Colopy's access to the Uber App has been governed at all relevant times

24  by a Software License and Online Services Agreement ("Licensing Agreement") the independent

25  transportation companies with which they have been affiliated entered into with Defendant, a

26  Driver Addendum Related To Uber Services ("Driver Addendum") O'Connor and Colopy

27  entered into with those transportation companies, and a City Addendum setting forth Defendant's

28  fees for the lead generation and payment processing services it provides. O'Connor Tr. at 258:3-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

9, 266:5-22, 269:19-270:5, Exs. 22-26; Colopy Tr. at 234:5-237:16, Exs. 44-48.  The Licensing

Agreements expressly provide that:

- Defendant does not provide transportation services and is not a transportation carrier; the transportation services provided by the transportation companies are fully and entirely their responsibility;

- Defendant desires to provide passengers with the ability to connect with transportation companies that maintain the highest standards of professionalism, and the transportation companies with which O'Connor and Colopy have been affiliated are independent companies in the business of providing transportation services;

- The transportation companies' employees and subcontractors are bound by the terms of the Licensing Agreements;

- The transportation companies are solely responsible for any obligations or liabilities to their drivers;

- The transportation companies are licensed to use the Uber App for lead generation service and payment processing;

- The transportation companies exercise sole control over their drivers; Defendant does not and does not intend to exercise any control over the actions of the transportation companies' drivers;

- The transportation companies and their drivers retain the sole right to determine when and for how long to use the Uber App for lead generation service;

- Transportation companies and their drivers retain the option to accept or reject each trip request they receive via the Uber App and agree only to accept at least one trip request per month in order to keep their accounts active;

- Transportation companies are paid by passengers per trip at prearranged rates, and Defendant will collect fares from passengers on behalf of the transportation companies and may deduct a specified fee per trip;

- The parties intend to create an independent contractor and not an employment relationship; and

- The agreements may be terminated (1) by either party with 7 days' written notice, (2) by Defendant without notice if the transportation companies and/or their drivers are no longer qualified under the law or Defendant's quality standards to provide transportation services, (3) by either party without notice upon a material breach by the other party.

O'Connor Tr., Ex. 23 at 1-9; Colopy Tr., Ex. 45 at 1-9.

      The Driver Addendum O'Connor and Colopy entered into provided that they agreed to be

bound by the terms of the Licensing Agreements, explained that Defendant only contracts with

transportation companies that provide high-quality service and professionalism, and explained

that Defendant reserved the right to suspend or terminate O'Connor's and Colopy's access to the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

Uber App if they failed to maintain acceptable passenger star ratings.  O'Connor Tr., Ex. 24;

Colopy Tr., Ex. 46.  Consistent with the terms of the Licensing Agreement, the Driver

Addendum also explained that access to the Uber App could be terminated immediately upon a

material breach of the Licensing Agreement.  By agreeing to the terms of the Driver Addendum,

O'Connor and Colopy specifically represented that they desired to enter into an independent

contractor and not an employment relationship with Defendant.  O'Connor Tr., Ex. 24, at iii;

Colopy Tr., Ex. 46, at iii.

### 2. The Rasier, LLC Transportation Service Agreement.

In order to gain access to the uberX lead generation platform, Manahan and Gurfinkel

each entered into a Transportation Provider Service Agreement with Rasier, LLC ("Rasier"),

Defendant's subsidiary and a licensee of the Uber App.  Manahan Tr. at 155:5-157:1, 158:24-

159:3, Exs. 15, 16; Gurfinkel Tr. at 64:24-66:13, Ex. 10.  The agreement expressly provides that:

- Rasier does not provide transportation services and is not a transportation carrier; Manahan and Gurfinkel are transportation providers who desire to enter into the agreement for the purpose of receiving lead generation services via the Uber App;

- Manahan and Gurfinkel have no obligation to log in to the Uber App at any specific time or for any specific duration—they have complete discretion to determine when to be available to receive trip requests via the Uber App, and they may refuse any trip request received via the Uber App without penalty;

- Rasier may not require display of Rasier's name, logo, or colors on Manahan's or Gurfinkel's vehicles, and Manahan and Gurfinkel are not required to wear a uniform or any other clothing displaying Rasier's name, logo, or colors;

- Rasier may not control the manner or prescribing the method Manahan and Gurfinkel use to perform transportation services booked through the Uber App — they are solely responsible for determining the most effective, efficient, and safe manner to perform the transportation services booked via the Uber App, subject only to the terms of the agreement and client specifications;

- Manahan and Gurfinkel may use subcontractors to provide transportation services booked through the Uber App, and Rasier has no authority to supervise, direct, select, approve, hire, fire, or discipline any such subcontractors;

- Manahan and Gurfinkel may enter into similar agreements with other lead generation providers, may perform transportation services for other customers, and may engage in any other occupation or business;

- Manahan and Gurfinkel have complete discretion and judgment in determining the means and methods of performance under the agreements, subject only to legal requirements, trip request parameters (e.g., pickup location, destination), and customer specifications;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

- Manahan and Gurfinkel are paid by customers per trip at prearranged rates and, in exchange for access to and use of the Uber App, they will in turn pay Rasier a fee per trip;

- Each trip request Manahan and Gurfinkel accept constitutes a separate contractual engagement;

- Manahan and Gurfinkel intend to create an independent contractor and not an employment relationship with Defendant;

- The agreements may be terminated (1) by mutual consent, (2) upon 7 days' written notice (if one party has materially breached the agreement), (3) upon 30 days' written notice by one party to the other (if without cause), or (4) upon inactivity of more than 180 days.

*See* Manahan Tr., Ex. 15 at 1-6, 9, 10, Ex. 16 at 1-6, 9, 10; Gurfinkel Tr., Ex. 10 at 1-6, 9, 10.

Like the Licensing Agreements and Driver Addendum O'Connor and Colopy accepted, the

agreements Manahan and Gurfinkel entered into with Rasier are fully integrated contracts. *See*

Manahan Tr., Ex. 15 at 16, Ex. 16 at 16; Gurfinkel Tr., Ex. 10 at 16.  Manahan and Gurfinkel

understood that by accepting the Transportation Provider Service Agreement they would be

bound by its terms.  Manahan Tr. at 159:4-17; Gurfinkel Tr. at 65:8-66:13.

### D. Plaintiffs Have Conceded That, Consistent With The Relevant Agreements, Defendant Did Not Control The Manner In Which They Performed Transportation Services Booked Via The Uber App.

Plaintiffs admitted at deposition that Defendant has never required them to log in to the

Uber App at any particular time or for any amount of time, has never set their work schedules,

has never threatened to deactivate their accounts for failure to adhere to a particular schedule, and

has never required them to accept any particular trip request received via the Uber App.

