1

2

3

4

5                        UNITED STATES DISTRICT COURT

6                        NORTHERN DISTRICT OF CALIFORNIA

7

8    DOUGLAS O'CONNOR, *et al.*,                    No. C-13-3826 EMC

9              Plaintiffs,

10         v.                                        **ORDER DENYING DEFENDANT UBER
                                                     TECHNOLOGIES, INC.'S MOTION
11   UBER TECHNOLOGIES, INC., *et al.*,              FOR SUMMARY JUDGMENT**

12             Defendants.                           **(Docket No. 211)**
     _____/
13

14

15         Plaintiffs filed this putative class action on behalf of themselves and other similarly situated

16   individuals who drive for Defendant Uber Technologies, Inc.  *See* Docket No. 201-2 (Second

17   Amended Class Action Complaint) (SAC).  Plaintiffs claim that they are employees of Uber, as

18   opposed to its independent contractors, and thus are eligible for various statutory protections for

19   employees codified in the California Labor Code, such as a requirement that an employer pass on

20   the entire amount of any gratuity "that is paid, given to, or left for an employee by a patron."  Cal.

21   Lab. Code § 351; *see also* SAC at ¶¶ 27-28.

22         Pending before the Court is Uber's motion for summary judgment that Plaintiffs are

23   independent contractors as a matter of law.  As is discussed below, the Court first concludes that

24   Plaintiffs are Uber's presumptive employees because they "perform services" for the benefit of

25   Uber.  The Court next holds that whether an individual should ultimately be classified as an

26   employee or an independent contractor under California law presents a mixed question of law and

27   fact that must typically be resolved by a jury.  Finally, because a number of facts material to the

28

**United States District Court**

For the Northern District of California

1 employee/independent contractor determination in this case remain in dispute, the Court denies

2 Uber's summary judgment motion.

3 ## I.   BACKGROUND

4     In a nutshell, Uber provides a service whereby individuals in need of vehicular transportation

5 can log in to the Uber software application on their smartphone, request a ride, be paired via the

6 Uber application with an available driver, be picked up by the available driver, and ultimately be

7 driven to their final destination.  Uber receives a credit card payment from the rider at the end of the

8 ride, a significant portion of which it then remits to the driver who transported the passenger.

9     Named plaintiffs Douglas O'Connor and Thomas Colopy drive principally for Uber's

10 "UberBlack" service.[1]  *See* Docket Nos. 212-1 (Colopy Depo.); 212-2 (O'Connor Depo).  UberBlack

11 drivers transport passengers in black sedans (*e.g.*, Lincoln Towncars) or other limousine-like

12 vehicles.  Docket No. 223-37.  O'Connor received access to a luxury vehicle through at least two

13 different companies, SF Bay and Bay Network Limo.  *See* O'Connor Depo. Tr. at 118:12-122:15  In

14 exchange for providing a car and paying all of O'Connor's expenses (*e.g.*, fuel and tolls), SF Bay

15 received sixty percent of O'Connor's earnings from transporting Uber passengers.  *See id.* at 124:12-

16 125:4.  Bay Network Limo provided O'Connor with a luxury vehicle for a flat $735 weekly fee,

17 which included maintenance and insurance on the vehicle, but no other expenses.  *See id.* at 135:4-

18 136:14.  O'Connor was free to use Bay Network Limo's vehicle as much or as little as he chose.  *Id.*

19 at 135:16-136:3.  Colopy had similar arrangements with two third-party limousine companies that

20 provided him with a vehicle necessary to work as an UberBlack driver.  *See* Colopy Depo. Tr. at

21 98:24-102:22; 126:11-129:4.

22     Named plaintiffs Matthew Manahan and Elie Gurfinkel drive principally for Uber's "uberX"

23 service.  Docket Nos. 212-3 (Manahan Depo.); 212-4 (Gurfinkel Depo.).  uberX drivers transport

24 passengers in their own personal vehicles, which are typically hybrids or other "mid-range" cars.

25 Docket No. 223-37.  Manahan, a self-employed screenwriter in Los Angeles, drives for uberX, as

26 well as Lyft and Sidecar, two of Uber's competitors.  Manahan Depo. Tr. at 71:3-6; 92:18-21.

27 ──────────

28     [1] O'Connor's account with Uber was terminated in 2014, but the other named Plaintiffs still have active accounts with Uber.  *See* Docket No. 211 at 5 n.7.

United States District Court
For the Northern District of California

1    Manahan transports passengers in his personal vehicle – a 2012 Kia Soul.  *Id.* at 110:17-21.

2    Gurfinkel began driving for uberX while he was employed full-time as a "fulfillment and project

3    manager" by a company called ADL Embedded Solutions.  Gurfinkel Tr. at 43:4-13.  Two months

4    after he began driving for Uber, Gurfinkel left his job at ADL, and now drives for Uber full time.  *Id.*

5    at 57:17-24.

6         Before becoming "partners" with Uber, Plaintiffs and other aspiring drivers must first

7    complete Uber's application process.  *See* Docket No. 223-20; Docket No. 223-28.  Applicants are

8    required to upload their driver's license information, as well as information about their vehicle's

9    registration and insurance.  Docket No. 223-28 at 2.  Applicants must also pass a background check

10   conducted by a third party.  *Id.* at 3.  Would-be drivers are further required to pass a "city knowledge

11   test" and attend an interview with an Uber employee.[2]  Docket No. 223-20 at 6740; Docket No. 223-

12   29 at 4.  Interviewees are instructed to "[b]ring your car, dress professionally and be prepared to stay

13   for 1 hour."  Docket No. 223-20 at 6740.

14        Once a prospective driver successfully completes the application and interview stages, the

15   driver must sign contracts with Uber or one of Uber's subsidiaries (Raiser LLC).  *See* Docket No.

16   223-15 (Transportation Provider Service Agreement) (Service Agreement); *see also* Docket No.

17   223-16 (Driver Addendum Related to Uber Services) (Addendum).[3]  Those contracts explicitly

18   provide that the relationship between the transportation providers and Uber/Raiser[4] "is solely that of

19   independent contracting parties."  *See* Addendum at 7; Service Agreement at 9.  The parties

20   "expressly agree that this Agreement is not an employment agreement or employment relationship."

21

22        [2] If a potential driver fails the city knowledge test, they "will not be able to interview until

23   they get more familiar with the city."  Docket No. 223-29 at 4.  At least one version of the "SF City
     Knowledge Test" contains forty questions, such as: "When driving on Sunset Blvd, how are the
     cross streets generally named," and "True or False:  The Museum of Modern Art (MOMA) and the

24   Palace of Fine Arts are two names for the same place."  Docket No. 238-6.

25        [3] The Raiser Service Agreement is signed by drivers on the uberX platform.  The Uber

26   Addendum is signed by drivers on the UberBlack platform.

27        [4] Uber never materially distinguishes between itself and Raiser or argues that Raiser's
     separate corporate status is relevant to this litigation.  Uber further admits Raiser is its subsidiary.
28   Colman Decl. at ¶ 7.  Consequently, the Court treats Raiser as equivalent to Uber for the purpose of
     this motion, and refers to these entities collectively as "Uber."

United States District Court

For the Northern District of California

Addendum at 7; Service Agreement at 9.  The relevant contracts further provide that drivers will be paid a "fee" (*i.e.*, fare) upon the successful completion of each ride.  According to an Uber 30(b)(6) deponent, Uber sets fares based principally on the miles traveled by the rider and the duration of the ride.  Coleman Depo. at 187:20-188:16.  Because Uber receives the rider's payment of the entire fare, the relevant contracts provide that Uber will automatically deduct its own "fee per ride" from the fare before it remits the remainder to the driver.  *See* Addendum at 7; Service Agreement at 9.  Plaintiffs presented evidence that Uber typically takes roughly 20 percent of the total fare billed to a rider as its "fee per ride."  *See, e.g.*, Colopy Depo Tr. at 128:15-19.

