SHANNON LISS-RIORDAN, *pro hac vice*
(sliss@llrlaw.com)
ADELAIDE PAGANO, *pro hac vice*
(apagano@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:      (617) 994-5801

MATTHEW CARLSON (SBN 273242)
(mcarlson@carlsonlegalservices.com)
Carlson Legal Services
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:     (415) 817-1470

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC,<br><br>Defendant. | Case No. CV 13-3826-EMC<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. Edward M. Chen<br><br>Date: August 6, 2015<br>Time: 1:30 PM |

# NOTICE OF MOTION AND MOTION

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on August 6, 2015, at 1:30 p.m., in Courtroom 5 of this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California, Plaintiffs Thomas Colopy, Matthew Manahan, and Elie Gurfinkel, individually and on behalf of all others similarly situated, will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 23 for class certification of Plaintiffs' claims against Defendant Uber Technologies, Inc. ("Uber").

This motion is brought pursuant to Rule 23 of the Federal Rules of Civil Procedure on the ground that Plaintiffs' claims that Uber has misclassified its drivers as independent contractors rather than employees and has failed to reimburse drivers for their necessary operating expenses pursuant to Cal. Labor Code § 2802 as well as failing to remit the total proceeds of gratuities customers reasonably believe and intend to pay to drivers, in violation of Cal. Labor Code § 351 (which is enforceable through the Cal. Bus. & Prof. Code § 17200 ("UCL") can be adjudicated on a classwide basis. The evidence submitted demonstrates that Plaintiffs have satisfied the requirements of Rule 23(a) and 23(b)(3) and that class certification is appropriate. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities included herein, the Declarations of Shannon Liss-Riordan and Adelaide Pagano, filed herewith, all pleadings and papers on file in this action, any matters of which the Court may or must take judicial notice, and such additional evidence or argument as may be presented at or prior to the time of the hearing.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. FACTUAL BACKGROUND ......................................................................... 4

    1. PLAINTIFFS' REIMBURSEMENT CLAIM UNDER CAL. LABOR CODE § 2802 ...........................................................................6

    2. PLAINTIFFS' CLAIM UNDER CAL. LABOR CODE § 351 (BROUGHT THROUGH THE UCL). ..............................................7

    3. NAMED PLAINTIFFS' WORK FOR UBER. ..............................................8

III. ARGUMENT ................................................................................................ 8

    A. The Class Satisfies The Requirements of Rule 23(a). ............................9

        1. The members of the class are so numerous that joinder is impracticable. ......................................................................9

        2. The claims satisfy the commonality requirement. ..........................10

        3. Plaintiffs satisfy the typicality requirement. ...................................12

        4. Plaintiffs and their counsel adequately represent the interests of the class. ..................................................................13

    B. The Putative Class Satisfies The Requirements of Rule 23(b)..............15

        1. Common questions predominate over questions affecting individual class members. ..............................................................15

        2. A class action is the superior mechanism for addressing the workers' claims. ..........................................................................21

    C. The Court Should Certify A Class That Includes All California Drivers Who Have Worked for Uber Since 2009 And Should Defer Consideration of Whether Uber May Enforce Its Arbitration Agreement Until After a Class is Certified. ..................................................................................22

CONCLUSION .................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**

Abdul-Haqq v. Arise Virtual Solutions, Inc.,
  AAA No. 32 160 00496 13 (Apr. 15, 2015) ......................................................14

Alexander v. FedEx Ground Package Sys., Inc.,
  765 F.3d 981 (9th Cir. 2014) ...........................................................................9

Ali v. Sugarland Petroleum,
  No. CIV.A. 4:09-CV-0170, 2009 WL 5173508 (S.D. Tex. Dec. 22, 2009)........23

Ansoumana v. Gristede's Operating Corp.,
  201 F.R.D. 81 (S.D.N.Y. 2001).......................................................................22

Arias v. Superior Court,
  46 Cal. 4th 969 (2009).....................................................................................1

Arnold v. DirecTV, Inc.,
  2011 WL 839636 (E.D. Mo. Mar. 7, 2011) .......................................................4

Arredondo v. Delano Farms Co.,
  2012 WL 1232294 (E.D. Cal. Apr. 12, 2012)...................................................19

Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79,
  238 F.R.D. 82 (S.D.N.Y. 2006) ......................................................................20

Awuah et al. v. Coverall North America, Inc.,
  460 Mass. 484 (2011) .....................................................................................14

Ayala v. Antelope Valley Newspapers, Inc.,
  59 Cal. 4th 522 (2014).......................................................................... 2, 9, 16

Beliz v. W.H. McLeod & Sons Packing Co.,
  765 F.2d 1317 (5th Cir. 1985)........................................................................19

Blackie v. Barrack,
  524 F.2d 891 (9th Cir.1975) .................................................................. 7, 8, 20

Bond v. Fleet Bank (RI), N.A.,
  2002 WL 31500393 (D.R.I. Oct. 10, 2002) ........................................... 2, 23, 24

Bradley v. City of Lynn,
  443 F. Supp. 2d 145 (D. Mass. 2006)..............................................................15

Calcagno v. High Country Investor, Inc., d/b/a Hilltop Steak House,
  Essex Civ. A. No. 03-0707 (Mass. Super. 2006) .............................................15

Campbell v. First Investors Corp.,
    2012 WL 5373423 (S.D. Cal. Oct. 29, 2012)......................................16

Carnegie v. H&R Block, Inc.,
    180 Misc. 2d 67 (N.Y.S.C. Jan. 7, 1999) .............................................25

Chavarria v. Ralphs Grocery Co.,
    733 F.3d 916 (9th Cir. 2013) ..............................................................2

Chaves v. King Arthur's Lounge, Inc.,
    2009 WL 3188948 (Mass. Super. Jul. 30, 2009)....................................14

Chun-Hoon v. McKee Foods Corp.,
    2006 WL 3093764 (N.D. Cal. Oct. 31, 2006).........................................9

Coleman v. Gen. Motors Acceptance Corp.,
    220 F.R.D. 64 (M.D. Tenn. 2004)........................................................24

Collins v. Int'l Dairy Queen, Inc.,
    168 F.R.D. 668 (M.D. Ga. 1996) ............................................ 2, 23, 24

Comcast Corp. v. Behrend,
    133 S. Ct. 1426 (2013) ......................................................................21

Dalton v. Lee Publications, Inc.,
    270 F.R.D. 555 (S.D. Cal. 2010).............................................. passim

D'Antuono v. C & G of Groton, Inc.,
    2011 WL 5878045 (D. Conn. Nov. 23, 2011)...................................2, 23

Davis v. Four Seasons Hotel Ltd.,
    810 F. Supp. 2d 1145 (D. Haw. 2011) ..................................................4

Davis v. Four Seasons Hotel Ltd.,
    2011 WL 4590393 (D. Haw. Sept. 30, 2011) ........................... 2, 12, 23

Davis v. Four Seasons Hotel Ltd.,
    277 F.R.D. 429 (D. Haw. 2011) ........................................................12

Delagarza v. Tesoro Ref. & Mktg. Co.,
    2011 WL 4017967 (N.D. Cal. Sept. 8, 2011)................................ 15, 20

Depianti et al v. Jan-Pro Franchising International, Inc.,
    465 Mass. 607 (2013) ......................................................................14

DiFiore v. American Airlines, Inc.,
    454 Mass. 486 (2009) ......................................................................15

Eisen v. Carlisle & Jacquelin,
    417 U.S. 156 (1974) ..........................................................................8

Estrada v. FedEx Ground Package Sys., Inc.,
  154 Cal. App. 4th 1 (2007).................................................................9

Garcia et al. v. EJ Amusements, Inc. et al,
  2015 WL 1623837 (D. Mass. Apr. 13, 2015) .................................25

Grosvenor v. Qwest Commc'ns Int'l, Inc.,
  2010 WL 3906253 (D. Colo. Sept. 30, 2010) .................................24

Guifu Li v. A Perfect Franchise, Inc.,
  2011 WL 4635198 (N.D. Cal. Oct. 5, 2011)...................................16

Haley v. Medtronic, Inc.,
  169 F.R.D. 643 (C.D. Cal. 1996) ......................................................3

Harris v. comScore, Inc.,
  825 F. Supp. 2d 924 (N.D. Ill. 2011)..............................................24

Hines v. Overstock.com, Inc.,
  668 F. Supp. 2d 362 (E.D.N.Y. 2009).............................................24

Hose v. Henry Indus., Inc,
  2014 WL 4749431 (D. Kan. Sept. 24, 2014) ........................... 11, 19

In re Currency Conversion Fee Antitrust Litigation,
  361 F. Supp. 2d 237 (S.D.N.Y. 2005).............................................25

In re Evanston Nw. Corp. Antitrust Litig.,
  2013 WL 6490152 (N.D. Ill. Dec. 10, 2013) ..................................24

In re Visa/MasterMoney Antitrust Litig.,
  280 F.3d 124 (2d Cir. 2001) ...........................................................20

Jimenez v. Allstate Ins. Co.,
  765 F.3d 1161 (9th Cir. 2014).........................................................21

Kamm v. Cal. City Dev. Co.,
  509 F.2d 205 (9th Cir. 1975)...........................................................21

Leyva v. Medline Indus. Inc.,
  716 F.3d 510 (9th Cir. 2013)...........................................................21

Madrigal v. Tommy Bahama Grp., Inc.,
  2011 WL 10511339 (C.D. Cal. June 27, 2011).................................8

Matamoros v. Starbucks Corp.,
  699 F.3d 129 (1st Cir. 2012) ..................................................... 14, 15

