1  GIBSON, DUNN & CRUTCHER LLP
   THEODORE J. BOUTROUS, JR., SBN 132099
2    tboutrous@gibsondunn.com
   DEBRA WONG YANG, SBN 123289
3    dwongyang@gibsondunn.com
   MARCELLUS A. MCRAE, SBN 140308
4    mmcrae@gibsondunn.com
   THEANE D. EVANGELIS, SBN 243570
5    tevangelis@gibsondunn.com
   DHANANJAY S. MANTHRIPRAGADA, SBN 254433
6    dmanthripragada@gibsondunn.com
   BRANDON J. STOKER, SBN 277325
7    bstoker@gibsondunn.com
   333 South Grand Avenue
8  Los Angeles, CA 90071-3197
   Telephone:   213.229.7000
9  Facsimile:   213.229.7520

10 JOSHUA S. LIPSHUTZ, SBN 242557
     jlipshutz@gibsondunn.com
11 KEVIN J. RING-DOWELL, SBN 278289
     kringdowell@gibsondunn.com
12 555 Mission Street, Suite 3000
   San Francisco, CA 94105-0921
13 Telephone:   415.393.8200
   Facsimile:   415.393.8306
14
   Attorneys for Defendant
15 UBER TECHNOLOGIES, INC.

16

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19 DOUGLAS O'CONNOR, THOMAS              Case No. CV 13-03826-EMC
   COLOPY, MATTHEW MANAHAN, and
20 ELIE GURFINKEL, individually and on    **DEFENDANT UBER TECHNOLOGIES,
   behalf of all others similarly situated,  INC.'S OPPOSITION TO PLAINTIFFS'**
21                                         **MOTION FOR CLASS CERTIFICATION**
22              Plaintiffs,
                                          Hearing Date:   August 6, 2015
23         v.                             Time:           1:30 p.m.
                                          Place:          Courtroom 5
24 UBER TECHNOLOGIES, INC.,               Judge:          Hon. Edward M. Chen

               Defendant.
25

26

27

28

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................................. 3

    A.   Uber's Business Model ........................................................................................... 3

    B.   Drivers' Onboarding Experiences.......................................................................... 5

    C.   Licensing Agreements............................................................................................ 6

    D.   Drivers' Star Ratings/Pro Tips/Suggestions .......................................................... 6

    E.   Third Party Employment And Drivers' Use Of Other Lead Generation
        Applications ........................................................................................................... 7

    F.   Expenses And Reimbursement .............................................................................. 7

    G.   Gratuities ............................................................................................................... 8

    H.   Proposed Class Representatives ............................................................................. 9

        1.   Plaintiff Thomas Colopy ........................................................................... 9

        2.   Plaintiff Elie Gurfinkel............................................................................... 9

        3.   Plaintiff Matthew Manahan ..................................................................... 10

III.  LEGAL STANDARD ..................................................................................................... 10

IV.  ARGUMENT .................................................................................................................. 11

    A.   Plaintiffs Have Failed To Prove That They Satisfy Rule 23(a)(2)'s Commonality
        Requirement Or Rule 23(b)(3)'s More Demanding Predominance Requirement ......... 11

        1.   Plaintiffs' Misclassification Claims Require Individualized Inquiries Into
            Each Transportation Provider's Relationship With Uber ................................ 11

            a.   Right To Control The Manner And Means Of Performance .............. 13

                (i)    Right To Terminate ................................................................. 16

                (ii)   Control Over Schedules And Routes ...................................... 19

                (iii)  Use Of Third-Party Apps ....................................................... 20

            b.   Secondary Indicia............................................................................... 20

                (i)    Whether Drivers Believe They Are Employees...................... 22

                (ii)   Length Of Time Worked And Method Of Payment .............. 22

                (iii)  Opportunity For Profit Or Loss............................................... 23

                (iv)  Negotiation Of Rates .............................................................. 24

                (v)   Engagement In A Distinct Occupation Or Business And
                      "Employment Of Helpers".................................................... 24

                (vi)  Provision Of The Instrumentalities And Tools Of Work........ 25

         2.   Plaintiffs' Tipping Claims Turn On Individualized Inquiries........................... 25

         3.   Plaintiffs' Claim For Expense Reimbursement Under Labor Code Section
            2802 Depends On A Host Of Individualized Inquiries..................................... 27

i

Gibson, Dunn &
Crutcher LLP

B.   Plaintiffs Have Failed To Satisfy The Typicality Requirement Of Rule 23(a)(3) Or The Adequacy Requirement Of Rule 23(a)(4)........................................................ 30

1.   The Named Plaintiffs Are Not Adequate Class Representatives Under Rule 23(a)(4) Because They Seek A Remedy That Many Class Members Oppose And That Could Subject Class Members To Legal Liability .............. 30

2.   The Claims Of The Named Plaintiffs Are Atypical Under Rule 23(a)(3) And The Named Plaintiffs Are Inadequate Class Representatives Under Rule 23(a)(4) Because They Are Subject To Unique Defenses........................ 32

3.   The Named Plaintiffs Are Not Typical Of The Putative Class Because There Is No Typical Uber Driver ...................................................................... 35

C.   That Some Members Are Subject To An Arbitration Clause Raises Individual Issues That Preclude Certification Under Rule 23(b)(3)................................................ 38

D.   Plaintiffs' Proposed PAGA Claim Fails To Satisfy The Requirements Of Rule 23...... 39

V.   CONCLUSION ...................................................................................................................... 40

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Adashunas v. Negley,*
    626 F.2d 600 (7th Cir. 1980)..................................................................................... 26

5

*Air Couriers Int'l v. Emp't Dev. Dep't,*
    150 Cal. App. 4th 923 (2007) ............................................................................... 1, 20

6

*Alatraqchi v. Uber Technologies, Inc.,*
    No. 11-42020 CT (Cal. Labor Comm. Aug. 1, 2012).............................................. 12

7

*Alberghetti v. Corbis Corp.,*
    263 F.R.D. 571 (C.D. Cal. Jan. 13, 2010)............................................................... 31

8

9

*Alexander v. FedEx Ground Package Sys.,*
    765 F.3d 981 (9th Cir. 2014).................................................................................... 19

10

*Ali v. U.S.A. Cab Ltd.,*
    176 Cal. App. 4th 1333 (2009) ........................................................... 13, 16, 20, 24

11

12

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.,*
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................... 31

13

*Am. Express Co. v. Italian Colors Rest.,*
    133 S. Ct. 2304 (2013) ............................................................................................ 10

14

*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court,*
    46 Cal. 4th 993 (Cal. 2009).................................................................................... 40

15

16

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................................................ 11

17

*Arias v. Superior Court,*
    46 Cal. 4th 969 (2009)............................................................................................ 40

18

19

*Arnold v. Mut. of Omaha Ins. Co.,*
    202 Cal. App. 4th 580 (2011) ................................................................. 16, 19, 24, 37

20

*Avilez v. Pinkerton Govt. Serv. Master Global Holding, Inc.,*
    596 F. App'x 579 (9th Cir. Feb. 10, 2015) ............................................................. 38

21

*Ayala v. Antelope Valley Newspapers, Inc.,*
    59 Cal. 4th 522 (2014) ...................................................................................... 15, 16

22

23

*Beaumont-Jacques v. Farmers Grp., Inc.,*
    217 Cal. App. 4th 1138 (2013) ......................................................................... 13, 16

24

*Beauperthuy v. 24 Hour Fitness USA, Inc.,*
    772 F. Supp. 2d 1111 (N.D. Cal. 2011) ................................................................. 30

25

26

*Bemis v. People,*
    109 Cal. App. 2d 253 (1952)............................................................................. 15, 19

27

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014).................................................................................. 14

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CV 13-03826-EMC

*Berwick v. Uber Technologies, Inc.*,
  No. 11-46739 EK (Cal. Labor Comm. June 3, 2015) ................................ 12

*Bieneman v. City of Chicago*,
  864 F.2d 463 (7th Cir. 1988) ................................................................... 31

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ................................................................................. 36

*Bodner v. Oreck Direct, LLC*,
  2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) ......................................... 35

*Bond v. Fleet Bank (RI), N.A.*,
  2002 WL 31500393 (D.R.I. Oct. 10, 2002) ............................................. 38

*Bowerman v. Field Asset Servs.*,
  2014 WL 4676611 (N.D. Cal. Sept. 17, 2014) .................................. 20, 21

*Brewer v. Gen. Nutrition Corp.*,
  2014 WL 5877695 (N.D. Cal. Nov. 12, 2014) ......................................... 30

*Broussard v. Meineke Discount Muffler Shops*,
  155 F.3d 331 (4th Cir. 1998) ................................................................... 31

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) .................................................................... 13

*Cassady v. Morgan, Lewis, & Bockius LLP*,
  145 Cal. App. 4th 220 (Cal. Ct. App. 2006) ........................................... 29

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ..................................................................... 27

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ................................................................... 33

*Chavez v. Lumber Liquidators, Inc.*,
  2012 WL 1004850 (N.D. Cal. Mar. 26, 2012) ......................................... 28

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ............................................................ 33

*Clure v. Bankers Life & Cas. Co.*,
  2015 WL 3994975 (D. Wash. June 30, 2015) ......................................... 16

*Collins v. Int'l Dairy Queen, Inc.*,
  168 F.R.D. 669 (M.D. Ga. 1996) ............................................................ 38

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ..................................................................... passim

*Cotter v. Lyft, Inc.*,
  60 F. Supp. 3d 1067 (N.D. Cal. 2015) ......................................... 21, 22, 32

*Curtis v. Extra Space Storage, Inc.*,
  2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ......................................... 26

*D'Antuono v. C & G of Groton, Inc.*,
  2011 WL 5878045 (D. Conn. Nov. 23, 2011) ......................................... 38

iv

*Dalton v. Lee Publ'ns, Inc.*,
    270 F.R.D. 555 (S.D. Cal. 2010)........................................................................... 14

*Davis v. Four Seasons Hotel Ltd.*,
    2011 WL 4590393 (D. Haw. Sept. 30, 2011) ...................................................... 38

*Dilts v. Penske Logistics, LLC*,
    2014 WL 866954 (S.D. Cal. Feb. 19, 2014) ........................................................ 28

*Drake v. Morgan Stanley & Co., Inc.*,
    2010 WL 2175819 (C.D. Cal. Apr. 30, 2010) ............................................... 33, 34

*Dunford v. Am. DataBank*,
    64 F. Supp. 3d 1378 (N.D. Cal. 2014) ................................................................. 30

*Dynamex Operations West, Inc. v. S.C.*,
    341 P.3d 438 (Cal. 2015) .................................................................................... 12

*Eckard Brandes, Inc. v. Riley*,
    338 F.3d 1082 (9th Cir. 2003).............................................................................. 32

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)....................................................................30, 33, 36

*Fendler v. Westgate-Cal. Corp.*,
    527 F.2d 1168 (9th Cir. 1975).............................................................................. 35

*Fields v. QSP, Inc.*,
    2011 WL 1375286 (C.D. Cal. Apr. 8, 2011) ...................................................... 32

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*,
    631 F.3d 1058 (9th Cir. 2011).............................................................................. 15

*Flores v. Supervalu, Inc.*,
    509 F. App'x 593 (9th Cir. 2013) ........................................................................ 30

*Fowler v. Varian Assocs.*,
    196 Cal. App. 3d 34 (Cal. Ct. App. 1987) .......................................................... 32

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
    42 Cal. 4th 554 (Cal. 2007)........................................................................ 2, 28, 29

*Grissom v. Vons Co.*,
    1 Cal. App. 4th 52 (Cal. Ct. App. 1991) ............................................................. 29

*Guido v. L'Oreal, USA, Inc.*,
    2012 WL 2458118 (C.D. Cal. June 25, 2012) .................................................... 33

*Gustafson v. BAC Home Loans Servicing, LP*,
    294 F.R.D. 529 (C.D. Cal. 2013) ........................................................................ 14

*Guzman v. Bridgepoint Educ., Inc.*,
    305 F.R.D. 594 (S.D. Cal. Mar. 26, 2015) ......................................................... 38

*Halvorson v. Auto-Owners Ins. Co.*,
    718 F.3d 773 (8th Cir. 2013)............................................................................... 26

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)............................................................................... 33

v

*Harris v. Vector Mktg. Corp.*,
  753 F. Supp. 2d 996 (N.D. Cal. 2010) ........................................................................ passim

*Hennighan v. Insphere Ins. Solutions, Inc.*,
  38 F. Supp. 3d 1083 (N.D. Cal. 2014) .................................................................................. 16

*Herbert's Laurel-Ventura v. Laurel Ventura Holding Corp.*,
  58 Cal. App. 2d 684 (1943) ................................................................................................ 26

*Herskowitz v. Apple, Inc.*,
  301 F.R.D. 460 (N.D. Cal. 2014) ........................................................................................ 22

*Hilderman v. Enea Teksci, Inc.*,
  2010 WL 546140 (S.D. Cal. Feb. 10, 2010) ........................................................................ 32

*Huong Que, Inc. v. Luu*,
  150 Cal. App. 4th 400 (Cal. Ct. App. 2007) ........................................................................ 32

*In re Facebook, Inc., PPC Adver. Litig.*,
  282 F.R.D. 446 (N.D. Cal. 2012) ........................................................................................ 22

*In re LifeUSA Holding, Inc.*,
  242 F.3d 136 (3d Cir. 2001) ................................................................................................ 14

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) .................................................................................. 26, 27, 28

*In re Titanium Dioxide Antitrust Litig.*,
  962 F. Supp. 2d 840 (D. Md. 2013) .................................................................................... 38

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009) .............................................................................................. 12

*Jovel v. Boiron, Inc.*,
  2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) .................................................................... 33

*Juarez v. Jani-King of Cal., Inc.*,
  273 F.R.D. 571 (N.D. Cal. 2011) ........................................................................................ 34

*Leighton v. Old Heidelberg, Ltd.*,
  219 Cal. App. 3d 1062 (1990) ............................................................................................ 26

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ........................................................................................ 25, 26

*Lindsey v. Normet*,
  405 U.S. 56 (1972) .............................................................................................................. 13

*Litty v. Merrill Lynch & Co., Inc.*,
  2014 WL 5904904 (C.D. Cal. Nov. 10, 2014) .................................................................... 40

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) .............................................................................................. 18

*Marlo v. United Parcel Serv., Inc.*,
  639 F.3d 942 (9th Cir. 2011) ................................................................................................ 2

*Martinez v. Combs*,
  49 Cal. 4th 35 (Cal. 2010) .................................................................................................. 12

vi

*Mayfield v. Dalton*,
    109 F.3d 1423 (9th Cir. 1997)................................................................. 31

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012).......................................................... 26, 27

*Mission Ins. Co. Workers Compensation Appeals Board*,
    123 Cal. App. 3d 211 (1981)................................................ 15, 16, 22, 24

*Monaco v. Bear Stearns Cos., Inc.*,
    2012 WL 10006987 (C.D. Cal. Dec. 10, 2012) .............................. 22

*Narayan v. EGL, Inc.*,
    285 F.R.D. 473 (N.D. Cal. 2012)................................... 15, 24, 25, 37

*Norris-Wilson v. Delta-T Grp., Inc.*,
    270 F.R.D. 596 (S.D. Cal. 2010)........................................................ 23

*Ortiz v. CVS Caremark Corp.*,
    2013 WL 6236743 (N.D. Cal. Dec. 2, 2013) ........................... 28, 40

*Otsuka v. Polo Ralph Lauren Corp.*,
    2007 WL 3342721 (N.D. Cal. Nov. 9, 2007)................................ 32

*Pablo v. Service Master Global Holdings, Inc.*,
    2011 WL 3476473 (N.D. Cal. Aug. 9, 2011)................................ 38

*Pickett v. Iowa Beef Processors*,
    209 F.3d 1276 (11th Cir. 2000)........................................................ 31

*Renton v. Kaiser Found. Health Plan*,
    2001 WL 1218773 (W.D. Wash. Sept. 24, 2001)......................... 38

*Richie v. Blue Shield of Cal.*,
    2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)................................ 35

*Royal Indem. Co. v. Indus. Acc. Comm'n*,
    104 Cal. App. 290 (Cal. Ct. App. 1930) ...................................... 16

