GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
DEBRA WONG YANG, SBN 123289
  dwongyang@gibsondunn.com
MARCELLUS A. MCRAE, SBN 140308
  mmcrae@gibsondunn.com
THEANE D. EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
  dmanthripragada@gibsondunn.com
BRANDON J. STOKER, SBN 277325
  bstoker@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
KEVIN J. RING-DOWELL, SBN 278289
  kringdowell@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:    415.393.8200
Facsimile:    415.393.8306

Attorneys for Defendant
UBER TECHNOLOGIES, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>             Defendant. | Case No. CV 13-03826-EMC<br><br>**DECLARATION OF DR. JUSTIN MCCRARY IN SUPPORT OF UBER'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

1

**TABLE OF CONTENTS**

2

Page

3   I.      INTRODUCTION ............................................................................................... 1

4           A.      Qualifications ......................................................................................... 1

5           B.      Assignment ............................................................................................ 3

6   II.     SCOPE OF OPINIONS ..................................................................................... 4

7   III.    TECHNOLOGICAL SOLUTIONS HAVE REDUCED MARKET

8           FAILURES ......................................................................................................... 7

9           A.      Internet Platforms Help Solve Traditional Coordination Problems ............ 8

10          B.      Internet Platforms Help Solve Traditional Information Problems ............. 11

11          C.      New Methods of Connecting People to Work Opportunities ..................... 13

12  IV.     LEAD GENERATION PLATFORMS LIKE UBER HAVE CHANGED
            COMPETITION AND CHOICES IN DRIVING SERVICES ............................... 15

13
            A.      Coordination Issues in Transportation Prior to New Technologies ........... 16

14          B.      The Transportation Industry Prior to Lead Generation Platforms ............. 16

15          C.      New Options and Sources of Competition Emerge with the Development

16                  of Lead Generation Platforms and TNCs ................................................ 25

17  V.      THERE IS NO TYPICAL DRIVER WHO USES THE UBER APP ...................... 30

18          A.      Some Drivers Who Use the Uber App Use Competing Platforms at the

19                  Same Time They Use the Uber App ........................................................ 31

20          B.      Californians Working as Drivers Before the Existence of Uber and Lead

21                  Generation Platforms ............................................................................. 33

22          C.      Californians Who Were Not Working as Drivers Before the Existence of
                    Uber and Other Lead Generation Platforms ............................................ 44

23
            D.      Small Businesses That Did Not Exist Before Uber ................................... 53

24
            E.      Drivers Using the Uber App Have Different Backgrounds, Reasons for

25                  Using the App and Outside Options ........................................................ 53

26  VI.     THE RELATIONSHIP BETWEEN EACH DRIVER AND THE UBER APP

27          IS UNIQUE AND INDEPENDENT ................................................................... 56

28

i

A. Drivers Who Use the Uber App Are Not Required to Drive Any Particular Time, Amount or Place Creating Highly Individualized Work Circumstances for Each Driver .................................................. 56

B. Supervision of Drivers on Jobs is Minimal and Drivers Have Other Full- and Part-time Commitments ........................................................ 74

VII. PLAINTIFFS' TIPPING AND EXPENSES THEORY IMPLIES NO HARM FOR THE PROPOSED CLASS ON AVERAGE AS WELL AS CLASS CONFLICT .................................................................................................. 81

A. It Is Not Possible to Calculate Potential Damages from Uber's Tipping Practices on a Class-wide Basis .................................................. 82

B. If Uber Were to Implicitly or Explicitly Pay Drivers for Tips There Is Meaningful Potential for Class Conflict .................................................. 85

C. It Is Not Possible to Calculate Potential Damages Incurred from Expenses on a Class-wide Basis ........................................................................ 88

D. If Uber Paid for Driver Expenses There Is Meaningful Potential for Class Conflict ........................................................................................ 90

VIII. MANY DRIVERS WOULD BE HARMED IF ACCEPTING A PASSENGER REFERRAL FROM UBER MADE THE DRIVER AN UBER EMPLOYEE .......................................................................................... 91

A. Many Current Drivers Would Be Harmed If Use of the Uber App Rendered Every Driver an Uber Employee .............................................. 92

B. Many Current Drivers Would Be Harmed If Uber Only Allowed Companies, and Not Individuals, to Use the Platform .............................. 96

IX. CONCLUSION ............................................................................................ 97

Gibson, Dunn & Crutcher LLP

1   I.      INTRODUCTION

2

3        A.      Qualifications

4        1.      I am an economist with expertise in economic modeling, statistical methods, law and

5   economics, labor economics, antitrust, and antitrust damages.  I received my A.B. in Public Policy

6   from Princeton University in 1996.  After working at National Economics Research Associates in

7   White Plains, New York, and the Federal Reserve Bank of New York from 1996-1998, I began my

8   Ph.D. in Economics at the University of California, Berkeley ("Berkeley"), completing the degree in

9   June 2003 with field specializations in labor economics and econometrics.  After close to five years

10  as Assistant Professor at the University of Michigan, I became an Assistant Professor of Law at

11  Berkeley in January 2008 and was promoted to Professor in July 2010.  While at Berkeley, I have

12  taught courses on introductory, intermediate, and advanced statistics to J.D. students, L.L.M.

13  students, and Ph.D. students; on law and economics to J.D. students as well as undergraduates; on

14  business law to J.D., L.L.M., and M.B.A. students; and on labor economics to Ph.D. students.

15       2.      In addition to my post as Professor, I am the Founding Director of D-Lab, the Social

16  Sciences Data Laboratory at Berkeley.  At D-Lab I lecture on and advise graduate students and

17  faculty regarding high-performance computing, statistical software, and appropriate statistical

18  techniques.

19       3.      From September 2009 until July 2014, when I began to direct the D-Lab, I co-directed

20  the Law and Economics Program at Berkeley Law with Bob Cooter and Dan Rubinfeld (2008−2011)

21  and with Bob Cooter and Eric Talley (2012−2014).

22       4.      Since 2008 I have codirected the Economics of Crime Working Group of the National

23  Bureau of Economic Research ("NBER").  The NBER is the preeminent professional association of

24  economists in the world, with approximately 1,300 members worldwide.  I was invited to become a

25  Faculty Research Fellow of the NBER in 2006 and remained in that position until 2012, when I was

26  invited to become a Faculty Research Associate.

27       5.      As noted, I previously worked at the University of Michigan.  From 2003 through

28  2007, I was Assistant Professor of Public Policy and Assistant Professor of Economics.  While at

Michigan, I taught introductory statistics and advanced microeconomic theory to M.P.P. students, and advanced econometric theory to Ph.D. students.

6.      My research spans a diverse range of topics, including antitrust, crime, employment discrimination, econometric and statistical methodology, education, fertility, financial markets, income inequality, and monetary policy.  Many of my articles have been published in leading field journals within economics, such as the *Review of Economics and Statistics* and the *Journal of Econometrics*.  In addition, I have written or co-written three papers that were published in the top economics journal in the world, the *American Economic Review*, and have co-edited a book, *Controlling Crime: Strategies and Tradeoffs*.  Over the years, my research has been supported by the University of Michigan, the University of California, Berkeley, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, and the Robert Wood Johnson Foundation.

7.      I am frequently asked to review articles for the leading journals within economics, including *Econometrica*, the *American Economic Review*, the *Quarterly Journal of Economics*, the *Journal of Political Economy*, the *Review of Economic Studies*, the *Review of Economics and Statistics*, and the *American Law and Economics Review*.  Since coming to Berkeley Law, I have also been asked to comment on empirical papers submitted to law reviews and to peer-reviewed law journals, including the *California Law Review*, the *Law and Society Review*, the *Journal of Law and Economics*, and the *Journal of Empirical Legal Studies*.

8.      My consulting experience has spanned a wide range of industries and markets.  For example, I have previously analyzed:  the extent to which alleged collusive behavior among health care providers affected prices; the extent of infringing sales in a patent lawsuit pertaining to pharmaceuticals; the potential anti-competitive implications of a proposed telecommunications merger; damages associated with an alleged price-fixing conspiracy in the corrugated packaging industry; damages associated with an alleged price-fixing conspiracy in several prominent high-technology product markets; and damages associated with an alleged price-fixing conspiracy in the sale of retail gasoline.

Gibson, Dunn & Crutcher LLP

2

9.      Finally, I am frequently asked to give talks regarding the utilization of statistical methodologies in empirical legal studies and for the past three summers have given day-long lectures for the week-long *Causal Inference Workshop*, as well as its more advanced version, the *Advanced Causal Inference Workshop*, both organized by Bernie Black (a Professor of Law and Business at Northwestern University) and Matthew McCubbins (a Professor of Law and Political Science at Duke University).

10.      A copy of my curriculum vitae, including a list of previous testimony and depositions, is included as Appendix A.

11.      I am being compensated at my standard billing rate of $750 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### B.      Assignment

12.      Uber Technologies, Inc. ("Uber") is a defendant in a federal putative class action lawsuit in which drivers using the Uber lead generation software application ("Uber App") allege that they are employees and not independent contractors.  Plaintiffs also claim that Uber has violated the California Labor Code by neither reimbursing expenses nor remitting tips to drivers that passengers allegedly believe they are paying.[1]  I understand that the putative class is limited to "individuals who have worked as [UberBLACK], [UberSUV], or [uberX] drivers in California."[2]

---

[1] Second Amended Class Action Complaint and Jury Demand, *Douglas O'Connor et al. v. Uber Technologies, Inc.*, 11/12/14 ("SAC") ¶¶ 2–3. While I understand this to be the core of Plaintiffs' claims, I dispute that there is a clear meaning to the terms "UberBLACK driver," "UberSUV driver," and "uberX driver," as I clarify below.

[2] SAC ¶ 9.

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

Gibson, Dunn &
Crutcher LLP

13.     I have been retained by counsel for Uber.  I have been asked to serve as an independent expert witness in connection with Uber's opposition to Plaintiffs' motion for class certification.  I will provide an economic analysis of the experiences of drivers using the Uber platforms, with a particular focus on the variety of experiences by drivers in California as this relates to Uber's purported uniform control over drivers' use of the Uber App and the other factors set forth in the Borello case.[3]  I understand that I may be called as an expert to testify in these legal proceedings.

14.     In developing my opinions, I have drawn on the record in this matter, as well as data from the Defendants.  A complete list of these data and materials is included in Appendix B to my report.  My analysis on this matter is ongoing and I reserve the right to amend my opinions as new information becomes available.

## II.     SCOPE OF OPINIONS

15.     Uber and other lead generation platforms[4] provide a new, technological solution to the existing regulatory approaches designed to connect providers of driving services (i.e., drivers) to customers (i.e., passengers).  Regulatory approaches were traditionally necessary because the market for driving services confronts an important information and coordination problem:  it is hard to coordinate the labor supply of drivers to match passenger demand.  The technological solution provided by lead generation platforms offers a more efficient method of solving these problems than any previous method and confers benefits upon drivers and riders alike.

---

[3] *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341, 350–351 (1989).

[4] Generally, lead generation platforms are software applications that help to match prospective buyers with sellers. In the context of driving services, lead generation platforms are software applications that match individuals seeking rides to drivers interested in driving passengers.  Because of the short-term, mobile nature of the demand for driving services, potential riders access the described software applications nearly exclusively using cell phones; similarly, since drivers are by definition mobile, they also access the software applications nearly exclusively using cell phones.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

16.     Certain types of lead generation platforms connect passengers to drivers who are using their own personal vehicles.  In California, these platforms are regulated by the California Public Utilities Commission ("PUC") as Transportation Network Companies ("TNCs").  TNCs do not, and under PUC regulations are not allowed to, own cars.  Rather, they provide referrals to individuals who choose whether or not to drive those referrals.  Because some drivers using the uberX platform drive their personal vehicles (while others drive liveried cars with special licenses as discussed below), Rasier-CA LLC, a wholly owned subsidiary of Uber is regulated as a TNC.

17.     Lead generation platforms provide a new option for existing and potential drivers seeking to find passengers.  These platform services have transformed the marketplace of driving services similar to how internet platforms have transformed other marketplaces (e.g., eBay and Etsy).  These platform services give drivers and consumers choices they did not previously have.  Each existing and potential driver will experience, use, and value these choices differently.

18.     In my opinion, there is no typical driver who uses the Uber App.  Each driver has a number of individual choices that will determine his/her work circumstances.  Each driver controls what months to drive, what days to drive, what times of day to drive, which city to  drive in, which neighborhood of a given city to drive in, the route for driving a passenger from one place to another, how fast to drive, and so on.  Drivers choose whether, when, and how often to turn on the Uber App and have the option, but not the obligation, of accepting referrals passed along to them by the Uber App.

19.     Each driver's relationship with Uber is unique.  This is not unexpected; indeed, I am not aware of any evidence that Uber exercises control uniformly, reserves the right of control uniformly, or has any uniform policy describing control over the physical conduct of drivers' work.  As a consequence, each driver makes their own choices about how to go about the work of driving.  Some drivers work for transportation companies that contract with Uber, while others contemplate accepting ride referrals using the Uber App directly.  Some drivers drive liveried cars with special licenses, while others drive their personal vehicles (as discussed below).

20.     Moreover, drivers have diverse backgrounds and diverse alternative work options.  Some drivers "moonlight" as drivers, accepting Uber App ride referrals when convenient for them,

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                CV 13-03826-EMC

1   and yet work a full-time job as the employee of an employer; indeed, some of these drivers have

2   employment contracts that disallow them from being the employee of any other employer.  Other

3   drivers accept referrals from the Uber App when convenient for them and work one or more freelance

4   jobs, such as a property manager, realtor, or graphic designer.  Yet other drivers have no employer and

5   only rarely accept referrals from the Uber App, perhaps because they care for a loved one who is sick;

6   they have small children; or they have a weak attachment to the labor force for other reasons.

7   Finally, some individuals may turn on the Uber App at the same time as they turn on the application

8   of a competitor for Uber, such as Lyft, SideCar, or InstantCab, for example.  Some of Uber's

9   licensing agreements allow this; some do not.

10        21.    Just as work options vary greatly, so do tipping practices and driver expenses.  Drivers

11   who have used the Uber App for at least one passenger referral would likely not be uniformly better

12   off if Uber changed its service to add tips or pay driver expenses.  I am not aware that Plaintiffs have

13   articulated any notion of a but-for world that might form a basis for claims of harm.  However, under

14   some notions of the but-for world, no member of the putative class would experience harm.  Under

15   other notions of the but-for world, some members of the putative class benefit from the status quo

16   and others are harmed by it.  Determining which member is of which type and what magnitude of

17   harm they may have experienced would involve individual inquiry and investigation.

18        22.    Underscoring these concerns, I conclude that drivers use the platform in such a large

19   variety of ways, under such a large variety of working relationships, that many current drivers who

20   have used the Uber App for ride referrals would be harmed if it were commonly found that the use of

21   the Uber App turned every driver into an employee of Uber.  Uber would, under any such

22   determination, be expected to contemplate many different reorganizations of its business model, and

23   many of these would be associated with potentially substantial harms to drivers.

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY           CV 13-03826-EMC

## III.     TECHNOLOGICAL SOLUTIONS HAVE REDUCED MARKET FAILURES

23.     Innovations in market coordination over the past decade have dramatically altered U.S. markets.  Many marketplaces that were not efficient due to coordination problems have utilized these technologies, with benefits to buyers and sellers alike.

24.     "Perfect" markets can achieve economic efficiency in the sense that no one can be made better off without harming someone else.[5]  Economists think of perfect markets as an ideal concept rather than a fact that we encounter in the real world; yet the ideal can help to clarify our thinking.  Many markets do not achieve economic efficiency due to market imperfections.[6]  In markets where consumers struggle to connect to service providers, as in driving services, imperfect information can significantly impede efficiency.[7]

25.     Increased coordination between buyers and sellers, perhaps through intermediaries or "matchmakers," can help solve imperfect information problems.[8]  The dynamic of an intermediary

---

[5]   Joseph Stiglitz, *Economics* (New York:  W. W. Norton & Company, 1993), pp. 384–385. In perfect markets actors are fully and equally informed about all facts relevant to all potential transactions, there are no transaction costs, and firms compete on price until profits are dissipated. The notion of "efficiency" I reference here is due to the 19th century Italian economist and sociologist, Vilfredo Pareto.

[6]   Frank, Robert and Ben Bernanke, *Principles of Economics* (New York: McGraw-Hill/Irwin, 2001), p. 219.   Three common market imperfections are market power (e.g., monopoly), externalities (e.g., network effects), and imperfect information.

[7]  Imperfect information is often described in terms of incomplete information (when a market participant is not fully informed and would need additional information to achieve an efficient transaction; see Joseph Stiglitz, *Economics* (New York:  W. W. Norton & Company, 1993), p. 493), and in terms of asymmetric information (when one party has more information than the other; see Robert Frank and Ben Bernanke, *Principles of Economics* (New York: McGraw-Hill/Irwin, 2001), p.  305, Joseph Stiglitz, *Economics* (New York:  W. W. Norton & Company, 1993), p. 493, or Pindyck, Robert and Daniel Rubinfeld, *Microeconomics, Third Edition* (Englewood Cliffs: Prentice-Hall, 1994), p. 596).

[8]   Intermediaries can sometimes provide information and value by ensuring that goods and services find their way to the consumer who values them most.   Einav, Liran, "The Economics of Peer-to-Peer Internet Markets," Presentation prepared for the Federal Trade Commission Workshop on the "Sharing" Economy, 6/9/15, p. 7.  Frank, Robert and Ben Bernanke, *Principles of Economics*, (New York: McGraw-Hill/Irwin, 2001), pp. 298, 300.

Gibson, Dunn & Crutcher LLP

coordinating buyers and sellers is under some conditions described as a two-sided market.[9]  Two-sided markets allow end-users to reach an efficient agreement that would otherwise be unlikely; value is created by coordination, which means that as a general economic proposition, platforms facilitating end-user transactions are best understood as products in their own right.[10]

26.     In this section, I discuss recent technological innovations that have improved coordination in a number of marketplaces.  Finally, I detail how these platforms help connect potential workers to work opportunities.

### A.     Internet Platforms Help Solve Traditional Coordination Problems

27.     In markets with coordination problems, better information often unlocks substantial value, leading to meaningful benefits for consumers, sellers, workers, and firms. Many recent technological innovations have done just this.  Many markets with coordination problems are characterized by many small, independent market participants who are quite differently situated from one another, have little in common, and place a premium on flexibility.

### 1.     *Garage Sales/Flea Markets and Online Marketplaces for Used Goods*

28.     Garage sales and flea markets are traditional venues for the informal sale of goods.  Advertising for garage sales is typically local (e.g., word-of-mouth or flyers).  Local advertising helps used goods sellers coordinate with buyers.

---

[9]   Markets can be two-sided in that "1) two sets of agents interact through an intermediary or platform, and 2) the decision of each set of agents affects the outcomes of the other set of agents." Rysman, Marc, "The Economics of Two-Sided Markets," *The Journal of Economic Perspectives* 23(3), 2009, pp. 125–143 at p. 125. This in turn means that "the structure, and not only the level of prices charged by platforms matters."  Rochet, Jean-Charles and Jean Tirole, "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics* 37(3), pp. 645–667 at p. 645.

[10]  Rochet, Jean-Charles., and Jean Tirole, "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics* 37(3), pp. 645–667 at p. 649.  Therefore, by facilitating voluntary transactions to take place, two-sided market platforms provide benefits similar to those known as "gains from trade." Joseph Stiglitz, *Economics*, (New York:  W. W. Norton & Company, 1993), p. 55.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                            CV 13-03826-EMC

29.     A much more effective coordination method has emerged in recent years on the Internet. A well-known example is the website run by eBay, which boasts 157 million active buyers worldwide and currently has 800 million items listed on its platform.[11]  Sellers and buyers can register on eBay to purchase used goods from each other; buyers can browse for thousands of products through a search engine.[12] The existence of eBay radically expands the options for both sellers and buyers; both groups benefit from the coordination provided by eBay.[13]

30.     Lead generation platforms such as Uber similarly coordinate transactions between drivers and passengers.

### 2.      *Craft or Art Fairs/Antique Shows and Online Marketplaces for Crafts*

31.     Craft and art fairs are traditional venues for the sale of works from independent artists and artisans.  A fair is more enticing for a potential buyer if many sellers are in attendance and it is easy to search among their wares; paradoxically, however, the more sellers, the harder it becomes to search among their wares.  Moreover, coordinating buyers and sellers to attend fairs is challenging. Fairs happen over a day or a week and in a single location, require advertising, and require both sellers and buyers to be physically present in order to coordinate transactions.

32.     These challenges have largely been overcome with the recent emergence of online marketplaces that seek to match sellers of craft goods with potential buyers.   The most famous of these is Etsy, which focuses on coordinating the sale of "handmade items, vintage goods and craft supplies."[14]  It currently has 1.4 million active sellers and 20.8 million active buyers and its presence

---

[11]   Other examples include Craigslist and other local platforms, such as the French website leboncoin.fr. Craigslist, "Factsheet," http://www.craigslist.org/about/factsheet, accessed on 7/3/15. eBay Inc., "One Company," http://www.ebayinc.com/who_we_are/one_company, accessed on 7/1/15.

[12]   Dinerstein, Michael et al., "Consumer Price Search and Platform Design in Internet Commerce," *Working Paper*, 8/14 at Figure 2.

[13]   Initially, eBay used only auctions as the pricing and buying mechanism but subsequently it has introduced other forms of transaction. Einav, Liran et al., "Sales Mechanisms in Online Markets: What Happened to Internet Auctions?," *Working Paper*, 2013, pp. 4–5.

[14]   Etsy, "About Etsy," https://www.etsy.com/about/?ref=ftr, accessed on 7/1/15.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

has increased the options for both, in large part due to scale, but also because of its convenience.[15] Etsy is a good example of an online marketplace mitigating coordination problems due to scale, but it is hardly the only such example.[16]

33.     Because any barriers to entry in these online marketplaces are readily overcome, Etsy has competitors, which further benefits buyers and sellers.[17]  Furthermore, for sales of antiques and vintage items, eBay and Etsy compete.  The existence of platforms like eBay and Etsy also allows small sellers (e.g., individual craftsmen, antique collectors, etc.) to compete effectively with larger companies (e.g., jewelry stores, furniture stores, etc.), which in the absence of these platforms would have been difficult.  Platforms like Etsy thus are often said to have a democratizing influence on commerce.[18]

34.     Lead generation platforms such as Uber similarly have a democratizing influence on the market for driving services by lowering the barriers to entry and facilitating entrepreneurism, seeking to enable carpooling and shift cost structures so that fewer individuals need to buy and possess their own car.

---

[15]  Etsy, "About Etsy," https://www.etsy.com/about/?ref=ftr, accessed on 7/1/15.

[16]  Another prominent example of a successful online marketplace solving a long-standing coordination problem is in dating.  Online dating services such as Match.com and eHarmony have changed how people find mates. See match.com, "About Match.com", http://www.match.com/help/aboutus.aspx?lid=4, accessed on 7/1/15; eHarmony, "Who We Are," http://www.eharmony.com/about/eharmony/, accessed 7/1/2015; or OKCupid, "About," https://www.okcupid.com/about, accessed on 7/1/15. It is estimated now that 35% of couples married between 2005 and 2012 met online, and almost half of those couples met through an online dating service. Of the 34.95% of people who met online, 45.01% met through an online dating site. Cacioppo, et al., "Marital Satisfaction and Break-ups Differ across On-line and Off-line Meeting Venues," *Proceedings of the National Academy of Sciences* 110(25) 2013, pp. 10135–10140 at p. 10136.

[17]  Competitors of Etsy include Zibbet and the German website DaWanda. Zibbet, "About Us," https://www.zibbet.com/about-us, accessed on 7/1/15; "DaWanda Secures 4 million Euros to Go International," *TechCrunch*, 11/30/11, http://techcrunch.com/2011/11/30/dawanda-secures-e4-million-to-go-international/, accessed on 7/1/15.

[18]  For example, see Michael Wolf, "The New Era of Democratized Business," *Forbes*, 11/5/12, http://www.forbes.com/sites/michaelwolf/2012/11/05/the-new-era-of-democratized-business/, accessed on 7/3/15.

DECLARATION OF DR. JUSTIN MCCRARY                                                    CV 13-03826-EMC

### B.     Internet Platforms Help Solve Traditional Information Problems

35.     A particular variety of an information problem confronting markets is the problem of asymmetric information, or a problem whereby one party has better information than the other.[19] The one may seek to take advantage of the other, leveraging such information.[20]  Moreover, when the other is aware of this informational disadvantage, she may opt out of the market altogether in order to avoid being taken advantage of.  Markets under such circumstances have the tendency of being thin and in the extreme can even collapse.[21]

36.     A reputation presents a partial solution to asymmetric information problems.[22]  A reputation is a type of guarantee that can help sellers earn more by establishing trust.[23]  Some online platforms provide mechanisms for creating and sustaining reputations through rankings or reviews.

#### 1.     Chain Restaurants and Yelp

37.     Reputations are particularly important in the restaurant market.  Many restaurants do not have enough repeat customers to develop a reputation.[24]  Branded chain restaurants seek to build

---

[19]  The canonical example of asymmetric information is the "market for lemons," where it is argued that sellers of used cars know more about the products than the buyers and therefore have an advantage in the transaction (see Akerlof, George, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *The Quarterly Journal of Economics* 84(3), 1970 pp. 488–500 at pp. 488–489; Frank, Robert and Ben Bernanke, *Principles of Economics*, (New York: McGraw-Hill/Irwin, 2001), pp. 306–307.)

[20]  Online transactions are prone to asymmetric information problems because the products cannot be physically inspected prior to purchase and delivery.  Frank, Robert and Ben Bernanke, Principles of Economics, (New York: McGraw-Hill/Irwin, 2001), p. 312.  Jin, Ginger Zhe, and Andrew Kato, "Price, Quality, and Reputation: Evidence from an Online Field Experiment," The RAND Journal of Economics 37(4) 2006, pp. 983–1005; Einav, Liran, et al., "*The Economics of Peer-to-Peer Internet Markets*," Presentation prepared for the Seventh Annual Federal Trade Commission Microeconomics Conference, 10/16/14, p. 10.

