GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
DEBRA WONG YANG, SBN 123289
  dwongyang@gibsondunn.com
MARCELLUS A. MCRAE, SBN 140308
  mmcrae@gibsondunn.com
THEANE D. EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
  dmanthripragada@gibsondunn.com
BRANDON J. STOKER, SBN 277325
  bstoker@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   213.229.7000
Facsimile:   213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
KEVIN RING-DOWELL, SBN 278289
  kringdowell@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:   415.393.8200
Facsimile:   415.393.8306

Attorneys for Defendant
UBER TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. CV 13-03826-EMC<br><br>**DECLARATION OF MICHAEL COLMAN IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing:**<br><br>Hearing Date:  August 6, 2015<br>Time:  1:30 p.m.<br>Place:  Courtroom 5<br>Judge:  Hon. Edward M. Chen |

DECL. OF MICHAEL COLMAN IN SUPPORT OF DEF'S. OPP'N TO PLS.' MOT. FOR CLASS CERT.
CASE NO. CV 13-03826

# DECLARATION OF MICHAEL COLMAN

I, Michael Colman, hereby declare and state:

1. The information set forth herein is true and correct of my own personal knowledge (unless otherwise stated) and if asked to testify thereto, I would do so competently.

2. I am employed as an Operations Specialist for Uber Technologies, Inc. ("Uber"), and I work in Uber's San Francisco office. I have been employed by Uber since October 19, 2011, and have worked as an Operations Specialist since February 2013. In that role, I consult with operations teams throughout California regarding nearly every facet of Uber's operations and have comprehensive personal knowledge of Uber's business model, as well as the operations of Uber's wholly-owned subsidiary, Rasier, LLC ("Rasier").

3. Uber is a technology company that connects individuals in need of a ride ("riders") with available, independent transportation providers looking for passengers. Uber provides the technology through its smartphone application (the "Uber App"), which allows riders and transportation providers to connect based on their location.

4. Using the Uber App, riders can connect with available transportation providers offering a variety of transportation options through several different platforms, including, but not limited to, UberBLACK, UberSUV, and uberX. The UberBLACK platform connects riders to limousines or town cars operated by transportation companies. The UberSUV platform connects riders to luxury sport utility vehicles operated by transportation companies. The uberX platform connects riders to vehicles operated by private individuals (*i.e.*, the product includes "ridesharing" or "peer-to-peer" services), as well as vehicles operated by transportation companies. Rasier contracts with independent transportation providers that desire to be part of the uberX platform.

5. Transportation providers and drivers do not pay a fee to sign up for the uberX, UberBLACK or UberSUV platforms, nor does Uber pay them a fee to join these platforms.

**Transportation Provider and Driver Agreements**

6. As an Operations Specialist for Uber, I am familiar with the agreements to which transportation providers and/or drivers must assent in order to gain access to the Uber App. I also have access to Uber's business records reflecting the identity of the transportation providers that use

1

the Uber App, as well as drivers whom those transportation providers have engaged. These records are maintained in the regular course of Uber's business and updated as new transportation providers and drivers join and leave the system.

7. Any transportation provider that wishes to access the UberBLACK or UberSUV platforms to book passengers must first enter into a licensing agreement with Uber governing the terms by which Uber will lease its software to the transportation provider and the contractual relationship between Uber and the transportation provider.

8. Transportation providers are free to engage drivers to provide transportation services on their behalf and under their accounts, but individual drivers who are employed by or contract with those transportation providers must assent to both a licensing agreement and a driver addendum with Uber. On occasion, Uber rolls out updated licensing agreements and driver addenda, to which transportation providers and drivers must assent in order to continue accessing the Uber App. Any transportation provider that wishes to access the uberX platform to book riders must enter into a separate agreement with Rasier. Some (but not all) versions of the licensing agreements, driver addenda, and Rasier agreements include an arbitration provision.

