THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DEBRA WONG YANG, SBN 123289
  dwongyang@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
KEVIN RING-DOWELL, SBN 278289
  kringdowell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendant UBER TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>            Defendant. | Case No. CV 13-03826-EMC<br><br>**DECLARATION OF MATTHEW SAWCHUK IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing:**<br><br>Date:    August 6, 2015<br>Time:   1:30 p.m.<br>Place:   Courtroom 5<br>Judge:  Hon. Edward M. Chen |

Gibson, Dunn & Crutcher LLP

DECLARATION OF MATTHEW SAWCHUK IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

# DECLARATION OF MATTHEW SAWCHUK

I, Matthew Sawchuk, hereby declare under penalty of perjury that the following is true and correct.

1. I submit this declaration in support of Defendant's Opposition to Plaintiffs' Motion for Class Certification. I have personal knowledge of each fact stated herein, and, if called as a witness, I could and would competently and truthfully testify thereto.

2. I began working for Uber in early 2012 as Driver Operations and Logistics Manager in Canada, where I helped launch Uber in Vancouver. In that role, I helped with partner onboarding process and supply management. In October or November of 2012 I moved to San Francisco, where I continued to work as a Driver Operations and Logistics Manager. In mid-2013, I became a Senior Driver Operations and Logistics Manager with responsibility for managing driver operations and onboarding in San Francisco. I am currently responsible for peer management, including onboarding and driver operations for UberX, in San Francisco and in some of the expansion markets around San Francisco.

3. "Onboarding" refers to the process by which independent individuals or transportation companies, such as limousine or livery companies, sign up to become Uber partners and use the Uber mobile application (the "Uber App"). The onboarding process is created and managed independently in each city or market in which Uber operates, and has changed over time in San Francisco.

4. The onboarding process in San Francisco for transportation network company ("TNC")[1] partners, including UberX, UberPool, and UberXL, has changed over time as follows.

5. From January or February 2013 to approximately October or November of 2013, TNC partners could apply online, but the rest of the onboarding process was completed in-person. Uber SF conducted manual outreach a few times a day by text message or email to invite applicants to information sessions in Uber SF's offices. At the in-person sessions, partners first completed an application and agreed to a background check, then watched a brief video on how to use the Uber App and maintain a good customer rating. The latter consisted of high-level suggestions for what

---

[1] Transportation network company ("TNC") is the California Public Utilities Commission's designation for a peer-to-peer transportation platform that connects drivers using their personal vehicles with passengers.

2

DECLARATION OF MATTHEW SAWCHUK IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

Gibson, Dunn & Crutcher LLP

riders appreciate. Frequently, after the video, one of Uber SF's driver operations managers led an informal question and answer ("Q&A") session, the content of which varied considerably depending on who was leading the session. Some session leaders used PowerPoint slides and held a more formal, classroom style Q&A session; others, especially those leading smaller groups, led an informal discussion without any PowerPoint slides. Finally, Uber SF collected and verified partners' documents, including drivers' licenses, insurance, and vehicle registration, and performed a visual vehicle inspection.

6. Approximately three to ten days following this initial session, when the background check was complete, the partner was sent a text message informing him or her that an Uber-issued device (a modified iPhone) was ready to be picked up, at which point the partner had to return to Uber SF's office, where they signed a contract with Raiser LLC and received an Uber-issued device and information containing tips for how to maintain a good customer rating. Attached hereto as **Exhibit A** is a true and correct copy of information that was provided to TNC partners in early 2013 in San Francisco. Attached as **Exhibit B** is a true and correct copy of information that was provided to TNC partners starting in late 2013. The documents in Exhibits A and B are only examples of many different materials that were provided to drivers. To my knowledge, they were used only in San Francisco, though it is possible other cities used San Francisco's documents as templates and incorporated some of their own unique content.

