THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DEBRA WONG YANG, SBN 123289
  dwongyang@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
KEVIN RING-DOWELL, SBN 278289
  kringdowell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendant UBER TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>        Defendant. | Case No. CV 13-03826-EMC<br><br>**DECLARATION OF BRAD ROSENTHAL IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing:**<br><br>Date:    August 6, 2015<br>Time:   1:30 p.m.<br>Place:   Courtroom 5<br>Judge:  Hon. Edward M. Chen |

Gibson, Dunn & Crutcher LLP

DECLARATION OF BRAD ROSENTHAL IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

# DECLARATION OF BRAD ROSENTHAL

I, Brad Rosenthal, hereby declare under penalty of perjury that the following is true and correct.

1. I have personal knowledge of each fact stated herein, and, if called as a witness, I could and would competently and truthfully testify thereto.

2. I joined Uber Technologies, Inc. ("Uber") in January 2014 in Los Angeles, working in driver operations. In mid-2014, I became the Senior Operations and Logistics Manager, with responsibility for all aspects of driver operations in Los Angeles, including onboarding. In December 2014, I moved to San Francisco to help work in the Company's Treasury team.

3. "Onboarding" refers to the process by which drivers or transportation companies, such as limousine or livery companies, sign up to become Uber partners and use the Uber mobile application (the "Uber Partner App"). The onboarding process is created and managed independently in each city or market in which Uber operates, and changed throughout the time I worked in Los Angeles.

4. From the time Uber launched in the Los Angeles market in February 2012 until March 2013, onboarding was conducted through in-person sessions during which Uber Los Angeles ("Uber LA") driver operations personnel met with potential drivers, verified their documentation, provided them with an Uber-issued device (a modified iPhone), and trained them how to use the Uber Partner App.

5. The presentation materials used in these in-person onboarding sessions were developed by driver operations personnel in Los Angeles and were largely unique to Uber LA. There were no standardized onboarding materials or presentations; rather, we maintained a collection of various presentations and handouts that driver operations personnel could use at their discretion. Similarly, the specific content and format of the presentations varied depending on who was leading it, as well as the number of partners participating. For instance, some session leaders created their own PowerPoint slides and used them in every session, while others frequently presented without PowerPoint. In addition, large groups of partners often participated in relatively formal presentations

2
DECLARATION OF BRAD ROSENTHAL IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

Gibson, Dunn & Crutcher LLP

followed by a question and answer ("Q&A") session, while smaller onboarding sessions were frequently conducted as informal discussions.

6. Around March 2013, Uber LA began moving to an online onboarding process, through which partners uploaded their documents to Uber's website and consented to a background check, though partners still had to visit Uber's offices in person to pick up an Uber-issued device. During this time period, Uber LA did not offer in-person onboarding sessions, and all partner support was conducted by phone and by email.

7. In the fourth quarter of 2013, Uber LA completed its move to an all-online onboarding process and began shipping Uber-issued devices to partners. At this point, partners did not need to visit Uber's offices for any portion of the onboarding process.

8. In approximately September 2014, Uber LA provided partners the option to download the Uber Partner App on their own personal cellular devices in lieu of, or in addition to, shipping the partner an Uber-issued iPhone. At this time, Uber LA also reintroduced the option of completing the onboarding process in-person if a partner chooses. Many partners still choose to come and complete the entire onboarding process in-person. The content for these in-person onboarding sessions sometimes differed from the online process. For instance, instead of showing an instruction video, some driver operations personnel gave live presentations using PowerPoint slides or held one-on-one meetings with partners. Others simply played an instructional video and then held an informal Q&A session with the partners following the video.

9. The onboarding process worked differently for Uber's livery partners in Los Angeles, and varied over time and by livery partner. For example, some livery partners added multiple vehicles to the Uber platform, some of which qualified for UberBlack and UberSUV while others for uberX and uberPLUS. Uber LA had background checks conducted on and verified the licenses of the drivers the livery company wished to operate the vehicles, but the livery partner itself was responsible for adding the drivers to its account and training them how to use the Uber Partner App. Some partners were given in-person (one-on-one or in group sessions) instructions on how to use the Uber Partner App, how to add drivers to their account, how to upload documents to their account, etc. Other partners were able to manage the process completely online.

