SHANNON LISS-RIORDAN, *pro hac vice*
(sliss@llrlaw.com)
ADELAIDE PAGANO, *pro hac vice*
(apagano@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:      (617) 994-5801

MATTHEW CARLSON (SBN 273242)
(mcarlson@carlsonlegalservices.com)
Carlson Legal Services
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:     (415) 817-1470

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC,<br><br>Defendant. | Case No. CV  13-3826-EMC<br><br>**PLAINTIFFS'  REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. Edward M. Chen<br><br>Date: August 6, 2015<br>Time: 1:30 PM |

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................................1

II. ARGUMENT ......................................................................................................................4

    A.  Contrary to Uber's Arguments, Plaintiffs Have Satisfied Both the Commonality
        and Predominance Requirements of Rule 23.......................................................................4

    B.  Plaintiffs' Expense Reimbursement Claim Under Cal. Labor Code § 2802 Should
        Be Certified..........................................................................................................................10

    C.  Plaintiffs' Tips Claim Under Cal. Labor Code § 351 Should Be Certified. ......................13

    D.  Contrary to Uber's Arguments, The Named Plaintiffs' Claims are Typical of the
        Class....................................................................................................................................16

    E.  Contrary to Uber's Arguments, Named Plaintiffs and Class Counsel Are
        Adequate Class Representatives Under Rule 23.................................................................19

    F.  That Some Class Members Are Subject to Arbitration Agreements Does Not
        Preclude Class Certification Where This Court Has Ruled The Agreements at
        Issue Are Permeated with Unconscionability and Are Unenforceable..............................23

CONCLUSION..........................................................................................................................25

1

## <u>**TABLE OF AUTHORITIES**</u>

2

3

### **CASES**

4

Alatraqchi v. Uber Technologies, Inc.,
  No. 11-42020 CT (Cal. Labor Comm. Aug. 1, 2012)..................................................... 3

5

Alexander v. FedEx Ground Package Sys., Inc.,
  765 F.3d 981 (9th Cir. 2014) ..................................................................................... 2, 8

6

7

Allen v. Holiday Universal,
  249 F.R.D. 166 (E.D. Pa. 2008).................................................................................... 21

8

9

Allen v. Similasan Corp.,
  2015 WL 1534005 (S.D. Ca. Mar. 30, 2015) ................................................................ 9

10

11

Antelope Valley Press v. Poizner,
  75 Cal. Rptr. 3d 887 (2008) ........................................................................................... 8

12

Arredondo v. Delano Farms Co.,
  301 F.R.D. 493 (E.D. Cal. 2014) ................................................................................. 11

13

14

Awuah v. Coverall North America, Inc.,
  460 Mass. 484 (2011) ................................................................................................... 23

15

Ayala v. Antelope Valley Newspapers, Inc.,
  59 Cal. 4th 522 (2014) ......................................................................................... passim

16

17

Baker v. Flint Eng'g & Constr. Co.,
  137 F.3d 1436 (10th Cir. 1998) ..................................................................................... 8

18

19

Bayshore Ford Truck Sales Inc. v. Ford Motor Co.,
  2015 WL 1639602 (3rd Cir. 2015) .............................................................................. 10

20

Beliz v. W.H. McLeod & Sons Packing Co.,
  765 F.2d 1317 (5th Cir. 1985) ....................................................................................... 2

21

22

Berwick v. Uber Technologies, Inc.
  No. 11-46739 EK (Cal. Labor Comm. June 3, 2015)............................................... 3, 4

23

24

Bradley v. City of Lynn,
  443 F. Supp. 2d 145 (D. Mass. 2006) .......................................................................... 23

25

26

Branch v. Grannis,
  2014 WL 5819212 (E.D.Cal. Nov. 7, 2014)................................................................... 9

27

28

Castillo v. Givens,
    704 F.2d 181 (5th Cir. 1983) ......................................................................... 2

Chavarria v. Ralphs Grocery Co.,
    733 F.3d 916 (9th Cir. 2013) ....................................................................... 25

Chaves v. King Arthur's Lounge,
    C.A. No. 07-2505 (Suffolk Super. Ct. Aug. 7, 2009) ................................. 17

Comcast Corp. v. Behrend,
    133 S.Ct. 1426 (2013) ....................................................................... 9, 10, 13

Costello v. Kohl's Illinois, Inc.,
    2014 WL 4377931 (S.D.N.Y. Sept. 4, 2014) ............................................. 19

Creely v. HCR ManorCare, Inc.,
    789 F. Supp. 2d 819 (N.D. Ohio 2011) ....................................................... 19

Cruden v. Bank of New York,
    1988 WL 9514 (S.D.N.Y. Feb. 1, 1988) ..................................................... 20

Dalton v. Lee Publications, Inc.,
    270 F.R.D. 555 (S.D. Cal. 2010) ...................................................... 7, 12, 17

DeGiovanni v. Jani-King International, Inc.,
    C.A. No. 07-10066 (D. Mass.) ..................................................................... 23

Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper,
    445 U.S. 326 (1980) ..................................................................................... 21

DiFiore v. American Airlines, Inc.,
    483 F. Supp. 2d 121 (D. Mass. 2007) ................................................... 15, 23

Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.,
    657 F.2d 890 (7th Cir. 1981) .................................................................. 20, 23

Ellis v. Navarro,
    2012 WL 3580284 (N.D. Cal. Aug. 17, 2012) ........................................... 11

Estate of Perry v. Green Card, Inc.,
    2006 WL 3479056 (R.I. Super. Nov. 30, 2006) ........................................... 5

Fanette v. Steven Davis Farms, LLC,
    2014 WL 2961239 (N.D. Fla. July 1, 2014) ................................................. 2

Garcia v. E.J. Amusements of New Hampshire, Inc.,
    2015 WL 1623827 (D. Mass. Apr. 13, 2015) ............................................. 17

iii

Gattuso v. Harte-Hanks Shoppers, Inc.,
    42 Cal. 4th 554 (2007) ............................................................................ 12

Gilette v. Uber Technologies,
    C.A. No.  3:14-cv-05241 (N.D. Cal.) ...................................................... 24

Harris v. Vector Mktg. Corp.,
    753 F. Supp. 2d 996 (N.D. Cal. 2010) .................................................... 19

In re Ampicillin Antitrust Litigation,
    1981 WL 2008 (D. D.C. Jan. 22, 1981)................................................... 10

In re Chevron U.S.A., Inc.,
    109 F.3d 1016 (5th Cir. 1997) ................................................................ 10

In re Fedex Ground Package Sys., Inc. Employment Practices Litig.,
    2010 WL 1838400 (N.D. Ind. May 4, 2010) ............................................. 9

In re Methyl Tertiary Butyl Ether (MTBE) Products,
    2007 WL 1791258 (S.D.N.Y. Jun. 15, 2007) .......................................... 10

In re Motor Fuel Temperature Sales Practices Litig.,
    292 F.R.D. 652 (D. Kan. 2013) ............................................................... 13

In re Nexium Antitrust Litig.,
    -- F.3d--, 2015 WL 265548 (1st Cir. Jan. 21, 2015).............................. 11

In re Organogenesis Sec. Litig.,
    241 F.R.D. 397 (D. Mass. 2007)............................................................. 20

In re Pfizer Inc. Sec. Litig.,
    282 F.R.D. 38 (S.D.N.Y. 2012) .............................................................. 22

In re Wells Fargo Home Mortg. Overtime Pay Litig.,
    527 F. Supp. 2d 1053 (N.D. Cal. 2007) .................................................. 19

Joseph v. GMC,
    109 F.R.D. 635 (D. Col. 1986) ............................................................... 19

JustMed, Inc. v. Byce,
    600 F.3d 1118 (9th Cir. 2010) ................................................................. 5

Leyva v. Medline Indus. Inc.,
    716 F.3d 510 (9th Cir.2013) ................................................................... 13

Martin v. Tango's Rest., Inc.,
    969 F.2d 1319 (1st Cir. 1992)........................................................... 17, 18

iv

Martinez v. Combs,
    49 Cal. 4th 35 (2010) ........................................................................................ 1, 2

Martins v. 3PD, Inc.,
    2013 WL 1320454 (D. Mass. Mar. 28, 2013).......................................................... 13

Matamoros v. Starbucks Corp.,
    699 F.3d 129 (1st Cir. 2012)................................................................................ 18, 23

McLean v. Runyon,
    222 F.3d 1150 (9th Cir. 2000) .................................................................................. 11

McPhail v. First Command Financial Planning, Inc.,
    247 F.R.D. 598 (S.D. Cal. 2007) ................................................................................ 9

Mendez v. Tween Brands, Inc.,
    2010 WL 2650571 (E.D. Cal. July 1, 2010) ............................................................ 25

Merkin v. Vonage Am. Inc.,
    2014 WL 457942 (C.D. Cal. Feb. 3, 2014) .............................................................. 25

Moeller v. Taco Bell Corp.,
    816 F. Supp. 2d 831 (N.D. Cal. 2011) ...................................................................... 10

Mohamed v. Uber Technologies, Inc.,
    2015 WL 3749716 (N.D. Cal. June 9, 2015) ................................................... 23, 24, 25

Morrison v. Circuit City Stores, Inc.,
    317 F.3d 646 (6th Cir. 2003) .................................................................................... 24

Narayan v. EGL, Inc.,
    285 F.R.D. 473 (N.D. Cal. 2012)................................................................................ 8

Newton v Am. Debt Servs., Inc.,
    549 F. App'x 692 (9th Cir. 2013) ............................................................................. 25

Norris-Wilson v. Delta-T Grp., Inc.,
    270 F.R.D. 596 (S.D. Cal. 2010) ................................................................................ 7

Ormond v. Anthem, Inc.,
    2009 WL 3163117 (S.D. Ind. Sept. 29, 2009) ......................................................... 22

Ortiz v. CVS Caremark Corporation,
    2013 WL 6236743 (N.D. Cal. Dec. 2, 2013)............................................................ 12

Overka v. American Airlines,
    265 F.R.D. 14 (D. Mass. 2010)........................................................................... 15, 23

v

Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.,
325 F. Supp. 2d 1252 (D. Utah 2004) ........................................................... 24

Pena v. Taylor Farms Pacific, Inc.,
305 F.R.D. 197 (E. D. Cal. Feb. 9, 2015) .................................................... 20

Pinal Creek Group v. Newmont Mining Corp.,
352 F.Supp.2d 1037 (D. Az. Jan. 24, 2005) ................................................. 9

Pryor v. Aerotek Scientific, LLC,
278 F.R.D. 516 (C.D. Cal. 2011) ................................................................ 22

Raposa v. Mardi Gras Entertainment, Inc.,
C.A. No. 10-00034 (Hampden Super. Ct. Dec. 11, 2013) ........................... 17

Richie v. Blue Shield of California,
2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)................................................. 10

