# Exhibit 1

U.S. Department of Labor
Wage and Hour Division
Washington, D.C. 20210

---

**Administrator's Interpretation No. 2015-1**

July 15, 2015

Issued by ADMINISTRATOR DAVID WEIL

---

SUBJECT:  The Application of the Fair Labor Standards Act's "Suffer or Permit" Standard in the Identification of Employees Who Are Misclassified as Independent Contractors.

---

Misclassification of employees as independent contractors is found in an increasing number of workplaces in the United States, in part reflecting larger restructuring of business organizations. When employers improperly classify employees as independent contractors, the employees may not receive important workplace protections such as the minimum wage, overtime compensation, unemployment insurance, and workers' compensation.  Misclassification also results in lower tax revenues for government and an uneven playing field for employers who properly classify their workers.  Although independent contracting relationships can be advantageous for workers and businesses, some employees may be intentionally misclassified as a means to cut costs and avoid compliance with labor laws.

The Department of Labor's Wage and Hour Division (WHD) continues to receive numerous complaints from workers alleging misclassification, and the Department continues to bring successful enforcement actions against employers who misclassify workers.  In addition, many states have acknowledged this problematic trend and have responded with legislation and misclassification task forces.  Understanding that combating misclassification requires a multi-pronged approach, WHD has entered into memoranda of understanding with many of these states, as well as the Internal Revenue Service.[1]  In conjunction with these efforts, the Administrator believes that additional guidance regarding the application of the standards for determining who is an employee under the Fair Labor Standards Act (FLSA or "the Act") may be helpful to the regulated community in classifying workers and ultimately in curtailing misclassification.

The FLSA's definition of employ as "to suffer or permit to work" and the later-developed "economic realities" test provide a broader scope of employment than the common law control test.  Indeed, although the common law control test was the prevalent test for determining whether an employment relationship existed at the time that the FLSA was enacted, Congress

---

[1] Information about the Department's Misclassification Initiative and related memoranda of understanding is available at http://www.dol.gov/whd/workers/misclassification/.

rejected the common law control test in drafting the FLSA. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947). Instead, the FLSA defines "employ" broadly as including "to suffer or permit to work," 29 U.S.C. 203(g), which clearly covers more workers as employees, *see U.S. v. Rosenwasser*, 323 U.S. 360, 362-63 (1945).

In order to make the determination whether a worker is an employee or an independent contractor under the FLSA, courts use the multi-factorial "economic realities" test, which focuses on whether the worker is economically dependent on the employer or in business for him or herself.[2] A worker who is economically dependent on an employer is suffered or permitted to work by the employer. Thus, applying the economic realities test in view of the expansive definition of "employ" under the Act, most workers are employees under the FLSA. The application of the economic realities factors must be consistent with the broad "suffer or permit to work" standard of the FLSA.

This Administrator's Interpretation first discusses the pertinent FLSA definitions and the breadth of employment relationships covered by the FLSA. When determining whether a worker is an employee or independent contractor, the application of the economic realities factors should be guided by the FLSA's statutory directive that the scope of the employment relationship is very broad. This Administrator's Interpretation then addresses each of the factors, providing citations to case law and examples. All of the factors must be considered in each case, and no one factor (particularly the control factor) is determinative of whether a worker is an employee. Moreover, the factors themselves should not be applied in a mechanical fashion, but with an understanding that the factors are indicators of the broader concept of economic dependence. Ultimately, the goal is not simply to tally which factors are met, but to determine whether the worker is economically dependent on the employer (and thus its employee) or is really in business for him or herself (and thus its independent contractor). The factors are a guide to make this ultimate determination of economic dependence or independence.[3]

---

[2] While most misclassified employees are labeled "independent contractors," the Department has seen an increasing number of instances where employees are labeled something else, such as "owners," "partners," or "members of a limited liability company." In these instances, the determination of whether the workers are in fact FSLA covered employees is also made by applying an economic realities analysis.

[3] The analysis in this Administrator's Interpretation should also be applied in determining whether a worker is an employee or an independent contractor in cases arising under the Migrant and Seasonal Agricultural Worker Protection Act (MSPA) and the Family and Medical Leave Act (FMLA). MSPA expressly adopts the FLSA's definition of "employ" as MSPA's definition of "employ" and thus incorporates the broad "suffer or permit" standard for determining the scope of employment relationships. *See* 29 U.S.C. 1802(5) ("The term 'employ' has the meaning given such term under [the FLSA, 29 U.S.C. 203(g)]."); *see also* 29 C.F.R. 500.20(h)(1)-(4). The FMLA also adopts the FLSA's definition of "employ" for employer coverage and employee eligibility purposes (subject to additional eligibility requirements). *See* 29 U.S.C. 2611(3); 29 C.F.R. 825.105.

