# Exhibit 3

# In The Matter Of:

*Douglas O'Connor, et al. v.*
*Uber Technologies, Inc.*

*Ryan Graves*
*July 13, 2015*

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*



O'BRIEN & LEVINE
Court Reporting Services
Making Your Case

Original File Ryan Graves 7-13-15.txt
**Min-U-Script® with Word Index**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - - - - - - -
 4   DOUGLAS O'CONNOR, THOMAS COLOPY,     )
 5   MATTHEW MANAHAN, and ELIE GURFINKEL, )
 6   individually and on behalf of all    )
 7   others similarly situated,           )
 8                    Plaintiffs,   ) CASE NO.
 9         vs.                      ) CV 13-3826-EMC
10   UBER TECHNOLOGIES, INC.,             )
11                    Defendant.    )
12   - - - - - - - - - - - - - - - - - - -
13
14
15              DEPOSITION OF RYAN GRAVES
16                MONDAY, JULY 13, 2015
17
18
19
20
21
22          BY: CHRISTINE A. TRISKA, CSR NO. 12826
23
24
25
```

Page 2

```
10      Deposition of RYAN GRAVES, taken on behalf of
11   PLAINTIFFS, at Gibson, Dunn and Crutcher, LLP,
12   555 Mission Street, Suite 3000, San Francisco,
13   California, commencing at 7:58 A.M., MONDAY, JULY 13,
14   2015, before Christine A. Triska, Certified Shorthand
15   Reporter No. 12826, pursuant to Notice.
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3      LICHTEN & LISS-RIORDAN, P.C.
 4      BY: SHANNON LISS-RIORDAN, ATTORNEY AT LAW
 5          ADELAIDE H. PAGANO, ATTORNEY AT LAW
 6      729 Boylston Street, Suite 2000
 7      Boston, Massachusetts 02116
 8      Telephone: (617) 994-5800
 9      Email: sliss@llrlaw.com
10             apagano@llrlaw.com
11
12   FOR THE DEFENDANT:
13      GIBSON, DUNN & CRUTCHER, LLP
14      BY:  MARCELLUS A. MCRAE, ATTORNEY AT LAW
15           PETER SQUERI, ATTORNEY AT LAW
16      333 South Grand Avenue
17      Los Angeles, California 90071
18      Telephone: (213) 229-7000
19      Email:  mmcrae@gibsondunn.com
20              psqueri@gibsondunn.com
21
22   ALSO PRESENT:
23      ABBY HORRIGAN, Managing Counsel, Employment, UBER
24
25
```

Page 4

```
 1                         INDEX
 2   MONDAY, JULY 13, 2015
 3   RYAN GRAVES                                      PAGE
 4      Examination by MS. LISS-RIORDAN                  6
 5
 6
 7                         -oOo-
 8
 9       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
10                    PAGE    LINE
11                         None.
```

Page 5

```
 1                      EXHIBITS
 2                    RYAN GRAVES
 3    Number           Description                  Page
 4    Exhibit 1     Article from "The Uber Blog,"
 5                  "Why Taxi's Suck"
 6                  - 2 pages                         21
 7
 8    Exhibit 2     "Should I tip my driver?"
 9                  - 1 page                          99
10
```

Page 6

MONDAY, JULY 13, 2015; 7:58 A.M.

RYAN GRAVES,
having been first duly sworn, testified as follows:
 **THE WITNESS:** Yes.

**EXAMINATION**
**BY MS. LISS-RIORDAN:**
Q. Good morning, Mr. Graves.
A. Good morning. How are you?
Q. I'm good. How are you?
A. I'm doing well. Thank you.
Q. Good. My name is Shannon Liss-Riordan. With me is Adelaide Pagano. We represent the plaintiffs in this case, "O'Connor et al. versus Uber Technologies."
  Let's start by having you state your full name for the record, please.
A. Ryan Allen Graves.
Q. And Mr. Graves, have you ever been deposed before?
A. I have not. This is the first. I'm excited.
Q. I'm pleased to be part of that experience with you.
  So as I'm sure you've been informed I'm going to be asking you various questions related to this case, and

Page 7

you understand that you are under oath today, and you are obligated to answer my questions fully, to the best of your ability and honestly as though we were in a court of law.
  Do you understand that?
A. I do.
Q. If you don't understand any of the questions that I'm asking, if you need me to rephrase or repeat something, please feel free to do so and I will do my best to make sure that you understand my questions.
A. I will. Thank you.
Q. Very good. And also -- and as you know, we have a court reporter who's taking down my questions and your answers. And in order to get a clean transcript it's important that we try not to talk over each other.
  So wait until I finish a question before you begin answering, even if you think you know what I'm about to say; okay?
A. Okay.
Q. And answer with words, not shakes of the head so it can get down on the transcript; okay?
A. Understood.
Q. Very good. Is there any reason that you can't testify truthfully here today?
A. No.

Page 8

Q. So Mr. Graves, I understand that you are involved with a company named Uber -- Uber Technologies; correct?
  **MR. MCRAE:** Objection. Vague and ambiguous.
  **THE WITNESS:** Uh-huh.
  **BY MS. LISS-RIORDAN:**
Q. Okay. And you have to answer with words, not just "uh-huh" because it's hard to make those out on the transcript.
A. I understand.
Q. And so my understanding is you got involved with this company in 2010; is that right?
  **MR. MCRAE:** Objection. Vague and ambiguous as to "involved."
  **THE WITNESS:** Can you help clarify?
  **BY MS. LISS-RIORDAN:**
Q. So, yes. I understand that you responded to a Tweet that Travis Kalanick put out looking for someone to help build this company; right?
