# Exhibit 5

# In The Matter Of:

*Douglas O'Connor, et al. v.*
*Uber Technologies, Inc.*

*Michael Coleman*
*July 9, 2014*

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*



Original File Michael Coleman 7-9-14.txt
**Min-U-Script® with Word Index**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - - - -
 4   DOUGLAS O'CONNOR, ET AL.,    )
 5            PLAINTIFFS,         )
 6     V.                         ) CASE NO. 13-03826-EMC
 7   UBER TECHNOLOGIES, INC.,     )
 8            DEFENDANT.          )
 9   - - - - - - - - - - - - - - - -
10
11
12
13
14
15              DEPOSITION OF MICHAEL COLEMAN
16                 WEDNESDAY, JULY 9, 2014
17
18
19
20
21
22         BY:   CYNTHIA F. DAMMANN, CSR NO. 10610
23
24
```

Page 2

```
 9             Deposition of MICHAEL COLEMAN, taken on
10   behalf of PLAINTIFFS, at 100 Bush Street, Suite
11   1800, San Francisco, California, commencing at 9:33
12   A.M., WEDNEDAY, JULY 9, 2014, before Cynthia F.
13   Dammann, Certified Shorthand Reporter No. 10610,
14   pursuant to Notice.
```

Page 3

```
 1   APPEARANCES OF COUNSEL
 2   FOR PLAINTIFFS:
 3       LICHTEN & LISS-RIORDAN, P.C.
 4       BY:  SHANNON LISS-RIORDAN, ATTORNEY AT LAW
 5       100 Cambridge Street
 6       20th Floor
 7       Boston, Massachusetts 02114
 8       Telephone:  (617) 994-5800
 9       Email:  Sliss@llrlaw.com
10
11   FOR DEFENDANT:
12       MORGAN LEWIS & BOCKIUS, LLP
13       BY:  ROBERT JON HENDRICKS, ATTORNEY AT LAW
14       One Market
15       Spear Street Tower
16       San Francisco, California 94111
17       Telephone:  (415) 442-1000
18       Email:  Rhendricks@morganlewis.com
19
20   ALSO PRESENT:
21       MATT ATKIN
22       ABIGAIL K. HORRIGAN
23
24
```

Page 4

```
 1                      INDEX
 2   WEDNESDAY, JULY 9, 2014
 3   MICHAEL COLEMAN                              Page
 4       Examination by MS. LISS-RIORDAN             7
 5
 6                      -oOo-
 7
 8       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
 9              PAGE     LINE
10                8       13
11                27      16
12                28      14
13                79      19
14               154       2
15               246      19
16               250      23
17               257      23
18               258      7, 22
19               259      19
20               264      15
21       251    7
22              MARKED FOR COUNSEL:
23               142      10
24
```

Page 5

```
                        EXHIBITS
                     MICHAEL COLEMAN
 Number              Description                    Page
 Exhibit 1    Craig's List posting - 1 page          79

 Exhibit 2    "How to Be a Star Uber Driver"
              - 5 pages                             260

 Exhibit 3    Uber document - 5 pages               264

 Exhibit 4    Document entitled Uber Taxi
              Onboarding - 19 pages                 265

