# Exhibit 7

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3
                                              )
 4   DOUGLAS O'CONNOR, THOMAS                 )
     COLOPY, DAVID KHAN, MATTHEW              )
 5   MANAHAN, WILSON ROLLE, JR., and          )
     WILLIAM ANDERSON, individually           )
 6   and on behalf of all others              )
     similarly situated,                      )
 7                                            )
                     Plaintiffs,              )
 8                                            )
           v.                                 )  No. CV 13-3826-EMC
 9                                            )
     UBER TECHNOLOGIES, INC.,                 )
10                                            )
                     Defendant.               )
11   _____)

12

13

14

15

16          Deposition of MATTHEW MANAHAN, taken

17          on behalf of the Defendant, at One

18          Market Street, Spear Tower, 28th Floor,

19          San Francisco, California, commencing

20          at 9:51 a.m., Tuesday, August 12, 2014,

21          before Karen Moon, Certified Shorthand

22          Reporter No. 12450.

23

24

25
```

Page 3

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        SHANNON LISS-RIORDAN, ESQ.
          LICHTEN & LISS-RIORDAN, P.C.
 5        100 Cambridge Street, 20th Floor
          Boston, Massachusetts 02114
 6        (617)994-5800
          sliss@llrlaw.com
 7

 8

 9   For Defendant:

10        ROBERT JON HENDRICKS, ESQ.
          MORGAN, LEWIS & BOCKIUS LLP
11        One Market Street, Spear Street Tower, 28th Floor
          San Francisco, California 94105
12        (415)442-1000
          rhendricks@morganlewis.com
13

14
15   Also Present:

16        Abby Horrigan

17        Philip Knowles, Videographer

18

19

20

21

22

23

24

25
```

Page 4

```
 1                        I N D E X

 2
 3   DEPONENT              EXAMINED BY              PAGE

 4   MR. MANAHAN           MR. HENDRICKS              8

 5

 6                         EXHIBITS

 7   DEFENDANT'S                                    PAGE

 8   1 - 12-page First Amended Class Action           15
         Complaint and Jury Demand.

 9

10   2 - 11-page Plaintiff Matthew Manahan's         33
         Answers and Objections to Defendant
11       Uber Technologies Inc.'s
         Interrogatories.

12   3 - 1-page E-mail from Ms. Liss-Riordan          37
         to Mr. Hendricks dated 8/12/14.
13

14   4 - 11-page Plaintiff Matthew Manahan's         38
         Answers and Objections to Defendant
15       Uber Technologies Inc.'s
         Interrogatories.

16   5 - 5-page Plaintiff Matthew Manahan's          42
         Responses to Defendant Uber
17       Technologies Inc.'s First Set of
         Requests for Admissions.

18
19   6 - 22-page Plaintiff Matthew Manahan's         43
         Answers and Objections to Defendant's
20       Requests for Production of Documents.

21   7 - 452-page document production by             44
         Mr. Manahan (MAN000001-452).
22
     8 - 1-page Facebook profile for                119
23       Matthew von Manahan.

24   9 - 1-page Facebook page for Booda             122
         Soap Box.
25
```

Page 5

```
 1                         EXHIBITS

 2   DEFENDANT'S                                    PAGE

 3   10 - 3-page IMDb page for Matthew              123
          von Manahan.
 4
     11 - 2-page IMDb biography for                 126
 5        Matthew von Manahan.

 6   12 - 18-page Uber promotions document.         149

 7   13 - 7-page document entitled Apply            152
          to Become an Uber Partner
 8        (UBE-OCO00004097-4104).

 9   14 - 2-page color copies of Mr.                153
          Manahan's driver's license and
10        vehicle registration
          (UBE-OCO00003234-3235).
11
     15 - 16-page Transportation Provider           155
12        Service Agreement, signed by Mr.
          Manahan 5/29/13 (UBE-OCO00001677-
13        1692).

14   16 - 16-page Transportation Provider       158, 192
          Service Agreement, signed by Mr.
15        Manahan 4/2/13 (MAN000430-445).

16   17 - 3-page Uber 2013 1099 form for            185
          Mr. Manahan (UBE-OCO00002387,
17        2388, and 3236).

18   18 - 8-page Uber fare rates document           190
          for Los Angeles
19        (UBE-OCO00004117-4124).

20   19 - 1-page Uber document to click on          193
          acknowledgment of Driver Addendum,
21        Software License and Online Services
          Agreement, and City Addendum.
22
     20 - 2-page opt-out form signed by             194
23        Mr. Manahan and letter to Uber
          Technologies from Sara Smolik
24        dated 8/21/13
          (UBE-OCO00001162-1163).
25
```

