# Exhibit 9

Page 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DOUGLAS O'CONNOR, THOMAS COLOPY, DAVID KHAN, MATTHEW MANAHAN, WILSON ROLLE, JR., AND WILLIAM ANDERSON, individually and on behalf of all others similarly situated,

          Plaintiffs,

vs.                    No. CV 13-3826-EMC

UBER TECHNOLOGIES, INC.,

          Defendant.

_____/

DEPOSITION OF THOMAS COLOPY taken on behalf of Defendant, at MORGAN, LEWIS & BOCKIUS, LLP, One Market, Spear Street Tower, San Francisco, California beginning at 9:36 a.m., Wednesday, June 11, 2014, before GINA V. CARBONE, RMR, CRR, CCRR, Certified Shorthand Reporter No. 8249.

---

Page 3

I N D E X

| EXAMINATION BY: | PAGE |
|---|---|
| MR. HENDRICKS | 9 |

--oOo--

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Class Action Complaint and Jury Demand | 24 |
| EXHIBIT 2 | First Amended Class Action Complaint and Jury Demand | 26 |
| EXHIBIT 3 | Plaintiff Thomas Colopy's Responses to Defendant Uber Technologies, Inc.'s First Set of Requests for Admissions | 29 |
| EXHIBIT 4 | Plaintiff Thomas Colopy's Answers and Objections to Defendant Uber Technologies, Inc.'s Interrogatories | 31 |
| EXHIBIT 5 | Plaintiff Thomas Colopy's Answers and Objections to Defendant's Request for Production of Documents | 34 |
| EXHIBIT 6 | Documents produced by Plaintiff, Bates COLOPY000001 - COLOPY000189 | 38 |
| EXHIBIT 7 | Documents produced by Plaintiff, Bates COLOPY000190 - COLOPY000823 | 38 |
| EXHIBIT 8 | A printout of a portal for Uber partners and drivers | 88 |
| EXHIBIT 9 | Ticket #65163 dated March 20, 2012 | 105 |
| EXHIBIT 10 | Ticket #76555 dated April 7, 2012 | 113 |

//

---

Page 4

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 11 | Ticket #258730 dated August 14, 2012 | 116 |
| EXHIBIT 12 | Cherifi Limousine Invoice, Bates COLOPY000011 - COLOPY000014 | 129 |
| EXHIBIT 13 | Cherifi Limousine Invoice, Bates COLOPY000015 - COLOPY000020 | 129 |
| EXHIBIT 14 | An email dated April 2012, Bates COLOPY000010 | 134 |
| EXHIBIT 15 | An email string dated August 2012 | 136 |
| EXHIBIT 16 | Ticket #120423 dated May 23, 2012 | 144 |
| EXHIBIT 17 | An email dated February 2013 | 145 |
| EXHIBIT 18 | 2012 Form 1099-MISC Miscellaneous Income | 145 |
| EXHIBIT 19 | An email dated February 2014, Bates COLOPY000040 | 145 |
| EXHIBIT 20 | 2013 Form 1099-Misc Miscellaneous Income | 145 |
| EXHIBIT 21 | Photocopies of several receipts, Bates COLOPY000186 - COLOPY000187 | 149 |
| EXHIBIT 22 | Partner/Driver Terms and Conditions August 2011, Bates COLOPY000002 - COLOPY000009 | 153 |
| EXHIBIT 23 | Ticket #168762 dated June 29, 2012 | 164 |
| EXHIBIT 24 | Ticket #205540 dated July 15, 2012 | 165 |
| EXHIBIT 25 | Ticket #253442 dated August 11, 2012 | 177 |
| EXHIBIT 26 | Ticket #355327 dated October 4, 2012 | 182 |
| EXHIBIT 27 | Ticket #822546 dated March 8, 2013 | 185 |

//

---

Page 5

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 28 | An email string dated July 2013, Bates COLOPY000031 | 187 |
| EXHIBIT 29 | Ticket #2952432 dated December 7, 2013 | 191 |
| EXHIBIT 30 | Driver Quality Report Card and several Driver Ratings with miscellaneous Bates numbers | 198 |
| EXHIBIT 31 | Uber presentation slides | 208 |
| EXHIBIT 32 | Uber Text Messages To/From Colopy | 224 |
| EXHIBIT 33 | An email dated May 2012, Bates COLOPY000175 - COLOPY000177 | 226 |
| EXHIBIT 34 | An email dated December 2012, Bates COLOPY000157 - COLOPY000159 | 226 |
| EXHIBIT 35 | An email dated December 2012, Bates COLOPY000154 - COLOPY000156 | 227 |
| EXHIBIT 36 | An email dated February 2013, Bates COLOPY000023 - COLOPY000025 | 227 |
| EXHIBIT 37 | An email dated March 2013, Bates COLOPY000148 - COLOPY000149 | 227 |
| EXHIBIT 38 | An email dated March 2013, Bates COLOPY000150 - COLOPY000151 | 227 |
| EXHIBIT 39 | An email dated July 2013, Bates COLOPY000133 - COLOPY000136 | 227 |
| EXHIBIT 40 | An email dated July 2013, Bates COLOPY000130 - COLOPY000132 | 227 |
| EXHIBIT 41 | An email dated January 2014, Bates COLOPY000095 - COLOPY000098 | 228 |
| EXHIBIT 42 | An email dated February 2014, Bates COLOPY000088 - COLOPY000089 | 228 |