O'Connor Tr. at 210:5-211:6, 220:8-221:3, 239:1-240:7, 348:4-21; Colopy Tr. at 103:2-11,

109:11-110:7 ("Q. Sir, you are given access to an application when you are approved by Uber;

isn't that what you are given access to?  A.  That's true.  Q.  Uber is not setting your schedule for

you, correct?  A.  That is correct.  Q.  Uber is not requiring you to take any particular trip, right?

A.  I have a choice of accepting a fare or not . . .  Q.  Okay.  Whether you wanted to activate and

utilize the app, that was a decision that you exclusively made, correct?  A. Yes."); Manahan Tr. at

134:25-135:3 ("There were no set hours, so you just logged in whenever you wanted to give

rides."), 164:14-168:12, 199:12-200:1 ("enjoyed the flexibility" of the Uber App and the fact that

"there's no set schedule"), 201:11-16 (could remain offline for as long as he liked), 201:21-24,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   219:10-17; Gurfinkel Tr. at 36:23-38:2, Ex. 3 (Response to RFA Nos. 3, 6, 9), 61:3-7, 78:1-19,

2   81:22-83:22, 137:20-139:10, 163:17-166:18, 172:9-18, 174:6-11, 197:4-7, 234:13-236:23, 244:2-

3   245:22, 276:22-277:5.  When asked at his deposition whether he could unilaterally decide not to

4   use the Uber App for weeks or even months at a time, Colopy acknowledged that Defendant

5   could not prevent him from doing so but said he "would have to run it through my boss" (i.e. the

6   owner of the transportation company he works for).  *Id.* at 233:7-234:4.  Plaintiffs also conceded

7   that it was entirely up to them to determine which locations to target for pickups.  O'Connor Tr.

8   at 252:21-255:2; Manahan Tr. at 219:10-17, 222:4-223:24, 308:17-309:5; Gurfinkel Tr., Ex. 3

9   (Response to RFA No. 10), 61:14-17, 62:1-8.

10          Plaintiffs have also acknowledged that, as far as Defendant is concerned, they are free to

11   use the Lyft, Sidecar, and other similar lead generation applications simultaneously with the Uber

12   App, to provide transportation services directly to the public, and to engage in any other

13   occupation or business.  O'Connor Tr. at 262:5-263:8; Colopy Tr. at 189:21-190:15; Manahan Tr.

14   at 80:6-9, 81:3-14, 92:13-21, 108:20-22, 110:25-111:23, 112:7-113:10, 127:5-17, 195:14-196:10,

15   198:3-22; Gurfinkel Tr., Ex. 3 (Response to RFA No. 4), 112:7-14, 133:14-134:6, 136:2-18,

16   170:23-171:8, 270:5-14.  Each Plaintiff, in one way or another, took advantage of his right to do

17   so.  O'Connor Tr. at 121:12-20, 131:10-16 (while authorized to use the Uber App was also

18   employed as a doorman at the Balboa Café in San Francisco); Colopy Tr. at 153:15-155:14 (while

19   authorized to use the Uber App also worked for Tommy's Audio Video—his own business—

20   installing stereos and televisions), 31:12-32:4, Ex. 4 (Response to Interrogatory No. 8) (formed an

21   S Corporation called Tommy's Limousine Corporation); Manahan Tr. at 71:3-6, 76:1-3, 110:25-

22   111:23 (used the Sidecar, Lyft, and Uber applications simultaneously and determined for himself

23   which application to use based on his "[g]eneral mood on the day")[9]; Gurfinkel Tr. at 40:15-41:6,

24   42:25-43:13, 57:14-16, 58:10-23, 59:7-18, 60:21-24 (use of the Uber App overlapped with his

---

26   [9] In fact, Manahan's use of the Lyft application has been far more extensive than his use of the
Uber App.  Between May 1, 2013 and November 6, 2014, Manahan accepted REDACTED trip requests
27   via the Lyft application and was logged in to the Lyft application in driver mode on a total of REDACTED
days (for a total of REDACTED hours).  Hendricks ¶ 6, Ex. 6.  During the same period, Manahan
28   completed 787 trips booked via the Uber App and was logged in to the Uber App on a total of
242 days (for a total of 629.29 hours).  Colman ¶ 12.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12                                        DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1    regular employment at ADL Embedded Solutions). O'Connor and Colopy have conceded that, in

2    connection with their work for various transportation companies, the Uber App was not their only

3    source of fares. O'Connor Tr. at 206:19-207:16; Colopy Tr. at 60:5-11.

4          Plaintiffs further acknowledge that: (1) they have had only limited contact with

5    Defendant, (2) Defendant has not supplied them with a vehicle or any tools or equipment (apart

6    from trade dress required by the CPUC and an iPhone to run the Uber App), (3) Defendant has

7    not required them to wear a uniform and does not monitor what they wear, (4) Defendant has not

8    provided them with any employment benefits, and (5) Defendant has never reported their

9    earnings on a Form W-2. O'Connor Tr. at 62:24-64:10, Ex. 3 (Response to RFA Nos. 9, 10, 12),

10   128:15-25, 151:22-25, 179:15-181:13, 255:3-256:6; Colopy Tr. at 29:15-31:9, Ex. 3 (Response to

11   RFA Nos. 9, 10, 12), 161:21-163:3; Manahan Tr. at 42:4-43:2, Ex. 5 (Response to RFA Nos. 11,

12   13), 96:21-97:3, 110:7-21, 136:12-138:8, 141:5-8 154:1-9, 161:10-15, 186:6-13, Ex. 17, 273:12-

13   20, 297:14-298:19; Gurfinkel Tr. at 37:6-14, Ex. 3 (Response to RFA Nos. 11, 12, 14), 69:22-

14   71:12, 71:21-72:11, 99:1-100:9, 132:8-23, 133:5-10, 167:11-168:3.

15          **E.**                              REDACTED

16

17                              REDACTED

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

REDACTED

**F.     Other Drivers Agree That Defendant Provides Them With A Service And Does Not Control The Manner In Which They Provide Transportation Services.**

Other drivers with access to the Uber App similarly report that Defendant provides lead generation and payment processing and has no right to control, and does not control, the manner in which they provide transportation services to passengers who book those services via the Uber App.  Like Plaintiffs, these drivers understood their relationship with Defendant to be one in which Defendant provided them leads — leads that accounted for between 10% and 100% of their business.[10]  They also agree that Defendant had no control over how they conducted their independent businesses, including when and whether to log into the Uber App, what hours to work, where to seek passengers, whether to use other lead generation services simultaneously with the Uber App or their own marketing to locate customers, what car to drive, or what clothing to wear.[11]  Drivers also agree that they operate and are paid as independent businesses, in many cases filing taxes as self-employed businesspersons and taking business deductions.[12]  Drivers report making  significant investments in their own businesses — purchasing a car or cars to drive, global positioning systems for directions, obtaining licenses and registering with state and local agencies, and, in some cases, hiring their own drivers and paying for their own marketing

---

[10] M. Ahmed ¶ 3; Akopov ¶ 7; Bisneto ¶¶ 3, 4, 6, 10; Canlas ¶ 9; Chakhalidze ¶ 6; Edwards ¶¶ 6, 8; Fields ¶ 11; Forester ¶¶ 6, 29; Galadjian ¶¶ 6, 8; Ilmi ¶¶ 4, 20; Mandour ¶ 19; Matevosyan, ¶ 2; Morgan ¶ 4, 12; Origat ¶ 4; Parsons ¶ 6; Trouplin ¶¶ 3, 7, 11; Wilson ¶ 4.