In this litigation, Uber bills itself as a "technology company," not a "transportation company," and describes the software it provides as a "lead generation platform" that can be used to connect "businesses that provide transportation" with passengers who desire rides.  Docket No. 213 (Colman Decl.) at ¶ 6.  Uber notes that it owns no vehicles, and contends that it employs no drivers.  *Id.*  Rather, Uber partners with alleged independent contractors that it frequently refers to as "transportation providers."  *Id.*

Plaintiffs characterize Uber's business (and their relationship with Uber) differently.  They note that while Uber now disclaims that it is a "transportation company," Uber has previously referred to itself as an "On-Demand Car Service," and goes by the tagline "Everyone's Private Driver."[5]  *See, e.g.*, Docket No. 223-3 at 1 (Coleman Depo. Ex. 3); Docket No. 223-6 at 1 (Onboarding Script) ("Our tagline and vision is to be 'Everyone's Private Driver.'").[6]  Indeed, in

---

[5] The Court observes that Uber owns a U.S. trademark on "Everyone's Private Driver."  U.S. Trademark No. 85,816,634.

[6] Uber objects to the Court considering the Onboarding Script (and a number of Plaintiffs' other exhibits) on the ground that Plaintiffs did not properly lay a foundation for these documents.  *See* Uber Reply Br. at 5 n. 7.  Specifically, Uber objects that the Plaintiffs have not established that any Plaintiff was actually exposed to the information contained in the Onboarding Script or other contested documents such as an Uber Handbook.  But the relevant legal question on summary judgment is whether the challenged evidence "*could* be presented in an admissible form at trial."  *Fraser v. Goodale*, 342 F. 3d 1032, 1037 (9th Cir. 2003) (emphasis added).  *See* Fed. R. Civ. P. 56(c)(2) (party may object to facts that "cannot be presented in a form that would be admissible in evidence").  If so, the Court may consider such evidence on summary judgment.  *Id.*  It is only where the evidence could *never* be presented in admissible form that such evidence should be excised from the summary judgment record.  *See* Fed. R. Civ. P. 56(c)(2); *see also Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (noting that an affidavit containing hearsay and subject to best evidence rule objections could still be considered on summary judgment because the facts

United States District Court

For the Northern District of California

1  commenting on Uber's planned expansion into overseas markets, its CEO wrote on Uber's official

2  blog: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a *transportation*

3  *system* in a city near you."  Docket No. 223-1 at 6 (emphasis added).[7]  Other Uber documents state

4  that "Uber provides the best transportation service in San Francisco . . . ."  Docket No. 223-29 at 2.

5       Moreover, Uber does not sell its software in the manner of a typical distributor.  Rather, Uber

6  is deeply involved in marketing its transportation services, qualifying and selecting drivers,

7  regulating and monitoring their performance, disciplining (or terminating) those who fail to meet

8  standards, and setting prices.

9       In addition to contending it is a technology company and not a transportation company, Uber

10  argues the drivers are not its employees but instead are independent contractors, and therefore not

11  entitled to the protection of the California Labor Code as asserted herein.  In this regard, Uber

12  contends it exercises minimal control over how its transportation providers actually provide

13  transportation services to Uber customers, an important factor in determining whether drivers are

14  independent contractors.  Among other things, Uber notes that drivers set their own hours and work

15  schedules, provide their own vehicles, and are subject to little direct supervision.  Plaintiffs

16  vigorously dispute these contentions, and claim that Uber exercises considerable control and

17  supervision over both the methods and means of its drivers' provision of transportation services, and

18  that under the applicable legal standard they are employees.  For the reasons explained in this Order,

19  based on the record before the Court, the question whether Uber's drivers are employees or

20  independent contractors is an issue to be decided by a jury, not this Court on summary judgment.

21

22

23

24  underlying the affidavit are of the type that would be admissible at trial even though the affidavit
    itself might not be admissible.  The Court further notes that at the hearing, Uber's counsel

25  acknowledged that Uber does not dispute the authenticity of a number of the contested exhibits and
    acknowledged that much of this evidence was produced by Uber and/or is printed on Uber's

26  letterhead.  *See* Oral Arg. Hearing Tr. at 90:22-94:20.

27       [7]  The same blog post notes that Uber first went by the name "UberCab," but later changed
    the name simply to "Uber" after the City of San Francisco sent a cease-and-desist letter "saying

28  amongst other things, that our name UberCab means we are marketing ourselves as a cab company."
    *Id.* at 3.

**United States District Court**
For the Northern District of California

## II.  DISCUSSION

A.      Applicable Legal Standards

     1.      Summary Judgment Standard

This Court may only grant summary judgment in favor of Uber if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 987 (9th Cir. 2014).  That is, Uber is entitled to summary judgment only if, viewing the evidence in the light most favorable to the drivers, this Court necessarily must conclude that Plaintiffs are independent contractors as a matter of law. *See id.* at 988.

     2.      California's Test of Employment

The parties agree that determining whether Plaintiffs are employees or independent contractors is an analysis that proceeds in two stages.  "First, under California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (citation omitted).  "As the Supreme Court of California has held . . . the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary." *Id.* at 901. (citation and internal quotation marks omitted) (internal modifications omitted).  If the putative employee establishes a prima facie case (*i.e.*, shows they provided services to the putative employer), the burden then shifts to the employer to prove, if it can, that the "presumed employee was an independent contractor." *Id.* (citations omitted); *see also Yellow Cab Coop. Inc. v. Worker's Comp. Appeals Bd.*, 226 Cal. App. 3d 1288, 1294 (1991) (explaining that under California law there is "a presumption that a service provider is presumed to be an employee unless the principal affirmatively proves otherwise").

For the purpose of determining whether an employer can rebut a prima facie showing of employment, the Supreme Court's seminal opinion in *Borello* "enumerated a number of indicia of an employment relationship." *Narayan*, 616 F.3d at 901.  The "most significant consideration" is the putative employer's "right to control work details." *S.G. Borello & Sons, Inc. v. Dep't of Indus.*

United States District Court

For the Northern District of California

1  *Relations* (*Borello*), 48 Cal. 3d 341, 350 (1989).  This right of control need not extend to every

2  possible detail of the work.  Rather, the relevant question is whether the entity retains "all *necessary*

3  control" over the worker's performance.  *Id.* at  357 (emphasis in original); *see also Air Couriers*

4  *Int'l v. Emp't Dev. Dep't*, 150 Cal. App. 4th 923, 934 (2007) (explaining that "the fact that a certain

5  amount of freedom is allowed or is inherent in the nature of the work involved" does not preclude a

6  finding of employment status).

7          The Supreme Court has further emphasized that the pertinent question is "not how much

8  control a hirer *exercises*, but how much control the hirer retains the *right* to exercise."  *Ayala v.*

9  *Antelope Valley Newspapers Inc.*, 59 Cal. 4th 522, 533 (2014) (citation omitted) (emphases in the

10  original).  When evaluating the extent of that control, the Supreme Court has stressed that an

11  employer's "right to discharge at will, without cause" is "strong evidence in support of an

12  employment relationship."  *Borello*, 48 Cal. 3d at 350; *see also Ayala*, 59 Cal. 4th at 531

13  (characterizing the right to discharge without cause as "[p]erhaps the strongest evidence of the right

14  to control"); *Narayan*, 616 F.3d at 900 (characterizing the right to discharge at will as the "most

15  important" factor for determining whether an employment relationship exists).  This is because the

16  "power of the principal to terminate the services of the agent [without cause] gives him the means of

17  controlling the agent's activities."[8]  *Ayala*, 59 Cal. 4th at 531 (citations omitted).