Meredith v. Honeywell Inter., Inc.,
  245 Fed. Appx. 325 (4th Cir. 2007) .................................................4

v

<u>Merkin v. Vonage Am. Inc.</u>,
   2014 WL 457942 (C.D. Cal. Feb. 3, 2014)........................................................2

<u>Newton v Am. Debt Servs., Inc.</u>,
   549 F. App'x 692 (9th Cir. 2013) ...................................................................2

<u>Norris-Wilson v. Delta-T Grp., Inc.</u>,
   270 F.R.D. 596 (S.D. Cal. 2010)................................................... 13, 19, 20

<u>Overka v. American Airlines, Inc.</u>,
   265 F.R.D. 14 (D. Mass. 2010) ...................................................... 3, 12, 22

<u>Pendergraft v. Arise Virtual Solutions, Inc.</u>,
   AAA No. 71 160 00563 13 (Feb. 4, 2015)...................................................14

<u>Perez v. Safety-Kleen Systems,Inc.</u>,
   253 F.R.D. 508 (N.D. Cal. 2008) ...............................................................22

<u>Phelps v. 3PD, Inc.</u>,
   261 F.R.D. 548 (D. Or. 2009) ....................................................................16

<u>Presseisen v. Swarthmore Coll.</u>,
   71 F.R.D. 34 (E.D. Pa. 1976).....................................................................20

<u>Price, et al. v. Uber Technologies Inc.</u>,
   LASC No. BC-554512, (Cal. Sup. Ct.)......................................................22

<u>Ruiz v. Affinity Logistics Corp.</u>,
   2009 WL 648973 (S.D. Cal. Jan. 29, 2009) .................................................9

<u>Schwann et al v. FedEx Ground Package System, Inc.</u>,
   C.A. No. 11-cv-11094-RGS (D. Mass. July 3, 2013) ................................14

<u>Sealy v. Keiser Sch., Inc.</u>,
   2011 WL 7641238 (S.D. Fla. Nov. 8, 2011)..........................................2, 23

<u>Skirchak et al. v. Dynamics Research Corporation</u>,
   508 F.3d 49 (1st Cir. 2007) ........................................................................15

<u>Smith v. Cardinal Logistics Mgmt. Corp.</u>,
   2008 WL 4156364 (N.D. Cal. Sept. 5, 2008)...................................... passim

<u>Soto v. Diakon Logistics (Delaware), Inc.</u>,
   2013 WL 4500693 (S.D. Cal. Aug. 21, 2013) ...................................... 10, 22

<u>Spicer v. Pier Sixty LLC</u>,
   269 F.R.D. 321 (S.D.N.Y. 2010).................................................................12

<u>Syndicate 1245 at Lloyd's v. Walnut Advisory Corp.</u>,
   2011 WL 5825979 (D.N.J. Nov. 16, 2011)..................................................24

vi

Taylor v. Eastern Connection Operating, Inc.,
    465 Mass. 191 (2013) ....................................................................15

Travers v. Flight Services & Systems, Inc.,
    C.A. No. 11-cv-10175 (D. Mass. 2014) ........................................15

Valentino v. Carter–Wallace, Inc.,
    97 F.3d 1227 (9th Cir.1996) ..........................................................21

Villalpando v. Exel Direct Inc.,
    303 F.R.D. 588 (N.D. Cal. 2014) ............................... 9, 16, 19, 20

Villon et al. v. Marriott,
    306 P.3d 175 (Haw. 2013) .............................................................15

Wal-Mart Stores, Inc. v. Dukes,
    131 S. Ct. 2541 (2011) ..................................................................21

Westways World Travel, Inc. v. AMR Corp.,
    265 F. App'x 472 (9th Cir. 2008) .................................................3

Whittington v. Taco Bell of America, Inc.,
    2011 WL 1772401 (D. Col. May 10, 2011) ................................23

**Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................1

Cal. Civ. Proc. Code ..........................................................................1

Cal. Lab. Code § 2802 ............................................................ passim

**Rules**

Fed. R. Civ. P. 23 ................................................................... passim

# I.    INTRODUCTION

In this case, Uber drivers claim they have been misclassified as independent contractors (and are thus entitled to reimbursement for expenses under Cal. Lab. Code § 2802), and further claim (through the Cal. Bus. & Prof. Code § 17200 ("UCL")) that Uber has violated Cal. Lab. Code § 351 by not remitting tips to drivers that passengers believe they are paying (based upon representations that Uber has made through its website and marketing materials that tips are included in the fare).[1]  Plaintiffs bring this case on behalf of a class of similarly situated individuals who have worked as UberX, UberBlack, and UberSUV drivers in the state of California since August 16, 2009.[2] The named plaintiffs who seek to be class representatives, like the putative class members, were hired by Uber to provide transportation service to Uber's passengers. In performing this work, Plaintiffs were subject to numerous rules and requirements set forth by Uber.  Most significantly (for class certification purposes), in its contracts with drivers, Uber has uniformly reserved the right to terminate drivers at will, in its discretion.

Class treatment is particularly appropriate here.  Adjudication of the Plaintiffs' claims under § 2802 and § 351 (brought through the UCL[3]) both hinge on analysis of the underlying legal question, common to every member of the proposed class – whether Uber's drivers are independent contractors or employees. As the California Supreme Court recently made clear, "[w]hether a common law employer-employee relationship exists turns foremost on the degree of a hirer's right to control how the end result is achieved," and "at the certification stage, the

---

[1]    Plaintiffs have also moved to amend their complaint to add a claim under the Labor Code's Private Attorneys General Act of 2004 (PAGA).  See Dkt. 253.  However there is no need to certify these claims pursuant to Fed. R. Civ. P. 23 because, although "[a]ctions under [PAGA] may be brought as class actions," they do not have to be, and a plaintiff need not satisfy class action requirements to bring a representative action under PAGA.  See Arias v. Superior Court, 46 Cal. 4th 969, 981 (2009); see also Baumann v. Chase Inv. Servs. Corp., 747 F.3d 1117, 1122 (9th Cir.), cert. denied, 135 S. Ct. 870 (2014).

[2]    The statute of limitations under the UCL is four years, see Cal. Bus. & Prof. Code § 17208, meaning that the statute of limitations for Plaintiffs' California Labor Code claims brought through the UCL is four years rather than three years. Cf. Cal. Civ. Proc. Code § 338.

[3]    For convenience, Plaintiffs will refer to these claims as their § 351 claim and § 2802 claim respectively, without always noting that the claims are brought as a violation of the UCL.

relevant inquiry is not what degree of control [defendant] retained over the manner and means of [the work]" but rather whether "there a common way to show [defendant] possessed essentially the same legal right of control with respect to each of its [workers]." <u>Ayala v. Antelope Valley Newspapers, Inc.</u>, 59 Cal. 4th 522, 528, 533 (2014). Here, Uber's uniform right to control its drivers can be established through its contracts, as well as its baseline set of policies with respect to hiring, firing, and paying drivers, and establishing rules and expectations for them to follow.

Furthermore, both Plaintiffs' § 2802 and § 351 claims are clearly amendable to class treatment as they depend upon Uber's uniform practices with respect to failing to reimburse drivers for expenses and common representations to customers that the fare includes a tip for drivers but failing to remit any gratuities to the drivers. Thus, certification of this case will conserve judicial resources and ensure the efficient resolution of the question of the drivers' claims. The alternative to certification would be a series of individual lawsuits, all raising the same factual issues, seeking relief under the same statute and subject to the same defenses.

Moreover, the prerequisites of Fed. R. Civ. P. 23 have clearly been met here. Rule 23(a)'s four requirements – numerosity, commonality, typicality, and adequacy – are all satisfied. There are thousands of Uber drivers across the state of California who have worked for Uber since August 2009, so joinder is clearly impracticable.[4] The misclassification at the heart of this case

---

[4]     Plaintiffs submit that all UberX, UberBlack, and UberSUV drivers in the state of California should be part of the class, including those who may be bound by Uber's arbitration clause, which was disseminated just before this case was filed. As courts have regularly found, the appropriate order of events, where an arbitration clause may be at issue, is for the court to first address class certification, and then, once a class is certified, address the issue of whether the arbitration clause is enforceable should the defendant move to compel arbitration for any class members. <u>See</u>, <u>e.g.</u>, <u>Davis v. Four Seasons Hotel Ltd.</u>, 2011 WL 4590393, *4 (D. Haw. Sept. 30, 2011) ("The possibility that Four Seasons may be able to compel unnamed members of the putative class to arbitrate in the future does not preclude class certification); <u>D'Antuono v. C & G of Groton, Inc.</u>, 2011 WL 5878045, *3 (D. Conn. Nov. 23, 2011); <u>Sealy v. Keiser Sch., Inc.</u>, 2011 WL 7641238, *3-4 (S.D. Fla. Nov. 8, 2011); <u>Bond v. Fleet Bank (RI), N.A.</u>, 2002 WL 31500393, *7 (D.R.I. Oct. 10, 2002) ("[T]hat some members may be subject to a valid arbitration agreement does not preclude this court from certifying a class"); <u>Collins v. Int'l Dairy Queen, Inc.</u>, 168 F.R.D. 668, 678 (M.D.Ga.1996). In this case, Plaintiffs contend that the Court should not enforce Uber's arbitration clause because it is unconscionable. <u>See Chavarria v. Ralphs Grocery Co.</u>, 733 F.3d 916, 927 (9th Cir. 2013); <u>Newton v Am. Debt Servs., Inc.</u>, 549 F. App'x 692, 694 (9th Cir. 2013); <u>Merkin v. Vonage Am. Inc.</u>, 2014 WL 457942, *6-7 (C.D. Cal. Feb. 3, 2014). However, the Court need not address that issue until after a class is certified and (continued on next page)

2

was common to all those drivers, as are the legal questions regarding the consequences of that

misclassification. The named plaintiffs' experiences as Uber drivers are typical of the

experiences, and the plaintiffs will serve as adequate representatives, because there is no conflict

between their interests in being properly classified as employees and reimbursed for their

expenses, and paid the gratuities owed to them, and the interests of the class.[5]  Likewise,

Plaintiffs' counsel will serve as an adequate representative for the class in light of their

substantial experience in wage-and-hour class actions, particularly class actions regarding

independent contractor misclassification. Furthermore, this case also satisfies the two

requirements of Fed. R. Civ. P. 23(b), because common questions plainly predominate over

individual damages issues, and because a class action is superior to thousands of identical claims.