*Ruiz v. Affinity Logistics Corp.*,
    754 F.3d 1093 (9th Cir. 2014)...................................... 13, 24, 28

*Ryan v. Jersey Mike's Franchise Sys.*,
    2014 WL 1292930 (S.D. Cal. Mar. 28, 2014) ............................ 33

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
    48 Cal. 3d 341 (1989) ........................................................ passim

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
    601 F.3d 1159 (11th Cir. 2010).......................................... 14, 19

*Savino v. Computer Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998)............................................................. 33

*Schlaud v. Snyder*,
    785 F.3d 1119 (6th Cir. 2015).......................................................... 31

*Schulken v. Washington Mut. Bank*,
    2012 WL 28099 (N.D. Cal. Jan. 5, 2012) .................................. 37

vii

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CV 13-03826-EMC

Gibson, Dunn &
Crutcher LLP

*Sealy v. Keiser Sch., Inc.*,
  2011 WL 7641238 (S.D. Fla. Nov. 8, 2011)......................................................... 38

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ............................................................................................. 40

*Sotelo v. MediaNews Grp., Inc.*,
  207 Cal. App. 4th 639 (2012) .......................................................................... 20, 21

*Soto v. Diakon Logistics (Delaware), Inc.*,
  2010 WL 3420779 (S.D. Cal. Aug. 30, 2010) ................................................. 14, 25

*Spencer v. Beavex, Inc.*,
  2006 U.S. Dist. LEXIS 98565 (S.D. Cal. Dec. 15, 2006)...................................... 21

*Spicer v. Pier Sixty LLC*,
  269 F.R.D. 321 (S.D.N.Y. 2010) .......................................................................... 14

*State Comp. Ins. Fund v. Brown*,
  32 Cal. App. 4th 188 (1995) ............................................................................ 17, 19

*Stokes v. Dole Nut Co.*,
  41 Cal. App. 4th 285 (Cal. Ct. App. 1995) ........................................................... 32

*Tokoshima v. The Pep Boys*,
  2014 WL 1677979 (N.D. Cal. Apr. 28, 2014) ................................................. 28, 29

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996).................................................................................. 27

*Vega v. T-Mobile USA Inc.*,
  564 F.3d 1256 (11th Cir. 2009)............................................................................. 36

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ................................................................................... passim

*Wang v. Chinese Daily News, Inc.*,
  709 F.3d 829 (9th Cir. 2013).................................................................................. 12

*Wash. St. Repub. Party v. Wash. St. Grange*,
  676 F.3d 784 (9th Cir. 2012).................................................................................. 40

*Washington v. Joe's Crab Shack*,
  271 F.R.D. 629 (N.D. Cal. 2010) .......................................................................... 28

*Westways World Travel, Inc. v. AMR, Corp.*,
  2005 U.S. Dist. LEXIS 47291 (C.D. Cal. Feb. 24, 2005)...................................... 14

*Yellow Cab Cooperative, Inc. v. Workers Compensation Appeals Board*,
  226 Cal. App. 3d 1288 (1991) ............................................................................... 20

**Constitutional Provisions**

U.S. Const. amend. XIV ............................................................................................ 4, 14

**Statutes**

28 U.S.C. § 2072 ........................................................................................................ 3, 13

viii

Cal. Labor Code § 351 ............................................................................................................ 26

Cal. Labor Code § 2802 .......................................................................................................... 29

**Rules**

Fed. R. Civ. P. 23 ............................................................................................... 30, 36, 40

**Treatises**

*Newberg on Class Actions* § 3:37 (5th ed. 2014) ............................................................. 36

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

# I.    INTRODUCTION

Plaintiffs, three individual drivers, seek an outcome that many, if not most, proposed class members oppose—a classwide determination that would destroy the very independence and flexibility that countless drivers love about Uber.  Relying on outdated law and scant evidence, Plaintiffs seek to certify a statewide class of over *160,000* individuals with widely varying personal interests and circumstances who have used the Uber lead generation application to connect with millions of passengers over the past six years.  They base their motion on a facially implausible theory that each and every one of these individuals had an identical relationship with Uber and has been misclassified as an independent contractor.  But the governing case law from the Supreme Court and this and other circuits, documentary evidence, expert report of Berkeley Professor Justin McCrary, sworn testimony of the named plaintiffs, and declarations of over ***400 drivers*** from across California all demonstrate that Plaintiffs do not—and cannot—represent the interests of this diverse group of absent individuals.  This Court should deny the motion.

Plaintiffs recognize that the proposed class cannot offer common proof as to each of the 13 *Borello* factors courts must consider in deciding misclassification claims and therefore myopically focus on a single factor:  the right to control as evidenced by Uber's purportedly "uniform" licensing agreements and supposed "set policies."  Mot. at 2.  But as this Court has recognized, "rarely does any one factor dictate the determination of whether a relationship is one of employment or independent contractor."  Order Denying Uber's Mot. for Summ. J., ECF No. 251, at 8–9, 16–18, 26 ("MSJ Order").  Accordingly, courts have repeatedly rejected Plaintiffs' contention that the *Borello* test may be resolved with a "laser-like" focus on a single factor—the right to control as purportedly evidenced by a handful of contract terms—to the exclusion of all other factors.  *Air Couriers Int'l v. Emp't Dev. Dep't*, 150 Cal. App. 4th 923, 933 (2007); *accord S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).  Plaintiffs' motion fails for this reason alone.

Moreover, the evidence proves that drivers are in fact a diverse group with widely divergent Uber experiences and interactions.  As such, individualized issues relating to Plaintiffs' misclassification claims overwhelm any common questions.  For example, the supposedly "uniform" licensing agreement on which Plaintiffs rely is actually 17 different agreements that vary over time in

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CV 13-03826-EMC

many legally significant ways, including whether they prohibit drivers from using competitors' apps; whether the parties have a mutual right to terminate without cause; and whether the parties must resolve disputes through arbitration.  And the parties' practices demonstrate that drivers have highly variable understandings of these agreements.  Drivers also vary widely regarding whether they work for a transportation company; operate their own transportation companies; hire subcontractors; use competitors' apps; use the Uber App consistently or sporadically; and use entrepreneurial profit-maximization techniques, such as targeting busy areas of town or driving during periods of "surge pricing"—all of which are relevant to the *Borello* factors.  There is thus no "common contention . . . of such a nature that it . . . will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Plaintiffs have failed to carry their burden under Rule 23 to provide this Court with a manageable framework (or *any* framework) to resolve the many *Borello* factors as to every individual driver in a single trial.  *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).

Further, Plaintiffs' expense reimbursement and gratuity claims are not "capable of [accurate] measurement on a classwide basis" because "[q]uestions of individual . . . calculations will inevitably overwhelm questions common to the class."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  For example, Plaintiffs' expense reimbursement claim requires individualized inquiries to determine whether drivers' expenses were *already* reimbursed by other transportation companies; what types of expenses drivers incurred; whether those expenses were a "necessary" part of each driver's work; and whether those expenses were incurred "in direct consequence" of work performed through the Uber App.  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 561 (Cal. 2007).  And Plaintiffs' gratuities claim requires individualized inquiries into whether drivers already received gratuities; the amounts of gratuities each driver received; whether riders intended to leave gratuities for drivers; and the gratuity each driver could have expected on each ride based on performance and quality of service.  In sum, the putative class consists of more than 160,000 individuals who have little or nothing in common, other than their use of the Uber App in California at some point over the past six years.  *See Dukes*, 131 S. Ct. at 2551 ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the *same* injury'") (emphasis added) (citation omitted).

Finally, Plaintiffs themselves are woefully inadequate and atypical class representatives under Rule 23(a).  For example, one of the named Plaintiffs admits to having defrauded Uber out of more than $25,000.  Moreover, Plaintiffs are taking positions directly contrary to the desires of many of the very people they claim to represent—who do not want to be employees and view Uber as having liberated them from traditional employment.  Selenge Thompson, for example, knows what it's like to "work[] for Corporate America"; she left that world to be an independent contractor with Uber, so she would never again have to "miss[] out on so many of [her] daughter's firsts."  Decl. of Selenge Thompson ¶ 7.  For some drivers like Dario Grant, a full-time employee of Los Angeles County, being declared an "employee" of Uber could lead to being fired or sued by their *actual* employers.  Decl. of Dario Grant ¶¶ 7-9.  And the duty of loyalty implicit in an employment relationship would preclude drivers like David Wong and Michael Banko from using multiple lead generation apps, including the apps of Uber's competitors.  Decl. of David Wong ¶ 4; Decl. of Michael Banko ¶ 5.  Plaintiffs are also atypical Uber users for a host of reasons:  Plaintiffs purportedly believed they were creating an employment relationship with Uber, but most drivers understand they are independent contractors; Plaintiffs believe Uber's suggestions are mandatory, but most drivers view them as optional; Plaintiffs opted out of arbitration, but most drivers did not; Plaintiffs do not own transportation businesses or hire subcontractors, but many drivers do.  In addition, Plaintiffs' licensing agreements and onboarding materials differ materially from those of other drivers.

In short, Plaintiffs' paltry evidence and flawed motion fail to satisfy their burden under Rule 23 to "affirmatively demonstrate . . . that there are *in fact* . . . common questions of law," typicality, adequate representation, and predominance.  *Dukes*, 131 S. Ct. at 2551.  For these reasons, and those below, class certification would violate Article III, Rule 23, the Rules Enabling Act, and due process.

## II.      FACTUAL BACKGROUND

### A.      Uber's Business Model

Uber developed and licenses a software application (the "Uber App") that permits riders to arrange trips with nearby transportation providers.  Decl. of Joshua S. Lipshutz ("Lipshutz Decl.") ¶ 2, Ex. A at 40:22-42:2; *id.* ¶ 3, Ex. B at 205:5-7.  The Uber App consists of multiple products, including:  (1) uberX; (2) UberBLACK; and (3) UberSUV.  *Id.* ¶ 2, Ex. A at 37:22-38:13.  The

transportation providers to whom Uber licenses the Uber App are called "partners" and consist of: (1) third-party businesses that employ or contract with drivers; and (2) individuals that transport riders. *Id.* ¶ 2, Ex. A at 33:4-36:19, 156:17-159:20.[1]

Drivers who use the Uber App may use it as much or as little as they want, and accept as many or as few ride requests as they want, whenever they want. Lipshutz Decl. ¶ 2, Ex. A at 200:8-201:10; *id.* ¶ 4, Ex. C at 133:16-134:17; *id.* ¶ 5, Ex. D at 61:3-7. Thus, drivers' usage of the App varies—some rarely use the App, while others use the App 60 or more hours per week. Decl. of Michael Colman ("Colman Decl.") ¶¶ 21, 23, 24, Exs. S, U, V; Decl. of Theane Evangelis ("Evangelis Decl.") ¶ 6, Ex. 13; Expert Report of Dr. Justin McCrary ("McCrary Report") ¶¶ 126-128. Drivers' usage fluctuates over time as well. Colman Decl. ¶ 27, Ex. Y. The vast majority of drivers, including Plaintiffs, value the flexibility that Uber provides them. Lipshutz Decl. ¶ 6, Ex. E at 109:15-22; *id.* ¶ 3, Ex. B at 199:12-201:16; *id.* ¶ 5, Ex. D at 165:18-20; *id.* ¶ 9, Ex. H at 11.

When a rider sends a request for a driver using the Uber App, it is routed to the nearest driver, who is given an opportunity to accept or decline the ride. Lipshutz Decl. ¶ 2, Ex. A at 209:7-210:8. Drivers have discretion whether to transport riders and may decline or cancel a request if, for example, a rider is unruly or intoxicated. *Id.* at 134:17-135:9, 208:9-216:16. Some drivers exercise this discretion frequently, while others rarely (if ever) do. Colman Decl. ¶ 22, Ex. T; Evangelis Decl. ¶ 6, Ex. 24. Following completion of a ride, Uber calculates a fare based on a base amount, ride distance, and time spent in transit, which may be multiplied during "surge" periods if rider demand is high and/or driver supply is low, and then processes a transaction on behalf of the driver. Lipshutz Decl. ¶ 2, Ex. A at 188:12-16. Uber collects a percentage of the fare as a software licensing fee—a percentage that has "changed over time" and "depends on the product" and "city"—and remits the remainder to the partner. *Id.* at 156:17-158:16, 162:20-164:9; *id.* ¶ 4, Ex. C at 54:19-20; *id.* ¶ 7, Ex. F at 70:9-72:10. After Uber has remitted fare amounts to partners, it has no means by which to track whether those partners thereafter transmit any portion of those remittances to any particular driver or

---

[1] Partners that use the uberX software license the Uber App from Rasier, LLC, a subsidiary of Uber. Lipshutz Decl. ¶ 2, Ex. A at 174:16-20; Colman Decl. ¶ 2.

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

1    the amounts of those transfers.  *Id.* ¶ 2, Ex. A at 158:17-159:20, 160:16-161:12; Colman Decl. ¶ 31.

2    **B.      Drivers' Onboarding Experiences**

3           Uber offers an "onboarding" process that drivers must attend before they begin to use the

4    Uber App—a requirement mandated by the California Public Utilities Commission ("CPUC").

5    Lipshutz Decl. ¶ 2, Ex. A at 50:3-51:15; Cal. Pub. Util. Comm'n, Decision Adopting Rules &

6    Regulations to Protect Public Safety While Allowing New Entrants To The Transp. Indus., R. 12-12-

7    011 ("CPUC Rule"), at 29 (Sept. 19, 2013).  However, because onboarding is run differently in each

8    city and constantly evolves, Lipshutz Decl. ¶ 2, Ex. A at 52:20-53:16, 267:19-268:17; *id.* ¶ 8, Ex. G

9    at 83:1-8, drivers' onboarding experiences vary considerably.  *Id.* ¶ 8, Ex. G at 51:8-18, 79:8-10

10   (onboarding has "changed hundreds of times"); *id.* ¶ 4, Ex. C at 45:19-46:15; *id.* ¶ 2, Ex. A at 94:9-

11   96:17; *see* Decl. of Christopher Ballard ("Ballard Decl.") ¶ 3; Decl. of Swathy Prithivi ("Prithivi

12   Decl.") ¶¶ 3-4; Decl. of Brad Rosenthal ("Rosenthal Decl.") ¶ 3; Decl. Matthew Sawchuk ("Sawchuk

13   Decl.") ¶ 3.  Some drivers attend in-person sessions, Lipshutz Decl. ¶ 6, Ex. E at 83:12-84:8; *id.* ¶ 3,

14   Ex. B at 128:22-129:5; *id.* ¶ 5, Ex. D at 70:18-72:21, other drivers view videos online, and still others

15   claim they attended no onboarding at all.  Evangelis Decl. ¶ 6, Ex. 26.  Even within each city, the

16   format of onboarding varies not only over time and by product, but also based on the particular Uber

17   employee leading the session.  Ballard Decl. ¶¶ 5-7; Prithivi Decl. ¶¶ 5-6; Rosenthal Decl. ¶¶ 5-10;

18   Sawchuk Decl. ¶¶ 4-10.  To the extent Uber provides suggestions during onboarding as to how

19   drivers can keep their customer satisfaction ratings high, *infra* pp. 6-7, many drivers interpret these as

20   permissive suggestions, *see* Evangelis Decl. ¶ 6, Ex. 27, whereas others—including Plaintiffs—

21   believe they are mandatory, Lipshutz Decl. ¶ 5, Ex. D at 95:20-100:18; *id.* ¶ 6, Ex. E at 231:1-15.

22          In some cities and during some timeframes, Uber has required drivers to pass "city knowledge

23   testing" before accessing the Uber App, but this practice has "varie[d] by time, city, even the product

24   or service . . . ."  Lipshutz Decl. ¶ 2, Ex. A at 90:17-24, 93:2-94:8; *id.* ¶ 4, Ex. C at 49:24-50:15.