[21]  For example, the market for shares in privately held companies may be thin due to asymmetric information.

[22]  Joseph Stiglitz, *Economics* (New York:  W. W. Norton & Company, 1993), p. 504.

[23]  Joseph Stiglitz, *Economics*,(New York:  W. W. Norton & Company, 1993), p. 504.

[24]  Pindyck, Robert and Daniel Rubinfeld, *Microeconomics*, *Third Edition*, (Englewood Cliffs: Prentice-Hall, 1994), p. 598.

DECLARATION OF DR. JUSTIN MCCRARY                                          CV 13-03826-EMC

a reputation across locations through standardization, and the brand may serve as a guarantee of consistency.[25] Independent restaurants have a much harder time establishing reputations.  Examples of traditional solutions to the reputation problem for independent restaurants include newspaper food critics or restaurant guides such as Zagat's or the Michelin guide.

38.     Internet services dramatically increased the ability of independent restaurants to develop reputations. Yelp is the most famous example of online consumer review aggregation, with over 77 million reviews of restaurants throughout the United States.[26] Reviews can reduce the informational advantage currently held by restaurant chains: a small independent restaurant can have reviews available that provide consumers with information on the quality of the food in restaurants separate from simple brand recognition.  In fact, research has shown that higher Yelp penetration leads to "an increase in revenue for independent restaurants, but a decrease in revenue for chain restaurants."[27] This evidence is consistent with the ability of online reviews and rankings to establish reputations and overcome the asymmetric information problem.

39.     Lead generation platforms such as Uber and Lyft utilize rankings in an analogous fashion to overcome problems in driving services with asymmetric information.

### 2.     Other Examples of Online Reputation Mechanisms

40.     Several of the online platforms that I discussed above have developed mechanisms for sellers and buyers to establish and maintain reputations.  Both eBay and Etsy encourage buyers to

---

[25] Pindyck, Robert and Daniel Rubinfeld, *Microeconomics*, *Third Edition*, (Englewood Cliffs: Prentice-Hall, 1994), p. 598. Michael Luca, "Reviews, Reputation, and Revenue: The Case of Yelp.com," *Harvard Business School Working Paper*, No. 12–016, 2011, pp. 4, 18; Joseph Stiglitz, *Economics*, (New York:  W. W. Norton & Company, 1993), p. 504.

[26] Yelp, "About Us," http://www.yelp.com/about, accessed on 7/1/15.

[27] Michael Luca, "Reviews, Reputation, and Revenue: The Case of Yelp.com," *Harvard Business School Working Paper*, No. 12–016, 2011, p. 19.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                              CV 13-03826-EMC

provide feedback and ratings of sellers.[28]   These sites aggregate the reviews collected from every transaction and display seller ratings prominently on the platform.

41.     These ratings are viewed credibly by buyers and have concrete consequences for trade. For example, on eBay, the growth rate of a seller's transactions drops after receiving negative feedback.[29] Furthermore, there is evidence that sellers invest in building a strong reputation on the platform and that sellers with negative feedback are more likely to exit the platform.[30]  These findings show that reputation is taken seriously by both sellers and buyers and influences transactions. However, reputation alone may not be sufficient to maintain compliance with the platforms' policies.  If a seller is found to not deliver a good enough service or to commit fraud, she can be prevented from using the platform.[31]

## C.     New Methods of Connecting People to Work Opportunities

### 1.     Technological Innovations Help Solve the Coordination Problem by Disaggregating Assets

42.     Another way in which coordination problems can arise is in the exact definition of the product.  Some products are not tradable because they are not easily divisible.  Recent technological innovations "enable the disaggregation of physical assets in space and in time," and therefore allow

---

[28]   eBay, "All About Feedback," http://pages.ebay.com/help/feedback/allaboutfeedback.html, accessed on 7/1/15; Etsy, "The Review System," https://www.etsy.com/help/article/102, accessed on 7/1/15.

[29]   Cabral, Luis, and Ali Hortacsu, "The Dynamics of Seller Reputation: Evidence from eBay", *The Journal of Industrial Economics* 58(1), 2010, pp. 54–78 at pp. 54, 75.

[30]   Cabral, Luis, and Ali Hortacsu, "The Dynamics of Seller Reputation: Evidence from eBay", *The Journal of Industrial Economics* 58(1), 2010, pp. 54–78 at p. 56.

[31]   For example, Etsy's policy states that "refusal or inability to provide a minimum level of customer service may ultimately result in the closure of your shop."  (See Etsy, "Seller Service Level Standards," https://www.etsy.com/help/article/5690, accessed on 7/1/15.)  eBay can also suspend an account "due to a rule or policy violation." (See eBay, "Suspended Accounts," http://pages.ebay.com/help/account/suspended-accounts.html, accessed on 7/1/15.)

for a better allocation of resources.[32]   The FTC has described numerous examples of this better use of resources: "spare rooms or apartments, idle automobiles, or the labor of underemployed individuals" such as individuals who might use spare hours to contemplate accepting ride referrals from a lead generation platform.[33]   By defining the product at a more granular level (i.e., a one-night rental of an empty home, a two-hour job for an idle person, etc.), online platforms have helped society to more fully realize the value of its resources (e.g., existing cars and homes being used more).

43.     For labor markets, this has meant the ability to provide workers with options that are disaggregated and flexible.  Workers now have increased ability to choose how much time to devote to an activity since online platforms usually do not specify a minimum commitment.  For example, a survey conducted by Etsy in 2012 showed that Etsy sellers invest on average 12 hours a week in their shops and that 26% of U.S. Etsy sellers are full-time employees of another company.[34]   As I discuss below, many people who contemplate accepting ride referrals from an Uber platform are similarly full-time employees of another company.

### 2.     Technological Innovations Foster Entrepreneurship

44.     Academic researchers have found that innovations in two-sided market platforms have "tremendous potential to expand grassroots entrepreneurship and innovation by allowing society to tap into individual abilities and aspirations that would otherwise not have been realized."[35]   For example, according to a survey conducted by Etsy in 2012, 74% of Etsy sellers consider their Etsy shop a business and 18% of sellers sell goods on Etsy full-time.[36]   Etsy has also shown that the costs

---

[32]   Sundarajan, Arun, "From Zipcar to the Sharing Economy," *Harvard Business Review*, 1/3/13.

[33]   Federal Trade Commission, "The 'Sharing' Economy: Issues Facing Platforms, Participants, and Regulators: A Federal Trade Commission Workshop," 6/9/15, p. 3.

[34]   Etsy, *Redefining Entrepreneurship: Etsy Sellers' Economic Impact*, online at http://extfiles.etsy.com/Press/reports/Etsy_RedefiningEntrepreneurshipReport_2013.pdf.

[35]   Cohen, Molly and Arun Sundarajan, "Self-Regulation and Innovation in the Peer-to-peer Sharing Economy," *The University of Chicago Law Review Dialogue* 82, 2015, pp. 116–133, at 129.

[36]   Etsy, *Redefining Entrepreneurship: Etsy Sellers' Economic Impact*, online at http://extfiles.etsy.com/Press/reports/Etsy_RedefiningEntrepreneurshipReport_2013.pdf.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

of starting a business on Etsy are smaller than the costs of starting a small business as measured in the 2007 Census Survey of Business Owners.[37]

45.    YouTube, the video sharing platform, allows individuals to develop careers offering specialized instruction and services.[38]  One example of this phenomenon is Michelle Phan, whose make-up tutorial channel has over 7 million subscribers.[39]  In 2012, this allowed her to start a subscription cosmetics company expected to yield $120 million in revenues in 2015 and start a line of makeup with L'Oréal.[40]  As I describe below, lead generation platforms such as Uber have also played an important role in fostering entrepreneurism.

## IV.    LEAD GENERATION PLATFORMS LIKE UBER HAVE CHANGED COMPETITION AND CHOICES IN DRIVING SERVICES

46.    The driving services industry is one example of a market that suffers from coordination challenges.  The development of lead generation platforms,[41] like Uber, has helped lessen these coordination problems.  Lead generation platforms offer a much improved, more

---

[37]  Etsy, *Redefining Entrepreneurship: Etsy Sellers' Economic Impact*, online at http://extfiles.etsy.com/Press/reports/Etsy_RedefiningEntrepreneurshipReport_2013.pdf.

[38]  Einav, Liran, et al., "The Economics of Peer-to-Peer Internet Markets," Presentation prepared for the Seventh Annual Federal Trade Commission Microeconomics Conference, 10/16/14, p. 15; Todd Spangler, "New Breed of Online Stars Rewrite the Rules of Fame," *Variety*, 8/5/14, http://variety.com/2014/digital/news/shane-dawson-jenna-marbles-internet-fame-1201271428/, accessed on 7/1/15.

[39]  Michelle Phan, "About," *YouTube.com*, https://www.youtube.com/user/MichellePhan/about, accessed on 7/1/15. Ms. Phan's videos have more than 1 billion views.

[40]  "30 under 30, Art & Style," *Forbes*, 2015, http://www.forbes.com/30under30/#/art-style, accessed on 7/1/15.

[41]  Later in this report I will refer to transportation network companies ("TNCs").  TNCs, which are regulated by the California Public Utilities Commission, are a particular type of lead generation platform that arranges rides between passengers and drivers using their own personal vehicles. TNCs "provide prearranged transportation services for compensation using an online-enabled application or platform (such as smart phone apps) to connect drivers using their personal vehicles with passengers."  California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 10.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

efficient referral service to connect potential passengers and potential drivers interested in on-demand prearranged driving services, increasing choice for both parties, much as eBay and Etsy have done for buyers and sellers. Prearrangement of transportation previously required brand recognition, advertising, and staffing of phone lines; against this backdrop, lead generation platforms have plainly made prearrangement quicker and cheaper. A side effect of this efficiency is that taxi companies now face more direct competition, but this is a difference of degree rather than kind.  For example, limousine services have long competed against taxi companies using prearrangement.

47.     In this section, I first describe in more detail the coordination issues the driving services industry was facing prior to the development of lead generation platforms.  Then, I discuss the different driving services available to passengers, how the industry developed in ways to attempt to overcome the coordination challenges, and what options were available to workers who wanted to provide driving services.  I close the section by describing the origins of Uber and how it and other lead generation platforms have changed the market for driving services.

## A.     Coordination Issues in Transportation Prior to New Technologies

48.     The coordination challenges faced by the driving services industry are similar to those present in many two-sided markets. The driving services industry depends critically on the ability to match passengers to available drivers in a physical location at the times that the driver wants to drive and the passenger wants the ride, as well as ensuring that drivers are with passengers who will pay and are safe, and passengers are with drivers who will take them safely and efficiently to where they want to go.  Efficiently coordinating passengers and drivers to solve these information challenges is complex. Prior to the emergence of lead generation platforms, governments regulated driving services with an eye towards mitigating these same problems.

## B.     The Transportation Industry Prior to Lead Generation Platforms

49.     Historically there have been a series of regulations governing the driving services industry, many of which attempted to solve the coordination problems described above.  Within this regulatory framework, many different driving service options were created, including taxis and black

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

cars or limousines.  A person wanting to drive passengers was by regulation only allowed to provide driving services for hire through one of these driving service options.

### *1.*     *Regulation of Taxis*

50.     Passengers value the ability to access driving services without much advance notice. How does one solve the coordination and safety issues that might arise in a system that would allow a potential passenger to stand on the corner and be picked up by a stranger? Current taxi regulations are an attempt to do so.  One way immediate driving service can be arranged is from the side of the street between a taxi driver and a potential passenger.  This method of matching passengers to drivers ("hailing") is unique to taxis; in California as in most other states, other driving services are required to prearrange rides.[42]  Passengers seeking a ride for a short or unexpected trip would typically find that taxis were the only viable option (as described below, prearrangement was of limited use because of the time lag necessary to prearrange).  It follows that if a driver wanted to offer driving services to passengers who were unable or unwilling to invest in a prearranged ride, driving a taxi was the only way that driver could compete to do so.

51.     In California, taxis are not regulated by the state, but are instead regulated by cities and counties.[43]  In order to make them easily identifiable to passengers, cities commonly regulate the appearance of taxis (e.g., the color schemes used to paint taxis, lights on the roof, ID numbers for cars

---

[42]  California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 7.  The term "hailing" may take on different meanings in different contexts.  For example, it is often used to juxtapose the matching method used by taxis from those used by limousine drivers, commonly referred to as "prearrangement."  However, lead generation platforms provide a service that is not hailing and yet is more immediate than traditional prearrangement.  As Judge Chen noted in, for example, the Order Granting Defendant's Motion for Judgment on the Pleadings, they provide a service that might be described as "hailing on demand" ("Uber provides a service that gives consumers the ability to hail a participating car service driver 'on demand' using their mobile phone" p. 2).  In my report, I refer to the services offered by lead generation platforms as "prearrangement."  In my view, these platforms represent an innovation that makes prearrangement much more effective and indeed much closer to "hailing on demand."

[43]  California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 7.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

and drivers, and so on) and the means of calculating fares (e.g., meters).[44]  These regulations attempt to reduce some of the imperfect information issues inherent in passengers getting into a stranger's car (i.e., finding the driver, safety of the ride).  So do other potential regulations including vehicle inspections, driver reviews, and daily hours limits.[45]

52.   Cities also may limit how many vehicles are allowed to operate as taxis within the city.[46]  Two methods used to control the number of taxis operating in a city are taxi medallions and franchising.[47]  Several California cities, including San Francisco, use a system of taxi medallions.  In these cities a driver of a taxi must either own a taxi medallion herself or rent a medallion, or taxi, from someone who does (often a taxi company).  Because cities limit the number of medallions available, and there is a financial opportunity to be one of a limited set of vehicles that can pick up hailing passengers, the cost of buying or leasing a medallion can be quite high.  For example, the cost of purchasing a medallion in San Francisco was $250,000 in 2014 and in my opinion would be higher if medallions could be purchased on the secondary market.[48]  Taxi drivers who don't own a medallion must rent one.  Since many taxi drivers do not own their own taxi, medallion rentals are often paired with a one day rental of a taxi.  The cost of this rental (often referred to as the "gate fee") could be

---

[44]  City and County of San Francisco, Transportation Code, Article 1100, Sections 1106 and 1113.

[45]  "Taxicab Services Ordinance," http://ci.santa-rosa.ca.us/departments/finance/revenue/tax-fees/Pages/taxi.aspx, accessed on 6/22/15; Taxicab Rules and Regulations of the Board of Taxicab Commissioners: City of Los Angeles, Rule 790, 9/14.

[46]  For example, as of 5/19/15, San Francisco had 1900 taxi medallions outstanding.  "Medallion Holders", https://www.sfmta.com/services/taxi-industry/medallions/medallion-holders, accessed on 7/1/15.

[47]  "Houston Taxi Study," Tennessee Transportation & Logistics Foundation, 1/20/14, p. 17.  *See also* Bruce Schaller, "Entry Controls in Taxi Regulation: Implications of US and Canadian experience for taxi regulation and deregulation," 2007, pp. 6–7.

[48]  In San Francisco, medallions are non-transferrable, so there is no open market for medallions.  The price is fixed at $250,000 with a waiting list based on driver seniority for the right to purchase a medallion. City and County of San Francisco, Transportation Code, Article 1100, Sections 1105 and 1116.  *See also* "A-Card Seniority List (Proposed)," https://www.sfmta.com/services/taxi-industry/medallions/seniority-list, accessed on 7/2/15.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                   CV 13-03826-EMC

over $100 per shift (typically 10 hours); in San Francisco, in any given week, the average gate fee that a cab company can charge for a 10-hour shift is $106.25.[49]

53.     Rather than taxi medallions, some cities in California, such as Los Angeles and Santa Rosa, offer a limited number of franchise licenses.[50] Taxi companies must be granted a franchise by the city in order to operate a taxi service in these cities.  To be granted a franchise, a taxi company must pay an annual fee and/or monthly fees which can be charged per vehicle.[51] Taxi owners and taxi companies must pay for medallions and/or franchises in order to gain access to the restricted ability to compete for hailing passengers.

### 2.     Regulation of black cars and limousines

54.     As noted above, in California, black car and limousine companies are regulated by the PUC.  This is in contrast to taxis and taxi companies which are regulated by cities and counties.  The PUC classifies a black car or limousine company as a Transportation Charter Party ("TCP").

55.     A certificate or permit is required to operate as a TCP in California.  Certificates and permits are issued to individuals, general partnerships, corporations, limited liability companies ("LLC"), and limited partnerships ("LP")[52] and are valid for three years.[53] A number of requirements must be met by applicants.  Each vehicle to be used to provide TCP services must be registered with the state as a commercial vehicle or a limousine.[54] The applicant must submit a one-page statement

---

[49] City and County of San Francisco, Transportation Code, Article 1100, Section 1124.

[50] For example, see "Taxicabs," http://ladot.lacity.org/WhatWeDo/TaxicabsAmbulancesPipelines/Taxicabs/index.htm, accessed on 7/3/15; and "Taxicab Services Ordinance," http://ci.santa-rosa.ca.us/departments/finance/revenue/tax-fees/Pages/taxi.aspx, accessed on 7/3/15.

[51] For example, see Los Angeles Municipal Code, Chapter VII, Article 1, Section 71.05.

[52] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 16.

[53] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants,  p. 7.

[54] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 11.

estimating revenues and expenses over a stated initial period of operations, either 90, 120, 180 days, or one year.[55]  Before a permit or certificate will be granted, all TCPs must have valid public liability and property damage insurance on file with the PUC.[56]  Assuming all criteria are met and all forms are properly completed, TCP authority is granted typically within three to six weeks.[57]

56.     The PUC also regulates the factors used by TCPs to determine fares.  With the exception of transportation used for sight-seeing tours, TCPs are required to charge fares based on the vehicle mileage, time of use, or a combination of both factors and are not allowed to charge fares based on the number of passengers.[58]

57.     TCPs are distinct from taxi services in several important ways according to the PUC.  First, taxis are regulated by cities and counties, whereas TCPs are regulated by the state, specifically by the PUC.  Taxis have meters and top lights, whereas TCPs do not.  Most importantly, TCPs are not allowed to be hailed by potential passengers.  Each ride provided by a TCP must be arranged beforehand, or prearranged, and the driver must maintain a waybill that contains detailed information about the arrangement, including the name of passenger or person arranging the trip, the time of arrangement, and the origin and destination of the trip.[59]

### 3.     Driving choices

58.     Prior to the recent technological changes in the marketplace, a person interested in working as a driver for passenger trips had the choice between driving a taxi or driving a black car or

---

[55] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 17.

[56] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 18.

[57] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 19.

[58] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 6.

[59] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 7.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

limousine.  Within each of these driving options, many work arrangements are possible.  In addition, drivers providing each service type have historically used a variety of different methods to coordinate with potential passengers.

### a. *Driving a taxi*

59.     Taxi drivers in California work under many different arrangements.  Some are employees of a taxi company, but others are self-employed.[60]  Some taxi drivers own their own medallions, but others do not.  Taxi drivers who do not own their own medallion – the majority of drivers[61] – must pay to rent the rights to a medallion during their shift.  This rental fee is usually included in the "gate fee" that is charged by taxi companies.  A gate fee typically covers not only the cost of renting the rights to the medallion, but also the cost of insurance and of renting the taxi.[62]  Drivers usually pay for their own gas.[63]

60.     Gate fees can be quite expensive.  For example, in any given week, the average gate fee that a cab company can charge for a 10-hour shift is $106.25.[64]  Furthermore, I understand that in order to lease a medallion and taxi for the day, drivers often find it necessary to "tip" employees at the taxicab companies or dispatch companies.[65]  This can cost the driver more than an additional $10

---

[60] Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2014-15 Edition, Taxi Drivers and Chauffeurs, http://www.bls.gov/ooh/transportation-and-material-moving/taxi-drivers-and-chauffeurs.htm, accessed on 7/3/2015

[61] In San Francisco, for example, there are 1,735 full time medallions, but over 7,000 licensed taxi drivers. Hara Associates, Best Practices Studies of Taxi Regulation: Meter Rates & Gate Fees, 8/27/13, p. 1-2.

[62] Hara Associates, Best Practices Studies of Taxi Regulation: Meter Rates & Gate Fees, 8/27/13, p. 1-2.

[63] Hara Associates, Best Practices Studies of Taxi Regulation: Meter Rates & Gate Fees, 8/27/13, p. 1-2.

[64] City and County of San Francisco, Transportation Code, Article 1100, Section 1124.

[65] Hara Associates, Best Practices Studies of Taxi Regulation: Taxi Driver Survey, Draft, 3/31/13, accessed at https://www.sfmta.com/about-sfmta/reports/hara-associates-draft-taxi-user-survey, p. 3.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                              CV 13-03826-EMC

per shift.[66]  Moreover, on the underground market, renting a medallion may cost many times the standard gate fee, leading to charges from former DeSoto Cab President Hansu Kim that brokers in possession of medallions are "extorting drivers… Such backroom deals are common in the cab industry."[67]  By paying the gate fee, the driver is paying an upfront fee for the opportunity to work that day and is provided with no guarantee that fares earned during the day will cover the cost of renting and operating the taxi.  That is, some taxi drivers may work a full day and yet experience a net loss.

61.    Taxi drivers who own their own medallions sometimes manage them on their own, but many lease their medallion to a taxi company.  The taxi company then has the right to operate a taxi using the medallion and to rent the medallion to other drivers on a shift-by-shift basis.  The medallion owner, in return, is paid a medallion lease by the taxi company, but may then be required to pay the taxi company a gate fee in order to use the medallion during his or her shifts.[68]  Alternatively, if a medallion owner wants to manage his medallion, he still needs to pay a monthly fee to affiliate with a "Color Scheme" or taxi company and use its branding and dispatch services.[69]

62.    Historically, several methods have been used by taxi drivers to find passengers, including hailing, taxi stands, and dispatch services.  Passengers can arrange for taxi service by hailing a taxi from the side of the street.  While the ability to pick up passengers in this manner is unique to taxis, it has considerable limitations.  For a match to occur, both parties—driver and passenger—must be in the same physical location and recognize that the match is desired and available.  Because of this, and to increase the chance of finding their next passenger, taxi drivers

---

[66] For example, 29% of drivers say they give more than $10 in tips on a desirable Friday or Saturday night shift.  Hara Associates, "Best Practices Studies of Taxi Regulation: Taxi Driver Survey," Draft, 3/31/13, accessed at https://www.sfmta.com/about-sfmta/reports/hara-associates-draft-taxi-user-survey, p. 5.

[67] Rachel Swan, "Color Schemes: The Underground Taxi Market," SF Weekly, 4/3/13, http://www.sfweekly.com/sanfrancisco/color-schemes-the-underground-taxi-market/Content?oid=2188488, accessed on 7/3/15.

[68] SFMTA Taxicab Advisory Council, Medallion Sales Pilot Program Report, 3/9/12, p. 2.

[69] Hara Associates, Best Practices Studies of Taxi Regulation: Meter Rates & Gate Fees, 8/27/13, pp. 1-2, 1-3; SFMTA Taxicab Advisory Council, Medallion Sales Pilot Program Report, 3/9/12, p. 2.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

often drive around the city, looking out the windows of their vehicle for potential passengers on the side of the street. Once the potential passenger and driver are in the same location, they both must simultaneously see each other and jointly signal their intentions, or else the match may fail, resulting in lost time for both parties.  For passengers, signaling often involves waiving a hand or whistling. Drivers often use lights on the top of the vehicles ("top lights") to indicate their availability.  This solution to the coordination problem is effective in certain circumstances, but limited in others.  For example, this solution is less effective in neighborhoods where there are fewer taxis, and fewer riders, on average.

63.     Taxi stands provide an alternative solution for matching potential passengers to available taxis.  The taxi stand provides a fixed location for potential passengers to seek out available drivers.  In this way, taxi stands are similar to the coordination solution offered by craft fairs and garage sales, which I discussed in **Section III**.  However, as with craft fairs and garage sales, this solution to the coordination problem has its drawbacks.  The passenger must physically be at the taxi stand in order to arrange a ride.  There is ebb and flow in passenger demand and willingness to wait in the taxi stand line, which is hard for drivers to anticipate.  A taxi driver consequently might have to wait for a long time at a taxi stand before obtaining a customer.  Conversely, a passenger might also to have to wait at a taxi stand.

64.     A third method used to mitigate the coordination problem facing drivers and passengers is dispatch services.  Both hailing and taxi stands are limited by the need for passengers and drivers to be in the same physical location in order to arrange a ride.  Dispatch services help alleviate this particular problem by centralizing and disseminating information about passenger requests to a group of taxi drivers.   Dispatch services can take several forms.  Some taxi companies own and operate their own dispatch ("branded dispatch").[70]  By construction, branded dispatch services only coordinate rides among taxi drivers who are either employed by the taxi company or work with the taxi company as an independent contractor.  Other dispatch services are not limited to a particular taxi company, or brand.  Rather, these companies provide only dispatch services

---

[70] For example, see Luxor Cabs in San Francisco, http://www.luxorcab.com/, accessed on 7/2/2015.

("independent dispatch"); they do not own or operate any taxis.[71]  Independent taxi drivers who subscribe to these independent dispatch services are responsible for providing their own taxi, equipment, and insurance.[72]  Like the two-sided platforms described in **Section III**, the efficacy and value of dispatch services are limited by the number of users of the service.  That is, passengers prefer dispatch services that will give them the best service (i.e., one aspect of service is quick and reliable connection to a driver, which is aided by having many drivers on the service) and taxi drivers get more value from a dispatch service that is used by many passengers.  Passengers historically have had to identify the dispatch service and phone number, call and communicate with a person on the other end of the call, who then needed to relay the information accurately to the pool of available drivers.[73]

### b.     *Driving a black car or limousine*

65.     There are several options for a driver who wants to drive passengers but does not want to drive a taxi.  Drivers can own their own black car or limousine and operate as an independent business.  To do so, the driver must register with the PUC and obtain a certificate or permit to operate a chartered driving service ("TCP").  As described above, the process to obtain authority to operate a TCP is nontrivial.[74]

66.     Black cars and limousines are only allowed to offer prearranged transportation – they are not permitted to pick up potential customers seeking to hail them – which has traditionally limited the methods available to them for finding and coordinating with passengers.  Drivers operating independent black car companies rely on passengers contacting them for rides.  These business

---

[71] For example, see American Taxi Dispatch, https://www.americantaxi.com/ATOnlineOrderWeb/main.htm, accessed on 7/2/2015.