9. From August 16, 2009, to the present, Uber and Rasier have issued and implemented a total of 13 different licensing agreements and Rasier agreements, and another 4 driver addenda, to California transportation providers and drivers who use or have used the uberX, UberBLACK and UberSUV platforms. These agreements have varied in many significant ways, as discussed in the Declaration of Theane Evangelis, filed concurrently herewith. I have reviewed each of these agreements and am familiar with their history and contents. Descriptions of these agreements now follow:

    a. From the start of Uber's business in each city until July 2011, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms were required to assent to an agreement with Uber called Partner/Driver Terms and Conditions, a copy of which is attached hereto as Exhibit A. This version of the licensing agreement did not include an arbitration provision.

    b. From approximately July 2011, to July 24, 2013, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms were required to assent to an amended version of the Partner/Driver Terms and Conditions, a true and correct copy of which is attached hereto as <u>Exhibit B</u>.  This version of the licensing agreement did not include an arbitration provision.

    c. From approximately February 2013, to August 27, 2013, transportation providers who signed up for the uberX platform were required to assent to an agreement with Rasier called the Transportation Provider Service Agreement, a true and correct copy of which is attached hereto as <u>Exhibit C</u>.  This agreement included an arbitration provision.

    d. From approximately July 24, 2013, to December 10, 2013, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms, or pre-existing transportation providers and drivers who wished to continue to use the UberBLACK or UberSUV platforms, were required to assent to the Software License & Online Services Agreement, a true and correct copy of which is attached hereto as <u>Exhibit D</u>.  This version of the licensing agreement included an arbitration provision.

    e. From approximately July 24, 2013, to December 10, 2013, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms, or pre-existing transportation providers and drivers who wished to continue to use the UberBLACK or UberSUV platforms, were required to assent to the Driver Addendum Related to Uber Services, a true and correct copy of which is attached hereto as <u>Exhibit E</u>.  This driver addendum incorporated the arbitration provision contained in Exhibit D.

    f. From approximately August 27, 2013, to October 22, 2013, transportation providers who signed up for the uberX platform were required to assent to an amended version of the Transportation Provider Service Agreement, a true and

correct copy of which is attached hereto as <u>Exhibit F</u>.  This agreement included an arbitration provision.

g. From approximately October 22, 2013, to December 10, 2013, transportation providers who signed up for the uberX platform and pre-existing transportation providers who wished to continue to use the uberX platform were required to assent to a second amended version of the Transportation Provider Service Agreement, a true and correct copy of which is attached hereto as <u>Exhibit G</u>.  This agreement included an arbitration provision.

h. From approximately December 10, 2013, to June 21, 2014, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms were required to assent to an amended Software License & Online Services Agreement, a true and correct copy of which is attached hereto as <u>Exhibit H</u>.  In accordance with the Court's Order Granting in Part Plaintiffs' Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses , *see* ECF No. 60, this agreement did not include an arbitration provision.

i. From approximately December 10, 2013, to June 21, 2014, transportation companies and drivers who signed up for the UberBLACK or UberSUV platforms were required to assent to an amended Driver Addendum Related to Uber Services, a true and correct copy of which is attached hereto as <u>Exhibit I</u>.  In accordance with the Court's Order Granting in Part Plaintiffs' Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses issued on December 6, 2013, *see* ECF No. 60, this version of the driver addendum did not include an arbitration provision.

j. From approximately December 10, 2013, to June 21, 2014, transportation providers that signed up for the uberX platform were required to assent to a third amended Transportation Provider Service Agreement, a true and correct copy of which is attached hereto as <u>Exhibit J</u>.  In accordance with the Court's Order Granting in Part Plaintiffs' Renewed Emergency Motion for Protective Order to

4

1   Strike Arbitration Clauses issued on December 6, 2013, *see* ECF No. 60, this
2   agreement did not include an arbitration provision.

    k.  From approximately June 21, 2014, to November 10, 2014, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms or pre-existing transportation providers and drivers who wished to continue to use the UberBLACK or UberSUV platforms were required to assent to a second amended Software License & Online Services Agreement, a true and correct copy of which is attached hereto as <u>Exhibit K</u>.[1] This version of the licensing agreement included an arbitration provision.

    l.  From approximately June 21, 2014 to November 10, 2014, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms were required to assent to a second amended Driver Addendum Related to Uber Services, a true and correct copy of which is attached hereto as <u>Exhibit L</u>.[2] This version of the driver addendum incorporated the arbitration provision contained in Exhibit K.

    m.  From approximately June 21, 2014 to November 10, 2014, transportation providers that signed up for the uberX platform were required to assent to an agreement with Rasier called the Software Sublicense and Online Services Agreement, a true and correct copy of which is attached hereto as <u>Exhibit M</u>.[3] This agreement included an arbitration provision.