7. From approximately November 2013 to mid-2014, Uber SF began holding larger onboarding sessions in offsite locations in addition to information sessions at Uber SF offices and shipping the Uber-issued devices directly to partners, though they still had the option of picking them up in person.

8. From mid-2014 to August 2014, due to the large number of drivers in the onboarding process, Uber SF switched entirely to remote onboarding, and began working with a third-party contractor called Brightstar to ship the Uber-issued devices directly to partners.

9. Finally, starting in August 2014, Uber SF began offering a bring-your-own device model. Once the documents were uploaded and verified, and the background check completed, the

Gibson, Dunn & Crutcher LLP

DECLARATION OF MATTHEW SAWCHUK IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

Uber SF's system automatically activates the driver.  Partners can still request an Uber-issued device by paying a refundable deposit of $200 and a $10 per week subscription fee.

10.     Unlike the onboarding for TNC partners, the format of onboarding for TCP partners, including UberBlack and UberSUV, has not transitioned to an online format, and is conducted in-person.  Partners who are TCP holders add new drivers to their accounts and then bring drivers to our Partner Support Center to be onboarded by members of the Uber SF team. During UberBlack onboardings, drivers take a multiple-choice city knowledge test. Upon passing the test and passing a background check, partners are notified that the driver is eligible to use the Uber app.

11.     From July 4, 2012, through March or April of 2013, Uber SF required all partners to take a city knowledge test.  In March or April of 2013, Uber SF stopped requiring TNC partners to take a city knowledge test, but anyone driving using UberBlack is still required to take such a test.

12.     From June 2010 until mid-2013, the onboarding process for both TCP partners and TNC partners included a visual vehicle inspection.  Beginning in mid-2013, partners were asked to upload photographs of their vehicles in lieu of an in-person visual inspection.

13.     Starting in August 2014, Uber SF began requiring all TNC and TCP partners to submit to a 19-point vehicle inspection at a lot staffed by qualified mechanics.  TNC and TCP partners are also required to upload vehicle photographs.

14.     From at least November 2012 until early 2013, drivers were deactivated based exclusively on failing to meet a minimum average star rating.  There were also isolated instances where a zero tolerance event, such as harassment, drunk driving, or a physical or verbal altercation, resulted in deactivation.  I am not aware of any driver being deactivated for any other reason during this time period.

15.     Sometime in early 2013, Uber SF began using a composite score to evaluate partners, which included both average star rating and metrics related to infractions that were reflected in written feedback from customers and notes on the account.  Infractions varied in severity, and included aggressive driving, physical disputes, verbal disputes, erratic behavior, falling asleep at the wheel, quality or condition of the car, such as missing a seatbelt or smelling very bad.  Different

Gibson, Dunn & Crutcher LLP

DECLARATION OF MATTHEW SAWCHUK IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

infractions were weighted differently in the composite metric. Acceptance and cancellation rates were also included in the composite score.

16. Early 2014, Uber SF iterated on the composite score and launched a quality retraining program in partnership with a third party called 7X7. As part of this program, partners with low average ratings rating were temporarily suspended, but offered reactivation if they completed a training course administered by 7X7.

17. Uber SF sends reminder emails to partners who have been inactive for 90 days informing the partner that their account will be deactivated if they do not log in. However, Uber SF rarely actually deactivated a partner based on inactivity, unless a partner requested that their account be suspended.

18. Uber SF occasionally performs an analysis to determine which drivers have very low acceptance rates and informs them that they should simply log out of the Uber Partner App if they do not wish to accept fares. Uber SF deactivates drivers with persistently low acceptance rates on a case-by-case basis.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on July 7, 2015 at San Francisco, California.

Matthew Sawchuk

DECLARATION OF MATTHEW SAWCHUK IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

I, Theodore J. Boutrous, Jr., hereby attest that concurrence in the filing of this document has been obtained from Matthew Sawchuck.

DATED: July 9, 2015      By:   /s/ Theodore J. Boutrous, Jr.
                                Theodore J. Boutrous, Jr.