Gibson, Dunn & Crutcher LLP

DECLARATION OF BRAD ROSENTHAL IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

10. Until approximately mid-2013, Uber LA required drivers for transportation charter-party ("TCP") partners, such as livery companies, to complete a city knowledge test to access the Uber Partner App. Uber LA has not required any partners to pass such a test since that time. To my knowledge, Uber LA has never required TNC partners, including those using uberX, to complete city knowledge tests.

11. Starting in approximately March 2014, subject to CPUC requirements, Uber LA began conducting 19-point vehicle inspections for vehicles on the TNC platform. Uber LA established relationships with major automotive repair chains and about 60 independent auto shops to conduct these inspections. They could also be performed by any Bureau of Automotive Repair-certified mechanic or by the TNC (Uber's subsidiary Rasier-CA, LLC) itself. In July 2014, Uber LA also required a one-time vehicle inspection for all current TCP vehicles to ensure their safety and that they met the requirements for the Uber products (e.g., UberBLACK and UberSUV) they were associated with. These inspections were conducted by Goodyear or Firestone.

12. Uber LA sets acceptable vehicle standards independently of other markets. Prior to mid-2014, Uber LA required UberBlack and UberSUV vehicles be at least model year 2006 or newer. In June or July 2014, the model year for UberBlack and UberSUV was changed from 2006 to 2010 or newer. Uber LA has always required UberBlack and UberSUV vehicles to have a black exterior and black leather interior.

13. Uber LA has independent responsibility for whether or not to "deactivate" a partner's account and suspend his or her usage of the Uber Partner App. At all times, partners have been deactivated for failing to meet a minimum average rating, based on star ratings provided by riders, or if they are involved in an egregious incident, such as drinking while driving, harassment, or fraud.

14. From approximately late 2013 to present, Uber LA temporarily suspends partners who commit four or more infractions within a certain period of time. Examples of minor infractions include, but are not limited to, vehicle smelling like smoke, inefficient trip route, or picking up the wrong rider. Examples of major infractions include, but are not limited to, an illegal traffic violation, or harassing the rider. Partners with a large amount of negative rider feedback were permanently deactivated on a case-by-case basis.

Gibson, Dunn & Crutcher LLP

4

DECLARATION OF BRAD ROSENTHAL IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

15. Starting in early 2014, Uber LA began notifying partners who are reaching the minimum average rating threshold to offer them a trial period in which to improve their rating. This trial period was offered on a case-by-case basis.

16. In the second quarter of 2014, Uber LA offered partners who had been deactivated the option of attending a driver training course offered by a third party called 7X7. Upon completion of the course, the drivers received a trial period in which they could show improvement in their rating.

17. Uber LA temporarily suspended partner accounts that were inactive for 180 days. Uber LA emailed partners who had been inactive to inform them that their account may be deactivated. If a partner responded by asking to be reactivated, Uber LA ran a background check and document check and then refreshed the account.

18. From approximately late 2013 to mid-2014, Uber LA evaluated those on the cusp of the minimum average rating deactivations on a case-by-case basis. This evaluation took into account the partner's history, time spent on the platform, any extenuating circumstances, including rider complaints, and other factors. During this period, Uber LA also deactivated partners based solely on falling below the minimum average rating. Starting in mid-2014, Uber LA moved away from case-by-case evaluations and attempted to make the star rating more black-and-white.

19. In my experience, no partner has ever been deactivated solely based on his or her low acceptance rate in Los Angeles.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on July 7, 2015 at Los Angeles, California.

*/s/ Brad Rosenthal*
Brad Rosenthal

Gibson, Dunn & Crutcher LLP

5
DECLARATION OF BRAD ROSENTHAL IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. CV 13-03826-EMC

1  I, Theodore J. Boutrous, Jr., hereby attest that concurrence in the filing of this document has been obtained from Brad Rosenthal.

DATED: July 9, 2015          By:    /s/ Theodore J. Boutrous, Jr.
                                         Theodore J. Boutrous, Jr.