Roach v. T.L. Cannon Corp.,
778 F.3d 401 (2d Cir. 2015) ................................................................. 10, 13

Roper v. Consurve, Inc.,
578 F.2d 1106 (5th Cir. 1978) .................................................................... 21

S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations,
48 Cal. 3d 341 (1989) ......................................................................... passim

Sakacsi v. Quicksilver Delivery Sys., Inc.,
2007 WL 4218984 (M.D. Fla. Nov. 28, 2007) .............................................. 8

Sales v. Bailey,
2014 WL 3897726 (N.D. Miss. Aug. 8, 2014) .............................................. 8

Schwann v. FedEx Ground Package Sys., Inc.,
2013 WL 3353776 (D. Mass. July 3, 2013)................................................. 23

Shankle v. B-G Maint. Mgmt. of Colorado, Inc.,
163 F.3d 1230 (10th Cir. 1999) ................................................................. 24

Sheehan v. FedEx Ground Package System,
C.A. No. 1:05-cv-10936-RGS (D. Mass.) ................................................... 23

Smith v. Cardinal Logistics Mgmt. Corp.,
2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .............................................. 17

Solis v. Cascom, Inc.,
2011 WL 10501391 (S.D. Ohio Sept. 21, 2011) .......................................... 8

vi

<u>Solis v. Int'l Detective & Protective Serv., Ltd.,</u>
  819 F. Supp. 2d 740 (N.D. Ill. 2011) ........................................................... 5, 8

<u>Stanich v. Travelers Indem. Co.,</u>
  259 F.R.D. 294 (N.D. Ohio 2009) ................................................................. 19

<u>Stuart v. Radioshack Corp.,</u>
  2009 WL 281941 (N.D. Cal. Feb. 5, 2009) ............................................. 12, 22

<u>Tony & Susan Alamo Foundation v. Sec'y of Labor,</u>
  471 U.S. 290 (1985) ............................................................................ 16, 17, 19

<u>Trosper v. Styker Corp.,</u>
  2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) .............................................. 12

<u>Villon v. Marriott Hotel Servs., Inc.,</u>
  306 P.3d 175 (2013) ..................................................................................... 23

<u>Wal-Mart Stores, Inc. v. Dukes,</u>
  131 S. Ct. 2541 (2011) ............................................................................. 9, 10


## STATUTES

Cal. Bus. & Prof. Code § 16600 ........................................................................ 18

Cal. Bus. & Prof. Code § 17200 ........................................................................ 13

Cal. Labor Code § 2802 ...................................................................... 10, 12, 13

Cal. Labor Code § 351 ...................................................................... 13, 15, 16

Fair Labor Standards Act, 29 U.S.C. § 201 ........................................................ 3

Fed. R. Civ. P. 23 ................................................................................... passim

Fed. R. Civ. P. 26 ............................................................................................... 9

Fed. R. Civ. P. 37 ............................................................................................... 9


## OTHER AUTHORITIES

Administrator's Interpretation No. 2015-1, Wage and Hour Division
  (Dep't of Labor July 15, 2015) .............................................................. 3, 5, 8

Ellen Meriwether, <u>Comcast Corp. v. Behrend: Game Changing or Business as Usual?,</u>
  Antitrust, Summer 2013 .............................................................................. 13

1   **I.   INTRODUCTION**[1]

2        Predictably, in opposition to Plaintiffs' motion for class certification, Uber attempts to

3   manufacture countless distinctions among its workforce in an attempt to escape liability for its

4   systemic misclassification of its drivers as independent contractors.  However, although Defendant

5   contends that "there is no typical Uber driver," Opp.at 12, the types of distinctions Uber refers to

6   throughout its opposition are largely immaterial.  Uber drivers may perform driving services for

7   different reasons (either as their full time occupation, or to make money on the side of another

8   job); they may contract directly with Uber (or its subsidiary Raiser), or they may contract with

9   Uber through an intermediary transportation company (as some UberBlack drivers do); and they

10  may "like" the flexibility that Uber's system provides, or they may be looking for more

11  dependable income.  Regardless of these differences, the primary question at issue in this case is

12  consistent for all drivers: are they employees of Uber under the <u>Borello</u> test (or, perhaps, even

13  more lenient IWC test[2])?  The analysis of this question will turn primarily on factors that do not

14  differ from driver to driver.  Indeed, in any case challenging independent contractor

15  misclassification, defendants will try to insist that the consideration must be done individually.

16  Courts have consistently rejected these arguments, recognizing that it makes little sense to

17  determine classification of a given position based on an individualized analysis that would not be

18  pragmatically workable for a company or an industry, and that would also make it virtually

19  impossible to challenge a company's systemic decision to misclassify its workers.

20

---

21  [1]      All exhibits cited herein are to the Liss-Riordan Declaration in Support of Plaintiffs' Reply
    Brief (filed herewith) unless otherwise noted.

22  [2]      In <u>Martinez v. Combs</u>, 49 Cal. 4th 35, 64 (2010), the California Supreme Court concluded

23  that the common law definition of employment set forth in <u>Borello</u>, is actually one of "three
    alternative definitions" of employment. These three alternative tests include "(a) to exercise

24  control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to
    engage, thereby creating a common law employment relationship." <u>Id.</u>  As Plaintiffs set forth in

25  their opposition to summary judgment, Dkt. 222 at 13-15, Plaintiffs here satisfy all three
    definitions.  The Court may thus look not only to the <u>Borello</u> test to certify a class, but could also

26  certify a class under the even more lenient two alternative definitions set forth in <u>Martinez</u>.  As
    Plaintiffs explain below, Uber's contracts and its practices establish a uniform right to "exercise

27  control over the wages, hours, or working conditions" of its drivers. <u>Id.</u>  Likewise, Uber has
    uniformly "suffer[ed] or permit[ted] its drivers to work" in furtherance of its business. <u>Id.</u>

28

1

1      Although Uber argues that the <u>Borello</u> factors will differ among its drivers, the California

2  Supreme Court has made clear that "the significance of any one [<u>Borello</u>] factor and its role in the

3  overall calculus may vary from case to case depending on the nature of the work and the

4  evidence" and that "the impact of individual variations on certification will depend on the

5  significance of the factor they affect." <u>Ayala v. Antelope Valley Newspapers, Inc.</u>, 59 Cal. 4th

6  522, 539-40 (2014).  Here, as in <u>Ayala</u>, "key factors such as control, the skill involved, and the

7  right to terminate at will" are capable of common proof, notwithstanding possible variation in

8  some of the other <u>Borello</u> factors.  <u>Id.</u>  Uber's contention that this Court must find each and every

9  <u>Borello</u> factor is capable of common proof is out of step with the current state of the law and

10  would render most any misclassification case impossible to certify on a classwide basis.

11      Plainly there are not 160,000 different types of Uber drivers; instead, drivers fall into broad

12  categories covered by the lead plaintiffs in this action.[3]  Indeed, Uber contends that <u>all</u> of its

---

[3]     For example, Plaintiffs Manahan and Gurfinkel are UberX drivers, while Colopy is an UberBlack driver. Colopy and Gurfinkel have driven full time (and have not driven for other "ride-sharing" companies), while Manahan has driven part time and has driven for Lyft, in addition to Uber.  Some drivers have contracted directly with Uber (or its subsidiary Raiser) (like Manahan and Gurfinkel), while others worked for Uber through intermediary transportation companies (like Colopy).  The only category of drivers for which Plaintiffs do not have a direct representative are those drivers who had other drivers working under them.  However, to the extent these drivers have actually performed driving work themselves, and have still been beholden to the same expectations as other Uber drivers (and could be deactivated at will, like all other Uber drivers), they can still be included in this class.  See <u>Alexander v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 981, 991 (9th Cir. 2014) (class included both "single route" FedEx drivers as well as "multi-route" drivers, who had other drivers "under" them, but who still reported to FedEx and were subject to its rules and right of termination).  Plaintiffs do not seek to include in the class any Uber "partners" who have not themselves driven for Uber.  See Dkt. 276 at 22 (seeking to include in class "all California <i>drivers</i> who have worked for Uber since 2009") (emphasis added).

     Moreover, even if some drivers like Colopy who drove through third-party transportation companies could be deemed to be employees of those companies, they may well be employees of Uber as well, as a joint employer.  Indeed, in <u>Martinez v. Combs</u>, 49 Cal.4th at 64, the California Supreme Court has noted that "the language of the IWC's 'employer' definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship…".  Other courts have likewise recognized that "employees" of intermediary "employees" are actually employees of the company employing the intermediary.  See, <u>e.g.</u>, <u>Beliz v. W.H. McLeod & Sons Packing Co.</u>, 765 F.2d 1317, 1328 (5th Cir. 1985) ("[I]f the alleged contractor were held to be an employee of the farmer, it would necessarily follow that the [contractor's] workers were in turn the farmer's employees."); <u>Castillo v. Givens</u>, 704 F.2d 181, 188 (5th Cir. 1983) (same); <u>Fanette v. Steven Davis Farms, LLC</u>, 2014 WL 2961239, *7 (N.D. Fla. July 1, 2014) (same).

drivers are independent contractors, which belies its insistence here that this issue cannot be decided on a classwide basis.  Despite whatever differences may exist among Uber drivers, Plaintiffs submit that the core questions at the heart of this case – (1) whether Uber misclassified its drivers, (2) whether it charged and failed to remit gratuities to its drivers, and (3) whether it failed to reimburse them for necessary business expenses – are fundamentally capable of common proof.  Moreover, the Court has many options at its disposal to craft a manageable class action, such as certifying a class on liability only (and perhaps trying liability through bellwether trials), while leaving damages for later determination (by a special master, claims process, or otherwise), or creating subclasses of drivers if the Court feels that any of the differing characteristics described in note 3, or other factors, are fundamental to the misclassification analysis.  However, Uber should not be permitted to escape liability for its widespread legal violations altogether by pointing to granular differences in drivers' experiences, particularly where the evidence shows that its basic system works the same for all drivers.  Requiring each individual driver to come forward and prove his or her case one-by-one would overwhelm the court system and is not in the interest of drivers, the courts, or Uber.  For all these reasons, the Court should grant Plaintiffs' motion and certify their claims under Fed. R. Civ. P. 23.[4]

---

[4]     Plaintiffs note that the U.S. Department of Labor recently issued an Administrative Interpretation discussing the test for determining employee status under the federal Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, which uses a multi-factor economic realities test, which factors are extremely similar to the <u>Borello</u> factors.  In this guidance, applying these factors, the DOL emphasized that "most workers are employees."  <u>See</u> Administrator's Interpretation No. 2015-1, Wage and Hour Division (Dep't of Labor July 15, 2015) (Ex. 1) at 2.  Notably also, in a recent administrative decision, the California Labor Commission determined that an Uber driver was an employee and was thus entitled to be reimbursed for her expenses. <u>Berwick v. Uber Technologies, Inc.</u> No. 11-46739 EK (Cal. Labor Comm. June 3, 2015) (Ex. 2).