## I. The Economic Realities Factors Should Be Applied in View of the FLSA's Broad Scope of Employment and "Suffer or Permit" Standard

The FLSA's definitions establish the scope of the employment relationship under the Act and provide the basis for distinguishing between employees and independent contractors. The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. 203(e)(1), and "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. 203(d). The FLSA's definition of "'employ' includes to suffer or permit to work." 29 U.S.C. 203(g). This "suffer or permit" concept has broad applicability and is critical to determining whether a worker is an employee and thus entitled to the Act's protections.

The "suffer or permit" standard was specifically designed to ensure as broad of a scope of statutory coverage as possible. *See Rosenwasser*, 323 U.S. at 362-63 ("A broader or more comprehensive coverage of employees . . . would be difficult to frame."); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("employ" is defined with "striking breadth"). The Supreme Court "has consistently construed the Act 'liberally to apply to the furthest reaches consistent with congressional direction,' recognizing that broad coverage is essential to accomplish the [Act's] goal . . . ." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)) (internal citation omitted).

The history of the "suffer or permit" standard highlights its broad applicability. Prior to the FLSA's enactment, the phrase "suffer or permit" (or variations of the phrase) was commonly used in state laws regulating child labor and was "designed to reach businesses that used middlemen to illegally hire and supervise children." *Antenor v. D & S Farms*, 88 F.3d 925, 929 n.5 (11th Cir. 1996). A key rationale underlying the "suffer or permit" standard in child labor laws was that the employer's opportunity to detect work being performed illegally and the ability to prevent it from occurring was sufficient to impose liability on the employer. *See, e.g., People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 225 N.Y. 25, 29-31 (N.Y. 1918). Thus, extending coverage of child labor laws to those who suffered or permitted the work was designed to expand child labor laws' coverage beyond those who controlled the child laborer, counter an employer's argument that it was unaware that children were working, and prevent employers from using agents to evade requirements.

Unlike the common law control test, which analyzes whether a worker is an employee based on the employer's control over the worker and not the broader economic realities of the working relationship, the "suffer or permit" standard broadens the scope of employment relationships covered by the FLSA. Indeed, the FLSA's statutory definitions (including "suffer or permit") rejected the common law control test that was prevalent at the time. As the Supreme Court explained:

> [I]n determining who are "employees" under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance. This Act contains its own definitions, comprehensive enough to require its

application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.

*Walling*, 330 U.S. at 150-51 (internal citation omitted); *see also Darden*, 503 U.S. at 326 (FLSA's "suffer or permit" standard for employment "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."); *Antenor*, 88 F.3d at 933 ("Indeed, the 'suffer or permit to work' standard was developed to assign responsibility to businesses that did not directly supervise putative employees."). Thus, the scope of employment under the FLSA is the "'broadest definition that has ever been included in any one act.'" *Rosenwasser*, 323 U.S. at 363 n.3 (quoting from statement of Senator Black on Senate floor).

An "entity 'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity." *Antenor*, 88 F.3d at 929. The Supreme Court and Circuit Courts of Appeals have developed a multi-factor "economic realities" test to determine whether a worker is an employee or an independent contractor under the FLSA. *See, e.g., Tony & Susan Alamo*, 471 U.S. at 301 (noting that the test of employment under the FLSA is economic reality); *Goldberg v. Whitaker House Co-op, Inc.,* 366 U.S. 28, 33 (1961) (the economic realities of the worker's relationship with the employer control, rather than any technical concepts used to characterize that relationship). The factors typically include: (A) the extent to which the work performed is an integral part of the employer's business; (B) the worker's opportunity for profit or loss depending on his or her managerial skill; (C) the extent of the relative investments of the employer and the worker; (D) whether the work performed requires special skills and initiative; (E) the permanency of the relationship; and (F) the degree of control exercised or retained by the employer.[4]

In undertaking this analysis, each factor is examined and analyzed in relation to one another, and no single factor is determinative. The "control" factor, for example, should not be given undue weight. The factors should be considered in totality to determine whether a worker is economically dependent on the employer, and thus an employee. The factors should not be applied as a checklist, but rather the outcome must be determined by a qualitative rather than a quantitative analysis. The application of the economic realities factors is guided by the overarching principle that the FLSA should be liberally construed to provide broad coverage for workers, as evidenced by the Act's defining "employ" as "to suffer or permit to work."