A. I did respond to a Tweet; yes.
Q. All right. And what -- and then after responding to that Tweet you talked with Mr. Kalanick about his plans for this company; right?
  **MR. MCRAE:** Objection. Leading.
  **THE WITNESS:** I responded to his Tweet and we

Page 65

1  Q. Uber can tell a driver "You can't be on the Uber
2  platform"; right?
3      MR. MCRAE: Objection. It's an incomplete
4  hypothetical. Vague and ambiguous as to time, location
5  and platform.
6      THE WITNESS: So Uber Cab at the time in 2010
7  would use that feedback to -- the passenger's feedback,
8  give it to the driver.
9      If the driver was unable to deliver a ride
10 experience over many cases, like I said, there are rare
11 cases where a driver would be asked to stop using the Uber
12 platform because of that kind of consistent feedback being
13 less than what the passenger would expect.
14     BY MS. LISS-RIORDAN:
15 Q. And that's continued past the launch of Uber
16 Cab, and Uber to this day uses this rating system to at
17 times take drivers off of the system who aren't able to
18 provide a high enough quality experience for passengers;
19 right?
20     MR. MCRAE: Objection. Vague and ambiguous as
21 to "high enough quality experience."
22     It's been asked and answered multiple times.
23 It's vague and ambiguous as to time, location and
24 platform. It assumes facts not in evidence, and it's an
25 incomplete hypothetical.

Page 66

1      THE WITNESS: Again, generally speaking, Uber
2  will provide that feedback to make sure that the quality
3  of experience exists for both riders and drivers.
4      So if that feedback isn't provided, the
5  expectation of what Uber Cab is and what a driver can
6  experience from a passenger in the future would
7  essentially change over time. And that wasn't something
8  that could change, because they need to both be able to
9  trust that there's a consistent experience on the
10 platform.
11     And so that's when we would provide the feedback
12 to ensure "Here's the experience that you will have on
13 Uber Cab," and it worked quite well to make sure that both
14 rider and drivers knew that they had a voice in the matter
15 and there was kind of an accountability to what quality
16 meant.
17     THE WITNESS: Can we take the coffee --
18     (Simultaneous colloquy.)
19     MS. LISS-RIORDAN: I'm just going to do one more
20 question.
21     THE WITNESS: Yes. I would love just a restroom
22 break.
23     BY MS. LISS-RIORDAN:
24 Q. This is my last question and we're going to take
25 a break, because my last question wasn't about Uber Cab.

Page 67

1      I said since the founding, since the launching
2  of --
3  A. Oh, you're right.
4  Q. -- Uber Cab, to this day --
5  A. I missed that portion of your question.
6  Q. -- to this day Uber has continued to use this
7  rating system in order to take drivers off of the system
8  that are not providing the high quality experience that
9  Uber's passengers have come to expect.
10     MR. MCRAE: Objection. It calls for
11 speculation.
12     BY MS. LISS-RIORDAN:
13 Q. Your last answer was focusing on Uber Cab.
14 A. You're right.
15 Q. I'm trying to bring this to the present.
16 A. I apologize.
17 Q. Uber has continued to use the rating system in
18 order to take drivers off the system that are not
19 providing high enough quality service for passengers?
20     Is that right?
21     MR. MCRAE: Objection. It mischaracterizes the
22 witness's testimony. It's been asked and answered
23 multiple times. It calls for speculation. It lacks
24 foundation, and it's vague and ambiguous as to time,
25 location and platform. And it's an incomplete

Page 68

1  hypothetical.
2      THE WITNESS: So I apologize. I missed the Uber
3  Cab clarification.
4      So to this day Uber has continued to use the
5  feedback that a passenger provides via the application to
6  give to a driver, and -- and continues to provide the
7  feedback from drivers to passengers to make sure that
8  there's a quality experience that's had and there's a
9  consistency in what you can expect on the Uber platform.
10     MS. LISS-RIORDAN: Now we can take a break.
11 Thank you.
12     (A recess was taken at 9:07 a.m.)
13     BY MS. LISS-RIORDAN:
14 Q. Mr. Graves, one way a company like Uber could
15 ensure that the drivers are providing consistently high
16 quality service to passengers is to have the drivers all
17 be classified as employees and then Uber can tell them
18 exactly what to do; right?
19     MR. SHEPARD: Objection. That calls for a legal
20 conclusion. It's vague and ambiguous. It's compound. It
21 assumes facts not in evidence. Counsel is testifying.
22 And it lacks foundation.
23     THE WITNESS: Can you clarify your question,
24 please? There was a lot there.
25     BY MS. LISS-RIORDAN:

Page 81

    1  rides; right?
    2       MR. MCRAE: Objection. Compound. It's vague
    3  and ambiguous as to "marketing materials." Vague and
    4  ambiguous as to time, platform and location. Lacks
    5  foundation.
    6       THE WITNESS: Yeah. Certainly Uber does market
    7  the experience that we've created on the platform.