 Exhibit 5    Uber presentation packet - 47 pages   269

 Exhibit 6    Uber presentation packet - 6 pages    273
```

Page 6

1  WEDNESDAY, JULY 9, 2014; 9:33 A.M.
2
3  MICHAEL COLEMAN,
4  having been first duly sworn, testified as follows:
5  **THE WITNESS:** Yes.
6  -oOo-
7  **MR. HENDRICKS:** Counsel, before we get
8  going, let me do a little bit of housekeeping, first
9  of which, in connection with the deposition, the
10 defendant does reserve, under the federal rules, the
11 right to review the transcript and so we would like
12 to make sure we get that opportunity.
13     Second, we did serve objections to the
14 topics in the deposition notice. We stand on those
15 objections. Having said that, as I look at this
16 notice, I don't know whether or not we made an
17 objection to the fact that the notice states, "The
18 oral examination will continue from day to day until
19 complete." We're proceeding under the federal rules
20 and so we object to the extent this is suggested
21 that it will proceed in a manner inconsistent with
22 the limitations set by the federal rules.
23     And as I previously have indicated, the
24 first designate will be Mr. Michael Coleman. He's

Page 7

1  being designated with respect to Topics B, C, D, E,
2  and F subject to the objections that we made in our
3  objections.
4      **MS. LISS-RIORDAN:** I'm sorry. Can you tell
5  me one more time the name of our designate?
6      **THE WITNESS:** The other designate will be
7  Matt Atkin, who we --
8      **MS. LISS-RIORDAN:** Matt Atkin?
9      **MR. HENDRICKS:** Yes. Who we designated with
10 respect to Topics A, G, H, and I.
11     **MS. LISS-RIORDAN:** Okay. Very good.
12     **MR. HENDRICKS:** To the extent you want to
13 ask certain questions that are outside the scope of
14 the designation, we'll allow that, but that -- I'll
15 probably make an objection that it's outside the
16 scope.
17     **MS. LISS-RIORDAN:** Okay.
18     **MR. HENDRICKS:** Okay.
19     -oOo-
20     EXAMINATION
21     BY MS. LISS-RIORDAN:
22 Q.  Good morning.
23 **A.  Good morning.**
24     **MS. LISS-RIORDAN:** I'm sorry. Did you swear

Page 8

1  the witness?
2      **COURT REPORTER:** I did.
3      **MS. LISS-RIORDAN:** You did. Thank you.
4  By MS. LISS-RIORDAN:
5  Q.  Mr. Coleman, my name is Shannon
6  Liss-Riordan. I'm an attorney who's representing
7  the plaintiffs against Uber in this matter.
8      Can we begin by having you state your full
9  name for the record, please?
10 **A.  Yes. It's Michael Coleman.**
11 Q.  And Mr. Coleman, where do you reside?
12 **A.  San Francisco.**
13 Q.  What's your address?
14     **MR. HENDRICKS:** Objection, privacy.
15 Instruct the witness not to answer.
16     **MS. LISS-RIORDAN:** I assume he'll be
17 available through Uber's counsel?
18     **MR. HENDRICKS:** I just don't think that
19 question's appropriate given the designation. So we
20 can talk about that after the deposition.
21     **MS. LISS-RIORDAN:** Okay.
22 By MS. LISS-RIORDAN:
23 Q.  Mr. Coleman, have you ever been deposed
24 before?

Page 45

 1  different based on location, and time as well.  But
 2  one of the first steps that a business needs to do
 3  to sign up to be able to -- to be a part of -- or to
 4  use the platform, they have to sign up on the
 5  website.
 6  By MS. LISS-RIORDAN:
 7  Q.  And let me just clarify before you go on.
 8      As I understand it -- and correct me if I'm
 9  wrong -- drivers who want to use the Uber platform
10  can either be working with a transportation company
11  or they may be on their own.  Is that right?
12      MR. HENDRICKS:  You're misstating the
13  witness's testimony.  He -- the question's been --
14      MS. LISS-RIORDAN:  I'm not stating
15  testimony.  I'm asking him a question.
16      MR. HENDRICKS:  Counsel, may I finish my
17  objection, please?
18      MS. LISS-RIORDAN:  No, you really can't
19  because --
20      MR. HENDRICKS:  I really can.  Misstates the
21  witness's testimony, it's been asked and answered,
22  the framing is compound, and counsel's being
23  argumentative at this point in time.
24  By MS. LISS-RIORDAN:

Page 46

 1  Q.  Am I correct, in order to lead into my next
 2  question, that there are -- that drivers who want to
 3  work with Uber -- use the Uber platform can either
 4  be working with a transportation company or they can
 5  be on their own and directly working with the Uber
 6  platform?  Is that right?
 7      MR. HENDRICKS:  Again, misstates the
 8  testimony.  The question is compound.  It's vague
 9  and ambiguous.  You may answer.
10      THE WITNESS:  So, in general, because there
11  are various offerings, with peer-to-peer they do not
12  have to be a part of a licensed limo company.  For
13  Uber Black, we partner with licensed limo
14  companies.
15  By MS. LISS-RIORDAN:
16  Q.  Okay.
17  A.  So we have to make that clear distinction
18  there.
19  Q.  Okay.  I understand.  And by peer-to-peer, I
20  understand you said that UberX includes peer-to-peer
21  and non-peer-to-peer drivers, but peer-to-peer only
22  refers to UberX.  Is that correct?
23      MR. HENDRICKS:  Misstates the testimony.
24  You may answer.

Page 47

 1      THE WITNESS:  That is correct for
 2  California, but various locations have different
 3  regulations with regards to peer-to-peer versus
 4  limo.
 5  By MS. LISS-RIORDAN:
 6  Q.  What's the difference between peer-to-peer
 7  and limo?
 8  A.  Limo is licensed, fully licensed by -- could
 9  be the city, county, state.  That varies by
10  location.  Peer-to-peer is personally owned
11  vehicles.  It's ride sharing.
12  Q.  All right.  So let's start then by talking
13  about the licensed drivers.  We'll come back to
14  peer-to-peer.
15      So the licensed drivers may be working with
16  Uber Black or Uber SUV.  Is that right?
17      MR. HENDRICKS:  "Working with," vague and
18  ambiguous, lacks foundation, misstates the
19  testimony.  You may answer.
20      THE WITNESS:  They're not working with Uber
21  Black or with Uber SUV.  They're working with their
22  partner who owns the limo company.
23  By MS. LISS-RIORDAN:
24  Q.  Okay.  But a driver could own his or her own

Page 48

 1  limo company and then partner with Uber.  Is that
 2  right?
 3      MR. HENDRICKS:  Vague and ambiguous.  You
 4  may answer.
 5      THE WITNESS:  Yes.  They could own their own
 6  company and the company can partner with Uber.
 7  By MS. LISS-RIORDAN:
 8  Q.  Okay.  So let's say a driver wants to use
 9  the Uber Black platform.  You were starting to tell