Page 6

```
                    EXHIBITS
DEFENDANT'S                                        PAGE

21 - 91-page Uber payment statements               207
     for Matthew Manahan
     (UBE-OCO00001417-1507).

22 - 35-page document of Uber texts to             211
     Mr. Manahan (UBE-OCO00003244_00001
     through 35).

23 - 296-page document, communications             224
     to Mr. Manahan related to Uber
     application (UBE-OCO00001699-1994).

24 - 211-page E-mail communications                255
     between Mr. Manahan and Uber
     (UBE-OCO00001995-2205).

25 - 20-page redlined copy of Plaintiff            293
     Matthew Manahan's Answers and
     Objections to Defendant Uber
     Technologies, Inc.'s Interrogatories.


                  MARKED ITEMS
                 PAGE      LINE
                  179        7
```

Page 7

1       SAN FRANCISCO, CALIFORNIA; TUESDAY, AUGUST 12, 2014
2                10:08 A.M.
3
4       THE VIDEOGRAPHER: Good morning, counsel.
5   Here begins media No. 1 of the video deposition of
6   Matthew Manahan, volume 1, in the matter of O'Connor v.
7   Uber Technologies, being heard before the United States
8   District Court for the Northern District of California.
9   And the case number is CV 13 dash 3826.
10      Today's date is August 12th, 2014, and the
11  time is approximately 10:09 a.m. This deposition is
12  taking place at One Market Street in the Spear Tower on
13  the 28th floor in the City of San Francisco, California,
14  94105.
15      The videographer is Philip Knowles appearing
16  on behalf of Barkley Count Reporters located at 201
17  California Street, Suite 375, in the City of San
18  Francisco, California, 94111.
19      Will counsel please identify yourselves and
20  state whom you represent.
21      **MR. HENDRICKS:** R.J. Hendricks with Morgan,
22  Lewis & Bockius on behalf of the defendant.
23      **MS. LISS-RIORDAN:** And Shannon Liss-Riordan on
24  behalf of the plaintiffs.
25      **THE VIDEOGRAPHER:** Thank you, counsel. The

Page 8

1   court reporter today is Karen Moon with Barkley Court
2   Reporters.
3       Will the court reporter please swear in the
4   witness.
5
6       (MATTHEW MANAHAN, deponent, was sworn and
7        examined and testified as follows:)
8
9       **DEPOSITION OFFICER:** Please raise your right
10  hand to be sworn. You do solemnly state that the
11  testimony you shall give in this matter shall be the
12  truth, the whole truth, and nothing but the truth, so
13  help you God?
14      **MR. MANAHAN:** I do.
15      **DEPOSITION OFFICER:** Thank you.
16
17              EXAMINATION
18  BY MR. HENDRICKS
19      Q   Mr. Manahan, let me introduce myself again.
20  My name is R.J. Hendricks. I'm a partner with the law
21  firm of Morgan, Lewis & Bockius. We represent the
22  defendant in this case.
23      A   Okay.
24      Q   I'm going to be asking you some questions
25  concerning the lawsuit that has been filed by you

Page 9

1   against Uber and general questions relating to your
2   experience using the Uber application.
3       A   Okay.
4       Q   But before I do that, I want to give you some
5   instructions with respect to how this deposition will
6   proceed. Okay?
7       A   Okay.
8       Q   The oath that you were just given is the same
9   oath you'd be given in a court of law.
10      Do you understand that?
11      A   Uh-huh.
12      Q   Is that a yes?
13      A   That is a yes.
14      Q   Okay. The court reporter is taking down
15  everything that's being said. It's important that you
16  use word responses. I know in everyday speech we can
17  shake our head and go uh-huh and uh-uhs and things like
18  that, but so that there's a clear written record, it's
19  important to use word responses. Yes, no, or a
20  narrative statement of words.
21      Do you understand this?
22      A   Yes.
23      Q   Okay. It is our intent to use the information
24  that we get from you today in order to defend against
25  the claims that you've brought.