//

Page 6

## EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 43 | An email dated March 2014, Bates COLOPY000071, COLOPY000128 - COLOPY000129 | 228 |
| EXHIBIT 44 | A screenshot of an Uber page | 234 |
| EXHIBIT 45 | Software License and Online Services Agreement | 235 |
| EXHIBIT 46 | Driver Addendum Related to Uber Services | 235 |
| EXHIBIT 47 | Uber City Addendum - San Francisco, East Bay, South Bay | 235 |
| EXHIBIT 48 | A screenshot of accepted agreements | 235 |
| EXHIBIT 49 | A letter from Mr. Colopy dated August 13, 2013 opting out of the Arbitration Provision | 236 |
| EXHIBIT 50 | Driver Details for Tom Colopy dated July 2, 2012 through March 22, 2014 | 256 |

--oOo--

Page 7

## APPEARANCES

For the Plaintiffs:

    LICHTEN & LISS-RIORDAN, P.C.
    By:  SHANNON LISS-RIORDAN
    100 Cambridge Street, 20th Floor
    Boston, Massachusetts 02114
    (617) 994-5800
    aliss@llrlaw.com

For the Defendant:

    MORGAN, LEWIS & BOCKIUS LLP
    By:  ROBERT JON HENDRICKS
         STEPHEN L. TAEUSCH
    One Market, 28th Floor, Spear Street Tower
    San Francisco, California 94105
    (415) 442-1000
    rhendricks@morganlewis.com
    staeusch@morganlewis.com

ALSO PRESENT:  ABIGAIL HORRIGAN, Uber in-house counsel
               PHILIP KNOWLES, Videographer

Page 8

1     SAN FRANCISCO, CALIFORNIA
2         June 11, 2014
3            --oOo--
4
5     BE IT REMEMBERED that set on Wednesday, June 11,
6  2014, at the hour of 9:36 a.m. at the Offices of MORGAN,
7  LEWIS & BOCKIUS, LLP, One Market, 28th Floor, Spear
8  Street Tower, San Francisco, California, before me,
9  GINA V. CARBONE, a Certified Shorthand Reporter in and
10 for the State of California, there personally appeared
11        THOMAS COLOPY,
12 called as a witness by the Defendant, who, being sworn
13 by me to tell the truth, the whole truth and nothing but
14 the truth, was thereupon examined and testified as
15 hereinafter set forth:
16            --oOo--
17
18        **THE VIDEOGRAPHER:** Good morning, counsel.  Here
19 begins media No. 1 of the deposition of Thomas Colopy,
20 volume 1, in the manner of O'Connor versus Uber
21 Technologies.  This case is in the United States
22 District Court for the Northern District of California,
23 San Francisco Division, and the case number is
24 CV 13-3826.
25        Today's date is June 11th, 2014, and the time

Page 9

1  is approximately 9:36 a.m.  This video deposition is
2  taking place at One Market Street on the 28th floor in
3  the city of San Francisco, California 94105.
4        The videographer is Phillip Knowles appearing
5  on behalf of Barkley Court Reporters located in Irvine,
6  California 92614.
7        Will counsel please identify yourselves and
8  state whom you represent.
9        **MR. HENDRICKS:** R.J. Hendricks with Morgan,
10 Lewis & Bockius on behalf of Uber.
11        **MS. LISS-RIORDAN:** Shannon Liss-Riordan,
12 Lichten & Liss-Riordan on behalf of plaintiffs.
13        **THE VIDEOGRAPHER:** The court reporter is Gina
14 Carbone with Barkley Court Reporters.
15        Will the reporter please swear in the witness.
16        (Witness sworn.)
17
18        EXAMINATION BY MR. HENDRICKS
19        **MR. HENDRICKS:** Q.  Good morning,
20 Mr. Colopy.
21        A.  Morning.
22        Q.  Again, let me introduce myself.  My name is
23 R.J. Hendricks, I'm a partner with the law firm of
24 Morgan, Lewis & Bockius.  We represent Uber
25 Technologies, Inc. in connection with a lawsuit that you