[11] M. Ahmed ¶¶ 9, 11-12, 14; Akopov ¶¶ 12-15; Bisneto ¶¶ 8, 9, 11, 23; Bouhelal ¶¶ 8, 15, 22; Canlas ¶¶ 12, 30; Chakhalidze ¶ 16 ; Cooper ¶¶ 12-14, 16; Edwards ¶¶ 6, 9, 10; Fields ¶¶ 11, 12, 16, 22; Forester ¶¶ 13, 14, 22-24, 27, 28; Galadjian ¶¶ 9-10, 14-16; Ilmi ¶¶ 11, 12, 14, 15, 18; Mandour ¶¶ 11, 12, 14, 16, 18, 20; Matevosyan ¶¶ 10-12, 17, 19, 20; Morgan ¶¶ 14-17; Origat ¶¶ 9-12, 15; Parsons ¶¶ 6, 10, 16, 17; Pinheiro ¶¶ 9, 15, 18, 20; Traore ¶¶ 6, 7-9, 11-14, 17, 22; Trouplin ¶¶ 2, 3, 10, 13-15, 18, 20; Wilson ¶¶ 12, 15, 17, 21; Yaldiz ¶¶ 11, 17, 18.

[12] Akopov ¶ 19; Bisneto ¶¶ 7, 8, 13, 21; Bouhelal ¶ 24; Canlas ¶¶ 20, 22; Chakhalidze ¶ 8; Cooper ¶¶ 9, 17; Fields ¶¶ 18, 23; Forester ¶ 21; Ilmi ¶ 22; Mandour ¶ 21; Matevosyan ¶ 23; Morgan ¶ 22; Origat ¶ 18; Pinheiro ¶ 21; Traore ¶¶ 7, 12, 16; Wilson ¶ 24.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1    expenses, such as websites, business cards, and yellow page advertisements.[13]  Drivers also attest

2    that they do not receive any training or evaluations from Defendant, receiving only limited

3    guidance on how to use the Uber App.[14]

4         G.    **The Labor Commissioner Has Likewise Determined That A Driver's Use Of**
               **The Uber App Does Not Give Rise To An Employment Relationship.**

5

6         Significantly, the Labor Commissioner has already held a hearing on a wage claim by a

7    putative class member who used the Uber App and claimed that he thereby became Defendant's

8    employee.  *The Labor Commissioner dismissed the plaintiff's claim, concluding that it lacked*

9    *jurisdiction because the plaintiff "performed services as an independent contractor of Defendant,*

10   *and not as a bona fide employee.*"  *See* Colman ¶ 14, Ex. 7 at 3 (emphasis added).  Based on the

11   evidence presented, the Labor Commissioner concluded that the following factors compelled a

12   finding that the plaintiff was *not* Defendant's employee: (1) "Defendant's business was engaged

13   in technology and not the transportation industry," (2) [t]he services Plaintiff provided were not

14   part of the business operated by Defendant," (3) "Plaintiff provided similar services for others,"

15   (4) "[t]he work arrangement was paid at a per-job rate," (5) "Plaintiff provided the means to

16   complete the job," (6) "Plaintiff set his own hours, and controlled the manner in which he

17   completed the job," and (7) "Defendant did not supervise or direct his work."  *Id*. at 3.

18   IV.    **LEGAL ARGUMENT**

19         A.    **Summary Judgment Standard.**

20         Summary judgment is proper when the evidence shows that there is "no genuine dispute

21   as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

22   Civ. P. 56(a).  The opposing party may not rely on generalizations or characterizations to create a

23

24   [13] M. Ahmed ¶ 3; Akopov ¶¶ 3, 5, 20, 21; Bisneto ¶¶ 5, 7, 8, 11, 18-21; Bouhelal ¶ 4; Canlas ¶¶ 4,
     5, 10, 12; Chakhalidze ¶¶ 3, 4; Cooper ¶¶ 4, 17; Edwards ¶¶ 5, 12; Fields ¶¶ 5, 8, 9, 23;

25   Forester ¶¶ 3, 8-11; Galadjian ¶¶ 3, 4, 17; Ilmi ¶¶ 7, 9, 15; Mandour ¶¶ 3, 13, 19; Matevosyan ¶¶
     3, 7, 15, 16; Morgan ¶ 12; Origat ¶ 6; Parsons ¶¶ 7, 9, 13-15; Pinheiro ¶¶ 5, 6, 21; Traore ¶¶ 9, 15;

26   Trouplin ¶ 4; Wilson ¶¶ 3, 19, 24; Yaldiz ¶¶ 3, 6, 8, 12-14.

27   [14] M. Ahmed ¶¶ 7, 16; Bisneto ¶ 3, 24; Bouhelal ¶ 21; Canlas ¶ 29; Chakhalidze ¶¶ 6, 13;
     Forester ¶ 26; Ilmi ¶¶ 16, 17; Matevosyan ¶¶ 4, 6, 13; Morgan ¶¶ 5, 20; Origat ¶¶ 5, 13; Pinheiro

28   ¶ 13; Traore ¶ 4; Trouplin ¶ 19; Wilson ¶¶ 6, 22.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

genuine issue of material fact to defeat summary judgment.  *See Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal.App.4th 580, 588 (2011) ("We examine the opposing *evidence* rather than the opposing party's characterization of that evidence . . .") (emphasis in original).  Where the underlying facts are not in dispute, an individual's employment status is a question of law appropriate for resolution at summary judgment.  *See Tieberg v. Unemp't Ins. App. Bd.*, 2 Cal.3d 943, 951 (1970) ("[W]here the facts are without conflict, existence of an employment relationship is a question of law."); *Rabanal v. Rideshare Port Mgmt. LLC*, Case No. B239708, 2013 WL 6020340 (Cal. Ct. App., Nov. 14, 2013) (unpublished);[15] *Hennighan v. Insphere Ins. Solutions, Inc.*, Case No. 13-cv-00638, 2014 WL 1600034 (N.D. Cal. April 21, 2014).[16]