18          The putative employer's right to control work details is not the only relevant factor, however,

19  and the control test cannot be "applied rigidly and in isolation."  *Borello*, 48 Cal. 3d at 350.  Thus,

20  the Supreme Court has also embraced a number of "secondary indicia" that are relevant to the

21  employee/independent contractor determination.  *Id.*  These additional factors include:

22              (a) whether the one performing services is engaged in a distinct
                occupation or business; (b) the kind of occupation, with reference to
23              whether, in the locality, the work is usually done under the direction of
                the principal or by a specialist without supervision; (c) the skill
24              required in the particular occupation; (d) whether the principal or the
                worker supplies the instrumentalities, tools, and the place of work for
25              the person doing the work; (e) the length of time for which the

26  _____

27          [8] The Supreme Court noted that the "worker's corresponding right to leave is similarly
    relevant: 'An employee may quit, but an independent contractor is legally obligated to complete his
28  contract.'"  *Ayala*, 59 Cal. 4th at 531 n. 2 (quoting *Perguica v. Indus. Accident Comm'n*, 29 Cal. 2d
    857 (1947)).

> services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.* at 351.  *Borello* also "approvingly cited" five additional factors (some overlapping or closely related to those outlined immediately above) for evaluating a potential employment relationship. *Narayan*, 616 F.3d at 900.  These additional factors include:

> (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

*Borello*, 48 Cal. 3d at 355.  While the Supreme Court explained that all thirteen of the above "secondary indicia" are helpful in determining a hiree's employment status, it noted that "the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends on particular combinations." *Id.* at 351.  Moreover, the Court made it "clear that the label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." *Alexander*, 765 F.3d at 989 (quoting *Borello*, 48 Cal. 3d at 349) (internal modifications omitted).  Thus, as the Ninth Circuit explained in *Narayan*, the fact-finder must "assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive, and that it is the rare case where the various factors will point with unanimity in one direction or the other." *Narayan*, 616 F.3d at 901 (citation omitted).

Indeed, this Court's extensive survey of the caselaw confirms that no one *Borello* factor is dispositive when analyzing employee/independent contractor status.  For instance, in *Mission Ins. Co. v. Workers' Comp. Appeals Bd.*, the Court of Appeal reversed a determination made by the Workers' Compensation Appeals Board that an individual was an employee of his putative employer.  123 Cal. App. 3d 211, 213 (1981).  The Court of Appeal held instead that the individual was an independent contractor as a matter of law.  *Id.* at 219.  One piece of evidence the Court of Appeal relied on in reaching this conclusion was that whereas a "regular employee applicant worked a normal eight-hour shift," plaintiff "did not work any specific hours."  *Id.* at 216.  But the same was

1   true of the putative employee in a later case, where the Court of Appeal determined that an

2   employment relationship did exist as a matter of law.  *See Air Couriers Int'l*, 150 Cal. App. 4th at

3   926 (package delivery drivers were employees of their courier company as a matter of law even

4   though "individual drivers determined their own schedules and decided when and how long to

5   work"); *see also JKH Enterprises, Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046, 1052

6   (2006) (holding that delivery drivers were employees of courier service, despite the fact that "drivers

7   set their own schedules").

8           The flexibility (and variability) of the *Borello* test can further be demonstrated by comparing

9   *Mission* with *Alexander*.  In *Mission*, the Court of Appeal found the putative employee was an

10  independent contractor despite the fact that he was required to wear a uniform displaying his

11  putative employer's insignia.  *Mission Ins. Co.*, 123 Cal. App. 3d at 217.  Yet, the same fact

12  supported a conclusion in *Alexander* that plaintiffs were FedEx's employees as a matter of law.

13  *Alexander*, 765 F.3d at 987 (noting that the fact that drivers were required to "wear a FedEx

14  uniform" supported finding of employee status) (internal quotation marks omitted).  And while in

15  *Mission*, the Court of Appeal found independent contractor status at least in part because the

16  putative employee used his own personal vehicle while on the job, 123 Cal. App. 3d at 216, the same

17  fact has proved not to be dispositive in *Alexander* and in numerous other California cases where an

18  employment relationship was found.  *See Alexander*, 765 F.3d at 986 ("FedEx requires its drivers to

19  provide their own vehicles"); *Air Couriers Int'l*, 150 Cal. App. 4th at 927 ("Drivers supplied their

20  own vehicles . . . when delivering for [defendant]"); *JKH Enterprises, Inc.*, 142 Cal. App. 4th at

21  1051 ("All drivers . . . use their own vehicles to make the deliveries.").

22          Put simply, the cases bear out the Supreme Court's exhortation that the weight given to the

23  *Borello* factors "depends on [their] particular combinations."  *Borello*, 48 Cal. 3d at 351.  It is with

24  these principles in mind that the Court now turns to the merits of Uber's summary judgment motion.

25  B.      The Plaintiffs Are Uber's Presumptive Employees Because They Provide a Service to Uber

26          If Plaintiffs can establish that they provide a service to Uber, then a rebuttable presumption

27  arises that they are Uber's employees.  *See Narayan*, 616 F.3d at 900; *Yellow Cab Coop.*, 226 Cal.

28  App. 3d at 1294.  Uber argues that the presumption of employment does not apply here because

Plaintiffs provide it no service. The central premise of this argument is Uber's contention that it is not a "transportation company," but instead is a pure "technology company" that merely generates "leads" for its transportation providers through its software. Using this semantic framing, Uber argues that Plaintiffs are simply its customers who buy dispatches that may or may not result in actual rides. In fact, Uber notes that its terms of service with riders specifically state that Uber is under no obligation to actually provide riders with rides at all.[9] Thus, Uber passes itself off as merely a technological intermediary between potential riders and potential drivers. This argument is fatally flawed in numerous respects.

First, Uber's self-definition as a mere "technology company" focuses exclusively on the mechanics of its platform (*i.e.*, the use of internet enabled smartphones and software applications) rather than on the substance of what Uber actually *does* (*i.e.*, enable customers to book and receive rides). This is an unduly narrow frame.[10] Uber engineered a software method to connect drivers with passengers, but this is merely one instrumentality used in the context of its larger business. Uber does not simply sell software; it sells rides. Uber is no more a "technology company" than Yellow Cab is a "technology company" because it uses CB radios to dispatch taxi cabs, John Deere is a "technology company" because it uses computers and robots to manufacture lawn mowers, or Domino Sugar is a "technology company" because it uses modern irrigation techniques to grow its sugar cane. Indeed, very few (if any) firms are *not* technology companies if one focuses solely on *how* they create or distribute their products. If, however, the focus is on the substance of what the firm actually does (*e.g.*, sells cab rides, lawn mowers, or sugar), it is clear that Uber is most certainly a transportation company, albeit a technologically sophisticated one. In fact, as noted above, Uber's

---

[9] The fact that Uber's Terms of Service apparently disclaim any actual obligation to provide its passengers with transportation services would likely come as a surprise to those numerous riders who successfully use Uber to obtain such services. In any event, Uber has presented no evidence that it actually fails to pair its riders with a driver on a regular basis, or that drivers pay it for leads even when those leads do not result in actual rides. At least on this last point, the evidence is clearly the opposite: Uber is only paid when a "lead" results in a completed ride.

[10] Indeed, Uber's own documents show that it characterizes itself as a transportation company, transportation network, or on-demand car service. *See, e.g.*, Docket No. 223-1 at 6; Docket No. 223-29 at 2. The Court further notes with interest that the California Public Utilities Commission has classified Uber as a "transportation network company." *See* Docket No. 223-11.

United States District Court

For the Northern District of California

1  own marketing bears this out, referring to Uber as "Everyone's Private Driver," and describing Uber

2  as a "transportation system" and the "best transportation service in San Francisco." *See* Docket No.

3  223-1 at 6; Docket No. 223-29 at 2.