　　The Ninth Circuit has recognized that "Rule 23 provides district courts with broad discretion

to determine whether a class should be certified." Westways World Travel, Inc. v. AMR Corp.,

265 F. App'x 472, 475 (9th Cir. 2008). Courts must bear in mind the "two primary purposes" of

class actions: "(1) to accomplish judicial economy by avoiding multiple suits; and (2) to protect

the rights of persons who might not be able to present claims on an individual basis." Haley v.

Medtronic, Inc., 169 F.R.D. 643, 647 (C.D. Cal. 1996).  Thus, class actions are aimed at

vindicating the rights of persons who might otherwise lack the wherewithal to bring claims on

---

(footnote continued from previous page)
Uber (if it chooses to) moves to compel arbitration for those class members who may be covered
by the clause.

[5]　　As set forth below, Plaintiffs are proposing Plaintiffs Colopy, Manahan, and Gurfinkel as
class representatives, and not Plaintiff O'Connor.  Although O'Connor does not seek to be a
class representative, he does intend to pursue his claims in this case (at least as a class member)
and so has not been dismissed from the case.  (When Plaintiffs first informed Uber that they did
not intend to propose O'Connor as a class representative, Uber suggested that his claims should
then be dismissed with prejudice and that he should pay costs.  Thus, Plaintiffs' counsel chose
not to dismiss him, since he does still have the right to pursue his claims individually or as a
member of the class, even if he does not intend to be a class representative.) It is not unusual for
courts to determine that an individual should not be a class representative for one reason or
another, but to still permit that individual to pursue their claims as a member of the class.  See,
e.g., Overka v. American Airlines, Inc., 265 F.R.D. 14, 24 (D. Mass. 2010) (striking seven
named plaintiffs as class representatives but allowing them to remain part of the class and
continue to pursue their claims in the case as class members).

their own. As a result, and for all the reasons discussed in more detail below, the Court should certify this case as a class action.

## II.    FACTUAL BACKGROUND

Defendant Uber Technologies Inc. ("Uber") is a car service established in 2009 in California,[6] which has engaged thousands of drivers across the state of California to transport riders through its UberBlack, UberSUV, and UberX services.  Although Uber has tried to characterize itself as a "technology company" that connects riders and drivers rather than a transportation service, see Ex. 2 at 40:22-41:14, it is plain that Uber is a transportation service. See Dkt. 251 at 13-14 ("it strains credulity to argue that Uber is not a 'transportation company' or otherwise is not in the transportation business").  Uber relies entirely on individuals it classifies as independent contractors to perform the transportation service that is at the heart of its business.

Before they are able to drive for Uber, all Uber drivers are required to agree to the terms of a form contract, which governs their terms and conditions of their employment. Ex. 2 at 246:4-8, 250:19-22.  UberX drivers like named Plaintiffs Manahan and Gurfinkel have been required to sign an agreement, titled "Transportation Provider Service Agreement."  Ex. 3.[7]  This agreement states that "[t]he Company reserves the right to withhold or revoke its approval and authorization of any Driver at any time, in its sole and unreviewable discretion." Id. at 7-8.  The agreement

---

[6]    Declaration of Shannon Liss-Riordan ("Liss-Riordan Decl."), Ex. 1. All exhibits are to the Liss-Riordan Declaration and are cited as "Ex."

[7]    UberX drivers contract through Uber subsidiary, Rasier LLC, which is "another legal entity within Uber." Ex. 2 at 174:13-175:6.  However, Uber is still the employer of UberX drivers notwithstanding the fact that their contracts are with Rasier.  Arnold v. DirecTV, Inc., 2011 WL 839036, *6 (E.D.Mo. Mar. 7, 2011) (upholding FLSA claims against parent company where plaintiffs had "to wear 'DirecTV' uniforms and display 'DirecTV' magnets …on their vehicles."); Davis v. Four Seasons Hotel Ltd., 810 F. Supp. 2d 1145, 1158-59 (D. Haw. 2011) (rejecting Four Seasons' argument that other entities were food servers' employer because "[a]lthough additional entities may be involved in the operation of [] resorts and may also have or have had power to control the Plaintiffs as banquet servers, a worker may be employed by more than one entity at the same time"); Meredith v. Honeywell Inter., Inc., 245 Fed.Appx. 325, 328-29 (4th Cir. 2007) (finding delivery drivers to be defendant's employees where defendant contracted out to trucking company, and trucking company hired the drivers).

4

uniformly labels drivers as independent contractors. Id. at 3 ("you are an independent contractor engaged in the independent business of providing the transportation services described in this Agreement"). Drivers also agree to maintain "a valid driver's license and all licenses, permits, and other legal prerequisites necessary to perform … transportation services" and to update those documents as necessary. Ex. 3 at 3. The contract requires that while signed in to drive for Uber, drivers must "perform transportation services only for [Uber]" and "shall not display on your vehicle any removable insignia provided by third-party transportation service providers, [or] other lead generation providers." Id. The contract further requires that drivers' vehicle models be no more than ten years old. Id. at 4. The agreement references "Uber's star rating system" and notes that drivers "with low ratings may be limited in their right to accept Requests." Id. at 5. The terms of the form contract are identical, or substantially similar, for every UberX driver. Ex. 2 at 246:4-8, 250:19-22.

UberBlack drivers such as Plaintiff Colopy have been required to sign a similar contract with Uber. See "Software License and Online Service Agreement" (with accompanying Driver Addendum for all UberBlack drivers), Ex. 4 at 234:11-237:16, Ex. 5. This agreement states that "Uber may terminate this Agreement automatically, without any notice requirement, at such moment when the Transportation Company and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle." Ex. 5 at § 9.1. The agreement also provides that Uber will receive a "Fee per Ride" which "is calculated as a percentage of each Fare" and "which shall be set by Uber at Uber's sole discretion based upon local market factors and may be subject to change." Id. at § 5.2.1. The Driver Addendum to the agreement further requires that drivers maintain a minimum star rating. Ex. 5 at § 2. Drivers also agree to submit to a background check and maintain a valid driver's license "and all licenses, permits, and other legal prerequisites necessary" to perform commercial transportation services. Id. at § 1.

All drivers are required by contract to maintain a minimum star rating. Ex. 2 at 61:1-62:14. The star ratings are out of 5 stars, with 5 stars being the highest rating and 1 star being the lowest

and drivers' ratings are continually updated and averaged to produce an average star rating. Id. at 101:17-102:1. The minimum threshold star rating is subject to change in Uber's discretion. Id. at 240:17- 241:17. If a driver fails to maintain that star rating, the driver operations manager, possibly in conjunction with the general manager for that city, has the discretion to terminate that driver. Id. at 239:24-241:17. Uber often communicates with drivers regarding their star ratings and customer feedback and warns drivers if their ratings are too low. See Dkt. 239; Ex. 6 at 130:1-22 (noting that if drivers' acceptance ratings fall too low they are subject to deactivation); Ex. 4 at 212:21-213:22; Ex. 21 at 167:17-23, 295:1-11, Ex. 2 at 76:17-77:24, 98:3-99:18.

Uber calculates all fares; drivers have no ability to negotiate the rates or prices charged to customers or the percentage of the fare retained by Uber. Ex. 2 at 165:2-21, 167:20-168:7; Ex. 7. The general manager of each city has the discretion to set the pricing for the various Uber "platforms" of UberX, UberBlack, and UberSUV. Ex. 8 at 16:19-24; 128:10-18; Ex. 6 at 18:17-19, 54:17-23. Whenever a customer takes a ride, Uber handles the billing of the customer's credit card and remits the driver's share, less the amount of its own fees. Ex. 2 at 163:6-164:9.[8]

### 1. Plaintiffs' Reimbursement Claim Under Cal. Labor Code § 2802.

Uber's policy is not to reimburse drivers for any expenses they must bear such as gas, insurance, car maintenance, or vehicle wear and tear. Ex. 2 at 178:12-179:3; 188:22-189:9. Uber has also deducted a $10 per month fee for a phone data plan from drivers' pay. Id. at 185:5-17.[9]

---

[8]     With respect to UberBlack drivers who drive through an intermediary transportation company, Uber remits the driver's share to the intermediary company, which may or may not deduct additional amounts before passing the rest of the fare on to the driver. Ex. 9 at 44:1-46:14. Although drivers who drive through transportation companies may receive their pay through those intermediary companies, it is Uber who sets the rates and the amount collected by Uber. Ex. 2 at 165:2-21, 167:20-168:7. Likewise, Uber still sets the rules these drivers must abide by and terminates drivers who fail to adhere to them. See Ex. 5 (Driver Addendum) at §§ 2, 5. Drivers like Plaintiff Colopy, who work through transportation companies, log-in to the Uber app directly to view their trips (including the mileage and duration of each trip and the fare) rather than through the intermediary transportation company. Ex. 10, 5 at 88:21-91:13. Likewise, these drivers receive riders directly from Uber through the App, rather than through the transportation company. Ex. 8 at 44:5-21.