25   Uber requires drivers to submit to background checks, but that requirement is mandated by the CPUC

26   and has "varied over time" and "varied over city."  *Id.* ¶ 2, Ex. A at 88:7-89:17; McCrary Report

27   ¶¶ 76, 95 n.129, 121.  And Uber has instituted requirements regarding the type of vehicle that a driver

28   must have to access the Uber App, though this, too, "differs by location" and has changed over time

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    *Id.* at 52:20-57:5; Evangelis Decl. ¶ 7, Ex. 44; *see also* Lipshutz Decl. ¶ 4, Ex. C at 38:8-40:17.

2    **C.    Licensing Agreements**

3          Before completing onboarding, drivers execute one or more agreements with Uber or Uber's

4    subsidiaries setting forth the terms governing their use of the Uber App and their relationship to Uber.

5    *See* Colman Decl. ¶ 9, Exs. A–Q; Evangelis Decl. ¶ 7, Ex. 41.  During the relevant timeframe, Uber

6    and Uber's subsidiary promulgated 17 agreements (13 licensing agreements and 4 driver addenda)

7    with drivers operating on the uberX, UberSUV, and UberBLACK platforms.  Colman Decl. ¶ 9, Exs.

8    A–Q.  These agreements are not identical, even for drivers operating on the same platform, and have

9    changed over time.  *See* Evangelis Decl. ¶ 7, Exs. 42–55.  For instance, some agreements create a

10   mutual right to terminate the agreement at will, some reserve Uber's right to terminate the contract

11   based on driver misconduct and require Uber to provide notice, and others provide Uber a unilateral

12   right to terminate the contract.  Evangelis Decl. ¶ 7, Exs. 52–54; Colman Decl. ¶ 10.

13         Some agreements address Uber's star rating system and caution that drivers may be "limited

14   in their right to accept Requests" if they achieve "low ratings."  Colman Decl. ¶ 9, Ex. C.  Other

15   versions—like those for UberBLACK users—tie a deactivation warning to compliance with specific

16   "standards of appearance and service."  Evangelis Decl. ¶ 7, Ex. 52.  Many give Uber authority to

17   deactivate drivers who fall "below the acceptable minimum star rating," untethered to any specific

18   standards or policies.  *Id.*  Still others do not even discuss Uber's five-star rating system.  *Id.*

19         The agreements vary in many other significant respects, including, for example, the propriety

20   and terms of accepting cash gratuities from riders (Evangelis Decl. ¶ 7, Ex. 50), whether drivers have

21   unlimited discretion to accept or reject ride requests, (*id.* ¶ 7, Ex. 45), whether and at what intervals

22   drivers must log in or complete ride requests to remain active on the Uber platform (*id.* ¶ 7, Ex. 46),

23   whether drivers are limited in their ability to simultaneously use competing transportation apps (*id.*

24   ¶ 7, Ex. 43), and requirements as to the type of vehicle a driver can register for use on the Uber

25   platform (*id.* ¶ 7, Ex. 44).  *See generally* Evangelis Decl. ¶ 7, Ex. 41.

26   **D.    Drivers' Star Ratings/Pro Tips/Suggestions**

27         Depending on the particular agreement(s) they signed, a driver might be deactivated from the

28   Uber App if:  (1) they fail to maintain a valid driver's license; (2) they pose a safety risk; or (3) their

star rating falls below certain scores, which vary "[c]ity by city," may "change over time," and "var[y] by product." Lipshutz Decl. ¶ 2, Ex. A at 103:6-104:17, 240:17-241:9. Riders—*not* Uber—determine drivers' star ratings, by scoring drivers on a scale of one to five stars after the completion of each ride. *Id.* at 101:17-102:16. Drivers' star ratings do not depend on whether they have complied with any suggestion from Uber; rather, they are dictated by riders. *Id.* at 104:19-105:6; *see, e.g.*, Decl. of Robert Raymond ¶ 8. Indeed, many drivers have high star ratings, yet do not follow Uber's suggestions. *See* Evangelis Decl. ¶ 6, Ex. 30. Uber sometimes provides drivers suggestions that, based on historical data and rider comments, have been successful in improving drivers' star ratings, such as dressing professionally. Lipshutz Decl. ¶ 2, Ex. A at 76:13-77:24, 97:22-101:15, 120:9-123:17. The majority of drivers view these for what they are—suggestions that, if implemented, may (or may not) help them to raise their star ratings. Evangelis Decl. ¶ 6, Ex. 27; *see also* Decl. of Ernest Avetisyan ¶ 18. Yet, some drivers, like Plaintiffs, believe they are *required* to follow these suggestions. Mot. at 18 n.23; Lipshutz Decl. ¶ 3, Ex. B at 132:18-133:11.

**E.     Third Party Employment And Drivers' Use Of Other Lead Generation Applications**

Uber does not limit drivers' ability to seek and obtain employment with third-party employers and, as such, drivers' employment statuses vary. Some provide transportation services for other companies as independent contractors, while others are part- or full-time employees or self-employed entrepreneurs. Evangelis Decl. ¶ 6, Ex. 21. In addition, Uber does not generally prohibit drivers from using other lead generation applications, like Lyft and Sidecar (Uber's direct competitors), nor does it keep track of whether drivers are using such applications. Lipshutz Decl. ¶ 2, Ex. A at 148:17-149:8, 207:3-17. Scores of drivers use lead generation applications other than the Uber App, often simultaneously with the Uber App; others do not. Evangelis Decl. ¶ 6, Exs. 19–20.

**F.     Expenses And Reimbursement**

Uber typically does not reimburse drivers for expenses they may incur, like gas, mileage, or beverages for riders. Lipshutz Decl. ¶ 2, Ex. A at 178:12-179:3, 182:20-183:15, 188:22-189:7. However, there are exceptions, which vary by city and have changed over time. For example, Uber sometimes (but not always) pays partners for car cleaning and phone service expenses. *Id.* at 184:3-185:17; *id.* ¶ 5, Ex. D at 265:12-21. And many drivers have all, or portions, of their expenses

7

reimbursed by their employers or Uber's transportation company partners.  *Id.* ¶ 6, Ex. E at 102:8-22; Evangelis Decl. ¶ 6, Ex. 40.[2]  Uber does not track, and has no means by which to track, whether and how much partners reimburse drivers for their expenses.  Colman Decl. ¶¶ 31-32; Lipshutz Decl. ¶ 2, Ex. A at 155:23-156:16, 160:16-161:12; *id.* ¶ 7, Ex. F at 44:1-46:1; *id.* ¶ 6, Ex. E at 127:3-129:4.  Some drivers keep track of expenses they incur while driving, some drivers estimate their expenses, and other drivers have no idea what expenses they have incurred.  Evangelis Decl. ¶ 6, Ex. 38.  In addition, many (but not all) drivers have received tax deductions for their driving-related expenses and/or plan to seek deductions for such expenses in the upcoming year.  *Id.*, Ex. 39; Lipshutz Decl. ¶ 5, Ex. D at 202:25-203:7; *id.* ¶ 3, Ex. B at 186:14-188:6.

## G.    Gratuities

Riders that use the Uber App need not tip their drivers because the fares "fully compensate[] for the services provided."  Lipshutz Decl. ¶ 7, Ex. F at 47:23-50:15; *id.* ¶ 2, Ex. A at 170:13-171:8.  Because riders' credit cards are simply "charged at the end of the trip," the Uber App provides efficiency to riders, who need not "fish[] in [their] wallet[s]," and drivers, who "can do presumably more trips per hour" because the payment system is cashless.  *Id.* ¶ 2, Ex. A at 170:22-171:8; *id.* ¶ 7, Ex. F at 60:19-61:19.  Although some licensing agreements state that "there is no tipping for any transportation services," Colman Decl. ¶ 9, Exs. C, F, G, J, M, most do not prohibit drivers from accepting cash tips from riders, *id.*, Exs. A-B, D-E, H-I, K-L, N, P, Q.  Many drivers understand that they may accept tips offered by riders, Evangelis Decl. ¶ 6, Ex. 31, though others, like Plaintiffs, believe they may not take tips at all, *id.* ¶ 6, Ex. 32; Lipshutz Decl. ¶ 10, Ex. I at No. 4; *id.* ¶ 5, Ex. D at 261:25-262:20; *id.* ¶ 3, Ex. B at 132:24-133:11.

Whether and how frequently drivers accept tips, and the amounts of those tips vary dramatically.  Some drivers, like Plaintiff Manahan, state they *never* accept tips, *see* Decl. of Eduardo Belloso ¶ 12; Lipshutz Decl. ¶ 3, Ex. B at 232:25-233:10, others accept tips occasionally, *see* Decl. of Aharon Hayrapetyan ¶ 8, and others accept tips regularly, *see* Decl. of Hanibal Poolisrezaeih ¶ 9 ("I get a tip 80% of my rides.").  Evangelis Decl. ¶ 6, Ex. 36.  Of the drivers who accept tips, many

---

[2]  *See, e.g.*, Decl. of Daniel Bisneto ¶ 19 ("I reimburse my drivers for their business expenses."), Decl. of Patrick Canlas ¶ 19 ("I cover [] [my drivers'] expenses, like gas, car washes, and tolls.").

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CV 13-03826-EMC

receive a few dollars, *see* Decl. of Enoch Shadkam ¶ 8, whereas others receive $100 tips, *see* Decl. of Christopher Martinez ¶ 6; Lipshutz Decl. ¶ 6, Ex. E at 258:15-260:15—simply put, "[t]he amount varies a lot." Decl. of Khairullah Karimi ¶ 11; Evangelis Decl. ¶ 6, Ex. 37.

### H.   Proposed Class Representatives

#### 1.   Plaintiff Thomas Colopy

Plaintiff Thomas Colopy has provided transportation services in the Bay Area using UberBLACK since February or March of 2012.  Lipshutz Decl. ¶ 6, Ex. E at 48:22-49:11, 83:25-84:2.  Colopy has only used the App through the accounts of LS Worldwide and Cherifi Limousine, his former and current employers, respectively.  *Id.* at 59:16-18, 74:5-12, 77:6-17, 92:7-93:3, 123:15-18.  The terms of Colopy's compensation have been set by his agreements with LS Worldwide and Cherifi Limousine, not Uber.  *Id.* at 98:9-23, 127:6-129:4.  Colopy has never used any other lead generation application.  *Id.* at 83:25-84:2, 190:7-15.  When he was employed by LS Worldwide, Colopy did not have a schedule, decided whether or not to accept ride requests, drove vehicles provided by LS Worldwide, and did not pay for (or was reimbursed for) use of vehicles, insurance, tolls, car cleaning, and other expenses.  Lipshutz Decl. ¶ 6, Ex. E at 63:4-24, 64:19-65:1, 98:9-103:7.  Cherifi Limousine provides Colopy a vehicle that he uses for business and personal purposes, and he does not pay for (or is reimbursed for) car maintenance, oil changes, and other expenses.  *Id.* at 137:15-139:11, 151:5-152:18.  Colopy has received 20 to 40 tips from riders while using the Uber App, ranging from $2 to $100.  *Id.* at 258:15-260:15, 277:13-23.

#### 2.   Plaintiff Elie Gurfinkel

Plaintiff Elie Gurfinkel has transported riders in San Diego using uberX since May 2013.  Lipshutz Decl. ¶ 5, Ex. D at 57:12-58:9, 61:8-13.  His schedule gives him flexibility and is "a function of . . . [his] family life and other obligations."  *Id.* at 163:17-165:23, 235:11-236:23.  Indeed, when he started using the App, he held a full-time job and logged on during whatever "time [he] had available."  *Id.* at 42:24-43:13, 60:21-61:5.  Gurfinkel has never used a lead generation app other than Uber because, in his words, "[i]f I'm driving for the best, why would I want to drive for anyone else?"  *Id.* at 132:2-134:9, 135:14-136:18; *id.* ¶ 11, Ex. J at No. 20.  Gurfinkel has never requested expense reimbursements from Uber.  Lipshutz Decl. ¶ 5, Ex. D at 160:24-161:2.  Although he has

9

1    kept rough estimates of the mileage he believes he has driven while using the App, his estimates

2    include mileage incurred while he is not transporting passengers (*i.e.*, getting gas and running

3    errands). *Id.* at 203:19-205:5, 207:16-211:21, 213:11-215:14.  Gurfinkel has received tips from riders

4    "a few [times]," though he is unable to identify any customer that would have tipped him but-for

5    Uber's alleged "no tip" policy. *Id.* at 124:9-17; *id.* ¶ 11, Ex. J at No. 7.

6        **3.**    **Plaintiff Matthew Manahan**

7         Plaintiff Matthew Manahan has provided transportation services to riders in Los Angeles

8    using the uberX platform since spring of 2013.  Lipshutz Decl. ¶ 3, Ex. B at 24:3-15, 108:18-110:6.

9    Manahan "enjoy[s] the flexibility" and high customer demand that the Uber App provides to him. *Id.*

10   at 199:7-17.  He previously used the Sidecar and Lyft applications, but stopped using them in May

11   2013 and March 2014, respectively. *Id.* at 72:21-75:5, 80:15-22, 92:13-93:3.  In deposition, Manahan

12   testified he has "never" received a tip from a rider, then claimed that "occasionally someone might

13   leave cash on the seat," then stated he received a tip from a rider "once," and then maintained he has

14   received tips twice.  Lipshutz Decl. ¶ 3, Ex. B at 232:25-235:15, 244:14-249:24.  Manahan did not, at

15   any point prior to the filing of this action, request that Uber reimburse him for any alleged out-of-

16   pocket expenses. *Id*. at 175:5-13.

17       **III.**    **LEGAL STANDARD**

18        Rule 23 "imposes stringent requirements for certification that in practice exclude most

19   claims." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013).  Accordingly, courts

20   must undertake a "rigorous analysis" to determine whether class certification is appropriate. *Wal-*

21   *Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quotation omitted); *see Comcast Corp. v.*

22   *Behrend*, 133 S. Ct. 1426, 1432 (2013).  "A party seeking class certification must affirmatively

23   demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact*

24   sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S. Ct. at 2551.  As

25   the parties seeking class certification, Plaintiffs bear the burden of demonstrating that they have met

26   each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy.

27   *Comcast*, 133 S. Ct. at 1432; *Dukes*, 131 S. Ct. at 2551.  Plaintiffs must *also* comply with Rule

28   23(b)(3)'s heightened burden of showing that common questions predominate over individual ones,

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION            CV 13-03826-EMC

1   and that a class action is the superior method of adjudication.  *Comcast*, 133 S. Ct. at 1432.

2                                          IV.      ARGUMENT

3   **A.       Plaintiffs Have Failed To Prove That They Satisfy Rule 23(a)(2)'s Commonality**
4   **Requirement Or Rule 23(b)(3)'s More Demanding Predominance Requirement**

5          Plaintiffs' claims are riddled with individualized inquiries that doom commonality and

6   predominance and preclude class certification.  To meet Rule 23(a)(2)'s commonality requirement,

7   Plaintiffs bear the burden of identifying a "common contention" that is "capable of classwide

8   resolution."  *Dukes*, 131 S. Ct. at 2551 ("'What matters . . . is not the raising of common

9   'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common

10  *answers* apt to drive the resolution of the litigation.'").  Plaintiffs must provide "significant proof" of

11  some "glue" that binds the entire class together and enables classwide adjudication.  *Id.* at 2552–53.

12         To satisfy the "even more demanding" predominance requirement of Rule 23(b)(3), Plaintiffs

13  must show that common questions *predominate*.  *Comcast*, 133 S. Ct. at 1432.  The Court has a "duty

14  to take a 'close look'" at whether that "vital prescription" is satisfied.  *Id.*; *Amchem Products, Inc. v.*

15  *Windsor*, 521 U.S. 591, 623 (1997).  Tellingly, Plaintiffs rely on outdated case law, failing to

16  acknowledge the recent sea change in class certification jurisprudence establishing that Plaintiffs'

17  burden under Rule 23 is significantly more demanding than those earlier decisions had anticipated.

18  Indeed, Plaintiffs scarcely mention *Dukes* or *Comcast*, let alone show how they can satisfy their

19  exacting standards (which they cannot).  Resolving liability and damages would require a host of

20  individualized inquiries that cannot be resolved on a classwide basis.