[72] For example, see American Taxi Dispatch, https://www.americantaxi.com/ATOnlineOrderWeb/main.htm, accessed on 7/2/2015.

[73] For example, San Francisco has 26 taxi companies, each with their own dispatch service.  "Taxi Company Directory," https://www.sfmta.com/getting-around/taxi/taxi-companies, accessed on 7/2/2015.

[74] California Public Utilities Commission Transportation License Section, Basic Information for Passenger Carriers and Applicants, p. 19.

owners must develop a reputation among potential passengers in order to increase the likelihood that a passenger will choose to prearrange with their company.  To do this, they can invest in advertising or self-marketing or rely on word of mouth.  Alternatively, owners of black car businesses can pay for passenger referrals, which could involve subscribing to a dispatch service.  Finally, as an owner of an independent business, the black car driver would be responsible for paying for their business expenses.  All of this adds to the cost and risk of operating an independent black car business.

67.     Rather than operating their own independent black car service, a driver could instead work for a black car company as either an employee[75] or as an independent contractor.[76]  In doing so, the driver may alleviate the need to invest their own money in methods for identifying passengers and may not be responsible for expenses.  However, the available options for identifying and coordinating with passengers are similar for the multi-car black car company – rides must be prearranged and passengers must somehow learn about the reputation and availability of the drivers.

### C.     New Options and Sources of Competition Emerge with the Development of Lead Generation Platforms and TNCs

68.     Historically, and as discussed, passengers could hail taxis to arrange for immediate, quick, or unexpected trips, but had to prearrange transportation in order to arrange travel with any non-taxi service, such as a black car or limousine.  Hailing taxis may be effective in dense urban areas during certain hours of the day, but may be less effective in many other areas and circumstances.   Prearrangement of transportation typically required coordinating over the phone well in advance of the trip, which required that drivers invest in infrastructure (dispatch systems and call centers) and advertising and that passengers incur search costs to identify a reliable, and available, driver.  These combined solutions only partially addressed the coordination challenges faced by the driving services industry.  Lead generation platform referral services have offered a new solution to these problems and in the process expanded choices for drivers and passengers.

---

[75] For example, see Declaration of Patrick Canlas, 8/11/14, UBE–OCO00009114–20, ¶ 19.

[76] For example, see Declaration of Oleg Lantsman, 5/19/15, ¶ 12.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

69.     Uber began in 2009, as a service offered to licensed black car and limousine companies to help them find customers for prearranged trips.  The platform service called UberCab was launched in San Francisco in May 2010, and eventually became what is now UberBLACK.[77] The Uber App facilitates the prearrangement of driving services in a way that was not previously possible.  The Uber App provided potential passengers and black car and limousine companies with a far more effective solution to their coordination problems.  Passengers could easily signal their desire to arrange a ride to many companies at once.  They no longer needed to identify and contact a particular company, nor spend the time to call a dispatch service or seek out a taxi stand to arrange a ride. Likewise, black car and limousine companies and independent owners were able to much more efficiently identify potential customers.  The Uber App reduced the need to invest in the advertising and infrastructure that was previously necessary to attract and identify passengers.

70.     In addition, the UberBLACK platform could, and does, quickly match black car drivers to passengers in the same geographic location, dramatically reducing the lead time needed to execute prearranged transportation.   This could allow passengers who valued the service offered by black car companies to rely on prearranged transportation options for more rides.  This put small black car businesses and black car independent drivers in a better position to compete directly with taxi companies for certain customers.

71.     Uber's initial service, UberCab/UberBLACK, was limited to arranging rides for licensed black cars and limousines.  These car services provided high quality rides, but usually at a higher price than a taxi fare.[78]  In the summer of 2012, Uber launched uberX,[79] a lower cost

---

[77] "Uber's Founding," 12/22/10, http://newsroom.uber.com/2010/12/ubers-founding/, accessed on 7/7/15.

[78] Leena Rao, "UberCab Takes The Hassle Out of Booking a Car Service," *TechCrunch* , 7/5/10. http://techcrunch.com/2010/07/05/ubercab-takes-the-hassle-out-of-booking-a-car-service/, accessed 7/2/15; Michael Arrington, "What if Uber Pulls an Airbnb? Taxi Business Could (Finally) Get Some Disruption," *TechCrunch*, 8/31/10, http://techcrunch.com/2010/08/31/what-if-ubercab-pulls-an-airbnb-taxi-business-could-finally-get-some-disruption/ accessed 7/6/15.

[79] Alexia Tsotis, "Uber Opens Up Platform to Non-limo Vehicles with 'UberX,' Service will be 35% Less Expensive," *TechCrunch*, 7/1/12, http://techcrunch.com/2012/07/01/uber-opens-up-platform-to-non-limo-vehicles-with-uber-x-service-will-be-35-less-expensive/, accessed 7/1/15.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

alternative to UberBLACK.[80]  At this time only drivers driving liveried hybrid vehicles with TCP licenses could use the uberX platform,[81] but starting in February 2013, drivers using their personal vehicles, including non-hybrids, could *also* use the uberX platform.[82]  It was no longer necessary for a driver to have a TCP license in order to use the Uber App and the vehicles did not have to meet the size and quality requirements of UberBLACK.[83]

72.     Use of the uberX platform provided new job opportunities for people who wanted to offer driving services.  Drivers using uberX did not need to own their own medallion or taxi.  Nor did they need to pay, explicitly or implicitly for the use of someone else's taxi or black car.  Because they could use the Uber App to help find passengers, it was no longer necessary for drivers to work for, or contract with, a taxi company or black car company, to pay for a dispatch service, or to find their own passengers by driving around town looking for potential customers.  Thus uberX and UberBLACK led to increased options and lower entry costs for drivers and put increased competitive pressure on the value of the ability to pick up hailing customers that was limited by regulation to taxi companies with medallions or franchises.  According to a 2014 to 2015 report of business travelers from expense management system provider Certify, in San Francisco 71 percent of business receipts for rides went to Uber with 29 percent going to taxis, and in Los Angeles 49 percent of business receipts went to Uber with 51 percent going to taxis.[84]  The ability of Uber to maintain such high (and increasing)

---

[80] Alexia Tsotis, "Uber Opens Up Platform to Non-limo Vehicles with 'UberX,' Service will be 35% Less Expensive," *TechCrunch*, 7/1/12, http://techcrunch.com/2012/07/01/uber-opens-up-platform-to-non-limo-vehicles-with-uber-x-service-will-be-35-less-expensive/, accessed 7/1/15; http://www.greencarreports.com/news/1078381_uberx-service-offers-hybrid-cars-lower-fares-in-ny-san-francisco, accessed on 7/2/15.

[81] Email from Thomas Colopy to Philip Acevedo, "Fw:  Introducing A New Opportunity With Uber," 5/21/14, COLOPY000175–80 at COLOPY000175.

[82] Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 35–36.

[83] "SF / Bay Area P2P Vehicle Requirements," http://www.sfuberpartners.com/accepted-vehicles.html, accessed on 6/30/15.

[84] "Sharing the Road: Uber on the Rise Nationwide," Certify, 2015, https://www.certify.com/CertifySpendSmartReport.aspx, accessed on 7/3/15.  These figures have been trending up, with Uber's share of business travel rising from 58 percent to 71 percent in San Francisco from the first quarter of 2014 to the first quarter of 2015, and from 23 percent to 49 percent in Los Angeles over the same period of time.  Indeed, in all eight cities listed in Certify's

Gibson, Dunn &
Crutcher LLP

market shares is partially a result of its convenience and competitive pricing for consumers and partially a result of its evident attractiveness to drivers.[85]

73.     Uber launched uberTAXI in several different cities over the course of 2012, beginning with Chicago in April, New York in September, and San Francisco in October.[86] uberTAXI rides are provided in a licensed taxi, rather than a personal vehicle.[87]  uberTAXI allows taxi companies to utilize the Uber App to arrange taxi rides and to alleviate the traditional coordination challenges of prearranged rides.

74.     On December 20, 2012, the PUC started a rulemaking process for companies such as Uber that "have recently begun using mobile internet, social media, and location services to offer new ways of arranging transportation of passengers over public highways for compensation."[88]  After completing its examination of these new companies, on September 19, 2013, the PUC ruled that it had jurisdiction over TNCs.  According to the PUC, a TNC "provides prearranged transportation

---

analysis, Uber gained ground on taxis.  In New York, Uber's share of business travel expenses rose from 9 to 21 percent; in Chicago it rose from 8 to 25 percent; in Dallas it rose from 27 to 56 percent; in Washington, D.C., it rose from 20 to 49 percent; in Miami, it rose from 0 to 23 percent; and in Atlanta it rose from 8 to 41 percent. According to the Boston Globe, Certify's analysis is based on 28 million business expense receipts nationally. Scott Mayerowitz, "More business travelers seen going with Uber," *Boston Globe*, 4/7/15. https://www.bostonglobe.com/business/2015/04/07/uber-popularity-surges-business-travelers-avoiding-taxis/x9SRbGh7B7RaCqmvL7e1wM/story.html, accessed 7/3/15.

[85] See Exhibit 3, below. Generally, uberX is less costly than a traditional taxi service. Certify's analysis of national business expenses is consistent with this and indicates that the average receipt in the first quarter of 2015 was $31.24 using Uber and $35.40 using taxis, limousines, and airport shuttles. "Sharing the Road: Uber on the Rise Nationwide," Certify, 2015, https://www.certify.com/CertifySpendSmartReport.aspx, accessed on 7/3/15.

[86] "Can a Chicago Taxi be Uber?" *Uber*, 4/18/12, http://newsroom.uber.com/chicago/2012/04/chicago-taxi-uber/, accessed on 7/6/15; "Introducing Uber Taxi NYC + One Free Ride for Every New Yorker," *Uber*, 9/5/12, http://newsroom.uber.com/nyc/2012/09/introducing-uber-taxi-nyc-one-free-ride-for-every-new-yorker/, accessed on 7/6/15; "Taxi is Arriving in San Francisco," *Uber*, 10/17/12, http://newsroom.uber.com/sf/2012/10/taxi-is-arriving-in-san-francisco/, accessed on 7/6/15.

[87] Alexia Tsotis, "Uber Opens Up Platform to Non-limo Vehicles with 'UberX,' Service will be 35% Less Expensive," *TechCrunch*, 7/1/12, http://techcrunch.com/2012/07/01/uber-opens-up-platform-to-non-limo-vehicles-with-uber-x-service-will-be-35-less-expensive/, accessed 7/1/15.

[88] California Public Utilities Commission, Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and new Online-Enabled Transportation Services, 12/27/12, p. 1.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                CV 13-03826-EMC

services for compensation using an online-enabled application (app) or platform to connect passengers with drivers using their personal vehicles."[89]

75.     Drivers using uberX can use their own personal vehicles or drive liveried cars with TCP licenses, whereas drivers using UberBLACK can only use commercially registered black cars and limousines.  The PUC ruling thus has important regulatory implications for drivers.  According to the PUC, the "primary" distinction between TNCs and other companies regulated by the PUC that provide prearranged driving services is that a "TNC connects riders to drivers who drive their personal vehicle, not a vehicle such as a limousine purchased primarily for a commercial purpose.  To that end, a TNC is not permitted to itself own vehicles used in its operation or own fleets of vehicles"[90] Thus, Rasier-CA LLC, a wholly owned subsidiary of Uber, is regulated as a TNC, because it contracts with drivers who use the uberX platform and drive personal vehicles (although drivers of liveried cars with TCP licenses also use the uberX platform).  The licensed black car and limousine companies that use UberBLACK to connect to riders are regulated by the PUC, but not as TNCs.[91]

76.     The PUC also imposed a series of rules and regulations that apply to all TNCs.  In particular, the PUC established that TNCs needed to obtain a permit from the PUC, require criminal background checks for each driver using the platform, establish a driver training program, implement

---

[89] California Public Utilities Commission, Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry, 9/19/13,  p. 2.

[90] California Public Utilities Commission, Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry, 9/19/13, p. 24.

[91] See California Public Utilities Commission, Decision Modifying Decision 13-09-045, 11/20/14, p. 23: "Uber Technologies has multiple transportation offerings, however, only UberX provides TNC services.  The other transportation offerings by Uber Technologies are licensed as limo drivers and regulated by this Commission.  All Uber offerings other than UberX such as Uber or Uber Black or Uber SUV are all and should be licensed professional drivers."  I also understand that it is under consideration by the PUC whether Uber itself should be regulated as a TCP.  See also California Public Utilities Commission, Assigned Commissioner and Assigned Administrative Law Judge's Scoping Memo and Ruling for Phase II of Proceeding, 11/26/14, pp. 2–3.

a zero-tolerance policy on drugs and alcohol, and require insurance coverage, as well as provide annual reports on several issues such as safety and accessibility.[92]

77.     Uber is not the only lead generation platform.  Indeed, several other companies compete with Uber to provide ride coordination services.  Two of Uber's largest competitors are Lyft and Sidecar, but many other companies compete with Uber as well, including Hailo and Kappa Phi.[93]

78.     In summary, the emergence of lead generation platforms, including Uber, has led to increased choice for those offering driving services.  Lead generation platforms have improved the efficiency of prearranged driving services such as limousines.  This efficiency put prearranged driving services in a better position to compete against hailing driving services such as taxis, but that does not mean that taxi drivers are necessarily worse off.  Taxi drivers, if they choose to, can accept referrals from a lead generation platform.  Moreover, if lead generation platforms are in fact growing the pie, for example by persuading people that they do not need to own a car, then there may be more business for prearranged and hailing driving services alike.

## V.     THERE IS NO TYPICAL DRIVER WHO USES THE UBER APP

79.     In this section I discuss the many different types of drivers who use the Uber App and describe the many ways in which the Uber App has changed their options for working and earning.  This highlights the individualized nature in which workers use the Uber App and shows that there is no typical driver using the Uber App.

---

[92] California Public Utilities Commission, Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry, 9/19/13, p. 26.

[93] "I'm not sure I'd be able to list all of Uber's competitors.  Some that come to mind are platforms that maybe use a similar model.  I'm not too familiar with exactly how they operate their business.  Sidecar, Halo, Lyft, Kappa Phi.  I believe there's just many more." Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, p. 149.

DECLARATION OF DR. JUSTIN MCCRARY                                CV 13-03826-EMC

1

### A.   Some Drivers Who Use the Uber App Use Competing Platforms at the Same Time They Use the Uber App

2

3      80.     A driver who chooses to sign up to use the Uber App may simultaneously do work on

4  behalf of herself or third parties; Uber does not have a uniform policy preventing that person from

5  working full-time or part-time for themselves or third parties, and indeed does not have a uniform

6  policy preventing that person from "multi-apping," or directly and simultaneously competing with the

7  Uber App by completing referrals from other lead generation platforms such as Lyft.[94]  As I describe

8  in this section, some drivers have additional work within the driving services industry; some even use

9  competing platforms at the same time as using the Uber App.  Other drivers have additional work in

10  non-car service industries.  For some people that non-car service industry work is part-time whereas

11  for others it is full-time.

12      81.     While not on a ride, some drivers who use the Uber App may decide whether to take

13  an Uber referral or the referral from another platform such as Lyft or Sidecar.  Many driver

14  declarations report actively serving another lead-generating platform.[95]  Other drivers also explain

15

---

16  [94] Uber has used many different licensing agreements.  Some of these contracts specifically indicate
that drivers have the right to work at another job, including jobs obtained through competing lead
17  generation platforms.  For example, see Rasier Transportation Provider Service Agreement, UBE-
OCO00009682–97 ("The Company neither has nor reserves the right to restrict you from
18  performing other transportation services for any company, business or individual, or from being
engaged in any other occupation or business.") and Rasier Software License and Online Services
19  Agreement, 11/10/14, §2.4 ("You acknowledge and agree that you have complete discretion to
provide services or otherwise engage in other business or employment activities. For the sake of
20  clarity, you understand that you retain the complete right to; (i) use other software application
services in addition to the Uber Services; and (ii) engage in any other occupation or business.").
21  On the other hand, some licensing agreements state that drivers cannot seek ride referrals from
competing lead generation platforms while the driver is signed onto the Uber App.  For example,
22  see Rasier Software Sublicense and Online Services Agreement, 6/21/2014, p. 3 ("The Parties
recognize that both you and the Company are, or may be, engaged in similar agreements with
23  others.  Nothing in this Agreement shall preclude the Company from doing business with other
independent transportation service providers, nor preclude you from entering into contracts
24  similar to this Agreement with other lead generation providers.  The Company neither has nor
reserves the right to restrict you from performing other transportation services for any company,
25  business or individual, or from being engaged in any other occupation or business.  However,
during the time you are actively signed into the Software, you shall perform transportation
26  services only for Requests received by you via the Software.").

27  [95] For example, see Declaration of Sebastien Trouplin, 11/21/14, UBE-OCO00009549–54, ¶ 2;
Declaration of Casey Cheung, 5/19/15, ¶ 5; Declaration of David Wong, 5/18/15, ¶ 4; Declaration
28  of Elmer Brigido A. Javier, 5/18/15, ¶ 8; Declaration of Euripedes Silva, 5/18/15, ¶ 3; Declaration

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

that they run their Uber and alternative platform app simultaneously to increase the chances of getting a driving job.[96] For example, Sevuloni Ratabumusu explains: "Uber has also never prevented me from operating multiple ride sharing apps simultaneously. I always operate the Uber App and the Lyft App simultaneously whenever I am driving. I accept a fare from whatever App sends me a lead first."[97] Michael Banko has a similar strategy: "I occasionally use another application at the same time as Uber. That application is called Lyft. The benefit of using two applications is that I can stay busier. There is less downtime. I can reject or accept leads. Uber has never suspended or threatened to suspend my application use because I did not accept enough leads. Uber does not restrict my use of other applications like Lyft."[98] Some drivers make a point of running Uber and the alternative app at mutually exclusive times. Hazim Jajo explains that he "would keep switching until [he] got a customer." [99]

82.     The share of each driver's trips that are arranged using the Uber App versus another platform varies from driver to driver. Umar Faruk Azam, for example, uses Lyft "off and on," but uses Uber 95 percent of the time.[100] For Sevuloni Ratabumsu, on the other hand, 70 percent of his San Francisco fares are arranged using the Lyft platform and 30 percent are arranged using the Uber App.[101] For some drivers, the split between the share of rides picked up from Uber versus another platform can change over time; for example, Sebastien Trouplin states: "Currently, about 90% of my

---

of Christopher J. Armentrout, 5/20/15, ¶ 3; Declaration of E. Bond Francisco, 5/19/15, ¶ 4; Declaration of Frank T. Chow, 5/19/15, ¶ 4; Declaration of Hanibal Poolisrezaeih, 5/19/15, ¶ 4; and Declaration of Jay Townsend, 5/20/15, ¶ 5.

[96] For example, see Declaration of Sebastien Trouplin, 11/21/14, UBE-OCO00009549–54, ¶ 15; Declaration of Casey Cheung, 5/19/15, ¶ 5; Declaration of David Wong, 5/18/15, ¶ 4; Declaration of Elmer Brigido A. Javier, 5/18/15, ¶ 8; Declaration of Euripedes Silva, 5/18/15, ¶ 6; Declaration of Jeremy Thomas Paz, 5/19/15, ¶ 4; Declaration of Ladawna Williams, 5/20/15, ¶ 6; Declaration of Michael Banko, 5/19/15, ¶ 5; Declaration of Richard Charles Elliott, 5/18/15, ¶ 4; and Declaration of Sevuloni Ratabumusu, 5/20/15, ¶ 5.

[97] Declaration of Sevuloni Ratabumusu, 5/20/15, ¶ 5.

[98] Declaration of Michael Banko, 5/19/15, ¶ 5.

[99] Declaration of Hazim Jajo, 5/28/15, ¶ 9.

[100] Declaration of Umar Faruk Azam, 5/20/15, ¶ 5.

[101] Declaration of Sevuloni Ratabumusu, 5/20/15, ¶ 5.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

fares are booked using the Uber app and about 10% are booked using Sidecar.  I do not use the Lyft app at this point, but at one time (up until February 2014), 30% or more of my fares came from Lyft-generated passengers."[102]

### B.   Californians Working as Drivers Before the Existence of Uber and Lead Generation Platforms

83.    Californians who were working as drivers prior to the existence of Uber and other lead generation platforms have been impacted by the entry of lead generation platforms in different ways. Among U.S. drivers who have driven passenger referrals using the Uber App, only 19 percent were in driving professions directly prior to their use of the platform.[103] And over half (51 percent) of drivers who have used the Uber App in the United States have never at any point in their career worked as a driver prior to joining Uber.[104]  These drivers who have used the Uber App share the new availability of a better method for finding passengers.  However, the impact of this new technology on individuals' work is varied.  I show this below by describing a number of different driver archetypes as well as real-world examples.

### 1.   Example 1: A self-employed driver of a black car

84.    Consider a self-employed individual who owns her own business and drives her own black car as an independent contractor.  She would have to obtain a P-Permit from the PUC, which includes a $1,000 application fee every three years; she would have to obtain a Charter-Party Carrier Permit from the Department of Motor Vehicles; and she would have to pay her own expenses and

---

[102] Declaration of Sebastien Trouplin, 11/21/14, UBE-OCO00009549–54, ¶ 11.

[103] Hall, Jonathan, and Alan Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *Princeton University Industrial Relations Section*, Working Paper 587, 1/22/15, p. 10.

[104] Hall, Jonathan, and Alan Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *Princeton University Industrial Relations Section*, Working Paper 587, 1/22/15, p. 10.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                   CV 13-03826-EMC

insurance as well as invest in her own methods of finding passengers.[105]  Methods for finding

passengers might include word of mouth, handing out cards, or networking and advertising.[106]

85.     The existence of Uber and other lead generation platforms provides this limousine

driver with a meaningful option: the opportunity to use these platforms to find fares when she is not

driving her regular passengers.  In order to accept a passenger referral from UberBLACK, she must

certify that the age and model of her car are consistent with it being an UberBLACK vehicle.[107]  In

return for doing the job, she obtains insurance coverage for its duration[108] and collects approximately

80 percent of the fare collected from the passenger, with the remainder going to Uber as a licensing

fee.[109]  She is free to continue to use word of mouth, networking, advertising or paying a larger

---

[105] California Public Utilities Commission Transportation License Section, Basic Information for
Passenger Carriers and Applicants, pp. 5, 7–9.

[106] For example, see Declaration of Daniel Bisneto, 9/4/14, UBE-OCO00009068–73, ¶ 21 ("I pay a
webmaster to do some advertising on google.com.  I also have business cards, and pay for the
domain fee to maintain my company's website"); and Declaration of Ali Bouhelal, 5/30/14, UBE-
OCO0009020– 5, ¶ 9 ("I do not formally advertise my business, but I have built a substantial
client base through networking and word of mouth, such as recommendations from friends,
neighbors, former colleagues, and current clients").

[107] The age and model requirements differ across cities.  For example, see "SF/Bay Area P2P Vehicle
Requirements," http://ubersupport.weebly.com/accepted-vehicles.html, accessed on 6/27/15; and
"OC UberBLACK / SUV / LUX Requirements," http://ubersupport.weebly.com/av-oc-b.html,
accessed on 7/3/15.

[108] When "on trip" with Uber, Uber provides $1 million of commercial auto coverage on every trip.;
while on platform but "not on trip", Uber offers contingent liability coverage in case a driver's
personal policy does not provide coverage ("Driver-jobs," https://www.uber.com/driver-jobs,
accessed on 7/5/15).

[109] Uber San Francisco states:  "Uber BLACK partners in SF pay Uber 20% of the client payment as
a commission and receive the remaining 80% of the client payment…  When a client specifically
requests an SUV, Uber SUV partners in SF pay Uber 28% of the client payment as a commission
and receive the remaining 72% of the client payment…  UBERx partners in SF pay Uber 20% of
the client payment and receive the remaining 80% of the client payment"  (Email from Uber San
Francisco to Douglas O'Connor, "Quality Report 4.9.13," 4/9/13, UBE-OCO00000255–7, at
UBE-OCO00000256–7).  The exact share of the ride that the driver pays to Uber as its licensing
fee depends on the service (UberBLACK, uberX, UberSUV, etc.), can differ across cities, and has
changed over time.  For example, see Deposition of Michael Colman (Driver Operation
Specialist, Uber), 7/9/14, pp. 156–158, 162–164; and Email from Uber SF Team to Thomas
Colopy, "Exciting New Changes to UberX!", 10/2/12, UBE-OCO00000923–25 at UBE-
OCO00000923 ("Commission for UberX will change from 80% to 90%.  That means that Uber's
cut will be reduced from 20% to 10% on every trip fare until January 1st, 2013.  Note:  This does
not apply to Uber Black or SUV rates").

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

limousine company or dispatch service for referrals while using Uber and other lead generation platforms.  She can use her old methods of finding passengers as her sole source of fares when they are sufficient to provide her with enough fares, and use Uber and other lead generation platforms to find passenger referrals only when she is between her normal passengers or it is a slow day.   Thus, the option of Uber and other lead generation platforms leads to a potential expansion in her business.  The degree to which she, on any given day or in any given hour, chooses to use UberBLACK to connect her to one or more passengers will depend on the value it provides to her as a referral service in that moment – the more value UberBLACK provides relative to her prior approach and other lead generation platforms, the more she will use it.

86.     Consider Mohammed Ahmed, who is the sole owner of Pacific Beach Limo, and drives his own black car.  Before he started using Uber, Mohammed Ahmed solicited customers using a variety of methods; the introduction to Uber simply allowed him to expand his business:  "I had a number of customers who continued to use my services after I left San Diego Cab Company and a few others that I either acquired through word of mouth or who or who had obtained my contact information through my business cards…  I was looking for ways to increase my revenue. Uber sounded like a great opportunity and an easy way for me to get more consistent fares."[110]

87.     Consider Patrick Canlas, who is the owner of Black Limousines, LLC.  Patrick Canlas drives a black car and manages his employees; he hired these employees to drive additional cars in Black Limousine's fleet.  Patrick Canlas initially sourced fares through traditional means: "In about 2008, I bought a used Town Car and obtained the proper licenses … At this time I was operating as a sole proprietor and had my own clients that I got through word of mouth referrals from friends.  Clients could book my services through email, text, or by calling."[111]  Patrick Canlas's decision to begin using the Uber App gave him access to a much larger client base, and leads sourced from Uber now make up a substantial portion of his business: "Transportation provided to non-Uber passengers

---

[110] Declaration of Mohammed Ahmed, 7/14/14, UBE-OCO00009091–6, ¶ 3.