---

[1] After approval by the Court, Uber rolled out a substantively identical version of this licensing agreement for pre-existing transportation providers and drivers who wished to continue to use the UberBLACK or UberSUV platforms, but included a Court-approved corrective notice on the first page of the agreement.

[2] After approval by the Court, Uber rolled out a substantively identical version of this driver addendum for pre-existing transportation providers and drivers who wished to continue to use the UberBLACK or UberSUV platforms, but included a Court-approved corrective notice on the first page of the agreement.

[3] After approval by the Court, Rasier rolled out a substantively identical version of this agreement for pre-existing transportation providers who wished to continue to use the uberX platform, but included a Court-approved corrective notice on the first page of the agreement.

n. From approximately November 10, 2014 to April 7, 2015, transportation providers and drivers who signed up for the UberBLACK or UberSUV platforms or pre-existing transportation providers and drivers who wished to continue to use the UberBLACK or UberSUV platforms were required to assent to the Uber Logistik, LLC Software License and Online Services Agreement, a true and correct copy of which is attached hereto as Exhibit N. This version of the licensing agreement included an arbitration provision.

o. From approximately November 10, 2014 to the present, transportation companies and drivers who have signed up for the UberBLACK or UberSUV platforms or pre-existing transportation providers and drivers who have wished to continue to use the UberBLACK or UberSUV platforms have been required to assent to a version of the Driver Addendum to Software License and Online Services Agreement, a true and correct copy of which is attached hereto as Exhibit O. This version of the driver addendum includes an arbitration provision.

p. From approximately November 10, 2014 to the present, transportation providers that have signed up for the uberX platform or pre-existing transportation providers and drivers who have wished to continue to use the uberX platform have been required to assent to an amended version of the Software License and Online Services Agreement, a true and correct copy of which is attached hereto as Exhibit P. This agreement includes an arbitration provision.

q. From approximately April 7, 2015 to the present, transportation providers and drivers who have signed up for the UberBLACK or UberSUV platforms or pre-existing transportation providers and drivers who have wished to continue to use the UberBLACK or UberSUV platforms have been required to assent to the Uber USA, LLC Software License and Online Services Agreement, a true and correct copy of which is attached hereto as Exhibit Q. This agreement includes an arbitration provision.

10. The terms of the agreements described in Paragraph 9 of this Declaration vary considerably and, as a result, so too do the implications of those terms. The following is a non-exhaustive list of key differences between the agreements:

   a. The agreements described above in Paragraphs 9(c), (f), (g), (j) and (m) expressly prohibit drivers from using the Uber App and other lead generation apps simultaneously. The remainder of the agreements described in Paragraph 9 do not.

   b. The agreements described above in Paragraphs 9(c), (f), (g), (j) and (m)–(q) expressly provide—or incorporate by reference contractual provisions that provide—that a transportation provider or driver may negotiate rider fares. The remainder of the agreements described in Paragraph 9 do not.

   c. The agreements described above in Paragraphs 9(n)–(q) expressly provide—or incorporate by reference contractual provisions that provide—that Uber or Rasier may adjust rider fares. The remainder of the agreements described in Paragraph 9 do not.

   d. The agreements described above in Paragraphs 9(c), (f), (g), (j) and (m) expressly prohibit transportation providers or drivers from accepting tips from riders. The remainder of the agreements described in Paragraph 9 do not.

   e. The agreements described above in Paragraphs 9(c), (f), (g), (j) and (m)–(q) require—or incorporate by reference contractual provisions that require—that transportation providers or drivers use specific vehicle models. The remainder of the agreements described in Paragraph 9 do not.

   f. The agreements described above in Paragraphs 9(d), (e), (h), (i), (k), (l) and (n)–(q) expressly provide—or incorporate by reference contractual provisions that provide—that Uber or Rasier arranges the processing of fare payment. The remainder of the agreements described in Paragraph 9 do not.

   g. The agreements described above in Paragraphs 9(c), (f), (g), (j) and (m)–(q) expressly provide—or incorporate by reference contractual provisions that

DECL. OF MICHAEL COLMAN IN SUPP. OF DEF'S. OPP'N TO PLS.' MOT. FOR CLASS CERT.
CASE NO. 3:15-CV-00262-EMC

provide—that the parties have a mutual right to terminate "without cause."  The remainder of the agreements described in Paragraph 9 do not.

h.  The agreements described above in Paragraphs 9(c)–(g) and (k)–(q) include—or incorporate by reference contractual provisions that include—arbitration provisions.  The remainder of the agreements described in Paragraph 9 do not.