Uber attempts to dismiss the California Labor Commission's recent decision by pointing out another decision in which the opposite conclusion was reached. Opp. at p. 12, n. 4.  However, <u>Alatraqchi v. Uber Technologies, Inc.</u>, No. 11-42020 CT (Cal. Labor Comm. Aug. 1, 2012), (where the Uber driver in question was not represented by counsel, and raised a number of varying arguments), merely shows that another factfinder could reach a different conclusion on the ultimate question on the merits but does not undercut class certification.  In <u>Berwick</u>, the Labor Commission relied principally upon factors that apply with equal force to <u>*all*</u> Uber drivers, notwithstanding Defendant's attempts to cloud the issues with factual distinctions.  For example, the <u>Berwick</u> decision cites specifically to the fact that Uber "obtain[ed] the clients in need of the service and provid[ed] the workers to conduct it," and that "Plaintiff's work was integral to Defendant's business to provide transportation services to passengers." Ex. 2 at 8.  This is equally <span>(continued on next page)</span>

## II. ARGUMENT

### A. Contrary to Uber's Arguments, Plaintiffs Have Satisfied Both the Commonality and Predominance Requirements of Rule 23.

In its opposition, Uber attempts to sow confusion by claiming that its contracts, which outline its right to control drivers, have varied so tremendously over time that class certification is impossible. Uber argues that certification is not possible because it has entered into 17 different contracts with its drivers. Opp at 14-18. However, although Uber attempts to paint this fact as creating too complex a case to certify, the reality is much simpler. First, Uber's contention that the Court or jury would have to analyze 17 "different" contracts is an overstatement. Most of the changes among these "versions" of the contract are minimal and have no bearing on the questions at issue in this case. The feature of the contract that the California Supreme Court has identified as the most significant to resolving employment status – the right to terminate drivers at will – remains intact throughout the agreements. <u>Ayala</u>, 59 Cal. 4th at 531 ("Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause"). In <u>all</u> of the contracts, Uber retains the right to terminate its drivers at will. <u>See</u> Pagano Decl. at ¶ 3.[5]

(footnote continued from previous page)

true for *all* drivers, regardless of their individual circumstances. Likewise, the Commission noted that "[w]hile Defendants permit their drivers to hire people, no one other than Defendants' approved and registered drivers are allowed to use Defendants' intellectual property," and "Defendants alone have discretion to negotiate with the passenger." <u>Id.</u> at 9. Moreover, Defendants "vet prospective drivers who must provide to Defendants their personal banking and residence information, as well as their Social Security Number" and must pass "background and DMV checks." <u>Id.</u> Again, these factors are equally true for *all* drivers (including Alatraqchi)

[5]    Prior to 2013, the Uber's contracts with UberBlack drivers did not have specific language regarding the circumstances under which Uber drivers could be deactivated. <u>Id.</u> at ¶4. Since July 2013, while there have been modest revisions made to the contracts, Uber's contracts with its drivers have consistently maintained language granting Uber the right to terminate drivers at will in its discretion. <u>Id.</u> at ¶ 3, Exs. A, B, C. For example, while there are six "versions" of Defendant's contract with UberX drivers like Plaintiffs Gurfinkel and Manahan, the language in these contracts regarding Uber's right to "withhold or revoke approval and authorization of any Driver at any time, in its sole and unreviewable discretion" has stayed consistent in five of the six "versions" and even this sixth version of the contract maintains Uber's right to terminate drivers "for any [] reason at the reasonable discretion of Uber." Ex. C to Pagano Decl. Likewise, since July 2013, the contract that governs all UberBlack drivers has consistently maintained language in multiple parts of the agreement, assuring Uber's right to terminate drivers at will "without notice" and in its "discretion." Ex. A to Pagano Decl. Finally, there have been four "versions" of the UberBlack driver addendum, which applies (in addition to the standard UberBlack agreement) to all UberBlack drivers like Colopy who work through intermediaries. Ex. B to Pagano Decl. These (continued on next page)

4

Indeed, as confirmed by its former CEO and current Vice President of Operations Ryan Graves,

Uber does not have a system for consulting a driver's contract language when a driver is at risk of

deactivation, to determine Uber's rights with respect to whether that driver may be deactivated.

Ex. 3 (Graves Dep.), at 185:25-186:8.  Instead, the evidence clearly demonstrates that Uber

exercises its right to terminate drivers—any drivers—in its sole discretion. Id.[6]

---

(footnote continued from previous page)

four "versions" likewise all contain language reserving Uber's right to terminate drivers at will.

     Uber argues that eight of its seventeen agreements create a "mutual right to terminate" as opposed to a unilateral right to terminate at will. Opp. at 16. However, contrary to Uber's contentions, a mutual right to terminate that envisions an ongoing relationship which ends only when one party or the other terminates it, is not evidence of independent contractor status, and is actually the hallmark of an employment relationship (an employee can always quit her at-will employment and this essentially amount to a mutual right to terminate). See, e.g., JustMed, Inc. v. Byce, 600 F.3d 1118, 1127 (9th Cir. 2010) (noting that the fact that the "software was an ongoing concern for the company, not a discrete project that JustMed expected Byce to simply finish and be done with," cut in favor of finding employment rather than independent contractor relationship); Solis v. Int'l Detective & Protective Serv., Ltd., 819 F. Supp. 2d 740, 752 (N.D. Ill. 2011) (parties "contemplated a long-term relationship"). Moreover, if one party to an independent contractor arrangement quits before the end of the contract term or discrete project, it typically owes contract damages. Estate of Perry v. Green Card, Inc., 2006 WL 3479056, at *5 (R.I. Super. Nov. 30, 2006), as amended (Dec. 1, 2006) (finding the "power to deprive [a worker] totally or substantially of a necessary aid to [their work] without the [defendant] being in breach of any obligation … [is] incompatible with the freedom of control enjoyed by an independent contractor") (internal quotation omitted). Thus, the fact that some contracts give Uber a unilateral right to terminate drivers at will and others provide for a mutual right to terminate, makes no difference to the ultimate inquiry as to whether there is a uniform right to control.

     However, if the Court were to deem this distinction material, the Court could certify subclasses of drivers where the contract allows Uber to terminate in its discretion, and where the contract creates a mutual termination provision.  Indeed, the Court could certify 17 different subclasses if each variation of the contract really made any difference (and allow plaintiffs to amend in a separate representative for each version).  However, neither option is necessary, because the most pertinent portion of the contract – that Uber may terminate in its discretion – is consistent across all Uber drivers.  See Pagano Decl., Ex. A, B, and C.

[6]     Uber argues that its so-called "suggestions" to drivers regarding everything from what music to play to how to dress have varied widely over time and geography.  Opp. at 14.  However, even if these specific "suggestions" have changed, it is not the content of the suggestions that matters so much as the fact that Uber has established such "suggestions" and is able to enforce them against its drivers.  As shown in Plaintiffs' opposition to summary judgment, Uber management has made discretionary decisions to deactivate drivers.  See, e.g., Dkt 238-2 at 9284 ("Terrible Reviews, No second chance needed"), ("Switched him to driver purgatory"); 9282 ("BANNING YOUR ASS AGAIN"); Dkt. 238-3 ("Get rid of this guy.  We need to make some serious cuts of guys below 4.5"); Dkt. 238-4; Ex. 4 (Barnes Dep.) at 121:4-7 (exercising discretion in deciding not to let a driver take a training class and get reactivated).  That Uber claims its "suggestions" are merely an attempt to "ensure that their customers are satisfied," or to comply with the California Public Utilities Commission (CPUC) requirements, makes no difference to the misclassification issue.  See DOL Administrator's Interpretation No. 2015-1, (Ex. 1) at 13-14

(continued on next page)

---

5

1    Uber also argues that it would be an abuse of discretion to rely on the uniform policy that

2    allows it to terminate its drivers at will, Opp. at 13, and that it can "establish an independent

3    contractor relationship by showing that in actual practice no control was exercised." Opp. at 15

4    (internal citation omitted).  Uber is mistaken on both counts.  First, the California Supreme Court

5    has made clear that "the considerations in the multi-factor [Borello] test are not of uniform

6    significance" and that "the strongest evidence of the right to control is whether the hirer can

7    discharge the worker without cause." Ayala, 59 Cal. 4th at 539.  Thus, the existence of a policy

8    allowing Uber to terminate its drivers at will is of singular importance. Id. at 534 (noting that

9    "agreements are a significant factor for consideration in assessing a hirer's right to control a hiree's

10   work").  Second, the California Supreme Court has made clear that "[f]or class certification under

11   the common law test, the key question is whether there is evidence a hirer possessed different

12   *rights* to control with regard to its various hires" and not whether the actual exercise of that control

13   was uniform that matters. Id.  at 536. Here, Uber's contractual right to control drivers has not

14   changed materially.

15   Moreover, Uber has admitted that it exercises its discretion to deactivate drivers who do not

16   meet the minimum star ratings that Uber managers set, as is borne out by the evidence in this case.

17   Ex. 5 (Coleman Dep.), at 101:17-104:3, 116:12-119:18; 242:5-18; Ex. 3 (Graves Dep.), at 67:13-

18   68:9; Dkt. 223-49 (showing Uber changing its minimum standard from 4.7 stars to 4.75 stars in a

19   three-week period in San Francisco); Dkt. 223-17 at 4 (minimum rating of 4.6); Dkt. 223-50 at

20   948 (minimum rating of 4.55).  This evidence shows that Uber has the *right* to control drivers; the

21   fact that Uber may not have exercised its right in exactly the same way with respect to all drivers

22   does not mean it does not have a uniform *right*.  Indeed, Uber has provided no evidence to suggest

23   any of its drivers may be terminated only for cause or material breach of the contract.

24

25   (footnote continued from previous page)

26   ("Some employers assert that the control that they exercise over workers is due to the nature of
     their business, regulatory requirements, or the desire to ensure that their customers are satisfied.

27   However, control exercised over a worker, even for any or all of those reasons, still indicates that
     the worker is an employee").