In applying the economic realities factors, courts have described independent contractors as those workers with economic independence who are operating a business of their own. On the other hand, workers who are economically dependent on the employer, regardless of skill level, are employees covered by the FLSA. *See, e.g., Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) ("To determine if a worker qualifies as an employee, we focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or

---

[4] The number of factors and the exact articulation of the factors may vary some depending on the court. Courts routinely note that they may consider additional factors depending on the circumstances and that no one factor is determinative.

is instead in business for himself."); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (the economic realities of the relationship govern, and the focal point is whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The ultimate concern is whether, as a matter of economic reality, the workers depend on someone else's business . . . or are in business for themselves."). "Ultimately, in considering economic dependence, the court focuses on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.'" *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013) (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975)).

Moreover, the economic realities of the relationship, and not the label an employer gives it, are determinative. Thus, an agreement between an employer and a worker designating or labeling the worker as an independent contractor is not indicative of the economic realities of the working relationship and is not relevant to the analysis of the worker's status. *See, e.g., Scantland*, 721 F.3d at 1311 ("This inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'") (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)); *Superior Care*, 840 F.2d at 1059 ("[E]mployer's self-serving label of workers as independent contractors is not controlling."); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (explaining that "[a]n employee is not permitted to waive employee status," and affirming that welders were employees despite having signed independent contractor agreements). Likewise, workers who are classified as independent contractors may receive a Form 1099-MISC from their employers. This form simply indicates that the employer engaged the worker as an independent contractor, not that the worker is actually an independent contractor under the FLSA. *See Olson v. Star Lift Inc.*, 709 F. Supp. 2d 1351, 1356 (S.D. Fla. 2010) (worker's receipt of Form 1099-MISC from employer does not weigh in favor of independent contractor status). "Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979).

The ultimate inquiry under the FLSA is whether the worker is economically dependent on the employer or truly in business for him or herself. If the worker is economically dependent on the employer, then the worker is an employee. If the worker is in business for him or herself (i.e., economically independent from the employer), then the worker is an independent contractor.

## II. The Economic Realities Factors Guide the Determination Whether the Worker Is Truly an Independent Business or Is Economically Dependent on the Employer

To help illustrate how the economic realities factors should be properly used to determine whether a worker is truly in business for him or herself, each factor is discussed in detail below. The distinction between workers who are economically dependent on employers and the narrower subset of workers who are truly independent businesspersons must not be eclipsed by a mechanical application of the economic realities test. The analysis whether the factors are met must focus on whether the worker is economically dependent on the employer or truly in business for him or herself. As a district court held in an enforcement action by the Department:

5

> These factors are to be considered and weighed against one another in each situation, but there is no mechanical formula for using them to arrive at the correct result. Rather, the factors are simply a tool to assist in understanding individual cases, with the ultimate goal of deciding whether it is economically realistic to view a relationship as one of employment or not.

*Solis v. Cascom, Inc.*, 2011 WL 10501391, at *4 (S.D. Ohio Sept. 21, 2011); *see also Scantland*, 721 F.3d at 1312 (the economic realities factors "serve as guides, [and] the overarching focus of the inquiry is economic dependence"); *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir. 1976) (The economic realities factors "are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is dependence that indicates employee status. Each test must be applied with that ultimate notion in mind.").

Each factor of the economic realities test is discussed below in order to highlight, using case law and examples, relevant considerations for each factor and how each suggests whether or not there is an employment relationship.

A.   Is the Work an Integral Part of the Employer's Business?

The policy behind the "suffer or permit" statutory language was to bring within the scope of employment workers integrated into an employer's business. If the work performed by a worker is integral to the employer's business, it is more likely that the worker is economically dependent on the employer. *See Rutherford*, 331 U.S. at 729 (workers were employees in part because work was "part of the integrated unit of production"); *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1385 (3d Cir. 1985) ("workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer"). A true independent contractor's work, on the other hand, is unlikely to be integral to the employer's business.[5]

Courts have found the "integral" factor to be compelling. *See, e.g., Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989) (holding that work performed by cake decorators "is obviously integral" to the business of selling cakes which are custom decorated); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537-38 (7th Cir. 1987) ("It does not take much of a record to demonstrate that picking the pickles is a necessary and integral part of the pickle business . . . ."). Work can be integral to a