    8       And there's a number of pieces of that
    9  experience that are -- that are marketable. But there's a
   10  laundry list of what those bullet points might be.
   11       BY MS. LISS-RIORDAN:
   12  Q.  And part of what Uber has marketed to passengers
   13  is that they shouldn't worry about tipping the drivers;
   14  right?
   15       MR. MCRAE: Objection. Vague and ambiguous. It
   16  lacks foundation. It calls for speculation.
   17       THE WITNESS: Uber markets the seamless
   18  transactional experience, if that's what you are asking.
   19       BY MS. LISS-RIORDAN:
   20  Q.  Right. A seamless -- Uber markets a seamless
   21  transactional experience in which the passenger is told
   22  that they don't have to worry about giving a tip to the
   23  driver; right?
   24       MR. MCRAE: Objection. It's vague and ambiguous
   25  as to time, location, platform. It mischaracterizes the

Page 82

    1  witness's testimony. It assumes facts not in evidence,
    2  and it calls for speculation.
    3       THE WITNESS: Can you clarify a few of those
    4  points?
    5       Exactly what experience you are talking about on
    6  the Uber platform is obviously -- I'm presuming we are
    7  moving away from the 2010 Uber Cab experience.
    8       Can you clarify which Uber experience you are
    9  referring to?
   10       BY MS. LISS-RIORDAN:
   11  Q.  All right. Well, haven't all the Uber
   12  experiences been based on the basic idea that a passenger
   13  has their credit card information in the system, they can
   14  call a ride, whether it be on Uber Black, uberX. The
   15  driver shows up, takes them to where they want to go, and
   16  they don't have to worry about paying cash because it's
   17  paid for by their credit card number on the system?
   18       MR. MCRAE: Objection. Compound. Lack of
   19  foundation. It's vague and ambiguous. Assumes facts.
   20       THE WITNESS: No.
   21       BY MS. LISS-RIORDAN:
   22  Q.  No? So what's not correct in what I just said?
   23  **A.  There's many different experiences on the Uber**
   24  **platform, so it wouldn't be all encompassing the way you**
   25  **just laid it out.**

Page 83

    1  Q.  Well, let's talk about for Uber Black.
    2       The concept behind Uber Black is that a
    3  passenger has their credit card in the system, they call a
    4  car on the app, the car comes, takes them to where they
    5  want to go, and then they get out of the car without
    6  having to worry about paying in cash because the payment
    7  is made by the credit card that it's in the Uber
    8  application; right?
    9       MR. MCRAE: Objection. Incomplete hypothetical.
   10  Vague and ambiguous. Lack of foundation.
   11       THE WITNESS: Yeah. The experience on Uber
   12  Black would be that you do have a credit card on your
   13  profile and you are able to hit a button, get a ride in
   14  minutes, and at the end of the ride you would not have to
   15  worry about the kind of friction of a transaction, and you
   16  would have the star rating system at the end of the
   17  experience to provide feedback, and that would be the
   18  entirety of the experience.
   19       BY MS. LISS-RIORDAN:
   20  Q.  So in order to promote the seamless system where
   21  the passenger doesn't have to worry about paying cash at
   22  the end of the ride, Uber has encouraged passengers not to
   23  worry about tips and has told passengers "Don't worry
   24  about tipping"?
   25       MR. MCRAE: Objection. Compound. Lacks

Page 84

    1  foundation. It's vague and ambiguous. It calls for
    2  speculation. It assumes facts. And again, vague and
    3  ambiguous as to time, location and platform. And asked
    4  and answered.
    5       THE WITNESS: So Uber Black, I think you
    6  clarified there, would -- has always been marketed as a
    7  seamless experience such that, you know, there's no
    8  transaction at the end of a ride that would, you know, get
    9  in the way of kind of that smooth experience.
   10       BY MS. LISS-RIORDAN:
   11  Q.  So what Uber has advertised to passengers is
   12  that you don't need to worry about tipping at the end of
   13  ride.
   14       That's part of making that seamless smooth
   15  experience; right?
   16       MR. MCRAE: Objection. Compound. It also
   17  assumes facts not in evidence. It also mischaracterizes
   18  the witness's testimony. It's vague and ambiguous as to
   19  time and location, and it calls for speculation.
   20       THE WITNESS: What Uber has advertised is a
   21  seamless, kind of all-inclusive experience.
   22       MR. MCRAE: And asked and answered.
   23       THE WITNESS: So that's what we've marketed.
   24       BY MS. LISS-RIORDAN:
   25  Q.  Okay. And the way that you -- the way that Uber

Page 101

1   **MR. MCRAE:** Objection. Calls for speculation.
2   Lack of foundation.
3   **THE WITNESS:** I do not know who wrote this post.
4   **BY MS. LISS-RIORDAN:**
5   Q.  Do you see it says "posted on December 9th,
6   2010"?
7   A.  Yes, I do.
8   Q.  Were there other Ryans employed at Uber in
9   September 2010?
10  **MR. MCRAE:** Objection. Calls for speculation.
11  Lack of foundation.
12  **THE WITNESS:** I -- there are. I think we
13  discussed that.
14  **BY MS. LISS-RIORDAN:**
15  Q.  There was a Ryan McKillen; correct?
16  A.  That's correct, yeah.
17  Q.  Are you aware of any other Ryans who were
18  employed by Uber in September 2010?
19  **MR. MCRAE:** Objection. Calls for speculation.