10  me before what that driver would need to do.  You
11  said first they need to sign up on a website.
12      Can you continue by telling me what a driver
13  would need to do in order to use the Uber Black
14  platform?
15      MR. HENDRICKS:  Again, I think it misstates
16  the testimony with respect to the use of the term
17  "driver," vague and ambiguous, and calls for a
18  narrative, but you may answer.
19      THE WITNESS:  So partners sign up on the
20  website.  These are essentially some functional --
21  what we consider functional requirements to use the
22  system.  So Uber Black specifically, right, they
23  sign up on the website, they provide documentation
24  that allows us to see that they are a licensed limo

Page 49

1  company, they provide other documentation, and this
2  varies by location as well as to what's required.
3  It can be commercial vehicle registration,
4  insurance, limo licenses, things of that nature.
5  By MS. LISS-RIORDAN:
6  Q. Okay. And again, you're talking now about
7  companies -- how companies work with Uber, correct?
8  A. Correct.
9  Q. Okay. So my question is in order for an
10 individual driver to be able to use the Uber
11 platform, tell me what a driver needs to do.
12 A. They --
13    MR. HENDRICKS: Again, as framed, the
14 question's vague and ambiguous, lacks foundation.
15 It's been asked and answered in part. You may
16 answer. It calls for a narrative as well.
17    THE WITNESS: To start, they would need to
18 be a part of a fully operational limo business.
19 By MS. LISS-RIORDAN:
20 Q. Okay. And say a driver is a part of a fully
21 operational limo business, what does he or she need
22 to do in order to use the Uber platform?
23    MR. HENDRICKS: Calls for a narrative. You
24 may answer. It's also vague and ambiguous. You may

Page 50

1  answer.
2     THE WITNESS: First, their partner would
3  have to be a part -- they would have to, you know,
4  be on -- with the platform as well.
5  By MS. LISS-RIORDAN:
6  Q. Okay. Then what?
7  A. **After that, the partner can sign up the**
8  **driver to use the system as well under their**
9  **business.**
10 Q. And what does the driver need to do in order
11 to work with the Uber platform?
12    MR. HENDRICKS: Calls for a narrative, vague
13 and ambiguous. You may answer.
14    THE WITNESS: The driver needs to provide
15 documentation, such as driver's license. They do --
16 they typically come into the office. They need to
17 receive a phone. They need to learn how to use the
18 software.
19 By MS. LISS-RIORDAN:
20 Q. What else?
21    MR. HENDRICKS: Again, calls for a
22 narrative, vague and ambiguous as to time and
23 location, but you may answer.
24    THE WITNESS: I think beyond that they would

Page 51

1  attend essentially an on-boarding session where they
2  would, you know, learn how to use the software. We
3  would do some basic, basic checking to ensure that
4  are -- you know, they're a top quality driver,
5  they're going to provide services that we're
6  comfortable referring riders to.
7  By MS. LISS-RIORDAN:
8  Q. And how is that checking performed?
9     MR. HENDRICKS: Again, vague and ambiguous
10 as to time and location, calls for a narrative. You
11 may answer.
12    THE WITNESS: This would vary by city. So
13 I'm not -- I'm not clear specifically how every city
14 did these forms, but that's -- it just varies. It
15 depends on kind of the needs of the city.
16 By MS. LISS-RIORDAN:
17 Q. Generally, are the drivers interviewed in
18 order to determine whether they will be high enough
19 quality to work with the Uber platform?
20    MR. HENDRICKS: Again, vague and ambiguous
21 aso to the term "work with" Uber platform. Vague
22 and ambiguous as to "interview." You may answer.
23 Vague and ambiguous as to time and as to city, but
24 you may answer.

Page 52

1     THE WITNESS: It does vary by location. It
2  has changed over time. Specifically -- I can speak
3  specifically to Seattle since I was there early on,
4  but with -- our goal is to ensure that we're
5  referring riders to high quality existing limo
6  businesses out there.
7     Drivers would have to -- would come into the
8  office to pick up a phone, to learn about the
9  system, and at that time, yes, we would speak to
10 partners and drivers and ensure that we felt
11 comfortable referring riders to their services.
12 By MS. LISS-RIORDAN:
13 Q. Okay. And if, based on that meeting with
14 them, you didn't feel comfortable referring riders
15 to their services, would you not let those drivers
16 use the Uber platform?
17 A. **If we did not feel comfortable that they**
18 **were going to provide top quality service, no, we**
19 **would not let them use the platform.**
20 Q. Okay. And in all the cities that Uber has
21 operated in, is -- I understand that the specifics
22 of how this is done may vary, but is there some
23 process to ensure that any drivers who are using the
24 Uber platform are high quality drivers who you would

Page 101

1  they -- you know, in general, this is what you
2  should do when we have no way of knowing what
3  happens in a car without getting that rider
4  feedback.
5  By MS. LISS-RIORDAN:
6  Q. Well, does Uber relay to drivers what is
7  expected of them when they're driving passengers
8  while using the Uber platform?
9      MR. HENDRICKS: Vague and ambiguous with
10 respect to "expected of them," lacks foundation, but
11 you may answer.
12     THE WITNESS: As it pertains to specific
13 service items, no, we don't tell them what is
14 expected of them. There's nothing expected of them
15 other than to maintain their star rating.
16 By MS. LISS-RIORDAN:
17 Q. Okay. I'm going to come back to this more
18 later on, but since you brought up the star rating,
19 can you just explain to me what the star rating is?
20 **A. Yeah. At the end of a trip a rider is given**
21 **the opportunity to rate a driver's service on a**
22 **scale of 1 to 5 stars. Some rate. Some don't. And**
23 **over time there becomes this average of how riders**
24 **rate the services provided, and essentially that**

Page 102

1  average is what we call the driver's star rating.
2  Q. Okay. How is the star rating used?
3      MR. HENDRICKS: Calls for a narrative, but
4  you may answer.
5      THE WITNESS: So, as per the agreement, the
6  driver's required to maintain a star rating, and the
7  star rating allows us to see which providers in this
8  pool of drivers and partners, which ones are
9  providing top tier service. It allows us to find
10 those that are not providing service that riders
11 like.