Page 246

1  questions that may be determined in this case is your
2  credibility as a witness; right?
3      A   Yes.
4      Q   And with that instruction, your testimony is
5  while utilizing the Uber app, no passenger ever gave you
6  a cash tip; correct?
7      A   Gave me a cash tip -- I don't -- gave me a
8  cash tip. We were told not to accept tips.
9      Q   That's not my question. I'm not getting into
10 evasion. Your testimony here in this deposition under
11 penalty of perjury is no Uber passenger ever gave you a
12 cash tip; correct?
13     A   Never gave me a cash tip. I don't know. I
14 don't know. You're saying it happened. I don't -- I
15 disagree.
16     Q   And that's your testimony? Your testimony is
17 without any hesitation, equivocation, no passenger ever
18 gave you a cash tip; correct?
19     A   I don't know. I mean, I don't know.
20     Q   Are you now saying that you recall that a
21 passenger did give you cash tips?
22     A   I'm saying sometimes occasionally someone
23 might leave cash on the seat, but I wasn't soliciting
24 tips.
25     Q   Okay. So let's go back to this. Okay. Are

Page 247

1  there passengers who left cash on the seat for you?
2      A   I said I wasn't able to accept it.
3      Q   Are there passengers who left cash tips on the
4  seat for you?
5      A   It's happened.
6      Q   Okay. While using the Uber application, there
7  were passengers that left cash tips for you. Correct?
8      A   Yeah. But I'm supposed to go chase them down?
9      Q   That's not my question. I want a clear yes or
10 no. Your testimony now is while using the Uber
11 application, there were passengers who left cash tips
12 for you. Correct?
13     A   It's -- yeah. It happened.
14     Q   Okay. How frequently did that happen?
15     A   How frequently did that happen? Not
16 frequently.
17     Q   Do your best job to quantify it. It was more
18 than once; wasn't it?
19     A   I mean, someone -- someone said that. But
20 like I said, the one -- the one guy said he didn't have
21 any cash. That's what I thought the complaint was
22 about. It was a guy that said he didn't have any cash.
23 That's not right that they're not tipping the drivers.
24     Q   Okay. But that's not my question. My
25 question is, you received cash tips from passengers

Page 248

1  using the Uber application more than once; didn't you?
2      A   Just the once.
3      Q   Just once?
4      A   Yeah. The one -- yeah. The one time they
5  gave me cash.
6      Q   Okay. So again, I just want to be clear here.
7  Your testimony now is is that you have a recollection of
8  at least one time a passenger leaving you a cash tip who
9  was using the Uber app; correct?
10     A   It was -- it was a long time ago. And so I'm
11 not a hundred percent positive. But the policy was
12 don't take cash tips. Sometimes people would leave tips
13 on the seat. I don't know how many.
14     Q   Mr. Manahan, I'm not trying to trick you.
15 Okay? I'm trying to get a straight-up answer that I
16 know what you're saying and what you're not saying.
17         You've gone from no one leaves me a cash tip,
18 no one's ever left me a cash tip, even when I complained
19 they didn't leave me a cash tip, to, well, yeah, there
20 are some folks who have left cash on the seat for me,
21 which I understood to be a tip, to I have a distinct
22 memory of one person, to, well, I don't know how many
23 people. That's your testimony so far.
24     A   Yeah.
25     Q   Okay. Can you give me a clear statement of

Page 249

1  how many folks on average have left you cash tips while
2  you were using the Uber application?
3      A   I can't.
4      Q   What's your best estimate of that?
5      A   That left cash tips. I don't -- I mean, I
6  don't know. It was a long time ago.
7      Q   Give me your best estimate.
8      A   Two. Two.
9      Q   Okay. That's your best estimate?
10     A   It's very rare.
11     Q   I understand you're saying it's very rare, but
12 I'm asking you a different question.
13         Is that your best estimate, that out of the
14 period of time that you've been using the Uber
15 application, now you have a recollection of two
16 instances where a passenger has left you a cash tip; is
17 that correct?
18     A   Well, yeah.
19     Q   Okay. And those instances, did they hand you
20 the cash tip or did they leave it in the seat? What
21 was -- what was the means of transferring this cash tip
22 to you?
23     A   The best of my memory was on the seat or in
24 the cup holder.
25     Q   And -- and just so we're clear, you're using