Page 98

1  Q. Okay. Payment associated with trips you took
2  was transmitted to the transportation company that you
3  were working for, correct?
4  A. Correct.
5  Q. And that would either be, at the time, LS
6  Transportation, or later the Riadh firm? The Cherifi
7  firm, correct?
8  A. Correct.
9  Q. And as to that amount that was transferred
10 to -- and let's just stay with LS Transportation for a
11 moment now -- you would split that fare, to some extent,
12 with LS; isn't that right?
13 A. Yeah. Certainly LS would get a cut of the
14 overall fare. Sure.
15 Q. You negotiated a split with them in terms of
16 they would take a portion of the proceeds from the Uber
17 payments, and you would take a percentage of it,
18 correct?
19 A. I never negotiated anything with them. They
20 set the terms and I accepted it. There was no
21 negotiation.
22 Q. Fine. They set the terms, you accepted, right?
23 A. That's correct.
24 Q. Okay. What were the terms that were set in
25 terms of what would be their split of those proceeds

Page 99

1  versus your split?
2  A. I was told I was going to get 48 percent of the
3  overall total.
4      MR. HENDRICKS: Could I hear the answer,
5  please.
6      (Record read as follows: I was told I was
7      going to get 48 percent of the overall total.)
8      MR. HENDRICKS: Q. And when you say the
9  overall total, are you referring to 48 percent of
10 the total fare, or 48 percent of that amount that
11 was transferred from Uber to LS Transportation?
12 A. They told me after all is said and done, you
13 get 48 percent of the total fare.
14 Q. Forty percent?
15 A. Forty-eight.
16 Q. Forty-eight.
17 A. I'm sorry if I was unclear.
18    They told me 50, and then they clarified it was
19 actually 48.
20 Q. Okay. And who specifically at LS told you that
21 that's what you would get?
22 A. One of the owners.
23 Q. Do you know their name?
24 A. No, I do not.
25 Q. With respect to -- this is while working with

Page 100

1  LS Transportation. With respect to rides involving
2  persons using the Uber app, did you have any agreement
3  or arrangement with them in terms of who would pay for
4  the insurance of the car?
5  A. I understood in all circumstances that the
6  company was responsible for the insurance of the car.
7  Q. Did you have any agreement with them as to who
8  would pay for maintenance of the car?
9  A. I was under -- understood that they were
10 responsible for mechanical maintenance -- the
11 maintenance of the vehicle.
12 Q. Okay. Did you have any agreement with them
13 with respect to who would pay for gas pertaining to
14 particular trips where you used the Uber app?
15 A. Yes. It was understood I was responsible for
16 gasoline.
17 Q. Was that told to you at the same time that you
18 were discussing that you would get 48 percent of the
19 total fare?
20 A. Yes. Should have been, yes.
21 Q. And what about the cleaning of the car? Was
22 there any discussion as to who would be responsible for
23 cleaning of the car?
24 A. I don't recall. But I was under -- it was
25 understood that with LS -- no, wait. Hang on a second

Page 101

1  here. Let me think.
2      There may have been a few times where I was
3  required to clean the car, but I was, I believe,
4  compensated or reimbursed for it. Provided them a
5  receipt.
6  Q. So generally they would take care of the
7  cleaning, but if you did it, you submitted a receipt for
8  it and you were reimbursed for it?
9  A. (Nonverbal response.)
10 Q. Is that a yes?
11 A. Yes.
12 Q. What about tolls? Was there any agreement
13 between you and LS with respect to the payment of tolls?
14 A. Yeah. I think they made a slight modification
15 of the policy. They certainly paid the airport tolls.
16 I think initially I paid some of the bridge tolls, but
17 they picked them up later. There was a mild
18 modification in that in the short time I was there.
19 Q. So at some point in time they were taking care
20 of tolls, and then at some point you took care of tolls?
21 Is that what you are saying?
22 A. There is different types of tolls. They always
23 took care of -- when you enter the airport, there is a
24 little sensor on the car, and there was a fee for going
25 to the airport. They always took care of those.

Page 150

1  A. Yes.
2  Q. Do you use -- are you assigned a particular
3  vehicle with them?
4  A. Yes.
5  Q. And do you maintain that vehicle 24/7 now?
6  A. I'm not responsible for maintenance, but I am
7  responsible for the vehicle, yes.
8  Q. So you have possession of the vehicle 24/7?
9  A. Yes.
10 Q. And you can use the vehicle for personal use,
11 correct?
12 A. I can.
13 Q. And, in fact, you do, on occasion, do so?
14 A. Not so often, but yes.
15 Q. Okay. How do you distinguish your purchase of
16 gasoline as it pertains to personal use versus business
17 use?
18 A. I use the car almost exclusively for Uber. I
19 have my own personal vehicle.
20 Q. I understand that, but you've indicated there
21 are occasions where you use it for personal use,
22 correct?
23    The question calls for a yes or no, sir.
24 You've indicated already in testimony that you use the
25 vehicle occasionally for personal use, correct?