## B.   Plaintiffs Are Not Defendant's Employees As A Matter Of Law.

Plaintiffs cannot prevail on any of their claims unless they are deemed Defendant's "employees."  *See* Cal. Lab. Code § 2802 ("An employer shall indemnify his or her *employee* for all necessary expenditures . . . .") (emphasis added); Cal. Lab. Code § 351 ("No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given, to, or left for *an employee* by a patron.") (emphasis added).[17]

### 1.   Plaintiffs Are Not Defendant's Employees Because They Do Not Provide Services To Defendant.

As set forth above, Plaintiffs' access to the Uber App was governed by contracts under which Defendant agreed to provide them with lead generation and payment processing services, and they (or the transportation companies they were affiliated with) agreed to pay a fee for those

---

[15] The Court may consider unpublished California appellate decisions as persuasive authority. *Turner v. City and County of San Francisco*, 892 F.Supp.2d 1188, 1202 n.3 (N.D. Cal. 2012) (Chen, J.), citing *Emp'rs  Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

[16] Employment status remains a question of law even if not all factors of the right-to-control test point in the same direction. *See, e.g., Arnold*, 202 Cal.App.4th at 590 ("[S]ummary judgment is . . . proper when . . . all factors weighed and considered as a whole establish that [plaintiff] was an independent contractor and not an employee."); *Varisco v. Gateway Science and Engineering, Inc.*, 166 Cal.App.4th 1099, 1107 (2008) (although some "of the factors set forth in *Borello* . . . suggest an employment relationship, when all the factors are weighed and considered as a whole . . . [plaintiff] was not an employee").

[17] Absent such a finding, the derivative UCL claim will also fail.  *Prachasaisoradej v. Ralph's Grocery Co.*, 42 Cal.4th 217, 244 (2007) (derivative UCL claim fails with underlying claim).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   services.  Because Plaintiffs have not provided a service to Defendant, they cannot have been its

2   employees as a matter of law.  The history of the employer/employee relationship in California

3   stems from the historical definition of the "master-servant" relationship, as described in the

4   *Restatement (Second) of Agency*.  A "master-servant" relationship is formed when one person is

5   employed to "*perform services* for another, and . . . is subject to the other's control while

6   performing those services."  *Kruger v. Mammoth Mountain Ski Area, Inc.*, 873 F.2d 222, 223 (9th

7   Cir. 1989) (emphasis added); *see also Varisco*, 166 Cal.App.4th at 1103 ("[T]he relationship of

8   *master and servant* or *employer* exists whenever the employer retains the right to direct how the

9   work shall be done as well as the result to be accomplished.") (emphasis added).   An independent

10  contractor is one who "*renders service* in the course of an independent employment or

11  occupation," following the hiring party's "desires only in the results of the work, and not the

12  means whereby it is to be accomplished."  *Varisco*, 166 Cal.App.4th at 1103.

13          Accordingly, to demonstrate he is part of either an employment or an independent

14  contractor relationship, a plaintiff must first satisfy a threshold requirement — demonstrating that

15  he "performed services" for another.  *See Kubinec v. Top Cab Dispatch, Inc.*, Case No.

16  SUCV201203082BLS1, 2014 WL 3817016, at *10 (Super. Ct. Mass. June 25, 2014) ("[T]he

17  three-part test that determines whether an individual is an employee or an independent contractor

18  must be undertaken only if the plaintiff is providing a service for the defendant."); *Yellow Cab*

19  *Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal.App.3d 1288, 1293 (1991) (court must first

20  determine whether plaintiff was providing a "service" to purported employer before determining

21  whether he was otherwise exempt from employment laws as an independent contractor); *Golden*

22  *Shear Barber Shop v. Morgan*, 481 P.2d 624, 627 (Or. 1971) ("Under [Oregon employment]

23  statutes, only services performed for an employer for remuneration can constitute employment.

24  *Until these elements are established, the question of 'control' . . . need not be reached.*")

25  (emphasis added); *Gilchrist v. Div. of Emp. Sec.*, 137 A.2d 29, (N.J. Super. Ct. 1957) (test for

26  employment status to be performed only once determined that plaintiff performed services for the

27  defendant).

28          In *Kubinec*, the plaintiff drove his own taxi cab and entered into a contract with the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1    defendant, Top Cab, under which Top Cab provided radio dispatch services for a set rate.

2    *Kubinec*, 2014 WL 3817016, at \*1.  Top Cab was in the business of radio dispatch and

3    communication services, and its only source of income was providing those dispatch services and

4    leasing communications equipment to its member drivers for a fee.  *Id*.  The plaintiff sued Top

5    Cab for, among other things, misclassification as an independent contractor and violation of wage

6    payment laws.  *Id*.  The court held that the plaintiff was not an employee, finding as a threshold

7    matter that the plaintiff did not even provide a service to Top Cab.  *Id*. at \*9 ("Simply stated,

8    Kubinec's assertion that he is Top Cab's employee makes no sense.").  Granting summary

9    judgment for Top Cab, the court concluded that the plaintiff had provided no evidence that *he*

10   provided services to *Top Cab*, finding instead that the evidence suggested the opposite

11   relationship — i.e., that the plaintiff received a valuable service *from* Top Cab.  *Id.* at \*10 ("[I]n

12   the real world taxi drivers compete for fares, and it is Top Cab that provides the service of

13   offering dispatches to its members . . . .").

14        This Court's inquiry into Plaintiffs' employment status may end here, because the

15   undisputed facts show that Plaintiffs did not perform any services for Defendant.  To the contrary,

16   Defendant, by providing leads, connecting drivers to passengers, and seamlessly processing

17   payment of fares, provides a service to drivers and receives a fee for that service in return.  Any

18   argument by Plaintiffs that they do provide a service to Defendant by satisfying Defendant's

19   contractual obligation to arrange for or provide transportation services to passengers will fail,

20   because Defendant has no such obligations.  As set forth above, Defendant's only obligation to

21   passengers is to provide them with a mobile application through which they can make trip

22   requests to third-party providers.

23                  **2.     Even If Plaintiffs Could Be Considered To Have Provided A Service
                           To Defendant, They Did So As Independent Contractors—Not
24                         Employees—Under California Law.**

25        Even if Plaintiffs have "provided services" to Defendant — which they have not — they

26   are still not Defendant's "employees."  Under California law, "the principal test of an

27   employment relationship is whether the person to whom service is rendered has the right to

28   control the manner and means of accomplishing the result desired."  *S.G. Borello & Sons, Inc. v.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

*Dept. of Ind. Relations*, 48 Cal.3d 341, 350 (1989).[18]  "Significantly, what matters under the

common law is not how much control a hirer exercises, but how much control the hirer retains the

*right* to exercise." *Ayala v. Antelope Valley Newspapers, Inc*., 59 Cal.4th 522, 533 (2014)

(emphasis in original).  "[T]he right to exercise complete or authoritative control must be shown,

rather than mere suggestion as to detail." *Ali v. U.S.A. Cab Ltd*., 176 Cal.App.4th 1333, 1347

(2009) ("A worker is an independent contractor when he or she follows the employer's desires

only in the result of the work, and not the means by which it is achieved."); *see also Millsap v.