4  Even more fundamentally, it is obvious drivers perform a service for Uber because Uber

5  simply would not be a viable business entity without its drivers.[11]  *See Yellow Cab Coop.*, 226 Cal.

6  App. 3d at 1293-1294 (holding that cab drivers provided service to cab company because "the

7  enterprise could no more survive without [drivers] than it could without working cabs"); *see also*

8  *JKH Enterprises*, 142 Cal. App. 4th at 1054 (finding that delivery drivers were employees of courier

9  service as a matter of law in part because "the worker's duties are an integral part of the operation,"

10 and "their work is the basis for [defendant's] business").  Uber's revenues do not depend on the

11 distribution of its software, but on the generation of rides by its drivers.  As noted above, Uber bills

12 its riders directly for the entire amount of the fare charged – a fare amount that is set by Uber

13 without any input from the drivers.  *See* Coleman Depo. Tr. at 165:2-21; 187:20-188:16; Docket No.

14 223-38.  Uber then pays its drivers eighty percent of the fare it charges the rider, while keeping the

15 remaining twenty percent of the fare as its own "service fee."  *See, e.g.*, Service Agreement at 4;

16 Colopy Depo Tr. at 128:15-19; Docket No. 223-62.  Put simply, the contracts confirm that Uber *only*

17 makes money if its drivers actually transport passengers.

18 Furthermore, Uber not only depends on drivers' provision of transportation services to obtain

19 revenue, it exercises significant control over the amount of any revenue it earns: Uber sets the fares

20 it charges riders unilaterally.  *See* Coleman Depo. Tr. 165:2-21; 167:21-168:21; Docket No. 223-62.

21 The record also shows that Uber claims a "proprietary interest" in its riders, which further

22 demonstrates that Uber acts as more than a mere passive intermediary between riders and drivers.

23 For instance, Uber prohibits its drivers from answering rider queries about booking future rides

24 outside the Uber app, or otherwise "soliciting" rides from Uber riders.  *See, e.g.*, Handbook at 7

25

26 _____

27  [11] While Uber's lawyers refuse to admit this fact, at least one Uber General Manager appears to have recognized as much in an Uber training video presented to its drivers:  "It's pretty clear to all of us [at Uber] that without what you guys do every week and every day we wouldn't have a

28 company.  We are not out there.  You guys are out there and you guys are the best at what you do." Docket No. 223-14.

United States District Court

For the Northern District of California

1   (providing that actively soliciting business from a current Uber client is categorized as a "Zero

2   Tolerance" event that "may result in immediate suspension from the Uber network."  By contrast,

3   "passive client solicitation (*e.g.*, business cards or branded equipment in backseat)" is categorized as

4   a "Major" issue that Uber "takes very seriously and will take action if you receive more than one in

5   every 180 trips"); Onboarding Script at 10 (stating that if a rider specifically asks drivers about

6   "arranging pickups, tell them to reach out to Uber"); Docket No. 223-13 at 6 (stating that riders

7   cannot request specific Uber drivers).

8           As further indicia of its role as a transportation company rather than a software provider,

9   Uber exercises substantial control over the qualification and selection of its drivers.  Before

10  becoming "partners" with Uber, aspiring drivers must first complete Uber's application process,

11  including a background check, city knowledge exam, vehicle inspection, and personal interview.

12  *See generally* Docket No. 223-20; Docket No. 223-28.  In an internal document titled "SF Hiring

13  Freeze & Quality Push," Uber stresses that these screening measures are important because "Uber

14  provides the best transportation service . . . and to keep it this way, we will be taking some major

15  steps to improve both driver and vehicle quality on the Uber system."  Docket No. 223-29 at 2.  In

16  another document, Uber notes that background checks are important because it only wants "to

17  partner with the safest drivers."  Docket No. 223-28 at 3.[12]  And Uber documents further reveal that

18  Uber regularly terminates the accounts of drivers who do not perform up to Uber's standards.  *See,*

19  *e.g.*, Docket No. 223-29 at 2 ("We will be deactivating Uber accounts regularly of drivers who are in

20  the bottom 5% of all Uber drivers and not performing up to the highest standards . . . . We believe

21  that the removal of underperforming drivers will lead to more opportunities for our best drivers.");

22  Docket No. 238-2 (spreadsheet listing terminated driver accounts and reasons for termination);

23  Docket No. 238-3 (email from "Uber SF Community Manager" instructing fellow Uber employer to

24  "[g]et rid of this guy.  We need to make some serious cuts of guys below 4.5"); Docket No. 238-5

25

26

27          [12] *See also* Docket No. 238-1 (email to Uber driver permanently terminating her account for
    allowing others to drive under her user name, a behavior Uber described as "not an acceptable
28  practice, as all of our drivers must go through the application process for safety reasons").

United States District Court

For the Northern District of California

1  (email terminating underperforming Uber driver because business was "slower than normal and we

2  have too many drivers . . . [so] we have to look for accounts to deactivate").

3       Although the Court's conclusion based on the record facts can likely stand on logic and

4  common sense alone, the case law makes abundantly clear that the drivers are Uber's presumptive

5  employees.  In *Yellow Cab Cooperative*, a cab company argued, like Uber here, that its drivers were

6  not its employees because they did not provide any service to the cab company.  *Yellow Cab Coop.*,

7  226 Cal. App. 3d at 1292-1294.  The company's principal argument, like Uber's, was that it was

8  only in the business of collecting fees from its drivers – specifically a flat $56 fee-per-shift for the

9  use of a cab and provision of "leads" through its radio dispatch service.  Notably, (and unlike Uber)

10  Yellow did not share in any of the actual fares a driver received.  *Id.* at 1291.  Thus, if a Yellow

11  driver never provided any rides during a shift or actually used any of Yellow's "leads," Yellow

12  would receive the same $56 lease payment regardless.  *Id.*  Based on these facts, the Court of Appeal

13  flatly rejected Yellow's argument that the drivers did not provide it a service, finding that Yellow's

14  actual "enterprise consists of operating a fleet of cabs for public carriage.  The drivers, as active

15  instruments of that enterprise, provide an indispensable 'service' to Yellow; the enterprise could no

16  more survive without them than it could without working cabs."[13]  *Id.*

17       The reasoning of *Yellow Cab Cooperative* applies even more forcefully here.  Unlike Yellow

18  Cab, which received a flat fee and did not share in its drivers' fares, Uber only receives its fees if a

19  driver successfully transports an Uber "lead" to some destination.  Moreover, the precise amount of

20  this fee is set by Uber, without negotiation or input from the drivers.  Under such circumstances, it

21  strains credulity to argue that Uber is not a "transportation company" or otherwise is not in the

22  transportation business; it strains credulity even further to argue that Uber drivers do not provide

23  ───────────────────────

24       [13] At oral argument, counsel for Uber asked the Court to consider a number of analogies and
hypotheticals he claimed demonstrate that Uber receives no service from its drivers.  For example,
Uber's counsel likened Uber to a recruiter that serves as an intermediary between potential job

25  seekers and potential employers.  Oral Arg. Tr. at 44:19-47:8.  According to Uber, such a recruiter
does not receive a service from either the candidates or the employers, despite the fact that the

26  recruiter only gets paid if she successfully places a candidate.  This analogy is inapt.  Uber not only
unilaterally qualifies and selects its drivers, it maintains an ongoing relationship and exercises

27  supervision over their performance.  Uber's success depends upon the quality of its drivers' ongoing
performance.  In contrast, recruiters engage in a one-time transaction and do not supervise the clients

28  it places; nor does the recruiter's income depend on the ongoing performance of those clients.