[9]     Some UberBlack drivers who work through transportation companies may have had certain expenses reimbursed to them by the intermediary transportation company, which acts as a pass-through between Uber and the drivers (although Plaintiff Colopy testified that he did not have gas reimbursed to him by the intermediary company through which he worked for Uber). (continued on next page)

6

Cal. Labor Code § 2802 states that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Here, Uber's drivers operating expenses, including the costs of maintaining their car and phones should be reimbursed and Plaintiffs seek all expenses that have not been reimbursed as well as all gratuities that have not been paid (see below).

### 2. Plaintiffs' Claim Under Cal. Labor Code § 351 (Brought Through the UCL).

Uber has represented to the public and its customers at various times that "the tip is included" in the fare. Ex. 12 at 4143, Ex. 13 at 890. More recently, Uber's website has represented simply that there is "no need to tip," but implying that the tip is included. Ex. 14 at 4139.[10] However, Uber has continued to distribute materials to its riders indicating that the "tip is included" up to the present. Ex. 15 at ¶¶ 2-3, Ex. B. Notwithstanding these representations, no amount of the fare is segregated as a tip that is remitted to drivers. Ex. 10 at 49:10-15.[11] In response to questions on its website asking "Should I tip my driver?" Uber has responded "No. We automatically include a tip into the Uber fare, so there's no need to provide anything additional to the driver" or "All Uber fares include the tip so there's no reason to ever hand money to your driver." Ex. 16, 17. Uber informs drivers in their training materials that they "are not allowed

---

(footnote continued from previous page)

See Ex. 4 at 62:13-24; cf. Ex. 11 at 124:22-125:1 (testifying that he briefly had expenses paid for by one transportation companies through which he worked for Uber). To the extent that drivers were required to bear any operating expenses themselves, Plaintiffs seek to recover such expenses. That "[t]he amount of damages is invariably an individual question [] does not defeat class action treatment." Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir.1975).

[10] It appears the language on the website that the "tip is included" was replaced with "no need to tip" around the end of 2012. Compare Ex. 14 at 4138 with Ex. 13 at 890.

[11] By representing that a tip is included in the fare, Uber suggests to customers that some segregated amount of the fare is remitted to the driver free and clear (for example 20% is a customary amount for a gratuity), without Uber taking a percentage. However, Uber takes its percentage from the entire fare rather than separating out some portion to be remitted free and clear as a tip. Cal. Lab. Code § 351 prohibits employers from keeping a share of a tip ("[n]o employer or agent shall collect, take, or receive any gratuity or a part thereof …"). Thus, if a reasonable customer would understand that a tip is included (meaning roughly 20% of the fare is a tip), and Uber takes its percentage fee out of that tip, Plaintiffs allege that Uber is in violation of California law. The Court endorsed Plaintiffs' contention that these facts state a claim in its ruling of December 5, 2013. See Dkt. 58.

under any circumstances" to accept cash from customers. Ex. 18 at 938. Uber training materials tell drivers that "All Uber trips are paid for by the client's credit card on file and include gratuity" and instruct drivers that "[i]f a client tries to give you cash, please let them know that the trip cost . . . is inclusive of gratuity." Ex. 19 at 3339; Ex. 20 at 3424.

### 3. Named Plaintiffs' Work for Uber.

Plaintiffs, like all other Uber drivers in California, performed their work pursuant to Uber's policies and under its control. Plaintiff Tom Colopy has worked as a driver for UberBlack since March 2012. Ex. 4 at 48:22-29:11. He initially worked for Uber through L&S Transportation and then was referred to another intermediary transportation company, Cherifi Limousine, by an Uber manager. Id. at 91:20-92:22. While Colopy's intermediary transportation company changed, his driving for Uber remained constant and indeed, he switched to Cherifi Limousine because he wanted to be able to drive "full-time for Uber." Id. at 80:23-81:21, 123:15-125:13.

Plaintiff Matthew Manahan has worked as a driver for UberX part-time since March 2013. Ex. 21 at 20:22-23. He has also worked as a driver part-time for Lyft and Sidecar at various times while working part-time for Uber. Id. at 90:1-5, 92:13-21.

Plaintiff Elie Gurfinkel has worked as a driver for UberX since May 2013. Ex. 22 at 57:12-24. He began working for Uber part-time when his current employer started laying off workers. After three months of driving part-time Gurfinkel was laid off from his company and he "started driving full-time for Uber" a week later, treating it as his "full-time source of revenue." Id. at 55:2-57:24, 171:14-20. He drove exclusively for Uber and never drove for Lyft or Sidecar or any other transportation company. Id. at 133:14-25, 169.

## III. ARGUMENT

A "district court has broad discretion to determine whether a class should be certified." Madrigal v. Tommy Bahama Grp., Inc., 2011 WL 10511339, *2 (C.D. Cal. June 27, 2011). In deciding a motion for class certification, courts focus on whether the requirements of Rule 23 have been satisfied. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). "The court is bound to take the substantive allegations of the complaint as true" in determining the appropriateness of

8

class certification. <u>Blackie</u>, 524 F.2d at 901 n.17. "[T]he court must only determine if the plaintiffs have proffered enough evidence to meet the requirements of FRCP 23, not weigh competing evidence." <u>Chun-Hoon v. McKee Foods Corp.</u>, 2006 WL 3093764, at *4 (N.D. Cal. Oct. 31, 2006) (internal citation omitted). In determining whether to certify "class claims based on the misclassification of common law employees as independent contractors," the California Supreme Court has held that certification "generally does not depend upon deciding the actual scope of a hirer's right of control over its hires," but rather "whether the scope of the right of control, whatever it might be, is susceptible to classwide proof." <u>Ayala</u>, 59 Cal. 4th at 537.

Courts considering the status of drivers as employees or independent contractors have consistently certified such cases as class actions.[12] Here, the Court should do the same and certify a class of all UberBlack, UberX and UberSUV drivers who have worked in the state of California at any time since August 16, 2009.

**A. The Class Satisfies The Requirements of Rule 23(a).**
   **1. The members of the class are so numerous that joinder is impracticable.**

A plaintiff will satisfy the numerosity requirement if "the class is so large that joinder of all members is impracticable." <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1019 (9th Cir.1998). "There is no absolute minimum number of plaintiffs necessary to demonstrate that the putative class is so numerous so as to render joinder impracticable." <u>Breeden v. Benchmark Lending Group, Inc.</u>, 229 F.R.D. 623, 628 (N.D. Cal. 2005). "Although the requirement is not tied to any

---

[12] <u>See</u>, <u>e.g.</u>, <u>Alexander v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 981, 997 (9th Cir. 2014) (ruling that summary judgment should be entered for class of full-time delivery drivers for FedEx); <u>Estrada v. FedEx Ground Package Sys., Inc.</u>, 154 Cal. App. 4th 1, 13-14 (2007) (upholding class certification "because it was clear that common issues—whether the drivers were employees and, if so, which expenses would be reimbursable—predominated"); <u>Villalpando v. Exel Direct Inc.</u>, 303 F.R.D. 588, 610 (N.D. Cal. 2014) (certifying a class of delivery drivers alleging misclassification as independent contractors); <u>Chun-Hoon</u>, 2006 WL 3093764, *1 (certifying a class of drivers/distributors who alleged "violations of various wage and hour laws based on defendant's treatment of them as independent contractors rather than employees"); <u>Ruiz v. Affinity Logistics Corp.</u>, 2009 WL 648973, *1 (S.D. Cal. Jan. 29, 2009) (certifying class of delivery drivers "on the lone issue of whether defendant should have classified the members of the class as employees, rather than independent contractors"); <u>Smith v. Cardinal Logistics Mgmt. Corp.</u>, 2008 WL 4156364, *1 (N.D. Cal. Sept. 5, 2008) (certifying a class of current and former truck drivers making deliveries for The Home Depot).

fixed numerical threshold, courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." <u>Villalpando</u>, 303 F.R.D. at 605-06; <u>see also</u> <u>Berry v. Baca</u>, 2005 WL 1030248, *3 (C.D. Cal. May 2, 2005); <u>Ansari v. New York Univ.</u>, 179 F.R.D. 112, 114 (S.D.N.Y.1998). Here, Plaintiffs seek a class of all UberX, UberBlack, and UberSUV drivers in the state of California who have worked for Uber since August 16, 2009. <u>See</u> Dkt. 209. The Court should include in the class all drivers without regard to whether drivers may be covered by Uber's arbitration agreement, for the reasons set forth <u>infra</u>, Part C.[13]

### 2. The claims satisfy the commonality requirement.

"Rule 23(a)(2) has been construed permissively" such that "[a]ll questions of fact and law need not be common to satisfy the rule." <u>Hanlon</u>, 150 F.3d at 1019. Instead, courts have found that "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." <u>Smith</u>, 2008 WL 4156364, *5. Courts throughout the Ninth Circuit "have found that commonality is met when the proposed class of plaintiffs asserts that class members were improperly classified as independent contractors instead of employees." <u>Soto v. Diakon Logistics (Delaware), Inc.</u>, 2013 WL 4500693, *4 (S.D. Cal. Aug. 21, 2013), <u>clarified on denial of reconsideration</u>, 2013 WL 5939787 (S.D. Cal. Nov. 5, 2013) (collecting cases).

For example, in <u>Dalton v. Lee Publications, Inc.</u>, 270 F.R.D. 555, 559 (S.D. Cal. 2010), the court determined that "[t]here is one significant issue common to the class sufficient to warrant certification: . . . whether Defendant improperly characterized Plaintiffs as independent contractors instead of employees." The court noted that "[a]ll class members had similar contracts with Defendant, all had similar duties, and all had similar pay structures." <u>Id.</u> The same is true here, where all Uber drivers had similar contracts, performed similar work, and had

---

[13]      However, even if the Court were to include in the class only those drivers who cannot be bound by Uber's arbitration clause, Plaintiffs have still clearly satisfied the numerosity requirement. Because of the large number of drivers who have worked for Uber each month, and high turn-over, clearly there are well more than 40 drivers who stopped working for Uber in the four years prior to Uber's implementation of its arbitration agreement in 2013. In addition, well more than 40 drivers in California have opted out of the arbitration clause. Ex. 15 at ¶ 4-5.

similar pay structures. As in <u>Dalton</u>, Plaintiffs have satisfied the commonality requirement.