21         **1.       Plaintiffs' Misclassification Claims Require Individualized Inquiries Into Each**
            **Transportation Provider's Relationship With Uber**

22
23         Certification of Plaintiffs' misclassification claim is improper under Rules 23(a)(2) and

24  23(b)(3) because, in applying the California Supreme Court's multi-factored *Borello* test, this Court

25  must conduct numerous individualized inquiries that predominate over any common issues.[3]  *See*

26  _____
    [3]  The California Supreme Court recently agreed to review a lower court decision holding that, for
27  certain Section 2802 claims, a plaintiff may establish an employment relationship by relying on
    the definition of employment set forth in Industrial Welfare Commission ("ICW") Wage Order
28  No. 9-2001—a definition that focuses on the putative employer's "right to control" the putative
    employee's wages, hours, and working conditions, and its "power to prevent [the putative

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                          CV 13-03826-EMC

MSJ Order at 6–9, 16.  As the Court emphasized, this test is "fact-bound" and "variab[le]," and the weight given the many "*Borello* factors 'depends on *[their] particular combination*'" for *each* driver. *Id.* at 8–9, 16–18 (citations omitted; emphasis added); *see id.* at 26 ("numerous factors point in opposing directions").  Plaintiffs do not (and cannot) meet their burden to demonstrate that Rule 23 is satisfied here because there is no typical "Uber driver."[4]

Plaintiffs claim this case turns on Uber's purportedly "uniform" licensing agreements with drivers and "baseline set of policies with respect to hiring, firing, and paying drivers, and establishing rules and expectations for them to follow."  Mot. at 2, 10–11, 17–18.  But this is demonstrably false. Uber executed at least 17 different agreements with drivers during the relevant timeframe; these agreements varied in many legally significant ways; and Uber's policies and suggestions varied by time and location, and changed frequently—in some cases, on a weekly basis.

In any event, even if Plaintiffs could identify a "uniform" policy applicable to all drivers, the Ninth Circuit has repeatedly held that "a district court abuses its discretion in relying on an internal uniform [employment] policy to the near exclusion of other factors relevant to the predominance inquiry."  *Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 835 (9th Cir. 2013) (internal quotation marks omitted); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958–59 (9th Cir. 2009).  Instead, predominance must focus on "the relationship between the common and individual issues in the case" and "the existence of . . . potential individual issues that may make class treatment difficult if not impossible."  *Wang*, 709 F.3d at 835 (internal quotation marks omitted).

Furthermore, Uber maintains that Plaintiffs—like all drivers who use the Uber App—are independent contractors, a complete, affirmative defense to Plaintiffs' misclassification and expense

---

employee] from working."  *See Dynamex Operations West, Inc. v. S.C.*, 341 P.3d 438, 438 (Cal. 2015); *see also Martinez v. Combs*, 49 Cal. 4th 35, 69-77 (Cal. 2010).  For the reasons discussed herein, Plaintiffs have failed to satisfy Rule 23 *regardless* of whether this Court (properly) applies the *Borello* test outlined in this Court's MSJ Order or (improperly) applies the ICW test.

[4] In fact, two conflicting decisions from the Labor Commissioner demonstrate that determining drivers' employment classification is individualized and fact-dependent.  *Compare* Lipshutz Decl. ¶ 17, Ex. P (concluding in *Alatraqchi v. Uber Technologies, Inc.*, No. 11-42020 CT (Cal. Labor Comm. Aug. 1, 2012) that driver who uses Uber App is independent contractor under *Borello* test) *with id.* ¶18, Ex. Q (concluding in *Berwick v. Uber Technologies, Inc.*, No. 11-46739 EK (Cal. Labor Comm. June 3, 2015) that driver who uses Uber App is employee under *Borello* test).

1    reimbursement claims.  *See Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014);

2    MSJ Order at 1, 6.  Uber has a right to litigate this defense with respect to *each* driver, and "a class

3    cannot be certified on the premise that [a defendant] will not be entitled to litigate its . . . defenses to

4    individual claims."  *Dukes*, 131 S. Ct. at 2561; *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 307

5    (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges

6    and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or

7    masks individual issues.").  Attempting to adjudicate these claims on a classwide basis would either

8    deprive Uber of its right to defend itself on an individualized basis and thus violate the Rules

9    Enabling Act, *Dukes*, 131 S. Ct. at 2561, and due process, *see Lindsey v. Normet*, 405 U.S. 56, 66

10   (1972) ("Due process requires that there be an opportunity to present every available defense."), or

11   result in an unmanageable proceeding in which individual issues predominate, or both.

### a.      Right To Control The Manner And Means Of Performance

12   The test for determining whether Plaintiffs are independent contractors or employees of Uber

13   first considers "whether [Uber] has the right to control the *manner and means* of accomplishing the

14   result desired."  *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations,* 48 Cal. 3d 341, 350–51 (1989)

15   (emphasis added; citation omitted); *accord Beaumont-Jacques v. Farmers Grp., Inc.*, 217 Cal. App.

16   4th 1138, 1143 (2013).  "Under this rule, the right to exercise *complete* or *authoritative* control must

17   be shown, rather than *mere suggestion* as to detail.  A worker is an independent contractor when he or

18   she follows the employer's desires only in the result of the work, and not the means by which it is

19   achieved."  *Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1347 (2009) (citing *Borello*, 48 Cal. 3d at

20   350).  Assessing Uber's right to control the details of driver's work will require individual inquiries

21   into a variety of factors, including the specific terms of many different licensing agreement and the

22   *actual practices* of Uber and drivers.  *Borello*, 48 Cal. 3d 354 ("Each service arrangement must be

23   evaluated on its facts, and the dispositive circumstances may vary from case to case.").

24   Plaintiffs claim they can prove a uniform right to control based entirely on Uber's licensing

25   agreements and a "baseline set of policies" (Mot. at 2, 10–11, 17–18), but this is incorrect.  Plaintiffs

26   assert that Uber's agreements and policies were "indisputably common to all drivers" (Mot. at 17–18

27   n.22), and rely on cases addressing "nearly identical" or "substantially identical" agreements and

28

13

policies.  *See, e.g.*, *Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555, 560, 563 (S.D. Cal. 2010); *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 337, 338 (S.D.N.Y. 2010).  However, Uber's agreements varied over time and by location (*see* Evangelis Decl. ¶ 7, Ex. 41; *supra* p. 6), and *each agreement* will require "independent legal analysis."  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) ("[A]ny common questions shared by [the] class do not predominate over the individual questions of contract interpretation" addressing five separate agreements); *Soto v. Diakon Logistics (Delaware), Inc.*, 2010 WL 3420779, at *6 (S.D. Cal. Aug. 30, 2010).[5]  Even determining *which* agreement governs which drivers' relationship with Uber would require this Court to engage in individualized inquiries, since many drivers have accepted multiple agreements over time and certain putative class members are likely to contest whether they assented to particular agreements.  Colman Decl. ¶ 15.[6]

Similarly, Uber's onboarding process and best-practice suggestions have varied over time, across geographic regions, and even based on the Uber personnel who led the onboarding sessions. *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 145-46 (3d Cir. 2001) (individual issues predominated where "presentations . . . were neither uniform nor scripted"); Lipshutz Decl. ¶ 8, Ex. G at 51:8-18, 79:8-10; *id.* ¶ 2, Ex. A at 94:9-96:17; Ballard Decl. ¶¶ 5-6; Prithivi Decl. ¶ 5; Rosenthal Decl. ¶¶ 5, 8; Sawchuk Decl. ¶ 5.  "Onboarding" is generally informal, unscripted, and can be self-guided on Uber's website (Evangelis Decl. ¶ 6, Ex. 26), conducted by any number of Uber personnel at an Uber office (*id.*), or—according to drivers—by other drivers or partners familiar with the Uber App (*id.*; Lipshutz Decl. ¶ 8, Ex. G at 215:2–13).  *See* Ballard Decl. ¶¶ 4-7; Prithivi Decl. ¶ 5-6.[7]

---

[5]  *Accord Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 542-43 (C.D. Cal. 2013) ("the variety and great number of [] contracts at issue here would alone preclude class certification"); *Westways World Travel, Inc. v. AMR, Corp.*, 2005 U.S. Dist. LEXIS 47291, at *26-27 (C.D. Cal. Feb. 24, 2005) (same); *see also Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1172–76 (11th Cir. 2010) ("powerful variations in the contractual terms alone are fatal to the . . . class").

[6]  In fact, Plaintiffs' counsel conceded this in *Yucesoy v. Uber Technologies, Inc.*, Case No. CV 3:15-0262, explaining that there may be "situations . . . in which a genuine dispute [could] exist as to whether a given driver ever actually assented to [an] agreement, or whether someone else assented on the driver's behalf . . . ."  Lipshutz Decl. ¶ 16, Ex. O.

[7]  Additionally, the mere fact that Uber offers onboarding to drivers does not establish that Uber controls the drivers who attend those sessions, given that onboarding is *required* by the CPUC. McCrary Report ¶ 76; CPUC Rule at 29.

14

In addition, Uber's onboarding suggestions are not part of the licensing agreement, and their relevance to Uber's right to control depends upon whether drivers viewed them as mere suggestions for maintaining a favorable star rating or requirements.  *See Mission Ins. Co. Workers Compensation Appeals Board*, 123 Cal. App. 3d 211, 224 (1981) ("[A]n employer who controls the manner in which the work is done has little need of establishing quality standards for completed work; such standards are indicative that [the defendant's] primary interest was in the quality of the result rather than the manner in which the work was done and constitutes evidence that applicant was an individual contractor.").  Drivers' attitudes about Uber's onboarding suggestions vary dramatically and will require individual inquiries.  Some view them as mandatory (Lipshutz Decl. ¶ 5, Ex. D at 95:20-100:18; *id.* ¶ 6, Ex. E at 231:1-15); others view them as optional (Evangelis Decl. ¶ 6, Ex. 27).

Regardless of the terms of any particular agreement, Uber can establish "an independent contractor relationship . . . by showing that in actual practice no control was exercised, and that the parties acted under the contracts and interpreted them so as *not* to give [Uber] the right of control." *Bemis v. People*, 109 Cal. App. 2d 253, 264 (1952); *accord Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1021 (N.D. Cal. 2010) ("[T]he control that is actually exercised may be informative of the control that may be exercised.").  Indeed, the Court is not limited to the four corners of the agreement when assessing the right to control.  *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1066–67 (9th Cir. 2011); *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012).

Plaintiffs disagree, suggesting that the relevant inquiry at class certification is whether "'there [is] a common way to show [defendant] possessed essentially the same legal right of control with respect to each of its [workers].'"  Mot. at 1–2 (quoting *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 528, 533 (2014)).  But *Ayala* disavows any notion that "the parties' course of conduct is irrelevant."  *Ayala*, 59 Cal. 4th at 533, 535.  Indeed, "[w]hile any written contract is a necessary starting point . . . the rights spelled out in a contract may not be conclusive if other evidence demonstrates a practical allocation of rights at odds with the written terms."  *Id.* at 535 (citation omitted).  Thus, where "the parties' course of conduct" is relevant—as it is here—the court must determine "whether that course of conduct is susceptible to common proof—*i.e.*, whether evidence of the parties' conduct indicates similar retained rights vis-à-vis each hiree, or suggests

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    CV 13-03826-EMC

1    variable rights, such that individual proof would need to be managed." *Id.*;[8] *see also Ali*, 176 Cal.

2    App. 4th at 1350 (affirming order denying class certification of taxi drivers' employee

3    misclassification claims because "[a]lthough the leases and training manuals [were] uniform, the

4    [trial] court reasonably found the testimony of putative class members would be required on the

5    issues of employment and fact of damage"); *Clure v. Bankers Life & Cas. Co.*, 2015 WL 3994975, at

6    *6 (D. Wash. June 30, 2015) (decertifying class of allegedly misclassified insurance agents and

7    holding that "common evidence . . . (namely agents' contracts) [was] insufficient to support a

8    classwide finding in light of agents' varied experiences").

9                          **(i)     Right To Terminate**

10          Plaintiffs argue that Uber's contractual right to terminate is a strong indicator of Uber's right

11   to control the manner and means of performance. Mot. at 1, 6 n.8, 17–18 & n.22. But Plaintiffs

12   assume that Uber's agreements "uniformly" give Uber a "right to terminate at will" (Mot. at 1, 6 n.8,

13   17–18 & n.22), which is not the case. *See, e.g.*, MSJ Order at 20–21 (finding conflicting evidence of

14   Uber's right to terminate at will). Of the 17 agreements at issue, 8 reserve a *mutual* right to terminate

15   for both Uber and the driver, which is "evidence of an independent-contractor relationship."

16   *Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F. Supp. 3d 1083, 1105 (N.D. Cal. 2014); *Beaumont-*

17   *Jacques*, 217 Cal. App. 4th at 1147; *see* Evangelis Decl. ¶ 7, Ex. 54.[9] Other agreements reserve a

18   right to terminate for specific misconduct and require a minimum amount of notice. Evangelis Decl.

19   ¶ 7, Ex. 52. Still others provide Uber a unilateral right to terminate at will. *Id*. ¶ 7, Ex. 53.

20          Even where agreements reserve a right to terminate at will, this is indicative of an employer-

21   employee relationship only if a principal *"exercised or threatened to exercise* its termination power

22   to control the means or manner by which the desired result was to be achieved." *Mission Ins. Co.*,

23

24   ───────────────

       [8]  Because the agreement at issue in *Ayala* was an *identical* form contract that provided a "uniform
25        right to control," the court did not have occasion to consider the parties' *actual* practices. *Ayala*,
         59 Cal. 4th at 536.

26
       [9]  *Accord Beaumont-Jacques*, 217 Cal. App. 4th at 1147 ("[A mutual] right to terminate . . . show[s]
27        an association, rather than the relation of employer and employee") (internal quotation marks and
         citations omitted); *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 589 (2011); *Royal*
28        *Indem. Co. v. Indus. Acc. Comm'n*, 104 Cal. App. 290, 297–98 (Cal. Ct. App. 1930).

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                        CV 13-03826-EMC

123 Cal. App. 3d at 222 (emphases added); *see Ayala*, 59 Cal. 4th at 533 (a court should consider whether "instructions . . . would have to be obeyed on pain of at-will discharge for disobedience" (quotation marks and citations omitted)); *Harris*, 753 F. Supp. 2d at 1021 ("The right to terminate alone does not establish control . . . where [it] is ambiguous . . . whether and how [employer's directives] would be enforced."). Here, drivers have varying beliefs about whether Uber would exercise its right to terminate their agreements for failure to follow Uber's recommendations. *Compare* Evangelis Decl. ¶ 6, Exs. 23, 28, 35 *with* Lipshutz Decl. ¶ 3, Ex. B at 127:18-129:5, 132:12-133:11, 140:5-18, 141:13-18, 144:12-145:4, 146:6-12, 147:12-14; *id.* ¶ 6, Ex. E at 212:14-215:13. And although some drivers state they have been warned by Uber that they must comply with terms of their licensing agreement or face deactivation, *see* Lipshutz Decl. ¶ 3, Ex. B at 22:10-22; *id.* ¶ 6, Ex. E at 212:14-215:13, many more have not, *see* Evangelis Decl. ¶ 6, Ex. 29.

For instance, Plaintiffs claim that Uber "informs drivers . . . that they 'are not allowed under any circumstances' to accept cash from customers" and asks drivers to inform passengers "that the trip cost . . . is inclusive of gratuity'" (Mot. at 7–8). But the licensing agreements vary significantly on this issue—some are silent as to gratuities, some expressly allow drivers to accept gratuities, and others expressly ban them. Evangelis Decl. ¶ 7, Ex. 50. Drivers' actual practices vary even further. Some always accept tips and do not inform passengers of any Uber policies regarding tips; others occasionally accept tips, but inform riders of Uber's tipping policy; and still others *never* accept tips and always inform riders of the tipping policy. Evangelis Decl. ¶ 6, Exs. 33–36.