[111] Declaration of Patrick Canlas, 8/11/4, UBE-OCO00009114–20, ¶¶ 2, 4, 12.

DECLARATION OF DR. JUSTIN MCCRARY                                CV 13-03826-EMC

makes up about 40% of my business's revenue. The remaining 60% of Black Limousines' business is generated using the Uber [A]pp … Since gaining access to the Uber [A]pp, my business has grown substantially faster than it was growing before … The business opportunity it presents speaks for itself – in only four years, I have gone from 1 car and 1 driver to 8 cars and 18 drivers."[112]

### 2. Example 2: An employee of a limousine company

88.     Consider a driver who is an employee for a limousine company.  He has to perform various regulatory requirements such as a daily written report on the state of the vehicle, and would likely receive insurance, expense reimbursement and passenger referrals from his employer.[113]  He could be paid hourly for his work or paid by the ride, depending on the nature of his contract with his employer.  The employer may require he wear a uniform, offer soft drinks, candy and magazines in the limousine and only play classical music.

89.     How does the existence of Uber or other lead generation platforms change this employee's job?  With Uber or other lead generation platforms, his employer has another option: using the platform to find passengers for its driver-employees. To appreciate that this is simply another option that employers might or might not use depending on what suits them, consider that Halim Arbouz's multi-driver business is "60% private clients and 40% from the Uber [A]pp,"[114] whereas Steve Galadjian's business receives "more than 90%" of its revenue from the Uber [A]pp.[115]

90.     With the added option of Uber's platform, the employer receives a passenger referral from Uber as well as insurance coverage for its employee who is driving that passenger.  In return, the employer pays Uber approximately 20 percent of the fare collected from the passenger as a

---

[112] Declaration of Patrick Canlas, 8/11/4, UBE-OCO00009114–20, ¶ 13–15.

[113] California Public Utilities Commission, A Guide to Filling out Form PL706-I, p. 2.  See also, Declaration of Daniel Bisneto, UBE-OCO00009068–73, 9/4/14, ¶¶ 9, 19.

[114] Declaration of Halim Arbouz, 5/19/15, ¶ 10.

[115] Declaration of Steve Galadjian, 10/18/14, UBE-OCO00009039–42, ¶ 8.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

licensing fee.[116]  This allows the employer's business to compete much more directly with taxi services.  The employer continues to be free to set its employee's wages and hours, to choose which passengers the driver must drive (whether found through UberBLACK platform or through other means), to require a uniform, treats in the car, etc.

91.     The employer has more choice than before; it can continue to use word of mouth, networking, advertising or paying a referral service while using Uber and other lead generation platforms to find passengers for its business and drivers.  However, the existence of Uber and other lead generation platforms might not change the employee-driver's job at all (other than his employer having access to more potential passengers that it can direct its drivers to drive).  On the other hand, it might change the employee-driver's job in potentially significant ways, including higher pay due to the employer's higher profits.  However, the employee could continue to be compensated in the exact same way (whether per hour or per ride), at even the exact same rates as he had before, as that compensation is not required to be directly connected to the fare a passenger pays the employer for the business service.[117]

---

[116] Uber San Francisco states:  "Uber BLACK partners in SF pay Uber 20% of the client payment as a commission and receive the remaining 80% of the client payment…  When a client specifically requests an SUV, Uber SUV partners in SF pay Uber 28% of the client payment as a commission and receive the remaining 72% of the client payment…  UBERx partners in SF pay Uber 20% of the client payment and receive the remaining 80% of the client payment"  (Email from Uber San Francisco to Douglas O'Connor, "Quality Report 4.9.13," 4/9/13, UBE-OCO00000255–7, at UBE-OCO00000256–7).  The exact share of the ride that the driver pays to Uber as its licensing fee depends on the service (UberBLACK, uberX, UberSUV, etc.), can differ across cities, and has changed over time.  For example, see Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 156–158, 162–164; and Email from Uber SF Team to Thomas Colopy, "Exciting New Changes to UberX!", 10/2/12, UBE-OCO00000923–25 at UBE-OCO00000923 ("Commission for UberX will change from 80% to 90%. That means that Uber's cut will be reduced from 20% to 10% on every trip fare until January 1st, 2013.  Note:  This does not apply to Uber Black or SUV rates").

[117] For example, Eternity Limousine Service employs 9 drivers and generates about 60% of its revenue through the Uber platform.  Eternity's drivers are paid hourly regardless of how their fares are booked, and so while Uber gives these drivers more opportunities to find fares, it does not change their compensation structure (Declaration of Daniel Bisneto, 9/4/14, UBE-OCO00009068–73, ¶¶ 7–8, 10).  Other companies, such as Bay Area Network Limo, pay their drivers based on the fares they generate through the Uber app, but take a flat fee for the use of the car (Declaration of Boris Doubnov, 5/19/15, ¶ 5).

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

92.     Consider drivers who are, or were in the past, employees of multi-driver businesses that decided to use Uber to generate some of its leads.  For example, Daniel Bisneto worked as an employee for Jet Car Limousine, which started to use Uber to generate some of its leads:  "I first learned about Uber about four years ago when I was working as an employee driver for a limousine company called Jet Car Limousine…  During the time I was working for Jet Car, someone from Uber contacted my boss and asked if Jet Car would be interested in partnering with Uber and using the Uber app as a source of referrals. After Jet Car partnered with Uber, my boss told me to go to the Uber office and sign up under Jet Car's account."[118]  Mark Forester is a multi-driver business owner who started hiring employees because his business grew so rapidly once he started using Uber: "After we signed up to use the Uber app, our business immediately grew so much that we hired our first employee…  We currently employ about 34 drivers."[119]

### 3.     Example 3: A taxi driver who rents her cab

93.     Consider a taxi driver who, unlike the limousine driver above, is an independent contractor and drives for 10 hours twice a week for a taxi company.[120]  She pays a rental fee that reflects not only the wear and tear of using the car, but also the investment that the owner of the cab has made to have the exclusive right to pick up customers who hail a ride (either by franchise or

---

[118] Declaration of Daniel Bisneto, 9/4/14, UBE-OCO00009068–73, ¶¶ 2–3.

[119] Declaration of Mark Forester, 11/20/14, UBEOCO00009555–60, ¶¶ 9–10.

[120] There are a large number of different financial and work relationships any given taxi driver may have related to the taxi he or she is driving.  Some driver relationships have the characteristics of an independent contractor relationship while others an employee relationship.  Courts have validated both relationships. The Employment Development Department of the State of California states that "taxicab drivers typically operate under three business arrangements:  1. The taxicab company acknowledges the driver as an employee.  2. The driver owns and operates the taxicab, independently arranges fares, and personally pays for required licenses, permits, and insurance [Driver is an independent contractor].  3. The driver performs services as a lease driver on either a *fixed-fee* or *percentage-of-receipts* basis [Detailed analysis required to determine whether the driver is an independent contractor or an employee]" (State of California Employment Development Department, Information Sheet, "Taxicab Industry").

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

medallion).  The driver pays a fixed amount every day to use the cab, as well as her own expenses.[121]  She has to meet a multitude of regulatory requirements,[122] and so does the car she uses.[123]  The taxi company or individual renting the cab to her may provide insurance while she is driving.[124]  She is free to drive the cab as much as she would like in her ten-hour rental period, but she is aware that she must use the time wisely as her investment has a fixed time period, even though this may lead to an incentive to drive while tired.[125]  She finds passengers through any referrals she receives from the taxi company as well as passengers found while she drives around looking on the street or waiting at taxi stands.[126]

94.     How does the existence of Uber and other lead generation platforms change this driver's work situation?  She now has new competition on the road for finding many types of passengers as Uber and other lead generation platforms have made it much easier and quicker to connect passengers to drivers in prearranged rides.  A company or driver using UberBLACK or uberX to find prearranged passengers does not have to invest in the franchise or medallion in order to

---

[121] Declaration of Ernest Avetisyan, 5/19/15, ¶ 7; Declaration of Hiis Ilmi, 7/9/14, UBE-OCO00009079–84, ¶ 2.

[122] As a San Francisco cab driver, for example, she would first have to meet prerequisite requirements including having proof of residency, meeting personal hygiene and health requirements, having a current California driver's license, being able to drive for at least four hours per day, having no prohibiting criminal background, being at least 21 years of age, and speaking reading and writing the English language.  She would then have to complete a driver pre-screening, attend and complete taxi training at one of the approved schools, get fingerprinted, obtain and pass a background check, obtain a 10 year printout of her driving record, obtain an offer from a taxi company, pay an application fee (currently waived due the shortage of cab drivers), take the class and test, drive with a temporary permit for 8 weeks and then exchange it for an A-card and a badge ("How to Become a Taxi Driver," SFMTA Municipal Transportation Agency,  https://www.sfmta.com/services/taxi-industry/become-taxi-driver, accessed on 7/3/15).

[123] A taxicab in San Francisco, for example, needs to, among other things, have an installed taximeter, be no older than seven model years, have a starting mileage lower than 100,000 miles, have a current mileage lower than 375,000 miles, have rubber floormats, have rear seats upholstered with vinyl or leather in good repair, and matching the vehicle's interior colors etc. City and County of San Francisco, Transportation Code, Article 1100, Section 1113.

[124] Declaration of Kathy J. Robinson, 5/20/15, ¶ 5.

[125] Declaration of Ernest Avetisyan, 5/19/15, ¶ 15; Declaration of Tesfaye Mekonnen, 5/18/15, ¶ 3.

[126] Declaration of Adama Traore, 9/29/14, UBE-OCO00009014–19, ¶ 22.

1   use the service.  She might find this competition leads to her referrals from the taxi company coming

2   less often, or that there are fewer riders with their arms raised on the streets as they opt for

3   prearranged services instead.  The earnings she can make for her daily rented investment may fall, as

4   she continues to pay rent for the cab (including the cost of the franchise right or medallion), but finds

5   it more difficult to fill her cab with passengers each day.

6          95.     Yet this cab driver also has new options.  She can continue to pay close to $100 to rent

7   the cab each day (implicitly paying for the wear and tear as well as the franchise or medallion) or she

8   can rent a car without a medallion and find passengers using uberX.[127] Her choice will depend on

9   which path is more attractive for her as a driver. Were she to continue to drive her cab, she might find

10  that uberTAXI was a useful way for her to find prearranged rides and results in less idle time as she

11  can find prearranged fares when she is less successful finding potential passengers hailing.[128]  The

12  taxi company from whom she rents her cab might also invest in its own prearrangement services and

13  make them available to her.  Were she to use uberX to find passengers, she would need to meet the

14  regulatory requirements imposed on TNCs by the PUC,[129] very few additional requirements by

15  Uber,[130] and then she would receive a passenger referral from uberX as well as insurance coverage

16

17

18  [127] Breeze, as one example, leases fuel-efficient cars that drivers can return at anytime after their first
        month with just two weeks' notice ("Breeze," https://www.joinbreeze.com/, accessed on 7/3/15).

19      The cost to lease a 2014 or 2015 Prius through Breeze is a one-time $250 fee, $195 per week, and
        $0.15 per mile for each mile over 30,000 a year ("How It Works",

20      https://www.joinbreeze.com/how_it_works, accessed on 7/1/15).

21  [128] Drivers have attested to the fact that uberTAXI helps them receive prearranged rides.  For
        example, Ernest Avetisyan contracted with Eco Taxi and used Uber to receive fares:  "After

22      signing up with Uber, I continued to contract with Eco Taxi and to provide taxi service in the
        same manner as before (including paying a gate fee)…By using the "Uber Taxi" service, I was

23      able to increase the number of fares I got, thereby increasing my gross revenue and profitability"
        (Declaration of Ernest Avetisyan, 5/19/15, ¶ 9).

24  [129] The PUC requires drivers using their own vehicle to pass a background check, meet a zero-
        tolerance policy on drugs and alcohol, be 21 years of age, have a valid California driver's license,

25      personal and commercial insurance etc. (California Public Utilities Commission, Decision
        Adopting Rules and Regulations to Protect Public Safety while Allowing New Entrants to the

26      Transportation Industry, 9/19/13).

27  [130] In addition to the requirements put forth by the PUC, Uber requires that the car is a four-door car
        and is either from 2000 or newer, or from 2005 or newer, depending on the city. ("Vehicle

28      Requirements," http://ubersupport.weebly.com/uberx-and-uberxl.html, accessed on 6/27/15).

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                        CV 13-03826-EMC

for each job she takes driving a passenger, and in return she would pay 20 percent of the fare

collected from the passenger as a licensing fee.[131]  While the ease of prearrangement has led to

competition from new drivers for taxi passengers and a potential reduction in the value of the taxi

medallion or franchise (i.e., its exclusive rights to pick up hailing passengers), she as a driver has the

new option to rent and drive a car that does not have the medallion or franchise fee associated with it.

96.     Consider Hiis Ilmi, who used to drive for a taxi company until his friends and other

taxi cab drivers told him about the Uber App; now he takes online classes and provides consulting

services to individuals who want to start their own business, with a focus on using the Uber App to

start a transportation business:  "I began driving a taxi cab for USA cab, then Yellow Cab, and finally

West Coast Cab... At the beginning of 2013, some of my friends and other cab drivers started using

the Uber [A]pp… they could now drive their own cars and make more money than they had ever

made."  He adds: "The flexibility of using the Uber app has allowed me to enroll in online courses

through Arizona State University.  In addition to going to school, I also started a second business

called Halabuur Enterprise (halabuur.com).  My business provides consulting services to individuals

in the San Diego area on how to start a small business, with a focus on using the Uber [A]pp to start a

transportation business."[132]

97.     Consider Kathy J. Robinson, who was first a taxi driver, then split her time between

driving for a taxi company and driving using Uber, and ultimately decided to drive only using Uber:

---

[131] Uber San Francisco states:  "Uber BLACK partners in SF pay Uber 20% of the client payment as a commission and receive the remaining 80% of the client payment…  When a client specifically requests an SUV, Uber SUV partners in SF pay Uber 28% of the client payment as a commission and receive the remaining 72% of the client payment…  UBERx partners in SF pay Uber 20% of the client payment and receive the remaining 80% of the client payment"  (Email from Uber San Francisco to Douglas O'Connor, "Quality Report 4.9.13," 4/9/13, UBE-OCO00000255–7, at UBE-OCO00000256–7).  The exact share of the ride that the driver pays to Uber as its licensing fee depends on the service (UberBLACK, uberX, UberSUV, etc.), can differ across cities, and has changed over time.  For example, see Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 156–158, 162–164; and Email from Uber SF Team to Thomas Colopy, "Exciting New Changes to UberX!", 10/2/12, UBE-OCO00000923–25 at UBE-OCO00000923 ("Commission for UberX will change from 80% to 90%. That means that Uber's cut will be reduced from 20% to 10% on every trip fare until January 1st, 2013.  Note:  This does not apply to Uber Black or SUV rates").

[132] Declaration of Hiis Ilmi, 7/9/14, UBEOCO00009579–84, ¶¶ 2–3, 13.

DECLARATION OF DR. JUSTIN MCCRARY                                                CV 13-03826-EMC

"I drove with only DeSOTO for a few months, and then in mid-December I onboarded with Uber so I could use the [U]berX platform to get fares. I would drive some days with my own car and get fares through [U]berX, and then some days I would drive a DeSOTO cab. I drove with both for about five months to decide which service was most profitable, but ultimately it was driving my own car and using [U]berX because I didn't have that gate fee to pay."[133]

### 4. Example 4: Truck driver-employee

98.     Consider a driver who was an employee for a local food delivery company, but did not drive passengers. His employer only does deliveries during the day, and he has been hired to do a 9 to 5 shift. He would have to fulfill various regulatory requirements,[134] and the employer may place many requirements on his time, including that he drives where he is told to and follows his scheduled hours.[135]

99.     The existence of Uber and other lead generation platforms gives such a driver a new option. A driver may value the flexibility of total freedom in his working hours or he may not. He might be a single father who needed to be home in the mornings and in the evenings, but also needed time off mid-day (to care for a relative, pursue his music career, etc.) and the ability to change his

---

[133] Declaration of Kathy J. Robinson, 5/20/15, ¶ 6.

[134] Truck drivers need to have commercial driver's license (CDL): "According to California CDL requirements, applicants must be at least 18 years old, have a valid California driver's license, pass a vision exam and obtain a health certificate. The U.S. Department of Transportation (USDOT) regulates interstate transportation of cargo. If you wish to transport materials across state lines, you must be at least 21 years old. All CDL applicants then need to pass a general knowledge exam and a skills test, which includes a pre-trip vehicle inspection, a basic control test and an on-road driving exam... Additional knowledge and skills tests may be required depending on the endorsements you need" ("California CDL License Requirements ," http://www.besttruckingschools.com/cdl-requirements/california-cdl-license-requirements, accessed on 7/3/15; see also "CDL program information  and how to apply for a license," http://www.dmv.ca.gov/portal/dmv/?1dmy&urile=wcm:path:/dmv_content_en/dmv/dl/dl_info#CDL, accessed on 6/27/15).

[135] For example, Richard Clark Nelson states: "Before I began operating my own business, I had been employed as a commercial truck driver. My work as an employee/commercial truck driver is not at all like my current business. For example, when I was an employee/commercial truck driver, I reported to a dispatcher. I also had scheduled hours. I was told where to go by my former employers. As a self-employed businessman, I no longer have any of those constraints" (Declaration of Richard Clark Nelson, 5/28/15, ¶ 3).

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                   CV 13-03826-EMC

schedule when unexpected issues came up with his children.  He might place a high value on the ability to set daily his own hours even if it required driving his own car and paying his own expenses. Were he to begin accepting ride referrals using the uberX platform and driving using his car, he would need to meet the above described regulatory requirements imposed on TNCs by the PUC, and very few additional requirements by Uber,[136] all of which are generally much simpler than those imposed on truck drivers.[137] He would then receive a passenger referral from uberX as well as insurance coverage for each job he takes driving a passenger, and in return he would pay to Uber approximately 20 percent of the fare collected from the passenger as a licensing fee.[138]  He could now choose to drive all day, or not at all, any day of the week.

100.    However, a driver who did not value this flexibility would not experience the tradeoffs in the same way.  The driver who would choose to move from his existing employment to driving his own car and using uberX to find passengers would be someone who valued the combination of features that these types of driving jobs offered relative to his prior position as an employee driving a delivery truck.

---

[136] In addition to the requirements put forth by the PUC, Uber requires that the car is a 4-door car and is either from 2000 or newer, or from 2005 or newer, depending on the city. ("Vehicle Requirements," http://ubersupport.weebly.com/uberx-and-uberxl.html, accessed on 6/27/15.)

[137] As discussed above, truck drives have to, among other things, pass a vision exam and obtain a health certificate ("California CDL License Requirements ," http://www.besttruckingschools.com/cdl-requirements/california-cdl-license-requirements, accessed on 6/27/15; see also "CDL program information  and how to apply for a license," http://www.dmv.ca.gov/portal/dmv/?1dmy&urile=wcm:path:/dmv_content_en/dmv/dl/dl_info#CDL, accessed on 6/27/15) .

[138]  Uber San Francisco states:  "Uber BLACK partners in SF pay Uber 20% of the client payment as a commission and receive the remaining 80% of the client payment…  When a client specifically requests an SUV, Uber SUV partners in SF pay Uber 28% of the client payment as a commission and receive the remaining 72% of the client payment…  UBERx partners in SF pay Uber 20% of the client payment and receive the remaining 80% of the client payment"  (Email from Uber San Francisco to Douglas O'Connor, "Quality Report 4.9.13," 4/9/13, UBE-OCO00000255–7, at UBE-OCO00000256–7).  The exact share of the ride that the driver pays to Uber as its licensing fee depends on the service (UberBLACK, uberX, UberSUV, etc.), can differ across cities, and has changed over time.  For example, see Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 156–158, 162–164; and Email from Uber SF Team to Thomas Colopy, "Exciting New Changes to UberX!", 10/2/12, UBE-OCO00000923–25 at UBE-OCO00000923 ("Commission for UberX will change from 80% to 90%. That means that Uber's cut will be reduced from 20% to 10% on every trip fare until January 1st, 2013.  Note:  This does not apply to Uber Black or SUV rates").

101.     Consider Sean Aldeguer, who worked as a commercial truck driver but switched over to driving using Uber in order to have more flexibility and spend more time with his kids:  "At the time, I was a commercial truck driver for an independent trucking company and a mobile paper shredding company… When I would take long hauls for the trucking company, I would have to travel a few days a week and I wouldn't be home for my kids. I wanted to be more independent, wanted something that paid more money, and wanted something that would give me more flexibility to spend more time with my kids."[139]

## C.     Californians Who Were Not Working as Drivers Before the Existence of Uber and Other Lead Generation Platforms

102.     The evidence I have reviewed and discussed above demonstrates that existing drivers have found that Uber and other lead generation platforms have opened up additional options to them. These options impact each person's work differently and may be valued differently depending on each individual's circumstances.  Importantly, though, Uber and other lead generation platforms have also opened up work options for people who were not existing drivers.  People who had previously either not been working at all or were actively working in other non-driving jobs have started offering driving services due to the flexibility and ease afforded by using the Uber App to find passengers.  In the United States in December 2014, over one-third (36 percent) of drivers were not actively looking for a new job before using the Uber App.[140]  Of drivers using the Uber App in the United States in December 2014, roughly 38 percent had no other job, 31 percent had a full-time job in addition to driving referrals received through the Uber App, and 30 percent had a part-time job in addition to driving referrals received through the Uber App.[141]

---

[139] Declaration of Sean Aldeguer, 5/19/15, ¶ 2.

[140] Hall, Jonathan, and Alan Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *Princeton University Industrial Relations Section*, Working Paper 587, 1/22/15, p. 10.

[141] Hall, Jonathan, and Alan Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *Princeton University Industrial Relations Section*, Working Paper 587, 1/22/15, p. 10.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

*1.*       *Example 5: People employed in existing jobs who add work hours by providing driving services using a TNC*

103.    Consider an employee who likes her full-time job and has no intention of leaving. For example, Amarachi Onuoha "currently work[s] as a full-time Mobility Specialist at a hospital.  In order to make extra money [she] offer[s] transportation services as a driver through Uber (on the uberX platform)."[142]  The existence of uberX has created new options for this employee to turn what would have been leisure time or wasted time into additional earning power, while keeping her existing employment.  If she simply meets the above described regulatory requirements, and supplies her own four-door car that is newer than 2000 or 2005, depending on the city,[143] she can take jobs driving prearranged passengers.  For example, a driver who uses Uber to find passengers may do so in order to pick up a small number of jobs driving people while the driver is on her own way to and from her full-time job.[144]  Whether a driver chooses to do this or not will depend on her individual situation.  This is not an uncommon occurrence; in fact many drivers reported in declarations that they had full-time employment outside of the car service industry.[145]  Such individuals enjoy tax advantages associated with receiving income both as an employee and as an independent contractor, in particular with regards to saving for retirement.  Employees are limited in the amount of retirement savings they can make on a tax-deferred basis; additionally working as an independent contractor

---

[142] Declaration of Amarachi Onuoha, 5/28/15, ¶ 2.

[143] Uber requires that the car is a 4-door car and is either from 2000 or newer, or from 2005 or newer, depending on the city. ("Vehicle Requirements," http://ubersupport.weebly.com/uberx-and-uberxl.html, accessed on 6/27/15).

[144] Some drivers do drive passengers on their way to and from work. Declaration of Dario Grant, 5/27/15, ¶ 10; and Declaration of Paul Kirz, 5/26/15, ¶ 2.

[145] For example, see Declaration of Carlos Erick Oliva, 5/26/15, ¶ 3; Declaration of Cliff Lyons, 5/26/15, ¶ 2; Declaration of Gonzalo A. Macias, 5/26/15, ¶ 3; Declaration of Alain Ntere Mani, 5/27/15, ¶ 3; Declaration of Rusty Patrick Shaw, 5/27/15, ¶ 3; Declaration of Lee Samantha Faelnar Te, 5/26/15, ¶ 4; Declaration of Adrian Castillejos, 5/28/15, ¶ 2; Declaration of Amarachi Onuoha, 5/28/15, ¶ 2; Declaration of Carlos Ramirez, 5/28/15, ¶ 5; and Declaration of Osama Tamaro, 5/28/15, ¶ 2.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                              CV 13-03826-EMC

allows individuals to make tax-deferred retirement contributions using both their income as employees and their incomes as independent contractors.[146]

104.    Consider Dario Grant, who is a full-time employee of Los Angeles County, is restricted in terms of jobs and hours he can work outside of this job, and drives using Uber in order to fund his IRA and pay for his car: "I work forty to fifty hours a week at [my] job.  I'm an employee of Los Angeles County.  Los Angeles County restricts how much time I can work doing other things.  I can't work doing something where there is a conflict of interest.  I also can't spend more than 24-hours during a week working outside of my County employment…  I decided to drive using UberX because I have two goals: 1) fund my IRA, which is $5500 a year; and 2) pay down my car which is $4000 a year."[147]

105.    Similarly, consider an employee who has found part-time work doing exactly what he wants to do to build his skills (e.g., apprenticing as a carpenter, working in a theater, or working as a property manager) but needs additional income to round out his earnings and may additionally value flexibility. The existence of uberX has created new options for him.  The flexibility of whether and when to use his car to drive prearranged passengers means he can earn money taking driving jobs during the exact hours that do not conflict with his existing employment.  For example, Amir Afshar Tavana explains:  "Uber does not restrict me from engaging in another occupation or business.  In addition to my transportation business, I have been working part-time for a marketing company for the past five years."[148]  Similarly, Shakeh Barseghian states:  "I have another part-time job at Griffith Observatory in the operations department 3 days a week for 6 hours a day.  Both my job at Griffith

---

[146] "Retirement Topics - 401(k) and Profit-Sharing Plan Contribution Limits," IRS, 10/23/14, http://www.irs.gov/Retirement-Plans/Plan-Participant,-Employee/Retirement-Topics-401k-and-Profit-Sharing-Plan-Contribution-Limits, accessed on 7/6/15; see also Ashlea Ebeling, "How Entrepreneurs Can Get Big Tax Breaks For Retirement Savings," *Forbes*, 3/4/13, http://www.forbes.com/sites/ashleaebeling/2013/02/13/how-entrepreneurs-can-get-big-tax-breaks-for-retirement-savings/, accessed on 7/6/15.