11. None of the various licensing agreements, Rasier agreements, and driver addenda discussed herein addresses a transportation provider's or driver's behavior when the transportation provider or driver has the Uber App activated, yet has not accepted a passenger referral.  That said, if the transportation provider or driver continues to reject trips (including by a failure to respond in any manner), Uber may automatically log him or her out of the software.  She or he can log back in within a matter of minutes.  This is a system integrity issue intended to manage drivers who may have forgotten to log out.

12. As Operations Specialist, I have access to Uber's business records, which include the names of those individuals who have opted out of the arbitration agreements contained or incorporated in the various versions of the agreements set forth above.  These business records reflect that a minority of transportation providers and drivers have opted out of arbitration.  Plaintiffs Manahan, Colopy and Gurfinkel are among the drivers who opted out of arbitration.

13. Some transportation providers and drivers never assented to any arbitration provisions because they did not use the Uber App after the arbitration provisions were added into the licensing agreements, Rasier agreements, and driver addenda.  Some transportation providers and drivers used various platforms—either simultaneously or at different times—and thus were subject to multiple agreements involving both Uber and Rasier.  Some transportation providers and drivers deactivated their accounts for a period and then reactivated them at a later time.

14. Since June 2010, approximately 162,206 transportation providers and drivers in California have used the uberX, UberBLACK, or UberSUV platforms to identify riders in need of transportation services.  Many more transportation providers and drivers used one or more of these platforms from August 16, 2009, *i.e.*, the start of Plaintiffs' putative class period, through June 2010; however, Uber does not have in its possession, custody, or control the data by which to calculate the

number of transportation providers and drivers that used one or more of the three platforms during that time period.

15. To determine the licensing agreement(s), Rasier agreement(s) and/or driver addenda that apply to each particular transportation provider or driver in the putative class, an Uber employee will need to individually review that transportation provider's or driver's record. For the more than 162,206 drivers who have used one or more of the uberX, UberBLACK, and UberSUV platforms during the putative class period, this process would be extremely unwieldy, time-consuming, and laborious, if not impossible.

### Plaintiff Matthew Manahan

16. I conducted a personal and individualized inquiry into Uber's electronic records regarding Plaintiff Matthew Manahan. Plaintiff Manahan signed up to use the uberX platform on May 29, 2013, at which time he assented to the version of the Rasier agreement described in Paragraph 9(c) above. A true and correct copy of the agreement to which Plaintiff Manahan assented is attached as Exhibit R.

17. Plaintiff Manahan subsequently assented to multiple additional Rasier agreements, including those described in Paragraphs 9(g), (m) and (p). *See* Exhibits G, M, P.

18. Rasier received electronic receipts when Plaintiff Manahan assented to the electronic versions of the Rasier agreements. True and correct copies of the receipts that Rasier received upon Plaintiff Manahan's assent are embedded below. The receipts include date and time stamps indicating Plaintiff Manahan's assent:

Plaintiff Manahan's Assent to Exhibit G

| f70ba454-1971-4a02-b9ed-4029d7eab1bd | Matthew | Manahan | 2013-10-30 18:29:57.481407 |

Plaintiff Manahan's Assent to a version of Exhibit M[4]

| f70ba454-1971-4a02-b9ed-4029d7eab1bd | Matthew | Manahan | 2014-06-21 00:02:43.873972 |

---

[4] Plaintiff Manahan assented to the substantively identical version of Exhibit M referenced in Paragraph 9(m) n.3.

Plaintiff Manahan's Assent to Exhibit P

| f70ba454-1971-4a02-b9ed-4029d7eab1bd | Matthew | Manahan | 2014-11-26 20:31:11.441324 |

**Data Regarding Uber Drivers' Variable Usage of the Uber App**

19.  As Operations Specialist, I am familiar with and have access to electronic data that Uber collects regarding the transportation providers and drivers who use the Uber App, as well as the rides that those transportation providers and drivers provide to their passengers.  The Uber App transmits certain limited data (some of which is discussed below) to Uber's databases, and the data is collected and stored in the regular course of Uber's business.