28

1    Uber contends that the Plaintiffs focus too heavily on the right to control to the exclusion of

2  the secondary <u>Borello</u> factors and suggest that even if a given factor such as the right to control

3  can be determined on a common basis, so long as all factors cannot be decided on a common basis

4  for all drivers, individualized weighing will necessarily be required. Opp at 20-21.  This argument

5  ignores the wealth of case law to the contrary and if accepted, would essentially preclude class

6  certification of *any* misclassification claims under California law.  The <u>Borello</u> factors are clearly

7  weighted to show that there are different ways workers can be held to be employees and the

8  multiplicity of factors should not provide a means for companies to over-complicate the analysis

9  and avoid liability for widespread misclassification.[7]

10    Here, a number of the secondary <u>Borello</u> factors are plainly susceptible to common proof.  For

11  example, the skill required to do the job is uniformly low – Uber simply requires that UberX

12  drivers have a standard California driver's license, <u>see</u> Dkt. 223-28, and that UberBlack drivers

13  have a commercial license or drive through a company that holds such a license. Ex. 5 (Coleman

14  Dep.), at 48:8-50:18.  Likewise, the method of payment is uniform across the class in that Uber

15  drivers have always been compensated with an "all-inclusive" fare (based on time and distance)

16  that is set unilaterally by Uber, less a percentage-based commission paid to Uber. <u>Id.</u> at 165:2-21,

17  167:20-168:7.[8]  Uber's only answer to this fact is to note that some drivers "may have different

18  terms" based on their arrangements with third-party transportation companies, but this has no

19  effect on the method of payment that *Uber uses* to compensate drivers and is irrelevant to

20

21  [7]    <u>See Ayala</u>, 59 Cal. 4th at 539-40; <u>Dalton v. Lee Publications, Inc.</u>, 270 F.R.D. 555, 562-63
     (S.D. Cal. 2010) (court noted that some secondary <u>Borello</u> factors may be "less susceptible to
22  common proof" than others but weighed the relative importance of the factors and certified the
     class because "the primary factor, the right to control, is also susceptible to common proof");
23  <u>Norris-Wilson v. Delta-T Grp., Inc.</u>, 270 F.R.D. 596, 608 (S.D. Cal. 2010) (in certifying class,
     noting that class members "do vary in a multitude of ways" but finding that "[a]t best, [these
24  variations] touch on just three of the seven secondary factors articulated in <u>Borello</u>" while "the
     remaining secondary factors are more than likely susceptible to common proof").

25  [8]    Uber's suggestion that drivers "have discretion to charge whatever price they want, up to a
26  maximum set by the App" is absurd. Opp. at 24.  There can be no question that Uber sets the fares
     that are charged to passengers and suggesting that drivers can "negotiate" rates by working for
27  free is simply disingenuous.

28

7

determining the relationship between Uber and its drivers.

Another secondary factor that is materially the same for all drivers is the expected duration of the relationship.  Although some drivers may work for Uber for long periods while others do not, Opp. at 23, the real issue with respect to this factor is whether the relationship is an open-ended one that contemplates indefinite duration as opposed to a fixed period of time.  All Uber drivers work for indefinite periods, until one side or the other terminates the relationship; they are not engaged for discrete, fixed periods of time, like the classic example of an independent contractor plumber who is engaged to complete a particular project.[9]  Similarly, while most Uber drivers have their own cars (other than those who lease them through intermediary transportation companies), this factor is likewise uniform (and does not suggest independent contractor status because the relevant consideration is drivers' investment relative to Uber's).[10]

Likewise, while drivers may drive for Uber for varying amounts of hours (with some driving full-time and others driving relatively little), what is uniform is their flexibility to work when and how much they want.  It makes little sense to determine that whether or not a given driver is an employee depends on how many hours they choose to work for the company.  The fact that drivers choose how much to work or when, may well be a factor (indeed, likely the only factor) that cuts

---

[9]   See Narayan v. EGL, Inc., 285 F.R.D. 473, 476 (N.D. Cal. 2012) ("the indefinite nature of drivers' tenure suggested an employment relationship"); Solis v. Cascom, Inc., 2011 WL 10501391, *6 (S.D. Ohio Sept. 21, 2011) (noting that plaintiffs "worked until they quit or were terminated by Cascom, similar to an at-will employment arrangement"); Antelope Valley Press v. Poizner, 75 Cal.Rptr.3d 887, 900 (2008) ("[T]he notion that an independent contractor is someone hired to achieve a specific result that is attainable within a finite period of time ... is at odds with carriers who are engaged in prolonged service to [an employer]."); Int'l Detective & Protective Serv., Ltd., 819 F. Supp. 2d at 752; Sales v. Bailey, 2014 WL 3897726, *11 (N.D. Miss. Aug. 8, 2014); DOL Administrator's Interpretation No. 2015-1, (Ex. 1) at 12 ("an independent contractor, [] typically works one project for an employer and does not necessarily work continuously or repeatedly for an employer").

[10]   See Ex. 1 (DOL Administrator's Guidance) at 9 ("Even if the worker has made an investment, it should not be considered in isolation; it is the relative investments that matter"); Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 995 (9th Cir. 2014) ("numerous California cases find employee status even though the employee provides his own vehicle or tools"); Sakacsi v. Quicksilver Delivery Sys., Inc., 2007 WL 4218984, *7 (M.D. Fla. Nov. 28, 2007) (relative investment weighed in favor of employee status where the cost of software used to scan deliveries into system far outweighed the costs to individual drivers for the purchase of cars, gas, and insurance); Baker v. Flint Eng'g & Constr. Co., 137 F.3d 1436, 1442 (10th Cir. 1998).

8

1  against a finding of employment status, but this fact applies uniformly to all Uber drivers and is

2  not a reason to deny class certification.  Thus, a number of the Borello secondary factors are

3  susceptible to common proof in this case, most notably Uber's right to terminate drivers in its

4  discretion, the level of skill involved in the occupation, as well as whether drivers form an integral

5  part of the business.  See Ayala, 59 Cal. 4th at 539 ("Some [factors] such as the hirer's right to fire

6  at will and the basic level of skill called for by the job, are often of inordinate importance").[11]

7       Thus, under the California Supreme Court's decision in Ayala, Plaintiffs have satisfied both

8  commonality and predominance.  Although Uber would like to trumpet two well-known Supreme

9  Court cases that denied class certification, Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011),

10  and Comcast Corp. v. Behrend, 133 S.Ct. 1426 (2013), nothing in those decisions undermines the

11  propriety of class certification here.  For example, Dukes involved a diffuse national class of 1.5

12  million employees with decision-makers all over the country, and claims that focused on a *lack* of

---

[11]      In its opposition, Uber offers an expert report in an attempt to show that there is "no typical Uber driver" and that a finding of employment status would "harm" drivers. See Dkt. 301. This report is inappropriate, as it is both inadmissible and legally irrelevant, and should be disregarded by the Court.  "[F]ederal courts typically prohibit lawyers, professors, and other experts from interpreting the law for the court or from advising the court about how the law should apply to the facts of a particular case" because "[t]estimony which articulates and applies the relevant law ... circumvents the [fact finder's] decision-making function by telling it how to decide the case." Pinal Creek Group v. Newmont Mining Co., 352 F.Supp.2d 1037, 1043 (D. Az. Jan. 24, 2005) (internal citation omitted); see also McPhail v. First Command Financial Planning, Inc., 247 F.R.D. 598, 604-05 (S.D. Cal. 2007) (expert reports that "amount[] to 'written advocacy … akin to a supplemental brief' … is not useful in evaluating whether class certification requirements have been met"); In re Fedex Ground Package Sys., Inc. Employment Practices Litig., 2010 WL 1838400, *1 (N.D. Ind. May 4, 2010) (excluding expert opinion regarding whether drivers were employees or independent contractors).  Moreover, Uber did not comply with the requirements of Fed. R. Civ. P. 26 or 37 because it never disclosed the existence of its expert until it filed his report with the Court, and only turned over the underlying data to Plaintiffs after filing the opposition and report (on July 13, ten days before Plaintiffs' reply brief was due). In determining whether to exclude evidence, courts consider: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Branch v. Grannis, 2014 WL 5819212, *1 (E.D.Cal. Nov. 7, 2014) (internal citation and quotation marks omitted).  Here, as Uber well knew, even if the report had been legally relevant, Plaintiffs had insufficient time to respond to the report, or depose the proposed expert.  See Allen v. Similasan Corp., 2015 WL 1534005, *3-4 (S.D. Ca. Mar. 30, 2015) (where plaintiffs notified defendant on the deadline for class discovery that they were going to pursue a new damages model, and two weeks later the plaintiffs filed their motion simultaneously with a supplemental expert report, the court held the delay was prejudicial and the evidence was not admissible).

1   process, see 131 S. Ct. at 2546, whereas here, Plaintiffs seek to certify a much more discrete class

2   of California drivers all operating under the same basic model. Moreover, in this case there are

3   only a handful of managers overseeing Uber's various markets, Ex. 3 (Graves Dep.) at 156:8-

4   157:8 (Uber currently has general managers for Los Angeles, San Francisco, Sacramento, San

5   Diego, and is looking into hiring two additional managers in southern California), unlike in Dukes

6   where there were "thousands" of managers whose decisions were at issue. Id. at 2548. Likewise,

7   as Plaintiffs have set forth infra, Part II.B., the Comcast case is not relevant to wage and hour

8   cases like this one and does not alter the basic understanding that individualized damages alone do

9   not defeat class certification. See Roach v. T.L. Cannon Corp., 778 F.3d 401, 408 (2d Cir. 2015)

10  (collecting cases). In any event, if the Court thought that it necessary, it could certify a class on

11  liability while reserving damages determinations for later determination.[12]

### B. Plaintiffs' Expense Reimbursement Claim Under Cal. Labor Code § 2802 Should Be Certified.

Uber does not make any real effort to refute that it has a uniform policy of not reimbursing its

drivers for their expense. See Ex. 5 (Colman Dep.), at 178:12-18 ("There's no reimbursement for

gas or anything like that"), 188:22-189:9 ("There's no notion of additional mileage

reimbursements or anything of that nature"); Richie v. Blue Shield of California, 2014 WL

6982943, *16 (N.D. Cal. Dec. 9, 2014) (commonality met where "an employer adopted a policy of

---

[12] One method the Court could consider for trial on liability could be bellwether trials, which "have long been included in the *Manuel for Complex Litigation*" on the theory that "[i]f a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts. Common issues or even general liability may also be resolved in a bellwether context in appropriate cases." In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997); Bayshore Ford Truck Sales Inc. v. Ford Motor Co., 2015 WL 1639602, *2 (3rd Cir. 2015) (class members were bound by decision of district court in bellwether trials of eleven class members as to the issue of liability); Moeller v. Taco Bell Corp., 816 F.Supp.2d 831, 835-36 (N.D. Cal. 2011) (describing how the court (1) certified a class of individuals with disabilities bringing suit under Title III of the ADA, the Unruh Civil Rights Act and the California Disabled Persons Act against Taco Bell stores throughout California, (2) appointed a special master to conduct site visits of all Taco Bell stores, and (3) ordered an exemplar trial of a Taco Bell store of the plaintiffs' choosing to address liability and injunctive relief); In re Methyl Tertiary Butyl Ether (MTBE) Products, 2007 WL 1791258, *4 (S.D.N.Y. Jun. 15, 2007); Wilson v. Sunstrand Corp., 2003 WL 21878738, *2 (N.D. Ill. Aug. 8, 2003); In re Ampicillin Antitrust Litigation, 1981 WL 2008, *6 (D. D.C. Jan. 22, 1981).