---

[5] Given that the "integral" factor particularly encompasses the "suffer or permit" standard and that the Supreme Court in *Rutherford* found the workers in that case to be employees, in part because they were "part of the integrated unit of production," whether the worker's work is an integral part of the employer's business should always be analyzed in misclassification cases. Although a few courts, such as the Fifth Circuit, do not include the "integral" factor in their recitation of the factors that comprise the economic realities test, they nonetheless recognize that the factors comprising the test are not exclusive. *See, e.g., Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 Fed. App'x 57, 59 (5th Cir. 2009) (describing the five factors it identifies as "non-exhaustive"); *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir. 1987) (same).

business even if the work is just one component of the business and/or is performed by hundreds or thousands of other workers. For example, a worker answering calls at a call center along with hundreds of others is performing work that is integral to the call center's business even if that worker's work is the same as and interchangeable with many others' work. Moreover (and especially considering developments such as telework and flexible work schedules, for example), work can be integral to an employer's business even if it is performed away from the employer's premises, at the worker's home, or on the premises of the employer's customers.

> **Example:**[6]   For a construction company that frames residential homes, carpenters are *integral* to the employer's business because the company is in business to frame homes, and carpentry is an integral part of providing that service.
>
> In contrast, the same construction company may contract with a software developer to create software that, among other things, assists the company in tracking its bids, scheduling projects and crews, and tracking material orders. The software developer is performing work that is *not integral* to the construction company's business, which is indicative of an independent contractor.

B.      Does the Worker's Managerial Skill Affect the Worker's Opportunity for Profit or Loss?

In considering whether a worker has an opportunity for profit or loss, the focus is whether the worker's managerial skill can affect his or her profit and loss.[7] A worker in business for him or herself faces the possibility to not only make a profit, but also to experience a loss. The worker's managerial skill will often affect opportunity for profit or loss beyond the current job, such as by leading to additional business from other parties or by reducing the opportunity for future work. For example, a worker's decisions to hire others, purchase materials and equipment, advertise, rent space, and manage time tables may reflect managerial skills that will affect his or her opportunity for profit or loss beyond a current job.

On the other hand, the worker's ability to work more hours and the amount of work available from the employer have nothing to do with the worker's managerial skill and do little to separate employees from independent contractors—both of whom are likely to earn more if they work more and if there is more work available. *See Scantland*, 721 F.3d at 1316-17 ("Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs than assigned,

---

[6] The addition or alteration of any of the facts in any of the examples could change the resulting analysis. Additionally, while the examples help illustrate the discussion of several common factors of the economic realities test, no one factor is determinative of whether a worker is an employee or independent contractor.

[7] This factor is sometimes articulated as "the degree to which the worker's opportunity for profit and loss is determined by the alleged employer," *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998), or simply as "the worker's opportunity for profit or loss," *Baker*, 137 F.3d at 1440. This factor should not focus, however, just on whether there is opportunity for profit or loss, but rather on whether the worker has the ability to make decisions and use his or her managerial skill and initiative to affect opportunity for profit or loss.

which is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces."). The effect on one's earnings of doing one's job well or working more hours is no different for an independent contractor than it is for an employee. Those considerations are not the product of exercising managerial skill and do not demonstrate that the worker is an independent contractor. As one court said:

> There was no opportunity for increased profit or loss depending upon an alleged employee's managerial skill. While the alleged employees were free to work additional hours to increase their income, they had no decisions to make regarding routes, or acquisition of materials, or any facet normally associated with the operation of an independent business.

*Cascom*, 2011 WL 10501391, at *6; *see also Scantland*, 721 F.3d at 1317 ("An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business."); *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1294 (3d Cir. 1991) (opportunity for profit or loss must depend on managerial skills to indicate independent contractor status); *Snell*, 875 F.2d at 810 (cake decorators' "earnings did not depend upon their judgment or initiative, but on the [employer's] need for their work").[8]

Consistent with determining whether the worker is in business for him or herself, it is important not to overlook whether there is an opportunity for loss, as a worker truly in business for him or herself faces the possibility of experiencing a loss. *See, e.g., Snell*, 875 F.2d at 810 (possibility of loss is a risk usually associated with independent contractor status, but there was no way for cake decorators to experience a loss, and possible reduction in earnings was not the same as a loss); *Lauritzen*, 835 F.2d at 1536 (migrant farm workers had no possibility for loss of investment, only loss of wages, indicating that they were employees). In sum, in order to inform the determination of whether the worker is in business for him or herself, this factor should not focus on the worker's ability to work more hours, but rather on whether the worker exercises managerial skills and whether those skills affect the worker's opportunity for both profit and loss.