20  Lack of foundation.
21  **THE WITNESS:** Not in -- I think we would have
22  been the only two Ryans at that point. It's unfortunately
23  a quite common name.
24  **BY MS. LISS-RIORDAN:**
25  Q.  Okay. So would this post have been written

Page 102

1   either by you or Ryan McKillen?
2   **MR. MCRAE:** Objection. Calls for speculation.
3   Lack of foundation, and assumes facts not in evidence.
4   **THE WITNESS:** I don't know where this post would
5   live in the first place, so it could have been written by
6   anybody.
7   **BY MS. LISS-RIORDAN:**
8   Q.  Okay. But it could have been written by you?
9   **MR. MCRAE:** Objection. Asked and answered.
10  Calls for speculation. Lack of foundation.
11  **THE WITNESS:** It's possible.
12  **BY MS. LISS-RIORDAN:**
13  Q.  In answer to the question "Should I tip my
14  driver," the answer is:
15      "No. We automatically include a tip
16      into the Uber fare so there's no need to
17      provide anything additional to the driver.
18      This makes your trip as convenient and
19      hassle-free as possible."
20      Do you see that?
21  **MR. MCRAE:** The document speaks for itself.
22  Objection.
23  **THE WITNESS:** I can read it, yes.
24  **BY MS. LISS-RIORDAN:**
25  Q.  Is that the message that Uber was trying to

Page 103

1   convey to passengers back in 2010?
2   **MR. MCRAE:** Objection. Calls for speculation.
3   Lack of foundation. Assumes facts not in evidence and
4   it's vague and ambiguous.
5   **THE WITNESS:** Can you please clarify that?
6   **BY MS. LISS-RIORDAN:**
7   Q.  Would you agree that the statement that's on
8   here is a statement that Uber was trying to convey to
9   passengers back in 2010?
10  **MR. MCRAE:** Objection. Calls for speculation.
11  Lack of foundation. Vague and ambiguous and asked and
12  answered.
13  **THE WITNESS:** Can you clarify the message? I'm
14  not sure what you're referring to.
15  **BY MS. LISS-RIORDAN:**
16  Q.  The message being -- in answer to a passenger's
17  question "Should I tip my driver," the message being:
18      "No. We automatically include a tip
19      into the Uber fare so there's no need to
20      provide anything additional to the driver.
21      This makes your trip as convenient and
22      hassle-free as possible."
23  **MR. MCRAE:** Objection. Assumes facts not in
24  evidence. Calls for speculation. Lack of foundation.
25  **THE WITNESS:** Do we know that it's a passenger

Page 104

1   asking this question, or how do we -- is that labeled or
2   --
3   **BY MS. LISS-RIORDAN:**
4   Q.  Is the message that's conveyed here that I just
5   read to you --
6   A.  Yes.
7   Q.  -- the message that Uber was trying to convey to
8   passengers in 2010?
9   **MR. MCRAE:** Objection. Asked and answered.
10  Lack of foundation. Calls for speculation. Assumes facts
11  not in evidence.
12      And asked and answered.
13  **THE WITNESS:** The message we would have conveyed
14  to passengers in 2010 is that the fare that they are
15  paying for their ride experience is all inclusive.
16  **BY MS. LISS-RIORDAN:**
17  Q.  Is there anything on this post that is
18  contradictory to the message that Uber was trying to
19  convey to its passengers in 2010?
20  **MR. MCRAE:** Objection. Assumes facts not in
21  evidence. And it's vague and ambiguous as to
22  "contradictory."
23      And it lacks foundation.
24  **THE WITNESS:** For 2010 we would have certainly
25  conveyed that the trip experience is convenient and hassle

Page 105

1  free, and that the fare is all -- the fare that the rider
2  pays for their Uber Cab ride for -- in 2010 would have
3  been inclusive of every aspect of what they could pay.
4      BY MS. LISS-RIORDAN:
5  Q. Including a tip. As it says we automatically
6  include a tip into the Uber fare.
7      So is that consistent with a message that Uber
8  was trying to convey to passengers?
9      MR. MCRAE: Objection. Compound. Objection.
10 Asked and answered. Objection. Assumes facts not in
11 evidence. Mischaracterizes the witness's testimony, and
12 it's vague and ambiguous. Calls for speculation.
13     THE WITNESS: I think it's -- I think the word
14 used is consistent. I think it's consistent in that it
15 communicates that what a rider pays for their Uber ride is
16 complete and all inclusive.
17     BY MS. LISS-RIORDAN:
18 Q. And has that message that Uber has tried to
19 convey to its passengers ever changed at any time since
20 2010?
21     MR. MCRAE: Objection. Vague and ambiguous as
22 to "that message." Lacks foundation. Calls for
23 speculation. Vague and ambiguous as to time, location and
24 platform.
25     THE WITNESS: Can you clarify the message that

Page 106

1  you are referring to and the passengers that you were
2  referring to?
3      BY MS. LISS-RIORDAN:
4  Q. Yes. The message being that a tip is included
5  in the fare so there is no need to provide anything
6  additional to the driver.
7      MR. MCRAE: Objection. Assumes facts not in
8  evidence. Calls for speculation. Lack of foundation.
9  Vague and ambiguous, and asked and answered.
10     THE WITNESS: Which passengers are you referring
11 to?