12     We may determine we don't want to refer
13 riders to those service providers anymore. It's a
14 way of maintaining this quality pool of both riders
15 and partners, and the star rating goes both ways.
16 Drivers rate riders. Riders rate drivers.
17 By MS. LISS-RIORDAN:
18 Q. So if a driver does not maintain what Uber
19 determines to be an adequate star rating, can the
20 driver be terminated?
21     MR. HENDRICKS: Objection with respect to
22 the phrase "terminated," vague and ambiguous. You
23 may answer.
24     THE WITNESS: We don't terminate drivers.

Page 103

1  They're not employed through Uber. We don't allow
2  them to use the system anymore.
3  By MS. LISS-RIORDAN:
4  Q. And is that called deactivation?
5  **A. Yes. We call that deactivation.**
6  Q. Okay. So under what circumstances may a
7  driver be deactivated?
8      MR. HENDRICKS: Calls for a narrative,
9  overly broad, but you may answer.
10     THE WITNESS: A driver may be deactivated
11 from the system if they don't maintain their
12 documents. So if a document expires, we cannot
13 allow them to continue to use the system. If they
14 assault a passenger, something of that nature,
15 anything safety related, we will deactivate them as
16 well. You know, if they are defrauding the system
17 in any sort of way, we will deactivate them. It's
18 all just a matter of maintaining this quality pool
19 of partners.
20     Also, if they don't maintain their star
21 rating, we will deactivate them over time, but as it
22 relates to any specific service item, no, there's
23 nothing actionable related to that, such as like if
24 a driver -- if a rider says, oh, the driver did not

Page 104

1  open doors, is that actionable by Uber, absolutely
2  not. That's all -- every service piece is
3  encompassed within that star rating.
4  By MS. LISS-RIORDAN:
5  Q. All right. You just listed for me a few
6  reasons why a driver may be deactivated, such as if
7  they don't maintain their documents, if they assault
8  a passenger, if they don't maintain a star -- a
9  certain star rating.
10     Are there any other circumstances in which a
11 driver could be deactivated?
12     MR. HENDRICKS: Asked and answered, calls
13 for a narrative.
14     THE WITNESS: I think that pretty much
15 encompasses most of what I'm thinking. There may be
16 something else but nothing that I can recall at the
17 moment.
18 By MS. LISS-RIORDAN:
19 Q. Okay. So is it safe to say that if a driver
20 performs poor service, he or she may be at risk of
21 being deactivated?
22     MR. HENDRICKS: Misstates the testimony,
23 vague and ambiguous as framed, incomplete
24 hypothetical, but you may answer.

Page 113

1  side of the story?
2     MR. HENDRICKS: Misstates the testimony.
3  Again, the question is overly broad, it's vague and
4  ambiguous as to city and as to time, it is an
5  incomplete hypothetical. You may answer.
6     THE WITNESS: We would typically -- we would
7  go to -- the driver's operations manager generally
8  would go to the partner directly.
9  By MS. LISS-RIORDAN:
10 Q. Go to the -- what does that mean, go to the
11 partner and do what?
12 A. Speak to the partner about the situation
13 directly.
14 Q. To get information about what happened?
15 A. To get further information.
16 Q. Okay. And then would the driver operations
17 manager determine whether it's necessary to then
18 speak to the driver as well to get his or her
19 explanation of what happened?
20    MR. HENDRICKS: Again, as framed, it's
21 overly broad, it's vague and ambiguous as to city
22 and as to time, it's also vague and ambiguous as to
23 situation, so it's an incomplete hypothetical. You
24 may answer.

Page 114

1     THE WITNESS: That decision would not be
2  made by the driver operations manager whether to go
3  directly to the driver, but it may be a decision by
4  the partner -- by the partner themselves whether
5  they need to bring in the driver or whatnot.
6  By MS. LISS-RIORDAN:
7  Q. Well, if there's a driver who's been accused
8  of having engaged in some serious safety-related
9  issue or defrauding of a passenger, would Uber rely
10 on what the partner explained happened, or would
11 Uber want to speak to the driver himself or herself
12 to find out the situation?
13    MR. HENDRICKS: Again, the question is an
14 incomplete hypothetical, it lacks foundation, it's
15 asking for speculation, it is vague and ambiguous
16 both as to time and as to location and as to the
17 situation, but you may answer.
18    THE WITNESS: It's just -- it's very
19 situational, depends on the city, but we would go
20 and speak with the partner related to the service
21 provided by the driver.
22 By MS. LISS-RIORDAN:
23 Q. But ultimately Uber would make the decision
24 about whether or not the driver could continue to

Page 115

1  use the Uber platform. Is that right?
2     MR. HENDRICKS: Again, overly broad,
3  incomplete hypothetical, vague and ambiguous. You
4  may answer.
5     THE WITNESS: We would make the -- the
6  driver operations manager would make the
7  determination whether the driver would be
8  deactivated from the system or not. Whether they --
9  whether the partner -- if we decide not to
10 deactivate them and the partner decides they don't
11 want the driver to use the system, that's between
12 the driver and that partner.
13 By MS. LISS-RIORDAN:
14 Q. Okay. I -- that makes sense. I understand
15 that.
16    But if, let's say, the Uber -- the Uber
17 driver operations manager determines that a driver
18 should no longer be able to use the Uber system but
19 the partner wants the driver to keep working -- keep
20 using the Uber platform, Uber could tell the partner
21 no, this driver's not going to be able to use the
22 platform anymore. Is that correct?
23 A. That's correct.
24 Q. Now, if a driver is deactivated, does -- is

Page 116

1  there any process by which he or she can appeal that
2  decision or speak to someone higher up at Uber in
3  order to try to get reactivated?
4     MR. HENDRICKS: Vague and ambiguous,
5  incomplete hypothetical, overly broad, but you may
6  answer.
7     THE WITNESS: I'm not aware of any
8  standardized process that deactivated drivers or
9  deactivated partners can go through to appeal
10 decisions made.
11 By MS. LISS-RIORDAN:
12 Q. So generally if a driver operations manager
13 determines that a driver will be deactivated, the
14 driver's deactivated. Is that right?
15    MR. HENDRICKS: Again, that's an incomplete
16 hypothetical, it also lacks foundation as framed, it
17 assumes facts not in evidence, it's vague and