Page 278

1  the money without actually utilizing the application in
2  a way that it was intended to be used under the
3  promotion?")
4      **THE WITNESS:** I don't know what intended
5  means, because everyone I know -- and the reason the
6  promotion stopped was because people were joining Lyft
7  just to go to Uber to get the sign-up bonus. A lot of
8  people would only give one ride and then go back to
9  driving for Lyft.
10 BY MR. HENDRICKS
11     Q   Other than examples like that, are you aware
12 of any other examples where people may be gaming the
13 system in order just to get the payment?
14     **MS. LISS-RIORDAN:** Objection. What --
15 objection. Vague and ambiguous. What were they being
16 asked to do and what were they doing?
17     **THE WITNESS:** Yeah. What were they being
18 asked to do?
19 BY MR. HENDRICKS
20     Q   Sir --
21     **MS. LISS-RIORDAN:** Can you read --
22 BY MR. HENDRICKS
23     Q   You were there. You've indicated --
24         How much money have you made -- how much money
25 have you received as incentive payments in connection

Page 279

1  with these sort of promotions offered by Uber in the
2  last two months?
3      **A   In the last two months? Probably over 9,000,**
4  **10,000.**
5      Q   Okay. And you've referred a lot of people.
6  How much in total have you made off of these incentive
7  programs?
8      **A   I don't know off the top of my head.**
9      Q   Give me your best estimate.
10     **A   Twenty-five to 27,000.**
11     Q   Over what period of time have you made 25 to
12 27,000 off of Uber incentive programs for referring
13 other drivers to use the application?
14     **A   March to present.**
15     Q   So within five months roughly $27,000? Is
16 that your estimate?
17     **A   Yes.**
18     Q   Okay. And -- and let me -- let me be more
19 direct. Have you ever gamed the Uber promotion system
20 to obtain money, but not to actually recruit bona fide
21 Lyft drivers?
22     **MS. LISS-RIORDAN:** And I'm going to object
23 again as vague and ambiguous, asking whether he's gamed
24 the system. You can ask him a more specific question as
25 to what he's done or what he hasn't done.

Page 280

1  BY MR. HENDRICKS
2      Q   You may answer.
3      **A   I mean, I referred drivers based on the rules**
4  **that were -- or the requirements that were set forth by**
5  **Uber. There's a lot of them.**
6      Q   Now you know that -- that -- do you know who
7  Mike McCaffrey is?
8      **A   No.**
9      Q   You don't know who Mike McCaffrey is?
10     **A   No.**
11     Q   Didn't you try to refer Mike McCaffrey to Uber
12 under one of these promotion programs?
13     **A   I don't know a Mike McCaffrey. What page are**
14 **you on?**
15     **MS. LISS-RIORDAN:** Just wait for a question.
16     **MR. HENDRICKS:** And I may have misspoke
17 regarding Mike McCaffrey.
18         Let me have marked as -- well it's a part of
19 the exhibit. Let me make reference to ticket No.
20 4711082.
21     **THE WITNESS:** 47 -- I'm sorry. What number?
22 BY MR. HENDRICKS
23     Q   It's Uber O'Connor pages 2123 to 2124. And
24 actually, I will say that the numbers I'm fully
25 referring to are 2123 through 2126.

Page 281

1      Will you please take a look at the document
2  here in the middle of the page, the first page it
3  says -- from you on March 18th, this is a follow-up to
4  your previous request 4269637. I referred a Lyft driver
5  friend of mine. Thanks. I just checked this week's and
6  the bonus is not included again. Any idea why not.
7      And then you got a response on March 21st --
8  strike that.
9      You made that request; correct? That was an
10 E-mail from you; right?
11     **A   Uh-huh.**
12     Q   Is that a yes?
13     **A   Yes.**
14     Q   Okay. And then on March 21st, 2014, Alex
15 Clatterbuck wrote back and said, hey, Matthew, we
16 largely appreciate your partnership, so I'm not trying
17 to discredit you, but the driver you referred committed
18 multiple instances of fraudulent activity and was
19 deactivated from our system. We do honor referrals, but
20 feel it's unwarranted in this case. We'll be speaking
21 with your referee again shortly. Best, Alex.
22     Now do you know who this was referring to?
23     **A   Yes.**
24     Q   Who was this referring to?
25     **A   My -- Moise. Moise.**