Page 151

1  A. In the rarest of circumstances, yes.
2  Q. Move to strike as nonresponsive. Answer my
3  question yes or no.
4  A. Yes.
5  Q. You've indicated just a few moments ago that
6  you do use the vehicle on occasion for personal use,
7  right?
8  A. I have.
9  Q. So my question is, is that in -- do you now pay
10 a lease fee to Cherifi Limousine for the use of the
11 vehicle?
12 A. No.
13 Q. You are able to use the vehicles because you
14 are using it in connection with driving; is that right?
15 That's a poor question. I withdraw the question.
16    So Cherifi Limousine doesn't place any
17 restriction on your ability to use the vehicle for
18 personal use, do they?
19 A. Not explicitly, no.
20 Q. And so whether and to what extent you use it
21 for personal use, that's up to you to decide, correct?
22 A. Yeah. I use it for work. Don't drive it all
23 across the country. But if you have to go to the
24 grocery store, so be it. That's what he told me.
25 Q. Okay. Do you -- are there other people who

Page 152

1  drive for Cherifi Limousine?
2  A. There are.
3  Q. Are you in contact with them?
4  A. One or two of them, barely.
5  Q. Do you know whether they have -- any of the
6  people that you are in contact with that work for
7  Cherifi, whether they have a different arrangement
8  wherein they're paying a lease payment for the vehicle?
9
10 A. I don't believe so. I can't say for certain,
11 but I don't believe so.
12 Q. Are you aware of whether or not there are other
13 drivers who utilize the Uber app that enter into lease
14 agreements with transportation companies paying them a
15 flat fee to use the vehicle and they do not split the
16 fares they receive?
17 A. I have heard from other people that is an
18 arrangement with other drivers.
19 Q. Have you ever tried to negotiate an arrangement
20 like that with Cherifi Limousine?
21 A. No, I have not.
22 Q. Why not?
23 A. I felt, in the long run, the current
24 arrangement might be more safer than a different
25 arrangement.

Page 153

1  Q. Okay. Safer in what sense?
2  A. Safer in the sense that if it's a really slow
3  week, that I would make less money than my current
4  arrangement. I felt the current arrangement, how should
5  I say, hedged against really bad circumstances.
6  Q. Okay.
7  A. I felt it was a safer arrangement.
8  Q. Okay. Now, you've produced, as a part of your
9  document production, a copy of an agreement. This is
10 COLOPY 2 through 9. We're going to identify that as
11 Exhibit No. 22.
12    I'm providing a copy to counsel.
13    (Whereupon, Exhibit 22 was marked for
14    identification.)
15    MR. HENDRICKS: Q. And just before I go
16 back into that, one of the things I was meaning to
17 ask you, in looking at your resume, I noticed that
18 you indicate -- and this is COLOPY 1, I notice that
19 you indicate that -- COLOPY 1, I'm sorry, sir, that
20 you worked at Tommy's Audio Video in San Francisco
21 from June 2005 to 2013?
22 A. A rough approximation, yes.
23    MR. HENDRICKS: Madam Court Reporter, did I
24 mark the resume as a separate exhibit or not? I don't
25 think I did.

```
1              DEPOSITION OFFICER'S CERTIFICATE
2  STATE OF CALIFORNIA    )
                          ) ss.
3  COUNTY OF SAN FRANCISCO )
4
5
6         I, GINA V. CARBONE, hereby certify:
7         I am a duly qualified Certified Shorthand
8  Reporter in the State of California, holder of
9  Certificate Number CSR 8249 issued by the Court
10 Reporters Board of California and which is in full force
11 and effect.  (Fed. R. Civ. P. 28(a)).
12        I am authorized to administer oaths or
13 affirmations pursuant to California Code of Civil
14 Procedure, Section 2093(b) and prior to being examined,
15 the witness was first duly sworn by me.  (Fed. R. Civ.
16 P. 28(a), 30(f)(1)).
17        I am not a relative or employee or attorney or
18 counsel of any of the parties, nor am I a relative or
19 employee of such attorney or counsel, nor am I
20 financially interested in this action.  (Fed. R. Civ. P.
21 28).
22        I am the deposition officer that
23 stenographically recorded the testimony in the foregoing
24 deposition and the foregoing transcript is a true record
25                         / / /
```

315

BARKLEY
Court Reporters

```
 1   of the testimony given by the witness.  (Fed. R. Civ. P.
 2   30(f)(1)).
 3           Before completion of the deposition, review of
 4   the transcript [  ] was [ X ] was not requested.  If
 5   requested, any changes made by the deponent (and
 6   provided to the reporter) during the period allowed, are
 7   appended hereto.  (Fed. R. Civ. P. 30(e)).
 8
 9   Dated:   JUNE 20, 2014
10
11                           _____
```

BARKLEY
Court Reporters