Fed. Express Corp*., 227 Cal.App.3d 425, 431 (1991).  "[T]he owner may retain a broad general

power of supervision and control as to the results of the work so as to insure satisfactory

performance of the independent contract—including the right to inspect, the right to make

suggestions or recommendations as to details of the work, the right to prescribe alterations or

deviations in the work — without changing the relationship from that of owner and independent

contractor . . . ." *McDonald v. Shell Oil Co*., 44 Cal.2d 785, 790 (1955).  Where the parties have

entered into a written contract, determining the extent of the alleged employer's legal right to

control "without full examination of the contract will be virtually impossible." *Ayala*, 59 Cal.4th

at 535; *see also Tieberg*, 2 Cal.3d at 952 (written agreements are a "significant factor" in

assessing the right to control); *Grant v. Woods*, 71 Cal.App.3d 647, 653 (1977) ("Written

agreements are of probative significance" in evaluating the extent of a hirer's right to control.).

> **a.    Defendant Has No Right To Exercise "Authoritative Control"
> Over Plaintiffs' Provision Of Transportation Services.**

Here, as set forth in Section III, *supra*, it is undisputed that Plaintiffs (or the companies

they worked for) independently determined how they would provide transportation services and

---

[18] *Borello* applied the common law test in the worker's compensation context and explained that, *in that specific context*, courts should apply the test "with deference to the purposes of the protective legislation."  48 Cal.3d at 352-53 ("*[I]n worker's compensation cases*, the employee-independent contractor issue cannot be decided absent consideration of the remedial statutory purpose" of the worker's compensation statutes) (emphasis added).  Importantly, however, no such deference applies *outside* the worker's compensation context.  *See Arnold*, 202 Cal.App.4th at 588 (expressly rejecting employee status presumption in context of a Labor Code section 2802 claim, holding that "the common law test for employment applies to such claims").  Accordingly, cases addressing a worker's employment status in the worker's compensation context must be treated with some caution outside that context.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   that, as far as Defendant was concerned, they were free to use the Uber App as much or as little as

2   they liked for the purpose of locating fares.  The contracts that governed Plaintiffs' access to the

3   Uber App — the primary evidence of the extent of Defendant's right to control — required only

4   that they accept at least one trip request per month (in the case of O'Connor and Colopy) or per

5   180 days (in the case of Manahan and Gurfinkel) in order to retain their access to the Uber App,

6   provided that the transportation services Plaintiffs provided were entirely their responsibility, and

7   stated the parties' intent to enter into an independent contractor  relationship.  It is undisputed

8   that, consistent with those contracts, Defendant did not set Plaintiffs' schedules, did not require

9   them to log in to the Uber App for any minimum amount of time, did not require them to accept

10  any particular trip request they received via the Uber App, did not assign them a territory, did not

11  restrict them from using other similar lead generation services simultaneously with the Uber App,

12  and did not restrict them from engaging in any other occupation or business.  It is also undisputed

13  that Defendant did not supply Plaintiffs with a vehicle or any tools or equipment (apart from

14  CPUC-required trade dress and an iPhone leased from Defendant to run the Uber App) and that

15  Defendant did not provide Plaintiffs with employment benefits.  Plaintiffs also admit that

16  Defendant reported the revenue they derived through Uber App booked trips on 1099 Forms and

17                                 REDACTED

18          In *Rabanal,* a recent case quite similar on its facts to the instant case, the California Court

19  of Appeal affirmed the trial court's determination on summary judgment that shuttle drivers were

20  independent contractors, not employees, in large part because "[t]hey decided when they wanted

21  to work and whether they wanted to obtain fares from [the defendant's] dispatch, or drive loops,

22  or solicit fares from other transportation networks such as Expedia, Go Airport, and Shuttle Fare"

23  and because "[t]here were no set hours or schedules."  *Rabanal*, 2013 WL 6020340, at *7 ("In

24  sum, [the defendant] acted as a broker by providing a service to its customers and its control was

25  limited to the results of plaintiffs' work, namely picking up and dropping off passengers, not how

26  those results were achieved.").[19]  As here, the *Rabanal* plaintiffs decided for themselves when to

---

[19] *See also State Comp. Ins. Fund v. Brown*, 32 Cal.App.4th 188, 202-03 (1995) ("*Brown*")
(drivers held to be independent contractors where they made substantial capital investments in
their own vehicles, and were paid on a job-by-job basis, and the defendant functioned as a broker

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

work, whether to obtain fares from the defendant or from other sources, what routes to take, and what geographical areas to work in. *Id*. at *2-3. As here, the *Rabanal* plaintiffs were paid by the fare and could decline to accept any fare the defendant offered to them. *Id*. at *2. As here, the defendant in *Rabanal* did not set drivers' schedules and did not require drivers to report to anyone on a regular basis. *Id*. And as here, the *Rabanal* plaintiffs entered into contracts that stated the parties' intent to form an independent contractor and not an employment relationship. *Id*.

Similarly, in *Mission Insurance Co. v. Workers' Compensation Appeals Board*, 123 Cal.App.3d 211 (1981) ("*Mission*"), the California Court of Appeal held that the following facts, among others, supported a finding that a driver was an independent contractor and not an employee: (1) he worked no specific hours, (2) he worked without supervision, (3) his work was "inspected only in the event of a specific customer complaint," and (4) he used his own vehicle and paid his own expenses. *Id*. at 216-17. The *Mission* court explained that merely because the defendant "prescribed standards of performance and that [the plaintiff] on occasion attended lectures or classes . . . was not evidence that [the defendant] controlled the manner in which the desired result was to be achieved. *Id*. at 221-22; *see also id*. at 224 ("We reject the . . . conclusion that [the defendant's] establishing quality standards for the completed work is indicative of an employer-employee relationship or constitutes evidence of subterfuge. On the contrary, an employer who controls the manner in which the work is done has little need of establishing quality standards for completed work; such standards are indicative that [the defendant's] primary interest was in the quality of the result rather than the manner in which the work was done and constitutes evidence that applicant was an independent contractor.").