United States District Court
For the Northern District of California

1   Uber a valuable service.  Like the cab drivers in *Yellow Cab Cooperative*, Uber's drivers provide an

2   "indispensable service" to Uber, and the firm "could no more survive without them" than it could

3   without a working smartphone app.  Or, put more colloquially, Uber could not be "Everyone's

4   Private Driver" without the drivers.

5          Uber cites two cases in support of its contention that it receives no services from its drivers,

6   but neither case is on-point.[14]  In *Kubinec v. Top Cab Dispatch, Inc.*, a Massachusetts trial judge

7   concluded (in an unpublished order applying Massachusetts law) that a taxi driver was not the

8   employee of his radio dispatch service, Top Cab.  2014 WL 3817016, at *9 (Super Ct. Mass. June

9   25, 2014).  Importantly, the court stressed that the $25 weekly fee Top Cab received from Kubinec

10  was the same "regardless of whether Kubinec had his cab on the road twenty-four hours a day . . . or

11  left it parked in his driveway."  *Id.*  Unlike Uber, Top Cab received "no income" from any

12  dispatches it provided, its members were not required to accept any dispatch assigned, and the

13  dispatches accepted constituted only "9.95% of all fares driven by Top Cab members in 2010."  *Id.*

14  at *10-11.  Top Cab "received only the same [$25] weekly payment from its members regardless of

15  whether the dispatches were accepted or passengers simply hailed member cabs from the street."  *Id.*

16

17         Without belaboring the multitude of differences between this case and *Kubinec*, the Court

18  notes that Uber does not receive a flat fee from its drivers in exchange for an unlimited number of

19  "leads" or dispatches.  Rather, Uber receives a percentage of each and every fare its drivers labor to

20  earn – a fact that, as indicated above, makes it clear that Uber receives a (very lucrative) service

21  from its drivers and depends on its drivers' performance of services for its revenues.  *Kubinec* is thus

22  completely distinguishable from the facts in this case.

23

24  ────────────────

25         [14] Uber also cites to a decision rendered by a California Labor Commission Hearing Officer
    finding that an Uber driver was not an employee of Uber because Uber's "business was engaged in
26  technology and not in the transportation industry," and thus the "services Plaintiff provided were not
    part of the business operated by the Defendant."  Docket No. 213-7 at 5.  Uber cites no case law
    suggesting this Court owes the Hearing Officer's conclusion any deference, and his conclusion
27  appears to warrant none.  On the merits, the decision (which contains only one paragraph of
    analysis) is plainly wrong.  One cannot necessarily blame the Hearing Officer for reaching the
    wrong conclusion, however:  while Uber was represented at the hearing, Plaintiff appeared *pro se*.
28  *Id.*

United States District Court

For the Northern District of California

1       Uber's second case, *Callahan v. City of Chicago*, -- F. Supp. 3d --, 2015 WL 394021 (N.D.

2  Ill. Jan 23, 2015), is equally inapposite to the issues here.  In *Callahan*, a Chicago taxicab driver

3  sued the City of Chicago arguing that the City was her employer under the Fair Labor Standards

4  Act.  *Id.* at *1.  According to the district court, the "critical question" in determining the viability of

5  the driver's claims was "whether the 'business' to which Callahan renders service is, in fact, the

6  City's business."  *Callahan*, 2015 WL 394021, at *8.  Callahan, the court noted, "is a taxicab driver;

7  the service she provides is therefore the transportation of passengers by taxicab . . . ."  *Id.*  But while

8  recognizing that the City "controls to quite a significant extent the operation of taxicabs in Chicago"

9  by way of extensive regulation, the court (unsurprisingly) concluded that "controlling or regulating

10  how taxicabs are operated is not the same as providing, or undertaking to provide, transportation by

11  taxicab.  The City does not perform the latter role."  *Id.*  While this Court will not exhaustively list

12  the ways a private corporation like Uber differs from a municipality like the City of Chicago, the

13  Court notes one obvious difference – Uber derives profits from providing transportation services,

14  whereas the City does not.[15]  Moreover, among other facts, Uber markets itself as "Everyone's

15  Private Driver;" Chicago does not.  As the district judge in *Callahan* correctly noted, "the collection

16  of taxes, fees, or revenue by a government entity does not make the regulated industry the business

17  of that government."  *Id.* at *9.  Uber's collection of fees from its drivers, however, and its deep

18  involvement in prescribing the qualifications of its drivers and the quality of their service, as well as

19  its representations to the public that it is a provider of transportation services ("Everyone's Private

20  Driver"), *does* indicate that transportation is its business.

21       This Court holds, as a matter of law, that Uber's drivers render service to Uber, and thus are

22  Uber's presumptive employees.[16]

---

[15] Uber ironically argues in one breath that Uber is sufficiently analogous to a government regulator to come under the holding of *Callahan*, while in another breath argues that Uber exercises so little control over its drivers that no reasonable jury could find that they are Uber's employees.

[16] The Court holds below that the ultimate question of whether a hiree should be classified as an employee or independent contractor is one that must typically be decided by a jury.  The Court need not definitively decide whether the threshold question of whether a hiree performs a service for her putative employer is similarly a question typically reserved for jury resolution (as opposed to resolution by the Court as a legal matter) because in this case the Court holds that no reasonable juror could conclude that Uber does not receive service from the Plaintiffs.  *See Alexander*, 765 F.3d

15

United States District Court

For the Northern District of California

C.       Whether a Hire is an Employee or Independent Contractor is a Mixed Question of Law and Fact Generally to be Decided by the Jury

Because the Court has determined that the Plaintiffs are Uber's presumptive employees, the burden now shifts to Uber to disprove an employment relationship. *Yellow Cab Coop.*, 226 Cal. App. 3d at 1294. As noted above, when determining under California law whether a putative employer can rebut a hiree's prima facie case of employment, the Court applies the multi-factor test laid out in the Supreme Court's decision in *Borello*. *Borello*, 48 Cal. 3d at 350.

Both parties suggest that the employee/independent contractor question is one of law for ultimate resolution by the Court. *See, e.g.*, Oral Arg. Tr. at 7:24-9:8. Both parties, however, are mistaken. According to the California Supreme Court, the "determination of employee or independent contractor status is one of fact if dependent upon resolution of disputed evidence or inferences." *Id.* at 349. This rule is consistent with long standing California Supreme Court precedent. *See Burlingham v. Gray*, 22 Cal. 2d 87, 100-101 (1943) (holding that the question of employee/independent contractor status "should have gone to the jury"). Only if the evidence is undisputed, and there is "but one inference [that] can reasonably be drawn from the evidence," *Burlingham*, 22 Cal. 2d at 100 (citation omitted), does the "question become[] one of law." *Borello*, 48 Cal. 3d at 349. This is no different from the general rule on summary judgment: when no reasonable jury could hold in favor of the non-moving party (because the evidence and evidentiary inferences are not disputed), courts must grant summary judgment.

While *Borello* and other California decisions sometimes refer to the question of employee/independent contractor status as one of fact, other California decisions recognize that the ultimate determination is more accurately described as a mixed question of law and fact. *See Hillen v. Indus. Acc. Comm'n*, 199 Cal. 577, 580 (1926) (holding that determination of employment relationship under California law involves questions "of mixed law and fact"); *Mission Ins. Co.*, 123 Cal. App. 3d at 219 (same); *Chapman v. Edwards*, 133 Cal. App. 72, 79 (Cal. 1933) (same); *see also Pullman-Standard v. Swint*, 456 U.S. 273, 289 n. 19 (1982) (defining a mixed question of law and

at 988 (summary adjudication is appropriate where the jury could return only one possible verdict).