Likewise, Plaintiffs' Cal. Labor Code § 2802 claim is susceptible to common proof. Section 2802 requires that an employer "indemnify his or her employee[s] for all necessary expenditures or losses incurred by the employee[s] in direct consequence of the discharge of [their] duties." Cal. Lab. Code § 2802(a). Plaintiffs and members of the proposed class are engaged in a common type of job performing substantially similar tasks that require them to regularly incur a common set of expenses which principally include: gas, car maintenance, car wear and tear, insurance, and phone data charges. Uber's policy is not to reimburse drivers for any of these expenses. Ex. 2 at 188:22-189:9. Thus, whether this policy violates § 2802 is a question common to the class.[14]

Similarly, Plaintiffs' claim under Cal. Lab. Code § 351 is susceptible to common proof. In other cases involving misrepresentations to customers that employees are receiving a gratuity

---

[14] As set forth <u>supra</u>, n. 9, some UberBlack drivers who work through transportation companies may have had certain expenses reimbursed to them by the intermediary transportation company, which acts as a pass-through between Uber and the drivers. <u>Compare</u> Ex. 4 at 62:13-24 (testifying that he had to pay for his own gas and that intermediary transportation company did not cover it); <u>with</u> Ex. 11 at 124:22-125:1 (testifying that he briefly had expenses paid for by one transportation company through which he worked for Uber). Plaintiffs simply seek to recover whatever operating expenses drivers were required to bear themselves, and which were not covered by Uber or third parties. Some UberBlack drivers who work through transportation companies have paid for use of their cars to the transportation company. <u>See</u> Ex. 4 at 152:12-21. Thus, they, like all other Uber drivers, have had to pay for their vehicles, but in the form of paying a portion of their Uber earnings to the intermediary company, rather than through incurring expenses directly through wear and tear.

If the Court finds the fact that some UberBlack drivers contracted through intermediary transportation companies significant, it has the option of certifying a sub-class of such drivers, who, like Colopy, drove through transportation companies, as opposed to other Uber drivers, like Manahan and Gurfinkel who bore all their own vehicle expenses directly and contracted directly with Uber (or Raiser). Other courts addressing independent contractor misclassification claims have recognized that classes may properly be certified to include class members who contract with the defendant through an intermediary. <u>See</u> <u>Alexander</u>, 765 F.3d at 991 (noting that the drivers who drove through other driver-intermediaries "are still properly considered employees of the larger company" and noting that the certified class included all drivers who "personally drove full-time for FedEx because the contract "grants FedEx identical rights to control both single-route and multiple-route drivers"); <u>see also</u> <u>Hose v. Henry Indus., Inc</u>, 2014 WL 4749431 (D. Kan. Sept. 24, 2014), <u>order clarified</u>, 2014 WL 5510927 (D. Kan. Oct. 31, 2014) (noting that "[w]hile some unknown number of drivers contract with Henry indirectly through intermediaries, this does not justify denial of conditional certification" and noting that if anything, "creation of an additional subclass" may be appropriate). Indeed, these distinctions are not relevant due to "[t]he uniformity of [Uber's] requirements on all drivers." <u>Ruiz</u>, 2009 WL 648973, *5, n. 3.

11

that is not in fact distributed to them, courts have held that commonality was established. <u>See, e.g.</u>, <u>Davis v. Four Seasons Hotel Ltd.</u>, 277 F.R.D. 429, 436 (D. Haw. 2011), <u>report and recommendation adopted,</u> 2011 WL 4590393 (D. Haw. Sept. 30, 2011) (certifying class on statutory gratuity claim in which plaintiffs alleged that defendant misled customers into thinking that waitstaff were receiving total proceeds of gratuities and noting that "the truth or falsity of the common contentions will likely resolve issues that are central to the validity of the class members' claims in one stroke")[15]; <u>Spicer v. Pier Sixty LLC</u>, 269 F.R.D. 321, 338 (S.D.N.Y. 2010) ("commonality is clearly satisfied" where "service charge policy that was in all material respects nearly identical for each plaintiff"); <u>Overka v. American Airlines, Inc.</u>, 2010 WL 517407 (D. Mass. Feb. 4, 2010) (certifying nationwide class challenging policy of imposing a $2 per bag charge that looked to reasonable customers like a tip but was not distributed to skycaps). Thus, all of Plaintiffs' claims are susceptible to common proof.

### 3. Plaintiffs satisfy the typicality requirement.

"Typicality is a permissive standard, and only requires that the named plaintiffs claims' are 'reasonably coextensive' with those of the class." <u>Dalton</u>, 270 F.R.D. at 560. "Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." <u>Smith</u>, 2008 WL 4156364, *5. Thus, "[i]n examining this condition, courts consider whether the injury allegedly suffered by the named plaintiffs and the rest of the class resulted from the same alleged common practice." <u>Id.</u> (internal quotation omitted).

Here, there are no factual distinctions between Plaintiffs' claims and those of putative class members. The named Plaintiffs predicate these claims entirely upon two of Uber's uniform practices: (1) misclassifying drivers as independent contractors (and failing to reimburse them

---

[15]     In <u>Four Seasons</u>, the court certified the class, and ultimately entered summary judgment in the plaintiffs' favor, notwithstanding the defendant's contention that at various points in time, on different documents, some differing representations were made regarding the gratuities at issue. <u>Davis v. Four Seasons Hotel Ltd.</u>, Civ. A. No. 08-00525 (D. Haw.), Dkt. 155 (attached to Liss-Riordan Declaration as Ex. 26), at 5-7, 20-22; <u>Four Seasons</u>, 2011 WL 4590393 *6 (D. Haw. Sept. 30, 2011) (certifying class).

for business expenses), and (2) failing to pay drivers gratuities which Uber has represented to passengers were being paid to them. Indeed, the claims of the named Plaintiffs are not merely typical of the claims of the proposed class but are, in fact, identical. See Norris-Wilson v. Delta-T Grp., Inc., 270 F.R.D. 596, 605 (S.D. Cal. 2010) (noting that "[t]he injuries alleged—a denial of various benefits—and the alleged source of those injuries—a sinister classification by an employer attempting to evade its obligations under labor laws—are the same for all members of the putative class" such that "[t]he typicality requirement is therefore satisfied"). Thus, the typicality requirement has been met.[16]

### 4. Plaintiffs and their counsel adequately represent the interests of the class.

To meet the adequacy requirement of Fed.R.Civ.P. 23(a)(4), courts require "(1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." Dalton, 270 F.R.D. at 560. Both factors are met here. First, there is no potential conflict between the named Plaintiffs and the other class members since they are challenging practices applied uniformly to all class members. Similarly, Plaintiffs' interests do not differ from those of the class as a whole, in that they seek to benefit the proposed class by obtaining damages for those class members.[17]

---

[16] Because all drivers were subject to substantially similar contracts and policies, Plaintiffs submit that sub-classes are not necessary. However, as noted supra at n. 14, if the Court were to find that there are material differences among different types of Uber drivers, such as those who drove through transportation companies (like Colopy), or those who drove part time (like Manahan), the Court could, in its discretion, certify sub-classes. But see Villalpando v. Exel Direct Inc., 303 F.R.D. 588, 599-600 (N.D. Cal. 2014) (court certified a class of all drivers who personally performed delivery services and did not limit class to full-time drivers, implicitly adopting plaintiffs' argument that "Exel's attempt to distinguish Alexander on the basis that the drivers in that case were full-time drivers fails because the reasoning of Alexander applies regardless of whether the plaintiffs in this case worked full-time or part-time.")

[17] Plaintiffs expect that Uber may argue that the named plaintiffs are not adequate class representatives because some Uber drivers want to be classified as independent contractors and these drivers' interests and desires are therefore in conflict with the interests of the named plaintiffs. However, "the conflicts that Rule 23(a)(4) is concerned about are conflicts between the class representatives and other members of the putative class, not between those who do and don't think a lawsuit is a good idea in the first place." Norris-Wilson, 270 F.R.D. at 606; Smith, 2008 WL 4156364, *7 (rejecting the argument that because some "drivers want to be independent contractors, rather than employees, and are opposed to the current litigation" this "creates irreconcilable conflicts between the named Plaintiffs and other putative class members" and renders them inadequate class representatives); see also Matamoros v. Starbucks Corp., 699 (continued on next page)

13

Additionally, Plaintiffs have retained counsel with extensive expertise and experience in prosecuting wage and hour cases, in particular cases alleging independent contractor misclassification and gratuities violations, and with the resources to represent the class effectively.[18] Lichten & Liss-Riordan, P.C. has been widely recognized as one of the leading plaintiffs' firms representing workers in wage and hour litigation, and Attorney Liss-Riordan has been noted as one of the top plaintiffs' lawyers nationally for her work on behalf of low-wage workers in class actions.[19] She has obtained many ground-breaking victories in wage and hour and employment law, including numerous successful appeals[20], trials[21], summary judgment

(footnote continued from previous page)
F.3d 129, 138 (1st Cir. 2012) (rejecting argument that intra-class conflict precluded class certification and noting that "an interest by certain putative class members in maintaining the allegedly unlawful policy is not a reason to deny class certification").