Likewise, policy and practice vary with respect to drivers' perceived ability to turn down leads, which also factors into the right-to-control analysis. *See* MSJ Order at 21; *see, e.g.*, *State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 202–03 (1995). Plaintiffs suggest that some agreements limited drivers' "right to accept Requests" under certain circumstances (Mot. at 5), and others caution that "repeated failure by a Driver to accept User requests . . . creates a negative experience for Users." Evangelis Decl. ¶ 7, Ex. 45. But many agreements provide drivers with unfettered discretion "to accept, reject, and select among the Requests received via the Service," and emphasize that drivers "have no obligation to [Uber] to accept any Request." *Id.* Drivers' beliefs with respect to accepting ride requests are equally varied. Some believe they have complete

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CV 13-03826-EMC

1    discretion to turn down requests and some believe they can turn down requests up to a limit.  *Id.*  In

2    practice, some routinely do turn down leads, while others generally accept every lead they receive

3    through the App.  *Id.* ¶ 6, Ex. 24; Colman Decl. ¶ 22, Ex. T; McCrary Report ¶¶ 135-36 & Ex. 8.

4           Plaintiffs suggest that Uber can deactivate a driver's account if her star rating falls below a

5    minimum threshold, and characterize the rating system as a tool for controlling the manner of drivers'

6    performance.  Mot. 5–6, 18.  But several agreements incorporate *no policies* with respect to Uber's

7    star rating system.  Evangelis Decl. ¶ 7, Ex. 52.  Others caution that drivers may be "limited in their

8    right to accept Requests" if they achieve "low ratings."  *Id.*  Some tie a threat of deactivation to

9    compliance with "standards of appearance and service."  *Id.*; Mot. at 17.  Still others give Uber

10   authority to deactivate drivers who fall "below the acceptable minimum star rating" or "minimum

11   *average* acceptable rating," untethered to any specific standards.  Evangelis Decl. ¶ 7, Ex. 52.

12          Drivers' understanding of and response to the star rating system also vary considerably.

13   Some understand the star rating to mean that suggestions from Uber during the onboarding

14   experience and "pro tips" are effectively *mandatory* and that Uber could deactivate their accounts if

15   they fail to obey.  *See supra* p. 17.  Many others understand they can attain acceptable star ratings any

16   way they like—driver Robert Jones, for example, ignores Uber's suggestion to provide gum to riders,

17   instead provides his riders newspapers, and maintains a high star rating.  Decl. of Robert Jones ¶ 5;

18   *see* Evangelis Decl. ¶ 6, Ex. 30; McCrary Report ¶¶ 145-49.  Many drivers understand that the star

19   rating system is a rider-driven metric, Uber has no control over ratings, and drivers have complete

20   control over how they conduct themselves and their businesses.  *See* Evangelis Decl. ¶ 6, Exs. 28, 30.

21          Consideration of the parties' *understanding* and *intent* with respect to Uber's control over the

22   details of drivers' work through the star rating system or threat of termination would involve

23   precisely the types of individual inquiries that subsume any common questions and make a class

24   proceeding inappropriate under Rule 23.[10]  *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718,

25   735 (9th Cir. 2007) (certification was inappropriate where the court would have to "ascertain each

26   ─────────────────────────

27   [10]  Any attempt to gloss over these differences among class members and create a "fictional
     composite" plaintiff would violate due process and the Rules Enabling Act by depriving Uber of
28   "the benefit of deposing or cross-examining the disparate individuals behind the composite
     creation."  *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998).

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

1   individual's expectations about the contract and determine whether those expectations were

2   reasonable"); *Sacred Heart*, 601 F.3d at 1164, 1177–78; *supra* pp. 14-16.  In sum, Uber's agreements

3   and the "actual practices" of the parties vary so widely that evaluating Uber's right to terminate as a

4   means of control cannot be done on a classwide basis.  *Bemis*, 109 Cal. App. 2d at 264.

5                  **(ii)      Control Over Schedules And Routes**

6          A principal's authority to establish mandatory work schedules and routes also factors heavily

7   into the control test.  *Arnold*, 202 Cal. App. 4th at 589 (finding an independent contractor relationship

8   where an insurance agent "used her own judgment in determining . . . the time, place, and manner in

9   which she would solicit, and the amount of time she spent soliciting"); *State Comp. Ins. Fund*, 32

10  Cal. App. 4th at 202–03; *see also Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981, 991, 993

11  (9th Cir. 2014).  As the Court has emphasized, "[t]his is a significant point," and evidence that Uber

12  does not control drivers' schedules "might weigh heavily in favor of a finding of independent

13  contractor status."  MSJ Order at 25.

14         Many of Uber's agreements provide that drivers "have no obligation to use the [App] at any

15  specific time or for any specific duration" and have "complete discretion to determine when [they]

16  will be available to receive Requests."  *See* Colman Decl. ¶ 9, Exs. C, F, G, J, M.  Some require the

17  driver to fulfill at least one ride request per month, and others require drivers to log into the App at

18  least once every 180 days.  Evangelis Decl. ¶ 7, Ex. 46  The agreements impose no requirements as to

19  specific driving routes or assigned geographic areas, but Uber does distribute recommendations and

20  "pro tips" regarding areas of high demand as well as alerts relating to "surge pricing" based on

21  demand or limited availability of drivers.  *Id*. ¶ 6, Exs. 16–17, 25; McCrary Report ¶¶ 126-27.  In

22  practice, most drivers feel free to drive whenever and wherever they want—if at all—and have never

23  been assigned by Uber to any particular schedule or area of town.  *Id*. ¶ 6, Ex. 14.  Some drive on a

24  daily basis, while others drive very infrequently.  *Id*. ¶ 6, Ex. 12; Colman Decl. ¶ 21, 23, 24, Exs. S,

25  U, V.   Some accept ride requests wherever they please and disregard Uber's recommendations.

26  Evangelis Decl. ¶ 6, Ex. 17.  Others closely follow Uber's suggestions regarding hours and locations

27  of peak demand, and generally respond to alerts regarding surge pricing or suggestions for high-

28  demand events, Evangelis Decl. ¶ 6, Exs. 16–17, 25; Colman Decl. ¶¶ 25-28, Exs. W-Y.

### (iii)     Use Of Third-Party Apps

Whether a principal forbids the alleged employee from providing services to third parties is also indicative of control.  *See Ali*, 176 Cal. App. 4th at 1349 (finding individual issues predominated where, *inter alia*, "[putative class members] . . . were not required to use [defendant's] dispatch service.  Some declarants used it for between 20 and 60 percent of their business, many used it infrequently, and some chose not to use it at all"); *cf. Yellow Cab Cooperative, Inc. v. Workers Compensation Appeals Board*, 226 Cal. App. 3d 1288, 1298 (1991) ("Yellow exercised control . . . . Perhaps most significant was the prohibition on driving cabs for other companies.").

Plaintiffs claim that some agreements require drivers to "perform transportation services only for [Uber]" while signed into the Uber App.  Mot. at 5.  But many other agreements are silent as to competing apps, or explicitly *allow* drivers to use such apps without limitation.  Evangelis Decl. ¶ 7, Ex. 43.  In practice, many drivers accept rides through competing applications, like Lyft and Sidecar.  *Id.* ¶ 6, Ex. 19; Lipshutz Decl. ¶ 3, Ex. B at 112:7-113:10.  Some drivers even use multiple apps *simultaneously* to find the most lucrative ride requests, and others are active on multiple platforms at different times.  Evangelis Decl. ¶ 6, Ex. 20.  Other drivers use the Uber App exclusively.  *Id*. ¶ 6, Ex. 19.  *See Bowerman v. Field Asset Servs.*, 2014 WL 4676611, at *10–11 (N.D. Cal. Sept. 17, 2014) (denying class certification because putative class comprised plaintiffs who were "dependent" on defendant, whereas others "contract[ed] with competitors").

### b.     Secondary Indicia

Common questions likewise do not predominate with respect to secondary indicia under the *Borello* test.  Plaintiffs largely ignore these 13 factors, which are devastating to Plaintiffs' certification arguments and cannot be resolved on a classwide basis.  Plaintiffs suggest that the "control" factor should be dispositive to the exclusion of *all* other *Borello* factors (Mot. at 16), but courts have repeatedly rejected this "laser-like [focus] on the issue of control," *Air Couriers Int'l v. Employment Dev. Dep't*, 150 Cal. App. 4th 923, 933 (2007), and "have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements."  *Borello*, 48 Cal. 3d at 350; *accord Sotelo v. MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 656–58 (2012)*;* MSJ Order at 7–8 ("The putative employer's right to control work

20

1    details is not the only relevant factor . . . [and] cannot be applied rigidly and in isolation . . . . [A]ll

2    thirteen of the [] 'secondary indicia' are helpful in determining a hiree's employment status")

3    (citations and quotation marks omitted).

4           The secondary factors are particularly important in this case, which involves a novel type of

5    service arrangement.   As the Court has held, "[t]he application of the traditional test of

6    employment—a test which evolved under an economic model very different from the new 'sharing

7    economy'—to Uber's business model creates significant challenges."   MSJ Order at 27; *see also*

8    *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1081-82 (N.D. Cal. 2015) ("[T]he jury in this case will be

9    handed a square peg and asked to choose between two round holes.   The test the California courts

10   have developed over the 20th Century for classifying workers isn't very helpful in addressing this

11   21st Century problem.").

12          Consideration of the relevant *Borello* factors will not yield common answers to the question

13   of each putative class members' employment classification because these factors apply differently to

14   each driver and cannot be considered *together* on a classwide basis.   *See* MSJ Order at 8–9

15   ("[T]he weight given to the *Borello* factors 'depends on [their] particular combinations'" for each

16   driver (citation omitted)).   Plaintiffs argue that the Court can create subclasses addressing each factor

17   individually (Mot. at 19 & n.25, 24 & n.9), but this would make class proceedings unmanageable and

18   preclude the court from weighing *all* of the relevant *Borello* factors for each individual driver.

19   As this Court has emphasized, "the individual factors *cannot be applied mechanically as separate*

20   *tests*" (MSJ Order at 8 (quoting *Borello*, 48 Cal. 3d at 351) (emphasis added)), and "the fact-finder

21   must 'assess and weigh *all of the incidents of the relationship* with the understanding that no one

22   factor is decisive" (*id.* (quoting *Narayan*, 616 F.3d at 901) (emphasis added)); *accord Sotelo*, 207

23   Cal. App. 4th at 660 ("multi-factor test 'requires that the factors be examined together.'   Thus, even if

24   [some] factors were able to be determined on a class-wide basis, those factors would still need to be

25   weighed individually, along with the factors for which individual testimony would be required")).[11]

---

26   [11]  *Accord Bowerman, Inc.*, 2014 WL 4676611, at *11; *Spencer v. Beavex, Inc.*, 2006 U.S. Dist.
27   LEXIS 98565, at *47 (S.D. Cal. Dec. 15, 2006) ("the *Borello* factors are not to be viewed in
     isolation, but in conjunction . . . it would [not] be of value to resolve some *Borello* factors by
28   class action, and others by individual inquiry").

Gibson, Dunn &
Crutcher LLP

### (i)      Whether Drivers Believe They Are Employees

A key factor in the independent contractor analysis is "whether or not the parties *believe* they are creating the relationship of employer-employee." *Borello*, 48 Cal. 3d at 351 (emphasis added); *see* MSJ Order at 7–8.  Each driver's subjective intent cannot be determined on a classwide basis, because it turns on individualized inquiries for each contracting party.  *See Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 471-73 (N.D. Cal. 2014) (the intent of each customer is "a question that can be resolved only on an individual basis"); *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 458 (N.D. Cal. 2012) ("Because individual assessments will be required to determine the parties' intent . . . common questions do not predominate"); *Monaco v. Bear Stearns Cos., Inc.*, 2012 WL 10006987, at *8 (C.D. Cal. Dec. 10, 2012).

Plaintiffs allegedly believed they were creating an employee-employer relationship with Uber when they signed their licensing agreements.  Lipshutz Decl. ¶¶ 10-12, Ex. I-K at No. 4.  But other drivers intended to create an independent contracting relationship.  Evangelis Decl. ¶ 6, Ex. 11.  In fact, many drivers have regular employment and recognize the distinctions between their jobs and the services they provide riders using the Uber App.  *Id.*, Ex. 21.  Some drivers may even be *precluded* by their actual employers from obtaining additional "employment," and signed their licensing agreements with the understanding that they would be independent contractors.  *See id.*, Exs. 10–11, 21.  Others accept ride requests through the App as employees or agents of third-party transportations companies, which those drivers consider to be their "employers."  *Id.*, Ex. 3.

### (ii)      Length Of Time Worked And Method Of Payment

Two particularly important factors are "the length of time for which the services are to be performed" and "the method of payment, whether by the time or by the job."  *Borello*, 48 Cal. 3d at 351; *Mission Ins.*, 123 Cal. App. 3d at 216, 219; *Millsap v. FedEx Corp.*, 227 Cal. App. 3d 425, 431–32 (1991).  In fact, in a similar case currently pending in the Northern District of California, Judge Chhabria recently held that "one could easily imagine a reasonable jury concluding that" drivers who use lead generation apps and have "relatively sparse work schedules" could be independent contractors, "even if other [] drivers with heavier or more regular schedules might properly be deemed employees."  *Cotter*, 60 F. Supp. 3d at 1081.

22

Drivers' usage of the Uber App varies dramatically. Some rarely use the App (Evangelis Decl. ¶ 6, Ex. 12; Colman Decl. ¶¶ 21, 23-24, 28, Exs. S, U, V, Y) or schedule their usage around employment or other obligations (*see* Decl. of Mark Lachar ¶ 16 ("The biggest advantage . . . is that I have complete flexibility to work when I want, especially given my full-time job."); McCrary Report ¶¶ 112-13 & Exs. 1-2). Others use the Uber App more than 60 hours per week. Evangelis Decl. ¶ 6, Ex. 13; Colman Decl. ¶ 21, Ex. S. Drivers' usage also fluctuates significantly over time, sometimes changing dramatically from one week to the next. *See* Evangelis Decl. ¶ 6, Ex. 12; Colman Decl. ¶¶ 21, 23-24, 28, Exs. S, U, V, Y; McCrary Report ¶ 132 & Ex. 6. All drivers decide, based on their own preferences and availability, when and how much to work. Colman Decl. ¶¶ 21, 23-24, 26, 28, Exs. S, U, V, Y; Lipshutz Decl. ¶ 2, Ex. A at 200:8-201:10; *id.* ¶ 4, Ex. C at 133:16-134:17; *id.* ¶ 5, Ex. D at 61:3-7; McCrary Report ¶¶ 128-29, 131, 133-34. Drivers generally are compensated on a per-ride basis by Uber, but others may have different terms depending on their relationship with Uber partners and whether the partners provide vehicles and cover the drivers' expenses. Evangelis Decl. ¶ 6, Exs. 3, 9, 40; Lipshutz Decl. ¶ 2, Ex. A at 160:16-163:17; McCrary Report ¶¶ 120-25, 140-41.[12]

### (iii)    Opportunity For Profit Or Loss

Drivers may also have the "opportunity for profit or loss depending on [their] managerial skill." *Borello*, 48 Cal. 3d at 355. Some drivers purchase more efficient vehicles (such as hybrids) to minimize fuel costs (*see, e.g.*, Decl. of Sumathe Haswang ¶ 6), hire subcontractors to drive additional vehicles (Evangelis Decl. ¶ 6, Ex. 6), or purchase luxury vehicles to accept higher-paying ride requests through UberPlus (*see, e.g.*, Decl. of Hassan Janaby ¶ 6). Other drivers target geographic regions that tend to have higher demand (Evangelis Decl. ¶ 6, Ex. 17), drive during hours when demand is at its peak (*id.* ¶ 6, Ex. 16), or drive when "surge pricing" is available (*id.* ¶ 6, Ex. 25). On the other hand, some drivers use only their own vehicles, make no upgrades or modifications, and drive when and where they are available, regardless of demand or surge pricing. *Id.* ¶ 6, Exs. 9, 16,

---

[12]  Plaintiffs acknowledge the significant variation in drivers' schedules, yet claim this "do[es] not affect the overall inquiry." Mot. at 19–20 (citing *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 608 (S.D. Cal. 2010)). But the case on which Plaintiffs rely—*Norris-Wilson*—cites no authority for the novel proposition that a court may consider certain *Borello* factors on a classwide basis while ignoring others (*see* 270 F.R.D. at 608). Nor could it. Courts have repeatedly held that the *Borello* factors cannot be applied in isolation. *See supra* pp. 13-16.