[147] Declaration of Dario Grant, 5/27/15, ¶¶ 7–9.

[148] Declaration of Amir Afshar Tavana, 5/27/15, ¶ 4.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

Observatory and Uber are okay with me having other jobs on the side.  I receive a W2 from Griffith Observatory and a 1099 from Uber."[149]

106.    Consider Julia Jimenez, who is an employee of a fashion design agency, which contracts her out to companies for specific jobs.  She drives using Uber full-time when she is waiting to be placed on a job and drives part-time once she is placed:  "In my work as a computer pattern maker, I work as an employee for a fashion design agency, which contracts me out to other companies for specific jobs that may last a couple months to a year… My last job through the fashion design agency just ended last week, and I am waiting to be placed in another full-time position. While I wait to be placed, I am driving, using the Uber App to find customers full-time. Once I receive another placement from the fashion design agency, I will go back to driving part-time."[150]

### 2.    Example 6: People who have multiple independent contractor jobs

107.    Consider an entrepreneurial person who has no employer, and uses the many different internet platforms that connect people to jobs, taking the best options among these various jobs in real time while foregoing anything less attractive.  The existence of uberX has created one more set of options for her, and she will take a driving job only when it is more valuable relative to the other options she is considering in that moment.  For example, Desirae Smidt is a stay at-home parent and makes use of multiple websites and platforms to receive leads, including Uber, Care.com, TaskRabbit, Thumbtack, and SitterCity.  While she takes projects from each of these sources, most of her leads come from Uber and Care.com.[151]

108.    Consider Andrew Harris, who drives using Uber but also participates in multiple other business ventures, including using delivery service apps and online platforms:  "I also use Sidecar and Postmates, which are delivery service apps.  However, I often log into more than one app at a

---

[149] Declaration of Shakeh Barseghian, 5/26/15, ¶ 2.

[150] Declaration of Julia Jimenez, 5/27/15, ¶ 2.

[151] Declaration of Desirae Smidt, 5/28/15, ¶ 3.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

time.  I spend about half of [my] time [as a] driver for the Uber app [sic], and half of my time driving for a combination of the Sidecar and Postmates apps.  Uber does not prohibit me from using other apps to find fares...  In addition to transportation service, I also have other business ventures, including buying and selling items on Ebay and Craigslist."[152]

### 3.   Example 7: People who were employed, but switched to taking driving jobs

109.   Consider someone who was employed, similar to the employee driving a delivery truck above, but did not find his current job satisfying.  His employer may place a variety of requirements on his time and work that he is not amenable to. The existence of uberX gives him a new option.  Does he value the flexibility of total freedom in his working hours?  Does he have a vehicle that is sitting idle?  A person who switched from his existing employment to using uberX to find passengers valued the combination of features of driving jobs he found from TNCs relative to his prior employment position.[153]  He would continue to choose to take driving jobs as long as they are a better means of earning money than the alternative employment available to him (including his prior job).

110.   Consider Christopher Jose Martinez, who was unhappy at his previous job at Coca-Cola, and now enjoys driving full-time using the Uber App. When speaking of his Coca-Cola job he says:  "I was often depressed when I was doing that job; I felt that my life lacked a purpose."  He started driving with Uber while still working for Coca-Cola.  He then took the "biggest risk of his life"; he quit his job and began driving full-time using Uber.[154]

---

[152] Declaration of Andrew Harris, 5/29/15, ¶¶ 3, 5.

[153] For example, Masis Avdalyan states: "I used to work at Access Services San Gabriel Transit. I left the company because they put too much pressure on me to work their schedule. They don't care what kind problems [sic] you might have at home or how hard you work … I realized that working for Uber, I could control my schedule and pick up my son when I needed to. Working for Uber helped me avoid all of the stress of the scheduling at my old job." (Declaration of Masis Avdalyan, 5/26/15, ¶ 8); see also Declaration of Aaron Parrish, 5/26/15, ¶ 4; and Declaration of Majic Hindi, 5/28/15, ¶ 6.

[154] Declaration of Christopher Jose Martinez, 5/27/15, ¶ 3.

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

### 4.    Example 8: People who were not working, but now are entering the labor force and taking driving jobs

111.    Consider someone who was not working (e.g., a student, retiree, or someone between jobs). The jobs available to earn money were not appealing or available for reasons that are unique to each person. The existence of uberX gives each of these people a new option, which is to work the exact amount she would like, and to have total freedom regarding when to start, stop and restart working. Were someone to enter the labor force and use uberX to find passengers to drive using her own car, it would be a sign that this option offered something new and of value. Such a person would continue to choose to take driving jobs from uberX as long as they suit her need to earn money and her taste for the activity. For example, the flexibility of driving using the Uber App for leads gives retired individuals the opportunity to earn extra income, while still maintaining the flexibility to do whatever they want.[155] Similarly, Uber allows students to make some extra money while also giving them the time and flexibility to attend classes and do school work on their own schedule.[156]

112.    Some drivers who use the Uber App are between jobs or are looking for jobs, as shown in Exhibit 1. For example, William Gfroehrer is "going through some life changes" and is using Uber while "looking for other jobs in the meantime."[157] Another driver, Adel Shallouf, explains: "I am between jobs right now and am actively looking for a purchasing position, possibly with a manufacturing company. Right now I am just driving for [u]berX. If I get a purchasing job, I'll probably just drive Uber on the weekends."[158] For such individuals, Uber may facilitate the job search process so that they do not have to take the first job they can find. The flexibility of the Uber work flow is presumably particularly important in this regard, as an individual who obtains a job

---

[155] For some examples of retired individuals who use Uber for the flexibility, see Declaration of James Coltrane, 5/28/15, ¶ 2; and Declaration of Ray Lebron, 5/29/15, ¶ 12.

[156] For example, Arshavir Steven Saryan states: "I am a full-time student at Azusa Pacific University and am earning my Bachelor's degree in English and Communications. When I drive using the Uber App, I usually drive in the mornings and weekend nights because that provides me the most flexibility for school" (Declaration of Arshavir Steven Saryan, 5/27/15, ¶¶ 6–7)

[157] Declaration of William Gfroehrer, 5/18/15, ¶ 5

[158] Declaration of Adel Shallouf, 5/26/15, ¶ 4.

DECLARATION OF DR. JUSTIN MCCRARY                                      CV 13-03826-EMC

interview would be able to stop driving and go to the interview on even short notice. In this way, the availability of uberX driving jobs may complement unemployment insurance, allowing individuals to eventually find the jobs that are best suited to their needs and abilities.

113.    Some drivers who use the Uber App may not have another job but they have other full and part-time commitments, and drive around this commitment.   Some drivers have to attend to family needs. Janice Fry explains:  "I'm a full-time mom.  I have a two-year-old son and a five-year-old son.  I drive for Uber when I have a babysitter. My friend from church normally babysits for me. When he's babysitting the kids, I can drive."[159]  Exhibit 2 shows additional examples of drivers who value the flexible work schedule due to restrictive personal commitments.

114.    Some individuals have emerged from retirement to work as drivers.  For instance, Mike Evans explains: "I retired five years ago from my job working with Farmers Insurance.  I was my own boss and worked my own hours, which is very similar to how I use the Uber app.  My daughter recommended that I look into driving with Uber to help me get over the boredom that follows retirement.  I enjoy speaking with the passengers and getting out of the house.  Honestly, driving with Uber has saved my sanity."[160]  Another driver, Bhupinder Singh Bhangal, states: "Becoming a driver for Uber appealed to me because it suits my lifestyle: I am retired and only want to work when I feel like it.  I also thought that becoming an Uber driver would provide me with pocket money for holidays."[161]

---

[159] Declaration of Janice Fry, 5/26/15, ¶¶ 5–6.

[160] Declaration of Mike Evans, 5/27/15, ¶ 2.

[161] Declaration of Bhupinder Singh Bhangal, ¶ 3.

Gibson, Dunn &
Crutcher LLP

# EXHIBIT 1

## EXAMPLES OF DRIVERS WHO USE THE UBER APP BETWEEN JOBS

| | Declarant | Statement |
|---|---|---|
| 1. | Adel Shallouf | I am between jobs right now and am actively looking for a purchasing position, possibly with a manufacturing company.  Right now I am just driving for UberX.  If I get a purchasing job, I'll probably just drive Uber on the weekends. |
| 2. | Sangwa Emmanuel | I had just quit my job at Home Depot and was in the onboarding process for a retail position at Apple, so I had to make some money to cover the bills in between.  There was nothing else I knew about that could pay me by the week right away. |
| 3. | Sheri Kellogg | Before I started driving, I owned a caregiving company that I knew I was going to sell.  I also knew I'd be starting a new business afterwards, but I needed a "safety blanket" in between.  Providing driving services has become that safety blanket. |
| 4. | William Gfroehrer | I put in about 40 hours a week driving using the Uber app.  I am going through some life changes and am looking for other jobs in the meantime. |
| 5. | Victorino Caballero | I worked in medical transportation until about June 2014, when the company closed.  I do not currently have a medical transportation job.  I am looking for another delivery job, and am using Uber to make money until I find another job. |
| 6. | Alexander Galloway | I am a high school teacher who is currently unemployed, but am interviewing at various schools.  I registered for some other apps, like dog walking and tutoring, but I found those to be less lucrative and so am focusing exclusively on providing driving services through the UberX app. |
| 7. | Julia Jimenez | My last job through the fashion design agency just ended last week, and I am waiting to be placed in another full time position.  While I wait to be placed, I am driving, using the Uber App to find customers full time.  Once I receive another placement from the fashion design agency, I will go back to driving part time. |
| 8. | Charles Close | I was using the Uber App as an interim source of income while I started and continued to grow an HVAC business, which I started in April 2012 … I currently do not use the Uber App because I am fully invested in my business and do not have time to use the Uber App. |
| 9. | Richard Ortega | As of a week ago I am using Uber fulltime.  Previously I was a facilities manager at the law library in Los Angeles.  When I was working as a facilities manager I used the Uber App on weekends and holidays for extra money.  I am in the process of getting a new job. |
| 10. | Dana Alexander | I used to drive more for Uber, but since my real estate business has picked up I drive less often.  When I started with Uber it paid well and I had flexible hours.  Uber helped me between contracts. |

Source:  Declaration of Adel Shallouf, 5/26/15, ¶ 4; Declaration of Sangwa Emmanuel, 5/20/15, ¶ 3; Declaration of Sheri Kellogg, 5/18/15, ¶ 2; Declaration of William Gfroehrer, 5/18/15, ¶ 5; Declaration of Victorino Caballero, 5/26/15, ¶ 3; Declaration of Alexander "AJ" Galloway, 5/27/15, ¶ 4; Declaration of Julia Jimenez, 5/27/15, ¶ 2; Declaration of Charles Skip Close, 5/28/15, ¶ 3; Declaration of Richard Ortega, 5/26/15, ¶ 2; Declaration of Dana Alexander, 5/26/15, ¶ 2.

DECLARATION OF DR. JUSTIN MCCRARY                                                    CV 13-03826-EMC

EXHIBIT 2

**EXAMPLES OF DRIVERS USING THE UBER APP WHO VALUE A FLEXIBLE WORK SCHEDULE DUE TO RESTRICTIVE PERSONAL COMMITMENTS**

| | Declarant | Statement |
|---|---|---|
| 1. | Hiis Ilmi | The flexibility of using the Uber app has allowed me to enroll in online courses through Arizona State University.  In addition to going to school, I also started a second business called Halabuur Enterprise (halabuur.com). |
| 2. | Don Esperon | To become a pilot, I have to go through a rigorous fitness test, engage in a long application process, and do community service to make myself a competitive applicant … All of this puts a huge demand on my time so I needed a flexible source of income.  Driving with the Uber app provides that for me. |
| 3. | Mohammad Sattar | I am a practicing Muslim, so I visit the mosque five times per day.  I like that Uber is a really flexible App that allows me to do this. |
| 4. | Samir Moussa | I am taking care of a sick family member, so I appreciate the flexibility that being an independent contractor gives me.  There have been weeks in which I have not driven at all if I was out of town or if I was sick. |
| 5. | Selenge Thompson | I have a daughter in Kindergarten.  I am a single mom.  I work during school hours.  That is the best part using the Uber application.  I can choose the hours I work.  Uber does not tell me where to work and when to work.  Uber tells me nothing.  It is very flexible.  That is the big part of why I love Uber. |
| 6. | Tesfaye Haile | During this past winter, I took a class at Laney College and turned on the Uber app when I felt like I needed money.  I would turn off the Uber app when I decided it was time for me to focus on my studies. |
| 7. | Sau Kuen Chu | I generally drive between 2:00pm and 2:00am six days a week … I work these hours because my dog is diabetic and I need to give her medicine before and after I drive.  I like this flexibility because I have almost always been self-employed. |
| 8. | John Bischop | My mom's health has been declining since May 2014.  She's ninety-one years old and I have been involved with her healthcare.  I have only been able to do this because of Uber.  It gives me the freedom to be able to do these things. |
| 9. | David Henning | The Kilgoris Project is a 50l(c)(3) non-profit that provides education to children in Kenya … I care deeply about the organization and wanted a job schedule that provided the flexibility for me to devote more time to it. |
| 10. | Henry Odiase | The best thing about Uber for me is the freedom to choose my schedule and not having obligations to repot [sic] to an office or work particular hours.  Again, I have a full-time job and am a student, so I love that Uber offers my [sic] an opportunity to earn income on my own terms. |

Source:  Declaration of Hiis Ilmi, 7/9/14, UBE-OCO00009079 – 84 at 82, ¶ 13; Declaration of Don R. Esperon, 5/20/15, ¶ 2; Declaration of Mohammad Sattar, 5/18/15, ¶ 10; Declaration of Samir Moussa, 5/19/15, ¶ 8; Declaration of Selenge Purev Thompson, 5/20/15, ¶ 5; Declaration of Tesfaye Haile, 5/19/15, ¶ 5; Declaration of Sau Kuen Chu, 5/19/15, ¶ 6; Declaration of John A. Bischop, 5/26/15, ¶ 8; Declaration of David L. Henning, 5/18/15, ¶ 2; Declaration of Henry Odiase, 5/20/15, ¶ 9.

### D.   Small Businesses That Did Not Exist Before Uber

115.   Californians who have used Uber and other lead generation platforms to find one or more driving jobs are not the only ones who have found opportunity and choice in the creation of lead generation platforms. *Entrepreneurial activities have developed due to these platforms.*[162]  For example, and as described above, if a driver would like to start his own driving business, he no longer needs invest in a medallion or an expensive dispatch system.  Additionally, if one finds driving jobs through Uber or other lead generation platforms, the flexibility in work schedule can support other entrepreneurial efforts.  For example, Ali Bouhelal worked as an independent contractor for a multi-driver business company using Uber before starting one himself.  He stated:  "I used my time employed with this company to familiarize myself with the Uber business model, as well as to have a source of income while I began building my own business.  While driving for California Limousine Service, I began applying for and processing all the permit, requirements, and licenses I needed to start a driving company."[163]  Ali Bouhelal is one of many owners of multi-driver businesses who used to be drivers of multi-driver businesses.[164]

### E.   Drivers Using the Uber App Have Different Backgrounds, Reasons for Using the App and Outside Options

116.   There has been a large increase in the number of Californians finding driving jobs using the Uber App.  This is seen clearly in Exhibit 3, which shows the number of active drivers

---

[162] Other examples of lead generation platforms are HopSkipDrive and Shuddle, two ride services designed specifically for transporting children to and from school and different activities.  Both services are styled after Lyft and Uber, utilizing independent contractors as drivers, many of whom are mothers and "bring their own children along on rides."  Claire Martin, "A Ride Start-Up for the After-School Set," *New York Times*, Sunday 6/28/15 p. B3.

[163] Declaration of Ali Bouhelal, 8/5/14, UBE-OCO00009020–25, ¶¶ 3–4.

[164] Daniel Bisneto used to work for Jet Car's limousines as a driver and subsequently started his own driving services business "Eternity Limousine Service" (Declaration of Daniel Bisneto, 9/4/14, UBE-OCO00009068–73, ¶¶ 3–5).  Christopher R. Edwards used to work as an independent contractor for a small transportation company but then decided to open his own business; he explains:  "In February 2012, I decided to end my contract with the transportation company and to open my own business with a partner, which at that time was Green Driver" (Declaration of Christopher R. Edwards, 10/7/14, UBE-OCO00009063–67, ¶ 4).

using the Uber App between June 2010 and June 2015.  But as shown above, the circumstances in

which any given driver chooses to take driving jobs are very different.

---

**EXHIBIT 3**

**THE NUMBER OF DRIVERS WHO COMPLETED AT LEAST ONE RIDE USING UBERX, UBERBLACK, OR UBERSUV BETWEEN JUNE 2010 AND JUNE 2015**



Source:  Uber Monthly Driver Data, California Drivers

---

117.    In short, there is no typical Uber driver.  Drivers have different education levels,[165]

some are employees in other jobs,[166] some are independent contractors in other work,[167] and some

---

[165] Hall, Jonathan, and Alan Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *Princeton University Industrial Relations Section*, Working Paper 587, 1/22/15, Table 1, p. 8.

[166] For example, see Declaration of Lakisha Evans, 5/26/15, ¶ 2; Declaration of Thu-hong Catellier, 5/29/15, ¶ 2; and Declaration of Harpreet S. Gandhi, 5/19/15, ¶ 4.

[167] For example, see Declaration of Dennis Saenz, 5/18/15, ¶ 5; Declaration of Alex Duque, 5/15, ¶ 5; and Declaration of Corey Green, 5/27/15, ¶ 7.

only take jobs from lead generation platforms, such as Uber.[168]  Some drivers take very few jobs over the course of a day,[169] week,[170] or month,[171] while some take jobs all day long.[172]  These differences in circumstance, reasons for and use of the platform all reflect the differences in the outside options each driver has when she chooses to take or not take a driving job she found on the Uber App at any given point in time.[173]

118.   In summary, in this section I have described the many different types of drivers who use the Uber platforms.  These drivers have many different work arrangements.  Many drivers have full or part-time jobs in addition to driving.  The way in which drivers use the Uber platforms are very different; some drivers contract directly with Uber and drive referrals from uberX using their personal cars, while others work, as employees or independent contractors, for a transportation company that then contracts directly with Uber.  Moreover, drivers can, and do, drive referrals from more than one Uber platform, creating a wide variety of possible permutations.  For example, drivers who usually use the UberBLACK platform may also use the uberX platform; while drivers who usually use the UberSUV  platform may also use the UberBLACK and uberX platforms; drivers may also use many of Uber's other platforms, such as UberPOOL, UberSelect, UberLUX, and uberXL.  In February 2015, of drivers who completed at least one ride using uberX, UberBLACK, or UberSUV, 52 percent also drove at least one ride through these other platforms.[174]  All the differences described in this section show that there is no typical driver using the Uber App.

---

[168] For example, see Declaration of Paul Cotter, 5/18/15, ¶ 4; Declaration of Alberto Dico Jr., 5/26/15, ¶ 4; and Declaration of Kathy J. Robinson, 5/20/15, ¶ 2.

[169] For example, see Declaration of Bo Lee, 5/19/15, ¶ 8.

[170] For example, see Declaration of Margalit Lipski, 5/26/15, ¶ 3.

[171] For example, see Declaration of Chris Keller, 5/19/15, ¶ 7.

[172] For example, see Declaration of Naveed Zafar, 5/19/15, ¶ 8.

[173] For some different examples of prior work experience, see Declaration of Casey Cheung, 5/19/15, ¶ 3; Declaration of Mike Evans, 5/27/15, ¶ 2; Declaration of Christopher Jose Martinez, 5/27/15, ¶ 3; Declaration of John Robert Lehman, Jr., 5/19/15, ¶ 2; Declaration of Elias Negash, 5/19/15, ¶¶ 3–4; and Declaration of Chris Keller, 5/19/15, ¶ 3.

[174] Uber Monthly Trip Data, California Drivers.

## VI.    THE RELATIONSHIP BETWEEN EACH DRIVER AND THE UBER APP IS UNIQUE AND INDEPENDENT

119.    In the previous section, I described the many different ways in which workers and their work options are affected by the Uber App.  These many differences make clear that the Uber App is used by many different types of individuals for many different reasons, and that as a result, there is no typical driver using the Uber App.  These differences are not unexpected given that for many dimensions of the work, Uber has no policy, or to the extent it does have policies, they differ across the many licensing agreements used by Uber.

### A.    Drivers Who Use the Uber App Are Not Required to Drive Any Particular Time, Amount or Place Creating Highly Individualized Work Circumstances for Each Driver

#### 1.    Each ride is a new job

120.    Drivers go through a number of steps in order to ultimately use the Uber App to receive, and drive, a passenger referral.  Each driver signs up to use the Uber App.  Then she must decide whether and when to turn the App on; which platform to use; and whether and when to take a driving job referral.

121.    It is my understanding that drivers do not need to pay to sign up for the Uber App, and they are not paid by Uber to sign up for the App.[175]  Drivers do need to meet specific requirements in order to be eligible to receive passenger referrals from the Uber App.  For example, the PUC requires that drivers using TNC platforms comply with a zero-tolerance policy on drugs and alcohol and

---

[175] I understand that in 2014 in San Francisco, Uber required drivers to pay $40 for a 3 hour training class for TCP drivers to start using UberBlack or UberX (Email from Uber San Francisco, "Uber SF:  New Uber Black Training – UPDATE," 7/9/14, COLOPY000906–9 at COLOPY000907).

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

successfully pass a criminal background check, and their vehicle must pass a 19-point inspection.[176] Uber has its own requirements, but because Uber has used many different licensing agreements, many of these requirements vary by city and have changed over time.  For example, Uber *may* require that a vehicle is no more than a certain number of years old and is in good condition, but the specifics vary by city.[177]

122.     One could imagine a policy whereby after signing up for the Uber service, the driver would be committed to turn on the platform at certain times or for a certain duration in order to receive and accept job referrals.  However, it is my understanding that no such uniform policy exists.[178]  A driver is not expected to be on call at any particular time, and Uber would not contact a driver to demand that she turn the platform on.   Although Uber occasionally notifies drivers through texts or emails when there are major events occurring or locations that are busy, it is entirely within the driver's discretion to decide whether to turn on the App or drive in those areas.  For example, driver Barry Perelman states,  "Uber texts me about how to make more money, by driving in

_____

[176] California Public Utilities Commission, "Decision Adopting Rules and Regulations to Protect Public Safety while Allowing New Entrants to the Transportation Industry," 9/19/13, pp. 26–29; California Public Utilities Commission, "CPUC Establishes Rules for Transportation Network Companies," Press Release, 9/19/13.

[177] "Vehicle Requirements," http://ubersupport.weebly.com/uberx-and-uberxl.html, accessed on 6/27/15.  See also Rasier Transportation Provider Service Agreement, UBE-OCO00009682–97 ("You agree that you shall maintain a vehicle that is a model approved by the Company.  Any such vehicle shall be no more than ten (10) model years old, and shall be in good operating condition.").  Other agreements do not include this requirement.  See Uber Software License and Online Services Agreement, 7/13.

[178] I understand that some licensing agreements do not provide requirements that govern whether a driver needs to turn on the App or accept a ride to maintain an active App account.  For example, see Uber Terms and Conditions, 8/11.  I also understand that in some instances Uber may deactivate a driver's account after a long period of inactivity and that the period of inactivity prior to which a driver may be deactivated varies across licensing agreements.  For example, see Rasier Software License and Online Services Agreement, 12/10/13, p. 9 ("The Agreement shall be automatically terminated for inactivity of more than 180 days, with the date of termination being the 180th day following the date of the last Request accepted and performed by you.") and Rasier Software License and Online Services Agreement, 11/10/14, p. 3 ("You acknowledge and agree that you are required to fulfill a request for Transportation Services using the Driver App at least once a month to maintain an active Driver profile, and Company reserves the right to deactivate your Driver ID if you have not fulfilled a request for Transportation Services using the Driver App at least once a month.").  I also understand that if the driver is in compliance with the requirements for accessing the Uber platform (e.g., the PUC requirement that the driver have insurance coverage), then Uber will reactivate the account upon request.

Gibson, Dunn &
Crutcher LLP

Downtown or West Hollywood, places that are late night areas where they are trying to encourage me to pick up fares. I ignore those text messages, because I will not pick up fares past 9:30 at night, and I will only do that in my area so I ensure I will not have to pick up young folks partying. I go offline at these times by turning off the app."[179] Another driver, Victor Mejia says, "Uber will sometimes text me that certain areas are busy, but I don't have to drive in those areas if I don't want to."[180] Thus, a driver can be signed up for the platform and essentially never choose to drive a single passenger referral (i.e., never do a single job).

123. When a driver does choose to turn the App on, she does not pay, nor is she paid, for "App on" time.[181] A driver could be logged on to the Uber App (and multiple other TNC platforms) and receive a referral while she is sitting in a coffee shop visiting with friends or at the track running laps. There are no requirements for a driver's behavior when the platform is on, but the driver has not yet accepted a passenger referral.[182]

124. When a driver is logged on to the platform she has the ability to accept or decline passenger referrals (i.e. accept or decline the job). My understanding is that Uber even spells this out directly in different ways in different contracts. For example:

- "You shall be entitled to accept, reject, and select among the Requests received via the Service. You shall have no obligation to the Company to accept any Request."[183]

---

[179] Declaration of Barry Allan Perelman, 5/26/15, ¶ 7.

[180] Declaration of Victor Mejia, 5/26/15, ¶ 3.