20.  Members of Uber's Policy Research Department, at my request, have reviewed certain electronic data regarding transportation providers and drivers who use the Uber App, the rides they provide, and their driving habits.  In addition, at my request, they have prepared a series of graphical charts depicting this information on a topic-by-topic basis.[5]

21.  Attached hereto as Exhibit S is a chart depicting the distribution of hours per week that driver-partners were logged into the Uber App and providing rides during the month of February 2015.  The x-axis depicts the number of hours per week that driver-partners spent providing rides to passengers while using the Uber App and the y-axis depicts the percentage of driver-partners.

22.  Attached hereto as Exhibit T is a chart showing the distribution of active California driver-partners by lifetime ride request acceptance rate.  The x-axis depicts the driver-partners' lifetime ride request acceptance rate and the y-axis depicts the percentage of driver-partners.  This data was compiled on July 3, 2015.

23.  Attached hereto as Exhibit U is a chart showing the distribution of California driver-partners by weekly number of trips completed using the Uber App.  The sample month for this data is February 2015.  The x-axis depicts the weekly number of trips completed using the Uber App, and the y-axis depicts the percentage of driver-partners.

---

[5] The data for the charts described below is limited to transportation providers and drivers who have used the uberX, UberBLACK or UberSUV platforms in California.

24. Attached hereto as <u>Exhibit V</u> is a chart showing the distribution of California driver-partners by weekly number of logins into the Uber App. The sample month for this data is February 2015. The x-axis depicts the number of times that a driver-partner logged into the Uber App and the y-axis depicts the percentage of driver-partners.

25. Attached hereto as <u>Exhibit W</u> is a chart showing the distribution of California driver-partners by percentage of trips driven during peak hours. This chart reflects data for the full history of each driver-partner's activity as of July 3, 2015. Figure 1 shows variability across driver-partners, while Figure 2 shows variability across months for individual driver-partners.

26. Drivers choose when—if at all—to log into the Uber App and for how long. Uber incentivizes use of the Uber App during periods of peak demand by increasing rates ("surge pricing"). The idea underlying surge pricing is that additional drivers will choose to log into the Uber App due to the increased earning potential from higher fares. This increases the supply of transportation providers to meet the higher passenger demand during these times. Drivers can choose to accept trip requests only in locations where surge pricing is prevalent (*e.g.*, in San Francisco's Financial District) or when rates have "surged" to a level they deem acceptable.

27. Attached hereto as <u>Exhibit X</u> is a chart showing the distribution of California driver-partners by percentage of trips driven during surge pricing. This chart reflects data for the full history of each driver-partner's activity as of July 3, 2015. Figure 1 shows variability across driver-partners, while Figure 2 shows variability across months for individual drivers.

28. Attached as <u>Exhibit Y</u> is a chart showing the distribution of California driver-partners by lifetime average trips completed per month. This chart reflects data for the full history of each driver-partner's activity as of July 3, 2015.

29. Attached as <u>Exhibit Z</u> is a chart showing the total number of driver-partners in California over time, by platform or "vehicle view," as of July 3, 2015. The x-axis depicts time and the y-axis depicts the number of active drivers, per platform.

### Reimbursements and Tips

30. As an Operations Specialist, I am familiar with the method by which Uber processes payments from riders who have received transportation services from Uber's driver-partners. I am

also familiar with the process by which Uber remits fare payments, after deducting Uber's software licensing fees, to driver-partners.

31. Uber remits fare payments to transportation providers who contract directly with Uber ("direct partners") and does not have any way of monitoring or even knowing how much, if any, of that fare payment is ultimately transferred from Uber's direct partner to any individual driver. Uber is not responsible for the distribution of payments from Uber's direct partners to the drivers who may be operating under a direct partner's Uber account.

32. Uber does not ask direct partners to report reimbursements for expenses such as vehicle maintenance or gas to their drivers, if the direct partner reimburses any expenses at all. Nor does Uber request that drivers report reimbursements. As such, Uber cannot determine whether any given direct partner has a reimbursement policy vis-à-vis its drivers, let alone the details of such a policy or whether a particular driver is being reimbursed by Uber's direct partner.

33. Uber operates a cashless payment system. When a transportation provider or driver completes a ride, the fare is charged to the customer's credit card through the Uber App. There is no mechanism for the customer to add a tip, so drivers do not receive tips through the Uber App. Uber never collects cash tips from its transportation providers and drivers; nor does it request that transportation providers and drivers report cash tips. Uber thus cannot determine from its records whether—or how much—a transportation provider or driver may have been tipped on any given ride.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed at San Francisco, California, the 7th day of July, 2015.

By: _____
MICHAEL COLMAN