10

not reimbursing its employees' necessary business expenses"). Instead, Uber claims that because some subset of drivers who drove through intermediary companies like Plaintiff Colopy may have received some reimbursement by third-parties for their expenses, they cannot properly be included in the class.  However, Uber should not be permitted to benefit because some third parties reimbursed (or partially reimbursed) some of Uber's drivers.[13]  That some subclass of drivers were paid some expenses through another source does not discharge Uber of its obligation to pay drivers' expenses. McLean v. Runyon, 222 F.3d 1150, 1155–1156 (9th Cir. 2000) ("Under the collateral source rule, 'benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages'"); Ellis v. Navarro, 2012 WL 3580284, *5 (N.D. Cal. Aug. 17, 2012).[14]  The common question that drives the litigation (and involves a common answer) is whether Uber has misclassified its drivers as independent contractors and owes them reimbursement.

The rest of Uber's arguments center on the alleged need to engage in individualized inquiries to ascertain Plaintiffs' damages.  For example, Uber claims that individualized inquiries will be necessary to determine the types of expenses that were "necessary" and "in furtherance of Uber's objectives." Opp. at 28-29.  However, there can be no doubt that fuel and car maintenance are necessary to the task of performing transportation services. In any case whether a given expense

---

[13]    That some drivers may have already received partial reimbursement does not defeat class certification, particularly on *Uber's* liability.  In any event, if it felt it was warranted, the Court could create a subclass of drivers like Colopy who drove through intermediary companies (and may have had some of their expenses reimbursed by that third party). However, there is no question that drivers who contracted directly with Uber (such as Gurfinkel and Manahan) paid for all of their own expenses. Moreover, those drivers who have driven through intermediaries have typically paid their own expenses just like those drivers who have driven directly for Uber (i.e. by leasing their vehicles from the intermediary company, either by paying a flat lease amount or by paying a cut of the fares remitted by Uber to the transportation company). Ex. 9 (Colopy Dep.), at 98:9-99:3; 152:5-18. If the Court deemed an offset necessary for some of the expenses for these drivers, these damages issues, which affect just this sub-set of drivers, could be handled through separate proceedings (for example, using a special master or a claims process).

[14]    Moreover, even if some class members were ultimately found not to have suffered any damages, this fact does not prevent class certification.  See In re Nexium Antitrust Litig., -- F.3d--, 2015 WL 265548, *6 (1st Cir. Jan. 21, 2015) (recognizing that class certification is appropriate, even if some members of the class are ultimately found not to have suffered violation); Arredondo v. Delano Farms Co., 301 F.R.D. 493, 544-45 (E.D. Cal. 2014).

like what is covered by the IRS mileage reimbursement is "necessary" is a question that can be resolved by a factfinder for all Uber drivers on a common basis. See Trosper v. Styker Corp., 2014 WL 4145448, *10 (N.D. Cal. Aug. 21, 2014) (finding "that a factfinder could look at the putative class members' duties and the common types of expenses and determine whether a type of expense is necessary to carry out those duties on a class wide basis"). Uber's suggestion that the Court would need to look at the individual type of car being used by each and every driver is simply false, and is belied by the fact that numerous other courts have relied upon the standard IRS mileage reimbursement rate for determining damages on a § 2802 claim – a method that does not account for car model.[15] Uber's records track the mileage that each and every driver has covered in transporting Uber's passengers. Ex. 5 (Coleman Dep.) at 190:9-17; Dkt. 277-10.[16] Thus, damages are readily provable for the entire class.

Moreover, even if this Court were to decide that individualized inquiries were necessary (such as for the drivers like Colopy, who have driven through intermediary transportation companies), individual questions regarding damages do *not* preclude class certification (contrary to what Uber

---

[15]     See Dalton, 270 F.R.D. at 564 (S.D. Cal. 2010) ("Defendant's own mileage estimates and the IRS standard mileage allowance (or some other method), provides a reasonable basis to calculate mileage expense" and holding that whether Plaintiffs claimed mileage on their taxes is irrelevant as that "is an issue between Plaintiffs and the IRS, not between Plaintiffs and Defendant"); Stuart v. Radioshack Corp., 2009 WL 281941, *18 (N.D. Cal. Feb. 5, 2009) ("reject[ing] [Defendant's] contention that individualized inquiries will be rampant because the actual expenses of each employee must be determined" and suggesting that the IRS reimbursement rate might be used instead); Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 569 (2007) (noting "that section 2802 permits use of the IRS mileage rate to calculate automobile expense reimbursement under the mileage reimbursement method," a method recognized by the DLSE); Trosper, 2014 WL 4145448, *10, n. 9 (distinguishing Ortiz v. CVS Caremark Corporation, 2013 WL 6236743, *12 (N.D.Cal. Dec. 2, 2013), a case relied upon by Uber, because unlike in Ortiz, the Plaintiff "alleges a company-wide policy *not* to reimburse putative class members for their business expenses" such that "[t]he question of *liability* in this case can be proven by common evidence on a classwide basis"). In any case, Uber maintains records of the types of cars its drivers utilize, see, e.g., Dkt. 277-10 (showing Uber's driver profile, which records the make, model and year of a driver's vehicle), such that data is readily available to calculate different mileage rates if it were determined to be necessary.

[16]     Uber suggests that some expenses might be used for the benefit of Lyft or Sidecar, Opp. at 29. However, this argument has no merit, as Plaintiffs are only seeking reimbursement for mileage for trips completed on Uber's system (or picking up Uber passengers), which is measurable from Uber's own data. Ex. 5 (Coleman Dep.), at 190:9-17; Dkt. 277-10.

12

1    argues about the import of the Supreme Court's holding in Comcast). See Leyva v. Medline Indus.

2    Inc., 716 F.3d 510, 514 (9th Cir.2013).[17]

3    Thus, at a minimum, the Court should certify a class of all drivers as to Uber's liability for its

4    uniform practice of failing to reimburse drivers' expenses and, if the Court deemed it necessary,

5    bifurcate the issues of liability and damages pursuant to Rule 23(c)(4) for drivers like Colopy who

6    drove through intermediary companies.[18] Concerns about the need to individualize damages

7    should not preclude certification, particularly where it means that Uber will otherwise avoid

8    liability for its systemic policies with respect to its entire workforce of drivers.

9    **C. Plaintiffs' Tips Claim Under Cal. Labor Code § 351 Should Be Certified.[19]**

10   Plaintiffs' tip claim is based upon Uber's policy of communicating to passengers that a tip is

11   included in the fare charged while not distributing any tip to drivers. Uber argues that Plaintiffs'

12   tips claim cannot be certified because (1) "there is no evidence in the record demonstrating

13   whether any particular rider thought he or she was leaving a gratuity for a driver," (2) the amount

14   of the gratuity would have varied, and (3) that "[t]o the extent some drivers would not have

15   _____

16   [17]    See also Roach, 2015 WL 528125, *5 ("Comcast, then, did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis….

17   Comcast's holding was narrower.  Comcast held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from

18   the class's asserted theory of injury….") (vacating district court's denial of class certification in wage and hour class action).

19   [18]    See In re Motor Fuel Temperature Sales Practices Litig., 292 F.R.D. 652, 664-65 (D. Kan. 2013). Under this approach, the Court may certify a class as to liability only, leaving damages for

20   a separate individualized determination. See Martins v. 3PD, Inc., 2013 WL 1320454, *8, n. 3 (D. Mass. Mar. 28, 2013) (noting that Comcast does not "foreclose the possibility of class certification

21   where some individual issues of the calculation of damages might remain, as in the current case, but those determinations will neither be particularly complicated nor overwhelmingly numerous"

22   and certifying a class as to liability only, and later referring to a magistrate the computation of damages); Wilson v. Kiewit Pac. Co., 2010 WL 5059522, *9 (N.D. Cal. Dec. 6, 2010) ("[W]hen

23   the time comes for proof of damages [for § 2802 claim] … that process will be determined largely by defendant's documents and manageable through a number of potential methods, including

24   review by a special master or submission of claims by employees subject to challenge or rebuttal by defendant"); Ellen Meriwether, Comcast Corp. v. Behrend: Game Changing or Business as

25   Usual?, Antitrust, Summer 2013, at 57, 61.

     [19]    This claim, as well as Plaintiffs' Cal Lab. Code § 2802 claim are brought through the Cal.

26   Bus. & Prof. Code § 17200 ("UCL"). For convenience, Plaintiffs will refer to these claims as their

27   § 351 claim and § 2802 claim respectively, without always noting that the § 351 claim is only alleged as a violation of the UCL.

28

13

received tips … those drivers have suffered no injury and have no Article III standing" Opp. at 26-27.  Uber's arguments fundamentally misunderstand Plaintiffs' tips claim.  Plaintiffs claim is premised on the fact that: (1) Uber has informed passengers that a tip is included in the fare and has thereby included a tip in the fare, and (2) Uber has _not_ distributed a tip in its payment to drivers.  From its inception, Uber's message to riders has been that, as part of Uber's seamless and convenient rider experience, the tip is already included in the fare and there is no need for riders to fumble for cash.[20]  Evidence in the case shows that Uber's website explicitly stated "tip is included" until at least late 2012, see Ex. 10, Ex. 11, Ex. 12.  Since late 2012, Uber has continued to convey the message that there is "no need to tip," Ex. 13, and other evidence shows that Uber has continued to inform passengers expressly that "tip is included" even after the "tip is included" language was apparently taken off its website at the end of 2012.  See Dkt. 277-15; Ex. 14 (as of April 2015, Uber was still sending emails to new customers stating "payment is automatically charged to a credit card on file, with tip included"); Ex. 15 ("Tip is taken into account in the fare").  Thus, the evidence shows that Uber has consistently informed passengers that a tip is part of the fare.

At the same time, Uber has consistently failed to distribute a tip to its drivers.  Uber has been adamant in its denial that it has never explicitly broken out for drivers that any part of their payment is a tip. Ex. 6 (Atkin Dep.), at 46:15-50:15; Ex. 5 (Coleman Dep.), at 171:3-172:16.  And now, Uber has stipulated that "A tip has never been part of the calculation of fares for either UberBlack or UberX in California." Ex. 16.  Thus, Uber cannot claim that it has distributed a tip to its drivers by imbedding it in the portion of the fare that it distributes to them.

Thus, Plaintiffs have evidence that Uber has uniformly charged a tip to passengers but has not

---

[20]     See Dkt. 223-4 at 3 ("Leave the Cash at Home: After the ride, Uber will automatically charge the credit card you have on file. There's no need to hand your driver any payment, and the tip is included"); Ex. 3 (Graves Dep.), at 83:20-84:21. ("Uber Black, … has always been marketed as a seamless experience such that, you know, there's no transaction at the end of a ride that would, you know, get in the way of kind of that smooth experience…What Uber has advertised is a seamless, kind of all-inclusive experience"); 104:17-108:19 (confirming that over time Uber has "communicated  [to customers] that the fare that they are paying with a credit card on file is inclusive of the whole experience that they are getting so they don't need to do anything else").