**Example:** A worker provides cleaning services for corporate clients. The worker performs assignments only as determined by a cleaning company; he does not

---

[8] In *Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 Fed. App'x 104, 106-07 (4th Cir. 2001), the Fourth Circuit identified "the business acumen with which the Installer makes his required capital investments in tools, equipment, and a truck" and the "decision whether to hire his own employees or to work alone" as indicative of the managerial skill that suggests independent contractor status. The court also identified the workers' skill in meeting technical specifications and their ability to control earnings by working more or fewer hours as indicative of managerial skill. *Id.; see also Express Sixty-Minutes*, 161 F.3d at 304 (relying on workers' "ability to choose how much they wanted to work" as indicative of managerial skill). These latter considerations do not helpfully distinguish between workers who are in business for themselves and those who are economically dependent on the employer.

independently schedule assignments, solicit additional work from other clients, advertise his services, or endeavor to reduce costs. The worker regularly agrees to work additional hours at any time in order to earn more. In this scenario, the worker *does not exercise managerial skill* that affects his profit or loss. Rather, his earnings may fluctuate based on the work available and his willingness to work more. This lack of managerial skill is indicative of an employment relationship between the worker and the cleaning company.

In contrast, a worker provides cleaning services for corporate clients, produces advertising, negotiates contracts, decides which jobs to perform and when to perform them, decides to hire helpers to assist with the work, and recruits new clients. This worker *exercises managerial skill* that affects his opportunity for profit and loss, which is indicative of an independent contractor.

C.  How Does the Worker's Relative Investment Compare to the Employer's Investment?

Courts also consider the nature and extent of the relative investments of the employer and the worker in determining whether the worker is an independent contractor in business for him or herself. The worker should make some investment (and therefore undertake at least some risk for a loss) in order for there to be an indication that he or she is an independent business. An independent contractor typically makes investments that support a business as a business beyond any particular job. The investment of a true independent contractor might, for example, further the business's capacity to expand, reduce its cost structure, or extend the reach of the independent contractor's market.

Even if the worker has made an investment, it should not be considered in isolation; it is the relative investments that matter. Looking not just to the nature of the investment, but also comparing the worker's investment to the employer's investment helps determine whether the worker is an independent business. If so, the worker's investment should not be relatively minor compared with that of the employer. If the worker's investment is relatively minor, that suggests that the worker and the employer are not on similar footings and that the worker may be economically dependent on the employer.

For example, investing in tools and equipment is not necessarily a business investment or a capital expenditure that indicates that the worker is an independent contractor. *See Snell*, 875 F.2d at 810 (citing cases); *Lauritzen*, 835 F.2d at 1537. Instead, the tools and equipment may simply be necessary to perform the specific work for the employer. Even if the investment is possibly a business investment, the worker's investment must be significant in nature and magnitude relative to the employer's investment in its overall business to indicate that the worker is an independent businessperson. The Tenth Circuit determined, for example, that rig welders' investments in equipped trucks costing between $35,000 and $40,000 did not indicate that the rig welders were independent contractors when compared to the employer's investment in its business. *See Baker*, 137 F.3d at 1442 (comparing rig welders' investment to employer's "hundreds of thousands of dollars of equipment at each work site"); *see also Snell*, 875 F.2d at 810-11 (comparing cake decorators' $400 investment in their tools to employers' business investments, including paying for rent, advertising, operating expenses, and labor, in addition to

9

supplies and decorating equipment); *Lauritzen*, 835 F.2d at 1537 (reasoning that where workers provided their own gloves, and the employer provided the farm equipment, land, seed, fertilizers, and living quarters, their work was not independent of the employer); *Hopkins*, 545 F.3d at 344 (comparing each worker's individual investment to employer's overall investment in the business); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) (strawberry growers' investment in light equipment, including hoes, shovels, and picking carts was "minimal in comparison" with employer's total investment in land and heavy machinery).

An analysis of the workers' investment, even if that investment is substantial, without comparing it to the employer's investment is not faithful to the ultimate determination of whether the worker is truly an independent business.[9] Moreover, an analysis that compares the worker's investment to the employer's investment—but only to the employer's investment in the particular job performed by the worker—likewise disregards the ultimate determination by examining only a piece of the employer's business for the comparison.