12     BY MS. LISS-RIORDAN:
13 Q. Uber passengers.
14     MR. MCRAE: Same objection. Objection. Vague
15 and ambiguous as to time and location and platform, and
16 assumes facts not in evidence. Asked and answered.
17     THE WITNESS: There's many different Uber ride
18 experiences. So the clarification of which passengers we
19 are referring to is important to understand how best to
20 answer your question.
21     BY MS. LISS-RIORDAN:
22 Q. Uber Black passengers.
23     MR. MCRAE: Same objections. Assumes facts not
24 in evidence. Asked and answered. Lacks foundation.
25 Vague and ambiguous.

Page 107

1      THE WITNESS: Certainly Uber Black passengers
2  would always be -- be communicated that the fare that they
3  are paying with a credit card on file is inclusive of the
4  whole experience that they are getting so they don't need
5  to do anything else.
6      BY MS. LISS-RIORDAN:
7  Q. "Inclusive" meaning including any tip they may
8  want to leave?
9      MR. MCRAE: Objection. Asked and answered.
10 Objection. Vague and ambiguous. Lack of foundation.
11     THE WITNESS: I'm not going to assume everything
12 that the Uber Black passenger would want to do.
13     But what they know clearly is that the fare that
14 they were paying is inclusive of everything that they need
15 to pay, and the driver is fully compensated for that.
16     BY MS. LISS-RIORDAN:
17 Q. Okay. So has Uber's message to Uber Black
18 passengers changed at all over time with respect to
19 assuring the passengers, as it says right here in Exhibit
20 Two, that the tip is included in the fare so there's no
21 need to provide anything additional to the driver?
22     MR. MCRAE: Objection. Lack of foundation.
23 Assumes facts not in evidence. Mischaracterizes this
24 document and the witness's testimony. And it's been asked
25 and answered.

Page 108

1      And it's vague and ambiguous.
2      THE WITNESS: Yeah. I mean to the point I made
3  earlier I think, you know, you have to understand the
4  context.
5      Uber is in 300 cities, and Uber Black exists in
6  many of them. And so exactly what messages have been
7  conveyed -- there's a lot of people who do this messaging
8  now. There's thousands of support people and thousands of
9  employees and, you know, millions of interactions with
10 these partners.
11     And so the message is -- I wouldn't -- of
12 course, I would never assume to know each message that's
13 gone to those partners.
14     But the sentiment of the messages, plural, would
15 always be that the fare that a passenger pays to a
16 rider -- I'm sorry. I'm getting confused here.
17     The fare that a passenger pays to a driver would
18 always be inclusive of everything that they would need to
19 pay. Correct.
20     BY MS. LISS-RIORDAN:
21 Q. So that message has remained consistent
22 throughout the time that Uber has been in existence; is
23 that right?
24     MR. MCRAE: Objection. Vague and ambiguous and
25 calls for speculation. Lack of foundation.

Page 153

1  Q.  Were you hiring -- you, personally were hiring
2  the teams that were being put in place in the different
3  cities that Uber was launching in?
4       MR. MCRAE: Objection. Vague and ambiguous.
5       THE WITNESS: I was certainly personally
6  involved in the early GMs.
7       So we kind of after my role I guess created the
8  kind of general manager concept of a market.
9       BY MS. LISS-RIORDAN:
10 Q.  Did most markets have a general manager?
11      MR. MCRAE: Objection. Lack of foundation.
12 Vague and ambiguous as to time, location and platform.
13 Calls for speculation.
14      THE WITNESS: We would often launch without.
15 But certainly having a general manager, GM, was a better
16 structure to have in place.
17      BY MS. LISS-RIORDAN:
18 Q.  Okay. And who trained the general managers?
19      MR. MCRAE: Objection. Vague and ambiguous as
20 to time, location, platform. Lacks foundation, and it
21 calls for speculation, and it's vague and ambiguous as to
22 "train."
23      THE WITNESS: Can you be specific what city you
24 are referring to?
25      BY MS. LISS-RIORDAN:

Page 154

1  Q.  Well, let's just focus right now on California.
2       Is California divided into a certain number of
3  regions --
4       MR. MCRAE: Objection.
5       BY MS. LISS-RIORDAN:
6  Q.  -- for Uber?
7       MR. MCRAE: Vague and ambiguous as to time and
8  lack of foundation.
9       THE WITNESS: No.
10      BY MS. LISS-RIORDAN:
11 Q.  Okay. Well, there have been various general
12 managers who have worked for Uber in California; right?
13 A.  Correct.
14 Q.  And what -- what areas have those general
15 managers covered?
16      MR. MCRAE: Objection. Vague and ambiguous as
17 to time. Lack of foundation.
18      THE WITNESS: So we were only in San Francisco
19 for a while. I think -- so LA would have been our second
20 market in -- second official city in California.
21      But I don't even remember. I don't think it was
22 even our -- in the top ten. In fact, people were confused
23 by that, as Marcellus is now, because it's -- obviously
24 it's a major market. But it is so broad and so spread
25 out, we weren't sure that the same kind of logistical

Page 155

1  dynamics would play out in Los Angeles as San Francisco.
2       So we spent most of our time in kind of more
3  dense metropolitan areas like Chicago or DC or New York or
4  Boston.
5       So LA was quite late in the process. But that
6  would have been the second city where we would have hired
7  a general manager.