18 ambiguous. You may answer.
19    THE WITNESS: We can't stop a driver from
20 emailing us, you know, with anything they want to
21 email us about, and I believe if they -- I don't
22 know how other cities handle situations where a
23 deactivated driver emails in. There's no standard
24 process again for elevating these emails or

Page 117

1  "tickets," as we call them. There's just no
2  standard way of doing it. I believe it just becomes
3  a city-based decision.
4  By MS. LISS-RIORDAN:
5  Q. Okay. So as a city-based decision, a driver
6  operations manager or another manager, such as a
7  general manager, could, in their discretion, decide
8  to then reactivate a driver if the driver attempts
9  to convince Uber that he or she shouldn't have been
10 deactivated?
11     MR. HENDRICKS: Again --
12     BY MS. LISS-RIORDAN:
13 Q. Is that correct?
14     MR. HENDRICKS: As framed, it lacks
15 foundation, it calls for speculation, it's vague and
16 ambiguous, it's an incomplete hypothetical, but you
17 may answer.
18     THE WITNESS: It is within the scope of the
19 operations manager or GM's job description to be
20 able to do that. How often it happens, when it
21 happens, where it's happened, or where it has
22 happened in the past, I can't recall specific
23 situations.
24 By MS. LISS-RIORDAN:

Page 118

1  Q. Okay. But it's within their job
2  description -- it's within the job description of
3  the general manager and driver operations managers
4  to use their best discretion to determine when
5  drivers should be deactivated and whether drivers
6  who've been deactivated could be reactivated. Is
7  that correct?
8     MR. HENDRICKS: That -- that -- first of
9  all, this is outside the scope of this witness's
10 deposition, so the witness is answering in his
11 individual capacity. It's vague and ambiguous.
12 It's an incomplete hypothetical. If you are aware
13 of a situation where that's happened, you know, you
14 can testify based upon that, but I don't want you to
15 guess or speculate as to whether or not that has
16 happened or could happen or anything like that. But
17 you are -- testify based upon your knowledge and
18 your experience and the information that you do
19 have.
20     Do you understand my instruction?
21     THE WITNESS: Yes.
22     MR. HENDRICKS: Okay.
23     THE WITNESS: Can I hear the question again,
24 please?

Page 119

1  (Record read: But it's within their job
2  description -- it's within the job
3  description of the general manager and
4  driver operations managers to use their best
5  discretion to determine when drivers should
6  be deactivated and whether drivers who've
7  been deactivated could be reactivated. Is
8  that correct?)
9     MR. HENDRICKS: Same objections, but you can
10 answer.
11     THE WITNESS: So maybe I misspoke. I don't
12 know if it's within their job description, but
13 within the role of the operations manager, and
14 including the GM, is to maintain this quality pool
15 of partners. Should it be decided that, you know, a
16 driver gets reactivated on the system or even
17 deactivated, it typically would fall within the
18 discretion of the operations manager.
19 By MS. LISS-RIORDAN:
20 Q. Okay. Thank you.
21     MR. HENDRICKS: Counsel, before you start
22 your new question, we are right at like a few
23 minutes before noon. Had you contemplated when you
24 want to take the lunch break?

Page 120

1     MS. LISS-RIORDAN: I'd probably like to go
2  another half hour or so. Is that okay?
3     MR. HENDRICKS: Sure. Is that fine with the
4  witness, another 30 minutes?
5     THE WITNESS: (Witness nods head.)
6     MR. HENDRICKS: Okay. Yeah, that's fine.
7     MS. LISS-RIORDAN: Okay.
8  By MS. LISS-RIORDAN:
9  Q. Mr. Coleman, would you agree that drivers
10 using the Uber platform should -- well, let me ask
11 you this.
12     Would you agree that drivers using the Uber
13 Black platform should dress professionally?
14     MR. HENDRICKS: As framed, the question is
15 outside the specific scope, but you may answer in
16 your individual capacity.
17     THE WITNESS: I would say that they should
18 maintain the level of service that maintains the
19 high star rating. If that means specifically
20 wearing a suit, I -- you know, it's whatever is
21 needed service-wise to maintain that level of
22 service.
23 By MS. LISS-RIORDAN:
24 Q. So does Uber inform drivers that they

Page 165

**BY MS. LISS-RIORDAN:**

Q. Okay. But Uber makes the decision as to what its fees will be for a particular city, for a particular period of time, for a particular type of Uber product. Is that right?

A. Correct.

Q. Does Uber negotiate these fees with drivers or with partners?

**MR. HENDRICKS:** I'm going to again object as lacking in foundation. It's outside the scope of the designated topics. To the extent you have knowledge, you may testify in your individual capacity, but do not testify as your designee capacity. You may answer. It's also vague and ambiguous as to the term "negotiate." You may answer.

**THE WITNESS:** I'm not aware of any negotiations that may have happened with partners or with potential partners, but before any partner uses the platform, they're fully aware of what these fees are.

**BY MS. LISS-RIORDAN:**

Q. Can you tell me what surge pricing is?

**MR. HENDRICKS:** Calls for a narrative, again

Page 166

outside the designated topics. You may answer. And may lack foundation, but you may answer.

**THE WITNESS:** Surge pricing is a way for Uber to adjust prices up and down in order to keep the ecosystem as efficient as possible and maximize the number of rides that drivers can provide to riders.

**BY MS. LISS-RIORDAN:**

Q. So at certain periods of time Uber's prices for customers go up when there's heavy demand. Is that right?

**MR. HENDRICKS:** Again, overly broad, vague and ambiguous as to time and as to location, but you may answer in your personal capacity.

**THE WITNESS:** During times of high demand it's possible that prices may go up and of course -- and down based on demand.

**BY MS. LISS-RIORDAN:**

Q. And Uber makes those decisions about what the prices for customers will be. Is that right?

**MR. HENDRICKS:** Vague and ambiguous, lacks foundation, outside the scope of the topic. If you have any individual information, you may provide it, but you're not testifying in any designated

Page 167

capacity.