Page 282

1  Q   What's Moise's last name?
2  A   Serrano.
3  Q   Moise Serrano. Now in response to Alex's
4  E-mail, you write back and say, sorry to hear that. I
5  don't really know the guy. I was told to refer active
6  Lyft drivers for bonus, so that's what I did. As a Lyft
7  driver myself, I was also told my bonus was being
8  processed a month ago. So if you're just telling me now
9  that's the reason why I haven't received it all this
10 time doesn't make sense. I mean, the guy did his 20
11 rides, right? Are you saying I have to be responsible
12 for a stranger's action the whole time he's a member of
13 the platform?
14     So -- and I won't finish the rest of this, but
15 let me say here, Moise was not a stranger to you; was
16 he?
17 A   He was an acquaintance.
18 Q   You characterized him as being a friend.
19 Didn't you?
20 A   I did -- I did, because I was trying to get
21 the referral.
22 Q   How did you meet Moise?
23 A   Just through Lyft.
24 Q   Was he not actually a friend of yours? Were
25 you just --

Page 283

1  A   He was an acquaintance, like a guy I knew
2  through Facebook.
3  Q   Okay. So he wasn't really a friend. You just
4  said that because you wanted to get the referral; is
5  that correct?
6  A   A friend on Facebook, but yeah.
7  Q   Now the issue here is -- if you go back up to
8  this note from Mike McCaffrey, it says it looks like he
9  was wait listed because he was accepting trips by the
10 same client multiple times.
11     Do you see that?
12 A   I -- where? What page? I'm sorry.
13 Q   2123.
14 A   Yes, I see that.
15 Q   Okay. And it further says, this client is the
16 same guy who Matthew Manahan, also shares the same last
17 name and phone number, has been accepting trips by
18 numerous times.
19     Do you see that?
20 A   Well, this guy is the same guy who Matthew
21 Manahan has been accepting trips by numerous times. So
22 he's given rides to me?
23 Q   Was he giving rides to you?
24 A   Me -- Moise -- Mo -- he -- what happened.
25 He -- this is New Year's Eve, and he had to have a

Page 284

1  certain number of rides done before the promotion ended.
2  And he asked if I could request him to do some rides so
3  he could be able to get the bonus.
4  Q   Okay. So basically in order for him to get
5  the bonus, he asked you to request him on several times
6  so that he could get the bonus; correct?
7  A   A couple times, yeah.
8  Q   Okay. How many times did you request him that
9  night so he could get this bonus?
10 A   I want to say just like two or three.
11 Q   And this is the same guy that if he got a
12 bonus you would get a bonus; correct?
13 A   Yes.
14 Q   And where were these trips? Where -- what
15 trips did you request for him to take you?
16 A   Let's see. I believe they were on New Year's
17 Eve. And the promotion ended at midnight, and he was
18 trying to get there, but he needed -- maybe it was
19 mid-December. I don't know. But he needed a couple more
20 rides to get the bonus.
21 Q   And so when you write -- when you write to
22 Alex on March 21st saying, I mean, the guy did his 20
23 rides, right, you knew that he had done the rides
24 because you helped him do those rides; correct?
25 A   Well, yeah. I was -- I mean, and they paid me

Page 285

1  the bonus. If I did anything wrong, why would they pay
2  out the bonus?
3  Q   Well, in fact, you were cautioned about it.
4  You were given the benefit of the doubt. You didn't
5  indicate to them that you consciously were facilitating
6  him getting rides in order for you and him to get the
7  bonus; did you?
8  A   A ride's a ride.
9  Q   That's not my question. You didn't
10 affirmatively communicate that; did you? You actually
11 played kind of dumb like you didn't know what to think
12 of it. Sorry to hear that. You were acting surprised
13 like you didn't understand he was engaging in fraudulent
14 activity. That was your response, wasn't it, on page
15 Uber O'Connor 2124?
16 A   I don't -- if --
17 Q   The first -- the first sentence of your E-mail
18 on March 21st to Alex says sorry to hear that. Right?
19 A   Yeah.
20 Q   Okay. But you already knew what they were
21 talking about, that he looked like he was gaming the
22 system; correct?
23 A   I didn't know.
24 Q   Well, you knew what you had been doing,
25 requesting repeated rides from the same guy so he gets a