Plaintiffs' complete freedom to set their own schedules, to decide whether and when to accept trip requests via the Uber App, and to determine where in the city to wait for passengers is particularly probative of the control they retained over their own livelihoods. *See Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366, 374-78 (D. D.C. 1983) (finding drivers' ability to choose who directed drivers to customer pick-up and drop-off locations); *Sahinovic v. Consolidated Delivery & Logistics, Inc*., Case No. C 02-4966 SBA, 2004 WL 5833528 (N.D. Cal. Sept. 13, 2004) (delivery drivers independent contractors as a matter of law where they used their own vehicles, paid for gas and vehicle maintenance, and did not receive employment benefits, even though they were required to wear uniforms and to follow detailed instructions).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   hours of work, freedom to reject dispatch calls and forgo business, ability to foster own business

2   with repeat customers outside of company's knowledge, and unobtrusive suggested dress code

3   precluded a finding that the company had the right to control cab drivers); *Arnold*, 202

4   Cal.App.4th at 585 (finding that plaintiff's ability to determine "who she would solicit for

5   applications for Mutual's products, when and where she would do so, and the amount of time she

6   spent engaging in such solicitations" supported her classification as independent contractor);

7   *Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 946 (9th Cir. 2010) (finding that plaintiff's

8   ability to "decide[] when and where to work" and "schedule[] her own time off" "strongly

9   favor[ed]" her independent contractor classification).  Plaintiffs' ability to log in to other lead

10   generation applications while also logged in to the Uber App and to provide transportation

11   services to anyone they liked is also significant evidence of their independent contractor status.  If

12   Plaintiffs were Defendant's employees, they would obviously not be permitted simultaneously to

13   "work for" Defendant's competitors.  Indeed, by doing so as employees they would breach their

14   duty of loyalty to Defendant.  *See Fowler v. Varian*, 196 Cal.App.3d 34, 41 (1987) (employee

15   breached duty of loyalty to employer by becoming involved with a competing business).

16        As set forth above, under the principal test for employment under common law principles,

17   Defendant had no significant right to control the manner and means by which Plaintiffs

18   accomplished the results of the transportation services they provided to passengers who booked

19   their services via the Uber App.

20             **b.**    **The *Borello* Secondary Factors Also Support A Finding That**

21                   **Plaintiffs Were Independent Contractors.**

22        Courts applying California's common law test of employment status also take a variety of

23   secondary factors into consideration.  *Borello*, 48 Cal.3d at 350-51.  These "'individual factors'

24   [are] not to be 'applied mechanically as separate tests' but [are] 'intertwined' and often given

25   weight depending on the particular combination of factors."  *Arnold*, 202 Cal.App 4th at 584

26   (quoting *Borello*, 48 Cal.3d at 351).  "Even if one or two of the individual factors might suggest

27   an employment relationship, summary judgment is nevertheless proper when, as here, all the

28   factors weighed and considered as a whole establish that [Plaintiffs were] independent

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1    contractor[s] and not [] employee[s] . . . ." *Arnold*, 202 Cal.App.4th at 590.  The secondary

2    factors, taken together, support a finding here that Plaintiffs are not Defendant's employees.

3                    **(1)    Plaintiffs And Defendant Could Terminate Their**
                             **Agreement.**
4

5           A mutual termination clause is evidence of an independent contractor relationship. *See*

6    *Beaumont-Jacques v. Farmers Grp., Inc.*, 217 Cal.App.4th 1138, 1147 (2013); *DeSimone v.*

7    *Allstate Ins. Co.*, 2000 WL 1811385, at *15 (N.D. Cal. Nov. 7, 2000) ("A mutual termination

8    provision is consistent either with an employment-at-will relationship or parties in a continuing

9    contractual relationship."); *Arnold*, 202 Cal.App.4th at 589 ("a termination at-will clause for both

10   parties may properly be included in an independent contractor agreement, and is not by itself a

11   basis for changing that relationship to one of an employee"); *Hennighan*, 2014 WL 1600034, at

12   *14 ("Since there was a mutual termination clause here, this factor weighs in favor of

13   [independent contractor status]."); *Brown*, 32 Cal.App.4th at 203 (agreement terminable at will by

14   either party with notice "is consistent either with an employment-at-will relationship or parties in

15   a continuing contractual relationship").  Here, as set forth above, the relevant contracts allow

16   either party to terminate the contracts with notice or upon the other party's material breach.

17   O'Connor Tr., Ex. 23 at 9; Colopy Tr., Ex. 45 at 9; Manahan Tr., Exs. 15, 16 at 10; Gurfinkel Tr.,

18   Ex. 10 at 10.   Because of the significant control Plaintiffs possess—including control over when,

19   where, and how often to use the Uber App—and because each trip request Manahan and

20   Gurfinkel accept constitutes a separate contractual engagement, the termination clause truly is

21   mutual.  This factor accordingly favors independent contractor status.

22                    **(2)    Plaintiffs Engage In A Distinct Occupation Or Business.**

23          "If a worker is engaged in a distinct occupation or business, then that would suggest that

24   the worker is an independent contractor rather than an employee."  *Harris v. Vector Mktg. Corp.*,

25   656 F.Supp.2d 1128, 1138 (N.D. Cal. 2009) (that the plaintiff's relationship "was nonexclusive,

26   and she in fact solicited for other insurance companies during her appointment" supported her

27   status as an independent contractor).  Here, each of the Plaintiffs has acknowledged that their

28   relationship with Defendant (or Rasier, in the case of Manahan and Gurfinkel) was non-exclusive

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   and that they did and/or could obtain referrals from other sources, which supports their

2   classification as independent contractors.  *See Hennighan*, 2014 WL 1600034, at *12 (fact that

3   relationship was non-exclusive supported independent contractor status).[20]

4   REDACTED

5                                                                       *Id*.  Finally, it is undisputed

6   that O'Connor and Colopy were affiliated with transportation companies that held themselves out

7   to the public as distinct businesses.  This factor weighs in Defendant's favor.

8                         **(3)    Plaintiffs Drove Passengers Without Supervision By
                                    Defendant.**
9

10          The fact that work is done by a specialist without supervision favors an independent

11   contractor relationship.  *Id*. at *13.  This is especially the case where "a plaintiff can determine

12   her own day-to-day hours, including her vacations and on most days fix the time of her arrival

13   and departure at her office and elsewhere, including lunch and breaks."  *Id.*; *see also Rabanal*,

14   2013 WL 6020340, at *2-7 (drivers' freedom to decide when to leave for pickup and what route

15   to take, and whether to accept or decline any fare offered, evidenced a lack of supervision by the

16   defendant and supported drivers' classification as independent contractors).  As at least one court

17   has noted, "this factor is largely duplicative of the control factor."  *Harris*, 656 F.Supp.2d at 1139.

18   Here, Plaintiffs do not dispute that Defendant did not set their schedules and did not supervise

19   their work.  While Plaintiffs will likely suggest that the star rating system permitted Defendant to

20   "supervise" them in some way, imposing quality standards in no way undermines the independent

21   contractor relationship.  *See Mission*, 123 Cal.App.4th at 221-22.