16

1   fact as one "in which the historical facts are admitted or established, the rule of law is undisputed,

2   and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the

3   rule of law as applied to the established facts is or is not violated").  Unless the facts are so clear that

4   only one inference may reasonably be drawn, mixed questions of law and fact are for the jury.  *See*

5   *Hana Fin., Inc. v. Hana Bank*, -- U.S. --, 2015 WL 248559, at *4 (2015) (question of "tacking" in

6   trademark cases is typically for jury resolution because it presents a mixed question of law and fact);

7   *see also S.E.C. v. Phan*, 500 F.3d 896, 908-909 (9th Cir. 2007) (recognizing that mixed questions of

8   law and fact are typically left for the jury); *Delange v. Dutra Constr. Co., Inc.*, 183 F.3d 916, 919

9   (9th Cir. 1999) (same); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1428-

10  1429 (9th Cir. 1996) (same).  California law governing employee/independent contractor status

11  appears no different.

12       Indeed, a number of recent California and Ninth Circuit cases expressly held that the precise

13  question of whether one is an employee versus independent contractor is generally a question of

14  fact.  For instance, in *Estrada v. FedEx Ground Package Sys., Inc.*, the Court of Appeal held that

15  "[t]he determination (employee or independent contractor) is one of fact . . . ."  154 Cal. App. 4th 1,

16  11 (2007).  Similarly in *Millsap v. Federal Express Corp.*, the Court of Appeal noted that "[w]hether

17  a person is an employee or an independent contractor is ordinarily a question of fact."  227 Cal. App.

18  3d 425, 431 (1991).  The panel noted unremarkably that employee/independent contractor status is

19  only a legal question for the court's resolution "if from all the facts only one inference may be

20  drawn."  *Id.*; *see also Arzate v. Bridge Terminal Transport, Inc.*, 192 Cal. App. 4th 419, 427-428

21  (2011) (reversing summary judgment that plaintiffs were independent contractors because "a

22  reasonable trier of fact, considering the totality of the evidence, might reasonably conclude that the

23  plaintiffs were employees of defendant").[17]  And in *Narayan*, the Ninth Circuit explicitly held that

24  under its view of California law, "we cannot readily say that the ultimate conclusion as to whether

25  _____

26       [17] *See further Brose v. Union-Tribune Publ'g Co.*, 183 Cal. App. 3d 1079, 1082 (1986)
     ("Whether a person is an employee or an independent contractor is ordinarily a question of fact but
27   if from all the facts only one inference may be drawn it is a question of law."); *Hillen*, 199 Cal. at
     580 ("Whether or not the relation of employer and employee existed in this case, under the oral
28   contract entered into, is a question of mixed law and fact, to be proved like any other question.");
     *Chapman*, 133 Cal. App. at 79 (same).

the workers are employees or independent contractors is one of law.  The drawing of inferences from subordinate to ultimate facts is a task for the trier of fact – if, under the governing legal rule, the inferences are subject to legitimate dispute."  616 F.3d at 901 (internal quotation marks and citation omitted).  The Ninth Circuit, quoting a concurrence written by Judge Easterbrook in a case involving employee/independent contractor status under federal law, noted pointedly that

> if we are to have multiple factors, we should also have a trial.  A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part.  That there is a legal overlay to the factual question does not affect the role of the trier of fact.

*Id.* (quoting *Sec'y of Labor v. Lauritzen*, 835 F. 2d 1529, 1542 (7th Cir. 1987) (Easterbrook, J., concurring) (internal modification omitted).

Because the Ninth Circuit's holding in *Narayan* is binding on this Court, its determination that employee/independent contractor status is a mixed question of law and fact under California law is dispositive.[18]  Notably, *Narayan* is consistent with California state appellate court decisions discussed above.  It is also consistent with the United States Supreme Court's recent decision in *Hana Financial*, 2015 WL 248559, at *4, where the Supreme Court held that generally a jury should decide ultimate questions that involve the application of a legal standard to the facts.

In *Hana*, the question at issue was one of trademark law, and specifically "tacking," which allows a trademark owner to "make certain modifications to their marks over time without losing [the] priority . . . position of an older mark."  *Id.* at *2.  Tacking is permitted when the original and revised marks are "legal equivalents" such that the two marks "create the same, continuing commercial impression so that consumers consider both as the same mark."  *Id.* at *3 (internal quotation marks and citations omitted).  The Supreme Court held that a jury should decide the ultimate question whether two marks are "legal equivalents" sufficient to warrant tacking.  *Id.*

---

[18] The Court further notes that the holdings of the California Supreme Court in *Burlingham* and *Borello* are also clear and consistent with the Ninth Circuit's determination in *Narayan* – employee/independent contractor status may only be resolved by the court where the evidence and all inferences from the evidence (including the ultimate inference as to the nature of the relationship) are undisputed.  Hence, the ultimate determination of employment status should typically be made by juries, not judges.

United States District Court

For the Northern District of California

Justice Sotomayor began by explaining that "the application-of-legal-standard-to-fact sort of question . . . commonly called a 'mixed question of law and fact,' has typically been resolved by juries." *Hana Financial*, 2015 WL 248559, at *4 (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)) (internal quotation marks omitted).  As the Court has previously held, the "jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion." *Gaudin*, 515 U.S. at 514.  "[A]n issue does not lose its factual character merely because its resolution is dispositive of the ultimate . . . question." *Hana Financial*, 2015 WL 248559, at *4 (quoting *Miller v. Fenton*, 474 U.S. 104, 113 (1985)).  The Court further explained that to the extent there is a concern that a jury "may improperly apply the relevant legal standard, the solution is to craft careful jury instructions that make that standard clear." *Id.* at *4.

The Court further explained that mixed questions of law and fact should be resolved by juries irrespective of whether this may permit juries to "create new law that will guide future . . . disputes – a task [arguably] reserved for judges." *Id.*  The Court observed that "[i]t is not at all clear . . . why a tacking determination in a particular case will 'create new law' any more than will a jury verdict in a tort case, a contract dispute, or a criminal proceeding." *Id.*  The Court also rejected the argument that allowing juries to make ultimate legal determinations, such as whether two marks are legally equivalent, would upset the "predictability required for a functioning trademark system." *Id.* at *5.  The unanimous Court explained that "the same could be said about the tort, contract, and criminal justice systems: In all of these areas, juries answer often-dispositive factual questions or make dispositive applications of legal standards to facts.  The fact that another jury, hearing the same case, might reach a different conclusion may make the system 'unpredictable,' but it has never stopped us from employing juries in these analogous contexts." *Id.*

Finally, the Court considered the argument that tacking disputes should be resolved by judges because judges have typically resolved such questions "as a historical matter."  Again, the Court rejected the argument, explaining that "petitioner relies on cases in which judges have resolved tacking disputes in bench trials, at summary judgment, or the like." *Id.* (citations omitted).  "As we have noted, it is undisputed that judges may resolve tacking disputes in those contexts.  But recognizing as much does not gainsay our conclusion that, when a jury is to be empaneled and when

United States District Court

For the Northern District of California

1 the facts warrant neither summary judgment nor judgment as a matter of law, tacking is a question

2 for the jury." *Id.*

3    Put simply, the reasoning in *Hana* that juries should typically decide mixed questions of law

4 and fact supports the great weight of California authority (including the Ninth Circuit's decision in

5 *Narayan*) that establishes that a hiree's status as either an employee or independent contractor

6 should typically be determined by a jury, and not the judge.

7 D.    Uber is Not Entitled to Summary Judgment Because Material Facts Remain in Dispute and a

8       Reasonable Inference of an Employment Relationship May Be Drawn

9    Because the ultimate determination of the Plaintiffs' employment status presents a mixed

10 question of law and fact, Uber may only obtain summary judgment if all facts and evidentiary

11 inferences material to the employee/independent contractor determination are undisputed, and a

12 reasonable jury viewing those undisputed facts and inferences could reach but one conclusion – that

13 Uber's drivers are independent contractors as a matter of law. *See Alexander*, 765 F.3d at 988.  The

14 Court explained at the hearing on this matter that this is a "pretty tough standard to meet,"  Oral Arg.

15 Tr. at 6:15, and it is one that Uber has failed to meet here.

16    As noted above, the "principal test of an employment relationship is whether the person to

17 whom service is rendered has the right to control the manner and means of accomplishing the result

18 desired." *Ayala*, 59 Cal. 4th at 531 (quoting *Borello*, 48 Cal. 3d at 350).  "Perhaps the strongest

19 evidence of the right to control" is whether Uber can fire its transportation providers at will.  *Id.*

20 This critical fact appears to be in dispute.  Uber claims that it is only permitted to terminate drivers

21 "with notice or upon the other party's material breach" of the governing contracts.  Mot. at 23.