[18] Plaintiffs' lead counsel, Attorney Liss-Riordan, has been a leader and pioneer in the field of independent contractor misclassification over the last decade. She has obtained significant and first-of-their-kind victories in cases challenging independent contractor misclassification in a variety of industries, including the cleaning, trucking, adult entertainment, and call center industries. See, e.g., Awuah et al. v. Coverall North America, Inc., 460 Mass. 484 (2011) (in case where federal court held "franchisee" cleaning workers to have been misclassified as independent contractors, SJC established the damages awardable for the misclassification, including refunds of "franchise fees"); Schwann et al v. FedEx Ground Package System, Inc., C.A. No. 11-cv-11094-RGS (D. Mass. July 3, 2013) (granting plaintiffs' motion for summary judgment, holding FedEx drivers to have been misclassified as independent contractors), reversed on federal preemption grounds, 2015 WL 501512 (D.Mass. Feb. 05, 2015) (appeal pending); Chaves v. King Arthur's Lounge, Inc., 2009 WL 3188948 (Mass. Super. Jul. 30, 2009) (exotic dancers were misclassified as independent contractors); Pendergraft v. Arise Virtual Solutions, Inc., AAA No. 71 160 00563 13 (Feb. 4, 2015), and Abdul-Haqq v. Arise Virtual Solutions, Inc. AAA No. 32 160 00496 13 (Apr. 15, 2015) (work-at-home call center workers were misclassified as independent contractors).

[19] See, e.g., "Lawyer Fights for Low Wage Workers' Rights", Boston Globe (Dec. 23, 2012) (Ex. 23). Each year since 2008, Attorney Liss-Riordan has been selected for inclusion in Best Lawyers in America (Chambers), and Lichten & Liss-Riordan, P.C. has been one of only a few plaintiffs' employment firms in Massachusetts to have attained a "Tier 1" ranking in that survey. The 2013 edition of Chambers Best Lawyers in America said this about her:

KEY INDIVIDUALS Shannon Liss-Riordan is considered a leader of the wage and hour litigation Bar, where she is described by peers as "the reigning plaintiff's champion." She has a nationwide practice, and is highly experienced in cases involving tipped employees.

Exhibit 24.

[20] See, e.g., Depianti et al v. Jan-Pro Franchising International, Inc., 465 Mass. 607 (2013) (company can be held liable for misclassification even if workers contracted through another
(continued on next page)

decisions, and settlements. Thus, Plaintiffs and their counsel have satisfied the adequacy requirement of Rule 23(a).

**B. The Putative Class Satisfies The Requirements of Rule 23(b).**

    **1. Common questions predominate over questions affecting individual class members.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Smith, 2008 WL 4156364, *8 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). "Because no precise test can determine whether common issues predominate, the court must pragmatically assess the entire action and the issues involved." Chun-Hoon, 2006 WL 3093764, *2. "A court evaluating predominance must determine whether the elements necessary to establish liability [here, employee status] are susceptible to common proof or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence." Villalpando, 303 F.R.D. at 608. Courts must thus separate the issues subject to "generalized proof" from those subject to "individualized proof" to determine whether plaintiffs have satisfied predominance. Delagarza v. Tesoro Ref. & Mktg. Co., 2011 WL 4017967, *10 (N.D. Cal. Sept. 8, 2011).

Common questions regarding liability plainly predominate in this case for the same reasons that the proposed class satisfies Rule 23(a)'s commonality requirement - the core claims of all

---

(footnote continued from previous page)

company); Taylor v. Eastern Connection Operating, Inc., 465 Mass. 191 (2013) (Massachusetts law could apply to workers in New York because of choice of law provision); Villon et al. v. Marriott, 306 P.3d 175 (Haw. 2013) (waitstaff can recover back wages under Hawaii service charge statute); Matamoros v. Starbucks Corp., 699 F.3d 129 (1st Cir. 2012) (Starbucks violated tips law); DiFiore v. American Airlines, Inc., 454 Mass. 486 (2009), rev'd on federal preemption grounds, 646 F.3d 81 (1st Cir. 2011), cert. denied, 132 S. Ct. 761 (2011); Skirchak et al. v. Dynamics Research Corporation, 508 F.3d 49 (1st Cir. 2007) (arbitration agreement unconscionable).

[21] See, e.g., Travers v. Flight Services & Systems, Inc., C.A. No. 11-cv-10175 (D. Mass. 2014) (jury awarded skycap approximately $1 million on retaliation claim, though verdict was later reduced by the court, and appeal is pending); DiFiore v. American Airlines, Inc., Civ. A. No. 07-10070 (D. Mass. 2008), reversed on federal preemption grounds, 646 F.3d 81 (1st Cir. 2011); Calcagno v. High Country Investor, Inc., d/b/a Hilltop Steak House, Essex Civ. A. No. 03-0707 (Mass. Super. 2006) (verdict for class in tips case); Bradley v. City of Lynn, 443 F.Supp.2d 145 (D. Mass. 2006) (verdict for class in disparate impact case challenging Civil Service hiring examination for firefighters and police officers).

class members turn on whether Uber's practice of classifying drivers as independent contractors, failing to reimburse them for expenses, and not remitting to drivers Plaintiffs the gratuities that Uber advertises to customers that they are paying when they pay their fare. The California Supreme Court has made clear that for purposes of deciding whether to certify a class on the issue of misclassification, the relevant inquiry is whether the defendant's "right of control over its [drivers], whether great or small, [is] sufficiently uniform to permit classwide assessment." Ayala, 59 Cal. 4th at 533. By its very definition, the *right* to control is an issue that may be determined by common evidence and representative testimony regarding control. Thus, in Villalpando, 303 F.R.D. at 608, the court considered delivery drivers' misclassification claims and found that common issues predominated because "drivers are required to sign the same contracts," and defendant's "policies as to safety, vehicle maintenance, grooming, the assignment of delivery routes, and communications with customers, among other things, [] show that the degree of control [it] exercised over the class members makes them employees rather than independent contractors."

Likewise, in Dalton v. Lee Publications, Inc., 270 F.R.D. 555, 563 (S.D. Cal. 2010), the court considered certifying misclassification claims and found that "[t]he primary factor, the right to control, is [] susceptible to common proof . . . because the rights and obligations of the class members and Defendant are set forth in two sets of substantially identical contracts." See also Phelps v. 3PD, Inc., 261 F.R.D. 548, 557 (D. Or. 2009) (noting that "driver contracts and the vehicle lease agreements, both of which have provisions relevant to defendant's right to control, are common evidence" and that "[o]ther common evidence is offered through the testimony of the regional managers and drivers on issues that are also relevant to the right to control" such that class certification was warranted); Campbell v. First Investors Corp., 2012 WL 5373423, *2-3 (S.D. Cal. Oct. 29, 2012) (whether insurance agents "were inappropriately classified as independent contractors and, as a result, not paid in accordance with the California Labor Code" was a common which predominated for purposes of Rule 23(b)(3)); Guifu Li v. A Perfect Franchise, Inc., 2011 WL 4635198, *12 (N.D. Cal. Oct. 5, 2011) (class of massage therapists

satisfied predominance requirement because "[t]he central question to be resolved—whether Perfect Day has the right to control the massage therapists—will be determined based on evidence common to the class" such as the "[independent contractor agreement] signed by every massage therapist" and "the policies and procedures that apply to all massage therapists" and further noting that "common proof also likely resolves [secondary factors such as ] whether the employer retains the right to discharge at will; the kind of occupation, . . . the skill required in the particular occupation; whether the principal or the worker supplies the instrumentalities, tools, and the place of work  . . . the method of payment . . . and whether or not the work is a part of the regular business of the principal").

Similarly, Plaintiffs may rely upon Uber's contracts with drivers and its policies related to hiring, firing, discipline, and payment of drivers as "common proof" of control.  Plaintiffs will show that Uber had baseline policies regarding rules that drivers were required to follow.  For example, Uber's contract with UberBlack drivers notes that drivers agree that they "will maintain high standards of professionalism and service, including but not limited to professional attire and maintaining an average Customer score set by Uber…" and that Uber may deactivate drivers who "fail to maintain the standards of appearance and service required by the users of the Uber Software." Ex. 5 at § 4.3.2.  The contract further provides Uber the uniform right to terminate drivers at will: "Uber will have the right, at all times and at Uber's sole discretion, to reclaim, prohibit, suspend, limit, or otherwise restrict the Transportation Company and/or the Driver from accessing or using the Driver App or the Device." Ex. 5 at § 4.1.1; see also Ex. 3 at 7-8.  The contract further provides that Fees are "set by Uber at Uber's sole discretion," thereby unilaterally granting Uber a uniform right of control over drivers' compensation such that drivers are unable to negotiate their rates. Ex. 5 at § 5.2.1; Ex. 7 at 19 ("We have every right to change pricing how we see fit").[22]  Uber uses its own employees and software to track drivers' ratings

---

[22]     Uber will likely argue that various documents disseminated to drivers and utilized in training were only distributed during certain time frames or in certain locations, undermining their utility as a form of common proof.  Plaintiffs submit that such documents are indicative of Uber's policies and that they need not show that every driver was in receipt of every document in (continued on next page)

17

and customer reviews and follow up with drivers as a way of ensuring drivers are following Uber's rules.[23] Plaintiffs will also be able to use the common evidence that it is Uber's uniform practice to set prices for drivers' services, bill customers and collect money from customers, and decide what 'star rating' threshold is acceptable in order to continue driving for them. Ex. 2 at 163:5-165:21; 167:20-168:7, 61:1-62:14, 240:17-241:17.