17, 25; *see also* Lipshutz Decl. ¶ 5, Ex. D at 138:3-18 (Gurfinkel does not implement any driving strategies, such as seeking out surge pricing, because he does not like driving in the late night hours).

(iv)    <b>Negotiation Of Rates</b>

Similarly, some drivers have effectively "negotiate[d] for higher rates, as independent contractors commonly can." *Ruiz*, 754 F.3d at 1101; *see Ali*, 176 Cal. App. 4th at 1349 (individual issues predominate where, *inter alia*, drivers could "set their own rates, such as flat rates for trips, or rates below the standard metered rate"). Uber cannot force drivers to accept ride requests, but uses "surge pricing" as a form of negotiation to bid up compensation and entice drivers to log in and accept ride requests. McCrary Report ¶¶ 137, 142. Indeed, many drivers refuse to accept requests *until* surge pricing is bid up to their satisfaction. Evangelis Decl. ¶ 6, Ex. 25. Other drivers, however, accept requests regardless of the applicable pricing. *Id.*; Colman Decl. ¶¶ 25-27, Exs. W, X. Drivers also have the discretion to charge whatever price they want, up to a maximum set by the App. *See* Evangelis Decl. ¶ 7, Ex. 48. Some drivers charge less than the maximum fare, while others have never accepted anything other than the maximum fare. Evangelis Decl. ¶ 6, Ex. 15; Agop Babikian Decl. ¶ 12 ("I will turn off the app and let them have a few free miles if I've enjoyed the conversation"); McCrary Report ¶¶ 142-44. Many drivers routinely request fare adjustments (*e.g.*, to reflect multiple stops on a route), whereas others do so rarely or never. Evangelis Decl. ¶ 6, Ex. 2.

(v)    <b>Engagement In A Distinct Occupation Or Business And "Employment Of Helpers"</b>

Some drivers may be "engaged in a distinct occupation or business" and/or "employ[] helpers" to run their transportation enterprises. *Borello*, 48 Cal. 3d at 351, 355; *see Arnold*, 202 Cal. App. 4th at 589-90 (plaintiff was engaged in a distinct occupation requiring a license); *Mission Ins. Co.*, 123 Cal. App. 3d at 224; *Ali*, 176 Cal. App. 4th at 1349 (individual issues predominated where, *inter alia*, drivers "independently advertised and promoted their own services . . . [and] g[ave] out business cards and their personal cell phone numbers"); *Narayan*, 285 F.R.D. at 479. Many drivers operate independent transportation companies, such as limousine, shuttle, or taxi services (Evangelis Decl. ¶ 6, Ex. 7); operate under independent business names, and use independent business signage, business cards, or social media websites (*id.* ¶ 6, Ex. 5); and/or hold independent transportation

24

1   licenses, such as "Transportation Charter-Party" licenses or "TCPs" (*id.* ¶ 6, Ex. 4).   Some hire

2   subcontractors (*id.* ¶ 6, Ex. 6), which, as this Court recognized, "support[s] an independent contractor

3   classification."   MSJ Order at 26.   On the other hand, other drivers accept ride requests *exclusively*

4   through the Uber App, do *not* have TCP licenses, do *not* hire subcontractors, and/or do *not* hold

5   themselves out as independent businesses.   Evangelis Decl. ¶ 6, Exs. 3–4.

6                         **(vi)      Provision Of The Instrumentalities And Tools Of Work**

7           Finally, courts consider "whether the principal or the worker supplies the instrumentalities,

8   tools, and the place of work."   *Borello*, 48 Cal. 3d at 351; *see Soto v. Diakon Logistics, Inc.*, 2010

9   WL 3420779, at *6 (S.D. Cal. Aug. 30, 2010) (denying certification where "the putative class may be

10  fragmented" in part because "some putative class members owned the trucks they used for deliveries,

11  while others rented them through Defendant").   Here, the principal instrumentalities of work are a

12  smart phone to access the Uber App and a vehicle to provide transportation to riders.   *See* McCrary

13  Report ¶¶ 151-53.   Some drivers access the App on iPhones they received directly from Uber in

14  exchange for a small monthly fee to help cover data charges.   Evangelis Decl. ¶ 6, Ex. 8.   Other

15  drivers use their personal phones and use no equipment from Uber.   *Id.*   Some drivers use their own

16  vehicles, while others use vehicles provided by third-party transportation companies.   *Id.* ¶ 6, Ex. 9.

17          In sum, the *Borello* factors make classwide adjudication of Plaintiffs' misclassification claim

18  impossible because individual issues predominate as to *every* relevant factor.   Driver classification

19  remains an individualized issue under *Borello*, and consideration of the legally significantly factors as

20  to each driver will yield no common answers to any questions that might be common to the putative

21  class.   *Dukes*, 131 S. Ct. at 2551; *Narayan*, 285 F.R.D. at 480.

22                **2.      Plaintiffs' Tipping Claims Turn On Individualized Inquiries**

23          Plaintiffs' claim for restitution under Labor Code Section 351 and the UCL likewise requires

24  individualized inquiries into liability and damages, which further defeats class certification.   As the

25  Supreme Court explained in *Comcast*, an assertion that "any method of measurement is acceptable so

26  long as it can be applied classwide, no matter how arbitrary the measurements," would "reduce Rule

27  23(b)(3)'s predominance requirement to a nullity."   *Comcast*, 133 S. Ct. at 1433; *Leyva v. Medline*

28  *Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (damages must be capable of being calculated

25

1  "feasibly" and "accurately" on a classwide basis); *Curtis v. Extra Space Storage, Inc.*, 2013 WL

2  6073448, at *4 (N.D. Cal. Nov. 18, 2013) (rejecting class certification "[b]ecause plaintiff fail[ed] to

3  demonstrate a reliable method to compute damages classwide").   Plaintiffs cannot—and have not

4  even attempted to—show that their claim is capable of *accurate* measurement on a classwide basis,

5  because "[q]uestions of individual . . . calculations will inevitably overwhelm questions common to

6  the class." *Comcast*, 133 S. Ct. at 1433; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d

7  244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").[13]

8      Uber is entitled to challenge the amount of allegedly unpaid gratuities for each class member

9  on numerous grounds, and these individual defenses will predominate over any common issues.

10  *Dukes*, 131 S. Ct. at 2561.  First, there is no evidence in the record demonstrating whether any

11  particular rider thought he or she was leaving a gratuity for a driver, whether as a result of any

12  purportedly misleading representations from Uber or otherwise.   *See* Cal. Labor Code § 351;

13  *Leighton v. Old Heidelberg, Ltd.*, 219 Cal. App. 3d 1062, 1069–70 (1990) (considering whether

14  patrons intended to leave gratuities and for whom); *Herbert's Laurel-Ventura v. Laurel Ventura

15  Holding Corp.*, 58 Cal. App. 2d 684, 694 (1943).

16      Even if a customer intended to leave a gratuity, the *amount* of that gratuity would vary

17  depending on a number of factors, including the quality of service provided by the driver.  McCrary

18  Report ¶¶ 157-59.  Plaintiffs concede they frequently receive less than 20% when they receive tips.

19  Lipshutz Decl. ¶ 6, Ex. E at 260:6-11.  Some drivers receive high gratuities—of over $100 per tip—

20  while others receive small tips of $1-2, or no tips at all.  Evangelis Decl. ¶ 6, Ex. 37; *see* McCrary

21  Report ¶¶ 160-61.  To the extent some drivers *would not have* received tips—regardless of Uber's

22  "policies"—those drivers have suffered no injury and have no Article III standing, thus precluding

23  class certification.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("no class may

24  be certified that contains members lacking Article III standing") (quoting *Denney v. Deutsche Bank

25  AG*, 443 F.3d 253, 264 (2d Cir. 2006)); *Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980);

26

27  ──────────

  [13]  Plaintiffs cite *Leyva*, 716 F.3d 510 to suggest that "the presence of individualized damages

28  cannot, by itself, defeat class certification" (Mot. at 21), but the plaintiffs in *Leyva* <u>did</u> produce a
    workable method of establishing damages.  *Leyva*, 716 F.3d at 514.  Plaintiffs here have not.

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                     CV 13-03826-EMC

1  *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013)).

2      Simply awarding a flat amount based on a composite or "customary" amount, as Plaintiffs

3  propose (*see* Mot. at 7 n.11), would also result in windfalls to drivers who already received tips from

4  riders.   Indeed, some drivers receive tips regularly, while others only sporadically or not at all.

5  Evangelis Decl. ¶ 6, Ex. 36; McCrary Report ¶¶ 160-63.  As Plaintiffs admit, Uber never took from

6  drivers any portion of cash tips that riders left for them.  Lipshutz Decl. ¶ 5, Ex. D at 124:9-17.

7      Finally, the Court may not certify a "liability-only" class to get around the intractable

8  individualized damages issues presented here.   Mot. at 21.   Rule 23(c)(4) does not permit the

9  certification of a "liability-only" class where the requirements of Rule 23(a) and (b) are not met, as

10  they are not here.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) (a "court

11  cannot manufacture predominance through the nimble use of subdivision (c)(4)."); *see also Valentino*

12  *v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1230, 1233-34 (9th Cir. 1996) (reversing certification of a

13  Rule 23(c)(4) class where requirements of Rule 23(b)(3) were not satisfied).

### 3.    Plaintiffs' Claim For Expense Reimbursement Under Labor Code Section 2802 Depends On A Host Of Individualized Inquiries

15      Plaintiffs' expense reimbursement claim under Labor Code Section 2802 similarly depends on

16  highly individualized inquiries, and thus is not suitable for certification because "there exists no

17  reliable means of proving classwide injury in fact."  *In re Rail Freight Fuel Surcharge Antitrust*

18  *Litig.*, 725 F.3d at 252-53; *Mazza*, 666 F.3d at 594 (quotation omitted).  In their motion, Plaintiffs

19  suggest that their Section 2802 claim satisfies the commonality and predominance requirements of

20  Rule 23 because (according to Plaintiffs) "Uber's policy is not to reimburse drivers for any of [their]

21  expenses."  Mot. at 11.  But even if Uber had a "policy" of not reimbursing drivers, that fact would

22  not confer standing on all drivers who use the app, given that many transportation companies (1) pay,

23  up-front, for expenses that their drivers otherwise would have borne; or (2) reimburse drivers, after

24  the fact, for any expenses incurred.  Evangelis Decl. ¶ 6, Ex. 40; *see also* Mot. at 6 n. 9 (conceding

25  that "drivers who work through transportation companies may have had certain expenses reimbursed

26  to them by the intermediary transportation company").   Drivers who fall into *either* of these

27  categories have suffered no injury at all, yet Uber has no method by which to determine *which* drivers

28

27

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

fall into these groups, Lipshutz Decl. ¶ 2, Ex. A at 158:17-159:20, 160:16-161:12, and Plaintiffs propose no manageable method by which to identify such drivers—failures that are, standing alone, fatal to Plaintiffs' motion.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 253.

Plaintiffs' claims also fail Rule 23's commonality, predominance, and superiority requirements because individualized inquiries are necessary to determine the *types* of expenses incurred by putative class members, and whether those expenses were a "*necessary*" component of a driver's ostensible employment relationship with Uber.  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 561 (Cal. 2007) (citing Section 2802(a)) (emphasis added).  As this Court recognized in *Harris v. Vector Marketing Corporation*, 753 F. Supp. 2d 996 (N.D. Cal. Nov. 5, 2010), Rule 23's predominance and superiority requirements, in particular, cannot be satisfied when a plaintiff has failed to prove "that there [are] common types of expenses" and "that evaluation under [Section] 2802 of the 'necessity' of various expenses . . . may be done on a relatively uniform basis."  *Harris*, 753 F. Supp. 2d at 1021-23.  Indeed, courts *routinely* hold it is improper to certify a Section 2802 class when plaintiffs have failed to make this crucial showing.  *See, e.g., Tokoshima v. The Pep Boys*, 2014 WL 1677979, at *10 (N.D. Cal. Apr. 28, 2014); *Chavez v. Lumber Liquidators, Inc.*, 2012 WL 1004850, *9-10 (N.D. Cal. Mar. 26, 2012); *Ortiz v. CVS Caremark Corp.*, 2013 WL 6236743 (N.D. Cal. Dec. 2, 2013); *Ruiz*, 2009 WL 648973, *7-8; *Dilts v. Penske Logistics, LLC*, 2014 WL 866954, *7 (S.D. Cal. Feb. 19, 2014); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 642 (N.D. Cal. 2010).

Plaintiffs try to circumvent this problem by arguing that they "simply seek to recover whatever operating expenses drivers were required to bear."  Mot. at 11 n.14.  But as the evidence makes clear, the expenses that drivers claim they were required to bear vary tremendously,[14] as does each driver's perception as to whether those expenses were *necessary* for them to preserve their

---

[14]  *See, e.g.*, Decl. of Shuly Amario ¶ 10 (claiming that car washes are expenses); Decl. of Sarkis Delakyan ¶ 7 (claiming that "new suits" are expenses); Decl. of Steve Deming ¶ 8 (claiming that parking citations are expenses); Decl. of Alexander Galloway ¶ 15 (claiming that a cell phone mount and food are expenses); Decl. of Veronique Geathers ¶ 15 (claiming that seat covers and phone chargers are expenses); Decl. of Corey Green ¶ 15 (claiming that Spotify is an expense); Decl. of Arshavir Saryan ¶ 13 (claiming that car payments are an expense); Lipshutz Decl. ¶ 6, Ex. E at 141:13-21 (claiming that Uber should pay for "proper clothes" for drivers).

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CV 13-03826-EMC

1    ostensible employment relationship with Uber.[15]   *Harris*, 753 F. Supp. 2d at 1022-23 (denying

2    certification because, *inter alia*, "[d]etermining the necessity of the variety of expenses incurred by

3    [plaintiffs] appear[ed] to involve qualitative as well as quantitative analysis, not a 'straightforward

4    calculation'"); *see also Grissom v. Vons Co.*, 1 Cal. App. 4th 52, 58 (Cal. Ct. App. 1991) ("Necessity

5    is by nature a question of fact . . . .").

6            A host of highly individualized inquiries will likewise be needed to determine whether

7    putative class members have incurred expenses "in direct consequence of the discharge of [their]

8    duties" with respect to *Uber*.   Cal. Labor Code § 2802.   Some drivers simultaneously use the Uber

9    App and apps offered by Uber's competitors, namely Lyft and Sidecar.   Evangelis Decl. ¶ 6, Ex. 20;

10   McCrary Report ¶¶ 80-82.   Many expenses incurred by those drivers would not qualify.   *Cassady v.*

11   *Morgan, Lewis, & Bockius LLP*, 145 Cal. App. 4th 220, 235, 237 (Cal. Ct. App. 2006) ("No public

12   policy would be served by requiring employers to indemnify for expenses attributable to an

13   employee's conduct while working for a different employer.").   Uber cannot determine, and Plaintiffs

14   have proposed no common or manageable method by which to determine, which of the myriad

15   expenses at issue were actually incurred by drivers in furtherance of <u>*Uber's*</u> objectives.   Lipshutz

16   Decl. ¶ 2, Ex. A at 207:3-17; Colman Decl. ¶¶ 31-32.

17           Finally, plaintiffs have proposed no methodology—let alone a manageable one—by which to

18   calculate damages on a classwide basis.   *See Harris*, 753 F. Supp. 2d at 1023 (expressing "serious

19   concerns about the manageability" of a Section 2082 claim); *Tokoshima*, 2014 WL 1677979, at *10

20   (denying certification of Section 2802 claim because, *inter alia*, "damages are [] individualized").

21   Although some drivers in this massive putative class keep records of their expenses, countless others

22   "ballpark" their expenses, and still others have no idea what their expenses might be.   Evangelis Decl.