[181] I understand that at certain points in time in certain cities, Uber has offered temporary promotions in which Uber offered to guarantee drivers a certain minimum amount of money if they surpassed certain thresholds for time using the Uber platform. For example, see Email from Uber to Matthew Manahan, "Thank You For Partnering With Uber | Earn Even More This Weekend," 9/26/14, MAN000772–3 at MAN000772.

[182] I understand that if a driver is logged on to the platform and has not accepted a ride for an extended period of time, the platform may automatically log off.

[183] Rasier Transportation Provider Service Agreement, UBE-OCO00009682–97. This version of the contract even states explicitly: "Each Request that you accept shall constitute a separate contractual engagement." Uber's policy on the ability to reject requests has evolved over time and in fact it is now stated in the contracts that the company has a cancellation policy that can be

125.    Were a driver to accept a driving job from a passenger referral, Uber has no expectation or requirement that she will take another one after finishing that one.[184]   Thus, each ride is its own "job."

### 2.    Drivers control when and where to take jobs.

126.    One could imagine a policy that controls drivers' schedules, including how many hours they drive during a given day and at what time.  It is my understanding that no such policy exists.  Rather, drivers using the Uber App decide when and where to take jobs.  At all times, each driver can choose whether he wants to look for rides, accept rides, complete the ride, or not.  This flexibility is true across minutes, hours, days, weeks, and months, as I show below.  Drivers decide to take an extended time off from using the Uber App to study, vacation, or pursue other endeavors.  While using the App, drivers can reject rides, and do so to varying degrees.  Furthermore, drivers implement their own strategy for when and where to turn the App on and when and where to accept rides.

127.    In their declarations, many drivers state that driving with Uber gives them the freedom to choose their own schedule.[185]   Declarations of drivers who use the Uber App also provide examples of the many different ways that drivers use this flexibility to choose the hours they want to drive.  Some drivers have a specific full-time schedule in which they drive passengers.   For example,

---

updated as often as the company chooses.  For example, see Rasier Software License and Online Services Agreement, 11/10/14, §2.4. ("You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies.").

[184]The agreements between Uber and different drivers make this point explicit in a variety of different ways.  For example, see Rasier Transportation Provider Service Agreement, UBE-OCO00009682–97 ("The Company will offer the Service to you during those times you choose to be available to receive the Requests. You shall have no obligation to use the Service at any specific time or for any specific duration. You shall have complete discretion to determine when you will be available to receive the Requests.") and Rasier Software License and Online Services Agreement, 11/10/14, §2.4 ("You retain the sole right to determine when and for how long you will utilize the Driver App or the Uber Services.").

[185] See Declaration of Masis Avdalyan, 5/26/15, ¶¶ 6–7; Declaration of Joseph Elias Saker, 5/29/15, ¶¶ 12–13.

DECLARATION OF DR. JUSTIN MCCRARY                                              CV 13-03826-EMC

Gibson, Dunn & Crutcher LLP

Jiawen Ling explains when she is driving using the Uber App:  "I start work around 7:30 a.m. and 8:00 a.m… I will work until 6 or 7 p.m., but I will take a break around noon to rest."[186]  Other drivers concentrate their work on the weekends; for example, Norman Paul Sternfeld explains that he "typically drive[s] only on Saturday and Sunday, eight to ten hours each day, starting around 4am and ending around noon or 2pm."[187]  Yet other drivers choose a more ad hoc schedule; for example, Maria Khaira states:  "I have no specific schedule.  I always work Friday nights, Saturdays from 2 p.m. or 3 p.m. to 1 a.m. or 2 a.m.  Sundays, I drive after church for 8-10 hours.  But it varies and depends.  I drive when I want."[188]

128.    The amount each driver chooses to work can also vary from week to week or month to month.  Again, driver declarations provide context for how drivers might use this flexibility to adjust their schedules over time.  For example, some drivers change the amount of time they drive based on family needs; Demes Mulat explains that his hours with Uber depend on his family's schedule:  "I don't have a set schedule for when I drive using the Uber App.  It depends on whether my sons are in school or not, if my wife is available to care for them or if I have to care for them, it just depends."[189]  Ronie Canlas sets her hours to match up with a changing schedule of her fulltime job:  "My schedule at the animal shelter changes every 3 months or so, which is another reason I really like to drive because I can just adjust my own hours."[190]

129.    I show that there is no typical approach taken by drivers regarding when to take passenger referrals from Uber. There is enormous variability in the number of jobs that drivers using the Uber App choose to take each month or day.  Exhibit 4 shows, for each driver who completed at least one ride using the Uber App in California during February 2015, the number of rides completed during that month.  The number by each driver ranged from 1 to 1,076.  As Exhibit 4 shows, many

---

[186] Declaration of Jiawen Ling, 5/19/15, ¶ 8.

[187] Declaration of Norman Paul Sternfeld, 5/19/15, ¶7.

[188] Declaration of Maria Khaira, 5/20/15, ¶ 4.

[189] Declaration of Demes Mulat, 5/18/15, ¶ 9.

[190] Declaration of Ronie Canlas, 5/20/15, ¶ 4–5.

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

drivers drove a small number of trips, such as 20 or fewer, and a few drivers drove a larger number of trips.

**EXHIBIT 4**

**DISTRIBUTION OF THE NUMBER OF RIDES COMPLETED BY CALIFORNIA DRIVERS IN FEBRUARY 2015**



Source:  Uber Monthly Trip Data, California Drivers

Note:  Analysis includes California drivers who completed at least one ride using uberX, UberBLACK, or Uber SUV in Feburary 2015.  493 out of 50,346 drivers have completed 500 or more rides. These individuals are not shown in this histogram but are used in the calculation of the distribution.

130.    Drivers also use this flexibility to choose not to use the Uber App for extended periods of time to accommodate unexpected commitments, study, vacation, or pursue other endeavors.  For example, Katie Guilfoyle took time off to care for sick family members:  "Uber doesn't require that I work a set schedule or a specified number of hours.  In fact, I took a couple months off of driving when my daughter was sick, and there were no repercussions."[191]  Thomas Walding took time off to travel:  "Today was the first time in 3 weeks that I used the Uber app because I have been out of the

---

[191] Declaration of Kate Guilfoyle, 5/18/15, ¶ 7.

Gibson, Dunn &
Crutcher LLP

country.  I use the Uber app for additional income that lets me drop off the face of the earth for a few weeks at a time.  Uber has not suspended my account or threatened to suspend my account because of the amount I drive."[192]

131.     Exhibit 5 shows the number of rides completed each month from April 2014 through March 2015 for ten drivers randomly selected from all drivers who completed at least one ride using uberX, UberBLACK, or UberSUV over the course of the 12 month period (identified as "Drivers A–J").[193]  It is clear that drivers vary considerably in the amount they use the Uber App to find and take jobs.  For some drivers, the number of rides completed per month is consistent; some others use the Uber App only sporadically, while others have unpredictable periods of low use.  Driver I, for example, worked steadily throughout the twelve month period, completing between 300 and 450 rides in each month.  Some other drivers had more sporadic patterns in driving.  For example, Driver G was steadily accepting and completing hundreds of rides during the Spring, but stopped working on rides entirely between August 2014 and December 2014.  This driver then started again in January 2014 and completed over 100 rides, but then stopped in February and March 2015.  Driver E completed rides in eight out of twelve months, but never completed any more than 11 rides in any given month.  This is consistent with someone who spends most of their time engaged in activity other than driving using the Uber App.  The evidence presented in Exhibit 5 is consistent with the evidence from the declarations provided above.  Similar exhibits showing data for additional random samples of drivers can be found in Appendix C.

---

[192] Declaration of Thomas Walding, 5/18/15, ¶ 7.

[193] Drivers A – E were selected randomly from drivers whose total number of trips completed between April 2014 and March 2015 was below the median among drivers who completed at least one ride using uberX, UberBLACK, or UberSUV in April 2014.  Drivers F – J were selected randomly from drivers whose total number of trips completed between April 2014 and March 2015 was above the median among drivers who completed at least one ride using uberX, UberBLACK, or UberSUV in April 2014.

EXHIBIT 5

**NUMBER OF RIDES COMPLETED EACH MONTH FROM APRIL 2014 TO MARCH 2015 FOR A SAMPLE OF CALIFORNIA DRIVERS**



Source: Uber Monthly Trip Data, California Drivers.

Note:  Drivers A – E (Drivers F – J) were selected randomly from drivers whose total number of trips completed between April 2014 and March 2015 was below (above) the median among drivers who completed at least one ride using uberX, UberBLACK, or UberSUV in April 2014.

132.    Exhibit 5 provides evidence of the variability in work patterns observed in a random sample of drivers.  However, in some circumstances, including the present one, a random sample is not able to capture the full breadth of the heterogeneity in the data and it is helpful to display directly

the range of variation in the data.  I do this in Exhibit 6.  Exhibit 6 shows the number of rides completed each month from April 2014 through March 2015 for five selected drivers (a different set from those described above but also identified as "Drivers A–E").  These drivers were chosen specifically to highlight the substantial variability in the patterns of work flow for drivers using the Uber App.[194]  Driver C displays a relatively consistent pattern in the number of rides completed from month to month.  Although this driver was busier in some months than others, he or she completed between 57 and 220 rides in each month.  On the other hand, consider Driver E, who displays very high variability in the number of rides completed each month.  From April 2014 through September 2014, this driver completed more than 800 rides in each month with the exception of July, in which he or she completed over 480 rides.  Yet, in October, Driver E only completed 55 rides and did not work on rides *at all* from November 2014 through January 2015, but then picked back up in February 2015, completing almost 700 rides in February and over 770 rides in March.  In addition, consider Driver B, who had a steady pattern of driving work throughout the twelve month period.  This driver completed between 2 and 30 rides per month.  In some months, Driver E was completing between 50 and 100 times more rides than Driver B.

---

[194] The analysis is limited to drivers who completed at least one ride using uberX, UberBLACK, or UberSUV in April 2014. For each driver, I calculated the variance across months in the number of completed rides.  I then identified five drivers according to this driver specific variance. Driver A has the minimum observed variance; Driver B has variance in the 10th percentile; Driver C has the median variance; Driver D has variance in the 90th percentile; and Driver E has the maximum observed variance.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

**EXHIBIT 6**

**NUMBER OF RIDES COMPLETED EACH MONTH FROM APRIL 2014 TO MARCH 2015**

**FOR SELECTED CALIFORNIA DRIVERS**



Source:  Uber Monthly Trip Data, California Drivers

Note:  Analysis limited to drivers who completed at least one ride using uberX, UberBLACK, or UberSUV in April 2014. For each driver, I calculated the variance across months in the number completed rides.  Driver A has the minimum observed variance; Driver B has variance in the 10th percentile; Driver C has the median variance; Driver D has variance in the 90th percentile; and Driver E has the maximum observed variance.

133.    Drivers using the Uber App are also able to choose when they want to work *during* any given day.  Drivers can turn on the Uber App whenever they want to contemplate accepting ride referrals and are free to turn it off whenever they are not interested in potential jobs (i.e., to work at another job, care for and pick up children, end their working day, etc.).  How each driver uses this flexibility will vary from driver to driver and depends on individualized factors including the other work options available to them and personal commitments.

134.    Exhibit 7 highlights this variation.  Exhibit 7 plots data from February 3, 2015, for five drivers sampled at random and shows the number of ride referrals accepted by each driver during each hour of the day.  Driver A accepted four referrals for rides on February 3, 2015.  One ride was in the 10 o'clock hour, another was in the 12 o'clock hour, and two were in the 2 o'clock hour.  This driver may have been accepting ride referrals between running errands, and the temporal pattern might be consistent with dropping children off and picking them up from school.  Driver B drove more frequently, seemingly focusing on accepting referrals for rides after the morning rush hour and after the evening rush hour, with a long gap in the middle of the day from the 1 o'clock hour to the 6 o'clock hour.  Driver C had a "night owl" pattern of driving from the midnight hour until the early hours of the morning.  This pattern might be consistent with working multiple jobs.  Driver D accepted three ride referrals in the 4 o'clock hour in the afternoon, and no others.  This might be consistent with a student's schedule.  Finally, Driver E began driving in the late afternoon, stopped accepting referrals for two hours around the early dinner hour, and then accepted ride referrals consistently from the 6 o'clock hour until the 11 o'clock hour.  Similar exhibits showing data for additional random samples of drivers can be found in Appendix D.

Gibson, Dunn &
Crutcher LLP



**EXHIBIT 7**

**NUMBER OF RIDES COMPLETED EACH HOUR BY A SAMPLE OF CALIFORNIA DRIVERS ON FEBRUARY 3, 2015**

Source:  Uber Hourly Trip Data, California Drivers

Note: Drivers were selected randomly from drivers who completed at least one trip using uberX, UberBLACK, or UberSUV on 2/3/15.

135.    Once a driver has decided to log onto the Uber App, she still retains control over what jobs she wants to take.  While using the Uber App, drivers are not required to accept every referral

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

offered by Uber.[195]  This is yet another way in which drivers who use the Uber App can choose when

to work: that is, drivers exercise choice both regarding whether and when to have the Uber App

turned on, and also regarding whether to accept referrals made to them while the App is turned on.

The reasons a driver may decide not to accept a given ride are individualized and depend upon

individual circumstances and preferences.  For example, some drivers reject rides because the

potential passenger has a low rating.  Sharon Collins states:  "While Uber provides me with leads for

passengers, I am not required to accept the leads.  I rejected a lead at 11:30 p.m. one evening where

the male passenger had a two star rating....  I value the rating system, because it allows me to decide

if there is a passenger that I prefer not to do business with."[196]  Yet other drivers reject rides because

they prefer not to provide the particular type of service requested by the passenger; for example,

Sevuloni Ratabumusu sometimes declines rides when he is "too far away from the prospective

passenger or when an Uber Pool is requested."[197]

136.    Exhibit 8 shows the variation in acceptance rates during February 2015 for drivers in

California who completed at least one ride using uberX, UberBLACK, or UberSUV during the

month.  Rounded acceptance rates ranged from 0 percent to 100 percent.

---

[195] For example, see Declaration of Juan Hurtado, 5/20/15, ¶14; Declaration of Juliana Bushore, 5/20/15, ¶ 18; Declaration of Philippe Lestienne, 5/18/15, ¶ 17; Declaration of John Hoffman, 5/27/15, ¶ 9; Declaration of Jeffrey Green, 5/26/15, ¶ 12; Declaration of Ali Bouhelal, 8/5/14, UBE-OC000009020 – 25, ¶ 22; Declaration of Casey Cheung, 5/19/15, ¶ 9; Declaration of Kimberly Henderson Strother, 5/20/15, ¶ 4; Declaration of Peter Marinakis, 5/20/15, ¶ 11; Declaration of Tom Hakim, 5/28/15, ¶ 12; and Declaration of Leonardo Bertucci, 5/25/15, ¶ 3.

[196] Declaration of Sharon Collins, 5/28/15, ¶ 12.

[197] Declaration of Sevuloni Ratabumusu, 5/20/15, ¶ 4.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

**EXHIBIT 8**

**LEAD ACCEPTANCE RATES VARY WIDELY ACROSS CALIFORNIA DRIVERS**

**FEBRUARY 2015**



Source: Uber Monthly Trip Data, California Drivers

Note:  368 out of 50,313 drivers have an acceptance rate below 40%. These individuals are not shown in this histogram but are used in the calculation of the distribution. 33 drivers were excluded from this analysis because their rounded acceptance rates were 0 on one or more platforms.

137.     A big part of Uber's value as a platform matching passengers to drivers can be attributed to its efficiency.  The efficiency is better maintained if drivers who have the Uber App running are interested in driving a potential referral.  There are many reasons for this including wait time and pricing.  Wait times for passengers and drivers alike are kept down when the only drivers logged on to the platform are those who actually want driving jobs.  Uber gives every contacted driver 15 seconds to decide whether he or she wants to accept a lead or not.[198]  If a large number of drivers who are not actively looking for jobs had inadvertently kept the App open, wait times could be much higher than the estimate originally shown to the passenger given the number of nearby drivers on the platform at the time the passenger opened the Uber App.  As a result, prices may

_____

[198] Email from Uber San Francisco to Douglas O'Connor, "Uber SF:  Update to Auto Logoff," 2/26/15, UBE-OCO00000170–2 at UBE-OCO00000170–1.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                           CV 13-03826-EMC

increase for rides in geographic areas in which there are fewer potential drivers for a given set of

passenger requests (i.e., surge pricing).[199]  This both advantages drivers when there is higher

passenger demand in their local area (i.e., passengers are looking for rides in a low driver supply

area), and incentivizes drivers from other geographies to come to that area to drive.

138.    I understand there is some evidence that Uber has warned some drivers that their

accounts were at risk of being deactivated when the drivers had a habit of keeping the platform on,

but did not accept many rides.[200]  These notifications are consistent with Uber seeking to incentivize

drivers not to have the platform open and running when they are not looking for rides. This improves

the efficiency of the platform for passengers and drivers alike.  When drivers are not interested in

finding driving jobs they have a simple option:  turn the App off.  A driver can do this for any amount

of time: 10 minutes, an entire day, a week, or a year.[201]

139.    While driving, drivers have different strategies for when and where to log onto the

Uber App.  For example, Anthony Braxton drives in a certain neighborhood at a certain time of day:

"I have a strategy for where I choose to log on to the Uber App.  I live in the Mission District, so I

usually log on there because I don't have to go very far for a fare.  In the afternoon, I head to the

Financial District because I know I can find a passenger who wants to go home from work.  I drive

---

[199] Uber SF states:  "As you know, surge pricing raises Uber's rates when the demand for cars is greater than the supply on the road" (Email from Uber SF to Douglas O'Connor, "BUSY Weekend in SF," 3/8/13, UBE-OCO00000183–4 at UBE-OCO00000183).  The challenge of dealing with the supply/demand balance is not unique to lead generation platforms.  Severin Borenstein writes about the variable supply/demand challenge in the electricity market:  "Over the last few years, a great deal has been written about time-varying retail pricing of electricity.  Many authors, myself included, have argued that real time retail electricity pricing (RTP) – retail prices that change very frequently, e.g., hourly, to reflect changes in the market's supply/demand balance – is a critical component of an efficient restructured electricity market" (Borenstein, Severin, "The Long-Run Efficiency of Real-Time Electricity Pricing," *The Energy Journal*, 26(2), 2005, pp.1–24 at p. 1).

[200] See Declaration of Helder Parreira, 11/17/14, ¶ 4.

[201] I understand that in some instances Uber may deactivate a driver's account after long periods of inactivity.  I also understand that if the driver is in compliance with the requirements for accessing the Uber platform (e.g., the PUC requirement that the driver have insurance coverage), then Uber will reactivate the account upon request.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                                    CV 13-03826-EMC

towards areas that I know tend to have a surge, such as the North Beach area or Marina District."[202]

Casey Cheung also focuses on surge pricing:  "I am trying to make as much money in the shortest

amount of time possible.  My strategy in trying to accomplish this depends in part on surge pricing,

which means that I get paid more for the same rides.  I used to notice a lot more surge pricing back

when I first started in September 2014, but there seems to be less now.  I try to target the surge

pricing fares because I make a lot more money on them, as they are almost always 'double digit fares'

even if they are short rides."[203]

### 3. Each driver is only paid when he/she chooses to drive, and the amount of pay depends on his or her unique circumstances

140.    Drivers contracting with Uber earn money piece rate when they take driving jobs.

Drivers who use the Uber App are paid by passengers for successfully completing a ride, based on the

distance driven and time spent on the ride.[204]  Uber provides the service of collecting this fare for the

driver.[205]  To do this, Uber collects payment from passengers for the job of the ride.  Drivers

themselves receive different compensation for a number of reasons.  As I discuss in **Section VII**,

passengers *may* offer cash tips to drivers.  And each driver has his or her own relationship with others

---

[202] Declaration of Anthony Braxton, 5/20/15, ¶ 8.

[203] Declaration of Casey Cheung, 5/19/15, ¶ 6.

[204] I understand that at certain times, in certain cities, there may have been temporary promotions during which the financial arrangement between drivers and Uber was different.

[205] It is my understanding that while some licensing agreements address this, others do not.  For example, see Rasier Software License and Online Services Agreement, 11/10/14, §4.1 ("You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ('*Fare*'), where such Fare is calculated based upon a base fare amount plus mileage and/or time amounts, as detailed for the applicable Territory ('*Fare Calculation*').").  Other versions of the licensing agreement address this point too, if in a slightly different way.  For example, see Rasier Transportation Provider Service Agreement, UBE-OCO00009682–97 ("In exchange for accepting and fully performing on a Request, you shall be paid an agreed upon Service Fee for your completion of that Request.").  Other versions of the licensing agreement do not explicitly state whether Uber will arrange and collect the fare. For example, see Uber Terms and Conditions, 8/11 p. 5 ("The Company may introduce you to third parties for the purposes of you providing transportation to them for a fee…The Company will not intervene I [sic] any disputes between you and such third parties.  We cannot and will not play any role in managing payments between you and such third party parties.").

involved in the driving service.  For independent drivers using their own car, Uber provides a payment processing service, by which Uber collects the fare on the driver's behalf, deducts its licensing fee, and provides the rest to the driver.  While some drivers finance or own their car, others lease their car or work at an hourly rate for another company.[206]  Thus the driver earnings vary from driver to driver.

141.    Some drivers work with a multi-driver business, which pays drivers in a multitude of different ways.  Robert Raymond, a driver for a multi-driver business, explains that he pays the multi-driver business a weekly fee but keeps "the entirety of fares I earn from my driving using the Uber App."[207]  Another driver for a multi-driver business, Daniel Bisneto, "was paid a set hourly wage for all hours [he] worked, regardless of whether the trips [he] completed were Jet Car's non-Uber customers or passengers booked using Uber."[208]  Yet other drivers drive for multi-driver businesses and are paid a share of their Uber fares, by the multi-driver businesses.  Shevket Saatchigou, a multi-driver business owner, explains:  "Most of the fares the drivers got using [the company's] vehicles were through Uber accounts under my partner account.  I would receive the fare, take out my daily rate according to the car the driver was using, and they could keep whatever they made beyond that."[209]

---

[206] Some drivers own or finance their car (for example, see Declaration of Angel Herroz, 5/28/15, ¶ 2; Declaration of Enoch Devon Shadkam, 5/26/15, ¶ 4; and Declaration of Dean Strickler, 5/26/15, ¶ 4).  Other drivers lease their car.  Drivers often lease the car from either a multi-driver business (for example, see Declaration of Keith Daniel Maddock, 5/18/15, ¶ 6; Declaration of Sameh Shehata, 5/27/15, ¶ 3; and Declaration of John Andrews Sideserf, 5/26/15, ¶ 4) or from a car dealership (for example, see Declaration of Robert Jones, 5/26/15, ¶ 2; Declaration of Christopher Armstrong, 5/26/15, ¶ 9; and Declaration of Hazim Jajo, 5/28/15, ¶ 2).  Other drivers for multi-driver businesses are paid an hourly rate for use of the vehicle (for example, see Declaration of Daniel Bisneto, UBE-OCO00009068–73, 9/4/14, ¶ 8; Declaration of Rufus Fields, 10/1/14, UBE-OCO00009121–6, ¶ 9; and Declaration of Mark Forester, 11/20/14, UBE-OCO00009555–60, ¶ 10.)

[207] Declaration of Robert Raymond, 5/27/15, ¶ 3. See also Declaration of Samir Moussa, 5/19/15, ¶ 4.

[208] Declaration of Daniel Bisneto, 9/14/14, UBE-OC000009068–73, 9/4/14, ¶ 4.  See also Declaration of Rufus Fields, 10/1/14, UBE-OCO00009121–6, ¶ 9.

[209] Declaration of Shevket Saatchigou, 5/19/15, ¶ 5.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                        CV 13-03826-EMC

### 4.   Drivers can - and some do - influence the price paid by the customer

142.   Drivers have different ways to influence the price paid by customers.  For instance, drivers can contact Uber to propose a fare reduction or increase or reduce the fare by stopping the fare before the ride is completed.  One could imagine a policy in which drivers were expressly prohibited from negotiating fares.  It is my understanding that Uber has no such uniform policy.  The many Uber licensing agreements and contracts vary in how they address price negotiations.  Often the agreement directly states that a driver has the right to negotiate the fare, but other agreements do not directly address price negotiation at all.[210]  There are many reasons why drivers may choose to influence the price paid by customers, as I now detail.

143.   Some drivers stop the fare early if they made a mistake along the way, such as selecting an undesirable route; for example, William Gfroehrer explains:  "I have never negotiated a fare but I have ended a ride early if I made a mistake so that the customer does not have to pay for my mistake."[211]  Babikian Agop ends the ride early because he enjoyed the customer's company so much:  "Often, I am very soft-hearted and I will give people a few miles for free.  I will turn off the app and let them have a few free miles if I've enjoyed the conversation and we've had a nice time.  So, I will turn off the Uber app early to give them a shorter ride and let them pay less."[212]

144.   Drivers also can approach Uber on a ride-by-ride basis to influence the price paid by the customer.  A driver may choose to increase the fare in order to factor in additional passenger

---

[210] For examples of contracts that specifically state that such negotiation is allowed, see Rasier Transportation Provider Service Agreement, UBE-OCO00009682–97 ("You and the Company shall always have the right to negotiate a Service Fee different from the pre-arranged fee. The purpose of the pre-arranged Service Fee is only to act as the default fee in the event neither party negotiates a different amount.") and Rasier Software License and Online Services Agreement, 11/10/14, p. 7 ("You shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare."). For examples of agreements that do not address price negotiation, see Uber Terms and Conditions, UBE-OCO00009571–4 and Uber Terms and Conditions 8/11.

[211] Declaration of William Gfroehrer, 5/18/15, ¶ 17.  See also Declaration of Kate Guilfoyle, 5/18/15, ¶ 17.

[212] Declaration of Babikian Agop, 5/26/15, ¶ 12.