1     actually distributed a tip to its drivers.  Should the drivers be employees, those facts establish a

2     violation of Cal. Labor Code § 351 ("Every gratuity is hereby declared to be the sole property of

3     the employee or employees to whom it was paid, given, or left for…").

4          Uber's argument that some riders might not have understood that they were leaving a tip for

5     the driver is belied by the unrefuted fact that Uber expressly communicated that "tip is included"

6     in the fare on its website and other marketing materials, including emails to passengers.  Likewise,

7     Uber's argument that some drivers "would not have received tips" from customers unhappy with

8     the service, also misses the point.  The claim that Plaintiffs seek to certify has nothing to do with

9     additional tips that passengers might leave for drivers.  The claim Plaintiffs seek to certify is that

10    Uber communicated to passengers that a tip was included in the fare, but Uber never paid a tip to

11    its drivers.  Plaintiffs' claim they are seeking to certify under § 351 is not that passengers chose

12    not to leave additional tips because they were misled – instead, Plaintiffs argue that passengers

13    paid tips (because they were labeled as such), but they were never remitted to drivers.  This is

14    equally true for every driver and every fare, regardless of the subjective customer experience such

15    that there are no individualized inquiries needed.  Indeed, this is the very claim that the plaintiff

16    skycaps prevailed on at trial in DiFiore v. American Airlines, Inc., 483 F. Supp. 2d 121, 128 (D.

17    Mass. 2007), and it is the claim that was certified on a nationwide basis in Overka v. American

18    Airlines, 265 F.R.D. 14, 17 (D. Mass. 2010).[21]

19         In opposing certification, Uber also argues that the amount of the gratuity customers might

20

21    [21]     In Overka, and DiFiore, airline passengers paid a $2 per bag fee, which appeared to be a tip
       for the skycaps, but which was not passed on to the workers but was instead retained by the
22    airline.  The skycaps were able to establish that they "traditionally received[] most of their
       compensation from tips given to them by airline passengers," and that when the airlines started
23    charging a fee for their services that looked like a tip, this new charge "interfered with their
       enjoyment of an expectancy of tips from passengers." DiFiore, 483 F. Supp. 2d at 128.  However,
24    the fact that customers rarely paid additional tips beyond the $2 per bag fee was simply additional
       background evidence to help establish that the passengers reasonably believed the charge at issue
25    was the tip.  The same is true here, where drivers are not claiming additional amounts customers
       "would have tipped."  Instead, they are claiming that a tip was charged but was not remitted in full
26    to the drivers (since Uber takes its cut from the entire fare, not a designated non-tip portion of the
       fare), just as the skycaps argued that the $2 per bag fee was a tip that was not remitted to the
27    skycaps.

28
                                                   15

have paid would have varied, such that "simply awarding a flat amount based on a composite or 'customary' amount". However, again, this argument fails to grasp Plaintiffs' argument (that a gratuity *was* charged to customers and not remitted in full to the drivers). It will be up to a jury to determine what the amount of that gratuity has been, based on reasonable customer expectations.[22]

### D. Contrary to Uber's Arguments, The Named Plaintiffs' Claims are Typical of the Class.

In a further attempt to avoid classwide liability, Uber argues that many of its drivers do not want to be employees and then attempts to discredit the named plaintiffs as inadequate class representatives. Both these arguments are commonly made by employers seeking to avoid responsibility for wage violations; however, the relevant legal question at issue in this litigation is not whether drivers *want* to be employees, but rather whether they were properly classified under the relevant legal standard. Drivers' desires on this question are legally irrelevant.

Uber's argument that the named Plaintiffs' claims are not typical of the class insofar as many drivers allegedly wish to remain independent contractors and fear disastrous results if they are misclassified, should be rejected for a number of reasons. First, courts have long held that workers may not disclaim their right to recovery in order to defeat enforcement of remedial wage and hours laws. See Tony & Susan Alamo Foundation v. Sec'y of Labor, 471 U.S. 290, 302 (1985) (employer liable for paying even employees who do not want to be reimbursed for their wages).

---

[22]       It is not necessary for Plaintiffs, or Uber, to present expert testimony regarding the customary amount of gratuities in the transportation industry because it falls within the knowledge of lay jurors. Moreover, the real question at issue is what a reasonable customer would think is a customary or reasonable amount for gratuity, not what every individual customer thinks. Any argument to the contrary would mean that this claim could not be pursued even for one driver, let alone a class, as no driver could ever prove the amount of tip each individual customer thinks is included. Given that the Court has already endorsed the theory underlying Plaintiffs' § 351 claim under the unlawfulness prong of the UCL, see Dkt. 136 at 15-16, Dkt. 58 at 10-15, it is clear that the claim is viable and can be pursued under this theory.

       In any case, based upon industry custom (as lay jurors will likely know), it is reasonable to assume that a reasonable customer would think that a gratuity in the range of 15-20% is included in Uber's fare, based on its consistent representation that there is no need to tip and "tip is included." It should not defeat class certification that some customers might think 15% is reasonable while others might find 18% or 20% to be the included amount of gratuity. Indeed, Uber itself used to charge a default 20% tip on all UberTaxi fares before it allowed customers to customize that amount, demonstrating that Uber recognized this was a reasonable and customary amount to tip in the transportation industry. See Ex. 6 (Atkin Dep.), at 21:19-23:20.

16

1     As the Supreme Court explained: "If an exception … were carved out for employees willing to

2     testify that they performed work 'voluntarily,' employers might be able to use superior bargaining

3     power to coerce employees to make such assertions, or to waive their protections under the Act."

4     Id.; Martin v. Tango's Rest., Inc., 969 F.2d 1319, 1324 (1st Cir. 1992) (awarding damages to an

5     "involuntary plaintiff" and noting that "payment of back wages, if proved due, is intended to

6     protect complying competitors of the defendants, in addition to making the employee whole").

7          Second, numerous courts have considered and rejected similar arguments when considering

8     whether to certify misclassification claims.  See Dalton, 270 F.R.D. at 560; Smith v. Cardinal

9     Logistics Mgmt. Corp., 2008 WL 4156364, *7 (N.D. Cal. Sept. 5, 2008); Garcia v. E.J.

10    Amusements of New Hampshire, Inc., 2015 WL 1623827, *9 (D. Mass. Apr. 13, 2015) (certifying

11    a class and rejecting defendant's argument that "there is a conflict of interest because many

12    putative class members have expressed satisfaction with [the defendant's] wage and hour

13    practices").[23] For example, in Dalton, the Court noted that:

> [M]erely because some class members do not want to pursue these claims does not mean
> the class should not be certified . . . If the Court adopted a rule denying certification
> because some class members were against pursuing the claims, then certification would
> likely be impossible for a large number of class action suits. There will always be some
> class members who are satisfied with the status quo, especially in employment cases.
> However, classes are routinely certified in the employment context.

17    Dalton, 270 F.R.D. at 560.  Similarly, in Smith, the Court noted that "courts must be mindful of

18    the purposes underwriting these [employment] laws," and found that "[i]t would be antithetical to

19    [their] underlying purpose to permit [a few] current drivers to frustrate the attempt by others to

20    assert rights under California labor law solely because these three are satisfied with their current

21    jobs." 2008 WL 4156364, *7.  Indeed, "an interest by certain putative class members in

22    maintaining the allegedly unlawful policy is not a reason to deny class certification." Matamoros

---

[23]    See also Raposa v. Mardi Gras Entertainment, Inc., No. 10-00034, pp. 9-10 (Hampden
Super. Ct. Dec. 11, 2013) (Ex. 21) (rejecting affidavits from disinterested class members and
observing that it is "not fatal [to class certification] if some members of the class might prefer not
to have violations of their rights remedied."); Chaves v. King Arthur's Lounge No. 07-2505, at p.
4 (Suffolk Super. Ct. Aug. 7, 2009) (Ex. 22) (rejecting argument that some class members may not
want to challenge their classification as independent contractors because "economic disparity
between the defendants and … [class members], as well as their dependence on the [defendant] for
employment, is likely a factor in the [class members'] reluctance...").

1   v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (affirming class certification

2   notwithstanding dozens of affidavits from class members attesting they did not agree with the

3   litigation, and felt they would be harmed if it was successful). The same is true here; that some

4   Uber drivers may prefer to be classified as independent contractors does not have any bearing on

5   the legal question of whether Uber has broken the law by classifying them as such.  Drivers who

6   prefer to be classified as independent contractors cannot be allowed to undermine the purpose of

7   protective employment legislation (which also exists to protect complying competitors, see

8   Martin, 969 F.2d at 1324), and to undermine relief for the rest of the class.[24]

9          In any event, Plaintiffs note that more than 1,700 drivers have contacted their counsel

10   expressing their support for the case and their desire to be classified as Uber's employees and

11   obtain their reimbursement for expenses. See Lopez Decl.  It is hardly surprising that Uber was

12   able to acquire 400 declarations, considering that it had access to those drivers' contact

---

[24]    As the court recognized in Matamoros, class members who do not want to join in seeking
the relief the plaintiffs are seeking (and collect whatever damages they may be owed) are free to
opt out of the class.  Of course, a court ruling that Uber is misclassifying its drivers will likely
affect all Uber drivers, whether or not a class is certified.  Thus, an argument that many drivers do
not want to be classified as independent contractors is not a reason not to certify a class.
        In support of its opposition, Uber submitted several hundred declarations from drivers
saying they want to remain classified as independent contractors.  Of course, several hundred is a
miniscule portion of the 160,000 drivers who would be part of this class.  But, in any event,
despite the fact that these declarations are not legally relevant, Plaintiffs note that it appears that
Uber obtained these declarations under false pretenses, without fully explaining to the drivers what
this case is about, and what the plaintiffs are seeking to recover on behalf of the class.  As shown
by the declarations attached as Exs. A through F to Lopez Beltran Decl., drivers who signed
Uber's declarations would indeed like to be reimbursed for their expenses, if they are legally
entitled to this relief.  These declarations show that at least some of these drivers (who Plaintiffs
have been able to reach over the last two weeks), were confused or misled by Uber and actually
support the litigation.  In signing declarations for Uber, drivers were given incomplete information
about this case, for instance being told that some drivers were seeking to receive "paid meal
breaks" (which not a claim in this case), or were told that some drivers might bring a claim that
would affect the drivers' flexibility. See, e.g., Ex. A to Lopez Beltran Decl.
        Uber has also made the alarmist argument that, if drivers were classified as employees,
they could not work for competitors like Lyft and Sidecar.  That Uber likely raised these fears with
drivers from whom it obtained declarations further undermines the reliability of the declarations,
as they further show a misunderstanding of the issues in this case, and likely reflect drivers' fear of
losing their ability to work for multiple ride-sharing companies.  Indeed, it seems highly unlikely
that classification as employees would prevent drivers from working for both Uber and Lyft,
particularly given that non-compete agreements are illegal under California law with very limited
exceptions. See Cal. Bus. & Prof. Code § 16600.

information and could contact them in its official capacity.  By contrast, Plaintiffs' contact with drivers has been the result of drivers who are unhappy with their treatment reaching out to Plaintiffs' counsel to discuss the case and their concerns.  Plaintiffs note that this case is not a "popularity contest" and indeed, whether drivers "want" to be classified as independent contractors or as employees is legally irrelevant, see Tony & Susan Alamo Foundation, 471 U.S. at 302; however, Plaintiffs note that Uber's suggestion that most drivers want to maintain the status quo is questionable given the outpouring of support and inquiries Plaintiffs' counsel has received (and which they have not solicited, other than posting information about this case on a website), unlike Uber's "happy camper" declarations, which plainly were solicited from drivers).[25]

### E.  Contrary to Uber's Arguments, Named Plaintiffs and Class Counsel Are Adequate Class Representatives Under Rule 23.