**Example**:   A worker providing cleaning services for a cleaning company is issued a Form 1099-MISC each year and signs a contract stating that she is an independent contractor. The company provides insurance, a vehicle to use, and all equipment and supplies for the worker. The company invests in advertising and finding clients. The worker occasionally brings her own preferred cleaning supplies to certain jobs. *In this scenario, the relative investment of the worker as compared to the employer's investment is indicative of an employment relationship between the worker and the cleaning company.* The worker's investment in cleaning supplies does little to further a business beyond that particular job.

A worker providing cleaning services receives referrals and sometimes works for a local cleaning company. The worker invests in a vehicle that is not suitable for personal use and uses it to travel to various worksites. The worker rents her own space to store the vehicle and materials. The worker also advertises and markets her services and hires a helper for larger jobs. She regularly (as opposed to on a job-by-job basis) purchases material and equipment to provide cleaning services and brings her own equipment (vacuum, mop, broom, etc.) and cleaning supplies to each worksite. Her level of investments is similar to the investments of the local cleaning company for whom she sometimes works. *These types of investments may be indicative of an independent contractor*.

D.   Does the Work Performed Require Special Skill and Initiative?

A worker's business skills, judgment, and initiative, not his or her technical skills, will aid in determining whether the worker is economically independent. "[T]he fact that workers are skilled is not itself indicative of independent contractor status." *Superior Care*, 840 F.2d at

---

[9] *Cf. Mid-Atlantic Installation*, 16 Fed. App'x at 107 (analyzing workers' investment without comparing it to employer's investment); *Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. App'x 782, 783-84 (11th Cir. 2006) (same).

1060. Even specialized skills do not indicate that workers are in business for themselves, especially if those skills are technical and used to perform the work. *See id*. Accordingly, the conclusion that the skills of installing cable are indicative of independent contractor status because the skills are "akin to those of carpenters, construction workers, and electricians, who are usually considered independent contractors," *Mid-Atlantic Installation*, 16 Fed. App'x at 107, overlooks whether the worker is exercising business skills, judgment, or initiative. The technical skills of cable installers, carpenters, construction workers, and electricians, for example, even assuming that they are special,[10] are not themselves indicative of any independence or business initiative. *See Selker Bros.*, 949 F.2d at 1295 ("the use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way"); *Superior Care*, 840 F.2d at 1060 (for skills to be indicative of independent contractor status, they should be used in some independent way, such as demonstrating business-like initiative); *Express Sixty-Minutes*, 161 F.3d at 305 (efficiency in performing work is not initiative indicative of independent contractor status); *Lauritzen*, 835 F.2d at 1537 ("Skills are not the monopoly of independent contractors."). Only carpenters, construction workers, electricians, and other workers who operate as independent businesses, as opposed to being economically dependent on their employer, are independent contractors.

**Example**: A highly skilled carpenter provides carpentry services for a construction firm; however, such skills are not exercised in an independent manner. For example, the carpenter does not make any independent judgments at the job site beyond the work that he is doing for that job; he does not determine the sequence of work, order additional materials, or think about bidding the next job, but rather is told what work to perform where. In this scenario, the carpenter, although highly-skilled technically, is *not demonstrating the skill and initiative of an independent contractor* (such as managerial and business skills). He is simply providing his skilled labor.

In contrast, a highly skilled carpenter who provides a specialized service for a variety of area construction companies, for example, custom, handcrafted cabinets that are made-to-order, may be demonstrating the *skill and initiative of an independent contractor* if the carpenter markets his services, determines when to order materials and the quantity of materials to order, and determines which orders to fill.

---

[10] A district court determined that the cable installation at issue in that case "did not require a special skill" and could be learned by workers with no experience in the field after six weeks of training. *Cascom*, 2011 WL 10501391, at *6; *see also Scantland*, 721 F.3d at 1318 (cable installers admitted that they were skilled workers; however, "[t]he meaningfulness of this skill as indicating that [they] were in business for themselves or economically independent . . . is undermined by the fact that [the employer] provided most [of them] with their skills"); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 809-810 (6th Cir. 2015) (denying summary judgment and contrasting carpenters, who have "unique skill, craftsmanship, and artistic flourish," with cable technicians who do not need "unique skills" but rather are selected on the basis of availability and location).