8       BY MS. LISS-RIORDAN:
9  Q.  So San Francisco is the first city in California
10 that had a general manager, and LA was the second city
11 that had a general manager?
12 A.  So funny enough, no. Because the team was here
13 in San Francisco. It was almost like a collective
14 overview of San Francisco for quite some time.
15      It wasn't until there was enough going on that
16 our attention was spread across enough cities that we
17 said, "Hold on. We got to come back to San Francisco and
18 have a general manager focused here."
19      So our GM of LA was hired I believe before any
20 general manager of San Francisco.
21      BY MS. LISS-RIORDAN:
22 Q.  Other than San Francisco and LA, are there other
23 areas of California that have had a general manager?
24 A.  Just ever?
25 Q.  Yes.

Page 156

1  A.  Yes, there are.
2  Q.  What other areas have had general managers?
3  A.  There's a general manager in San Diego. So if
4  I'm doing "ever" this is going to be a long list, because
5  there's a lot of general managers now.
6       So is there a specific time frame that would be
7  clearest to address?
8  Q.  I'm just trying to get a sense of how the
9  operations have been organized in California.
10 A.  I see.
11 Q.  How many general managers at a time has Uber
12 had?
13      And if that fluctuates you can explain that.
14      MR. MCRAE: Objection. Lack of foundation.
15 Calls for speculation, and vague and ambiguous.
16      THE WITNESS: It would -- I'd have to explain
17 that. I think it would vary so much that any guess I
18 would give you would certainly be inaccurate.
19      Just to highlight what that looks like, right
20 now we have a GM of San Francisco. We also now have a GM
21 of Sacramento. We also now have a GM of our business
22 called UberEATS that's based here in San Francisco. And
23 we are recruiting for others.
24      In LA -- we have a GM of LA. We've, you know,
25 recently made the decision to have a GM of some of the

Page 157

1    portions in LA.
2       So we've now hired a GM of UberEATS LA, but we
3    are also looking for a general manager of Orange County
4    and the inland empire.
5       And so it's a very distributed structure, and
6    the number of general managers certainly would have varied
7    from time to time. So it would be hard to say exactly
8    what we have.
9       **BY MS. LISS-RIORDAN:**
10   Q. Is there someone at Uber who these various
11   general managers have reported to, or is there a position
12   that the general managers have reported to, even if that
13   person has changed over time?
14      **MR. MCRAE:** Objection. Vague and ambiguous.
15      **THE WITNESS:** There is a team structure, yes.
16      **BY MS. LISS-RIORDAN:**
17   Q. Can you describe it for me?
18      **MR. MCRAE:** Objection. Vague and ambiguous.
19   Lack of foundation.
20      **THE WITNESS:** Yeah. I think I have a little
21   bit, but the -- those general managers, depending on where
22   they are, would -- so let's say the general manager of
23   Sacramento. He currently -- which could have changed --
24   but he currently reports into the general manager of San
25   Francisco.

Page 158

1       The general manager of San Francisco reports
2    into a regional general manager, and he looks over the
3    West Coast, and then that person currently reports to me.
4       **BY MS. LISS-RIORDAN:**
5    Q. Who is the regional general manager for the West
6    Coast?
7    **A. His name is William Barnes.**
8    Q. And he was general manager of LA?
9    **A. He was.**
10   Q. And now he's general manager for the whole West
11   Coast?
12   **A. Yes.**
13   Q. Okay. So these various general managers you
14   just described, there have been general managers in San
15   Francisco, LA, San Diego, Sacramento --
16   **A. Yeah.**
17   Q. Have they -- prior to there being a creation of
18   the regional general manager position, have those general
19   managers reported to you?
20      **MR. MCRAE:** Objection. Vague and ambiguous and
21   compound.
22      **THE WITNESS:** Yeah. You have to clarify.
23   Because there's been so -- as we've grown, the business
24   has morphed and evolved and kind of responded to the
25   need -- sorry -- the team structure has morphed and

Page 159

1    evolved to the need of the business.
2       So trying to outline exactly -- I can certainly
3    give you a perfect -- not perfect -- to the best of my
4    ability a picture of how it works today. But it's morphed
5    and changed, and this person is having to work for this
6    person, and then one person stepped up.
7       There's been a past general manager of San
8    Francisco is no longer a general manager, and they work at
9    another position in the company, and we kind of evolved to
10   meet the gap that existed for the period of time and then
11   we backfilled. So it's just -- it's been highly dynamic.
12      **BY MS. LISS-RIORDAN:**
13   Q. Let me ask you this: How generally has Uber
14   recruited drivers?
15      **MR. MCRAE:** Objection. Vague and ambiguous as
16   to the term "recruit," and also assumes facts not in
17   evidence and lacks foundation and is vague as to time,
18   location and platform.
19      Assumes facts not in evidence, if I didn't say
20   that.
21      **THE WITNESS:** Can you clarify the term
22   "recruit"?
23      **BY MS. LISS-RIORDAN:**
24   Q. How has Uber brought drivers onto the platform
25   to drive?

Page 160

1       **MR. MCRAE:** Objection. Mischaracterizes the
2    witness's testimony. Assumes facts not in evidence. It's
3    vague and ambiguous and it lacks foundation.
4       **THE WITNESS:** One of the key dynamics that the
5    company will use is the -- the kind of referral structure.