**MS. LISS-RIORDAN:** I just want to point out for the record that Topic F is how drivers using Uber's application have received compensation for services. So all of these questions that I'm asking are within the scope of what we noticed. So --

**MR. HENDRICKS:** We'll have to --

**MS. LISS-RIORDAN:** I don't want to get into an argument on the record.

**MR. HENDRICKS:** We'll just have to disagree. Regardless of what the prices are, how they receive them is unrelated to how the prices are set. It relates to the receipt. There's nothing in this notice that would put anyone on notice as to that other issue from my perspective. But plaintiff is making the contention that this designation covers it, so she can proceed as she thinks is best. And we'll reserve our objections.

**BY MS. LISS-RIORDAN:**

Q. Mr. Coleman, let me restate the question. Uber decides on the price that customers will pay, correct?

**MR. HENDRICKS:** Objection, lacks foundation, calls for speculation. I believe that part's been

Page 168

asked and answered, but you're answering in your individual capacity. You may answer.

**THE WITNESS:** Uber sets the prices that are offered to riders and offered to drivers as well. It's certainly within either of their rights to use the system or not use the system to get connected with one another.

**BY MS. LISS-RIORDAN:**

Q. Do drivers have any ability to negotiate their own prices with customers while using the Uber app?

**MR. HENDRICKS:** Same objections, outside the scope. You may answer in your individual capacity. Overly broad, may lack foundation, but you may answer.

**THE WITNESS:** Once a driver accepts a trip request, whatever the price is at that time, let's -- if there's no surge pricing or if there is surge pricing, the rider is fully aware of what that rate is and they've agreed to it, and there's just no need for any negotiations there.

**BY MS. LISS-RIORDAN:**

Q. But if a driver wanted to negotiate a price, would he or she be able to?

Page 169

1   MR. HENDRICKS: Vague and ambiguous. You
2   may answer.
3       THE WITNESS: There's no functionality
4   within the Uber app to -- for price negotiations.
5       BY MS. LISS-RIORDAN:
6   Q.  So the driver can't, for instance, charge
7   more if he or she thinks that a particular ride
8   merited more pay from the customer?
9   A.  There's no way within the Uber app for a
10  driver to negotiate rates with a rider.
11  Q.  And Uber drivers are not supposed to take
12  cash from customers, right?
13      MR. HENDRICKS: Vague and ambiguous, overly
14  broad. You may answer.
15      THE WITNESS: There's no need for a driver
16  to take cash from a rider who has used the Uber
17  system. It's a cashless system. That's what we
18  built. It's a cashless model of being able to refer
19  a rider to a driver, and there's just no need for
20  cash. That's one of the beauties of the system.
21      BY MS. LISS-RIORDAN:
22  Q.  And not only is there no need for cash,
23  drivers are instructed they are not to accept cash
24  from customers, right?

Page 170

1       MR. HENDRICKS: It's vague and ambiguous,
2   "accept cash," overly broad. You may answer. It's
3   also lacking in -- potentially in foundation as well
4   as -- I withdraw that. It seems as though this may
5   fall within one of the topic areas. You may
6   proceed.
7       THE WITNESS: Can I hear the question again,
8   please?
9       (Record read: And not only is there no need
10          for cash, drivers are instructed they are
11          not to accept cash from customers, right?)
12      MR. HENDRICKS: Same objections.
13      THE WITNESS: We tell drivers that there's
14  no need for a -- for them to accept cash from
15  riders. The rider's credit card will be charged at
16  the end of the trip, and there's just no
17  functionality within the app for that not to happen.
18  And there is an expectation that -- drivers ensure
19  that riders are aware that there is just no need to
20  pay cash for these trips.
21      BY MS. LISS-RIORDAN:
22  Q.  And drivers are also not supposed to accept
23  cash trips from riders. Is that correct?
24      MR. HENDRICKS: That is vague and ambiguous

Page 171

1   as to time, as to city, and just generally as
2   framed. You may answer.
3       THE WITNESS: We let riders know that
4   there's no need to tip with Uber. We tell the same
5   thing to drivers: The full fare that gets
6   calculated fully compensates for the services
7   provided. There's just no need to accept tips. The
8   full fare compensates for the services provided.
9       BY MS. LISS-RIORDAN:
10  Q.  So Uber tells riders that the tip is
11  included in the fare?
12      MR. HENDRICKS: I'm having a hard time --
13  and I know counsel has made the point of me asking
14  that questions be repeated. With this window and
15  the noise -- the extensive noise we're hearing out
16  on the street level, I sometimes have a hard time
17  hearing the question. So if we can do something
18  regarding the noise, that would be helpful. If not,
19  I'm going to continue to need to have the question
20  reread back.
21      MS. LISS-RIORDAN: Do you want to try
22  closing the window more? It was very heavy. I
23  tried, and that's as far as I could get it. You
24  might be stronger than me.

Page 172

1       MR. HENDRICKS: Hold on one moment. Okay.
2   Can I hear the question again, please?
3       (Record read: So Uber tells riders that the
4          tip is included in the fare?)
5       MR. HENDRICKS: Vague and ambiguous as to
6   time, as to city and otherwise. You may answer.
7   Oh, and this particular topic is, I believe, outside
8   of the scope of the topic, but as a follow-up to
9   what the witness has testified to, he may answer in
10  his individual capacity. You may answer.
11      THE WITNESS: We tell riders there's no need
12  to tip, the full fare compensates for the services
13  provided. That's simply how it is. I believe on an
14  old version of the website it said tip was included,
15  but that was merely to just make it clear that
16  there's no need to tip.
17      BY MS. LISS-RIORDAN:
18  Q.  Okay. So Uber wants to convey to riders
19  that what they're paying for already includes what
20  they would understand to be a tip?
21      MR. HENDRICKS: Misstates the testimony,
22  vague and ambiguous. You may answer.
23      THE WITNESS: What we're conveying to riders
24  is that the full fare compensates for the services

Page 177

1 enough about the intricacies of Rasier versus Uber
2 and that entire structure to be able to answer
3 fully. I don't --
4   BY MS. LISS-RIORDAN:
5 Q. Okay. Are you -- even if you can't answer
6 it fully, do you know of any differences with
7 respect to how the whole system works between the