Page 286

bonus?
 A   I didn't think that was fraudulent activity.
 Q   Okay.
 A   I still paid for the ride. Just because I wasn't physically in the car.
 Q   And you weren't even physically in the car; correct?
 A   No. I requested the ride. He gave the ride.
 Q   Right. Okay. So you were using the application to request rides that you weren't even physically in the car so that he and you would get a bonus?
 A   But he's still doing the rides.
 Q   Then why -- going back to Uber O'Connor 2124, in your March 21st E-mail, why are you saying sorry to hear that, I don't really know the guy?
 A   I don't really know the guy.
 Q   Why didn't you say in here, well, I know he did it, I in fact requested him to do rides even though I wasn't in the car so that he would get the bonus and I would get the bonus?
 A   I didn't think that constituted fraudulent activity.
 Q   You didn't disclose that information in connection with your E-mail to the company; did you?

Page 287

 A   I did not disclose that, no.
 Q   Okay. And in fact the response ultimately you get back from Tim --
 A   Wait. This says -- but here it says --
     MS. LISS-RIORDAN: Okay. Wait. Wait for there to be a question.
     THE WITNESS: Oh, okay.
BY MR. HENDRICKS
 Q   The E-mail you get from Tim on March 25th as reflected on Uber O'Connor 2126 is that, hi, Matthew. We have a zero tolerance for fraud and gaming our referral system. I am paying out this referral because we appreciate your partnership. However, if we get further referrals that are at all fraudulent in their approach to completing their trips, we will not be paying them out -- we will not be paying them or you out.
     Do you see that?
 A   Uh-huh.
 Q   Is that a yes?
 A   Yes.
 Q   Okay. A part of the experience of having an actual rider utilize the service is that you allow riders to see how the service works; correct? That's one of the benefits of it?

Page 288

 A   I don't know what the benefits are.
 Q   Mr. Manahan, you understand that -- that -- there are multiple benefits in this promotional. One is that it allows Lyft drivers to get exposed to the application, and if you're dealing with actual bona fide rides with passengers in the vehicle, it allows them to better understand and appreciate the system as well. You understand that; don't you?
     MS. LISS-RIORDAN: Okay. That's --
     THE WITNESS: It also educates the driver on how to use the app properly.
     But if you look right here from Alex, it says the referred driver ended up being fraudy after his initial 20 trips. So that has nothing to do with -- that's not why he was deactivated.
     On 2124, referred Lyft driver ended up being fraudy after his initial 20. If you're accusing me of being fraudulent for giving him a few rides to help him get to that bonus, that's not accurate.
BY MR. HENDRICKS
 Q   Okay. Let me move on to a different document at this point.
     Now at any point during the time you utilized the Uber app, did you run a small business?
 A   No.

Page 289

 Q   Okay. Let me draw your attention to Uber O'Connor 2135. This is in reference to ticket No. 4833267 and it's a two-page really E-mail chain, Uber O'Connor 2135 and 2136.
     Okay. So will you take a look, Mr. Manahan, at the E-mail at the middle of the page dated March 24th.
     Do you see that?
 A   Yeah.
 Q   Okay. That's an E-mail from you; correct?
 A   Yeah.
 Q   Okay. And it says, hi, I run a small business and would love to give these out to my customers. Can I get loads of them, please. When should I expect them to arrive.
     Do you see that?
 A   Yeah.
 Q   You were communicating to the company that in fact at this time you did run a small business; correct?
 A   Yeah.
 Q   What small business were you referring to here? Or were you lying?
 A   I wanted to give the -- the codes to a cooking school that I took classes at that served alcohol during the classes. And so I thought it would be great if

Page 306

1  not using it in order to generate more revenue?
2  A  No, I don't like that.
3  Q  Why not?
4  A  It's immoral to me.
5  Q  Okay.  That's a choice that you're making;
6  correct?
7  A  Yeah.
8  Q  You've not considered hiring on other drivers
9  to assist you in operating your business?
10  A  No.  The stories I've heard of that are just
11  very exploitive and there's major -- no.  I've never
12  considered that.
13  Q  Have you -- have you considered doing it in a
14  way that you feel is not exploitive?
15  A  No.
16  Q  You mentioned before that in connection with
17  your contract with Rasier, that you believe you received
18  the document via E-mail; is that correct?
19  A  Yes.
20  Q  Okay.  Will you take a look at the document
21  Bates label Manahan 348.  Is this a copy of the E-mail
22  that accompanied the signed document that you entered
23  into?
24  A  Yes.
25  Q  Okay.  Okay.  Okay.  Now in connection with