22                         **(4)    Plaintiffs' Occupation Requires Skill.**

23          "A fact finder is more likely to classify someone as an independent contractor when the

24   work involved requires highly specialized or educated skills."  *See Sahinovic,* 2004 WL 5833528

25   at *7.  In *Sahinovic*, a case in which "the primary skills involve[d] driving and delivery," Judge

26

---

27   [20] That O'Connor continued providing transportation services after his access to the Uber App
     was discontinued also supports a finding that he was engaged in a distinct occupation or business.
28   *Id.*  ("That Hennighan apparently continued selling insurance after his termination by Insphere
     also suggests an independent-contractor status.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1    Armstrong of this District concluded that "this factor is neutral or slightly favors a finding that

2    Plaintiffs are [independent contractors]." *Id.* (citing numerous cases in which courts concluded

3    that professional drivers are properly classified as independent contractors).

    **(5)      Plaintiffs Supplied Their Own Instrumentalities for**
4               **Transporting Passengers.**

5

6          "Where the defendant 'did not furnish the majority of the tools and instrumentalities' nor 'a

7    place to work' this fact weighs in favor of finding an independent-contractor relationship."

8    *Hennighan*, 2014 WL 1600034, at *13; *see also Rabanal*, 2013 WL 6020340, at * 7 (granting

9    summary judgment for defendant in part because drivers supplied their own clothing and owned

10   or leased their own vans); *Arnold*, 202 Cal.App.4th at 589 (granting summary judgment for

11   defendant in part because plaintiff "was responsible for her own instrumentalities or tools with the

12   exception of limited resources offered by Mutual to enhance their agents' successful solicitation of

13   Mutual's products").  Here, Plaintiffs have conceded that, apart from an iPhone leased from

14   Defendant to run the Uber App and CPUC-required trade dress (in the form of a removable

15   magnetic "U" light placed anywhere on the vehicle during trips procured through the App),

16   Defendant did not provide them any tools or instrumentalities.  Plaintiffs used their own vehicles,

17   or vehicles made available to them by their transportation companies, to provide transportation

18   services to passengers, whether booked via the Uber App or otherwise.

    **(6)      The Indefinite Duration Of The Parties' Contracts Does**
19               **Not Support Employment Status.**

20

21          A worker's engagement for a lengthy period of time tends to favor employment status, but

22   courts have concluded that a long-term or indefinite contract does not support employment status

23   when the contract is terminable at will by either side or when work is performed on a job-by-job

24   basis without any obligation on the part of the worker to accept any assignment. *See Hennighan*,

25   2014 WL 1600034, at *13-14 (this factor neutral where the relationship between the parties "lasted

26   only two years" and was "terminable at will by either side"); *Brown*, 32 Cal.App.4th at 203 ("The

27   contracts are indefinite, which gives the relationship the permanence associated with employment.

28   However, the work is performed and compensated on a job-by-job basis, with no obligation on the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   part of the independents to accept any assignment and no retribution by [the defendant] for

2   refusing assignments."). Here, as in *Hennighan*, the parties' contracts contain mutual termination

3   provisions. As in *Brown*, Plaintiffs are compensated per trip, and they are under no obligation to

4   log in to the Uber App or to accept any trip request they receive via the application. This factor

5   accordingly either supports independent contractor status or is neutral.

6           **(7)    Plaintiffs' Work Was Not Part Of Defendant's Regular**
            **Business.**
7

8           The work Plaintiffs performed — driving passengers — is distinct from Defendant's

9   principal business of developing mobile lead generation and payment processing software. In

10  *Kubinec*, the Massachusetts Superior Court recognized this distinction, finding that the defendant

11  Top Cab's business was not a passenger ride service, but rather that it "provides a communication

12  and referral service and leases equipment for a flat fee." 2014 WL 3817016, at *11. Top Cab

13  itself employed no drivers, nor did it own or lease any taxi medallions or taxis. *Id*. The court

14  therefore determined that the services the plaintiffs performed were "outside the usual course of

15  the business of the employer." *Id*. Here, as in *Kubinec*, Defendant owns no vehicles and does not

16  provide transportation services to passengers; it develops and licenses mobile software

17  applications. In *Brown*, the California Court of Appeal held that this "was not a strong factor

18  either way" because, "[d]epending on how one defines [the defendant's] 'business,' the work

19  performed by the [plaintiffs] can either be considered an integral part of providing transportation

20  services, or it could be considered a tangential aspect of the provision of brokering services." 32

21  Cal.App.4th at 203. Here, Defendant cannot reasonably be said to be in the "transportation

22  business" because it has no obligation under its contracts with passengers to provide them with

23  transportation services or even to ensure that they receive such services from third-party

24  providers. Colman ¶¶ 5-6, Exs. 1-4. Nor is the Uber App exclusively focused on transportation

25  providers. *Id*. ¶ 6. Like the defendant in *Rabanal*, Defendant here acted as a *broker* of

26  transportation services, not as a *provider* of transportation services. *Rabanal*, 2013 WL 6020340

27  at *7. This factor accordingly favors Defendant or is, at the very least, neutral.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

**(8)**      **Plaintiffs Were Paid Not By The Hour But Per Trip.**

Payment by the hour suggests an employment relationship; payment by the job suggests an independent contractor relationship. *See Harris,* 656 F.Supp.2d at 1140; *Hennighan*, 2014 WL 1600034, at *14; *Rabanal*, 2013 WL 6020340, at *7 (drivers paid by the trip and issued IRS K-1 and 1099 forms were independent contractors as a matter of law). Here, Plaintiffs were paid per trip, not by the hour. This factor favors Defendant.

**(9)**      **Plaintiffs Stated Their Intent To Enter Into An Independent Contractor Relationship.**

Entering an agreement stating an intent to enter into an independent contractor relationship is significant evidence of independent contractor status. *See Arnold*, 202 Cal.App.4th at 584-85 (contract providing that plaintiff was "an independent contractor and not an employee" and that no terms of the contract "shall be construed as creating an employer-employee relationship" supported independent contractor status); *Beaumont-Jacques,* 217 Cal.App.4th at 1145 (citing the parties' independent contractor agreement providing for "no employer/employee relationship" as evidence of plaintiff's independent contractor status); *Mission*, 123 Cal.App.3d at 226 ("When, as here, the parties have entered into a written agreement setting forth the details of their relationship and, indeed, expressly stating the legal relationship they intended to create, such agreement is a significant factor for consideration."). Here, it is undisputed that, in the agreements governing their use of the Uber App, Plaintiffs expressed an intent to enter into an independent contractor and not an employment relationship. O'Connor Tr., Ex. 23; Colopy Tr., Ex. 45; Manahan Tr., Exs. 15, 16; Gurfinkel Tr., Ex. 10.

As set forth above, any control Defendant exercised over Plaintiffs was unrelated to the manner and means by which they accomplished their work and was directed more toward the results of their work. All of the *Borello* factors are either in Defendant's favor or neutral. As Plaintiffs cannot point to any genuine dispute of material fact as to their independent contractor status, summary judgment should be entered in Defendant's favor.