22 Plaintiffs, however, point out that the actual contracts seem to allow Uber to fire its drivers for any

23 reason and at any time.  *See, e.g.*, Addendum at 4 ("Uber will have the right, at all times and at

24 Uber's sole discretion, to reclaim, prohibit, suspend, limit or otherwise restrict the Transportation

25 Company and/or the Driver from accessing or using the Driver App . . . .").  To the extent this

26

27

28

United States District Court

For the Northern District of California

1    important factor in the employee/independent contractor test is in dispute, summary judgment is

2    unwarranted.[19]

3         Uber further claims that the right to control element is not met because drivers can work as

4    much or as little as they like, as long as they give at least one ride every 180 days (if on the uberX

5    platform) or every 30 days (if on the UberBlack platform). Mot. at 20. According to Uber, drivers

6    never have to accept any "leads" generated by Uber (*i.e.*, they can turn down as many rides as they

7    want without penalty), and they can completely control *how* to give any rides they do accept. These

8    contentions are very much in dispute. For instance, while Uber argues that drivers never actually

9    have to accept ride requests when logged in to the Uber application, Plaintiffs provided an Uber

10   Driver Handbook that expressly states: "We expect on-duty drivers to accept all [ride] requests."

11   Handbook at 1. The Handbook goes on to state that "[w]e consider a dispatch that is not accepted to

12   be a rejection," and we "will follow-up with all drivers that are rejecting trips." *Id.* The Handbook

13   further notes that Uber considers "[r]ejecting too many trips" to be a performance issue that could

14   lead to possible termination from the Uber platform. *Id.* at 8; *see also* Docket No. 223-57 (email

15   from Uber to driver stating that the driver's "dispatch acceptance rate [of 60%] is too low. . . Please

16   work towards a dispatch acceptance rate of 80%. If you are unable to significantly improve your

17   dispatch acceptance rate, Uber may suspend your account").

18        It is also hotly disputed whether Uber has the right to significantly control the "manner and

19   means" of Plaintiffs' transportation services. *See Alexander*, 765 F.3d at 988. Plaintiffs cite

20   numerous documents, written in the language of command, that instruct drivers to, amongst other

21   things: "make sure you are dressed professionally;" send the client a text message when 1-2 minutes

22   from the pickup location ("This is VERY IMPORTANT"); "make sure the radio is off or on soft

23   jazz or NPR;" and "make sure to open the door for your client." Onboarding Script at 3-6. As Uber

24   emphasizes, "it is the small details that make for an excellent trip," and Plaintiffs have presented

25   _____

26        [19] The issue of Uber's right to terminate its drivers may not truly be in dispute. The contracts
     say what they say, and this Court may interpret unambiguous contractual terms as a matter of law.
27   *See Alexander*, 765 F.3d at 988 (granting summary judgment in favor of FedEx drivers based in
     large part on Court's legal interpretation of the relevant contracts). Assuming the Court reads the
28   contracts to mean what they say – that Plaintiffs are terminable at will – then this factor would tip in
     favor of finding Plaintiffs are Uber's employees.

evidence (when viewed in the light most favorable to them) that Uber seeks to control these details

right down to whether drivers "have an umbrella in [their] car for clients to be dry until they get in

your car or after they get out." *Id.* at 6, 9.  Plaintiffs note that drivers are even instructed on such

simple tasks as how to pick up a customer with their car:



Docket No. 223-20.

Uber responds that it merely provides its drivers with "suggestions," but does not actually

require its drivers to dress professionally or listen to soft jazz or NPR.  *See, e.g.*, Reply Br. at 6.  But

the documents discussed above (and others in the record) are not obviously written as mere

suggestions, and Uber's arguments to the contrary cannot be assumed as true on Uber's motion for

summary judgment where all reasonable inferences from the record must be drawn in favor of

Plaintiffs.  *See, e.g.*, *Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir. 2013) (reiterating that the

court must view summary judgment evidence in the light most favorable to the nonmoving party).

1   Indeed, there is evidence of drivers being admonished (or terminated) by Uber for failing to comply

2   with its "suggestions."  *See, e.g.*, Docket No. 223-50 (informing driver that "a passenger let us know

3   that your attitude wasn't up to Uber's professional standards," and noting that "[i]f we continue to

4   receive negative feedback . . . your account will be reviewed and may be deactivated"); Docket No.

5   223-54 (terminating driver whose "overall driver rating has fallen below the minimum threshold we

6   allow"); Docket No. 223-58 (informing driver that a "passenger let us know that they felt you did

7   not take the most efficient/direct route on a trip" and noting that the driver's account may be

8   deactivated).

9        Nor can this Court at this juncture credit the argument that Uber has no ability to ensure that

10  any driver actually complies with its "suggestions" or otherwise actively monitor its drivers'

11  performance.  In fact, there is evidence suggesting that Uber monitors its drivers to ensure

12  compliance with Uber's many quality control "suggestions."  Most notably, Uber requests

13  passengers to give drivers a star rating, on a scale of 1-5, after each completed trip based on the

14  driver's performance.  Uber also provides a space for riders to provide written comments or

15  feedback on drivers.  Uber documents make it clear that Uber uses these ratings and feedback to

16  monitor drivers and to discipline or terminate them.  As the Uber Driver Handbook clearly states,

17  "Uber follows up on all client reports of dissatisfaction" and "monitor[s] your star rating as well as

18  any complaints made by clients."  Handbook at 7.  Uber notes that it tries to "follow up on *every*

19  quality issue."  *Id.* (emphasis added); *see also* Addendum at 9 ("Transportation Company agrees that

20  its Drivers will maintain high standards of professionalism and service, including but not limited to

21  professional attire and maintain an average Customer score set by Uber based on feedback from

22  users of its Software.").  Furthermore, the relevant contracts with Plaintiffs provide that Uber may

23  terminate any driver whose star rating "falls below the applicable minimum star-rating," Addendum

24  at 9, and a significant amount of evidence in the record indicates that Uber does, in fact, terminate

25  drivers whose star ratings far below a certain threshold determined by Uber.  *See, e.g.*, Docket No.

26  223-54; Docket No. 238-2; Docket No. 238-5.  While it is apparent that drivers' adherence to every

27  detail of Uber's directions (or "suggestions") may not be specifically discernible through rider

28  ratings (since specific questions are not asked in the feedback form), the facts viewed in Plaintiffs'

United States District Court

For the Northern District of California

1   favor suggest monitoring through rider ratings may be a generally effective enforcement mechanism.

2           In arguing there is insufficient monitoring to warrant an inference of an employment

3   relationship, Uber asks the Court to contrast the level of monitoring of Plaintiffs' job performance

4   here to that performed by management in *Alexander*.  In *Alexander*, the Ninth Circuit found the fact

5   that drivers were accompanied on ride-alongs by management representatives up to four times each

6   year important to its determination that drivers were FedEx's employees as a matter of law.

7   *Alexander*, 765 F.3d at 985.  During these ride-alongs, the drivers were scrutinized on minute details

8   of their performance, such as "whether a driver uses a dolly or cart to move packages" or "places his

9   or her keys on the pinky finger of his or her non-writing hand after locking the delivery vehicle." *Id.*

10  (internal quotation marks and modifications omitted).