As noted earlier, that some UberBlack drivers drove through intermediary companies, or that other UberBlack "partners" had drivers driving under them, makes no difference for purposes of certifying the class. For example, in Alexander, 765 F.3d at 991, some FedEx drivers were so-called multi-route drivers who had other drivers working under them. These multi-route drivers are not unlike the UberBlack partners who drive for Uber but also have other drivers driving for Uber under their accounts. In Alexander, the Ninth Circuit noted that both the multi-route drivers and their workers – the FedEx drivers who drive through other driver-intermediaries – were all properly considered FedEx employees because "the [operating agreement] grants FedEx identical rights to control both single-route and multiple-route drivers." Id. Likewise, here, any UberBlack partner who personally drives for Uber,[24] and any UberBlack driver who contracts through a transportation company are subject to Uber's "identical right[] to control" their work

---

(footnote continued from previous page)
order to rely upon them. However, this hardly matters given that Uber's contracts, which were indisputably common to all drivers, give Uber the right to terminate drivers at will (and control various other aspects of their work).

[23] Uber will undoubtedly continue to raise merits-based arguments, including the argument that it merely provided "suggestions" to drivers as to how to perform better and not enforceable rules. However, whether these requirements are better characterized as rules or suggestions should not prevent certification of the class and Uber should not be allowed to avoid class certification simply by denying responsibility for the rules imposed on its drivers.

[24] As explained, supra, n. 14, UberBlack drivers who contract through transportation companies share common questions regarding the propriety or Uber's misclassification, reimbursement, and gratuity policies, with other Uber drivers (including UberX drivers), such that the certified class should include all Uber drivers (though the Court could certify sub-classes if it found these differences material). Likewise, so-called UberBlack "partners" who act as intermediaries between Uber and UberBlack drivers may also be part of the class to the extent they personally performed transportation services for Uber. See, e.g., Atkin Dep. at 46:11-14 ("There are instances when the partner is the sole proprietor and independent operator and only person in the business"). To the extent an UberBlack "partner" drove for Uber, he would be subject to the same exact contract and identical right of control.

via the Licensing agreements. Similarly in <u>Villalpando</u>, 303 F.R.D. at 598-99, the court rejected

defendant's argument that class certification was inappropriate because some Exel drivers hired

helpers and secondary drivers to help them perform deliveries, and instead certified a class of

"[a]ll individuals who have personally provided delivery services for Defendant." <u>Id.</u> at 610.

The Court should do the same here and certify a class of any Uber partner or driver who

personally drives for Uber, regardless of whether they drove through an intermediary company

or have had other drivers under their account.[25]

Finally, courts have rejected arguments that an "individualized inquiry into the nature of each

driver's situation," is required to determine employee status because subsidiary issues "although

relevant, are largely subsumed under the ultimate issue of [defendant's] control over its []

drivers." <u>Smith</u>, 2008 WL 4156364, *10.  For example, in <u>Smith</u>, the court rejected the argument

that individual questions as to "whether the driver had established his own corporation and

whether the driver owned his own truck" would preclude certification.  Similarly, in <u>Norris-</u>

<u>Wilson</u>, 270 F.R.D. at 608, the court noted that although drivers "vary in a multitude of ways . . .

the question is whether those variations . . . are meaningful when it comes to answering the

question whether they are independent contractors or employees."  There, the court found that

variations "in the number of hours per day and days per week they worked, in the nature of the

work they performed, in their educational backgrounds, [and] in the certifications and licenses

they carry, . . . [a]t best, [] touch on just three of the seven secondary factors articulated in

<u>Borello</u>." <u>Id.</u>  The court in <u>Norris-Wilson</u> found class certification was warranted because the

majority of the <u>Borello</u> factors were subject to common proof and the overall question of

misclassification could be determined with resort to that common proof. <u>See also</u> <u>Delagarza</u>,

---

[25]     <u>See also</u> <u>Hose</u>, 2014 WL 4749431, *11 (noting that "[w]hile some unknown number of
drivers contract with Henry indirectly through intermediaries, this does not justify denial of
conditional certification" and noting that if anything, "creation of an additional subclass" may be
appropriate); <u>Arredondo v. Delano Farms Co.</u>, 2012 WL 1232294 *9 (E.D.Cal. Apr. 12, 2012)
("If it is determined that the farm labor contractor [intermediary] is an employee of the
agricultural employer, the agricultural workers [under the farm labor contractor] are deemed to
be employees of the agricultural employer..."); <u>see also</u> <u>Beliz v. W.H. McLeod & Sons Packing</u>
<u>Co.</u>, 765 F.2d 1317, 1328 (5th Cir. 1985) (same).

19

2011 WL 4017967, *12 ("Defendant would read the predominance requirement to constitute a

uniformity requirement, such that a single exception would defeat class certification. Such a

standard does not exist in the case law or the federal rules").  As in Norris-Wilson, variations

among drivers as to "the number of hours per day and days per week they worked," or what

expenses may have been paid for by transportation companies, does not affect the overall inquiry

into employee-status where so many other sources of common proof exist.  Thus, it is clear that

common questions predominate here because "the elements necessary to establish liability … are

susceptible to common proof" and "there are ways to manage effectively [those] element that

may require individualized evidence." Villalpando, 303 F.R.D. at 608.

    That the individual damages of each driver necessarily will vary – a characteristic of any

wage-and-hour class action – is of no consequence. Blackie, 524 F.2d at 905 ("The amount of

damages is invariably an individual question and does not defeat class action treatment").  For

example, in Dalton, 270 F.R.D. at 564, the court found that "reimbursement for vehicle and

mileage expenses," could be easily handled by resort to "the IRS standard mileage allowance (or

some other method) [which] provides a reasonable basis to calculate mileage expenses." Uber

will likely argue that different drivers will have different categories of unreimbursed expenses,

particularly with respect to UberBlack drivers who drive through transportation companies and

may have had agreed that the transportation company would pay certain expenses like car

washes or repairs, etc.  However, these individual variations are not a barrier to class

certification. At this stage, the Court may certify the class as to liability while reserving damages

determinations for a later proceedings.[26]  See Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1168

_____

[26]    Calculating damages is generally an administrative hurdle that has no bearing on liability and
may be accomplished through a number of methods without prejudice to defendants. See In re
Visa/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001) ("There are a number of
management tools available to a district court to address any individualized damages issues that might
arise in a class action, including: (1) bifurcating liability and damage trials with the same or different
juries; (2) appointing a magistrate judge or special master to preside over individual damages
proceedings; (3) decertifying the class after the liability trial and providing notice to class members
concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or
amending the class"), superseded by statute on other grounds as stated in Attenborough v. Constr. &
Gen. Bldg. Laborers' Local 79, 238 F.R.D. 82, 100 (S.D.N.Y. 2006).

(9th Cir. 2014) (approving district court's decision to bifurcate proceedings).

Likewise, in <u>Leyva v. Medline Indus. Inc.</u>, 716 F.3d 510, 514 (9th Cir. 2013), the court noted that even after the Supreme Court's decision in <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1435 (2013), and <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541 (2011), "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)" so long as plaintiffs can "show that their damages stemmed from the defendant's actions that created the legal liability." As in <u>Leyva</u>, the plaintiffs here can demonstrate that their damage for expenses and gratuities stem from their misclassification and from defendant's uniform policies with respect to these questions, such that the need to make an individualized calculation of damages cannot defeat class certification. Thus, the predominance requirement has been satisfied.

### 2. A class action is the superior mechanism for addressing the workers' claims.

Where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." <u>Valentino v. Carter–Wallace, Inc.</u>, 97 F.3d 1227, 1234–35 (9th Cir.1996). A district court has "broad discretion" in determining whether class treatment is superior. <u>Kamm v. Cal. City Dev. Co.</u>, 509 F.2d 205, 210 (9th Cir. 1975). The following factors are pertinent to this analysis:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

Here, a class action is clearly a superior method. It would be grossly inefficient to require each driver to bring a case challenging these practices individually, resulting in increased expense, duplication of discovery, and potential for inconsistent results. Even if damage issues require individualized assessments, the efficiencies gained by use of a class action for common questions will ultimately benefit all of the class members, and Uber, by dramatically reducing litigation expenses. This is equally true notwithstanding the fact that damages for expense

21

reimbursement under § 2802 are potentially substantial.[27]

Moreover, "class adjudication is superior in the employment context because fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis." Overka, 265 F.R.D. at 24. Indeed, numerous courts have held that class actions are superior in wage cases because of the prospect of retaliation. See, e.g., Perez v. Safety-Kleen Systems,Inc., 253 F.R.D. 508, 520 (N.D. Cal. 2008). Permitting Plaintiffs to prosecute their claims on behalf of the proposed class meets these challenges and provides a superior method of resolving the claims of the putative class members.[28]

Finally, this case offers a readily identifiable class of people in a limited geographical area (California), which presents no unusual management problems. Thus, for all these reasons, the superiority requirement of Rule 23(b) has been met.

### C. The Court Should Certify A Class That Includes All California Drivers Who Have Worked for Uber Since 2009 And Should Defer Consideration of Whether Uber May Enforce Its Arbitration Agreement Until After a Class is Certified.

Plaintiffs anticipate that Uber will argue that many (indeed, most of its current) drivers cannot be members of this class because they are bound by an arbitration agreement that Uber disseminated to its drivers beginning shortly before this case was filed. However, as a number of courts have recognized, when faced with such a situation, the proper course is for the Court first to certify the class and then, if necessary, address the enforceability of any arbitration clause that

---

[27] See Soto, 2013 WL 4500693, *7 (rejecting defendant's argument that where damages were as high as $50,000 per plaintiff, workers would have "sufficient economic incentive to bring their own claims" and a class action would not be superior and instead concluding that "individually controlling separate actions, [would] heavily burden[] the Court and the litigants").