23   ¶ 6, Ex. 38.   Moreover, and as discussed above, *see supra* pp. 7-8, numerous transportation providers

24

---

25   [15]   Even if Plaintiffs tried to confine their claim to certain types of expenses, such as "car
     maintenance" and "wear and tear," Mot. at 11, the necessity of such expenses would still turn on
26   individualized factors, including the type of car being used.   *See, e.g.*, Decl. of Dennis Brady
     Decl. ¶ 3 (Mercedes ML 350), Decl. of Mark Demos ¶ 5 (BMW); Decl. of Peter Marinakis ¶ 5
27   (Honda Accord); *see also Gattuso*, 42 Cal. 4th at 568 ("[A]n employee's choice of automobile
     will significantly affect the costs incurred" and thus the "necessity" of the employee's expenses
28   under Section 2802).

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    CV 13-03826-EMC

that partner with Uber reimburse their drivers for all, or at least some, of drivers' expenses. These expenses vary in amount and type, meaning that individualized inquiries would be required to determine the *identities* of those drivers who were reimbursed, the *types* of expenses for which they were reimbursed, and the *amounts* for which they were reimbursed. Evangelis Decl. ¶ 6, Ex. 40.[16]

**B.    Plaintiffs Have Failed To Satisfy The Typicality Requirement Of Rule 23(a)(3) Or The Adequacy Requirement Of Rule 23(a)(4)**

**1.    The Named Plaintiffs Are Not Adequate Class Representatives Under Rule 23(a)(4) Because They Seek A Remedy That Many Class Members Oppose And That Could Subject Class Members To Legal Liability**

To justify a departure from the "usual rule that litigation is conducted by and on behalf of the individual named parties only," proposed class representatives bear the burden of proving that they are "part of [a] class and 'possess the same interest and suffer the same injury' as the class members." *Dukes*, 131 S. Ct. at 2551. Thus, they must prove that they "will fairly and adequately protect the interests of the class" before a class can be certified. Fed. R. Civ. P. 23(a)(4); *see Amchem Products*, 521 U.S. at 625 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."); *Dunford v. Am. DataBank*, 64 F. Supp. 3d 1378, 1396-97 (N.D. Cal. 2014). "Adequate representation . . . depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). In this case, Plaintiffs seek a remedy—an employment relationship with Uber—that irreconcilably conflicts with the interests of countless drivers, and that could even subject a substantial number of drivers to legal liability or the loss of a job. As such, class treatment is improper.

"For obvious reasons, a class representative is not adequate if the representative seeks relief

---

[16]    Plaintiffs suggest that the Court can certify a sub-class of drivers who "contracted through intermediary companies" in order to resolve the inherent flaws in their request for class treatment, Mot. at 11 n.14, 13 n.16, but Plaintiffs' proposed sub-class does nothing to alleviate the serious predominance, superiority, and commonality problems that plague Plaintiffs' claims. Even with a sub-class, individualized inquiries into the types and amounts of drivers' reimbursements would *still* be necessary. *See* Lipshutz Decl. ¶ 2, Ex. A at 158:17-159:20, 160:16-161:12. Accordingly, Plaintiffs' proposed sub-class certification must be denied. *See Brewer v. Gen. Nutrition Corp.*, 2014 WL 5877695, at *13 (N.D. Cal. Nov. 12, 2014); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1128 (N.D. Cal. 2011); *see also Flores v. Supervalu, Inc.*, 509 F. App'x 593, 594 (9th Cir. 2013).

1   which the class members do not want." *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 578 (C.D. Cal.

2   Jan. 13, 2010). Thus, courts routinely hold that class certification is inappropriate when the interests

3   of the named plaintiffs "are actually or potentially antagonistic to, or in conflict with, the interests

4   and objectives of other class members."[17]   *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare*

5   *Group, L.P.*, 247 F.R.D. 156, 177-78 (C.D. Cal. 2007); *Broussard v. Meineke Discount Muffler*

6   *Shops*, 155 F.3d 331, 338 (4th Cir. 1998) (overturning order granting class certification because the

7   class representatives' claim "was in tension with the evident desire of many [putative class

8   members]"). Here, Plaintiffs seek an order mandating that all putative class members be classified as

9   employees, even though—unlike Plaintiffs—countless putative class members, like Bryan Melhus,

10   "intended to be" and "want to stay as [] independent contractor[s]." Decl. of Bryan Melhus ¶ 9;

11   Evangelis Decl. ¶ 6, Exs. 10–11. Plaintiffs' requested relief could force Uber to restructure its entire

12   business model, thus jeopardizing the very attributes (*e.g.*, flexibility, autonomy) that make the Uber

13   App so appealing to drivers. McCrary Report ¶¶ 188-193, 205; Evangelis Decl. ¶ 6, Exs. 1, 22.

14   Furthermore, some drivers could be subject to disciplinary or legal action if Plaintiffs prevail

15   because—unlike Plaintiffs, Lipshutz Decl. ¶ 5, Ex. D at 147:2-8, 171:14-20, *id.* ¶ 12, Ex. K at No.

16   11—they are employees of other companies and may have exclusivity provisions in their

17   employment contracts. Evangelis Decl. ¶ 6, Ex. 21; Decl. of Rafik Sergoyan ¶ 3 (scientist), Decl. of

18   Raman Basha ¶¶ 2-3 (doctor), Decl. of Wossenyeleh Mekonnen ¶ 2 (accountant).

19        Similarly, if the named plaintiffs prevail, thousands of drivers who use lead generation apps

20   offered by Ubers' competitors could be subject to liability for breaching the duty of loyalty that

21   would be implicit in each of their employment relationships. The duty of loyalty "is breached, and

22   may give rise to a cause of action in [an] employer, when [an] employee takes action which is

---

24   [17]   *See, e.g., Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997) (affirming denial of class
25   certification in putative class action challenging a repository of blood samples for members of the
     armed forces where "there were undoubtedly people among the broad [putative] class . . . who did
26   not oppose the repository, and who, in fact, approved of it and wished the policies fully
     enforced"); *Schlaud v. Snyder*, 785 F.3d 1119, 1128 n.2 (6th Cir. 2015); *Pickett v. Iowa Beef*
27   *Processors*, 209 F.3d 1276, 1280–81 (11th Cir. 2000); *Bieneman v. City of Chicago*, 864 F.2d
     463, 465 (7th Cir. 1988).

28

Gibson, Dunn &
Crutcher LLP

inimical to the best interests of the employer." *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (Cal. Ct. App. 1995); *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (Cal. Ct. App. 2007).[18] Here, there can be no dispute that Uber and other lead generation app companies are competitors of one another, Lipshutz Decl. ¶ 5, Ex. D at 135:14-136:1, 169:20-170:22, nor that a driver's use of a competitor's app is inconsistent "with his duty to prefer [Uber]'s interests over those of its competitors." *Fowler v. Varian Assocs.*, 196 Cal. App. 3d 34, 42 (Cal. Ct. App. 1987); *Huong Que*, 150 Cal. App. 4th at 416. Thus, by asking that this Court classify *all* drivers as employees, Plaintiffs seek a remedy that will *force* drivers to pick one app over all others—or else face potentially severe consequences, including disgorgement.[19] *Hilderman v. Enea Teksci, Inc.*, 2010 WL 546140, at *1 n.2 (S.D. Cal. Feb. 10, 2010); *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1086 (9th Cir. 2003). This will have devastating consequences for Uber partners like Quinn Renfro, whose transportation business "needs Uber to generate leads," and yet will "suffer tremendously if [it] [is] limited to using only Uber . . . ." Decl. of Quinn Renfro ¶¶ 8, 11 ("[M]y business would probably cease to exist."). And while this choice is not difficult for Plaintiffs—because they do not currently use any other lead generation app, Lipshutz Decl. ¶ 5, Ex. D at 135:14-136:18, 163:4-15, 169:1-170:16; *id.* ¶ 6, Ex. E at 188:18-189:14; *id.* ¶ 3, Ex. B at 80:19-22, 82:1-13, 107:23-108:1—it will harm countless drivers who make their living by using multiple apps. Evangelis Decl. ¶ 6, Ex. 19.

### 2. The Claims Of The Named Plaintiffs Are Atypical Under Rule 23(a)(3) And The Named Plaintiffs Are Inadequate Class Representatives Under Rule 23(a)(4) Because They Are Subject To Unique Defenses

"[A] named plaintiff's motion for class certification should not be granted if 'there is a danger

---

[18] "California courts [do] not distinguish between managerial employees and lower-level employees with respect to the duty of loyalty, but rather use[] broad language suggesting that all employees owe a duty of loyalty to their employers." *Otsuka v. Polo Ralph Lauren Corp.*, 2007 WL 3342721, at *2 (N.D. Cal. Nov. 9, 2007); *see also Fields v. QSP, Inc.*, 2011 WL 1375286, at *3 (C.D. Cal. Apr. 8, 2011).

[19] Even if *Uber* does not institute breach of duty of loyalty claims against drivers (which it would be entitled to do if those drivers were its employees), it would be impossible for drivers to know, *ex ante*, whether <u>*all*</u> lead generation app companies would refrain from bringing legal claims against them. Indeed, the plaintiffs in another case, *Cotter v. Lyft, Inc.*, No. 13-cv-04065-VC, allege that users of Lyft's lead generation app are Lyft employees.

---

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted); *see also Ellis*, 657 F.3d at 974 (vacating order granting class certification). "'[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation.'" *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 556-57 (C.D. Cal. 2012) (quotation omitted); *see also Drake v. Morgan Stanley & Co., Inc.*, 2010 WL 2175819, at *6 (C.D. Cal. Apr. 30, 2010). Here, the named plaintiffs are each subject to unique defenses, including credibility problems and an alarming lack of knowledge regarding the claims they have asserted.

Each of the proposed class representatives has demonstrated a severe lack of credibility and trustworthiness regarding the material issues of this case and their relationships with Uber, a fact that significantly "reduce[s] the likelihood [that plaintiffs will] prevail[] on the class claims."[20] *Harris*, 753 F. Supp. 2d at 1015 (citations and internal quotations omitted). Plaintiff Manahan, for example, conceded he has fraudulently manipulated Uber's driver referral program, whereby Uber offers drivers an incentive payment if they refer new drivers and those drivers complete a certain number of rides. Lipshutz Decl. ¶ 3, Ex. B at 274:4-276:8. Rather than referring bona fide drivers to use the App, Manahan referred drivers to use the App temporarily, paid those drivers to complete sham rides (without being in their vehicles), and collected the resulting referral incentive payments—more than $25,000 in total.[21] *Id.* at 276:9-280:5, 280:23-288:1, 303:6-8. Manahan has also provided

---

[20] In such circumstances, courts routinely find that plaintiffs have failed to prove adequacy and typicality under Rule 23(a)(3) and (4). *See, e.g., Guido v. L'Oreal, USA, Inc.*, 2012 WL 2458118, at *4 (C.D. Cal. June 25, 2012); *Jovel v. Boiron, Inc.*, 2014 WL 1027874, at *4-5 (C.D. Cal. Feb. 27, 2014); *Ryan v. Jersey Mike's Franchise Sys.*, 2014 WL 1292930, at *8 (S.D. Cal. Mar. 28, 2014); *Drake*, 2010 WL 2175819, at *6; *see also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).

[21] The Rasier Transportation Provider Service Agreement that Manahan executed states that it is a "material breach of [the] Agreement" to make "intentional misrepresentations . . . to [Uber]." Colman Decl. ¶¶ 16, Ex. R. As a result, Manahan's fraudulent conduct also exposes him to a unique counterclaim for breach of contract and a unique affirmative defense based on unclean hands—two independent bases for this Court to find that Manahan is an inadequate class

---

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                     CV 13-03826-EMC

1   contradictory discovery responses regarding the degree of control that Uber supposedly has exerted

2   over him, including:  (1) whether Uber has required him to drive during particular times, *compare id.*

3   ¶ 13, Ex. L at Nos. 3, 5, 8 & *id.* ¶ 12, Ex. K at No. 4 *with id.* ¶ 3, Ex. B at 308:17-309:5; and

4   (2) whether Uber has required him to drive in particular geographic areas, *compare id.* ¶ 13, Ex. L at

5   No. 9 *with id.* ¶ 3, Ex. B at 220:3-223:10, 309:2-5.  Furthermore, Manahan provided inconsistent

6   testimony regarding the tips he has received from riders, first testifying he has *never* received a tip,

7   *id.* at 232:25-233:10, 244:14-20, then saying that "occasionally someone might leave cash on the

8   seat," *id.* at 245:22-246:24, later testifying he received a tip "just [] once," *id.* at 247:6-248:5, and

9   then claiming he received tips twice, *id.* at 248:14-249:24.

10      Plaintiff Colopy suffers from credibility problems as well, as he has provided inconsistent

11  discovery and testimony regarding the degree of control that Uber purportedly exerts over him.  For

12  example, Colopy provided contradictory discovery regarding:  (1) whether Uber requires him to drive

13  during particular times, *compare* Lipshutz Decl. ¶ 14, Ex. M at Nos. 3, 5 & *id.* ¶ 10, Ex. I at No. 4

14  *with id.* ¶ 6, Ex. E at 109:18-22, 110:4-7; (2) whether Uber sets his schedule, *compare id.* ¶ 6, Ex. E

15  at 109:15-17 *with id.* ¶ 10, Ex. I at No. 5; and (3) whether Uber restricts him from using other lead

16  generation applications, *compare id.* ¶ 14, Ex. M at No. 4 *with id.* ¶ 6, Ex. E at 190:7-15.  Colopy

17  even provided contradictory responses within the *same* set of discovery responses, claiming in one

18  response that he "does not know who paid for [his] vehicles' operation, maintenance, or insurance"

19  and then—two responses later—that Cherifi Limousine has paid some of these expenses.  *Compare*

20  *id.* ¶ 10, Ex. I at No. 14 *with id.* at No. 16.

21      Plaintiff Gurfinkel suffers credibility problems too, as he provided contradictory testimony

22  regarding:  (1) whether Uber requires him to drive at particular times, *compare* Lipshutz Decl. ¶ 11,

23  Ex. J at No. 4 *with id.* ¶ 15, Ex. N at No. 6 & *id.* ¶ 5, Ex. D at 163:17-165:23, 235:11-236:23;

24  (2) whether Uber has ever threatened to terminate his account, *compare id.* ¶ 11, Ex. J at No. 4 *with*

25  *id.* ¶ 15, Ex. N at No. 9; and (3) whether Uber requires drivers to have water in their vehicles,

26  compare *id.* ¶ 11, Ex. J at No. 4 *with id.* ¶ 5, Ex. D at 127:2-128:2.  Furthermore, Gurfinkel stated that

27

28          representative with atypical claims.  *See Juarez v. Jani-King of Cal., Inc.*, 273 F.R.D. 571, 580
            (N.D. Cal. 2011); *Drake*, 2010 WL 2175819, at *6.

Gibson, Dunn &
Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

he has never operated, owned, or attempted to establish a business, *id.* ¶ 11, Ex. J at No. 8, a contention he later contradicted, *id.* ¶ 5, Ex. D at 50:170-53:6, 273:1-274:24.

Finally, Gurfinkel is subject to a unique defense because he lacks "a general understanding of the claims asserted" and "does not understand the scope of [the] action filed on [his] behalf"—an independent basis for a finding of inadequacy. *Richie v. Blue Shield of Cal.*, 2014 WL 6982943, at *18-19 (N.D. Cal. Dec. 9, 2014); *see also Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007). Gurfinkel has no knowledge about his responsibilities as a class representative, Lipshutz Decl. ¶ 5, Ex. D at 33:11-17, what class certification means, *id.* at 143:20-22, what motions have been filed in this case, *id.* at 143:20-22, the name of the presiding judge, *id.* at 143:18-19, or the existence (or non-existence) of other named plaintiffs, *id.* at 141:25-143:7. *See also id.* 143:4-7 (admitting he has taken no "steps whatsoever" to familiarize himself with the other named plaintiffs). Gurfinkel lacks understanding about the most fundamental aspects of this case, as he cannot articulate—at a very basic level—the difference between an employee and an independent contractor, *id.* at 49:16–50:15, and cannot identify the claims he is bringing against Uber on behalf of the putative class, *id.* at 143:23-145:5.[22]

### 3. The Named Plaintiffs Are Not Typical Of The Putative Class Because There Is No Typical Uber Driver

Plaintiffs also have failed to establish that their *own* claims are typical of those that might be asserted by the 160,000+ drivers they seek to represent. Indeed, Plaintiffs signed only a handful of the 17 operative service agreements between Uber and drivers in California, and their experiences with the Uber App differ considerably from many or most drivers.