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

requests not reflected in the original price.[213]  Some drivers ask for a fare adjustment because the app didn't properly capture the start and end point of the ride.[214]  Sometimes drivers make a mistake and want to mitigate it by decreasing the fare; Reynaldo Adelantar states:  "I have asked for a fare adjustment once or twice, when I overshot the destination."[215]  Kaptan Ghimire explains:  "Sometimes, a passenger will say that they do not want to pay the full fare because I went the wrong way or a trip took too long.  When this happens, I request a fare adjustment via the Uber app and the price is automatically adjusted."[216]  Drivers also request a fare adjustment to factor in customer requests.  For example, some drivers contact Uber to ask for an increased fare due to additional stops,[217] or because the passengers ordered uberX, but more passengers get in the car than is allowed for uberX and so they should have ordered uberXL.[218]

### B.      Supervision of Drivers on Jobs is Minimal and Drivers Have Other Full- and Part-time Commitments

#### 1.      *Customers provide the only ratings of driver performance*

---

[213] For example, see Declaration of Kirill Sobolev, 5/19/15, ¶ 12.

[214] Chris Uribe explains:  "I have had to request a fare adjustment a few times.  For example, there have been times when I have dropped off a passenger in an area with poor cellular service, and because the iPhone did not get service, the Uber app was not able to record the trip mileage until I got back to an area of better cell service.  In those situations, the fare ends up being more expensive than it should be.  I would then request that Uber correct the fare based on the actual mileage of the trip, and Uber did make the corrections" (Declaration of Chris Uribe, 5/20/15, ¶ 16.)

[215] Declaration of Reynaldo Adelantar, 5/18/15, ¶ 13.

[216] Declaration of Kaptan Ghimire, 5/20/15, ¶10.

[217] Oleg Lantsman explains:  "Once in a while, I request fare adjustments if the passengers require something extra, such as an extra stop (Declaration of Oleg Lantsman, 5/19/15, ¶8).

[218] Hovsep Sarafyan explains:  "In my experience so far, I've only had to contact Uber to discuss the fares – especially when there are more than four passengers but the rider request was just for an UberX and not an Uber XL.  Whenever this situation has arisen, Uber has resolved it quickly and without a problem" (Declaration of Hovsep Sarafyan, 5/26/15, ¶16).

Gibson, Dunn & Crutcher LLP

145.     As explained above, driver and passenger ratings allow the Uber App to solve a market failure (imperfect information and asymmetric information).  Driver ratings are customer-driven;[219] Uber has no input into the ratings provided by customers.  Uber neither performs any evaluation of drivers, nor does it give drivers significant rewards for high performance.[220]  It is my understanding that prospective customers use the ratings of prior customers to decide whether or not to accept a ride from the driver.  Likewise, drivers use other drivers' ratings of passengers to select riders.

146.     An individual driver's star rating is determined by averaging the customer-given star ratings of the last 500 completed rides.[221]  The ratings are completely customer-driven.  Santos Venegas explains:  "To my knowledge, my rating is determined completely by my passengers, and Uber has no control over my rating at all.  Additionally, I have the opportunity to rate my passengers

---

[219] This point is made in a variety of ways throughout the different versions of the agreements that Uber driver enter into.  For example, in earlier versions, it is said that: "For quality assurance purposes, the Company has access to Uber's star rating system designed to determine the level of service provided by the Transportation Providers contracting with the Company through Client feedback.  In a sense, the star rating is similar to a Yelp® or Zagat® rating, as it is based on a continuously growing collection of star reviews submitted by Clients."  Rasier Transportation Provider Service Agreement, UBE-OCO00009682–97.  Other versions state that: "You acknowledge and agree that: (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services."  Rasier Software License and Online Services Agreement, 11/10/14.

[220] Uber does have a weekly celebration of, and prize for, two of its platform users.  There is a "Sixth Star" award that consists of a $1,000 American Express gift card and an Uber gift package that is awarded to two drivers a week.  These awards are customer driven, with one driver being chosen by rider nomination for doing something extraordinary and the other driver being chosen for having the highest rating and number of trips in a given region.  "Finally, A Way to Give Your Driver a Sixth Star," http://newsroom.uber.com/2014/10/finally-a-way-to-give-your-driver-a-sixth-star/, accessed on 6/26/15.  Due to the large number of drivers, the probability of winning the celebratory award is very low per individual driver.  "The Sixth Star Award Goes Global," Uber, 4/9/15,  http://newsroom.uber.com/2015/04/the-sixth-star-award-goes-global/, accessed on 7/6/15.

[221] Uber's guide to the Rating System states:  "Only the last 500 trips are counted towards your ratings.  So, if you have completed more than 500 trips, only your last 500 trips count toward your rating" (Email from Uber San Francisco to Douglas O'Connor, "The Rating System, Part 1," 9/12/13, UBE-OCO00000301–7 at UBE-OCO00000303; Email from Uber LA to Ike Zimack, "Uber Notice:  Account Status," 10/2/14, COLOPY000986–7 at COLOPY000986).

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                         CV 13-03826-EMC

on the App as well."[222]  Some drivers appreciate the informational exchange the platform incentivizes; Harpreet S. Gandhi states:  "I think that the star rating system that Uber uses is great, because it makes sure that the best drivers and best riders are connected, and it ensures the best behavior from both sides.  I believe my star rating is about 4.9 right now, and I know that is a high rating.  In order to maintain that high rating, I will offer my riders free water.  No one told me I should do this or suggested I do so, I just thought it would be a good idea."[223]

### 2.  *Drivers control the route taken during a ride*

147.    Drivers who use the Uber App are not required to use a particular navigation application during the job and I am not aware of any claim or evidence that Uber monitors or provides feedback on routes taken to complete rides.[224]  Drivers are able to utilize their own preferred navigation systems while driving passengers, whether that is another GPS application like Waze or Google Maps or their own personal GPS device.  Kathy J. Robinson explains: "When I drive, I don't rely on the Uber app for navigation because I much prefer Waze.  Some passengers even tell me I should be the Waze spokeswoman because I tell everyone how great it is.  I find it's the best tool I can use to help me drive."[225]  Drivers also note that they often use their own expertise instead of relying on the Uber app to provide the most efficient ride.  Richard Charles Elliott explains that if he is familiar with an area he "will just [drive] the way [he] know[s] best."[226]

### 3.  *Drivers choose the ambience of their car*

---

[222] Declaration of Santos Venegas, 5/27/15, ¶ 10.

[223] Declaration of Harpreet S. Gandhi, 5/19/15, ¶ 11.

[224] Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 100–101.  For example, see Declaration of Kathy J. Robinson, 5/20/15,  ¶ 10; Declaration of Shafqat Malik, 5/26/15, ¶ 6; and Declaration of Guy Cooper,  9/3/14, UBE-OCO00009074–78, ¶ 15.

[225] Declaration of Kathy J. Robinson, 5/20/2015, ¶ 10.

[226] Declaration of Richard Charles Elliott, 5/18/2015, ¶ 12.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                        CV 13-03826-EMC

148.    It is my understanding that there is no uniform policy that controls the feel, atmosphere and look of a driver's car.  Many drivers understand that there is no dress code and hence different drivers can wear different things.[227]  Some drivers dress professionally because they think it will help their business; Yonatan Girma tries "to dress professionally because [he] think[s] it is good to be respectful to my passengers."[228]  Other drivers dress more casually for their own comfort; Charles Skip Close states:  "Uber did not require me to adhere to any dress code and in fact on most days I would wear shorts and a t-shirt so I could be comfortable while I drive."[229]  Yet others dress for their own convenience and will often wear what they wore to a previous job.[230]

149.    Some drivers provide customer service on their own initiative and in their own way.  Uber may make suggestions on how drivers can make passengers happy (e.g., such as offering water and gum to the passengers), but many drivers understand that these are suggestions and are not requirements.[231]  Jose Diaz provides customer service because it feels natural to him:  "I recall that Uber gives partners tips on how to interact with passengers, but I don't recall what they are.  What I do for my passengers I do because I'm accustomed to treating people courteously, such as greeting them, letting them know my name, saying good afternoon or good evening, and the like.  My star rating is 4.86.  I don't do anything in particular to try to butter the passengers up; I just try to be

---

[227] For example, see Declaration of Richard Charles Elliott, 5/18/15, ¶ 11; Declaration of Rych Dorsie, 5/19/15, ¶ 12; Declaration of Sharon Hurt, 5/19/15 ¶ 4; Declaration of Naveed Zafar, 5/19/15, ¶ 13; Declaration of David Wong, 5/18//15, ¶ 9; Declaration of Muhammad Lodhi, 5/20/15, ¶ 15; Declaration of Tony Thurston, 5/20/15, ¶ 10; Declaration of David Malamud, 5/18/15, ¶ 20; Declaration of Brian Haig, 5/20/15, ¶ 16; and Declaration of Chris Uribe, 5/20/15, ¶ 19.

[228] Declaration of Yonatan Girma, 5/18/15, ¶ 11.

[229] Declaration of Charles Skip Close, 5/28/15, ¶ 8.

[230] Christopher J. Armentrout explains:  "I haven't made any changes in how I act as a result of the guidance I've gotten from Uber.  For example, if I'm leaving straight from work, I wear whatever I wore to work that day" (Declaration of Christopher J. Armentrout, 5/20/15, ¶ 8).

[231] For example, see Declaration of Fabio Lorenzo Betancourth, 5/20/15, ¶ 8; Declaration of Hanibal Poolisrezaeih, 5/19/15, ¶ 6; Declaration of Howard Hsu, 5/18/15, ¶ 13; Declaration of Ismail Ezzikhe, 5/19/15, ¶ 8; Declaration of Issa Alzghoul, 5/19/15, ¶ 3; Declaration of Jiawen Ling, 5/19/15 , ¶ 13; Declaration of Jonathan Oliver, 5/18/15, ¶ 10; Declaration of Juan Hurtado, 5/20/15, ¶ 17; Declaration of Juliana Bushore, 5/20/15, ¶ 21; and Declaration of Kimberly Henderson Strother, 5/20/15, ¶ 6.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

myself."[232]  Jacob Dayeh provides customer service as a result of his past experience in the transportation industry: "Uber makes suggestions on how to increase my 'star rating' from passengers, such as having water in the car.  I have experience in the transportation industry, so very little of this was new to me.  However, I do not need to follow these suggestions.  I make my own decisions on how to provide customer service to my passengers.  I have a background in customer service and I know what good customer service is."[233]  Euripedes Silva does not believe that the customer service he provides needs to be anything beyond just being a good driver and being courteous: "Uber doesn't require that I provide any sort of amenities to passengers.  I don't provide any gum or candy or anything like that.  My mission is to drive, not to feed passengers.  I do a good job driving, and that's what I focus on.  In my experience, passengers expect me to be a motorist, and they are happy when you do a good job at that."[234]  Other drivers provide innovative customer service that goes beyond Uber's suggestions to their passengers; Hanibal Poolisrezaeih explains:  "I was the first person to provide wifi to my passengers.  I have a bike rack for passengers who have bikes.  I provide an Ipad for my passengers.  I provide all sorts of amenities for my passengers."[235]

150.    While Uber offers suggestions to drivers during the onboarding process, because these onboarding practices and presentations vary across many dimensions, different drivers receive different information.  Uber's driver operation specialist Michael Colman explains that the onboarding process in which drivers learn how to use the software "varies by city," and depends on the "needs of the city."[236]  The onboarding processes have also changed over time.  For example, for Uber Black in Los Angeles in early 2012, the onboarding process entailed the owner of the transportation company first going through some paperwork; then the driver would come into the

---

[232] Declaration of Jose Diaz, 5/26/15, ¶ 9.

[233] Declaration of Jacob Dayeh, 5/28/15, ¶ 11.

[234] Declaration of Euripedes Silva, 5/18/15, ¶ 8.

[235] Declaration of Hanibal Poolisrezaeih, 5/19/15, ¶ 6.

[236] Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 50–51.  See also Deposition of Matthew Atkin (Senior Project Manager, Uber), 7/9/14, pp. 13–15.

Uber office for an education session about the App, to provide further information, and to take a city knowledge test.[237]  Later, the city knowledge test was dropped and the Uber app training was "virtualized" although some drivers still come into an office.[238]  The onboarding process also varies by driver class.  Ilya Abyzov, product manager at Uber, explains that the document used during onboarding depends "on which class of partner you're talking about."[239]

### 4.   *Drivers choose and generally, but not always, supply the instrumentalities of work*

151.    To use the Uber App and accept a referral for a driving job requires having a car to drive and a phone that is compatible with the Uber App.  Many drivers, though not all, provide these instrumentalities themselves.  Regarding the phone, drivers can choose between using their own phone and leasing one from Uber.  Regarding the car, drivers can use their own personal car, leased or bought, or they can work with a multi-driver business, which provides them with a car.  Uber does not provide drivers with a vehicle.[240]

152.    Many drivers use their own personal phone, whereas other drivers use a smartphone offered by Uber for $10 a week.[241]  James Coltrane, for example states:  "The licensing agreement was provided to me via e-mail, and I reviewed it and accepted the terms online.  I downloaded Uber's software on my cell phone, which allowed you to start using the Uber app."[242]  Other drivers use the phone issued by Uber in order to keep their work phone and their personal phone separate; Philippe Lestienne explains: "I lease an i[P]hone through Uber.  I pay $10 per week to use the Uber i[P]hone. I only use it for the app.  I have my own separate cell phone that I do not use for the Uber App.  I had

---

[237] Deposition of William Barnes (General Manager for Los Angeles, Uber), 9/19/14, pp. 46–47.

[238] Deposition of William Barnes (General Manager for Los Angeles, Uber), 9/19/14, p. 51.

[239] Deposition of Ilya Abyzov (Product Manager, Uber), 9/19/14, p. 95.

[240] Deposition of Michael Colman (Driver Operation Specialist, Uber), 7/9/14, pp. 156.

[241] Deposition of William Barnes (General Manager for Los Angeles, Uber), 9/19/14, p. 30.

[242] Declaration of James Coltrane, 5/28/15, ¶ 5.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                        CV 13-03826-EMC

the choice whether to use my own phone or lease a phone from Uber.  I chose to lease a phone because I prefer to keep things separate."[243]   Some drivers even decided to have the App on both phones for their own convenience.[244]

153.    Some drivers own their own car while others lease a car to drive.[245]   Some individuals even have more than one car that they utilize for driving on the Uber App.  For example, Lavon Ohanian states:  "I have two cars that I drive when I use the UberX app – a 2015 Toyota Prius and a 2010 Volkswagen CC.… Usually I drive the Prius, but I have put almost 35,000 miles on the Prius since November.  As a result, I started alternating weeks between the Prius and the CC so that I can manage the level of wear and tear on my Prius."[246]   Some drivers choose what type of car they use in order to reduce their business costs; E. Bond Francisco states:  "I use a 2014 Toyota Prius V to provide transportation services.  I purchased this vehicle myself in approximately October 2014.… I also chose the Toyota Prius V because of the gas mileage, which allows me to reduce my business costs."[247]   Drivers for multi-driver businesses normally lease cars from the multi-driver businesses, although there are variations in how drivers pay for the use of the vehicle and whether they can use it for their personal use.  Sameh Shehata, for example, leases a car from the business he drives for, on a weekly basis,[248] whereas Brian Haig works with a business that keeps a portion of each fare.[249]   Owners of multi-driver businesses also vary in whether they own or lease the cars that drivers utilize for driving on the Uber App.[250]   There are even companies that own some cars and lease others.[251]

---

[243] Declaration of Philippe Lestienne, 5/18/15, ¶ 9.

[244] For example, see Declaration of Jonathan Oliver, 5/18/15, ¶ 3.

[245] For example, Hazim Jajo owns his car (Declaration of Hazim Jajo, 5/28/15, ¶ 2), whereas Fred Blitzer leases his car (Declaration of Fred Blitzer, 5/26/15, ¶ 5).

[246] Declaration of Lavon Ohanian, 5/27/15, ¶ 4.

[247] Declaration of E. Bond Francisco, 5/19/15, ¶ 5.

[248] Declaration of Sameh Shehata, 5/27/15, ¶ 3.

[249] Declaration of Brian Haig, 5/20/15, ¶ 5.

[250] Ismail Ezzikhe owns his vehicles (Declaration of Ismail Ezzikhe, 5/19/15, ¶ 3), whereas Arthur Armstone leases his vehicles (Declaration of Arthur Armstone, 5/27/15, ¶ 3).

DECLARATION OF DR. JUSTIN MCCRARY                                                   CV 13-03826-EMC

## VII.    PLAINTIFFS' TIPPING AND EXPENSES THEORY IMPLIES NO HARM FOR THE PROPOSED CLASS ON AVERAGE AS WELL AS CLASS CONFLICT

154.    I understand that Plaintiffs' claim that as a result of Uber's policies regarding tips, drivers in California who use the Uber App are paid less than they would have been but-for the alleged conduct.[252]  I also understand that Plaintiffs argue that drivers using the Uber App have been commonly harmed because they are "misclassified as independent contractors and thereby required to pay business expenses (such as for their vehicles, gas, and maintenance)."[253]

155.    In this section I show that Plaintiffs' theory of harm cannot be assessed commonly for all drivers who use the Uber App.  Plaintiffs' claims of common facts regarding tipping and expenses are false.  There are individualized factors that are important to consider when assessing whether any given driver using the Uber App may have been harmed by Uber's tipping and expense practices as claimed by Plaintiffs.  As a result, damages cannot be calculated on a class-wide basis.  Moreover, there is meaningful potential for class conflict when one considers carefully the likely nature of the but-for world.  Plaintiffs have not described what the nature of the but-for world would be, but I conclude that it could take a variety of forms.  In some of those forms, no member of the putative class experienced harm.  In other of those forms, members of the putative class would be in conflict with one another, in the sense that some members would have benefited while others would have been harmed.

156.    In particular, and as I more fully articulate in a subsequent section, I take particular note of the fact that Plaintiffs' theory of harm is ill-posed, in the following sense: if it were decided that all drivers using the Uber App were determined to be employees rather than independent contractors, Uber would be expected, as an economic matter, to reorganize its business accordingly.  Some of these reorganizations might be substantial and might lead to harm for many members of the

---

[251] See Declaration of Patrick Canlas, 8/11/14, UBE-OCO00009114–20, ¶ 10.

[252] SAC, ¶¶ 1–2.

[253] SAC ¶ 3.

DECLARATION OF DR. JUSTIN MCCRARY                                      CV 13-03826-EMC

class.  In this section, I limit my attention to the specific issue of tipping and expenses and contemplate no reorganizations.  Under the narrow version of what the but-for world looks like, it is far from clear that *any* member of the putative class would be harmed.  Under the broad version of what the but-for world looks like, it is far from clear that all members of the putative class would experience harm – and, if some members of the putative class would experience such harm, then there is meaningful potential for class conflict.

### A.   It Is Not Possible to Calculate Potential Damages from Uber's Tipping Practices on a Class-wide Basis

157.   The facts that Plaintiffs claim are common to the proposed class and upon which they base their theory of harm regarding driver tips are false.  There is no common practice in the car service industry regarding tipping.  As a result, each driver's experience is, and would be expected to be, individualized.  Moreover, even if one were to assume, as Plaintiffs claim, that somehow tips were included in the fares collected by Uber for the driver, it would not be possible to reliably determine the amount of tips that would have been received by any particular driver, let alone using common evidence on a class-wide basis.

#### 1.   *There is no common industry "practice" regarding tipping*

158.   I understand Plaintiffs have asserted that it is "customary in the car service industry for customers to leave approximately a 20 percent gratuity for drivers."[254]  However, the available evidence shows this is not true.  Certain passengers tend to tip more than others, and some passengers leave no tip at all.  Moreover, the amount a particular passenger may leave for a tip can vary considerably from ride to ride.  The reasons for this variation are numerous and individualized; tip size is not simply determined by the length of the ride.

159.   Publicly available data from New York City shows considerable variation in tipping behavior among taxi passengers.  For taxi rides that were paid for using a credit card, tips ranged

---

[254] SAC ¶ 19.

DECLARATION OF DR. JUSTIN MCCRARY                                        CV 13-03826-EMC

Gibson, Dunn &
Crutcher LLP

from zero to as high as 40 percent.  Leaving no tip at all is not uncommon.  In fact, the seventh most common tip amount was 0%, with roughly 3 million out of 51 million rides having 0% tips.[255]

### 2. The experience with cash tips of each driver using the Uber App is varied and individualized

160.    Driver declarations submitted in this matter provide evidence that drivers using the Uber App have varied and individualized experiences with cash tips.  Some drivers have never received a cash tip from a passenger for a ride arranged using the Uber App;[256] others have only rarely received cash tips.[257]  However, there are also drivers who receive cash tips more frequently.  For example, Corey Green says he receives cash tips "almost every day," Hanibal Poolisrezaeih states that he receives tips for 80 percent of the rides he completes through the Uber App, and Kindred Sheppard estimates that he receives cash tips about twice a day.[258]

161.    In addition, the size of the cash tips received by drivers using the Uber App varies substantially from ride to ride and from driver to driver.   For example, Patrick Canlas states that "the tips vary from client to client" and the "variety of tips [range] from $2 to $400 (which only happened once)."  In addition, according to Mr. Canlas, "[i]t's hard to say why I receive a tip or not, but in my experience, certain people always tip by nature, not because it's expected from the driver's

---

[255] Eric Chemi and Ariana Giorgi, "Here's How Much You Should Be Tipping Your Cab Driver," *Bloomberg Businessweek*, 7/31/14, http://www.bloomberg.com/bw/articles/2014-07-31/heres-how-much-you-should-be-tipping-your-cab-driver, accessed on 6/29/15.

[256] For example, see Declaration of Philippe Lestienne, 5/18/15, ¶ 28 ("I have never received a tip from a customer.") and Declaration of Eduardo Belloso, 5/26/15, ¶ 12 ("Uber does not collect tips. I never get tips from passengers. Uber tells passengers that there is no tip in the fare. There are no tips.").

[257] For example, see Declaration of Jonathan Meyers, 5/26/15, ¶ 8 ("I rarely get cash tips, although it does occasionally happen--maybe once in a hundred rides. My understanding is that I get to keep 100% of those cash tips for myself. I usually get about $1-5 on the rare occasions when I do get a tip.").

[258] Declaration of Corey Green, 5/27/15, ¶ 10 ("I have received cash tips almost every day that I've driven."); Declaration of Hanibal Poolisrezaeih, 5/19/15, ¶ 9 ("I am allowed to get tips from passengers. I tell my passengers that a tip is not required but if they offer me a tip, I take it. I get a tip 80% of my rides."); and Declaration of Kindred Sheppard, 5/18/15, ¶ 20 ("I have received cash tips – about two a day.").

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                              CV 13-03826-EMC

perspective."[259]  Mr. Canlas is not the only driver who reports receiving a wide range of cash tips while using the Uber App.  Corey Green says that he has received cash tips "anywhere from \$2.00 to \$60.00,"[260] and Christopher Jose Martinez has "received tips from \$1 all the way up to \$100."[261]

**3.**     *Identifying the tips a driver using the Uber App would have received is not possible using available evidence*

162.     In the previous two sub-sections, I explained that there is no single tipping practice that can characterize tipping behavior in the car services industry and that the variability in passenger tipping practices leads to tipping experiences for each driver that are varied and individualized, including for drivers using the Uber App.  As a result, even if we assume that a court determined that tips were included in the fare charged for rides arranged using the Uber App, it would not be possible to use available, common evidence to determine the size of the tips a particular driver would have received.  To do so would require substantial individualized information and inquiry.  For example, one might want to consider the tipping tendencies of each passenger driven by a particular driver, the quality of the service provided in each ride, and how the service quality impacts the size of the tip offered by each passenger.  This information is not commonly available.

163.     In addition, there is no way to retroactively identify which drivers using the Uber App received cash tips, for which rides, or the size of those tips.  As I documented above, some passengers pay cash tips after rides using the Uber App, but the Uber App does not track any cash tips that are exchanged between passengers and drivers.  There would be no way to determine whether a particular passenger paid a cash tip for a given ride, did not pay a cash tip but assumed the tip was covered by the fare, did not pay a cash tip because they generally do not pay tips for car service, or did not pay a cash tip because they simply chose not to tip for that particular ride for whatever reason.

---

[259] Declaration of Patrick Canlas, 8/11/14, UBE-OCO00009114–20, ¶ 26.

[260] Declaration of Corey Green, 5/27/15, ¶ 10.

[261] Declaration of Christopher Jose Martinez, 5/27/15, ¶ 6.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

164.  For all the reasons described above, it would not be possible to calculate potential damages from Uber's tipping practices on a class-wide basis using common and available evidence.

**B.      If Uber Were to Implicitly or Explicitly Pay Drivers for Tips There Is Meaningful Potential for Class Conflict**

165.    In the previous section, I showed why it is not possible to calculate damages from tipping behavior on a class-wide basis.  In this section I consider the licensing fee that Uber currently charges and how that might change if Uber were required to implicitly or explicitly pay drivers for tips.  I show that under some of the but-for worlds that might hypothetically form a basis for a theory of harm, there is no harm, whereas in other hypothetical scenarios, there is a meaningful potential for class conflict.

166.    What if Uber changed the way it paid drivers so that each fare included a fixed tip, as Plaintiffs claim should be the case?  In this scenario, I am assuming that nothing else has changed about Uber's business model or the relationship between Uber, drivers, and passengers.  The only change is that Uber now explicitly includes a fixed tip as part of the fare charged to passengers. Would all putative class members be better off?

167.    In this scenario, Uber now faces a new cost—namely that of covering driver tips. Firms are organized to make profits.  A fundamental precept of economics is that firms confronting new costs take steps to minimize the impact of those costs on their profitability.[262]  In some situations, the firm is able to fully avoid any such new costs.  Applying these principles to the matter at hand, I would expect that if Uber were including a fixed tip as part of the fare charged to passengers, it would contemplate changing its referral rate so that the imposition of this new cost was revenue neutral.[263]  As noted above, Uber might contemplate other changes as well, but I defer

---

[262] For example, see Pindyck, Robert and Daniel Rubinfeld, *Microeconomics, Third Edition* (Englewood Cliffs: Prentice-Hall, 1994), pp. 238–273.

[263] Revenue neutrality is often discussed in the tax reform literature to capture the concept that the government can restructure the taxing procedure in a way that allows them to still receive the same amount of revenue (for example, see, Michael Pflüger, "On the Employment Effects of Revenue Neutral Tax Reforms," *Public Finance Analysis, New Series,* 54(4), 1997, pp. 430–446

Gibson, Dunn & Crutcher LLP

consideration of these until the next section. Consequentially, here I ask simply: What would happen if Uber changed its referral rate in order to help cover the new cost of driver tips that are included in the fare?

168.    To answer this question, suppose that for each ride, Uber leaves unchanged the total fare charged to the passenger, but sets aside a fixed share of the total fare as the driver's "tip." This "tip" is paid in its entirety to the driver. Under these changes the passenger pays the same fare, the driver receives a larger share of the fare since Uber does not take a licensing fee on the fixed "tip," and Uber, in turn, receives a smaller share of the total fare. However, Uber is organized for profit and can charge the licensing fee it deems would put itself in the best position vis-à-vis its competitors (e.g., other lead generation platforms such as Lyft and Sidecar). Suppose that Uber increased the referral rate in an amount to exactly offset the revenue it loses by setting aside the fixed "tip" for the driver. In turn, the driver's share of the non-"tip" portion of the fare would be reduced, exactly offsetting the increased pay from the "tip." The final costs and revenues of all three parties – the passenger, the driver, and Uber – are unchanged.

169.    To see how this might work with a simple numerical example, suppose that in the current world, Uber's licensing fee were a flat 20% of the fare charged to passengers. (I recognize that licensing fee schedules are more complex than this; I seek merely to clarify the content of this argument with a few hypothetical numbers.) To make the argument conservative, suppose the fixed tip Uber provided to drivers were a hefty 20%–seemingly providing drivers with a substantial improvement. This improvement is a mirage, however. Because Uber is at liberty to charge the referral rate it deems appropriate, under this hypothetical Uber could reduce its pre-tip fares by approximately 16.7% so as to leave customer fares unaffected, and yet increase its licensing fee to 24%. Such a change would leave passenger costs unchanged and Uber revenues unchanged.[264]

---

at p. 430. Similarly, Uber can restructure its licensing procedure in a way that allows them to still receive the same amount of revenue.

[264] In general, if the current world licensing fee rate is $c$ and the constant tip rate Uber provided for drivers were $t$, then for an actual world fare of $\$F$, new pre-tip fares are set as $\$F/(1+t)$, and the new licensing fee rate is $c(1+t)$. Here, $c(1+t)=0.2(1+0.2)=0.24$.

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

170.     Note that in this hypothetical scenario, I have simply relabeled compensation.  I have set aside a portion of the driver's portion of the passenger's fare to be called "tip," I have given all of it to the driver, and I have calculated what new fares Uber would charge to leave customer fares unchanged and what new licensing fee Uber would have to charge to have its revenues unaffected.

171.     The only thing that the putative class members would have in common is that none of them are harmed: their earnings are the same under the but-for world Plaintiffs seek and under the actual world of which Plaintiffs complain.

172.     Alternatively, imagine that instead of including a fixed "tip" in the total fare, tips were instead determined by riders through the App in some way.  For the reasons described above, tips would likely vary substantially across drivers and rides. Uber would not necessarily find it in its interests to leave fares unchanged since under this scenario passengers are paying more for rides. Uber might lower its fares so that passengers are paying, on average, the same total amount for a ride as they are in the current world.  Uber could then increase the licensing fee it charges such that it receives, on average, the same revenue that it does under the current arrangement.

173.     To return to a basic numerical example as above, suppose that in the current world, Uber's licensing fees were a flat 20% of the fare charged to passengers. (Again, I recognize that licensing fee schedules may be more complex than this; I seek merely to clarify the content of this argument with a few hypothetical numbers.) If passengers on average paid tips of 15%, then under this hypothetical Uber would reduce the fares it charges customers by approximately 13%, allow for passengers to choose their tip amount, and increase its licensing fee to 23%.  Such a change would leave passengers' aggregate costs unchanged (in the hypothetical where they pay a 15% tip on average) and Uber's aggregate revenues unchanged.[265]

174.     However, in this scenario, some drivers would be better off and some drivers would be worse off.  The drivers who receive higher than average tips from passengers would be better off.

---

[265] In general, if the current world licensing fee rate is c and the average tip rate t, then for an actual world fare of \$F, new fares are set as $\$F/(1+t)$ and the new licensing fee rate is $c(1+t)$.  Here, $c(1+t)=0.2(1+0.15)=0.23$.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                        CV 13-03826-EMC

The drivers who receive *lower* than average tips from passengers would be *worse* off.  Thus, in this hypothetical scenario, putative class members are in conflict with one another.

175.    Moreover, as I described above, highly individualized factors influence tipping.  Consequently, an individual investigation would be necessary to identify if any particular driver was harmed or made better off.

### C.    It Is Not Possible to Calculate Potential Damages Incurred from Expenses on a Class-wide Basis

176.    Plaintiffs claim that some of the main sources of expenses borne by drivers using the Uber App are vehicle and gas expenses.[266]  However, the extent to which drivers incur, and bear, the cost of these expenses is not common to the class.  Drivers using the Uber App drive a wide variety of vehicles.  Driver declarations provide a sense of the variation in type and age of these vehicles.[267]  These vehicles incur expenses at varying rates.  Gas mileage varies considerably among cars used by drivers.[268]  In addition, the value of a vehicle does not depreciate linearly; that is, new vehicles

---

[266] SAC ¶ 23.

[267] For example, see Declaration of Janet Waller, 5/19/2015, ¶ 8 ("I drive a 2013 Scion XB when I drive using Uber and Lyft Applications.  I own the car as well."); Declaration of Quinn Renfro, 5/28/15, ¶¶ 2–3 ("We shared one car, a 2009 Yukon Denali, which was owned by Q-Star Charters.  Within the next six months, between November 2013 and February 2014, my company acquired two more vehicles–a 2008 Cadillac STS and a 2009 Cadillac Escalade."); Declaration of Edmond Chouteau, 5/26/15, ¶ 6 ("I drive both UberX and UberPlus.  The vehicle I use for UberPlus is a Mercedes and I have a Ford F150 that I use for UberX"); Declaration of Angel Herroz, 5/28/15, ¶ 2 ("I own a 2012 Jeep Patriot that I use to drive with the Uber App."); and Declaration of Terry Gambra Baruti, 5/20/15, ¶ 3 ("I use a Town & Country LX minivan for transportation of passengers.").

[268] To best demonstrate the variation in gas mileage, consider the following three declarants.  Each declarant reported driving for UberX, but the first has a 2015 Toyota Prius, the second drives a 2015 Honda Accord, and the third uses a 2015 GMC Acadia. The Prius receives an mpg rating of 51 city/48 hwy, the Accord receives a rating of 27 city/36 hwy, and the Acadia receives a rating of only 17 city/24 hwy. Declaration of John Nicholas Marantos, 5/28/15, ¶ 2; Declaration of Thomas Ogu, 5/19/15, ¶ 4; Declaration of Abdulai Amidu, 5/26/15, ¶ 2; "2015 Prius," Toyota, http://www.toyota.com/prius/, accessed on 7/3/15; "2015 Accord Sedan," Honda, http://automobiles.honda.com/accord-sedan/, accessed on 7/3/15; and "2015 Acadia," GMC, http://www.gmc.com/acadia-crossover-vehicle.html, accessed on 7/3/15.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                      CV 13-03826-EMC

1    depreciate faster, per mile and/or per day, than older vehicles.[269]  This means that the expenses

2    incurred by a particular driver may depend on the age and odometer reading of her vehicle at the time

3    she was providing each ride referred through the Uber App.

4         177.    In addition, some drivers using the uberX platform use their personal vehicle (while

5    others using uberX drive liveried cars with TCP licenses).[270]  Many of the drivers who use their

6    personal vehicles likely also use their vehicles for personal driving when they are not driving a

7    referral from the Uber App.  The degree of accumulated wear and tear on a vehicle that is incurred

8    during personal use would likely vary considerably across drivers, depending in large part on the type

9    and amount of personal driving.

10        178.    The responsibility each driver currently bears for his or her own expenses is not

11   common.  Drivers driving a black car for a licensed TCP, for instance, may not cover their vehicle

12   and gas expenses.  For example, drivers for the TCP company Black Limousines have their gasoline,

13   car washes, and tolls covered and they only have to pay for their own parking or moving violations,

14   lunches, and transportation to get to the company to pick up the cars that they use.[271]  Drivers for

15   another licensed TCP, in contrast, may be responsible for paying the majority of their own expenses,

16   especially if they use their own car to drive.  For example, the driver who works for J.J. VIP Limo

17   Inc. is responsible for paying his own "gas, maintenance, etc." and is not reimbursed for any

18   expenses.[272]

19        179.    For all the reasons described above, it would not be possible to calculate potential

20   damages incurred from expenses on a class-wide basis using common and available evidence.

21

22   _____

23   [269] "Q: What is Car Depreciation?" Kelley Blue Book, 12/17/13, http://www.kbb.com/what-is-car-
     depreciation/?r=643161140864619600, accessed on 7/3/15; and "Don't Get Stuck, Choose
24   Wisely," Kelley Blue Book, http://www.kbb.com/new-cars/about-total-cost-of-ownership/,
     accessed on 7/3/15.

25   [270] For example, see Declaration of Alexander "AJ" Galloway, 5/27/15, ¶ 3; and Declaration of
26   Ahmed Yousif Abdi, 5/28/15, ¶ 2.

27   [271] Declaration of Patrick Canlas, 8/11/14, UBE-OCO00009114–20, ¶ 19.

28   [272] Declaration of Mostapha Makki, 5/26/15, ¶ 3.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

180.     Were Uber to implement a rate scheme to cover expenses as a proportion of the fare, then the same argument regarding tips would apply here:  the only thing members of the putative class would have in common is that there would be no harm.  Uber would predictably increase its licensing fee to offset any flat rate expenses it paid to drivers.  Uber would predictably do so in such a way as to leave itself in a revenue neutral position, and this would leave drivers with no actual change in their economic position.

### D.     If Uber Paid for Driver Expenses There Is Meaningful Potential for Class Conflict

181.     In the previous section, I showed why it is not possible to calculate damages from expenses on a class-wide basis.  In this section I consider the licensing fee that Uber currently charges and how that might change if Uber were required to implicitly or explicitly pay drivers for expenses.  I show that under hypothetical scenarios, there is a meaningful potential for class conflict.

182.     What if Uber bore responsibility for paying, either implicitly or explicitly, for expenses incurred by drivers?  Assuming that nothing else has changed about Uber's business model or the relationship between Uber, drivers, and passengers, would all putative class members be better off?

183.     In this scenario, Uber now faces a new cost—namely, covering driver expenses.  What would happen if Uber changed its licensing fee rate in order to help cover this new cost?  As I showed in the previous section, the expenses incurred by each driver are individualized, but Uber could increase the licensing fee rate it charges so that it could cover, on average, driver expenses through the increased licensing fees.  This would necessarily reduce the revenues received by drivers, but would be at least in part offset by the fact that their expenses would be now covered.

184.     In this scenario, drivers would be, on average, no better or worse off than before Uber covered expenses. However, some drivers would be better off and some drivers would be worse off.  Drivers who incur higher than average expenses would be better off.   For these drivers, the reduction in revenue as a result of the increased Uber licensing fees would be more than offset by their expense reimbursement.  However, drivers who incur lower than average expenses would be worse off for

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

similar reasons.  Moreover, as I showed above, the actual expenses incurred by each driver depend on individual factors.  Thus, individual investigation and information would be required to identify if a particular driver was harmed or made better off.  In this scenario, there is again substantial scope for conflicts among putative class members.

## VIII.   MANY DRIVERS WOULD BE HARMED IF ACCEPTING A PASSENGER REFERRAL FROM UBER MADE THE DRIVER AN UBER EMPLOYEE

185.    In the previous section, I showed (a) that damages could not be calculated on a class-wide basis, (b) that under some notions of the but-for world there are harms to no members of the putative class, and (c) that if there are harms for some members of the putative class then there is meaningful potential for class conflict.  A theme of these considerations is that the licensing fee Uber currently charges would be expected to change in the wake of any change to how tips and expenses are handled.[273]

186.    In this section, I discuss the potential harm to different putative class members under two different hypothetical scenarios:  (1) were all drivers who use Uber's platform for referrals to be found uniformly to be Uber employees and Uber agreed to keep at least some of them on as employees, and (2) were Uber to change its business model to only allow companies, and not individuals, to use the platform.

---

[273] To be clear, in my opinion, there is nothing inappropriate about changing the referral fee in the wake of any alteration to Uber's work relationship with drivers who accept ride referrals.  Uber is a firm organized for profit and has the right to charge the referral fee it deems appropriate in light of the competitive environment it confronts and its costs.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                             CV 13-03826-EMC

### A.   Many Current Drivers Would Be Harmed If Use of the Uber App Rendered Every Driver an Uber Employee

187.   What if every driver using the Uber platform were found to be an employee of Uber (i.e., every member of the putative class were found to be an employee of Uber)?[274]  How would this impact different drivers in the putative class going forward?   Economic principles allow one to assume that drivers who currently use the platform prefer it to their current outside options.  Thus, the threshold question is whether each driver in the putative class would be able to continue to use the Uber App.  An equally important question is whether each driver would be better off (i.e., prefer) the tradeoffs that come from all platform users being found to be Uber employees.

### 1.   Increased costs (some fixed) relative to each driver-"employee" could lead Uber to employ fewer drivers and many putative class members would be harmed

188.   If use of the Uber App rendered a driver an Uber employee, then the costs, both fixed and variable, to Uber of each driver accepting ride referrals using the platform could increase substantially, because employers must pay in whole or in part for certain legally mandated benefits and insurance coverage including for example workers' compensation,[275] state unemployment insurance,[276] employment training tax,[277] and paid sick leave.[278]  There may also be further legally

---

[274] For the purposes of this discussion, define "Uber driver" as a driver who has signed up for the Uber platform, turned it on, and driven at least one passenger through a referral.

[275] "Obtaining Worker's Compensation Insurance," Governor's Office of Business and Economic Development, http://www.business.ca.gov/StartaBusiness/AdministeringEmployees/WorkersCompensation.aspx, accessed on 7/7/15

[276] "Employment Taxes," Governor's Office of Business and Economic Development, http://www.business.ca.gov/StartaBusiness/AdministeringEmployees/EmploymentTaxes.aspx, accessed on 7/3/15.

[277] "Employment Taxes," Governor's Office of Business and Economic Development, http://www.business.ca.gov/StartaBusiness/AdministeringEmployees/EmploymentTaxes.aspx, accessed on 7/3/15.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

mandated benefits and insurance, or compliance with other policies, which Uber would have to cover if drivers were deemed employees.   For example, if drivers were deemed employees, it is not clear how Uber might go about verifying whether it were in compliance with minimum wage policies. This would immediately make flexible work and "multi-apping" problematic from Uber's perspective.  Such considerations could substantially undercut Uber's economic incentive to allow drivers to use the platform unless their use of it was sufficiently frequent to justify the costs and difficulties associated with their "hire."  For example, consider a driver like Ray Lebron.  His driving brings very little revenue to Uber.  Approximating current Uber licensing fees at 20% of fares, Mr. Lebron generates less than $60 a month, or $720 a year, in revenues for Uber.[279]  Uber would have very little incentive to have a relationship with drivers of this type if they were deemed to be employees, particularly in light of the increased costs described above, and would be expected to choose not to "hire" them.  As a result, it is manifestly evident that any drivers similarly situated might be harmed.

> **2.** *Drivers who do not value the benefits that come with employee status, would likely be harmed if Uber raised its referral rates to cover the cost of employee benefits*

189.    Imagine that Uber, as an employer, had to provide workers' compensation and unemployment insurance to all its driver-"employees." It would be unsurprising if Uber, in order to pay for these benefits, increased the average licensing fee it charges drivers for accepted referrals.

---

[278] See "Employee Benefits," Governor's Office of Business and Economic Development, http://www.business.ca.gov/StartaBusiness/AdministeringEmployees/EmployeeBenefits.aspx, accessed on 7/3/15:  "Beginning July 1, 2015, employers will be required to offer paid sick leave…An employee who, on or after July 1, 2015, works in California for 30 or more days within a year from the commencement of employment is entitled to paid sick days for prescribed purposes."

[279] Ray Lebron works on average 4 hours a week (Declaration of Ray Lebron, 5/29/15, ¶ 10).  The calculation assumes he makes $16.37 per hour, which is the average rate in LA for drivers who work 1–15 hours/week (Hall, Jonathan, and Alan Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *Princeton University Industrial Relations Section*, Working Paper 587, 1/22/15, p. 18).

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                      CV 13-03826-EMC

1    Drivers who value the new benefits might find themselves equally situated or even better off than

2    before.  But drivers who did not value the benefits would be worse off.  They would earn less when

3    driving using the Uber App without any offsetting increase in value because the benefits do not hold

4    value for that particular driver.

5

6         ***3.***    *Were Uber to take an employer's stance of asking for employee loyalty as a*

7              *condition of employment or some expectation of permanence (e.g., setting*

8              *hours of work), many putative class members would be harmed*

9         190.    Were Uber to be an employer, and all users of the platform employees, Uber would be

10   free to require of those drivers many of the typical conditions of employment.  Were Uber to require

11   employee loyalty (i.e., that a term of existing employment was that drivers work only with Uber and

12   not with other driving services), many putative class members would be harmed (absent

13   demonstrable and meaningful offsetting benefits).  For example, and as shown above, putative class

14   members currently choose to work with and for many different transportation companies at the same

15   time.  These putative class members would generally be expected to be harmed, although a

16   determination of the amount of harm would require individual investigation.  One such example

17   might be a full-time driver who currently chooses to drive Uber referrals only part-time, and drives a

18   taxi part-time.  Such an individual would no longer enjoy the flexibility to work in this way.  If she

19   prefers her taxi job to driving referrals with her own car, she would then be limited to part-time

20   employment with the taxi company.  Absent demonstrated benefits, she would be expected to be

21   harmed.  As a second example, consider a driver who always uses his own car, but takes passenger

22   referrals from Uber, Lyft and other lead generation platforms, sometimes simultaneously.  Such an

23   individual might no longer be allowed to enjoy this flexibility and might have to rely solely upon

24   Uber referrals, consistent with any new understanding that drivers are Uber employees.  Absent

25   demonstrated benefits, this driver would also be expected to be harmed.  Moreover, I understand that

26   it is additionally conceivable that under such a determination, such a driver might have breached a

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

duty of loyalty to Uber by previously having driven for its competitors.[280]  The fact that this is conceivable could potentially expose such a driver to litigation.  While in both examples, putative class members would be expected to be harmed, the fact of harm and the magnitude of any such harm would require individual investigation.

191.    Were Uber to exercise the right to choose when and where employees worked—which could be helpful for Uber on the margin from a resource matching/planning perspective—the many drivers who value the freedom to begin, end and re-start work whenever they please would be harmed, absent meaningful demonstrated offsetting benefits.  Determining the magnitude of harm would by necessity involve pricing how much workers value flexibility, which would involve individual investigation.

### 4.    Were all drivers for black car/limousine companies to become employees of Uber, some putative class members would be harmed

192.    A driver currently employed for a black car company who receives and prefers an hourly wage could be harmed if the choice to accept an Uber referral turned him into an Uber employee.  Uber does not pay hourly, but rather by the job, which means that drivers who use the Uber App for referrals bear risk (e.g., of not getting enough referrals or the right referrals and not earning enough day to day).  Some drivers would prefer to remain in an employment situation in which they did not bear daily risk on their take home earnings.

193.    An owner-driver of a black car company could be harmed if he, a currently self-employed business owner, and all his drivers were to become employees by accepting a referral from Uber.  Were he to choose not to accept referrals in order to maintain his status as a self-employed business owner, he would unambiguously be harmed as he now has access to fewer referrals.  On the other hand, were he to choose employment status for himself and all his employees, the determination of whether or not that owner-driver would be harmed would require inquiry into all the details of his business and the ultimate status of his relationship with Uber.

---

[280] The American Law Institute, Restatement of the Law Third, "Agency," Volume 1, p. 33.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

## B.    Many Current Drivers Would Be Harmed If Uber Only Allowed Companies, and Not Individuals, to Use the Platform

194.    It is instructive to consider the hypothetical of what would happen to putative class members were Uber to choose to only allow companies, and not individuals, to use its platform.  For example, could this happen if all individual driver use of the platform were deemed to constitute employment by Uber, but drivers who use the platform through their employment with a small business were not?  In this hypothetical Uber would no longer allow individuals to use the platform directly, but rather they could only do so if they were employed by a business that Uber had approved.  Many putative class members would likely be harmed by this, unless it could be somehow demonstrated that all putative class members would be able to obtain work for employers on that basis.  Barring that, any potential benefit of being determined to be an employee rather than an independent contractor would have to be juxtaposed with the possible harm suffered by members of the putative class unable to obtain work.

195.    Similarly, under such a hypothetical, individuals who currently exercise freedom over their hours and are free agents in regard to for whom and when they work would be forced to obtain employment with a firm in order to be able to offer driving services with their own car.  The hours, location and other requirements of the job would likely be different than the driver's current independent relationship using the Uber App for referrals.  Their new status as an employee would be expected to be associated with an employer's traditional insistence on hourly schedules, modes of dress, and so on.  Those putative class members who value the current flexibility of driving using a passenger referral system with no requirements on days worked, geography, number of rides or time driven in a day, when to stop using the App, and so on, would be harmed absent some demonstrated offsetting benefit to being an employee.  Demonstrating such offsetting benefits would again seem to require individual investigation; even if the benefits were somehow able to be determined on a class-wide basis, the harm from loss of flexibility cannot be determined using information common to the putative class and thus would require individual investigation.

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

## IX. CONCLUSION

196. Traditionally, the market for driving services has confronted information and coordination problems that have kept simple market solutions from working well. The essence of these problems is that those who would like to be driven may find it difficult to locate in time and space those who might be willing to drive them to their destination. For many people, this may be a central motivation for car ownership, despite its cost. Uber and other lead generation platforms provide a new, technological solution to these problems, leveraging the prevalence of cell phones on the part of drivers and those who might want to be driven. This technological approach complements existing regulatory approaches.

197. In my report, I have emphasized that Uber provides a wide array of platforms, each of which is best understood as a product, that facilitate the matching of passengers and drivers. Most of the economic activity taking place on Uber platforms is regulated by the PUC, but other economic activity taking place on Uber platforms is regulated by cities and counties. Those activities regulated by the PUC may be regarded as underneath either the TCP or TNC regulatory regimes, with the distinction being drawn based on whether the driver is engaged in work on behalf of a third-party entity that is regulated as a TCP.

198. Drivers using Uber platforms are involved in a wide variety of work relationships with companies engaged in driving services. Those accepting ride referrals through UberBLACK may be sole proprietors or employees or independent contractors of third-party black car companies. Those accepting ride referrals through the UberTAXI platform could own their own taxi company or be independent contractors or employees for third-party taxi cab companies. Those accepting ride referrals through the uberX platform could be sole proprietors or employees or independent contractors of third-party driving service companies.

199. Moreover, drivers may, and do, accept ride referrals on more than one Uber platform, mixing and matching as they see fit the platforms for which they qualify. Every driver has the option of accepting ride referrals on any platform for which she meets the qualifications.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                    CV 13-03826-EMC

200.    Additionally, drivers using Uber platforms are involved in a wide variety of work relationships with companies having nothing to do with driving services.  Some drivers "moonlight" as drivers in the sense that they work full-time for an employer and accept Uber platform referrals when convenient for them. Others work primarily as freelancers, cobbling together various flexible work or part-time work and accept referrals from Uber platforms when they have the time and inclination. Yet other drivers have no employer and only rarely accept referrals from the Uber App, perhaps because of competing obligations at home or leisure choices.  Finally, some individuals may simultaneously be contemplating accepting referrals from one or more Uber platforms at the same time as they are contemplating accepting referrals from competitors for Uber.

201.    In my opinion, there is no typical driver who uses the Uber App.  I am not aware of any evidence that Uber exercises control, retains a right of control, or has any uniform policy in connection with control over drivers' physical conduct of their work.  Consistent with this understanding, the evidence reviewed above demonstrates that each driver controls whether to drive, when to drive, where to drive, and how to drive; that each driver elects whether, when, and where to turn on the Uber App; and that each driver makes an election regarding which platform to turn on from among those for which she is eligible.

202.    Just as work options and practices vary greatly, so do driver expenses.  Drivers are in the best position to minimize their own expenses:  they choose which type of car to drive,[281] they choose which route to take, how aggressively to drive, whether to purchase generic or name-brand gasoline, regular unleaded, midgrade, or premium gasoline, and so on.  Because of this heterogeneity in expenses, determining how much members of the putative class may have been harmed would require, at a minimum, individual inquiry and investigation.  Moreover, I am not aware of any commonly available information on expenses.

---

[281] I understand that these choices are subject to the requirements of the Uber platform for which the driver contemplates accepting ride referrals.  For example, more cars are eligible for driving using the uberX platform than for driving using the UberBLACK platform, which is a higher end driving service.

Gibson, Dunn & Crutcher LLP

DECLARATION OF DR. JUSTIN MCCRARY                                         CV 13-03826-EMC

203. Because tipping practices vary greatly in the real world, there is similarly no method for estimating how much members of the putative class may have been harmed using commonly available information.

204. Moreover, as I emphasized above, drivers would not be uniformly better off if Uber were to change its service to add tips or pay driver expenses. To the best of my knowledge, Plaintiffs have not articulated any notion of a but-for world that might form a basis for claims of harm. In my report, I postulated what some of those but-for worlds might look like. Under some of them, members of the putative class are united in having experienced no harms. Under others, there is meaningful scope for class conflict, with some members benefiting from the status quo and others being harmed by it. Further, determining which member is of which type and what magnitude of harm or benefit is involved would involve individual inquiry and investigation.

205. Underscoring these concerns, I conclude that drivers use the platform in such a large variety of ways, under such a large variety of working relationships, that many current drivers who have used the Uber App for referrals would be harmed if it were commonly found that the use of the Uber App turned every driver into an employee of Uber. Uber would, under any such determination, be expected to contemplate many different reorganizations of its business model, and many of these would be associated with potentially substantial harms to drivers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7 day of July at Kensington, California.

_Justin. McCrary_

_____

Gibson, Dunn &
Crutcher LLP