In another attempt to avoid classwide liability, Uber also resorts to the typical attacks on the named plaintiffs.  None of these attacks warrants a finding that any of these plaintiffs is not adequate to represent the class.  "Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." Harris v. Vector Mktg. Corp., 753 F. Supp. 2d 996, 1015, 1020 (N.D. Cal. 2010).  Thus, there is "inadequacy only where the representative's credibility is questioned on issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud." Id. at 1015, 1020 (finding plaintiff was an adequate class representative for certain claims notwithstanding the fact that she apparently lied about facts relevant to other claims in the litigation).[26]

---

[25]     Numerous courts have questioned the use of such affidavits. Costello v. Kohl's Illinois, Inc., 2014 WL 4377931, *7, n. 7 (S.D.N.Y. Sept. 4, 2014) ("The Court finds these declarations— dubbed 'happy camper' declarations by Plaintiffs—to be of limited value to the instant motion"); Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 840 (N.D. Ohio 2011) (finding the happy camper "affidavits are of little use" because it is not helpful "for the employer to round up a small sample of favorable statements from employees….hand-picked by [defendant]"); In re Wells Fargo Home Mortg. Overtime Pay Litig., 527 F. Supp. 2d 1053, 1060-61 (N.D. Cal. 2007); Joseph v. GMC, 109 F.R.D. 635, 640 (D. Col. 1986).

[26]     See also Stanich v. Travelers Indem. Co., 259 F.R.D. 294, 315 (N.D. Ohio 2009) ("[T]he general rule . . . is that unrelated unethical or even criminal conduct is not sufficient to support a finding of inadequacy" under Rule 23); Cruden v. Bank of New York, 1988 WL 9514, *5 (continued on next page)

1    Here, Uber claims that the three named plaintiffs lack credibility because of what Uber claims

2    are inconsistencies in their answers to interrogatory responses and at their depositions.  Uber's

3    attempts to smear the class representatives' credibility should be soundly rejected as a self-

4    interested attempt to discredit the lead plaintiffs in an attempt to escape liability for its own

5    wrongdoing.  Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A., 657 F.2d

6    890, 895 (7th Cir. 1981) ("[I]t is often the defendant, preferring not to be successfully sued by

7    anyone, who supposedly undertakes to assist the court in determining whether a putative class

8    should be certified. When it comes, for instance, to determining whether 'the representative parties

9    will fairly and adequately protect the interests of the class,' . . . it is a bit like permitting a fox,

10   although with a pious countenance, to take charge of the chicken house").  See also In re

11   Organogenesis Sec. Litig., 241 F.R.D. 397, 411 (D. Mass. 2007).

12       First, Uber claims that Plaintiff Manahan "fraudulently" collected referral fees, but Uber fails

13   to explain how he acted "fraudulently."[27]  More importantly, Uber's argument fails to explain how

14   such alleged conduct would affect the question of whether Manahan was misclassified, suffered

15   wage violations, or is fit to serve as a class representative.  Although Uber attempts to suggest that

16

17   (footnote continued from previous page)
     (S.D.N.Y. Feb. 1, 1988) ("[T]he inconsistencies in plaintiffs' deposition testimonies put forth by
18   defendants are not significant enough so as to indicate that plaintiffs' interests are antagonistic to
     those of the class or that plaintiffs will not vigorously and adequately represent the class . . .
19   inconsistencies in deposition testimonies are generally insufficient to disqualify plaintiffs from
     representing the class."); Pena v. Taylor Farms Pacific, Inc., 305 F.R.D. 197, 215 (E. D. Cal. Feb.
20   9, 2015) ("The purpose of an investigation into the representative's credibility is not to squelch a
     class action, but to ensure it is prosecuted well and fairly to class members").

21   [27]     Indeed, Uber has never claimed that the $25,000 in referral fees Manahan received from
22   Uber was wrongly obtained; instead, it only now brings up this unsubstantiated accusation, for the
     first time, in order to try to defeat class certification. The passage Uber cites from Manahan's
23   deposition establishes only that on one occasion he requested rides that he did not need in order to
     help another driver meet a bonus requirement.  Manahan testified that he did not think this was
24   fraudulent behavior since he paid for the rides as any normal passenger would.  See Ex. 7
     (Manahan Dep.) at 285:24-286:5.  Apart from this single incident, Uber offers no evidence
25   whatsoever that Manahan purposely referred ineligible drivers through its referral program and,
     indeed, Manahan was clear throughout his testimony that he referred drivers and was paid referral
26   fees pursuant to Uber's requirements. Id. at 280:3-5 ("I referred drivers based on the rules that
     were -- or the requirements that were set forth by Uber"). Manahan had no control over whether
27   the drivers he referred continued driving for Uber after trying out the service and he was only paid
     if the driver met Uber's requirements.

28

the allegations regarding Manahan's collection of referral fees would somehow create

individualized issues, Uber did not even assert a counter-claim against him (and even if it had, that

itself would not defeat class certification). See Dkt. 63, 110, 206.[28]  Uber should not be permitted

to use these types of baseless threats of legal action to undermine a class representative.  Likewise

Uber's characterization of Plaintiff Manahan's discovery responses as "contradictory," Opp. at 34,

constitutes a misleading attempt to manufacture controversy where there is none.[29]

Likewise, Uber claims that Colopy provided "contradictory responses with the same set of

discovery responses," when in fact, Colopy merely explained that he did not know who paid for

expenses related to his vehicle's operation, maintenance, and insurance generally, Ex. 18 at No.

14, but that he was aware that the transportation company he worked through occasionally

reimbursed him for "detailing" specifically. Id. at No. 16.  Answering questions that are posed

with different levels of generality does not constitute deliberate falsehood (as Uber well knows).[30]

With respect to Gurfinkel, Uber argues that he "lacks understanding about the most

---

[28]   See Allen v. Holiday Universal, 249 F.R.D. 166, 183 (E.D. Pa. 2008) (noting that
"hypothetical counterclaims do not impact class certification, particularly where the record
provides no basis for finding that such counterclaims would create difficulties that outbalance the
advantages of class treatment" and rejecting "the defensive 'sabre-rattling' that such
counterclaims, even if they in fact exist, cause a conflict between class members"); Roper v.
Consurve, Inc., 578 F.2d 1106, 1116 (5th Cir. 1978), aff'd sub nom. Deposit Guar. Nat. Bank,
Jackson, Miss. v. Roper, 445 U.S. 326 (1980) ("The potential assertion of counter claims against
these few members of the proposed class cannot be allowed to defeat an otherwise valid class
action when to do so would effectively deprive thousands of class members of the relief to which
they are entitled").

[29]   For example, Manahan consistently explained in both his deposition and his written
discovery responses that he "received emails encouraging [him] to work busier times," Ex. 7 at
308:20-21, and that he viewed these emails as "instructing him to work more hours during busier
times," Ex. 17 at No. 4.  As to Manahan's allegedly "contradictory" responses regarding tips, he
testified that it was rare for passengers to leave tips beyond the fare charged, and that he could not
clearly remember the precise number of times it occurred. Ex. 7 at 248:6-249:10.

[30]   Similarly, the other places that Uber claims Colopy gave inconsistent responses address
primarily whether Uber controlled his schedule.  In his deposition, Colopy agreed that "Uber is not
setting [his] schedule for [him]", but this testimony does not conflict with his written discovery
responses, which noted that "Uber has frequently instructed him to work more hours during busier
times." Ex. 18 at No. 4.  Likewise, Uber does require that its drivers give a ride after a certain
period of days in order to stay active on the system or their account will be disabled, see Ex. 3 at
174:4-17, such that Colopy's response that Uber has in fact "required that [he] log in to the Uber
App at any particular time" is also accurate. Ex. 19 at No. 3. Ultimately, this kind of parsing of
Plaintiff's answers, completely out of context serves only to create controversy where none exists.

1    fundamental aspects of this case." Opp. at 35. However, "courts have found that a plaintiff may

2    adequately represent the class if he or she has a basic understanding about the nature of the suit, or

3    a generalized understanding of the allegations in the case" even if he or she does not have a

4    nuanced understanding of the law and the specifics of the case. <u>Stuart</u>, 2009 WL 281941, *11

5    (internal citations omitted); <u>Ormond v. Anthem, Inc.</u>, 2009 WL 3163117, *5 (S.D. Ind. Sept. 29,

6    2009) (noting "the relatively undemanding standard for a class representative's involvement in the

7    case").  Gurfinkel's participation in this case plainly does not raise the situation in which "it

8    appears that [he] ha[s] abdicated any role in the case beyond that of furnishing [his] name[] as

9    plaintiff[]." <u>Pryor v. Aerotek Scientific, LLC</u>, 278 F.R.D. 516, 529 (C.D. Cal. 2011).  Indeed,

10   Gurfinkel has participated in interviews with the media and has been in active communication

11   with his attorneys. <u>See</u> Ex. 20.  Moreover, it is not a requirement that named plaintiffs memorize

12   the name of the judge or befriend, or even meet, other named plaintiffs in the case. As in <u>Stuart</u>,

13   this is plainly a case where "there is no dispute that [Gurfinkel] understands the gist of this suit—

14   that he and others were not reimbursed for expenses" and were not properly paid tips,

15   notwithstanding defense counsel's attempts at his deposition to quiz him regarding the details of

16   the docket and judge. 2009 WL 281941, *11; Ex. 8 (Gurfinkel Dep.) at 143:23-144:15

17   (articulating that the case covers a claim "for tips" and "one that we are [in] an employer-

18   employee relationship"); 146:12-15 (describing his understanding of his responsibilities as class

19   representative "to look out for all the drivers").

20        Not only should the Court reject Uber's attempts to smear the class representatives' credibility

21   in order to defeat the prospect of classwide liability for its systemic wage violations, but Uber's

22   protestations regarding the suitability of the named plaintiffs (and class counsel) should be viewed

23   with a healthy dose of skepticism.  In re <u>Pfizer Inc. Sec. Litig.</u>, 282 F.R.D. 38, 47 (S.D.N.Y.

24   2012).  Indeed, courts have employed a "presumption of strategic behavior by class action

25   defendants," which shall preclude, or severely limit, the types of challenges that Uber levels in this

26   action.  <u>Id.</u>  Plaintiffs' counsel is highly experienced in this very type of litigation and dedicated to

27

28

22

1    vigorously pursuing these types of claims[31], and the named plaintiffs are likewise committed to

2    representing the class and are adequate to do so.

3        **F. That Some Class Members Are Subject to Arbitration Agreements Does Not Preclude**
         **Class Certification Where This Court Has Ruled The Agreements at Issue Are**
4        **Permeated with Unconscionability and Are Unenforceable.**

5        In their motion for class certification, Plaintiffs had asked the Court to certify a class prior to

6    considering the enforceability of the arbitration agreements. See Dkt. 276 at 22-25.  However, in

7    the interim, the Court found that Uber's arbitration agreements are unconscionable and

8    unenforceable, see Mohamed v. Uber Technologies, Inc., 2015 WL 3749716 (N.D. Cal. June 9,

9    2015), such that this issue is no longer pertinent, and all UberX and UberBlack drivers in

10   California can be included in the class, regardless of whether they had an arbitration agreement in

11   their contract or whether they opted out of arbitration.[32]  Uber claims that this Court's decision

12   ────────────────────
     [31]     In seeking to defeat class certification, Uber has also expressed concern over Plaintiffs'
13   counsel's caseload and their ability to devote adequate resources to the litigation. See Opp. at 35,
     n. 22.  While these concerns are touching, Plaintiffs submit that this a classic example the "fox . . .
14   tak[ing] charge of the chicken house." Eggleston, 657 F.2d at 895.  Indeed, Plaintiffs' lead counsel
     and her firm have demonstrated their commitment and success in representing low-wage workers
15   in large (and numerous) cases that have required enormous resources, lasted years (even more than
     a decade), have taken thousands of hours of attorney time, and have required investment of
16   hundreds of thousands in case expenses.  Plaintiffs' counsel have succeeded in obtaining
     numerous landmark rulings, including the following examples: Starbucks, see Matamoros, 699
17   F.3d at 129 (Starbucks violated Massachusetts Tips Law by allowing low level supervisors to
     share in tip pool with baristas); national cleaning franchise companies, see, e.g., Awuah v.
18   Coverall North America, Inc., 460 Mass. 484 (2011) (misclassified cleaning workers could
     recover franchise fees they had to pay in order to obtain work), DeGiovanni v. Jani-King
19   International, Inc., C.A. No. 07-10066 (D. Mass.) (also holding franchisee cleaning workers to
     have been misclassified); airlines, see, e.g., DiFiore, 07–10070 (trial victory for skycaps who did
20   not receive tips passengers believed they were paying), reversed on federal preemption grounds,
     646 F.3d 81 (1st Cir. 2011), and Overka, 265 F.R.D. at 17 (certification of national class on this
21   claim); FedEx, see Sheehan v. FedEx Ground Package System, 1:05-cv-10936-RGS, Schwann v.
     FedEx Ground Package Sys., Inc., 2013 WL 3353776, *6 (D. Mass. July 3, 2013), rev'd in part,
22   2015 WL 501512 (D. Mass. Feb. 5, 2015), appeal docketed, No. 15-214 (1st Cir. Feb. 24, 2015)
     (holding FedEx drivers to have been misclassified under Massachusetts law); the Commonwealth
23   of Massachusetts for discriminating against minority firefighter and police applicants based on
     civil service exams which had disparate impact on minorities, see Bradley v. City of Lynn, 443 F.
24   Supp. 2d 145 (D. Mass. 2006) (judgment for plaintiff class following federal bench trial); national
     hotel chains, see, e.g., Villon v. Marriott, and Rodriguez v. Starwood, 306 P.3d 175 (2013)
25   (Hawaii Supreme Court held that state law provided protection for food and beverage workers to
     recover total proceeds of service charges not remitted to them); and numerous other employers.

26   [32]     Even if the Court's ruling in Mohamed were reversed, a class can still be certified here
     because well more than 40 drivers in California are not covered by Uber's arbitration clause.
27   These include drivers who stopped working for Uber before the roll-out of the arbitration clause in
     (continued on next page)
28
     ─────────────────────────────
                                        23

1   invalidating its arbitration agreements in <u>Mohamed</u> "underscore[s] that the enforceability of

2   Uber's arbitration agreement vis-à-vis any particular driver is an individualized inquiry that turns

3   on the sophistication and economic means of the driver..." Opp. at 39.  However, Uber misreads

4   this Court's decision, which held that Uber's agreement was "permeated with . . . substantively

5   unconscionable terms" and was procedurally unconscionable without regard to the sophistication

6   of the parties, such that the agreement is unenforceable as to all drivers. <u>Mohamed</u>, 2015 WL

7   3749716, *27.  The Court's findings in <u>Mohamed</u> did not rely on the particular characteristics of

8   the plaintiffs in those cases but rather on aspects of the agreement that apply with equal force to all

9   drivers.[33]  With respect to procedural unconscionability, the Court found the "[a]greement was

10  presented to drivers on a take-it-or-leave it basis, and was adhesive and oppressive," the

11  "Agreement first appears on the eleventh page of the printed document," "the arbitration clause

12  itself is inconspicuous," and that "drivers were prompted to view the relevant contracts, and accept

13  them, while using their smartphones or other mobile devices." <u>Id.</u>, *21.

14      Likewise, with respect to substantive unconscionability, (1) the cost-splitting provision; (2) the

15  confidentiality provision; (3) the intellectual property claim carve out; (4) the unilateral

---

(footnote continued from previous page)

2013, those who are bound by Uber's 2013 Agreement (with respect to which the Court found
Defendant is unlikely to succeed in appealing its ruling of unconscionability, <u>see</u> <u>Gillette</u>, 3:14-cv-
05241, Dkt. 66), those who drove for Uber during its pause in distributing arbitration clauses in
2014, and those who opted out of the clause.  While Plaintiffs urge the Court to include all
California drivers in the class, regardless of whether they had an arbitration agreement in their
contract, this subset of the class would be able to proceed with their claims in court no matter the
outcome of Uber's appeal of the <u>Mohamed</u> ruling.

[33]     <u>Mohamed</u>, 2015 WL 3749716, *10, n. 16 (noting that "Uber's delegation clauses are not
sufficiently clear and unmistakable to be enforced *even against a legally sophisticated entity*")
(emphasis added).  To the extent the Court relied on the financial circumstances of the plaintiffs in
those cases, Plaintiffs note that courts have relied upon evidence of a single employee's financial
circumstances to hold that where an employee "could not afford such a fee, [] it is unlikely other
similarly situated employees could either." <u>Shankle v. B-G Maint. Mgmt. of Colorado, Inc.</u>, 163
F.3d 1230, 1234-35 (10th Cir. 1999); <u>see also</u> <u>Morrison v. Circuit City Stores, Inc.</u>, 317 F.3d 646,
663 (6th Cir. 2003) (holding that "if the reviewing court finds that the cost-splitting provision
would deter a substantial number of similarly situated potential litigants, it should refuse to
enforce the cost-splitting provision" and noting that the court should consider "the class of such
similarly situated potential litigants by job description and socioeconomic background"); <u>Owner-
Operator Indep. Drivers Ass'n v. C.R. England, Inc.</u>, 325 F. Supp. 2d 1252, 1262 (D. Utah 2004).

24

1    modification provision; and (5) the waiver of the ability to bring claims under the Private Attorney

2    General Act ("PAGA"), are equally unconscionable as applied to every California Uber driver.

3    Id.,*27-31. In the face of so many unconscionable terms, other courts have likewise stricken entire

4    arbitration agreements as unenforceable rather than severing the many offending portions. See,

5    e.g., Chavarria v. Ralphs Grocery Co., 733 F.3d 916, 926-27 (9th Cir. 2013); Newton v Am. Debt

6    Servs., Inc., 549 F. App'x 692, 694 (9th Cir. 2013); Merkin v. Vonage Am. Inc., 2014 WL 457942,

7    *6-7 (C.D. Cal. Feb. 3, 2014).[34]

8                                       **CONCLUSION**

9        Uber's opposition brief amounts to an attempt to escape liability for its systemic legal

10   violations by painting a picture of its workforce that attempts to maximize variation.  However,

11   despite whatever differences may exist among Uber drivers, Plaintiffs submit that the core

12   questions at the heart of this case – (1) whether Uber misclassified its drivers that it charged to

13   customers, (2) whether it charged gratuities to passengers and then failed to remit them in full to

14   its drivers, and (3) whether it failed to reimburse drivers for necessary business expenses – are

15   fundamentally capable of common proof.  The Court can manage the class as necessary, whether

16   by creating subclasses of drivers (possibly, for example, for those who drove through intermediary

17   transportation companies like Colopy), by utilizing bellwether or exemplar trials to decide

18   common issues, or by certifying Plaintiffs' claims as to liability only and leaving damages issues

19   for later determination by some alternate means such as a special master, exemplar trials, or a

20   claims process.  However, Uber should not be permitted to escape liability for its systemic legal

21   violations altogether simply by burying this Court in paper in an attempt to sow doubt and

22   confusion.  For all these reasons, Plaintiffs urge the Court to grant their motion for class

23   certification and certify their claims under Fed. R. Civ. P. 23.

24   ────────────────────────
       [34]        Uber also argues that Plaintiffs' proposed PAGA representative claims should be
25   dismissed as they also do not meet the requirements of Rule 23. Opp. at 39-40.  As this Court has
       recognized, Plaintiffs need not satisfy Rule 23's requirements to bring this claim. See Mendez v.
26   Tween Brands, Inc., 2010 WL 2650571, *3 (E.D.Cal. July 1, 2010) (collecting cases).  However,
       if it were necessary to satisfy the Rule 23 requirements, the same considerations that are relevant
27   to certifying Plaintiffs' other claims would apply and, as discussed throughout this briefing,
       Plaintiffs have satisfied Rule 23 as to all of their claims.

28

Date: July 23, 2015

Respectfully submitted,

DOUGLAS O'CONNOR, THOMAS COLOPY,
MATTHEW MANAHAN, and ELIE GURFINKEL
individually and on behalf of all others similarly
situated,

By their attorneys,

  /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic filing on July 23, 2015, on all counsel of record.

  /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.