11

E. Is the Relationship between the Worker and the Employer Permanent or Indefinite?

Permanency or indefiniteness in the worker's relationship with the employer suggests that the worker is an employee. After all, a worker who is truly in business for him or herself will eschew a permanent or indefinite relationship with an employer and the dependence that comes with such permanence or indefiniteness. Most workers are engaged on a permanent or indefinite basis (for example, the typical at-will employee). Even if the working relationship lasts weeks or months instead of years, there is likely some permanence or indefiniteness to it as compared to an independent contractor, who typically works one project for an employer and does not necessarily work continuously or repeatedly for an employer. *See, e.g., DialAmerica Mktg.*, 757 F.2d at 1384-85 (correcting district court for ignoring fact that workers worked continuously for the employer and that such evidence indicates that workers were employees); *Cascom*, 2011 WL 10501391, at *6 (workers who "worked until they quit or were terminated" had relationship "similar to an at-will employment arrangement").

However, a lack of permanence or indefiniteness does not automatically suggest an independent contractor relationship, and the reason for the lack of permanence or indefiniteness should be carefully reviewed to determine if the reason is indicative of the worker's running an independent business. As the Second Circuit noted, neither working for other employers nor not relying on the employer as his or her primary source of income transform the worker into the employer's independent contractor. *See Superior Care*, 840 F.2d at 1060. The key is whether the lack of permanence or indefiniteness is due to "operational characteristics intrinsic to the industry" (for example, employers who hire part-time workers or use staffing agencies[11]) or the worker's "own business initiative." *Id.* at 1060-61 ("the fact that these nurses are a transient work force reflects the nature of their profession and not their success in marketing their skills independently"); *see also Mr. W Fireworks*, 814 F.2d at 1054 ("We thus hold that when an industry is seasonal, the proper test for determining permanency of the relationship is not whether the alleged employees returned from season to season, but whether the alleged employees worked for the entire operative period of a particular season."). A worker's lack of a permanent or indefinite relationship with an employer is indicative of independent contractor status if it results from the worker's own independent business initiative. *See Superior Care*, 840 F.2d at 1060-61.

---

[11] *See, e.g., Solis v. A+ Nursetemps, Inc.*, 2013 WL 1395863, at *7 (M.D. Fla. Apr. 5, 2013) (holding that nurses were employees of a temporary health care staffing agency; although nurses "enjoy[ed] a degree of flexibility . . . not shared by many in the work force," had "an enhanced ability to 'moonlight' by working for more than one [staffing] agency at a time," and had some flexibility in choosing "when and where to make themselves available for work," the court concluded that when the nurses were working on assignment for the staffing agency they were, during those work weeks, its employees).

**Example**:[12]   An editor has worked for an established publishing house for several years. Her edits are completed in accordance with the publishing house's specifications, using its software. She only edits books provided by the publishing house. This scenario *indicates a permanence to the relationship* between the editor and the publishing house that is indicative of an employment relationship.

Another editor has worked intermittently with fifteen different publishing houses over the past several years. She markets her services to numerous publishing houses. She negotiates rates for each editing job and turns down work for any reason, including because she is too busy with other editing jobs. This *lack of permanence* with one publishing house is indicative of an independent contractor relationship.

F.   What is the Nature and Degree of the Employer's Control?

As with the other economic realities factors, the employer's control should be analyzed in light of the ultimate determination whether the worker is economically dependent on the employer or truly an independent businessperson. The worker must control meaningful aspects of the work performed such that it is possible to view the worker as a person conducting his or her own business. *See Scantland*, 721 F.3d at 1313 ("'Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.'") (quoting *Pilgrim Equip.*, 527 F.2d at 1312-13); *Baker*, 137 F.3d at 1441. And the worker's control over meaningful aspects of the work must be more than theoretical—the worker must actually exercise it. *See, e.g., Snell*, 875 F.2d at 808; *Mr. W Fireworks*, 814 F.2d at 1047 ("it is not what the operators *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive") (emphases in original).

For example, an employer's lack of control over workers is not particularly telling if the workers work from home or offsite. As the Third Circuit explained in *DialAmerica Marketing*, the fact that the workers could control the hours during which they worked and that they were subject to little direct supervision was unsurprising given that such facts are typical of homeworkers and thus largely insignificant in determining their status. *See* 757 F.2d at 1384 ("The district court therefore misapplied and overemphasized the right-to-control factor in its analysis."); *see also Superior Care*, 840 F.2d at 1060 ("An employer does not need to look over his workers' shoulders every day in order to exercise control."); *Antenor*, 88 F.3d at 933 (The "courts have found economic dependence under a multitude of circumstances where the alleged employer exercised little or no control or supervision over the putative employees."). Moreover, workers' control over the hours when they work is not indicative of independent contractor status. *See, e.g., Snell*, 875 F.2d at 806 ("Of course, flexibility in work schedules is common to many

---

[12] This factor helps illustrate how no one factor alone is determinative of the economic realities of the relationship between a worker and an employer and how it can be difficult to isolate one factor. Here, the example necessarily includes relevant facts beyond just the permanence or indefiniteness of the editors' relationships with the publishing houses to illustrate the existence, or not, of an employment relationship.

businesses and is not significant in and of itself."); *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984) ("A relatively flexible work schedule alone, however, does not make an individual an independent contractor rather than an employee.").

Technological advances and enhanced monitoring mechanisms may encourage companies to engage workers not as employees yet maintain stringent control over aspects of the workers' jobs, from their schedules, to the way that they dress, to the tasks that they carry out. Some employers assert that the control that they exercise over workers is due to the nature of their business, regulatory requirements, or the desire to ensure that their customers are satisfied. However, control exercised over a worker, even for any or all of those reasons, still indicates that the worker is an employee. As the Eleventh Circuit explained:

> [The employer] also argues that its quality control measures and regulation of schedules stemmed from "the nature of the business" and are therefore not the type of control that is relevant to the economic dependence inquiry. We disagree. The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control. Business needs cannot immunize employers from the FLSA's requirements. If the nature of a business requires a company to exert control over workers to the extent that [the employer] has allegedly done, then that company must hire employees, not independent contractors.

*Scantland*, 721 F.3d at 1316. Thus, the nature and degree of the employer's control must be examined as part of determining the ultimate question whether the worker is economically dependent on the employer.

Finally, the "control" factor should not play an oversized role in the analysis of whether a worker is an employee or an independent contractor. All possibly relevant factors should be considered, and cases must not be evaluated based on the control factor alone. *See, e.g., Superior Care, Inc.*, 840 F.2d at 1059 ("No one of these factors is dispositive; rather, the test is based on a totality of the circumstances."). As discussed above, the FLSA's statutory definitions (including "suffer or permit") rejected the common law control test for determining employment that was prevalent at the time. *See Walling*, 330 U.S. at 150-51; *Darden*, 503 U.S. at 326. Indeed, the FLSA covers workers of an employer even if the employer does not exercise the requisite control over the workers, assuming the workers are economically dependent on the employer. The control factor should not overtake the other factors of the economic realities test, and like the other factors, it should be analyzed in the context of ultimately determining whether the worker is economically dependent on the employer or an independent business.

**Example**:   A registered nurse who provides skilled nursing care in nursing homes is listed with Beta Nurse Registry in order to be matched with clients. The registry interviewed the nurse prior to her joining the registry, and also required the nurse to undergo a multi-day training presented by Beta. Beta sends the nurse a listing each week with potential clients and requires the nurse to fill out a form with Beta prior to contacting any clients. Beta also requires that the nurse adhere to a certain wage range and the nurse cannot provide care during any weekend hours. The nurse must inform Beta if she is hired by a client and must contact Beta if she

14

> will miss scheduled work with any client. In this scenario, *the degree of control exercised by the registry is indicative of an employment relationship*.
>
> Another registered nurse who provides skilled nursing care in nursing homes is listed with Jones Nurse Registry in order to be matched with clients. The registry sends the nurse a listing each week with potential clients. The nurse is free to call as many or as few potential clients as she wishes and to work for as many or as few as she wishes; the nurse also negotiates her own wage rate and schedule with the client. In this scenario, *the degree of control exercised by the registry is not indicative of an employment relationship.*

### III.   Conclusion

In sum, most workers are employees under the FLSA's broad definitions. The very broad definition of employment under the FLSA as "to suffer or permit to work" and the Act's intended expansive coverage for workers must be considered when applying the economic realities factors to determine whether a worker is an employee or an independent contractor. The factors should not be analyzed mechanically or in a vacuum, and no single factor, including control, should be over-emphasized. Instead, each factor should be considered in light of the ultimate determination of whether the worker is really in business for him or herself (and thus is an independent contractor) or is economically dependent on the employer (and thus is its employee). The factors should be used as guides to answer that ultimate question of economic dependence. The correct classification of workers as employees or independent contractors has critical implications for the legal protections that workers receive, particularly when misclassification occurs in industries employing low wage workers.