6    So a driver can kind of tell a friend, a colleague or what
7    have you, often times within their same company, you know,
8    how Uber works, and there'll be a kind of a reward or
9    referral fee for that -- for telling the friend.
10      So if I tell you -- if I'm an Uber partner and I
11   think you might be interested in that opportunity and I
12   tell you about it and you sign up and create an account
13   and end up using the platform, then you'll get part of
14   that fee and I'll get a part of that fee.
15      And so that's a very, very kind of successful
16   mechanism for us in growing the partner side, kind of
17   supply side of our business.
18      **BY MS. LISS-RIORDAN:**
19   Q. But has Uber screened the drivers who can use
20   the platform?
21      **MR. MCRAE:** Objection. Vague and ambiguous as
22   to "screen." Lack of foundation. Calls for speculation.
23   Vague and ambiguous as to time, location and platform.
24   And again, he's not a 30(b)(6) witness.
25      **THE WITNESS:** I'm not 100 percent sure how to

Page 173

1  would vary significantly by city, if it did happen.
2      **BY MS. LISS-RIORDAN:**
3  Q.  Does Uber encourage drivers to accept as many
4  trips as possible?
5      **MR. MCRAE:** Objection. Calls for speculation.
6  Lack of foundation, and it's vague and ambiguous.
7      **THE WITNESS:** Uber would encourage a driver to
8  use the platform however they best see fit. And if that
9  means if they are using it for the purpose of earning,
10 then certainly the more trips they did the greater their
11 earnings would be.
12     So in that regard it's good for a driver who
13 wants to earn more from the platform to take more trips.
14     But that's as far as I believe that would go.
15     **BY MS. LISS-RIORDAN:**
16 Q.  Are you aware of Uber drivers ever getting
17 warnings that their acceptance rates are not high enough
18 and they are at risk of being deactivated?
19     **MR. MCRAE:** Objection. Vague and ambiguous as
20 to "drivers." Lack of foundation. It assumes facts not
21 in evidence.
22     **THE WITNESS:** It's probably a good time to
23 clarify which drivers we are talking about here.
24     **BY MS. LISS-RIORDAN:**
25 Q.  I'm focused on Uber Black and uberX.

Page 174

1      **MR. MCRAE:** Objection. It's compound. And
2  again, objection to the term "Uber drivers."
3      **BY MS. LISS-RIORDAN:**
4  Q.  Again, are you aware that Uber drivers -- uberX
5  or Uber Black drivers have ever been informed that they
6  need to maintain a certain level of acceptance rates in
7  order to stay on the Uber platform?
8      **MR. MCRAE:** Objection as to the term "Uber
9  drivers." It's compound. It calls for speculation.
10 Assumes facts not in evidence, and it's vague and
11 ambiguous.
12     **THE WITNESS:** I'm aware of a policy if a driver
13 never uses the platform, say 90 days of inactivity, then
14 we will communicate to the driver that if they don't need
15 to use the platform that's fine, but we would waitlist
16 their account. Because it'll kind of mess up the data
17 that we have.
18     Going back to how we use the data, we want to
19 make sure that drivers who are using the platform are
20 doing so in a positive way.
21     So if there's a significant period of inactivity
22 we'll communicate that. We'll put him on a waitlist so we
23 can do kind of querying of accurate data, if that makes
24 sense, of how many people are using the platform.
25     **BY MS. LISS-RIORDAN:**

Page 175

1  Q.  Right. But other than a driver just not using
2  the platform for some period of time, are you aware of any
3  uberX or Uber Black drivers ever receiving warning that
4  they need to keep up an acceptance rate at a certain level
5  in order not to be deactivated?
6      **MR. MCRAE:** Objection. Compound. Objection to
7  the term "Uber drivers" as it assumes a fact.
8      Calls for speculation. Lack of foundation.
9  It's vague and ambiguous as to time and location.
10     And he's not a 30(b)(6) witness.
11     **BY MS. LISS-RIORDAN:**
12 Q.  Have you ever heard that those warnings go to
13 drivers?
14     **MR. MCRAE:** Objection. Vague and ambiguous and
15 compound.
16     **THE WITNESS:** The communications that would go
17 from a city team to a driver would vary significantly
18 by -- by that city. So it's hard to say what
19 communications happen from the operations team to the
20 partners in that market.
21     **BY MS. LISS-RIORDAN:**
22 Q.  So can the operations team in each city decide
23 what a minimal acceptable acceptance rate is?
24     **MR. MCRAE:** Objection. Assumes facts not in
25 evidence. It calls for speculation. Lack of foundation.

Page 176

1  He's not a 30(b)(6) witness. And it is vague
2  and ambiguous.
3      **THE WITNESS:** The city team would be charged
4  with ensuring that the experience that riders and drivers
5  have on the platform would be a good one to make sure that
6  the business grows and that the number of drivers that
7  have -- that have the ability to partner with Uber would
8  grow.
9      And so their use of any data would be around
10 ensuring the health for a rider and a driver on that
11 platform. So that's how they would apply that data in
12 practice.
13     **BY MS. LISS-RIORDAN:**
14 Q.  So do city teams have the ability to deactivate
15 drivers?
16     **MR. MCRAE:** Objection. Vague and ambiguous.
17 Calls for speculation. Lack of foundation.
18     **THE WITNESS:** When are you referring to?
19     **BY MS. LISS-RIORDAN:**
20 Q.  Well, let me just ask more generally.
21     Who decides whether a particular driver should
22 be deactivated?
23     **MR. MCRAE:** Objection. Assumes facts not in
24 evidence. It lacks foundation. Calls for speculation.
25 Vague and ambiguous as to time and platform and location.

Page 185

safety of a rider, often times those situations will -- will call for a tough -- a really tough judgment call based on the evidence that we have.

And so we are not -- certainly we are not the law enforcement. So we'll have to, you know, work with the appropriate parties who are collecting evidence on a particular incident to make a judgment call, and in that process you've heard me use the term "waitlist." So we will waitlist a partner until an appropriate judgment call can be made.

And "waitlist" means that at the time they are not able to do a trip. And that's for the safety of the other riders on the platform and sometimes themselves.

   BY MS. LISS-RIORDAN:
Q. Let me ask you this: Is it your understanding that some versions of the contracts that Uber drivers have with Uber don't allow Uber to deactivate drivers in its discretion?
   MR. MCRAE: Objection. Calls for a legal conclusion. It's vague and ambiguous and compound. It assumes facts not in evidence. It lacks foundation and it calls for speculation.
   THE WITNESS: I don't know.
   BY MS. LISS-RIORDAN:
Q. Are you aware of there being any process by

Page 186

which a manager is required to check the driver's contract to determine whether or not that driver can be deactivated in Uber's discretion?
   MR. MCRAE: It calls for a legal conclusion. It's vague and ambiguous. It lacks foundation. It's compound. It's an incomplete hypothetical and it calls for speculation.
   THE WITNESS: I'm not.
   BY MS. LISS-RIORDAN:
Q. So Mr. Graves, Uber classifies all Uber Black and uberX drivers as independent contractors; right?
   MR. MCRAE: Objection.
   BY MS. LISS-RIORDAN:
Q. None are classified as employees; is that right?
   MR. MCRAE: Calls for speculation. Lack of foundation.
   THE WITNESS: I do not know.
   BY MS. LISS-RIORDAN:
Q. So based on your knowledge there may be some Uber Black or uberX drivers who are employees of Uber?
   MR. MCRAE: Objection. Mischaracterizes the witness's testimony. It calls for speculation and lack of foundation.
   THE WITNESS: No. That is not my understanding.
   BY MS. LISS-RIORDAN:

Page 187

Q. So is it your understanding that all Uber Black and uberX drivers are all independent contractors and not employees?
   MR. MCRAE: Objection. Lack of foundation. Calls for speculation.
   THE WITNESS: My understanding --
   MR. MCRAE: And it calls for a legal conclusion.
   THE WITNESS: Yes. My understanding is that Uber Black and uberX drivers are not employees.
   BY MS. LISS-RIORDAN:
Q. And why is it that you understand that none of them are employees?
   MR. MCRAE: Objection to the extent that it calls for divulging communications with counsel. It's confidential, and the witness is instructed not to answer if his only understanding is through his communications with counsel.
   And also -- well, I'll leave it at that.
   BY MS. LISS-RIORDAN:
Q. I didn't hear an answer.
   MR. MCRAE: Same objections.
   BY MS. LISS-RIORDAN:
Q. Was it your understanding that all Uber Black and uberX drivers are independent contractors and not employees?

Page 188

   MR. MCRAE: That's asked and answered now multiple times. And again, the objection is one that calls for a legal conclusion. It's compound. It lacks foundation and calls for speculation in addition to being asked and answered.
   BY MS. LISS-RIORDAN:
Q. Here's my question: Does it vary as far as you know?
   Does it vary that some are employees and some are independent contractors, or are they all independent contractors?
   MR. MCRAE: Again, that's now asked and answered multiple times. That question is compound. It still calls for a legal conclusion. It still lacks foundation, and it calls for speculation.
   And asked and answered.
   THE WITNESS: Can you simplify your question, please?
   BY MS. LISS-RIORDAN:
Q. Yeah. Well, I guess I want to know if -- if it's your understanding that no Uber Black or uberX drivers are employees -- well, I'm sorry. Let me just go back.
   Did I just hear you correctly that it's your understanding that all Uber Black -- I'm sorry.

```
 1   STATE OF CALIFORNIA            )
 2                                  )  ss.
 3   COUNTY OF SAN FRANCISCO        )
 4         I hereby certify that the witness in the
 5   foregoing deposition, RYAN GRAVES, was by me duly sworn to
 6   testify to the truth, the whole truth, and nothing but the
 7   truth, in the within-entitled cause; that said deposition
 8   was taken at the time and place herein named; that the
 9   deposition is a true record of the witness's testimony as
10   reported by me, a duly certified shorthand reporter and a
11   disinterested person, and was thereafter transcribed into
12   typewriting by computer.
13         I further certify that I am not interested in
14   the outcome of the said action, nor connected with, nor
15   related to any of the parties in said action, nor to their
16   respective counsel.
17         IN WITNESS WHEREOF, I have hereunto set my hand
18   this 14th day of July, 2015.
19   Reading and Signing was:
20   _X_  requested     ____waived     ____not requested
21
22
23                   [Signature: Christine A. Triska]
24                   CHRISTINE A. TRISKA, CSR NO. 12826
25                   STATE OF CALIFORNIA
```