8 driver partners who receive their payments directly
9 from Uber and the driver partners who receive their
10 payments from Rasier? Are you aware of any
11 difference?
12   MR. HENDRICKS: Again, the question's vague
13 and ambiguous with respect to how the system works,
14 what system's being referred to, overly broad. You
15 may answer. It's also outside the scope of this
16 particular designation potentially, depending on
17 what the question really is. You may answer.
18   THE WITNESS: I'm not aware of any
19 differences, at least that I can recall right now.
20   BY MS. LISS-RIORDAN:
21 Q. Okay. And then the drivers who work with or
22 for other partners, for those drivers, the payments
23 are made from Uber to the partner and then Uber
24 issues 1099s to the partner, right?

Page 178

1 A. So we pay the partner for the services
2 provided. Whether it's -- whether they have one
3 driver or a hundred drivers, we pay the limo company
4 for the services provided. Then the 1099 would go
5 to that partner as well.
6 Q. All right. And the partner is responsible
7 for issuing whatever tax forms it feels appropriate
8 to the drivers working under or for it. Is that
9 right?
10 A. It's not with us. It would be between them
11 and their drivers.
12 Q. Uber does not reimburse any drivers for gas.
13 Is that right?
14   MR. HENDRICKS: Vague and ambiguous, overly
15 broad. You may answer.
16   THE WITNESS: The fare collected from the
17 rider is for the full services provided. There's no
18 reimbursement for gas or anything like that.
19   BY MS. LISS-RIORDAN:
20 Q. And there's no reimbursement for insurance,
21 is there?
22   MR. HENDRICKS: Again, these questions
23 regarding reimbursement are not part of designated
24 topics. So in that sense the witness is testifying

Page 179

1 in his individual capacity. You may answer.
2   THE WITNESS: There's no reimbursement for
3 insurance.
4   BY MS. LISS-RIORDAN:
5 Q. Drivers using the platform, they're required
6 to have insurance. Is that right?
7 A. Partners are required to carry the proper
8 amount of insurance by law, and that amount is going
9 to vary by state, product, things of that nature.
10 Q. And does Uber carry insurance for drivers in
11 any states?
12   MR. HENDRICKS: Again, as framed, outside
13 the scope of the designated topics. May lack
14 foundation therefore, vague and ambiguous. To the
15 extent you have knowledge -- I don't want you to
16 guess or speculate, but to the extent you have
17 knowledge, you may testify in your individual
18 capacity.
19   THE WITNESS: I'm not knowledgeable of the
20 insurance and the carriers, if any at all. I just
21 don't.
22   BY MS. LISS-RIORDAN:
23 Q. Does Uber provide reimbursement for tolls
24 that drivers need to pay?

Page 180

1   MR. HENDRICKS: Overly broad. There's an
2 ambulance going in the background that's a little
3 bit distracting. Vague and ambiguous, overly broad
4 as to time and location, but you may answer. Again,
5 I don't believe that this is covered in one of the
6 topics, but you may answer to the extent you know in
7 your individual capacity.
8   THE WITNESS: So this is going to vary quite
9 a bit based on product and potentially location.
10 Taxi, for example, they would enter tolls -- I
11 believe in most cases enter tolls in their meter, or
12 they may be automatically entered into the meter. I
13 think that can vary based on location. And, of
14 course, the rider would be charged for the full
15 metered fare plus the 20 percent tip, or now
16 variable tip. That would be added on top of that.
17   For Uber Black, peer-to-peer, where Uber is
18 doing the calculation for the full fare, those tolls
19 that are accrued during a trip are calculated within
20 that full fare and Uber pays the partner the full
21 compensation on those tolls. There's no percentage
22 fee taken out of these tolls. So they go -- flow
23 straight through to the partner.
24   BY MS. LISS-RIORDAN:

Page 189

1  reimbursement. Is that right?
2     MR. HENDRICKS: Asked and answered, vague
3  and ambiguous. You may answer again.
4     THE WITNESS: The full fare compensates for
5  the services provided. That's what we pay to the
6  partner, the full fare less the fees that we've
7  collected. It's what they've agreed to. There's no
8  notion of additional mileage reimbursements or
9  anything of that nature.
10    BY MS. LISS-RIORDAN:
11 Q. And in the data that Uber has for all of the
12  fares that drivers have driven using the Uber app,
13  there's information regarding how many miles the
14  drivers drove?
15    MR. HENDRICKS: This particular question is
16  not within the designated topics for this witness.
17  To the extent the witness has knowledge, he may
18  answer in his personal capacity. You may answer.
19    THE WITNESS: Can I hear the question again,
20  please?
21    BY MS. LISS-RIORDAN:
22 Q. It wasn't stated very well. Let me restate
23  the question.
24    Uber -- and this may be a question that's

Page 190

1  more appropriate for the next witness, but if you
2  know, isn't it correct that Uber keeps the data on
3  how many miles drivers have driven while
4  transporting riders who have used the Uber app? Is
5  that correct?
6     MR. HENDRICKS: Same objections, outside the
7  scope, lacks foundation, and the question as framed
8  is vague and ambiguous.
9     THE WITNESS: So we collect the data from
10  the phone that's required to calculate the fare.
11  That's it.
12    BY MS. LISS-RIORDAN:
13 Q. And that data includes the amount of miles
14  driven, right?
15 A. It would cover distance traveled.
16 Q. And that data also shows the amount of time
17  that the rides took, right?
18 A. M-hm.
19    MR. HENDRICKS: Is that a yes?
20    THE WITNESS: And the riders -- yes. And
21  the riders can see that on their receipt as well.
22  Drivers can see that online on their account as
23  well.
24    BY MS. LISS-RIORDAN:

Page 191

1 Q. And drivers can set themselves to be on duty
2  or off duty or, as you put it, online or offline,
3  right?
4 A. They do that themselves. We don't tell them
5  when. We don't tell them where. We don't tell them
6  how long to be online. That's -- that is fully up
7  to them to determine what they want to do or how
8  they want to use the system.
9 Q. Does Uber have the data in its system
10  showing how much time a driver is online?
11    MR. HENDRICKS: As framed, lacks foundation,
12  vague and ambiguous, outside the scope for the
13  designated topics for this witness. If you have
14  personal knowledge, you may testify in your
15  individual capacity.
16    THE WITNESS: So we know when a driver goes
17  online, and we know when a driver goes offline.
18    BY MS. LISS-RIORDAN:
19 Q. And does Uber maintain data regarding how
20  much time a driver has spent online?
21    MR. HENDRICKS: Lacks foundation, vague and
22  ambiguous, outside the scope of the topics. You may
23  answer in your individual capacity, if you know.
24    THE WITNESS: I don't know the full extent

Page 192

1  of the information that we keep, but I do know we
2  know when the driver goes online and when they go
3  offline.
4     BY MS. LISS-RIORDAN:
5 Q. And Uber tracks in the various cities how
6  many drivers are online at various times in order to
7  determine when there's more demand, less demand,
8  need for more drivers to be online. Is that right?
9     MR. HENDRICKS: Vague and ambiguous with
10  respect to the term "tracks," lacks foundation.
11  It's outside the scope of the topics. You may
12  answer in your individual capacity.
13    THE WITNESS: We have visibility into how
14  many drivers are online at any given moment.
15    BY MS. LISS-RIORDAN:
16 Q. And does Uber use that information to
17  encourage drivers to go online during times when
18  there's more need for drivers?
19    MR. HENDRICKS: Vague and ambiguous. You
20  may answer. Well, it's overly broad as to city and
21  location. It's overly broad and vague and ambiguous
22  as to time, but you may answer.
23    THE WITNESS: How drivers are communicated
24  with is left up to the individual operations

Page 241

    acceptable, can the drivers be deactivated?)
      THE WITNESS: If a driver's star rating
 falls below what a city has determined to be
 acceptable, yes, they may be deactivated.
      BY MS. LISS-RIORDAN:
 Q.  And what that star rating is varies from
 city to city and from time to time.  Is that right?
 A.  City by city.  It may change over time, and
 it varies by product.
 Q.  And the managers for the different cities
 make those decisions?
      MR. HENDRICKS: Vague and ambiguous as to
 which decisions.  You may answer.
      THE WITNESS: The managers within the city
 are the ones that determine what an appropriate star
 rating is to maintain within the city and within
 that product.
      BY MS. LISS-RIORDAN:
 Q.  And if a driver falls below whatever that
 star rating is for that city and that product, is
 the driver automatically deactivated, or does the
 manager decide whether the driver should be
 deactivated?
      MR. HENDRICKS: Again, this is a little bit

Page 242

 outside the scope of the designated topics, but not
 fully.  It's vague and ambiguous, it's overly broad
 as to situation, location and time, but you may
 answer.
      THE WITNESS: Can I hear the question again,
 please?
      (Record read:  And if a driver falls below
      whatever that star rating is for that city
      and that product, is the driver
      automatically deactivated, or does the
      manager decide whether the driver should be
      deactivated?)
      MR. HENDRICKS: Same objections.  It's also
 compound as framed, but you may answer.
      THE WITNESS: I'm not aware of any automated
 way of deactivating drivers or partners.  So it
 would fall into the discretion of the driver
 operations manager to make those determinations.
      BY MS. LISS-RIORDAN:
 Q.  Do you know how many drivers are using the
 Uber platform currently?
      MR. HENDRICKS: Outside the scope of the
 topic.  I don't want you to guess or speculate, but
 if you have individual knowledge, you may answer.

Page 243

      THE WITNESS: I have no idea.
      BY MS. LISS-RIORDAN:
 Q.  Do you know how frequently drivers are
 deactivated?
      MR. HENDRICKS: Again, outside the scope,
 but if you have personal knowledge, you may answer.
      THE WITNESS: No, I'm not aware.
      BY MS. LISS-RIORDAN:
 Q.  Can a driver stop using the Uber app at any
 time that he or she wants?
      MR. HENDRICKS: Vague and ambiguous.  You
 may answer.
      THE WITNESS: Absolutely.  They can choose
 when to use it, when to not use it, whether they
 want to sign up or not.
      BY MS. LISS-RIORDAN:
 Q.  And if a driver decides that he or she
 doesn't want to use Uber anymore, they don't have to
 give some kind of notice to Uber, do they?
      MR. HENDRICKS: Well, objection.  That calls
 for a legal conclusion with respect to what they
 have to do.  It may lack foundation.  This is
 outside of the scope of the application -- of the
 topics.  I don't want you to guess or speculate, but

Page 244

 if you have knowledge in your personal capacity or
 believe you do, provide her with what you know.
      THE WITNESS: I'm not aware of what's
 legally in the contract, but again they just don't
 have to use the system at any time.
      BY MS. LISS-RIORDAN:
 Q.  Uber doesn't expect them to give advance
 notice that they're no longer going to be using the
 system?
      MR. HENDRICKS: Again, this is outside the
 scope, lacks foundation as framed.  With respect to
 expectation, may call for a legal conclusion in
 terms of interpreting the agreement.  If you have
 personal knowledge, you may provide it, but I don't
 want you to guess or speculate.  I'm not familiar
 with what it states in the agreement as far as
 advance notice.
      BY MS. LISS-RIORDAN:
 Q.  I'm not asking what it states in the
 agreement.  I'm asking does Uber expect that drivers
 are going to inform it in advance when they've
 decided they no longer want to use the Uber
 application?
      MR. HENDRICKS: Asked and answered, outside

```
1   STATE OF CALIFORNIA        )
2   COUNTY OF SAN FRANCISCO    )
3
4         I hereby certify that the witness in the
5   foregoing deposition, MICHAEL COLEMAN, was by me
6   duly sworn to testify to the truth, the whole truth
7   and nothing but the truth, in the within-entitled
8   cause; that said deposition was taken at the time
9   and place herein named; that the deposition is a
10  true record of the witness's testimony as reported
11  by me, a duly certified shorthand reporter and a
12  disinterested person, and was thereafter transcribed
13  into typewriting by computer.
14        I further certify that I am not interested
15  in the outcome of the said action, nor connected
16  with, nor related to any of the parties in said
17  action, nor to their respective counsel.
18        IN WITNESS WHEREOF, I have hereunto set my
19  hand this 16th day of July, 2014.
20        _X_  Reading and Signing was requested.
21
22
23              _____
24              CYNTHIA F. DAMMANN, CSR No. 10610
25              STATE OF CALIFORNIA
```