Page 307

1  this case, we asked you to produce documents to us that
2  would reflect any sort of expenses that you were seeking
3  to recover in this litigation; correct?
4  A  Correct.
5  Q  And you've not produced in your production
6  Exhibit No. 7 any documents that are receipts of any
7  expenses that you incurred in connection with utilizing
8  the Uber application; correct?
9  A  Correct.
10  Q  And during the period of time that you were
11  utilizing the Uber application, did you maintain any
12  sort of diary or journal?
13  A  No.
14  Q  Okay.  And in fact, in terms of your
15  production, you've not produced any sort of diary or
16  journal; correct?
17  A  Correct.
18  Q  Okay.  We asked you to produce documents
19  pertaining to any income that you had generated from
20  August of 2009 to the present; correct?
21  A  Correct.
22  Q  Okay.  And you didn't produce any of your
23  payment statements from SideCar; did you?
24  A  No.
25  Q  You didn't produce any of your payment

Page 308

1  statements relating to using the Lyft application;
2  correct?
3  A  No.
4  Q  No, what?
5  A  No, I didn't produce any documents.
6  Q  Okay.  Why not?  Why didn't you produce those
7  documents?
8     MS. LISS-RIORDAN:  There was an objection
9  stated.  I don't really think it's something that needs
10  to be asked of the witness.  If you want to confer with
11  us on additional discovery that you believe needs to be
12  produced, we can confer on this.
13  BY MR. HENDRICKS
14  Q  Okay.  Did you take -- well, I already asked
15  you that question.  You didn't take any steps.  Okay.
16  A  Steps to -- okay.
17  Q  And while using the Uber application, Uber's
18  never set a specific schedule or required you to use the
19  application under a specific schedule; correct?
20  A  They've sent E-mails encouraging me to work
21  busier times.
22  Q  I'm not asking about encouragement.  I'm
23  asking about did they set a schedule such that they told
24  you if you did not work this schedule, you will be
25  deactivated from having access to the application?

Page 309

1  A  No.
2  Q  Okay.  And in fact, you know on a daily basis
3  you determine for yourself the times and locations that
4  you would utilize the application; correct?
5  A  Yeah.
6  Q  Okay.  And we asked you to produce the
7  documents that reflected the litany of detailed
8  requirements referenced in the complaint that you claim
9  you were required to perform; correct?
10  A  Correct.
11  Q  Okay.  And you produced all the documents that
12  you had in your possession, custody, and control that
13  reflected that, what you characterize as the litany of
14  requirements; correct?
15  A  To the best of my knowledge.
16  Q  Okay.  And we attached those exhibits, those
17  documents you produced as Exhibit 7; correct?
18  A  That's this one?
19  Q  Yeah.
20  A  Yes.
21  Q  Okay.  Now I want to talk to you about this
22  issue with the -- the tip again.
23    Have you quantified what specific amount
24  you're claiming will -- strike that.
25    Are you claiming currently that there's a

```
 1            DEPOSITION OFFICER'S CERTIFICATE
 2
 3   STATE OF CALIFORNIA     }
                             } ss.
 4   COUNTY OF ALAMEDA       }
 5
 6        I, Karen Moon, hereby certify:
 7        I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 12450 issued by the Court
10   Reporters Board of California and which is in full force
11   and effect.  (Fed. R. Civ. P. 28(a)).
12        I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a), 30(f)(1)).
17        I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22        I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25                          / / /
```

320

BARKLEY
Court Reporters

```
 1   of the testimony given by the witness.  (Fed. R. Civ. P.
 2   30(f)(1).)
 3           Before completion of the deposition, review of
 4   the transcript [ ] was [XX] was not requested.  If
 5   requested, any changes made by the deponent (and
 6   provided to the reporter) during the period allowed, are
 7   appended hereto.  (Fed. R. Civ. P. 30(e).)
 8   Dated:    AUG 2 5 2014    ,
 9
10                              _____
11
12
```

321