///

///

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

### 3.    Defendant Is Not A "Joint Employer" Of O'Connor Or Colopy.

Plaintiffs' counsel has suggested that Defendant may have jointly employed O'Connor and Colopy with the transportation companies they worked for.  However, under the test for joint employment articulated by the California Supreme Court in *Martinez v. Combs*, 49 Cal.4th 35 (2010), and in light of Plaintiffs' own testimony, Defendant was not their joint employer as a matter of law.  Under the *Martinez* test, an entity is not liable as a "joint employer" unless it: (a) exercises control over wages, hours or working conditions; (b) suffers or permits the relevant work; or (c) engages in a common law employment relationship.  *Id*. at 58-64; *see also Futrell v. Payday Cal., Inc.*, 190 Cal.App.4th 1419, 1429 (2010).  As discussed above, O'Connor and Colopy cannot establish the third prong: that they are employees under California's common law employment test.  As a result, to demonstrate an employment relationship under the *Martinez* standard, Plaintiffs must show that Defendant controlled their wages, hours or working conditions, or that Defendant "suffered or permitted" them to work.   Undisputed evidence compels the contrary conclusion.

### a.    Defendant Did Not Exercise Control Over Plaintiffs' Wages, Hours, Or Working Conditions.

In *Martinez*, under circumstances in some ways similar to those presented here, the California Supreme Court held that the purported joint employers did not exercise sufficient control over the plaintiffs' wages, hours, or working conditions to be deemed their employer under California law.  49 Cal.4th at 72 ("Munoz alone, with the assistance of his foremen, hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay (hourly or piece-rate), and set their hours, telling them when and where to report to work and when to take breaks").  Significantly, the Supreme Court held that the purported joint employers did *not* control the plaintiffs' working conditions through their "activities in the areas of quality control and contract compliance." *Id*. at 75. *See also Braboy v. Staples, Inc.*, No. C 09-4534 PJH, 2011 WL 743139, at *2 (N.D. Cal. Feb. 24, 2011) (company that interviewed and hired the plaintiff, signed her offer letter, issued her paychecks and Form W-2s, maintained her payroll records, supervised her daily work, and evaluated her performance — and not Staples — was her

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC

1   employer under California law, even though various documents the plaintiff received and signed

2   referred to Staples as her employer); *Futrell*, 190 Cal.App.4th at 1431-33 (purported joint

3   employer lacked sufficient control to become an "employer" because, although it issued

4   paychecks to plaintiff, calculated her pay, and withheld employment taxes, it lacked actual

5   control over the worksite and did not engage in day-to-day supervision of the plaintiff's work);

6   *Rosales v. El Rancho Farms*, 2011 WL 6153276, at *14-16 (E.D. Cal. Dec. 12, 2011) (El Rancho

7   not the plaintiffs' employer even though its personnel trained them, inspected their work, and

8   supervised them to ensure that they were performing their work according to specifications

9   because supervision for the purpose of quality control is "collateral, indirect control" that does not

10   create a joint employer relationship under California law) (citing *Martinez*, 49 Cal.4th at 46).

11       As described in detail in Section III, *supra*, Defendant did *not* hire O'Connor or Colopy,

12   supervise them, instruct them when and where to report to work, when to start, stop and take

13   breaks, provide their tools and equipment, set their wages, pay them, handle their payroll or taxes,

14   or provide them with employment benefits, among other factors.  Accordingly, because it has not

15   exercised control over their wages, hours, or working conditions, Defendant has not been their

16   employer under California law.

17                  **b.      Defendant Did Not Suffer Or Permit Plaintiffs To Work.**

18       In *Martinez*, the Supreme Court explained that "the historical meaning [of the phrase

19   "suffer or permit to work"] continues to be highly relevant today:  A proprietor who knows that

20   persons are working in his or her business without having been formally hired, or while being

21   paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it,

22   while having the power to do so."  49 Cal.4th at 69.  The Supreme Court rejected the argument

23   that the defendants "suffered or permitted" the plaintiffs to work because neither defendant "had

24   the power to prevent plaintiffs from working."  *Id*. at 70 (defendants lacked power to prevent

25   plaintiffs from working because plaintiffs' direct employer had the "exclusive power to hire and

26   fire his workers, to set their wages and hours, and to tell them when and where to work").

27   Similarly, in *Futrell*, the California Court of Appeal held that the putative joint employer did not

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29

1    "suffer or permit" the plaintiff to work because it did not control the hiring, firing and day-to-day

2    supervision of the direct employer's workers.  190 Cal.App.4th at 1433-34.

3        As in *Martinez* and *Futrell*, Defendant has not jointly employed O'Connor or Colopy

4    under this second prong of the *Martinez* test because the companies they worked for exercised

5    sole control over and responsibility for their wages and working conditions, as O'Connor and

6    Colopy have admitted.  Those companies' control over their wages and working conditions is

7    underscored by their agreements with Defendant, which have provided that the companies: (1) are

8    independent companies in the business of providing transportation services, (2) are solely

9    responsible for any obligations or liabilities to their drivers, (3) exercise sole control over their

10   drivers, (4) retain, with the drivers, the sole right to determine when and for how long drivers use

11   the Uber App, and (5) retain, with the drivers, the option to accept or reject each trip request they

12   receive via the Uber App.[21]  O'Connor Tr., Ex. 23 at 1-9; Colopy Tr., Ex. 45 at 1-9.  That

13   Defendant lacked the authority to prevent Plaintiffs from working is further underscored by the

14   fact that, following the deactivation of his Uber account due to his refusal to undergo a CPUC-

15   mandated background check, O'Connor has continued to work as a transportation provider.

16       Accordingly, Plaintiffs cannot demonstrate that they have been Defendant's employees

17   under the "suffer or permit" prong of the *Martinez* test.

18   **V.    CONCLUSION**

19       For all of the foregoing reasons, this Court should grant summary judgment to Defendant

20   on all of Plaintiffs' claims for relief because Plaintiffs have never been Defendant's employees.

21   Dated: December 4, 2014                    MORGAN, LEWIS & BOCKIUS LLP

22                                              By    /s/ *Robert Jon Hendricks*

23                                                  Robert Jon Hendricks
                                                   Attorneys for Defendant
24                                                 UBER TECHNOLOGIES, INC.

25

26   [21] In *Martinez*, the Supreme Court took note of the fact that the contracts between the purported
     joint employer and its contractor, like the contracts in place here, included such provisions, and
27   observed that "[t]he plain import of these contractual provisions is that Munoz agreed to pay his
     employees the wages required by law, assuming sole responsibility in the matter, and to
28   indemnify [the purported joint employer] if his employees sued [the purported joint employer] for
     unpaid wages."  49 Cal.4th at 77.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30

DEFENDANT'S MSJ
CASE NO. 13-03826-EMC