11          Uber claims that the level of monitoring in *Alexander* is far more extensive than what its

12  transportation providers are subjected to.  Indeed, Uber notes that its admitted employees or

13  members of management never conduct *any* performance inspections or ride-alongs with its drivers.

14  This is an argument for the jury.  At this point it suffices to note that it is not immediately clear that

15  Uber drivers are subject overall to less monitoring than the employees in *Alexander*.  Indeed,

16  viewing the evidence in the light most favorable to the Plaintiffs, it appears they are monitored more

17  pervasively than the drivers in *Alexander*.  The *Alexander* drivers were monitored just four times a

18  year, and knew exactly when they were being inspected.  Uber drivers, by contrast, are monitored by

19  Uber customers (for Uber's benefit, as Uber uses the customer rankings to make decisions regarding

20  which drivers to fire) during each and every ride they give, and Uber's application data can similarly

21  be used to constantly monitor certain aspects of a driver's behavior.  This level of monitoring, where

22  drivers are potentially observable at all times, arguably gives Uber a tremendous amount of control

23  over the "manner and means" of its drivers' performance.  *Cf.* Michel Foucalt, *Discipline and*

24  *Punish: The Birth of the Prison* 201 (Alan Sheridan ed., 1979) (a "state of conscious and permanent

25  visibility [] assures the automatic functioning of power").  If the quarterly monitoring in *Alexander*

26  was sufficiently pervasive to weigh in favor of finding FedEx's drivers were employees as a matter

27  of law, a reasonable jury could conclude that Uber's more persistent performance monitoring

28  similarly weighs in favor of finding that Uber drivers are Uber's employees under California law.

1    Finally, Uber makes much of the fact that Uber has no control over its drivers' hours or

2    whether its drivers even "report" for work more than once in the relevant period.  This is a

3    significant point, and one on which this Court previously commented in noting that such evidence

4    might weigh heavily in favor of a finding of independent contractor status.  However, as noted

5    above, freedom to choose one's days and hours of work (which concededly did not truly exist for

6    FedEx drivers in *Alexander*[20]) does not in itself preclude a finding of an employment relationship.

7    *See, e.g., Air Couriers Int'l*, 150 Cal. App. 4th at 926 (holding hires were employees as a matter of

8    law despite the fact that "drivers determined their own schedules"); *JKH Enterprises Inc.*, 142 Cal.

9    App. 4th at 1051 (holding certain hires were employees as a matter of law despite the fact that they

10   were "not required to work either at all or on any particular schedule").  The more relevant inquiry is

11   how much control Uber has over its drivers *while they are on duty* for Uber.  The fact that some

12   drivers are only on-duty irregularly says little about the level of control Uber can exercise over them

13   when they *do* report to work.[21]  Indeed, and as noted above, the Court of Appeal has (at least

14   implicitly) recognized this precise distinction in earlier cases where hires who were "not required to

15   work either at all or on any particular schedule" were nonetheless held to be employees as a matter

16   of law based on the amount of control the employer could exercise when those employees decided to

17   turn up for work.  *JKH Enterprises Inc.*, 142 Cal. App. 4th at 1051; *see also Air Couriers Int'l*, 150

18   Cal. App. 4th at 937 (identifying "no inconsistency between [finding of] employee status and the

19   driver's discretion on when to take breaks or vacation").

20   Because the Court concludes that a number of material facts relevant to the "primary"

21   *Borello* analysis are in dispute, thus precluding summary judgment, the Court need not examine in

22   detail each of *Borello*'s numerous secondary factors.  The Court nonetheless notes that a reasonable

23   jury could find that numerous secondary factors cut in favor of finding an employment relationship.

24

25   [20] *See Alexander*, 765 F.3d at 985 (in practice drivers had to report to the FedEx Center at the beginning of the day and at the end of the shift.).

26
27   [21] Thus, for instance, a day laborer or any other temporary or casual worker may choose when to make him or herself available for work:  but if once hired, the means and manner of performance is substantially controlled by the hirer, an employment relationship may be found.  *See,*
28   *e.g.*, *Borello*, 48 Cal. 3d at 345-46 (holding that temporary "sharefarmers" were employees entitled to workers' compensation coverage).

United States District Court

For the Northern District of California

1    For instance, a jury could conclude that driving a car (as opposed to, *e.g.*, a truck or bus) does not

2    require a special skill, particularly if no special driver's license is required.  *Compare JKH*

3    *Enterprises*, 142 Cal. App. 4th at 1064 (holding that "the functions performed by the drivers, pick-

4    up and delivery of packages and driving in between, did not require a high degree of skill") *with*

5    *State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 202-203 (1995) (noting that "truck driving –

6    while perhaps not a skilled craft – requires abilities beyond those possessed by a general laborer").

7    Moreover, such driving is typically done in the field without close supervision.  A jury could also

8    find, for the reasons previously discussed, that drivers perform a regular and integral part of Uber's

9    business.

10         To be sure, a number of secondary factors (*e.g.*, drivers use their own vehicle, may employ

11   other drivers to drive on their behalf,[22] and signed an agreement stating no employment relationship

12   is created), do support an independent contractor classification.  But even as to these factors, their

13   significance is ambiguous.  For instance, the fact that the drivers provide their own vehicles and thus

14   invest significant capital is a substantial factor favoring an independent contractor relationship as

15   Uber properly contends, but this fact alone is not dispositive.  In *Alexander*, an employment

16   relationship was found even though drivers provided their own vehicles.  The same is true in *Air*

17   *Couriers International* and *JKH Enterprises.*  Moreover, this *Borello* factor is qualified by the fact

18   that Uber supplies the critical tool of the business – a smart phone with the Uber application.  *See*

19   Service Agreement at 7 (Uber provides drivers with the smartphone to run the Uber app); Docket

20   No. 223-54 (email terminating driver and including "steps" to "return your Uber-issued phone").  In

21   the aggregate, the secondary factors do not clearly cut in one direction.

22         As noted above, rarely does any one factor dictate the determination of whether a

23   relationship is one of employment or independent contract.  Here, numerous factors point in

24   opposing directions.  As to many, there are disputed facts, including those pertaining to Uber's level

25   of control over the "manner and means" of Plaintiffs' performance.  Viewing the current record in

26

27         [22] Drivers are allowed to hire "subcontractors" or "agents" to actually drive Uber passengers
28   for their benefit, so long as those subcontractors or agents meet the same quality standards Uber
     imposes on the actual contracting party.  *See* Service Agreement at 3, 6.

the light most favorable to Plaintiffs, the Court cannot conclude as a matter of law that Plaintiffs are Uber's independent contractors rather than their employees.  Consequently, Uber's summary judgment motion must be denied.

### III.   CONCLUSION

The application of the traditional test of employment – a test which evolved under an economic model very different from the new "sharing economy" – to Uber's business model creates significant challenges.  Arguably, many of the factors in that test appear outmoded in this context.  Other factors, which might arguably be reflective of the current economic realities (such as the proportion of revenues generated and shared by the respective parties, their relative bargaining power, and the range of alternatives available to each), are not expressly encompassed by the *Borello* test.  It may be that the legislature or appellate courts may eventually refine or revise that test in the context of the new economy.  It is conceivable that the legislature would enact rules particular to the new so-called "sharing economy."  Until then, this Court is tasked with applying the traditional multifactor test of *Borello* and its progeny to the facts at hand.  For the reasons stated above, apart from the preliminary finding that Uber drivers are presumptive employees, the *Borello* test does not yield an unambiguous result.  The matter cannot on this record be decided as a matter of law.  Uber's motion for summary judgment is therefore denied.

This order disposes of Docket No. 211.


IT IS SO ORDERED.


Dated:  March 11, 2015

_____
EDWARD M. CHEN
United States District Judge