[28] As for the extent and nature of other litigation concerning the same controversy, Plaintiffs note that another case was subsequently filed in California state court alleging similar claims, see Price, et al. v. Uber Technologies Inc., LASC No. BC-554512, (Cal. Sup. Ct.). However no class has been certified in Price, the case was filed after this case, and it is not as far advanced in the proceedings such that Plaintiffs submit that certification in this case is appropriate. The Court should conclude that "[t]he proceedings already undertaken [here] cause any separate actions in this and other forums to be wasteful and inefficient," Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 89 (S.D.N.Y. 2001), and a certify the class in this case.

22

might bind some members of the class.

A number of federal courts have found that until a class or collective action is certified and notice is distributed, it is inappropriate to consider the enforceability of any arbitration agreements. See, e.g., Four Seasons, 2011 WL 4590393, *4 ("The possibility that Four Seasons may be able to compel unnamed members of the putative class to arbitrate in the future does not preclude class certification"); D'Antuono, 2011 WL 5878045, *3 (holding that after class notice was disseminated, it could then consider whether to compel arbitration for any class members who had signed arbitration agreements); Sealy, 2011 WL 7641238, *3-4 (rejecting the defendant's argument that plaintiff could not meet the similarly situated requirement because the vast majority of the defendant's employees, including nearly all of the opt-in plaintiffs, had signed arbitration agreements); Ali v. Sugarland Petroleum, No. CIV.A. 4:09-CV-0170, 2009 WL 5173508 (S.D. Tex. Dec. 22, 2009) (refusing to consider arbitration agreements at the notice stage); Bond, 2002 WL 31500393, *7 ("[T]hat some members may be subject to a valid arbitration agreement does not preclude this court from certifying a class" under Rule 23); Collins, 168 F.R.D. 668, 678 (M.D. Ga. 1996) (holding that it was improper to deny class certification under Rule 23 on that basis that some members of the putative class were subject to arbitration agreements); see also Whittington v. Taco Bell of America, Inc., 2011 WL 1772401 (D. Col. May 10, 2011); Davis v. Novastar Mortg., Inc., 408 F.Supp.2d 811 (W.D. Mo. 2005); Villatoro v. Kim Son Restaurant, L.P., 286 F.Supp.2d 807 (S.D. Tex. 2003).

These courts have agreed that, when faced with a motion for class or conditional certification, the proper course is first for the court to certify the class and issue notice, and then for any class members who signed arbitration agreements to be given the opportunity to challenge the enforceability of the agreement. See D'Antuono, 2011 WL 5878045, *4. Courts that have certified such cases and issued notice prior to entertaining arguments regarding the enforceability of arbitration clauses have reasoned that:

> the sensible course . . . is to decide whether to certify the class without considering the possibility of arbitration, bring the [putative class] into the case, see what their position is on arbitration, and then decide who must arbitrate. If it turns out that . . . either group,

23

must arbitrate . . . the Court can always decertify, subclassify, or otherwise alter the class later.

In re Evanston Nw. Corp. Antitrust Litig., 2013 WL 6490152, *5 (N.D. Ill. Dec. 10, 2013).[29]

Thus, this Court should now certify the class prior to addressing the enforceability of the arbitration agreements. Following class certification, notice would issue pursuant to Fed. R. Civ. P. 23(c)(2), and, following an opt-out period, the Court would then know the composition of the class. At that point, with the class then before the Court, Uber may, if it so chooses, move to compel arbitration with respect to class members who it contends are bound by arbitration agreements.[30]

---

[29]     In Bond, 2002 WL 31500393, *7, the court rejected the notion that the "proposed class [is] overbroad because it includes members who did not opt-out of the arbitration agreement" and noted that the fact that "some members may be subject to a valid arbitration agreement does not preclude this court from certifying a class." The court stated that "at some later juncture, the arbitration agreement may call for the creation of subclasses, or the eliminating some members of the class, but it does not defeat the merits of certification." Id.; see also Collins, 168 F.R.D. at 678 (certifying "an additional subclass" of those whose "agreements contain arbitration clauses" and noting that the clause "may result in redefinition of the classes of plaintiffs to exclude some or all of the members of this subclass" at a later stage); Coleman v. Gen. Motors Acceptance Corp., 220 F.R.D. 64, 91 (M.D. Tenn. 2004) ("The possibility that some class members might have signed arbitration agreements does not defeat class certification, although the court reserves the right to create a subclass, modify the class definition, or otherwise specially treat the class members subject to arbitration at a later juncture").

[30]     If Uber brings such a motion after class certification, Plaintiffs would argue that Uber's arbitration agreement is unconscionable and unenforceable. However, even if the Court does ultimately enforce the arbitration clause, by certifying the class first and distributing notices prior to deciding enforceability, class members will at least receive notice and can be informed that they would have to utilize individual arbitration in order to pursue their claims. Although the Court has already ordered corrective notice be sent in this case, see Dkt. 106, 111, this notice was not effective in informing Plaintiffs that they would need to opt out of the arbitration clause in order to be potential class members in this case. The notice was disseminated on drivers' iPhones when they were in their cars and about to go on-duty with Uber. In order to see the arbitration agreement contained in the agreement that they had to accept in order to continue or begin driving, drivers would have had to click on a link. A number of courts have held that such "clickwrap" agreements are only enforceable where (unlike here) the terms of the agreement were visible on the page the user viewed. See, e.g., Grosvenor v. Qwest Commc'ns Int'l, Inc., 2010 WL 3906253, *2 (D. Colo. Sept. 30, 2010) (noting that "[a]s a rule, a clickwrap is valid where the terms of the agreement appear on the same screen with the button the user must click to accept the terms and proceed with the installation of the product"); Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., 2011 WL 5825979, *4 (D.N.J. Nov. 16, 2011) ("Generally, courts have enforced . . .clauses in clickwrap agreements, [because] the clickwrap agreement, which collects all of the terms of the agreement in a single dialog box and then requires the user to affirmatively accept the agreement before proceeding, *makes every term equally visible*.") (emphasis added); Harris v. comScore, Inc., 825 F. Supp. 2d 924, 927 (N.D. Ill. 2011); Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), aff'd, 380 F. App'x 22 (2d Cir. (continued on next page)

24

# CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted.

Date: April 23, 2015

---

(footnote continued from previous page)

2010) (finding no reasonable communication and acceptance where "the website did not prompt her to review the Terms and Conditions and [] the link to the Terms and Conditions was not prominently displayed"). Here, even in the unlikely event that drivers clicked on the link, what appeared was a fourteen page single space legal document which contained the arbitration clause (again—all being viewed on a tiny iPhone screen). Dkt. 60 at 10 (noting that "[t]he opt-out clause itself is ensconced in the penultimate paragraph of a fourteen-page agreement presented to Uber drivers electronically in a mobile phone application interface" such that "[i]n sum, it is an inconspicuous clause in an inconspicuous provision of the Licensing Agreement…"), see also Dkt. 81-1, 81-2.

In sum, even though a court-ordered corrective notice was sent out in this case, Uber drivers were not effectively informed of their rights. The ineffectiveness of the corrective notice is underscored by the extremely small number of drivers who timely opted out. See Ex.15 at ¶ 5 (approximately 269 drivers in California opted out of the arbitration clause within 30 days of accepting the licensing agreement, out of thousands that have driven for Uber in California).

If the Court chooses to address the enforceability of the arbitration clause at this juncture, Plaintiffs respectfully request the opportunity to submit an additional brief, as page limits prevent Plaintiffs from developing here their full argument regarding the unconscionability of Uber's arbitration clause. Plaintiffs also, alternatively, incorporate by reference the arguments they made previously in this case, both in briefing and orally, see Dkt. 15, Dkt. 35, Dkt. 56 at 4-9, and note the Court's earlier comments regarding the potential unconscionability of the arbitration clause. Dkt 56 at 6:17-24; 9:15-10:15, 16:15-25; Dkt. 60, Dkt. 99.

Uber may argue that the lead plaintiffs in this case lack standing to challenge the arbitration clause because they opted out of the agreement in a timely manner. However, courts have considered the validity of arbitration agreements distributed to putative class members so as to attempt to avoid class certification (or limit the scope of the class), even where the named plaintiff did not actually sign the agreement. See, e.g., In re Currency Conversion Fee Antitrust Litigation, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005); Carnegie v. H&R Block, Inc., 180 Misc. 2d 67, 70 (N.Y.S.C. Jan. 7, 1999). Other courts that have considered it necessary for a lead plaintiff to have "standing" to challenge an arbitration agreement have allowed amendment to add a lead plaintiff with such standing. See, e.g., Garcia et al. v. EJ Amusements, Inc. et al, 2015 WL 1623837, *1 (D. Mass. Apr. 13, 2015) (certifying class but excluding workers who had signed releases and arbitration agreements, but suggesting that plaintiffs could amend the complaint to add a lead plaintiff with standing to challenge the arbitration agreement, even just a few months before trial. See Garcia, C.A. No. 13-12536, Dkt. 226 (attached hereto as Ex. 25) at 75:5-76:5. Here, should the Court deem it necessary for Plaintiffs to have a lead plaintiff who did not opt out of the arbitration clause in order to challenge the clause, the Court should allow Plaintiffs to amend to add such a representative. The Court is already considering a pending motion to amend (Dkt. 253), which will not change the substantive claims in this case. Such an additional amendment here would likewise not change any substantive claims in the case but could, if the Court were to find such "standing" to be necessary, potentially have an enormous impact on the scope of this case in court.

25

Respectfully submitted,

DOUGLAS O'CONNOR, THOMAS
COLOPY, MATTHEW
MANAHAN, and ELIE GURFINKEL individually
and on behalf of all others similarly situated,

By their attorneys,

 _/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic filing on April 23, 2015, on all counsel of record.

 _/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, Esq.