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Dukes*, 131 S. Ct. at 2550 (citations omitted). Accordingly, Rule 23(a)(3) requires Plaintiffs to demonstrate that "the claims or defenses of the representative parties

---

[22]  In addition, there is considerable doubt that Plaintiffs' lead counsel will be able to adequately prosecute Plaintiffs' claims, *see Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168 (9th Cir. 1975), given her inordinately large case load. Although there are just seven attorneys employed at Ms. Liss-Riordan's law firm, Ms. Liss-Riordan has filed nearly a *dozen* lawsuits and arbitration proceedings (including many class actions) in the last 6 months alone—all of which will divert substantial time and energy from prosecution of this case. Lipshutz Decl. ¶ 20.

Gibson, Dunn &
Crutcher LLP

1    are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Courts seek to determine

2    "whether other members have the same or similar injury, whether the action is based on conduct

3    which is not unique to the named plaintiffs, and whether other class members have been injured by

4    the same course of conduct." *Ellis*, 285 F.R.D. at 533.  "[A] plaintiff who has been subject to

5    injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in

6    litigating conduct of another kind, although similar, to which he [was not] subject." *Blum v.*

7    *Yaretsky*, 457 U.S. 991, 999 (1982).

8         Plaintiffs claim this litigation turns on Uber's licensing agreements and onboarding

9    documents, but as previously discussed, these documents vary considerably by time period, platform,

10   and locality. *See supra* pp. 5-6; McCrary Report ¶ 150.  Uber's driver operations were launched and

11   operated independently in each city, and drivers' onboarding experiences varied considerably, even

12   within cities, depending on who conducted the onboarding session.  Ballard Decl. ¶¶ 5-7; Prithivi

13   Decl. ¶¶ 5-6; Rosenthal Decl. ¶¶ 5-10; Sawchuk Decl. ¶¶ 4-10; McCrary Report ¶ 150; Lipshutz

14   Decl. ¶ 8, Ex. G at 38:10–13; 171:10–24.  Uber's driver operations personnel did not share a common

15   script.  Ballard Decl. ¶ 5; Prithivi Decl. ¶ 5; Rosenthal Decl. ¶ 5, 8; Sawchuk Decl. ¶ 5; Lipshutz

16   Decl. ¶ 8, Ex. G at 56:11–57:13.  Thus, Plaintiffs, who were onboarded in San Francisco, Los

17   Angeles, and San Diego, are not typical of drivers from other cities, or even of drivers in their own

18   cities who were "onboarded" at different points in time or by different people.  Lipshutz Decl. ¶ 8,

19   Ex. G at 51:8–18; 79:8–10 (the process "literally changed hundreds of times").

20        For instance, Plaintiffs allege—based on "training materials" purportedly used in Los

21   Angeles, San Francisco, and San Diego—that Uber forbids drivers from accepting cash tips.  (Mot. at

22   8.)  But Plaintiffs cannot prove that *every* driver saw these documents or that the documents remained

23   consistent over time in these cities, much less in *other cities*.  *See Vega v. T-Mobile USA Inc.*, 564

24   F.3d 1256, 1276 (11th Cir. 2009) ("Without a common contract, it is impossible for [the named

25   plaintiff] to bring a case typical of all class members."); *Newberg on Class Actions* § 3:37 (5th ed.

26   2014) ("[W]hen the class suit is predicated on more individualized contracts, and differences exist

27   among the relevant provisions in different class members' contracts, the representatives' claim may

28   not be typical of the claims of class members with different contracts.").  Indeed, many drivers

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

1    understand that they are *permitted* to accept cash tips (Evangelis Decl. ¶ 6, Ex. 31), and routinely

2    accept such gratuities (*id.* ¶ 6, Ex. 33).

3           Nor are Plaintiffs typical with respect to Uber's licensing agreements, which varied over time

4    and by platform.  *See supra* pp. 5-6.  *Schulken v. Washington Mut. Bank*, 2012 WL 28099, at *12

5    (N.D. Cal. Jan. 5, 2012) ("A class that contains multiple form contracts with materially different

6    language raises the possibility that there may be a breach of contract for some class members but not

7    others . . . . Plaintiffs' claims cannot be typical of the class as a whole.").  Plaintiffs signed only a few

8    of the 17 relevant agreements, and significant differences exist between Plaintiffs' agreements and

9    those of putative class members.  *See supra* pp. 5-6, 33; Evangelis Decl. ¶ 7, Ex. 41.

10          Plaintiffs are also atypical of the putative class with respect to the *Borello* factors.  For

11   example, many class members subcontract with additional drivers (Evangelis Decl. ¶ 6, Ex. 2)—a

12   key indicator of independent contracting.  *See Narayan*, 285 F.R.D. at 478.  Plaintiffs, however, have

13   never engaged subcontractors.  Lipshutz Decl. ¶ 3, Ex. B at 202:20-22; *id.* ¶ 5, Ex. D at 174:12-14.

14   Unlike Plaintiffs, many class members are licensed transportation providers (Evangelis Decl. ¶ 6, Ex.

15   4), which indicates engagement in a "distinct occupation."  *Arnold*, 202 Cal. App. 4th at 585–90.

16   Plaintiffs are not.  Lipshutz Decl. ¶¶ 10-12, Exs. I-K at No. 10.  And many class members operate

17   transportation businesses and use the Uber App to generate leads (Evangelis Decl. ¶ 6, Ex. 2), which

18   likewise demonstrates engagement in a "distinct occupation or business."  *Borello*, 48 Cal. 3d at 351;

19   *Ali*, 176 Cal. App. 4th at 1349.  But none of the Plaintiffs operates an independent transportation

20   business.  Lipshutz Decl. ¶¶ 10-12, Exs. I-K at No. 9.

21          Additionally, while Plaintiffs believed they were creating an employment relationship

22   (Lipshutz Decl. ¶¶ 10-12, Exs. I-K), most drivers intended to create an independent contracting

23   relationship with Uber (Evangelis Decl. ¶ 6, Ex. 11)—a factor that bears heavily on the classification

24   analysis (*see Borello*, 48 Cal. 3d at 351).  Indeed, driver Fabio Betancourt, a minister, "knew that

25   [he] would be an independent contractor" and "want[s] to continue to be an independent contractor"

26   because it allows him to "satisfy [his] financial situation for [his] family while also ministering to

27   [his] congregation."  Decl. of Fabio Betancourt ¶ 4.  Plaintiffs use iPhones provided by Uber

28   (Lipshutz Decl. ¶ 5, Ex. D at 264:22-265:4), which may be indicative of an employment relationship

Gibson, Dunn & Crutcher LLP

DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CV 13-03826-EMC

(*Soto*, 2010 WL 3420779, at *6), but many drivers use their own phones (Evangelis Decl. ¶ 6, Ex. 8). Finally, Plaintiffs opted out of arbitration, Colman Decl. ¶ 12, and consequently are not typical of class members who did not.  *See Renton v. Kaiser Found. Health Plan*, 2001 WL 1218773, at *5–6 (W.D. Wash. Sept. 24, 2001); *see also Avilez v. Pinkerton Govt. Serv. Master Global Holding, Inc.*, 596 F. App'x 579, 580 (9th Cir. Feb. 10, 2015).

## C.    That Some Members Are Subject To An Arbitration Clause Raises Individual Issues That Preclude Certification Under Rule 23(b)(3)

In addition, class certification is improper because, *unlike* Plaintiffs and other drivers who opted out of arbitration with Uber, many drivers are subject to the arbitration provisions contained in Uber's licensing agreements and the class action waivers therein.  Colman Decl. ¶ 12; Lipshutz Decl. ¶ 6, Ex. E at 236:4-238:2; *id.* ¶ 3, Ex. B at 192:19-195:15.  "[W]here certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroy[] the commonality and typicality of the class," and can also render the named plaintiffs inadequate representatives.  *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861-62 (D. Md. 2013); *see also Pablo v. Service Master Global Holdings, Inc.*, 2011 WL 3476473, at *3 (N.D. Cal. Aug. 9, 2011); *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 610-12 (S.D. Cal. Mar. 26, 2015); *Avilez,* 596 F. App'x at 579-80.

Plaintiffs acknowledge that their putative class includes drivers "who may be bound by Uber's arbitration clause," but assert that the Court should certify the class and "address the issue of whether the arbitration clause is enforceable" at a later date.  Mot. at 2 n.4.  But Rule 23 does not permit "conditional certification"—plaintiffs must prove, and the Court must find, that the elements of plaintiffs' claims and Uber's defenses can be tried on a classwide basis now, not later.  *Dukes*, 131 S. Ct. at 2551; *see also Pablo*, 2011 WL 3476743, at *3; *Avilez*, 596 Fed. App'x. at 579-80.[23]

---

[23]  The authorities cited by Plaintiffs in support of their "conditional certification" theory either (1) do not involve Rule 23 class certification and are thus plainly irrelevant, *D'Antuono v. C & G of Groton, Inc.*, 2011 WL 5878045, at *1 (D. Conn. Nov. 23, 2011) ("FLSA [actions] are not subject to Rule 23 requirements."); *Sealy v. Keiser Sch., Inc.*, 2011 WL 7641238, at *1 (S.D. Fla. Nov. 8, 2011); or (2) were decided prior to the Supreme Court's decision in *Dukes*, and are based on obsolete and discredited analyses of Rule 23, *Collins v. Int'l Dairy Queen, Inc.*, 168 F.R.D. 669, 673 (M.D. Ga. 1996); *Bond v. Fleet Bank (RI), N.A.*, 2002 WL 31500393, at *7 (D.R.I. Oct. 10, 2002), *Davis v. Four Seasons Hotel Ltd.*, 2011 WL 4590393, at *3 (D. Haw. Sept. 30, 2011).

Plaintiffs also contend that class certification is appropriate because, according to Plaintiffs, the arbitration agreements are "unconscionable and unenforceable." Mot. at 24 n.30. Uber expects that Plaintiffs will point to this Court's orders denying Uber's motion to compel arbitration in *Gillette v. Uber Technologies, Inc.*, No. C-14-5241 EMC, Dkt. 48 and *Mohamed v. Uber Technologies, Inc.*, No. C-14-5200 EMC, Dkt. 70 (the "Arbitration Orders") as proof that *all* of the arbitration agreements executed by putative class members are unenforceable. But the Arbitration Orders, which Uber has appealed, underscore that the enforceability of Uber's arbitration agreement vis-à-vis any particular driver is an *individualized* inquiry that turns on the sophistication and economic means of the driver and the circumstances under which he or she accepted the arbitration agreement.

In the Arbitration Orders, the Court held that Uber's arbitration agreements were procedurally unconscionable because, according to the Court, they were "a 'surprise' to drivers like Gillette and Mohamed." Arbitration Orders at 41. The Court further held that the delegation clause in Uber's arbitration agreements is substantively unconscionable because the named plaintiffs purportedly "could not afford to pay the arbitration fees" required to litigate the issue of arbitrability, and that, although it was "an extremely close question" as to whether the arbitration agreement in Uber's 2014 Licensing Agreement possessed *any* degree of procedural unconscionability, the agreement had *some* degree of procedural unconscionability because plaintiffs in those cases were allegedly "lower-level laborers" with "a fairly urgent need to obtain employment" and thus felt "pressure" to agree to arbitration. Arbitration Orders at 29, 39, 40. Unlike the plaintiffs in *Gillette* and *Mohamed*, many putative class members in *this* case read the Licensing Agreement before accepting its terms and unequivocally understood its terms, including the arbitration agreement. *See, e.g.*, Decl. of Thomas Barry ¶ 14; Decl. of Sarah Knapp ¶ 20. And vast numbers of putative class members in *this* case are anything but "lower-level laborers"—they are instead real estate brokers (Decl. of Cliff Lyons ¶ 2), teachers (Decl. of Pamela Nelson ¶ 8), paralegals (Decl. of Rusty Shaw ¶ 3), doctors (Decl. of Raman Basha ¶ 3), and consultants (Decl. of John Hoffman ¶ 2). *See also* Evangelis Decl. ¶ 6, Ex. 21.

**D.    Plaintiffs' Proposed PAGA Claim Fails To Satisfy The Requirements Of Rule 23**

Finally, Plaintiffs' motion for leave to amend to add a claim under the Private Attorneys General Act ("PAGA") based on the allegations underlying their class action claims—a motion that

1    is currently under submission with this Court, Am. Civil Mins., ECF No. 289—should be denied

2    because Plaintiffs have failed to satisfy, and cannot satisfy, the requirements of Rule 23. *Wash. St.*

3    *Repub. Party v. Wash. St. Grange*, 676 F.3d 784, 798 (9th Cir. 2012) (citation omitted).

4           In their motion, Plaintiffs contend that "a plaintiff need not satisfy class action requirements

5    to bring a representative action under PAGA." Mot. at p. 1 n.1. However, in federal court, parties

6    must follow federal procedural rules notwithstanding the existence of contrary state procedural rules.

7    *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (citation

8    omitted). This includes Rule 23, the *only* procedural mechanism by which a party may bring a

9    "representative" action in federal court. Fed. R. Civ. P. 23(a) (a plaintiff "may sue . . . as [a]

10   representative part[y] . . . only if" Rule 23's requirements are satisfied); *Shady Grove*, 559 U.S. at

11   396-99. Because PAGA is "a procedural statute" intended to "authorize[] a representative action,"

12   *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009), and "does not create property rights or any

13   other substantive rights," *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46

14   Cal. 4th 993, 1003 (Cal. 2009), a plaintiff pursuing a PAGA action in federal court must satisfy the

15   requirements of Rule 23. Here, Plaintiffs have fallen short of meeting their burden in this respect,

16   and their proposed amendment is therefore futile.

17          In fact, regardless of whether this Court is inclined to address Rule 23's application to PAGA

18   claims, it should hold that amendment of Plaintiffs' complaint would be futile because the highly

19   individualized allegations underlying Plaintiffs' PAGA claim render the claim unmanageable. *See*

20   *Litty v. Merrill Lynch & Co., Inc.*, 2014 WL 5904904, at *3 (C.D. Cal. Nov. 10, 2014) (striking

21   PAGA claim as unmanageable without deciding whether Rule 23 applied); *Ortiz v. CVS Caremark*

22   *Corp.*, 2014 WL 1117614, at *3 (N.D. Cal. Mar. 18, 2014) (PAGA claim based on alleged failure to

23   reimburse mileage was unmanageable because it "would require individualized inquiries" about

24   whether plaintiffs received any mileage reimbursements or "used [] vehicles [other] than their own").

25                                    **V.    CONCLUSION**

26          Plaintiffs' motion fails to meet the rigorous standards established by the U.S. Supreme Court

27   in *Dukes* and *Comcast* and their progeny. Accordingly, and for all of the foregoing reasons, the

28   Court should deny Plaintiffs' motion.

40

Dated:  July 9, 2015

Respectfully submitted,
GIBSON, DUNN & CRUTCHER LLP


By:   _/s/ Theodore J. Boutrous, Jr._

Attorneys for Defendant
UBER TECHNOLOGIES, INC.

41

1

2

**DECLARATION OF SERVICE**

3

I, Daniel Tom declare as follows:

4

I am employed in the County of San Francisco, State of California; I am over the age of
eighteen years and am not a party to this action; my business address is 555 Mission Street, San
5

Francisco, California, 94105, in said County and State.  On July 9, 2015, I served the within:

6

**DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

7

to all named counsel of record as follows:

8

 **BY ECF (ELECTRONIC CASE FILING)**:  I e-filed the above-detailed documents utilizing the
9

United States District Court, Northern District of California's mandated ECF (Electronic Case Filing) service
on July 9, 2015.  Counsel of record are required by the Court to be registered e-filers, and as such are
10

automatically e-served with a copy of the documents upon confirmation of e-filing.

11

I certify under penalty of perjury that the foregoing is true and correct, that the foregoing
document(s) were printed on recycled paper, and that this Declaration of Service was executed by me
12

on July 9, 2015, at San Francisco, California.

13

14

_____/s/_____

15

Daniel Tom

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP