**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOUGLAS O'CONNOR, *et al.*,

        Plaintiffs,

    v.

UBER TECHNOLOGIES, INC.,

        Defendant.

_____/

No. C-13-3826 EMC

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**(Docket No. 276)**

**United States District Court**
For the Northern District of California

**TABLE OF CONTENTS**

I.  INTRODUCTION .......................................................... 5

II. DISCUSSION ............................................................. 7

    A.    Legal Standard (Class Certification) ..................................... 8

    B.    Legal Standard (California's *Borello* Test for Employment) ................ 10

    C.    The Rule 23(a) Criteria Are Satisfied For Plaintiffs' Tip Claim ............... 13

        1.    Ascertainability ............................................... 13

        2.    Numerosity .................................................... 14

        3.    Commonality .................................................. 15

        4.    Typicality And Adequacy ....................................... 17

    D.    Plaintiffs Have Not Met Their Burden to Prove Adequacy With Respect to Their Expense Reimbursement Claim ........................................ 26

    E.    The Rule 23(b)(3) Requirement of Predominance is Satisfied ................ 29

        1.    Whether Class Members Are Employees or Independent Contractors .... 30

            a.    Uber's Control Over Driver Schedules ...................... 32

            b.    Uber's Control Over Driver Routes or Territories ............. 33

            c.    Pay Set Unilaterally By Uber .............................. 33

            d.    Use of Third-Party Applications .......................... 35

            e.    Star Ratings, Monitoring of Driver's Performance and Compliance With Uber's Training "Requirements" or "Suggestions" ........ 36

            f.    Uber's Right to Terminate Without Cause ................... 37

            g.    *Borello*'s Secondary Factors ........................... 41

                i.    Whether The One Performing Services is Engaged in a Distinct Occupation or Business ........................... 41

                ii.    The Kind of Occupation, With Reference to Whether, in the Locality, The Work is Usually Done Under The Direction of the Principal or by a Specialist Without Supervision ..... 45

iii.      The Skill Required in The Particular Occupation . . . . . . . . 46

iv.      Whether The Principal or the Worker Supplies the
Instrumentalities, Tools, And The Place of Work For The
Person Doing The Work . . . . . . . . . . . . . . . . . . . . . . . . . . 46

v.      The Length of Time For Which Services Are to
be Performed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

vi.      The Method of Payment, Whether by Time or by The Job . 49

vii.      Whether or Not The Work is a Part of The Regular Business of
The Principal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

viii.      Whether or Not The Parties Believe They Are Creating The
Relationship of Employer-Employee . . . . . . . . . . . . . . . . . 50

ix.      The Alleged Opportunity For Profit or Loss Depending on His
Managerial Skill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

x.      The Alleged Employee's Investment in Equipment or
Materials Required for His Task, or His employment of
Helpers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

xi.      Whether The Service Rendered Requires a Special Skill . . 55

xii.      The Degree of Permanence of The Working Relationship . 55

xiii.      Whether The Service Rendered is an Integral Part of The
Alleged Employer's Business . . . . . . . . . . . . . . . . . . . . . . . 56

xiv.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2.      Plaintiffs' Tip Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

F.      Individualized Inquiries May Predominate For Drivers Who Did Not Opt-Out of
Uber's Most Recent Arbitration Clauses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

G.      Superiority Test is Satisfied For Plaintiffs' Tips Claim . . . . . . . . . . . . . . . . . . 64

H.      Plaintiffs' Counsel Will Fairly And Adequately Represent The
Interests of The Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

I.      The Remainder of Plaintiffs' Motion is Denied Without Prejudice . . . . . . . . . . . 66

United States District Court

For the Northern District of California

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

## I.   INTRODUCTION

Plaintiffs Douglas O'Connor, Thomas Colopy, Matthew Manahan, and Elie Gurfinkel are current or former drivers who have performed services for Defendant Uber Technologies, Inc. Docket No. 330. (Second Amended Complaint) (SAC).  They are prosecuting this lawsuit against Uber on behalf of themselves and a putative class of approximately 160,000 other "UberBlack, UberX and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009."[1]  Docket No. 276 (Class Cert. Mot.) (Mot.), Ex. 1; *see also* Docket No. 298 (Opp. Br.) at 1.  Plaintiffs contend that they and all 160,000 putative class members are Uber's employees, as opposed to its independent contractors, and thus are eligible for various protections codified for employees in the California Labor Code.  *See* SAC at ¶ 21.  Specifically, Plaintiffs allege that Uber has uniformly failed to reimburse its drivers "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties," in violation of California Labor Code section 2802, and uniformly failed to pass on the entire amount of any tip or gratuity "that is paid, given to, or left for an employee by a patron."  Cal. Lab. Code § 351.

Pending before the Court is Plaintiffs' motion for class certification.  The merits of the case are not currently at issue.  Rather, the Court needs to consider only two questions at this juncture; whether the case can properly proceed as a class action, and, if so, how.  While answering both of those questions necessarily requires the Court to perform a rigorous analysis of a number of legal issues, the parties correctly recognize that one threshold issue is of paramount importance to the success or failure of Plaintiffs' class certification motion:  as to whether drivers are Uber's employees or independent contractors under California's common-law test of employment, will "questions of law or fact common to class members predominate over any questions affecting only individual members" of the proposed class?  Fed. R. Civ. P. 23(b)(3); *see also Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014).  That is, are the drivers' working relationships with Uber sufficiently similar so that a jury can resolve the Plaintiffs' legal claims all at once?  This

---

[1]  While O'Connor remains a plaintiff in this action, he is no longer seeking to serve as a class representative.  Thus, for the purpose of this motion, the Court refers to Colopy, Manahan, and Gurfinkel collective as "Plaintiffs."

question is of cardinal importance because if the Plaintiffs' worker classification cannot be adjudicated on a classwide basis, then it necessarily follows that Plaintiffs' actual substantive claims for expense reimbursement and conversion of gratuities cannot be adjudicated on a classwide basis either.

Uber contends that the drivers' employment classification cannot be adjudicated on a classwide basis. According to Uber, both its right of control over its drivers, as well as the day-to-day reality of its relationship with them, are not sufficiently uniform across the proposed class to satisfy the requirements of Federal Rule of Civil Procedure 23 (hereafter Rule 23). As other courts weighing certification of employment misclassification claims have recognized, however, there is inherent tension between this argument and Uber's position on the merits: on one hand, Uber argues that it has properly classified *every single driver* as an independent contractor; on the other, Uber argues that individual issues with respect to each driver's "unique" relationship with Uber so predominate that this Court (unlike, apparently, Uber itself) cannot make a classwide determination of its drivers' proper job classification. *See In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (holding that "[a]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the employees are too diverse for uniform treatment"); *see also Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 602 (S.D. Cal. 2010) (explaining that "it may be that [Defendant] believes its workers are in fact independent contractors for reasons unique to each individual, but it's more likely the case [Defendant] believes the independent contractor classification is universally appropriate. That runs at cross-purposes with the reason for objecting to class certification, which is that it's impossible to reach general conclusions about the putative class as a whole") (emphasis omitted). It appears that at least one of these arguments cannot be entirely accurate, and for the purposes of resolving this motion the Court concludes that a number of Uber's class certification arguments are problematic.

For the reasons explained below, and further for the reasons stated on the record at the lengthy hearing on this matter, Plaintiffs have met their burden to show that a class can be certified on both the threshold employment classification question and their claim for converted tips under

United States District Court

For the Northern District of California

1    Labor Code section 351 (hereafter, Tips Claim).  Specifically, the Court will certify the following

2    class to pursue the Tips Claim under Rule 23(b)(3):

3           All UberBlack, UberX, and UberSUV drivers who have driven for
            Uber in the state of California at any time since August 16, 2009, and
4           who (1) signed up to drive directly with Uber or an Uber subsidiary
            under their individual name, and (2) are/were paid by Uber or an Uber
5           subsidiary directly and in their individual name, and (3) did not
            electronically accept any contract with Uber or one of Uber's
6           subsidiaries which contain the notice and opt-out provisions
            previously ordered by this Court (including those contracts listed in
7           the Appendix to this Order), *unless* the driver timely opted-out of that
            contract's arbitration agreement.

8

9           Plaintiffs' request to certify a class under California Labor Code section 2802 is denied

10   without prejudice for the reasons stated herein, as is Plaintiffs' request to certify other possible

11   classes or subclasses of Uber drivers.

12                              **II.   DISCUSSION**

13          The Court assumes the reader's familiarity with the procedural and factual background of

14   this increasingly complicated litigation.  *See generally O'Connor v. Uber Techs., Inc.*, -- F. Supp. 3d

15   --, 2015 WL 1069092 (N.D. Cal. 2015); *O'Connor v. Uber Techs., Inc.*, No. 13-cv-3826-EMC, 2014

16   WL 1760314 (N.D. Cal. May 2, 2014); *Mohamed v. Uber Techs., Inc.*, -- F. Supp. 3d --, 2015 WL

17   3749716 (N.D. Cal. 2015).  Hence, the Court does not separately recount such details here.  Instead,

18   any relevant factual or procedural details are included in the body of this Order as necessary to

19   provide context for the Court's discussion of the merits of Plaintiffs' class certification motion.

20          This Order proceeds as follows.  First, the Court discusses the legal standards under Rule 23

21   that are applicable to Plaintiffs' request for class certification.  Next, the Court describes the legal

22   standard that will be applied at trial to determine whether the class members are Uber's employees

23   or independent contractors under California law.  For while the Court will not decide the merits of

24   Plaintiffs' case at this juncture, the Court can only be assured that the Rule 23 criteria are satisfied

25   by previewing the merits of Plaintiffs' claims, and, particularly, the types of proof (whether common

26   or individualized) that will be offered at trial.

27          After laying out the relevant legal standards, the Court will then apply the Rule 23(a) criteria

28   to the Plaintiffs' claim that they are/were Uber's employees, rather than independent contractors.

1    Because the Court concludes that the Rule 23(a) criteria are satisfied on the threshold

2    misclassification question, the Court will then further consider whether Rule 23(a) is satisfied with

3    respect to Plaintiffs' substantive law claims.  Ultimately, while the Court concludes that Plaintiffs

4    satisfy all of the Rule 23(a) criteria for their Tips Claim,[2] the Court is not currently convinced the

5    Plaintiffs have established adequacy with respect to their expense reimbursement claim.

6            The Court will then consider whether Plaintiffs have met their burden under Federal Rule of

7    Civil Procedure 23(b)(3) to prosecute their Tips Claim on a classwide basis.  This requires that the

8    Court first determine whether the employment classification question can be resolved with reference

9    to predominately common proof.  The Court concludes that the predominance requirement is

10   satisfied with respect to whether the class members are properly classified as independent

11   contractors or employees.  The Court similarly concludes that class members' substantive Tips

12   Claim can be litigated on a classwide basis because common questions predominate over

13   individualized issues.  However, the Court will not certify the claims of any driver who accepted one

14   of the driver contracts listed in the Appendix to this Order, and who did not timely opt-out of an

15   arbitration clause in those contracts, because the Court finds that individualized issues as to whether

16   Uber's more recent arbitration clauses are enforceable against class members will predominate over

17   questions common to all putative class members regarding arbitration.  Finally, the Court concludes

18   its analysis by finding that a class action is a superior method for adjudicating class members' Tips

19   Claims, and further finds that Plaintiffs' counsel will fairly and adequately represent the interests of

20   the class.

21   A.      Legal Standard (Class Certification)

22           Class actions have long been an integral part of the legal landscape.  And while expressly

23   authorized by Rule 23, it must be recognized that the "class action is an exception to the usual rule

24   that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart*

25

26           [2]  Because there is no private right of action to bring a claim under Labor Code section 351,
27   the Plaintiffs are pursuing this claim through California's Unfair Competition Law (UCL).  No party
     has argued that this procedural detail in any way impacts the class certification analysis, and thus the
28   Court simply refers to the claim as the Tips Claim (or section 351 claim) without reference to the
     UCL.

*Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011).  "In order to justify departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as [her fellow] class members."  *Id.* (internal quotation marks omitted).

Accordingly, before certifying a class, this Court "must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted).  The Supreme Court has made it clear that Rule 23 "does not set forth a mere pleading standard."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Rather, the party seeking certification must "affirmatively demonstrate" her compliance with the requirements of both Rule 23(a) and 23(b).  *See Dukes*, 131 S. Ct. at 2551.

Rule 23(a) of the Federal Rules of Civil Procedure permits Plaintiffs to sue as representatives of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  The purpose of these Rule 23(a) requirements is largely to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Dukes*, 131 S. Ct. at 2550 (internal quotation marks and citations omitted).

If each of the Rule 23(a) requirements are satisfied, the purported class must also satisfy one of the three prongs of Rule 23(b).  Here Plaintiffs seek certification under Rule 23(b)(3) which provides:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

1     As noted previously, the underlying merits of the case, while admittedly relevant at the class

2     certification stage, should not overly cloud the Court's certification analysis – the only question

3     presently before the Court is whether the requirements of Rule 23 are met. *See Comcast Corp.*, 133

4     S. Ct. at 1432. The fact that certain elements of proof may favor the defendant on the merits does

5     not negate class certification; the issue is whether the proof is amenable to class treatment.

6     Moreover, "[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the

7     possibility that the later course of the suit might unforeseeably prove the original decision to certify

8     the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."

9     *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). Indeed, even "after a certification order is

10    entered, the judge remains free to modify it in the light of subsequent developments in the

11    litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). Ultimately, whether or not to

12    certify a class is within the discretion of the Court. *United Steel, Paper & Forestry, Rubber, Mfg.*

13    *Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO CLC v. ConocoPhilips Co.*, 593 F.3d

14    802, 810 (9th Cir. 2010); *see also Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

15    B.    Legal Standard (California's *Borello* Test For Employment)

16    This Court has previously written at length about the common-law test of employment in

17    California. *See O'Connor*, 2015 WL 1069092, at *4-6 (N.D. Cal. 2015). Applying that test at the

18    summary judgment stage, the Court determined that because Uber drivers "render service to Uber,"

19    they are Uber's presumptive employees as a matter of law. *Id.* at *9. Thus, the Plaintiffs have

20    proved their prima facie case, although the ultimate question of their employment status will need to

21    be decided by a jury. *Id.* at *10-12. The burden will be on Uber at trial to "disprove an employment

22    relationship." *Id.* at *10.

23    For the purpose of determining whether a presumptive employer can rebut a prima facie

24    showing of employment, the California Supreme Court's seminal opinion in *Borello* "enumerated a

25    number of indicia of an employment relationship." *Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th

26    Cir. 2010). The "most significant consideration" is the putative employer's "right to control work

27    details." *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations* (*Borello*), 48 Cal. 3d 341, 350

28    (1989) (internal quotation marks omitted). Formulated somewhat differently, the "'principal test of

United States District Court

For the Northern District of California

an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.'" *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (quoting *Borello*, 48 Cal. 3d at 350). The putative employer's right of control need not extend to every possible detail of the work. *See Narayan*, 616 F.3d at 904 (explaining that a truck driver's "ability to determine a driving route is 'simply a freedom inherent in the nature of the work and not determinative of the employment relation'") (quoting *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 876 (1990)). Rather, the relevant question is whether the presumptive employer retains "all *necessary* control" over the worker's performance. *Borello*, 48 Cal. 3d at 357 (emphasis in original).

Critically for the purposes of this motion, the Supreme Court has further stressed that the pertinent question under California's right-of-control test is "not how much control a hirer [actually] *exercises*, but how much control the hirer retains the *right* to exercise." *Ayala*, 59 Cal. 4th at 533 (emphases in original) (citation omitted). Or, as the Supreme Court stated the issue nearly a century ago, "'[i]t is not a question of interference, or non-interference, not a question of whether there have been suggestions, or even orders, as to the conduct of the work; but a question of the right to act, as distinguished from the act itself or the failure to act.'" *Id.* (quoting *Hillen v. Indus. Accident Comm'n.*, 199 Cal. 577, 581-82 (1926)); *see also Air Couriers Int'l v. Emp't Dev. Dep't*, 150 Cal. App. 4th 923, 933 (2007) (explaining that if the employer has the authority to exercise control, "'whether or not that right is exercised with respect to all details, an employer-employee relationship exists'") (quoting *Empire Star Mines Co. v. Cal. Emp't Comm'n*, 28 Cal. 2d 33, 43 (1946))).

No one consideration "is dispositive when analyzing employee/independent contractor status" under the *Borello* test. *O'Connor*, 2015 WL 1069092, at *5. Indeed, as this Court previously explained, the case law clearly indicates that the ultimate outcome of the classification inquiry turns on the specific details of the service relationship under consideration, rather than a mechanical checking-off of various factors. *See id.* at *5-6; *see also Alexander*, 765 F.3d at 989. For instance, in some cases an independent contractor relationship has been found where, among many other considerations, there is evidence that the putative employer did not control its hirees' work hours. *See, e.g.*, *Mission Ins. Co. v. Workers' Comp. App. Bd.*, 123 Cal. App. 3d 211, 216

United States District Court

For the Northern District of California

(1981). But other cases have found that on the whole, a service relationship was one of employment even where the hiree had full control over his or her own work schedule. *See Air Couriers Int'l*, 150 Cal. App. 4th at 926; *see also O'Connor*, 2015 WL 1069092, at *5-6.

Still, while no one factor is dispositive, some factors are considered to be more important in ascertaining the extent of the putative employer's right to control. For example, when evaluating the extent of a presumptive employer's right to control, the Supreme Court has stressed that an employer's "right to discharge at will, without cause" is "strong evidence in support of an employment relationship." *Borello*, 48 Cal. 3d at 350 (citations omitted); *see also Ayala*, 59 Cal. 4th at 531 (characterizing the right to discharge without cause as "[p]erhaps the strongest evidence of the right to control"); *Narayan*, 616 F.3d at 900 (characterizing the right to discharge at will as the "most important" factor for determining whether an employment relationship exists). This is because the "power of the principal to terminate the services of the agent" without cause "gives him the means of controlling the agent's activities." *Ayala*, 59 Cal. 4th at 531 (citations omitted). The "worker's corresponding right to leave is similarly relevant: 'An employee may quit, but an independent contractor is legally obligated to complete his contract.'" *Id.* at 531 n. 2 (quoting *Perguica v. Indus. Accident Comm'n*, 29 Cal. 2d 857 (1947)).

The putative employer's right to control work details, while the primary factor, is not the only relevant consideration under *Borello*, however, and the control test cannot be "applied rigidly and in isolation." *Borello*, 48 Cal. 3d at 350. Thus, the Supreme Court has also embraced a number of "secondary indicia" that may be relevant to the employee/independent contractor determination. *Id.* These additional factors include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.* at 351.  *Borello* also "approvingly cited" five additional factors (some overlapping or closely

related to those outlined immediately above), taken from the federal test of employment under the

Fair Labor Standards Act (FLSA), that may help shed light on a putative employee's proper job

classification.  *Narayan*, 616 F.3d at 900.  These additional factors are:

> (i) the alleged employee's opportunity for profit or loss depending on his managerial skill; (j) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (k) whether the service rendered requires a special skill; (l) the degree of permanence of the working relationship; and (m) whether the service rendered is an integral part of the alleged employer's business.

*Borello*, 48 Cal. 3d at 355 (citing *Driscoll Strawberry Assoc., Inc.*, 603 F.2d 748, 754 (9th Cir.

1979)).  While the Supreme Court has explained that each of the above "secondary indicia" are

helpful in determining a putative employee's job status, as noted above, "the considerations in the

multi-factor test are not of uniform significance."  *Ayala*, 59 Cal. 4th at 539.  "Some, such as the

hirer's right to fire at will and the basic level of skill called for by the job, are often of inordinate

importance," while "[o]thers, such as the 'ownership of the instrumentalities and tools' of the job,

may be of only evidential value relevant to support an inference that the hiree is, or is not, subject to

the hirer's direction and control."  *Id.* (internal quotation marks, citations, and modifications

omitted).  Finally, it is clear that the "label placed by the parties on their relationship is not

dispositive, and subterfuges are not countenanced."  *Alexander*, 765 F.3d at 989 (quoting *Borello*, 48

Cal. 3d at 349) (internal modifications omitted).

C.     The Rule 23(a) Criteria Are Satisfied For Plaintiffs' Tips Claim

        1.      Ascertainability

        Before analyzing numerosity under Rule 23(a)(1), courts typically require a showing that the

class to be certified is ascertainable.  *See Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 121-22

(N.D. Cal. 2014); 7A Charles Alan Wright *et al.*, Federal Practice and Procedure § 1760 at 142-47

(3d ed. 2005).  To be ascertainable, the definition of the class must be "definite enough so that it is

administratively feasible for the court to ascertain whether an individual is a member" before trial,

and by reference to "objective criteria."  *Daniel F*, 305 F.R.D. at 122 (citations omitted); *see also*

United States District Court

For the Northern District of California

*Newton v. Am. Debt Servs., Inc.*, No. 11-cv-3228-EMC, 2015 WL 3614197, at *5-6 (N.D. Cal. June 9, 2015) (discussing ascertainability requirement).  Put differently, the Court must ensure that the class is precisely and objectively defined because defining the class with the requisite precision allows the Court to identify "the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action."  *Daniel F*, 305 F.R.D. at 121 (quoting *Manual for Complex Litigation, Fourth* § 21.222 (2004)).

Membership in the class being certified here[3] is objectively ascertainable from Uber's business records.  Uber does not dispute that it maintains business records with respect to each of its drivers, nor is there any dispute that those records will reveal: (1) whether the driver signed up with Uber or an Uber subsidiary using his individual (as opposed to a fictional/corporate) name, (2) is paid directly by Uber or an Uber subsidiary with payments made to the driver in his individual (as opposed to a fictional/corporate) name, (3) whether the driver electronically accepted a certain contract with either Uber or one of Uber's subsidiaries, and (4) whether a driver timely opted-out of arbitration.  *See, e.g.*, Docket No. 299 (Evangelis Decl.), Ex. 3 (chart recognizing the difference between those drivers who are "direct partners with Uber" versus those who work with third-party companies that partner with Uber); Case No. 14-cv-5200-EMC, Docket. No. 28-2 (Colman Decl.) at ¶¶ 7-14.  Thus, the ascertainability requirement is satisfied here.

　　2.　　Numerosity

A plaintiff satisfies the numerosity requirement if  "the class is so large that joinder of all members is impracticable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (citation omitted).  While no court has set the precise number of class members that are needed to satisfy the numerosity requirement, there is general recognition that Rule 23(a)(1) is *at least* satisfied when the proposed class contains one hundred or more members.  *See, e.g.*, *Wang v. Chinese Daily News*, 231

---

[3] Again, the class being certified is defined as follows:  All UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009, and who (1) signed up to drive directly with Uber or an Uber subsidiary under their individual name, and (2) are/were paid by Uber or an Uber subsidiary directly and in their individual name, and (3) did not electronically accept any contract with Uber or one of Uber's subsidiaries that is listed in the Appendix to this Order, *unless* the driver timely opted-out of that contract's arbitration agreement.

**United States District Court**

For the Northern District of California

F.R.D. 602, 607 (C.D. Cal. 2005) (recognizing there is a presumption of numerosity where the proposed class contains one hundred or more members), *reversed on other grounds by* 737 F.3d 538 (9th Cir. 2013); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1998) (finding a proposed class of forty members sufficient to satisfy numerosity). While the Court does not currently know the exact number of class members in the certified class, the Court has no doubt that at least one hundred of the roughly 160,000 individuals who drove for Uber in California since August 2009 will meet the class definition here. Notably, neither party has even suggested that numerosity is not satisfied here. And there is sufficient evidence in the record to suggest that the class being certified will number at least into the hundreds. For instance, in other litigation, Uber has alleged that "several hundred" drivers have opted out of the arbitration agreements listed in the Appendix, and further claimed that at least 269 drivers have opted-out of its earlier 2013 contracts. *See Yucesoy v. Uber Techs., Inc.*, No. 15-cv-262-EMC, Docket No. 107 at 7 n.5; *Gillette v. Uber Techs., Inc.*, No. 14-cv-5241-EMC, 2015 WL 4481706, at *4 (N.D. Cal. Jul. 22, 2015) (Uber's counsel alleged that "roughly 270 drivers" successfully opted-out of earlier versions of arbitration provision). Thus, the Court finds that the numerosity requirement is satisfied.

　　　　3.　　<u>Commonality</u>

　　　　In order to satisfy Rule 23(a)(2)'s commonality requirement, a plaintiff must "affirmatively demonstrate" that their claims depend upon at least one common contention the truth or falsity of which "will resolve an issue that is central to the validity" of each one of the class members' "claims in one stroke." *Dukes*, 131 S. Ct. at 2551. That is, the lawsuit must call upon the court or jury to decide at least one factual or legal question that will generate a common answer "apt to drive the resolution of the litigation." *Id.*; *see also id.* at 2556 (holding that "even a single common question" will suffice to satisfy Rule 23(a)) (citation and internal modifications omitted).

　　　　Despite Uber's argument to the contrary, there are numerous legally significant questions in this litigation that will have answers common to each class member that are apt to drive the resolution of the litigation. Most notably, the common legal issue of whether all class members should be classified as employees or independent contractors is one whose answer would not only be "apt to drive the resolution of the litigation," but could in fact be outcome determinative. *See Guifu*

United States District Court

For the Northern District of California

1   *Li v. A Perfect Franchise, Inc.*, No. 10-cv-1189-LHK, 2011 WL 4635198, at \*7 (N.D. Cal. Oct. 5,

2   2011) (Koh, J.).  As Judge Koh properly noted when certifying a class action alleging worker

3   misclassification under California law, if, "for example, Plaintiffs have been properly classified as

4   independent contractors, the Court need not consider the additional claims that Plaintiffs have

5   raised."  *Id.* (certifying Rule 23(b)(3) class of massage therapists who had been classified as

6   independent contractors by their putative employer, and who sought relief under various provisions

7   of California Labor Code, including for converted gratuities under Labor Code section 351).  Should

8   the jury determine that the class members here are not Uber's employees, this class action will have

9   reached its end.  Should the jury determine they are Uber's employees, as discussed in greater detail

10   below, they are likely to be entitled to relief as a class at least with respect to the California Tips

11   law.

12       Indeed, given the threshold and determinative nature of the employment classification

13   question, it should come as no surprise that district courts "throughout this circuit have found that

14   commonality is met when the proposed class of plaintiffs asserts that class members were

15   improperly classified as independent contractors instead of employees."  *Giufu Li*, 2011 WL

16   4635198, at \*7 (collecting cases); *see also Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606

17   (N.D. Cal. 2014) (finding commonality established solely because "Plaintiffs assert there is a

18   threshold issue as to all of their claims, namely, whether they are independent contractors or

19   employees of Exel"); *Bowerman v. Field Asset Servs., Inc.* (*Bowerman II*), No. 13-cv-0057, 2015

20   WL 1321883, at \*14 (N.D. Cal. Mar. 24, 2015) (Orrick, J.) ("Commonality is satisfied here.  The

21   key legal issue underlying this case is whether putative class members were misclassified under

22   California law as independent contractors instead of employees . . . . [T]his is a common question

23   that is capable of resolution for the class."); *Norris-Wilson*, 270 F.R.D. at 604 (holding "that whether

24   workers are properly classified as employees or independent contractors is, by itself, a factual and

25   legal issue that satisfies Rule 23(a)").

26       To be sure, it may be argued that the commonality requirement of Rule 23(a) must be

27   examined at a level of greater specificity, and not rest solely on the general legal question of whether

28   Uber's drivers are employees or independent contractors.  Indeed, the Supreme Court has recognized

United States District Court
For the Northern District of California

1   that Rule 23(a)(2)'s commonality requirement is "subsumed under, or superseded by, the more

2   stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other

3   questions." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997).  Thus, the Court notes that

4   its predominance analysis, conducted below, is also relevant to its determination that Rule 23(a)(2)'s

5   "rigorous" commonality standard is met here.  *Dukes*, 131 S. Ct. at 2551.  That discussion of

6   predominance examines in greater detail whether the specific factors which inform the *Borello*

7   analysis are susceptible to common and classwide proof.  As noted in that discussion, the worker

8   classification claim presents a common issue capable of classwide adjudication because all (or

9   nearly all) of the individual elements of the *Borello* test themselves raise common questions which

10  will have common answers.  Thus, even if the authorities stated above did not establish the

11  commonality requirement of Rule 23(a) is met by the overarching common question of driver status

12  as employee or independent contractor, commonality at a more specific level is satisfied here for the

13  reasons discussed in the predominance analysis below.

14        Furthermore, the class claims here raise numerous other common questions that will have

15  common answers apt to drive the resolution of the litigation.  For instance, to prevail on their Tips

16  Claim, Plaintiff will be required to show that Uber included a tip or gratuity in the fares it charged to

17  its riders, but that Uber never paid these tips to its drivers.  Thus, one common question important to

18  resolving Uber's liability for the Tips Claim on a classwide basis is whether Uber ever actually

19  remitted tips to its drivers.  Importantly, Uber has stipulated that "[a] tip has never been part of the

20  calculation of fares for either UberBlack or UberX in California," and thus admits that a common

21  question has a common (and conceded) answer that will help establish Uber's potential classwide

22  liability for Tips Law violations:  Uber has never paid gratuities to any of its drivers.  *See* Docket

23  No. 313-16 at 33:22-24.  Rule 23(a)(2)'s commonality requirement is therefore satisfied for this

24  reason as well.

25        4.    Typicality And Adequacy

26        Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be]

27  typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Representative claims are

28  "typical" if they are "reasonably co-extensive with those of absent class members; they need not be

17

United States District Court

For the Northern District of California

substantially identical." *Hanlon*, 150 F.3d at 1020. Thus, the "'test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Bowerman II*, 2015 WL 1321883, at *15 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Moreover, courts may evaluate whether a named plaintiff is typical by determining whether she is "subject to unique defenses which threaten to become the focus of the litigation." *Id.* (citation omitted). "Class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her]." *Id.* (internal modification and citation omitted).

Rule 23(a)(4) imposes a closely related requirement to typicality – namely that the putative class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A named plaintiff satisfies the adequacy test if the individual has no conflicts of interest with other class members and if the named plaintiff will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

As other courts and commentators have noted, the typicality and adequacy inquiries tend to significantly overlap. *See, e.g.*, Newberg on Class Actions § 3:32 (5th ed. 2015) ("Due to the related nature of the two requirements and the frequency with which they are challenged on the same grounds, many courts address the typicality and adequacy requirements in a single inquiry.").[4] For instance, a named plaintiff who is subject to unique defenses (*i.e.*, may not satisfy typicality) may also have a conflict of interest with her fellow class members (*i.e.*, be an inadequate class representative). In light of this overlap, and because Uber and the parties largely treat the two issues together in their briefs, the Court will do the same when analyzing the representative Plaintiffs' ability to represent their fellow class members (as the class is defined above) with respect to their Tips Claims. The Court evaluates the Plaintiffs' adequacy to pursue expense reimbursement claims under California Labor Code section 2802 in the next section.

---

[4] As will be discussed below, the typicality and commonality requirements also tend to merge together in certain ways. *See* Newberg on Class Actions § 3:31 (5th ed. 2015) (explaining that "[b]oth commonality and typicality measure the degree of interrelatedness between the claims in a class action").

**United States District Court**
For the Northern District of California

1    Uber principally argues that the named Plaintiffs' claims are atypical of their fellow class

2  members' because there is "no typical Uber driver."  Opp. Br. at 35.  For instance, Uber argues that

3  "Plaintiffs, who were onboarded in San Francisco, Los Angeles, and San Diego, are not typical of

4  drivers from other cities, or even of drivers in their own cities who were 'onboarded' at different

5  points in time or by different people."  Opp. Br. at 36.  Uber also argues that the representative

6  Plaintiffs are not typical of fellow class members with respect to certain secondary elements of the

7  common law *Borello* test.  For example, Uber notes that none of the named Plaintiffs ever operated

8  their own distinct transportation company, while other Uber drivers (but, importantly, no class

9  members) have operated distinct transportation companies which contract with Uber directly.[5]  *Id.* at

10  37; *see also* Uber's Demonstrative Hearing Slides at 4.  This argument fails for at least two reasons.

11    First, to the extent that Uber's "no typical Uber driver" contention is focused on legally

12  relevant differences between drivers under the *Borello* test (*e.g.*, whether or not they operate a

13  distinct transportation business), the argument is really a commonality or predominance argument

14  masquerading as a typicality argument:  If *legally material* differences between class members are

15  so substantial that the predominance or commonality tests cannot be satisfied, then the typicality test

16  likely cannot be satisfied either.  As discussed below, however, the Court finds that the

17  predominance test *is* satisfied with respect to the specific class defined above because there are *not*

18  significant material legal differences between the claims and defenses of the class members and

19  those of the named Plaintiffs.  *See* Section II.E, *infra.*

20    As for the remainder of Uber's "no typical driver" argument, it fails because Uber focuses on

21  *legally irrelevant* differences between the named Plaintiffs and class members.  Rule 23(a)(3)'s test

22  of typicality is not whether there are *any* differences between the representative plaintiffs and the

23  class members they seek to represent.  For example, the named Plaintiffs may all be left-handed and

24  drive Hondas, while numerous class members are right-handed and drive Toyotas.  But these

25  differences do not demonstrate that the named Plaintiffs are not typical class representatives under

---

[5]  As discussed below, the class as defined excludes all drivers who operated or drove for a distinct transportation businesses that contracted to perform services for Uber, thereby eliminating any class variance on this *Borello* factor.

United States District Court

For the Northern District of California

Rule 23.[6]  Instead, the typicality requirement simply measures whether the named Plaintiffs' *legal claims* all arise from essentially the same conduct underlying their fellow class members' claims and whether the named Plaintiffs and their fellow class members suffered the same legal injury.  As one district court noted in rejecting an argument similar to Uber's with respect to typicality:

> 'The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'  The entire class alleges an identical injury, namely that they were wrongfully classified as independent contractors by DTG and, as a result, denied a panoply of work-related benefits that are afforded to employees under California labor laws.  The injuries alleged – a denial of various benefits – and the alleged source of those injuries – a sinister classification by an employer attempting to evade its obligations under labor laws – are the same for all members of the putative class.  DTG has no real rebuttal to this.  The typicality requirement is therefore satisfied.

*Norris-Wilson*, 270 F.R.D. at 605 (quoting *Hanon*, 976 F.2d at 508).  Indeed, as with commonality, typicality is almost universally found in employment cases like this one where the representative class plaintiffs allege that they, along with every other member of the class, were wrongfully misclassified as independent contractors rather than an employees.  *See, e.g.*, *Giufu Li*, 2011 WL 4635198, at *8 ("The typicality requirement is met here because Plaintiffs have alleged an identical injury, namely that the proposed class members were improperly classified as independent contractors and as a result they were denied a host of work-related benefits provided by California labor laws."); *Bowerman II*, 2015 WL 1321883, at *15 (holding typicality was satisfied because the named plaintiffs' "claims arise from the same conduct that provides the basis for all class members' claims – namely, FAS's alleged misclassification of vendors as independent contractors and

---

[6] For instance, Uber seems to argue that a driver who received in-person training could not represent a person who watched training videos online because their experiences with Uber are somehow not typical of each other.  But if the *form* of training received is in no way material to the merits of the case, then a difference between class members on this factor cannot destroy (or even impact) typicality.  *See Bowerman II*, 2015 WL 1321883, at *15  ("test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation omitted).  As discussed below, it is not the precise content or style of training that informs the *Borello* analysis; rather, it is Uber's right to control that training and to monitor drivers' compliance with its "rules" or "suggestions."  For the reasons discussed below, that right to control is common with respect to class members, and hence typicality is met here.

1   consequent failure to pay overtime wages and indemnify costs"); *Breeden v. Benchmark Lending*

2   *Group, Inc.*, 229 F.R.D. 623, 629 (N.D. Cal. 2005) (typicality met where class representatives'

3   misclassification claims are "precisely the same as the claims of the other class members"); *Dalton*

4   *v. Lee Publ'ns Inc.*, 270 F.R.D. 555, 560 (S.D. Cal. 2010) (explaining that the class representatives

5   "performed nearly identical work as the class members.  They were all classified as independent

6   contractors, not employees.  They have allegedly suffered damages similar to the class members in

7   the form of unpaid wages and improper deductions and expenses, among other things.  The named

8   plaintiffs' claims are therefore typical of the class").

9        Uber's next typicality argument fares no better.  Uber claims that named Plaintiff Manahan is

10   subject to a unique defense because he "conceded" at his deposition that he "fraudulently

11   manipulated Uber's driver referral program," thereby wrongfully obtaining $25,000 from Uber.

12   Opp. Br. at 33.  In a footnote, Uber then argues that "Manahan's fraudulent conduct . . . exposes him

13   to a unique counterclaim for breach of contract and a unique affirmative defense of unclean hands."

14   *Id.* at 33 n.21.  This argument is flawed for a multitude of reasons.  First, Uber has not actually

15   pleaded a counterclaim for breach of contract against Manahan, despite the fact that his deposition

16   was completed over a year ago.  Docket No. 300 (Lipshutz Decl.), Ex. B. (Manahan Depo).

17   Moreover, Manahan's deposition testimony is far less damning than Uber's brief implies.  At best,

18   Manahan testified that on one occasion he requested multiple rides from a Lyft driver whom he had

19   referred to drive for Uber so that the driver would meet his necessary ride quota, and the two of

20   them would thereby receive their respective referral bonuses from Uber.[7]  *See* Manahan Depo. Tr. at

21   276:6-288:1.  While Manahan paid Uber (and thus his referred driver) for the rides he booked,

22   Manahan did not actually ride in the car with the driver.  *Id.* at 286:1-13.  Even if this activity could

23   constitute fraud, which Uber has not nearly established (and Manahan denies), there appears to be no

24   evidence in the record that Manahan engaged in such activity more than once.  Thus, Manahan is not

25   likely subject to a "unique defense" that will "become the focus of the litigation."  *Hanon*, 976 F.2d

26   _____

27        [7]  Apparently, Uber was paying referral bonuses to existing Uber drivers, like Manahan, who
      successfully recruited Lyft drivers to drive for Uber.  Both the referred driver and the referee would

28   receive a bonus as long as the new driver completed a minimum number of rides (*e.g.*, 20) for Uber
      within a certain period of time.  *See* Manahan Depo. Tr. at 282:3-13.

United States District Court

For the Northern District of California

at 508; *see also Yucesoy v. Uber Techs., Inc.*, No. 15-cv-262-EMC, 2015 WL 4571547, at *3 (N.D. Cal. Jul. 28, 2015) (recognizing that "the general rule . . . is that unrelated unethical or even criminal conduct is not sufficient to support a finding of inadequacy") (citation omitted).

Of course, while Uber likely cannot prove that Manahan actually committed fraud, it could conceivably use Manahan's deposition testimony about the referral program to attack his credibility should he testify at trial. Indeed, Uber argues that both Manahan and Gurfinkel[8] have "demonstrated a severe lack of credibility and trustworthiness regarding the material issues of this case and their relationships with Uber." Opp. Br. at 33. As this Court has previously recognized, "credibility may be a relevant consideration with respect to the adequacy analysis," because "an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (citations and internal quotations omitted). "That being said, credibility problems do not automatically render a proposed class representative inadequate." *Id.* (internal modifications, quotation marks, and citations omitted). Rather, "[o]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." *Id.* (citation omitted). Thus, a finding of inadequacy based on the representative plaintiff's credibility problems is only appropriate where the representative's credibility is seriously "questioned on issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud." *Id.* (citation omitted).

None of the named Plaintiffs' putative credibility problems are sufficiently severe so as to undermine their ability to serve as class representatives. For instance, Uber states that Colopy provided "contradictory responses" in discovery; however, the Court reviewed the cited discovery responses and found no contradiction at all. Other claimed credibility problems also appear relatively minor. For instance, in a request for admission (RFA), Manahan denied that "UBER has

---

[8] Uber also argued that Colopy would be an inadequate class representative. This point is not currently ripe. Because Colopy drove for independent transportation companies rather than Uber directly as an individual, he is not a member of the certified class and similarly cannot represent members of that class. Whether he might be an adequate representative of a subclass Plaintiffs may seek to certify as discussed below is not an issue currently before the Court.

United States District Court

For the Northern District of California

1   not established any schedule for when YOU must use the UBER APP," but later testified at his

2   deposition that while Uber  "encourag[ed] me to work busier times," Uber had never actually "set

3   [his] schedule."  Manahan Depo. Tr. at 308:20-309:1.  This and other apparent contradictions

4   between Manahan's and Gurfinkel's RFA responses and their later deposition testimony are not

5   sufficiently serious to support a finding of inadequacy.

6        Uber additionally argues that Gurfinkel is an inadequate class representative because he

7   testified at his November 2014 deposition that he does not "have any understanding as to what [his]

8   responsibilities would be to the extent this case were to be certified as a class," did not know the

9   name of the presiding judge, did not know precisely who the other named plaintiffs are, nor knew

10  what motions had been filed to that point in this case.  *See* Lipshutz Decl., Ex. D (Gurfinkel Depo.)

11  at 33:11-17, 143:1-22.  But a putative class representative will only be deemed inadequate "if she is

12  *startlingly* unfamiliar with the case," and specifically lacks a "general understanding of the claims

13  asserted."  *See Richie v. Blue Shield of Cal.*, No. 13-cv-2693-EMC, 2014 WL 6982943, at *18 (N.D.

14  Cal. Dec. 9, 2014) (emphasis added) (citations omitted).  Thus in *Richie*, this Court found a class

15  representative inadequate because the putative representative could not "articulate the basic harm on

16  which she has filed suit to recover."  *Id.* at *19.  Here, however, Gurfinkel was able to articulate the

17  basic elements of his claim, testifying that the claims alleged in this lawsuit involve "an employer-

18  employee relationship" and the request for payment of tips.[9]  Gurfinkel Depo. Tr. at 144:2-22.  Nor

19  has Uber shown that Gurfinkel's purported ignorance at his deposition nearly a year ago has

20  persisted to the present day.

21       Finally, Uber vigorously argues that the named Plaintiffs are neither adequate nor typical of

22  the putative class members they seek to represent because they "seek a remedy – an employment

23

24  _____

      [9]  Admittedly in the deposition excerpts provided by Uber, Gurfinkel apparently did not

25  specifically identify the expense reimbursement claim being prosecuted by Plaintiffs under Labor
    Code section 2802.  But unlike in *Richie*, Gurfinkel was never asked directly whether he was

26  bringing a reimbursement claim, and thus there is no proof that Gurfinkel would have "disavowed
    any intent to pursue a claim for mileage reimbursement" had he been asked.  *Richie*, 2014 WL

27  6982943, at *19.  Moreover, it is at least reasonably plausible that a lay person like Gurfinkel could
    believe that his answer that he was seeking to be declared an employee of Uber would also

28  adequately describe his rights and remedies as an employee under the Labor Code, which includes
    expense reimbursement under section 2802.

United States District Court

For the Northern District of California

1    relationship with Uber – that irreconcilably conflicts with the interests of countless drivers . . . ."

2    Opp. Br. at 30; *see also id.* at 3 (arguing that "Plaintiffs are taking positions directly contrary to the

3    desires of many of the very people they claim to represent – who do not want to be employees and

4    view Uber as having liberated them from traditional employment").  The Court rejects this

5    argument.  First, while Uber claims that "countless drivers" hail the firm as a "liberator" from

6    traditional employment, Uber has only submitted evidence of the beliefs of a small fraction of its

7    California drivers:  400 out of 160,000 (*i.e.*, 0.25%).  Notably, even out of these 400 declarations,

8    Uber identified only about 150 where the driver actually stated that she prefers to remain an

9    independent contractor.  *See* Evangelis Decl., Ex. 10 (chart listing roughly 150 "Drivers Who Want

10   To Be Treated As Independent Contractors With Uber").  There is simply no basis in the record

11   supporting Uber's claim that some innumerable legion of drivers prefer to remain independent

12   contractors rather than become employees.

13          Moreover, not only are the expressed views of these 400 drivers a statistically insignificant

14   sample of the views of their fellow drivers and class members, there is nothing to suggest (and Uber

15   does not contend) that these 400 drivers were randomly selected and constitute a representative

16   sample of the driver population.[10]  Nor is there evidence that the responses of these drivers were free

17   from the taint of biased questions.  Nothing suggests, for instance, that they were told that were the

18   Plaintiffs to prevail, they might be entitled to thousands of dollars.[11]

19          More fundamentally, the views expressed have little probative value to the question at hand.

20   As the Court noted at the hearing on Plaintiffs' motion, it has doubts that most Uber drivers or

---

22   [10]  Indeed, a significant percentage of the 400 declarations submitted by Uber appear to be
23   from drivers who likely will not be members of the certified class.  *See, e.g.*, Evangelis Decl., Ex. 3
     (listing numerous declarants who did not partner directly with Uber); Ex. 6 (listing numerous
24   declarants who own their own transportation services company).  Thus, it is safe to assume that of
     the roughly 150 declarations submitted by individuals who would prefer to remain independent
     contractors, a significant number of these individuals will similarly not be actual class members.

25

26   [11]  Uber submitted a copy of the scripts its attorneys used to solicit these declarations.
     Docket No. 319-3.  The scripts only suggest generically that class members might be entitled to
     restitution of tips or reimbursement of certain expenses – no possible dollar figure is mentioned.
27   Moreover, Uber did not submit evidence of what it told drivers once they agreed to be interviewed
     for the purpose of submitting a declaration.  Rather, the very end of the script reads "Ok, *let's begin
28   the interview* . . . ."  The Court has no idea what Uber's attorneys actually told the drivers during
     their interviews.

declarants correctly understand the pertinent legal differences between being an employee and an independent contractor, or the potential consequences of this lawsuit. *See, e.g.*, Docket No. 336 (Oral Arg. Tr.) at 16:19-17:25. Indeed, Plaintiffs submitted five counter-declarations from drivers who had previously provided declarations for Uber that indicate that the declarants did not understand when they provided their initial declarations that they would be entitled to expense reimbursement or other employee-only benefits if the Plaintiffs prevail on their claims here. *See, e.g.*, Docket No. 314-1 (Beltran Decl). at ¶¶ 5-7. Furthermore, the Court's independent review of the 400 declarations seems to indicate that most (if not all) Uber drivers who reported a desire to remain independent contractors are operating under the assumption that they would lose all "flexibility" in their working relationship with Uber if they are reclassified as employees. *See* Oral Arg. Tr. at 16:19-17:25. But Uber has not definitely established that all (or even much) of this "flexibility" would necessarily be lost, nor has Uber even established that a victory for Plaintiffs in this lawsuit would require Uber to use "less flexible" work schedules going forward. *See Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-cv-2104-SC, 2008 WL 4156364, at *7 (N.D. Cal. Sept. 5, 2008) ("Plaintiffs, however, are not seeking to outlaw the employment relationship of an independent contractor. Rather, Plaintiffs are alleging that the current system, as operated by Cardinal, violates California law by attempting to label Cardinal delivery drivers as independent contractors when such drivers are employees as a matter of law. Even if Plaintiffs were to eventually prevail on this claim, there would be nothing to stop Cardinal, at that point, from employing actual independent contractors, so long as such an arrangement complied with California law."). Indeed, even if Uber loses this case, it will be free to restructure its relationship with its drivers in such a way that the drivers would actually be *bona fide* independent contractors.

Furthermore, even if Uber *had* demonstrated some real tension between the goals of the class representatives and some statistically significant percentage of the class members, courts have refused to find inadequacy on these grounds. As one district judge correctly explained, "the conflicts that Rule 23(a) is concerned about are conflicts between the class representatives and other members of the putative class, not between those who do and don't think a lawsuit is a good idea in the first place. Just because potential class members disagree with the spirit of an action doesn't

United States District Court

For the Northern District of California

1    mean it shouldn't be certified.  It will almost always be the case that some putative class members

2    are happy with things as they are." *Norris-Wilson*, 270 F.R.D. at 606 (citations omitted); *see also*

3    *Guifu Li*, 2011 WL 4635198, at *9 (holding that the fact that "some potential class members may

4    prefer their current employment situation[] is not sufficient to defeat adequacy"); *Smith*, 2008 WL

5    4156364, at *7.  Indeed, as Judge Conti correctly explained in *Smith*, where putative employees seek

6    to invoke the protections afforded under California labor laws, the Court "must be mindful" of the

7    fact that "'the protections conferred by [these laws] have a public purpose beyond the private

8    interests of the workers themselves.'"  *Smith*, 2008 WL 4156364, at *7 (quoting *Borello*, 48 Cal. 3d

9    at 358); *see also* Department of Labor Administrator's Interpretation No. 2015-1, 2015 WL

10   4449086, at *1 (July 15, 2015) (noting as a public policy matter that "[m]isclassification also results

11   in lower tax revenues for government and an uneven playing field for employers who properly

12   classify their workers").  "It would be antithetical" to the public interest embodied in California's

13   Labor Code to permit a statistically insignificant portion of Uber's workforce "to frustrate the

14   attempt by others to assert rights under California labor law solely because [they] are satisfied with

15   their current jobs."  *Smith*, 2008 WL 4156364, at *7.  Moreover, if there really are class members

16   who truly object to the goals of this lawsuit, they are always free to opt-out of this class action.  *See*

17   *Dalton*, 270 F.R.D. at 560-61.

          In conclusion, the Court finds that Manahan's and Gurfinkel's Tips Claims are typical of

their fellow class members' claims, and that both representative Plaintiffs are adequate class

representatives.

D.        Plaintiffs Have Not Met Their Burden to Prove Adequacy With Respect to Their Expense

          Reimbursement Claim

          By contrast, Plaintiffs have not demonstrated that they are adequate class representatives

with respect to their expense reimbursement claim under Labor Code section 2802.  That provision

provides, as relevant here, that:

> An employer shall indemnify his or her employee for all *necessary*
> expenditures or losses incurred by the employee in *direct consequence*
> of the discharge of his or her duties . . . .

United States District Court
For the Northern District of California

1   Cal. Lab. Code § 2802(a) (emphases added).  As this Court has previously recognized, expense

2   reimbursement claims under section 2802 can sometimes be problematic to certify as class actions

3   because "there may be substantial variance as to what kind of expenses were even incurred by [the

4   putative employees] in the first place."  *Harris*, 753 F. Supp. 2d at 1022; *see also Giufu Li*, 2011 WL

5   4635198, at *14 (denying certification of section 2802 claim where plaintiffs did not narrow their

6   "claim to any specific expenses or category of expenses, and as a result, Plaintiffs claim

7   reimbursement over a wide and divergent range of items").  Moreover, depending on the case, it

8   may be challenging to determine on a classwide basis whether a particular expense (or type of

9   expense) was "necessary" or incurred in "direct consequence" of the employee's duties.  *See Harris*,

10  753 F. Supp. 2d at 1022; *Giufu* Li, 2011 WL 4635198, at *14 (holding that it would be difficult to

11  determine on a class wide basis whether massage therapists' expenses for various items like

12  uniforms, sheets, oil, paper, and flyer fees were "necessary" or incurred in "direct consequence" of

13  their duties).

14          That is not to say, of course, that a class action can never be certified under section 2802.

15  The opposite is clearly true.  *See, e.g.*, *Dalton*, 270 F.R.D. at 563-64 (certifying Rule 23 class action

16  that included expense reimbursement claim under section 2802); *Stuart v. Radioshack Corp.*, No.

17  07-cv-4499-EMC, 2009 WL 281941 (N.D. Cal. Feb. 5, 2009) (same); *Shepard v. Lowe's HIW, Inc.*,

18  No. 12-cv-3893-JSW, 2013 WL 4488802 (N.D. Cal. Aug. 19, 2013) (same).  But certification of

19  such claims typically requires the Plaintiff to identify "specific expenses or categor[ies] of expenses"

20  that were incurred uniformly (or are calculable based on a common formula) on a classwide basis,

21  and that the answers to section 2802's "necessity" and "direct consequence" inquiries will similarly

22  be subject to common proof across the class.  *See Giufu Li*, 2011 WL 4635198, at *14

23          Plaintiffs seemed to suggest in their papers, and again at the hearing, that the "main thing

24  that we're seeking" is reimbursement for vehicle operating expenses, such as gas, maintenance and

25  wear and tear.  *See* Oral Arg. Tr. at 92:24-25.  And Plaintiffs further suggested that the Court could

26  utilize the Internal Revenue Service's (IRS) mileage reimbursement rate to easily determine

27

28

                                                      27

damages on a classwide basis for their section 2802 claim.[12]  Such a class might be certifiable –

indeed, this Court has previously certified a class action on behalf of drivers who sought

reimbursement of vehicle operation expenses using the IRS reimbursement rate as the common

damages model.  *Stuart*, 2009 WL 281941, at *18; *see also Dalton*, 270 F.R.D. at 564 (certifying

class action on behalf of newspaper delivery drivers where damages would be determined on

classwide basis using IRS standard mileage allowance); *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42

Cal. 4th 554, 569 (2007) (explaining that the IRS reimbursement rate is considered a generally

permissible measure of vehicle operation expense for purposes of Labor Code section 2802).

However, when the named plaintiffs seek to waive other elements of damage on behalf of the class

in order to facilitate class certification, the Court must determine whether representation is adequate.

In particular, the Court must examine, *inter alia*, the relative magnitude of the damage elements

sought to be waived; where elements of damages for the class sought to be waived are substantial,

questions may be raised about the adequacy of representation.  *See Tasion Commc'n, Inc. v. Ubiquiti

Networks, Inc.*, -- F.R.D. --, 2015 WL 4734935, at *10 (N.D. Cal. 2015) (finding an "adequacy

problem" where "[p]laintiffs have failed to give any real explanation as to why they are willing to

abandon other kinds of compensable damages" where the value of the forgone damages is "likely to

exceed by many times" the measure of damages the plaintiffs actually sought); *Drimmer v. WD-40

Co.*, No. 06-cv-900 W(AJB), 2007 WL 2456003, at *5 (S.D. Cal. Aug. 24, 2007) ("A class

representative is not an adequate representative when the class representative abandons particular

remedies to the detriment of the class."); *Thompson v. Am. Tobacco Co., Inc.*, 189 F.R.D. 544, 550

(D. Minn. 1999).

      Plaintiffs here did not make any attempt to demonstrate that the monetary value of the other

types of expenses that they had previously sought to recover for absent class members in this

litigation, and now would be waiving in order to obtain class certification (*e.g.*, water bottles, gum

---

[12]  The IRS mileage reimbursement rate is calculated by the IRS "based on an annual study of the fixed and variable costs of operating an automobile, including depreciation, insurance, repairs, tires, maintenance, gas and oil."  *See* http://www.irs.gov/uac/Newsroom/New-Standard-Mileage-Rates-Now-Available;-Business-Rate-to-Rise-in-2015, last accessed August 18, 2015.

and mints for passengers, clothing, etc...),[13] were not so substantial so as to create a conflict of interest between the class representatives and class members. That is, Plaintiffs have not demonstrated (or even tried to demonstrate) that it is in the best interests of the absent class members to waive their claims for reimbursement of all their actual expenses (including actual vehicle operation expenses) that are not captured by the IRS mileage rate formula.

To be clear, the Court does not conclude that Plaintiffs could not make such a showing. For instance, Plaintiffs could submit an expert report or other evidence that shows that absent class members will be well served receiving the IRS mileage rate rather than receiving their actual damages. On the current record, however, the Plaintiffs have not provided the Court with sufficient information for it to be reasonably assured that what Plaintiffs purport to be giving up on behalf of the class members they seek to represent is not of such value to absent class members that the interests of those class members would be at odds with those of the named Plaintiffs. Thus, Plaintiffs have not established adequacy with respect to their expense reimbursement claim, and the claim cannot be certified at this time.

E.     The Rule 23(b)(3) Requirement of Predominance is Satisfied

Having satisfied the Rule 23(a) criteria for their Tips Claim, the Plaintiffs must next demonstrate that the proposed class claim meets the requirements of Rule 23(b)(3), which tasks the Court with determining whether common questions of law and fact predominate over individualized

---

[13] While it is somewhat unclear, it is possible that the Plaintiffs are not willing to waive recovery of all other types of expenses not encompassed in the IRS mileage rate. *See* Oral Arg. Tr. at 93:1-24. If that is the case, however, the Plaintiffs did not even begin to explain *how* the Court could certify such a class (or classes). Indeed, a significant flaw pervades many aspects of Plaintiffs' class certification papers: Rather than providing detailed proposals of how this Court might certify or try different class claims from the one Plaintiffs asked to be certified, Plaintiffs simply state without explanation that the Court could "use subclasses" or "employ" certain trial management techniques. That is, Plaintiffs put the burden on this Court to figure out precisely what claims (or portions of claims) might be certifiable. That is not an acceptable practice. The Court, facing a motion for class certification, must determine the nature of this proof and whether it is amenable to class treatment in adjudicating the motion, rather than deferring the question until trial. Nor does Plaintiff's trial plan, even if relevant, submitted for the first time at the hearing, cure this deficiency. First, the plan was untimely – Plaintiffs' motion for class certification was filed in April 2015. *That* was the time to submit detailed trial proposals and define possible subclasses, not on the day of the hearing. Moreover, Plaintiff's trial plan is still not sufficiently detailed regarding how or why this Court should engage in the types of subclassing or employ the various trial procedures Plaintiffs suggest.

1  issues, and whether class adjudication is superior to individual litigation of the Plaintiffs' claims.

2  Fed. R. Civ. P. 23(b)(3) (providing a court may certify a (b)(3) class if it "finds that the questions of

3  law or fact common to the class members predominate over any questions affecting only individual

4  members, and that a class action is superior to other available methods for fairly and efficiently

5  adjudicating the controversy").  "The predominance test of Rule 23(b)(3) is 'far more demanding'

6  than the commonality test under Rule 23(a)(2)."  *Villalpando*, 303 F.R.D. at 607 (quoting *Amchem*

7  *Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)).  Only where "common questions present a

8  significant aspect of the case and they can be resolved for all members of the class in a single

9  adjudication [is] there clear justification for handling the dispute on a representative rather than

10  individual basis." *Hanlon*, 150 F.3d at 1022 (citations omitted); *see also Edwards v. First Am.*

11  *Corp.*, -- F. 3d. --, 2015 WL 4999329, at *7 (9th Cir. Aug. 24, 2015).

12       Here, the Court must actually perform the predominance analysis twice.  First, the Court

13  considers whether common questions predominate over individualized issues with respect to the

14  employment misclassification claim.  "If they do not, then the inquiry ends there and class

15  certification should be denied." *Giufu Li*, 2011 WL 4635198, at *12.  "If, however, common

16  questions predominate the classification inquiry," the Court then considers Plaintiffs' individual

17  substantive claim "to determine whether [it] also pass[es] the predominance test." *Id.*; *see also*

18  *Norris-Wilson*, 270 F.R.D. at 606 (following same analytical protocol); *Villalpando*, 303 F.R.D. at

19  608 (same); *Soto v. Diakon Logistics (Del.), Inc.*, No. 08-cv-33-L(WMC), 2013 WL 4500693, at *8

20  (S.D. Cal. Aug. 21, 2013) (same).

21       1.    <u>Whether Class Members Are Employees or Independent Contractors</u>

22       The question of whether class members are employees or independent contractors under

23  California law turns on the application of the common-law test from *Borello*.[14]  As discussed above,

24  the *Borello* analysis proceeds in roughly two stages.  First, the fact-finder considers "the putative

25

26  _____

27       [14]  Plaintiffs suggest that this Court could apply an alternate test of employment under the
California Supreme Court's decision in *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010).  Reply Br. at
28  1 n.1.  The Court declines to do so at this juncture absent more definitive guidance from the
California Supreme Court or Ninth Circuit indicating that the *Borello* test should not apply here.

**United States District Court**
For the Northern District of California

1    employer's right to control work details." *Borello*, 48 Cal. 3d at 350.  Then the fact-finder considers

2    the various "secondary indicia" enumerated by the Supreme Court.  *Id.*

3            Recently, the California Supreme Court issued an comprehensive opinion clarifying what

4    putative class plaintiffs must show to demonstrate that the *Borello* test can be adjudicated on a

5    classwide basis.  *Ayala*, 59 Cal. 4th 522.   While the *Ayala* Court was considering the issue under

6    California's state-law class action rules, the predominance requirement discussed at length in *Ayala*

7    appears essentially identical to the predominance requirement under Rule 23(b)(3).  *Compare Ayala*,

8    59 Cal. 4th at 530, 532-33 *with* Fed. R. Civ. P. 23(b)(3).  Indeed, the California Supreme Court has

9    "stated that in determining whether a class action proponent has demonstrated a predominance of

10   common issues and manageability of the class, 'we may look to the procedures governing federal

11   class actions under rule 23 of the Federal Rules of Civil Procedure for guidance.'"  *Lockheed Martin*

12   *Corp. v. Super. Ct.*, 29 Cal. 4th 1096, 1121 (2003) (quoting *Washington Mutual Bank, FA v.*

13   *Superior Court*, 24 Cal. 4th 906, 922 (2001)); *see also Green v. Obledo*, 29 Cal. 3d 126, 145-46

14   (1981) (explaining that it is "well established that in the absence of relevant state precedents our trial

15   courts are urged to follow the procedures prescribed in rule 23 of the Federal Rules of Civil

16   Procedure for conducting class actions") (citations omitted).  Thus, while *Ayala*'s considered

17   discourse on the application of the predominance requirement in misclassification cases is not

18   binding on this Court, it is persuasive authority that has been followed carefully by other federal

19   courts.  *See, e.g.*, *Villalpando*, 303 F.R.D. at 608; *Bowerman II*, 2015 WL 1321883 at *9.

20           As the Supreme Court explained in *Ayala*, when evaluating predominance with respect to

21   California's common-law test of employment, the court "must determine whether the elements

22   necessary to establish liability [here, employee status] are susceptible to common proof or, if not,

23   whether there are ways to manage effectively proof of any elements that may require individualized

24   evidence."  *Ayala*, 59 Cal. 4th at 533 (alteration in original).  "Consequently, at the certification

25   stage, the relevant inquiry is not what degree of control [Uber actually] retained over the manner and

26   means" of its drivers' performance.  *Id.*  While under *Borello*, the question as to the extent of the

27   employer's right to control (as distinct from actual control) is one which goes to the merits (*see*

28   *Alexander*, 765 F.3d at 989; *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101-03 (9th Cir.

2014)), the question currently before the Court on class certification is "one step further removed: Is [Uber]'s right of control over its [drivers], *whether great or small, sufficiently uniform to permit classwide assessment*?" *Ayala*, 59 Cal. 4th at 533 (emphasis added). Put differently, "is there a common way to show that [Uber] possessed essentially the same legal right of control with respect to each of its [drivers]?" *Id.* Or, viewing the issue from the flip side of the same coin, did Uber's right to control its drivers "vary substantially, such that it might subject some [drivers] to extensive control as to how they [performed], . . . while as to others it had few rights and could not have directed their manner of [performance] even had it wanted, with no common proof able to capture these differences." *Id.* at 533-34. Thus, "[f]or class certification under the common law test, the key question is whether there is evidence a hirer possessed different *rights* to control with regard to its various hirees, such that individual mini-trials would be required." *Id.* at 536 (emphasis in original); *see also Villalpando*, 303 F.R.D. at 608-09; *Bowerman II*, 2015 WL 1321883, at *9.

          a.   <u>Uber's Control Over Driver Schedules</u>

Whether a putative employer has the power to dictate its hirees's work schedule is highly relevant to the right of control test. *See, e.g.*, *Alexander*, 765 F.3d at 989-990; *Arnold v. Mutual of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 589 (2011). Here, both parties agree that Uber does not control any of its drivers's schedules – all Uber drivers are free to work as much or as little as they like so long as UberBlack drivers give at least one ride every thirty days, and UberX drivers give at least one ride every 180 days. *See* Evangelis Decl., Ex. 46; *see also* Opp. Br. at 23 ("*All drivers* decide, based on their own preferences and availability, when and how much to work.") (emphasis added); Docket No. 319-3 (Uber Attorney Script) (internal document prepared by Uber's lawyers confirms that "Uber *never* sets drivers' schedules, [and] *never* requires them to log into the Uber App for any minimum amount of time") (emphases added); Docket No. 301 (McCrary Report) at ¶¶ 120-122.[15] Uber does not address this point in its papers, simply noting that "evidence that Uber

_____

[15] Uber's expert, Professor Justin McCrary, goes on at length about how some Uber drivers drive only part-time while others drive full-time, etc. What the Professor does not acknowledge, however, is that this is irrelevant for the class-certification analysis under *Borello*. The relevant question is Uber's *right* to control its drivers' schedules. Because it uniformly has no such control, it is not surprising that there are significant differences between class members with respect to the actual number of hours they spend driving for Uber.

United States District Court

For the Northern District of California

1  does not control drivers' schedules might weigh heavily in favor of a finding of independent

2  contractor status."  Opp. Br. at 19.  But while Uber is correct that this factor will likely weigh in its

3  favor on the merits, the fact that Uber admits that it exercises a *uniform* amount of control over its

4  drivers' work schedules (*i.e.*, none) benefits Plaintiffs at the class certification stage because it

5  proves that this factor can be adjudicated on a classwide basis.

6                    b.     Uber's Control Over Driver Routes or Territories

7        Uber similarly does not dispute that it uniformly exercises no control over where its drivers

8  work or what routes they take.  *See* McCrary Report at ¶¶ 119-127; Uber Attorney Script (admitting

9  that Uber "never assigns [drivers] a territory"); Docket No. 210-4 (Uber SJ. Mot.) at 20 (arguing that

10  it is "undisputed that" Uber "did not assign [Plaintiffs] a territory").  While this fact may support

11  Uber's position on the merits, it supports Plaintiffs' position at class certification because this factor

12  can be adjudicated on a classwide basis.

13                    c.     Pay Set Unilaterally by Uber

14        As a number of courts have recognized, bona fide independent contractors typically have the

15  power to set their own compensation or at least "negotiate for higher rates."  *Ruiz*, 754 F.3d at 1101.

16  By contrast, where the putative employer maintains a unilateral right to control the hiree's "salary,"

17  this supports a finding of employee status.  *See id.*

18        Here, Uber argues that some of its drivers have negotiated to receive higher fares from Uber,

19  but this is false.  As discussed in this Court's summary judgment order, the evidence is clear that

20  Uber sets its drivers' pay without any input or negotiation from the drivers.  *O'Connor*, 2015 WL

21  1069092, at *7; *see also* Docket No. 313-5 (Coleman Depo.) at 165:2-21 (Uber 30(b)(6) deponent

22  testified that he is "not aware of any negotiations that may have happened" between Uber and its

23  drivers regarding prices); *id.* at 168:3-7 ("Uber sets the prices that are offered to riders and offered to

24  drivers as well.  It's certainly within either of their rights to use the system or not use the system to

25  get connected with one another.").  Indeed, Uber's own expert recognizes that "Uber is at liberty to

26  charge the referral rate it deems appropriate."  McCrary Report at ¶ 169.  Uber's arguments to the

27  contrary, therefore, are wholly without merit.

28

United States District Court

For the Northern District of California

Uber suggests that it "uses 'surge pricing' as a form of negotiation to bid up compensation and entice drivers to log in and accept ride requests." Opp. Br. at 24. Even if true, this is not evidence that Uber does not unilaterally maintain the right to control it drivers' compensation, or that drivers can actually negotiate over their compensation with Uber. The evidence is undisputed that, as with its "normal fares," the "surge pricing" fare is unilaterally set by Uber, not by individual drivers – there is no "negotiation" between Uber and Uber drivers over fares. If Uber wants to raise prices, it raises prices. If Uber wants to lower prices, it lowers prices. Put simply, it is Uber that sets the price, and drivers either accept Uber's offered piece rate or do not. *See* McCrary Report at ¶ 140 (Uber's expert notes that *all* drivers "earn money piece rate when they take driving jobs").

Uber's alternative suggestion similarly misses the mark. Uber suggests that drivers have the power to negotiate their own fares *with riders* because they can turn off the Uber application before a ride is complete. As Professor McCrary put it, quoting from one of Uber's 400 driver declarations, certain Uber drivers may be "'very soft-hearted and [] will give people a few miles for free. I will turn off the app and let them have a few free miles if I've enjoyed the conversation and we've had a nice time.'" McCrary Report at ¶ 143. Of course, Uber does not submit proof to indicate how many of its drivers are "very soft-hearted," or how many regularly turn off the meter early as some sort of price negotiation.[16] In any event, to suggest that Uber drivers' alleged right to turn off the meter before a ride is over – which right, by the way, Uber seems to admit is uniformly possessed by *all* Uber drivers – is proof of the drivers' power to negotiate their compensation with Uber is incorrect: The fact that an Uber driver can theoretically negotiate with *her passenger* to accept a lower fare than that passenger would otherwise be charged says nothing about that driver's power to negotiate fares with her putative employer – Uber.[17] There can simply be no dispute that Uber does not let any

---

[16] Exhibit 15 to the Evangelis Declaration lists certain declarants who have "accepted less than the maximum fare," but most of these drivers stated that they have turned off the meter early once or a handful of times, and most stated that they did so because they had made a "mistake," such as taking a wrong turn, and thus the fare amount otherwise would have been too high.

[17] Uber also seems to suggest that drivers negotiate their fares with Uber because Uber allows them to request "fare adjustments (*e.g.*, to reflect multiple stops on a route)." Opp. Br. at 24. Even assuming this is true, Uber does not argue that it permits some drivers to request fare adjustments while prohibiting others from doing so (*i.e.*, exercises a different right of control over different drivers). Thus Uber's argument is not well-taken at the class certification stage.

United States District Court

For the Northern District of California

of its drivers negotiate their compensation – fares are unilaterally determined by Uber. *See also*

Opp. Br. at 24 (admitting that Uber does not allow drivers to charge more than the "maximum [fare]

set by the App"). Uber's uniform and unilateral right to control its drivers' compensation is

important common proof that bears directly on the class members' work status.

        d.     Use of Third-Party Applications

Uber claims in its opposition brief that "Uber does not limit drivers' ability to seek and

obtain employment with third-party employers . . . ." Opp. Br. at 7. Indeed, in the script Uber's

attorneys used to solicit driver declarations, Uber admitted that it "*never* restricts [drivers] from

engaging in another occupation or business, and *never* restricts them from simultaneous use of other

apps like Lyft and Sidecar."[18] Uber Attorney Script at 1 (emphases added). If true, this would

support an independent-contractor determination on the merits. *See, e.g.*, *Ali v. U.S.A. Cab Ltd.*, 176

Cal. App. 4th 1333, 1349 (2009) (recognizing that a putative employee's right to work for other

firms is indicative of an independent contractor relationship). For the purposes of class certification,

however, what is relevant is that Uber acknowledges that it retains the exact same right of control

over all of its drivers with respect to their ability to work for other companies like Lyft and Sidecar –

none. Thus, this factor can easily be adjudicated on a classwide basis.

---

[18] In passing, Uber suggested that certain of its contracts purport to forbid drivers from using the Uber application and competitor applications "simultaneously." Opp. Br. at 6. This is hard to square with Uber's own contentions elsewhere that it "never restricts [drivers] from simultaneous use of other apps like Lyft and Sidecar." Uber Attorney Script at 1. Indeed, Uber argued in its earlier summary judgment motion that it is "undisputed that, consistent with [their contracts], Defendants . . . . did not restrict [named Plaintiffs] from using other similar lead generation services simultaneously with the Uber App, and did not restrict them from engaging in any other occupation or business." Uber SJ. Mot. at 20. Notably, at least two of the named Plaintiffs (Manahan and Gurfinkel) whose claims were at issue at the summary judgment stage were bound to versions of Uber's contracts that Uber now tries to suggest actually *did* "restrict them from using other similar lead generation services simultaneously." *Id.*; *see also id.* at 1 ("Transportation providers may use the Uber App as much or as little as they like, while continuing to service their regular clients or passengers acquired from any other source – including from competing services like Sidecar and Lyft . . . .") (emphasis omitted). Uber cannot have it both ways. The Court finds that [there is no evidence] that Uber has actually maintained or exercised a right to control its drivers to prevent them from driving for other third-party transportation providers. Rather, as Uber itself has repeatedly argued, Uber uniformly maintains no control over whether its drivers can use competing applications. Although there were some contracts which prohibit "simultaneous use" of competitor applications, Uber has presented no evidence that Uber has ever enforced these provisions.

e.    Star Ratings, Monitoring of Driver's Performance And Compliance With
      Uber's Training "Requirements" or "Suggestions"

The evidence shows that Uber provides its drivers with various training materials when they first sign up to become drivers during a process Uber calls "onboarding." Uber admits that *all* drivers "must attend" some onboarding training "before they begin to use the Uber App," Opp. Br. at 5, but claims that the content of these training sessions has varied considerably from city to city and over time. Thus, Uber claims that determining what "suggestions" it has given its drivers regarding how to perform well as an Uber driver cannot be manageably analyzed on a classwide basis. This argument misses the point, however. As the California Supreme Court has made clear, whether Uber "varied in how it exercised control does not answer whether there were variations in its underlying *right* to exercise that control . . . ." *Ayala*, 59 Cal. 4th at 534 (emphasis in original). The fact that some Uber drivers in 2009 may have been trained to drive with their radio set to NPR or smooth jazz, while in 2013 others were told (or, as Uber prefers, "suggested") to drive with their radio off or set to a classical music station, does not determine whether Uber uniformly maintained the right and power to actually monitor and enforce its drivers' compliance with whatever "requirements" or "suggestions" Uber gave, regardless of their precise content. *See, e.g.*, Docket No. 223-6 (undated Uber SF Onboarding Script including statements such as "[m]ake sure the radio is off or on soft jazz or NPR," and "You should NOT contact the client for any reason AFTER the trip, except for lost items"); Docket No. 223-20 (undated Uber training materials stating, among other things, "no papers in visor," "front seat forward," "rims are spotless," and telling drivers not to "forget to shower"). In any event, there is evidence in the record of Uber promulgating some consistent and significant rules that have applied to all drivers throughout the class period. *See, e.g.*, Docket No. 223-13 at 8 (Uber prohibits "client solicitation" or otherwise asking an Uber "client to become a client of your private car service business").

Uber's right to control its drivers' actual performance can be evaluated on a common basis by considering Uber's uniform ability to monitor that performance. Uber does not dispute that it collects extensive performance data regarding *all* of its drivers, and asks riders to rank *all* drivers' performance after each ride on a one-to-five scale. *See, e.g.*, Coleman Decl., Ex. K at § 11.2

36

(contract providing Uber the right to "collect, use, and share precise geo-location data" of its drivers

for the "analytical, marketing and commercial purposes of Uber"); *id.* at § 4.3.3 (contract providing

that "Uber utilizes a five-star rating system designed to allow the Users of its Software to provide

feedback on the level of service provided" by its drivers and stating that "there is a minimum star-

rating Drivers must maintain to continue receiving access" to the Uber application).  Uber does not

claim that only some of its drivers are subject to such monitoring while others are not – rather, *all*

Uber drivers are subject to being monitored via star ratings and Uber's application data.  Such

evidence of employee monitoring is relevant to the "right to control" inquiry, *see Alexander*, 765

F.3d at 990, and the fact that Uber has a uniform right to monitor its drivers' performance supports

adjudicating the misclassification question on a classwide basis.  *Ayala*, 59 Cal. 4th at 536.

There can be no dispute – Uber maintains a uniform ability to monitor certain aspects of its

drivers' performance, principally through the star rating system and other rider feedback provided to

Uber through the application, and the evidence further shows that Uber actually uses this

information to reprimand or terminate drivers who do not meet Uber's standards.  *See, e.g.*, Docket

No. 238-2, Ex. 23 (Uber spreadsheet listing drivers who received performance warnings or were

deactivated from the Uber application because of low star ratings or as a result of other complaints

Uber received from riders through the application); Docket No. 238-5, Ex. 27 (email from Uber

terminating driver, and explaining that Uber makes its termination decision "based heavily on

feedback from our customers.  Unfortunately, with a rating of 4.1 stars, your account is in the

bottom 5% of our active drivers, and with a number of outstanding client issues we had no choice

but to deactivate [your account]"); Docket No. 223-24 (email from Uber threatening driver with

termination for accepting cash tips).  Thus, common evidence probative of Uber's right to monitor

and control driver's performance weighs in favor of class certification.

### f.    Uber's Right to Terminate Without Cause

As noted above, a putative employer's right to discharge a hiree at will, without cause, is

"[p]erhaps the strongest evidence of the right to control."  *Ayala*, 59 Cal. 4th at 531.  Here, Plaintiffs

contend that Uber has uniformly retained the right to discharge all of its drivers at will, citing

provisions in Uber's contracts with its drivers that purport to give Uber that very right.  To the

extent that Uber has uniformly retained a right to discharge its drivers at will in its standardized

form contracts, this factor weighs heavily in favor of class certification. *See Ayala*, 59 Cal. 4th at

534 (explaining evidentiary importance of form employment contracts); *Villalpando*, 303 F.R.D. at

608 (recognizing that "uniform contracts are a significant focus of the 'right to control' inquiry")

(citing *Alexander*, 765 F.3d at 989-94 and *Ruiz*, 754 F.3d at 1102).

Uber argues that Plaintiffs cannot manageably show that Uber retained a uniform right to

terminate its drivers at will for at least two reasons. First, Uber argues that there are simply too

many contracts – seventeen different versions in all – that could have possibly governed the

relationship between Uber and the class members. *See* Opp. Br. at 14. More importantly, however,

Uber claims that the various provisions of these 17 agreements changed materially over time. For

instance, Uber claims that in eight of the seventeen contracts, the parties "reserve a *mutual* right to

terminate for both Uber and the driver,"[19] while in "other agreements" Uber solely "reserve[s] a right

to terminate for specific misconduct and require[s] a minimum amount of notice," while "[s]till

others provide Uber a unilateral right to terminate at will." Opp. Br. at 16 (emphasis in original).

Uber's characterization of its contracts with its drivers is inaccurate.

Of the seventeen contracts, fifteen have been promulgated since 2013. Careful review of

these contracts shows that *each one* contains at an at-will termination clause, although the precise

language employed is somewhat different between some of the contracts. For instance, the July

2013 Software License and Online Services Agreement provides that "[t]his Transportation

Company Agreement shall commence on the date this Agreement is accepted, for an indefinite

period of time, unless terminated by either party by written notice with due observance of a notice

---

[19] Uber argues that contracts which provide a *mutual* right to terminate at will are "evidence of an independent-contractor" relationship and thus are somehow distinguishable from contracts that only provide the employer with a right to terminate at will, which contracts would indicate an employment arrangement. Uber is incorrect. The driver's right to terminate at will is indicative of employee status. The California Supreme Court in *Ayala* recognized that a bona fide independent contractor cannot terminate the agreement at will – if he was truly a *contract*or he would have to finish out his contract or pay damages to Uber for early termination. *Ayala*, 59 Cal. 4th at 531 n.2. Thus, the fact that some Uber agreements expressly provide that a driver has the right to quit at will, while others are silent on this issue does not suggest there is any real variation in driver's rights. There is no contractual provision restricting a driver's right to quit or imposing any penalty therefor. Uber has presented no evidence that it has ever sought contract damages from a driver who stopped driving for Uber, or that it has even contemplated doing so.

United States District Court

For the Northern District of California

1   period of seven (7) calendar days." Coleman Decl., Ex. D at § 9.1; *see also id.* at Ex. H at §

2   9.1(same language in December 2013 version of contract); *Id.*, Ex. K at § 9.1 (same language in

3   June 21, 2014, version of contract); *id.*, Ex. P at § 12.2 (November 2014 Rasier agreement providing

4   that either party may terminate "without cause at any time upon seven (7) days prior written

5   notice"); *id.*, Ex. Q at § 12.2 (same language in April 2015 Uber agreement). Similarly, various

6   Rasier "Transportation Provider Service Agreements" provide that the contract may be terminated

7   "[b]y either party without cause upon thirty (30) days' prior written notice to the other party." *Id.*,

8   Ex. C at 10; *see also id.*, Ex. F at 9 (same); *id.*, Ex. G at 9 (same); *id.*, Ex. J at 9 (same); *id.*, Ex. M at

9   10 (same). Thus, for eleven of the seventeen potential contracts, Uber clearly retained a uniform

10  right to unilaterally terminate its drivers without cause, the only difference being whether Uber was

11  required to give seven or thirty days notice of its unilateral termination decision.[20]

12      Uber similarly retained a unilateral termination right in its four "driver addenda." Three of

13  these driver addenda provide that "Uber reserves the right, at all times and at Uber's *sole discretion*,

14  to reclaim, prohibit, suspend, limit or otherwise restrict the Subcontractor from accessing or using

15  the Driver App or the Device if the Transportation Company or its Drivers fail to maintain the

16  standards of appearance and service required by the users of the Uber Software." Colman Decl., Ex.

17  E at § 2.1 (emphasis added); *id.*, Ex. I at § 2.1 (same); *id.*, Ex. L at at § 2.1 (same). And the fourth

18  driver addendum similarly provides Uber the right to unilaterally terminate drivers without cause,

19  providing that a "[d]river may be deactivated or otherwise restricted from accessing or using" the

20  Uber application for any "reason at the reasonable discretion of Uber." *Id.*, Ex. O at at § 2.3. Put

21  simply, the driver addenda permit Uber – in either its "sole" or "reasonable" (but either way

22  unreviewable) discretion – to terminate a driver with no notice whatsoever.

23      At bottom then, fifteen of the seventeen potentially applicable contracts in this case (and *all*

24  of the contracts issued to drivers from roughly February 2013 onwards) contain express language

25  that provides Uber with a right to terminate *any* and *all* drivers without cause. The only variation

26  between the contracts is immaterial under the "right-of-control" test – whether Uber can fire its

27  _____

28      [20] Uber does not argue or cite any authority indicating that this difference is somehow
material to the employment classification question under either *Borello* or *Ayala.* It is not.

39

1  drivers at will without notice, with only seven days notice, or with thirty days notice. *See Shepard*,

2  2013 WL 4488802, at *4 (noting that while there were "minor differences among the contracts for

3  the types of installers and . . . [provisions which] changed over time, the variations do not effect the

4  issue of Defendant's right to control") (citation and internal quotation marks omitted).  And even if

5  these differences were somehow potentially material, Plaintiffs have presented evidence that Uber

6  does not in practice differentiate between contracts in terminating drivers. *See* Docket No. 313

7  (Liss-Riordan Decl.), Ex. 3 (Graves Depo.) at 185:25-186:8 (testimony of Uber's former CEO that

8  he is not aware of Uber having any method to ascertain which of its seventeen contracts applies to a

9  given driver in order to determine "whether or not that driver can be deactivated in Uber's

10  discretion").  The fifteen contracts the Court has discussed are therefore probative common proof

11  that Uber has maintained a uniform right to unilaterally terminate its drivers without cause

12  throughout much of the class period.

13          This leaves for consideration only the two additional contracts that were in place between

14  Uber and its drivers until early 2013. *See* Colman Decl., at Exs. A and B.  Uber notes that these

15  contracts are entirely silent as to whether Uber had the right to unilaterally terminate its drivers. *See*

16  Evangelis Decl., Ex. 53 (conceding that these contracts do not say one way or another whether Uber

17  could terminate a driver without cause).  This is not helpful to Uber, however, because California

18  law is clear that there is a "statutory presumption of at-will employment" where an agreement is

19  otherwise silent as to whether the employer can only terminate with cause. *See Guz v. Bechtel Nat.*

20  *Inc.*, 24 Cal. 4th 317, 335 (2000) (describing California's statutory presumption); Cal. Lab. Code §

21  2922 ("An employment, having no specified term, may be terminated at the will of either party on

22  notice to the other.").  Neither of Uber's pre-2013 contracts contain a for-cause termination

23  requirement, and neither have a "specified term." *See* Colman Decl., at Exs. A and B.  Thus, Uber

24  retained a uniform right to terminate all of its drivers at will under these contracts as well.[21]

25  _____

26          [21] Other evidence in the record supports the Court's conclusion that Uber has always
    maintained a uniform right to fire its drivers without cause.  For instance, as noted above, Uber's

27  former CEO testified that he is unaware of any system that would permit Uber to determine what its
    contractual duties are vis-á-vis termination with respect to any individual driver.  Graves Depo. at

28  185:25-186:8.  Moreover, Plaintiffs have submitted evidence that indicates Uber has actually
    exercised its right to terminate at will. *See, e.g.*, *O'Connor*, 2015 WL 1069092, at *7 (citing

United States District Court

For the Northern District of California

1    In sum, all seventeen of Uber's contracts provide Uber with the right to unilaterally terminate

2    its drivers without cause.  This common proof will allow this important factor in the *Borello* test to

3    be analyzed on a classwide basis without individualized inquires.  Thus, this factor weighs heavily

4    in favor of class certification.

5              g.       *Borello*'s Secondary Factors

6    Uber also argues that analysis of the *Borello* secondary factors is not possible on a classwide

7    basis.  Uber is wrong.  In fact, it appears every single *Borello* secondary factor can be adjudicated on

8    a classwide basis using common proof.

9                        i.       Whether The One Performing Services is Engaged in a Distinct

10                               Occupation or Business

11   Uber strenuously argues that a class cannot be certified here because the very first *Borello*

12   factor is not subject to resolution with common proof across the class.  Uber's argument is correct

13   up to a point.  The Plaintiffs' original proposed "mega-class" of all Uber drivers who have ever

14   driven for Uber since 2009 likely cannot be certified because, as Uber persuasively argues, there

15   would be tremendous (and likely material) variance between those class members who held

16   themselves out as a distinct business – or contracted to drive for Uber indirectly through a distinct

17   third-party business that had itself contracted with Uber to provide driving services – and those who

18   did not.[22]  For instance, Uber rightly argues that putative class member Mark Forester and named

19   Plaintiffs Manahan and Gurfinkel are very differently situated with respect to the first *Borello* factor.

20   While Manahan and Gurfinkel signed up to be UberX drivers directly with Uber, are paid directly by

21   Uber for their services, and do not hold themselves out as distinct business entities, Forester is a

22   driver and part owner of a formally incorporated transportation company that has hired 34

23   _____

24   evidence); Docket No. 238-3; Docket No. 238-5; Docket No. 238-2.  Uber, by contrast, has not
     presented even a scintilla of evidence showing that it has ever been (or even felt) constrained in its
25   right to terminate at will.

26        [22]  The Court does not find that there is any individual variation with respect to the "distinct
     occupation" portion of the first *Borello* secondary factor.  The Court has already held that Uber is in
27   the transportation business as a matter of law, and it is similarly beyond dispute that its drivers are in
     the transportation business as well.  Thus there can be no doubt that the "one performing services"
28   here is not "engaged in a distinct occupation" from Uber, and that this answer is common for all
     class members.  This is different than having a "distinct business."

United States District Court

For the Northern District of California

1   "employee-drivers who operate a fleet of 12 vehicles" who all use the Uber application.  *See* Uber

2   Hearing Slides at 4.  The Court cannot conclude that a jury would necessarily reach the same result

3   under the common-law test of employment with respect to Uber drivers like Mr. Forester and drivers

4   like Mananhan and Gurfinkel.[23]  *See, e.g.*, *Bowerman v. Field Asset Servs., Inc.*, No. 13-cv-0057-

5   WHO, 2014 WL 4676611, at *10 (N.D. Cal. Sept. 17, 2014) (*Bowerman I*) (initially denying class

6   certification for want of predominance, and remarking that "[i]t is critical to me" that some proposed

7   class members "have independent businesses and do not work full time for [Defendant]"); *Sotelo v.*

8   *MediaNews Group, Inc.*, 207 Cal. App. 4th 639, 657-68 (2012) (affirming denial of class

9   certification where the trial court had found a materially significant difference between proposed

10  class members with respect to the "distinct business" *Borello* factor).

11          Nor can the Court say with confidence that a driver like putative named Plaintiff Colopy –

12  who is not actually a member of the class being certified herein – is sufficiently similar to Gurfinkel

13  and Manahan to conclude that the first *Borello* test would have a common answer between these

14  three drivers.  Colopy drove for Uber through two different independent limousine companies that

15  had themselves contracted to provide services to Uber.  He did not drive exclusively Uber – Colopy

16  also provided transportation services to the limousine companies' clients.  *See* Colopy Depo. Tr. at

17  59:16-60:16.  By contrast, Manahan and Gurfinkel contracted directly with Uber and are paid

18  ///

19  ///

20  ///

21  ///

22  ///

23  _____

24      [23]  That is not to say that Forester or those who subcontracted with him to perform driving
    services for Uber *cannot* be Uber's employees.  *Cf. Martinez*, 49 Cal. 4th at 72-74 (explaining that
25  where a contractor is a firm's employee, there is a "strong possibility, generally speaking, that the
    contractor and its employer jointly employ the contractor's employees") (citation omitted).  What
26  the Court decides today is simply that Plaintiffs have failed to establish sufficient commonality of
    proof to adjudicate the claims of these subcontracted drivers with the claims of those drivers who
27  contracted directly with Uber to perform services.  Should Plaintiffs still seek to certify an additional
    class or subclasses that includes drivers like Forester and his subcontractors, the parties should
28  properly address the issue of joint employment and how that might impact the class certification
    analysis.

United States District Court

For the Northern District of California

1    directly by Uber.[24]  While the Court will not prejudge the issue, it seems at least plausible that a jury

2    could find this type of variation in circumstances material to the *Borello* analysis.

3        That is not to say that the Court is necessarily foreclosing class certification for drivers who

4    drove for third-party transportation companies, although further subclassing might be necessary if

5    Plaintiffs are to demonstrate that an additional class (or classes) of such drivers can be certified

6    under Rule 23(b)(3).  For instance, Uber has submitted evidence that some portion of its drivers who

7    drive through third-party transportation companies only render service to Uber clients, or service

8    substantially more Uber clients than clients obtained through other sources.  *See, e.g.*, Docket No.

9    307 at 394 (Ezzikhe Decl.) (indicating that "100% of my business comes from leads generated

10   through the Uber App"); *id.* at 452 (Gebretensia Decl.) (same); *id.* at 470 (Girma Decl.) ("The Uber

11   app makes up about 90% of my business"); *id.* at 286 (Collins Decl.) (same).  While such drivers

12   technically drive for distinct businesses, in reality they appear to be largely (if not entirely)

13   economically dependent on Uber for their livelihoods.  *See, e.g.*, *Messenger Couriers Ass'n of Am.*

14   *v. California Unemployment Ins. Appeals Bd.*, 175 Cal. App. 4th 1074, 1092 (2009) (suggesting that

---

16       [24]  The Court finds that there is a material difference under *Borello* between drivers who
17   drove as subcontractors for firms that themselves contracted directly *with Uber* to provide
     transportation services for Uber, and drivers who individually contracted with Uber and have also
18   individually contracted with Uber's competitors such as Lyft or Sidecar.  While drivers in the former
     category at least initially appear to be engaged in a "distinct business" that is selling its services to
19   Uber (and potentially other clients), drivers in the later category more closely resemble individual
     workers who simply labor for two or more entities.  To use a hypothetical, drivers like Colopy may
20   more closely resemble workers who labor for a catering company and are assigned jobs with the
     catering company's clients.  Drivers like Manahan and Gurfinkel, however, more closely resemble
21   fast-food workers who may work shifts at both Burger King and McDonald's.  In contrast to an
     individual who holds two jobs, one having a distinct business, such as a consulting firm, that serves
22   many clients (as opposed to a single putative client), is a factor utilized by courts and agencies under
     both California law and in other contexts when considering independent contractor status.  *Compare*
23   *Bowerman I*, 2014 WL 4676611, at *11 (finding that distinct business factor under *Borello*
     materially varied where "[s]ome vendors have many clients; some only FAS") *with Bowerman II*,
24   2015 WL 1321883, at *10-11 (granting class certification where revised class only included
     "vendors who work for FAS at least 70 percent of the time" and thus "are substantially dependent on
25   FAS for their revenue").  *See also* Department of Labor Administrator's Interpretation No. 2015-1,
     2015 WL 4449086, at *4-5, 8 (noting that "courts have described independent contractors as those
26   workers with economic independence who are operating a business of their own" and further noting
     that "[a]n independent contractor typically makes investments that support a business as a business
27   beyond any particular job"); *Brock v. Super. Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)
     (explaining that under the FLSA test, which was partially incorporated into the California law test in
28   *Borello*, the "ultimate concern is whether, as a matter of economic reality, the workers depend upon
     someone else's business for the opportunity to render service or are in business for themselves").

United States District Court

For the Northern District of California

1   the *Borello* analysis requires the court to consider "criteria such as the economic dependence of the

2   worker" on the putative employer).  By contrast, other Uber drivers who work for third-party

3   transportation companies may derive a much smaller portion of their business from Uber.  *See, e.g.*,

4   Docket No. 307 at 378 (Enriquez Decl.) ("I would say that 30% of my revenue comes from Uber.");

5   *id.* at 45 (Alshara Decl.) (same).  While the Court is not currently willing to certify these drivers as a

6   group as class members, it is possible Plaintiffs could demonstrate that some such drivers could

7   participate in a class action via an appropriately defined subclass or subclasses where there are no

8   material variations within such subclass.  At this point in the litigation, the Court is simply holding

9   that drivers who drove for third-party transportation companies cannot as a group be members of the

10  same class as Uber drivers who contracted with Uber directly, and did not operate or work for a

11  distinct business entity while driving for Uber.[25]

12      At the hearing, Plaintiffs belatedly proposed certain subclasses that they claim could

13  eliminate any predominance issues with respect to drivers who serve Uber clients through third-

14  party transportation companies.  For instance, Plaintiffs suggested that the Court could certify a

15  subclass of all drivers who operated or worked for a third-party transportation company and who

16  performed services for Uber full-time (*e.g.*, 30 or more hours per week).  While it is conceivable that

17  a group of such drivers who drive essentially full time (however that is defined) for Uber may

18  present a subclass that meets commonality and predominance requires (*see Bowerman II*, 2015 WL

19  1321883, at *1, 10-11), the Court today denies Plaintiffs' request to certify such a subclass (or other

20  possible subclasses) without prejudice.  Plaintiffs have not met their burden to demonstrate that such

21  a class would be certifiable.  Notably, Plaintiffs have not offered a concrete proposal regarding how

22  the members of any such subclass (or classes) could be identified for ascertainability purposes.  For

23  example, Plaintiffs have not submitted any proof that they could objectively identify all drivers who

24

25      [25] To be clear, the Court is also not holding that differences between class members

26  regarding the "distinct business" *Borello* factor will always be sufficiently material to the
    classification analysis to derail class certification in every case.  As noted elsewhere in this Order,

27  the *Borello* factors must be considered on a case-by-case basis.  The fact that in *this specific case* the
    Court finds that this *Borello* secondary factor may well have a significant impact on the merits and

28  thus informs the scope of the class to be certified does not require a similar finding by a different
    court faced with different facts.

**United States District Court**

For the Northern District of California

1   drove for Uber more than 30 hours per week.  Alternatively, if a subclass were to be defined by the

2   percentage of rides given to Uber customers versus customers obtained from other sources, Plaintiffs

3   have not shown that they could objectively determine whether a driver was more like Ezzikhe or

4   Gebretensia (*i.e.*, drive solely for Uber) or more like Enriquez or Alshara (*i.e.*, drive for Uber about

5   30% of the time).

6          Importantly, the possible predominance problems identified immediately above do not affect

7   the class certification analysis for the class the Court is actually certifying herein.  Specifically, the

8   class as defined does not present a predominance problem with respect to the "distinct business"

9   factor because all drivers who operated or drove for a third-party transportation company – as

10  opposed to driving directly for Uber itself or one of its wholly-owned subsidiaries – are currently

11  excluded from the class defined in this order.  Clearly, there can be no material classwide variation

12  with respect to the "distinct business" *Borello* factor to the extent that all drivers who signed up to

13  drive for Uber as a "distinct business,"[26] or who drove as purported subcontractors for a distinct

14  business entity that contracted directly with Uber, are not members of the class.  The members of the

15  class consist solely of those who do not operate a distinct business in their relationship with Uber.

16  Thus, with respect to the class actually being certified, the Court finds that the first *Borello* factor

17  can be proved with common proof, and Rule 23(b)(3)'s predominance requirement is met.

18                  ii.      The Kind of Occupation, With Reference to Whether, in The Locality,

19                          The Work is Usually Done Under The Direction of The Principal or by

20                          a Specialist Without Supervision

21          There can be no question that the answer to this *Borello* secondary factor will be common to

22  all class members.  Here, the "kind of occupation" at issue (*i.e.*, driver) is the same for every class

23  member.  And Uber has presented no evidence that drivers in some locations are typically

24  supervised while they drive, while drivers in other locations are "specialists" who can drive without

25  supervision.  Indeed, Uber argued at summary judgment that each named Plaintiff was a specialist

26  who drove passengers without supervision.  Uber SJ. Mot. at 24.  The named Plaintiffs drove for

27  _____

28          [26]  *I.e.*, they signed up for Uber and/or are paid in a fictitious/corporate name, instead of as
    an individual.

45

United States District Court
For the Northern District of California

1    Uber in San Francisco, Los Angeles, and San Diego, respectively.  Uber essentially concedes it does

2    not believe that the second *Borello* factor varies by location; it certainly has presented no evidence

3    of such variation.  The second *Borello* factor will have a common answer to all class members.  *See*

4    *Ayala*, 59 Cal. 4th at 538 ("In a case where every class member performs the same tasks, some

5    factors will *always be common*, such as the kind of occupation and the skill it requires.") (emphasis

6    added) (citation omitted).

iii.    The Skill Required in The Particular Occupation

8          The third *Borello* factor will also have a common answer for all class members.  All Uber

9    drivers share the same occupation (driver), and Uber does not argue that the "skill required" of its

10   drivers varies from driver to driver or location to location.  Nor is there evidence in the record that

11   the level of skill required of Uber drivers varies between class members.  For instance, Uber does

12   not require a special type of license for any of its drivers.  This factor can be adjudicated on a

13   classwide basis.

iv.    Whether The Principal or The Worker Supplies The Instrumentalities,
       Tools, And The Place of Work For The Person Doing The Work

16         The fourth *Borello* secondary factor can be adjudicated on a classwide basis.  There is no

17   dispute that all drivers have to provide their own vehicles.  *See, e.g.*, McCrary Report at ¶ 151

18   ("Uber does not provide drivers with a vehicle.").  Similarly, there is no dispute that Uber does not

19   provide a "place of work" for its drivers.  Uber drivers work in the cars that they themselves

20   provide.

21         Indeed, the *only* equipment Uber offers to its drivers is a smartphone to access the Uber

22   application.  McCrary Report at ¶ 151.  Not all Uber drivers take Uber up on this offer – some

23   provide their own phones, while others lease a phone through Uber.  *Id.*  On the current record, it is

24   unclear whether the number of Uber drivers who lease a smartphone from Uber is large (*e.g.*, 50% of

25   the class) or small (*e.g.*, 1% of the class).  If it is the latter, any individual variation would have

26   minimal impact on class certification.  Moreover, the fact that some drivers lease the phone from

27   Uber does not mean that Uber is providing the phone; if the driver has to pay for the use of the

28   phone, as a financial matter, it is the driver, not Uber that is supplying the phone.  And even if there

**United States District Court**
For the Northern District of California

1   were significant classwide variation as to who actually provides a driver's smartphone, this issue

2   simply is not sufficiently material to be an impediment to class certification. *See Ayala*, 59 Cal. 4th

3   at 539 (holding that "[w]hen the issue of common law employment is involved," the weighing of

4   *Borello*'s secondary indicia "must be conducted with an eye to the reality that the considerations in

5   the multi-factor test are not of uniform significance . . . . The proper course, if there are individual

6   variations in parts of the common law test, is to consider whether they are likely to prove material").

7       As the cases make clear, the real heart of the inquiry under the fourth *Borello* secondary

8   factor is the *relative* investment in equipment as between the putative employer and the laborer. *See*

9   *Alexander*, 765 F.3d at 995 (finding that this *Borello* factor favored FedEx because drivers provided

10  the more costly equipment, such as delivery trucks, while FedEx made significantly less expensive

11  equipment available to drivers, such as package scanners); *Borello*, 48 Cal. 3d at 346, 355, 357

12  (requiring the Court to consider the "employee's investment in equipment or materials required for

13  his task," and noting in that specific case that the sharefarmers "invest nothing but personal service

14  and hand tools," whereas the putative employer made significant investments in land, transportation

15  of crops to market, and the like); Restatement (Second) of Agency § 220 cmt. k (noting that "if the

16  worker is using his employer's tools or instrumentalities, *especially if they are of substantial value*, .

17  . . this indicates that the owner is a master") (emphasis added); *see also* Department of Labor

18  Administrator's Interpretation No. 2015-1, 2015 WL 4449086, at *7-8 (explaining that courts in the

19  analogous FLSA context "consider the nature and extent of the relative investments of the employer

20  and the worker"). Here, the relative investment in tools and equipment is reasonably discernable on

21  a classwide basis – all drivers invest considerably more in tools and equipment by obtaining their

22  own vehicle than Uber does by arguably providing certain of its drivers with a smartphone. Thus,

23  the Court finds that the fourth *Borello* factor can be adjudicated on a classwide basis.

24          v.    The Length of Time For Which Services Are to be Performed

25      Uber argues that this *Borello* factor cannot be adjudicated on a classwide basis because

26  "[d]rivers' usage of the Uber App varies dramatically. Some rarely use the App . . . [while] [o]thers

27  use the Uber App more than 60 hours per week." Opp. Br. at 4. This argument is meritless with

28  respect to this factor for at least two reasons.

First, it is irrelevant.[27]  This *Borello* factor does not ask whether a hiree's shift is long or short (*i.e.*, whether the average hiree works 5 hours per week or 75); rather the focus is on whether the duration of the putative employment *relationship* is extended and open-ended, or short and specified.  See *Alexander*, 765 F.3d at 996; *Narayan*, 616 F.3d at 903.  The fifth *Borello* factor asks the fact-finder to evaluate the "length of time for which services are *to be* performed," not the length of time for which services *are* performed within a given day or workweek.  Indeed, as the Ninth Circuit recently explained in commenting on this *Borello* factor, it is the:

> length and indefinite nature of the plaintiff Drivers' tenure with EGL [that] point[s] toward an employment relationship . . . . This was not a circumstance where a contractor was hired to perform a specific task for a defined period of time.  There was no contemplated end to the service relationship at the time that the plaintiff Drivers began working for EGL.

*Narayan*, 616 F.3d at 903.  Whether some Uber drivers work longer days than others is simply not relevant to this determination.[28]

Second, even if Uber had made (and substantiated) the correct argument with respect to this factor – that some of its drivers only remain Uber drivers for a relatively short period of time (*i.e.*, give a couple of rides and then quit) while others (like the named Plaintiffs) drive with the company for years – it would make no material difference relative to this *Borello* factor.  It is undisputed that Uber's contracts provide that the relationship between Uber and its drivers is open-ended and could have an infinite duration.  *See, e.g.*, Coleman Decl., Ex. D at § 9.1 ("This Transportation Company Agreement shall commence on the date this Agreement is accepted, *for an indefinite period of time*, unless terminated by either party . . . ."); *id.*, Ex. F at 9 (no set duration to relationship between driver and Uber); *id.*, Ex. Q at § 12.1 (same); Uber SJ. Mot. at 25-26 (conceding that Uber's

---

[27]  It is also inconsistent with Uber's previous position at the summary judgment stage, where Uber acknowledged that it signs "long-term or indefinite contract[s]" with its drivers, but argued nevertheless that this *Borello* factor "either supports independent contractor status or is neutral." Uber SJ. Mot. at 25-26.

[28]  Moreover, as noted above, it is undisputed that Uber *uniformly* relinquishes control over all of its worker's hours – thus individual variation between drivers with respect to whether they drive full-time or part-time for Uber cannot defeat class certification because Uber's *right* to control (or not control) this aspect of the drivers' work is uniform across the class.  *See Ayala*, 59 Cal. 4th at 533-34.

1   contracts with drivers are "long-term or indefinite").  And there is no evidence in the record that,

2   contrary to the contract rights, Uber actually terminates any of its drivers after some specified term

3   has expired, or otherwise restricts its drivers' ability to use the Uber application after some specific

4   set period of time has elapsed.[29]  This factor is therefore capable of adjudication on a classwide

5   basis.

6                    vi.     The Method of Payment, Whether by Time or by The Job

7         This *Borello* secondary factor will have an answer common to the class, and is thus capable

8   of classwide resolution.  There is no dispute that *all* Uber drivers are paid by the job, as Uber's own

9   expert admits.  *See* McCrary Report at ¶ 140 ("Drivers contracting with Uber earn money piece rate

10  when they take driving jobs.").  Uber's only response is contained in the following sentence from its

11  opposition brief:  "Drivers are generally compensated on a per-ride basis by Uber, but others may

12  have different terms depending on their relationship with Uber partners and whether the partners

13  provide vehicles and cover the drivers' expenses."  Opp. Br. at 23.  This is immaterial to this

14  *Borello* secondary factor as to the class certified herein.  The class as currently defined only includes

15  drivers who were paid directly by Uber, and all drivers who are paid directly by Uber are paid on a

16  per-job basis.

17                  vii.    Whether or Not The Work is a Part of The Regular Business of The

18                        Principal

19        As this Court has already found, Uber's business is the business of transportation.  *See*

20  *O'Connor*, 2015 WL 1069092, at *6 (holding that "it is clear that Uber is most certainly a

21  transportation company").  It is equally clear that Uber drivers are also in the transportation

22  business.  This factor has a common answer – the drivers' work *is* part of the regular business of

23  Uber – and thus this factor can be adjudicated on a classwide basis.

24

25

26  _____

27      [29]  Admittedly, some of Uber's contracts require drivers to accept at least one ride request from Uber every 30 or 180 days to remain active on the Uber application.  This is not particularly informative, however.  As long as the driver meets this minimal requirement, the contracts

28  contemplate that the relationship between the parties will last indefinitely.  There is no specific time frame for which Uber drivers are hired, nor specific end dates in any of the contracts.

viii.   Whether or Not The Parties Believe They Are Creating The

Relationship of Employer-Employee

Uber argues that the eighth *Borello* factor cannot be adjudicated on a classwide basis because its drivers likely had different subjective expectations as to whether they were creating an employment or independent contractor relationship with Uber when they first signed up to drive for the company.  Opp. Br. at 22.  The Court disagrees.  Notably, Uber has provided no evidence that any of its drivers actually had varying subjective expectations regarding their employment status at the time of contracting.  For instance, while Uber provided the court with a chart listing every one of its 400 declarants who "intended to create an independent contractor relationship with Uber," the company submitted no corresponding chart indicating that even a single one of its declarants "intended to create an employment relationship with Uber."[30]  *See* Evangelis Decl., Ex. 11.

Indeed, the evidence overwhelmingly indicates that all Uber drivers likely understood themselves to be agreeing to be independent contractors when they first signed up to drive for Uber.  Most probatively, every version of Uber's contracts with its drivers states clearly and expressly that the parties intend to form an independent contractor relationship; not an employment relationship.  *See, e.g.*, Coleman Decl., Ex. A. at 9574 (disclaiming any employment relationship in Uber's first driver contract); *id.*, Ex. Q at § 13.1 (disclaiming any employment relationship in Uber's most recent driver contract).  Moreover, Uber has previously admitted that it "never provided" drivers with "any employment benefits, and never reported their earnings on a Form W-2."  Uber SJ Mot. at 2.  Thus, all drivers were confronted with the same set of circumstances when they signed up with Uber.[31]  These circumstances apply even in the case of the two named Plaintiffs when they first signed up to

---

[30] Nor has the Court identified any such declaration in Uber's voluminous filing.

[31] Of course, that is not to say that drivers were not actually Uber's employees.  Whether or not Uber misclassified its drivers is the central issue to be decided in this case.  For the purposes of this particular *Borello* factor, however, the question is not whether the drivers thought they *should* be employees, or even whether after some contemplation they now think that they are employees, but whether they believed they were signing on to be Uber's employee when the relationship between the parties was first "created."  *See, e.g.*, Department of Labor Administrator's Interpretation No. 2015-1, 2015 WL 4449086, at *4 ("Likewise, workers who are classified as independent contractors may receive a Form 1099-MISC from their employers.  This form simply indicates that the employer engaged the worker as an independent contractor, not that the worker is actually an independent contractor . . . .").

United States District Court

For the Northern District of California

1   be Uber drivers.  *See, e.g.*, Gurfinkel Depo. Tr. at 51:3-53:15 (acknowledging that he filed his taxes

2   as an independent contractor and certified his independent contractor status to the IRS); Manahan

3   Depo. Tr. at 186:25-187:6 (same); *see also* Uber SJ. Mot. at 13 (arguing that the named Plaintiffs

4   acknowledged their alleged independent contractor status because none of them "ever reported to the

5   IRS that they had earned any wages from [Uber] or Rasier.  Instead, each filed their taxes as self-

6   employed, reporting business income and taking advantage of various deductions they would not

7   have been able to take as employees").  What is important under this *Borello* factor is not the

8   particular legal label attached (expressly or implicitly) by the parties to the relationship (*cf.*

9   *Alexander*, 765 F.3d at 989; *Borello*, 48 Cal. 3d at 349), rather, it is their understanding as to the

10  nature of that relationship as a matter of fact (*e.g.*, the amount of control Uber had a right to exercise

11  and the other *Borello* factors).  This factor is subject to proof common for the class.

12      Moreover, the California Supreme Court in *Ayala* cautioned that the relevant inquiry with

13  respect to this particular *Borello* factor may depend not just on the subjective beliefs of the parties,

14  but on "general custom with respect to the nature of the work."  *Ayala*, 59 Cal. 4th at 538.  The

15  Court explained:

16          It is not determinative that the parties believe or disbelieve that the
            relation of master and servant exists, except insofar as such belief

17          indicates an assumption of control by the one and submission of
            control by the other.  However, community custom in thinking that a

18          kind of service, such as household service, is rendered by servants, is
            of importance.

19

20  *Id.*  (citation omitted).  Community custom is likely informed by facts commonly applicable to the

21  class.

22      Finally, even if there were individual variance with respect to this factor, it would still not

23  defeat class certification because this particular *Borello* secondary factor is entitled to the least

24  weight of all of the various factors.  As the *Borello* opinion itself makes clear, "[t]he label placed by

25  the parties on their relationship is not dispositive, and subterfuges are not countenanced."  *Borello*,

26  48 Cal. 3d at 349.  Indeed, in *Alexander* the plaintiffs formally admitted that they all "intended to

27  enter into an independent contractor relationship" with FedEx when they were first hired, and

28  nevertheless the Ninth Circuit held that they were employees as a matter of law.  *See Alexander*, 765

1   F.3d at 996-97; *see also JKH Enters., Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046,

2   1064 (2006) (recognizing that "neither JKH's nor the drivers' own perception of their relationship as

3   one of independent contracting" is dispositive or particularly important when balanced with the

4   remaining *Borello* factors); *Grant v. Woods*, 71 Cal. App. 3d 647, 654 (1977) ("[T]he belief of the

5   parties as to the legal effect of their relationship is not controlling if as a matter of law a different

6   relationship exists.").  Because this factor is typically not entitled to significant weight, Uber could

7   not defeat class certification even if it had established that some of its drivers had a different

8   subjective understanding of the parties' relationship than others.

9                          ix.      The Alleged Opportunity For Profit or Loss Depending on His

10                                  Managerial Skill

11          Uber argues that this *Borello* secondary factor cannot be adjudicated on a classwide basis

12   because some Uber drivers employ "driving strategies" in an effort to maximize profits, while others

13   do not.  Opp. Br. at 23-24.  For instance, Uber notes that some drivers "target geographic regions

14   that tend to have higher demand, drive during hours when demand is at its peak, or drive when

15   'surge pricing' is available.  On the other hand, some drivers . . . drive when and where they are

16   available, regardless of demand or surge pricing."[32]  *Id.* at 23.  This argument fails.  Notably, the

17   factor asks whether the drivers have an "*opportunity* for profit or loss depending on . . . managerial

18   skill."  *Borello*, 48 Cal. 3d at 355 (emphasis added).  Uber, however, once again erroneously focuses

19   on the "variations in the actual exercise of control" rather than the relevant "right to control."  *Ayala*,

20   59 Cal. 4th at 536.  Uber does not claim that it prohibits some drivers from driving in certain

21   "geographic regions that tend to have higher demand" while permitting others to drive in these more

22   profitable areas.  Nor does Uber dictate whether only some drivers can drive during surge pricing.

23   All Uber drivers have the exact same "opportunity" to earn profits or losses depending on their

24   alleged "managerial skill."

25

26

27

28          [32]  Whether a reasonable juror would consider such decisions to be examples of a driver's
     "*managerial* skill" is significantly open to doubt.  But at the class certification stage that is of no
     moment, because the answer to that question will be the same for all class members.

x.    The Alleged Employee's Investment in Equipment or Materials
Required for His Task, or His Employment of Helpers

As noted above, class members' investment in equipment or materials is the same on a classwide basis – there is no dispute that *all* drivers provide their own equipment, including vehicles, with the possible exception of some unspecified portion of class members who might lease a smartphone from Uber. And even in that instance, it appears that it is the driver who is the party providing the phone because the driver pays to lease it from Uber. The Court finds that any such variation is either non-existent or immaterial to the class-certification analysis, and that common questions predominate with respect to investment in equipment or materials. *See* Section II.E.1.g.iv, *supra*.

Uber argues, however, that there is still considerable variance among class members with respect to this *Borello* secondary factor because a number of Uber drivers employ helpers (*i.e.*, hire subcontractors), while others do not. Uber argues that this difference is highly material to the class certification analysis, and that variance on this *Borello* factor defeats predominance. The Court disagrees.

First, it is important to note that Uber purports to allow all of its drivers to hire subcontractors. There is no evidence in the record that Uber permits some drivers to hire helpers, while prohibiting others from doing so. Thus, Uber's right to control class members' employment of helpers is uniform across the class.

More importantly, however, the fact there may be variance as to whether class members actually employ helpers is immaterial to the weighing of the *Borello* factors in this specific case. The law is clear that where the principal retains the right to "approve all helpers, this [is] indicative of control of the details of the drivers' performance under California law." *Alexander*, 765 F.3d at 994 (citing *Narayan*, 616 F.3d at 902). That is, the tenth *Borello* factor may weigh in favor of finding employee status *even if* a putative employee has hired subcontractors, so long as the subcontractors hired were subject to the principal's approval and control. As the Ninth Circuit explained in *Alexander*, citing other recent Ninth Circuit case law:

United States District Court

For the Northern District of California

> In *Narayan*, we concluded that, where drivers 'retained the right to employ others to assist in performing their contractual obligations,' but the company had to approve all helpers, this was indicative of control of the details of the drivers' performance under California law. 616 F.3d at 902.   And in *Ruiz*, we found that drivers were employees where the company 'retained ultimate discretion to approve or disapprove of those helpers and additional drivers.'   754 F.3d at 1102. 'Approval was largely based upon neutral factors, such as background checks required under federal regulations,' but the drivers nonetheless did not have an unrestricted right to choose these persons, which is an 'important right that would normally inure to a self-employed contractor.'   *Id.* [further citations omitted].   Further, 'any additional drivers were subject to the same degree of control exerted by Affinity over the drivers generally.'   *Id.*

*Alexander*, 765 F.3d at 994. (internal modifications omitted).

As the above-cited cases make clear, a worker's right to hire subcontractors (or the worker's actual utilization of subcontractors) is only indicative of a *bona fide* independent contractor relationship where the putative employer does *not* retain the right to approve the worker's choice of subcontractors and where the putative employer does *not* retain the right to subject the worker's chosen subcontractors to the "same degree of control" as the worker herself.  *See Alexander*, 765 F.3d at 994.

The evidence here demonstrates that Uber maintains a uniform right to approve its drivers' chosen subcontractors.  And it is undisputed that Uber maintains the very same right to control the performance of its drivers' chosen subcontractors as it does over the drivers themselves.  *See, e.g.*, Uber SJ. Mot. at 9 (stating that the "Licensing Agreements expressly provide that: . . . [t]he transportation companies' employees *and subcontractors* are bound by the terms of the Licensing Agreements") (emphasis added).  For instance, the record shows that drivers are flatly prohibited from "[a]llowing someone else to drive under your Uber account," which is characterized as a "zero tolerance" event.  Docket No. 223-13 at 8; *see also* Docket No. 238-1 at 2 ("[Y]our account has been deactivated permanently due to receiving reports that you have been sharing your account with other drivers.  This is not an acceptable practice, *as all of our drivers must go through the application process* for safety reasons.") (emphasis added).  Moreover, Uber's contracts with its drivers mandate that any driver/entity who wants to hire a subcontractor must have that subcontractor sign one of Uber's "Driver Addenda," which contracts state that the subcontractor must bind herself to the very

United States District Court

For the Northern District of California

same contract with Uber as the "hiring" driver/entity. *See, e.g.*, Coleman, Decl., Ex. D. at § 1.8 ("'Driver Addendum' means the applicable terms and conditions that Transportation Company is required to enter into with all Drivers prior to allowing access to the Software and Uber Services . . . By consenting to this agreement, You are consenting to the Driver Addendum."); *id.*, Ex. E (Driver Addendum) at § 1 ("As a condition of receiving trip requests though the Service, Subcontractor hereby acknowledges and agrees to be bound by the Software License and Online Services Agreement between Transportation Company and Uber . . . ."); *see also id.* at § 2.1 (providing Uber with the right to fire subcontractors in its "sole discretion" if the subcontractor does not meet standards set by Uber). Uber exercises a veto right over all subcontractors, and subjects all subcontractors to the exact same level of control as all of its other drivers. Under such circumstances, therefore, whether a class member actually employs helpers or not will likely have no impact on the *Borello* analysis – either the class member does not hire helpers or the class member does hire helpers who must be approved and are monitored by Uber; in either case, this *Borello* factor would appear to weigh in favor of a finding of employee status. More importantly, whatever its probative value on the merits, there are no material variances in this factor which defeat predominance.

xi.     Whether The Service Rendered Requires a Special Skill

The answer to this *Borello* factor will be common to all class members. Either the jury will decide that all Uber drivers require special skills to drive for Uber, or not. *See Ayala*, 59 Cal. 4th at 538 ("In a case where every class member performs the same tasks, some factors will *always be common*, such as the kind of occupation and the skill it requires.") (emphasis added) (citation omitted). Uber has not argued to the contrary. Because there will be no variation between class members with respect to this factor, it supports class certification.

xii.     The Degree of Permanence of The Working Relationship

As noted above in subsection (e), Uber's contracts and course of dealing indicate that this factor can be resolved uniformly on a classwide basis – Uber drivers are not hired to work for specific terms. Rather, they are hired for an unspecified and indefinite period. *See, e.g.*, Coleman

United States District Court

For the Northern District of California

1    Decl., Ex. D at § 9.1 ("This Transportation Company Agreement shall commence on the date this

2    Agreement is accepted, *for an indefinite period of time*, unless terminated by either party . . . .").

3            xiii.    Whether The Service Rendered is an Integral Part of The Alleged

4                     Employer's Business

5            The last of *Borello*'s secondary factors will also have a common answer, and it is one that is

6    already known.  As this Court previously found as a matter of law, "Uber's drivers provide an

7    'indispensable service' to Uber, and the firm 'could no more survive without them' than it could

8    without a working smartphone app.  Or, put more colloquially, Uber could not be 'Everyone's

9    Private Driver' without the drivers."  *O'Connor*, 2015 WL 1069092, at *8.  Even if the jury were

10   permitted to reach its own conclusion on this factor, there can be no dispute that the question admits

11   no individual variation.  The question is *not* whether a particular driver is an integral part of Uber's

12   business, but whether the "service rendered" by the drivers (*i.e.*, driving) is integral to Uber's

13   business.  This factor can be adjudicated on a classwide basis.

14            xiv.    Conclusion

15           At bottom, it appears that common questions will substantially predominate over individual

16   inquiries with respect to class members' proper employment classification under the *Borello* test.

17   Indeed, every (or nearly every) consideration under the California common-law test of employment

18   can be adjudicated with common proof on a classwide basis.  Some may favor Plaintiffs' position on

19   the merits, while others support Uber's.  But all favor certification.  Thus, this portion of the Rule

20   23(b)(3) inquiry weighs strongly in favor of class certification.

21           2.    Plaintiffs' Tips Claim

22           Because the threshold question of class members' employment status can be adjudicated on a

23   classwide basis, the Court must next consider whether class members' substantive claim for

24   withheld/converted tips under Labor Code section 351 is susceptible to classwide adjudication.  The

25   Court concludes that it is.

26           Labor Code section 351 provides that "[n]o employer or agent shall collect, take, or receive

27   any gratuity or a part thereof that is paid, given to, or left for an employee by a patron . . . ."  Cal.

28   Lab. Code § 351.  Determining Uber's liability under section 351 will require the jury to consider

1    two issues.  First, did Uber "take, or receive any gratuity" from its riders?  And second, if Uber has

2    "taken or received" such gratuities, has Uber "paid" or "given" the full amount of those tips to its

3    drivers?  Here, both questions can be answered by common proof, and thus Rule 23(b)(3)'s

4    predominance test is met.

5         Plaintiffs have cited extensive evidence that Uber has consistently and uniformly advertised

6    to customers that a tip is included in the cost of its fares (*i.e.*, evidence that Uber "takes or receives"

7    a gratuity).  *See, e.g.*, Docket No. 277, Ex. 12 (November 2011: "When the ride is over, Uber will

8    automatically charge your credit card on file.  No cash is necessary.  Please thank your driver, but *tip*

9    *is already included*.") (emphasis added); Ex. 16 (November 2011: "*All* Uber fares include the tip . . .

10   .") (emphasis added); Ex. 13 (May 2012: "There's no need to hand your driver any payment, and the

11   *tip is included*.") (emphasis added); Ex. 14 (January 2013: "With UberBlack, SUV, and UBERx

12   there *is no need to tip*.  With Uber TAXI we'll automatically add 20% gratuity for the driver.")

13   (emphasis added); Ex. 15 (April 2015:  "payment is automatically charged to a credit card on file,

14   *with tip included*") (emphasis added).[33]  Uber does not even contest this fact in its papers.

15        Moreover, Uber has stipulated for the purposes of this litigation that, despite its

16   representations that a "tip is included," a "tip has *never* been part of the calculation of fares for

17   either UberBlack or UberX in California."  *See* Docket No. 313-16 (emphasis added).  That is, Uber

18   essentially admits that despite making allegedly consistent and uniform representations to customers

19   that a tip was *included* in all of its fares, Uber never actually calculated such a tip, and clearly never

20   segregated and remitted any tip amount to drivers.[34]  Or, put differently, Uber has stipulated that it

21   kept the entire amount of any tip that might be "included" in its fares.  These facts, if proven at trial,

22

23        [33] All of the cited statements were apparently made by Uber on either its website or in
24   promotional materials intended for riders who were new to using the Uber application.  The Court
     also notes that Uber made similar representations regarding gratuities to its drivers.  *See, e.g.*,
25   Docket No. 223-6 at 7 (onboarding script: "Remember, fare includes gratuity and so if the client
     offers you a tip tell them that the fare includes the tip.  There should be no confusion about that!);
26   Docket No. 223-24 (threatening driver with termination for accepting cash tip and informing driver
     that Uber has "calculated the average fare with tip for drivers in Los Angeles and have ALREADY
27   adjusted our fares to compensate you accordingly . . . .").

28        [34] Uber could not possibly have remitted a tip to drivers that it did not even calculate or
     *actually* include in its fares.

will likely establish Uber's uniform and classwide liability for violating California's Tips Law. *See* Reply Br. at 14-15 (arguing correctly that "Plaintiffs have evidence that Uber has uniformly charged a tip to passengers but has not actually distributed a tip to its drivers. Should the drivers be employees, those facts establish violation of Cal. Labor Code § 351"); *see also Guifu Li*, 2011 WL 4635198, at *15 (certifying class claims brought pursuant to section 351 because common proof was available to prove that employer had consistently converted class members' gratuities).

Uber argues otherwise, but as Plaintiffs rightly point out, Uber's arguments are all premised on a fundamental misunderstanding of section 351 and Plaintiffs' Tips Claim. For instance, Uber argues that "[t]o the extent some drivers *would not have* received tips – regardless of Uber's 'policies' – those drivers have suffered no injury and have no Article III standing." Opp. Br. at 26. Under Plaintiffs' theory, however, no such drivers exist; Uber's alleged practice was to charge *every* rider for a tip ("tip is included") on *every* ride. Plaintiffs' claim is that after charging every rider for a tip, Uber then failed to pay any of those gratuities to the drivers. *See* Reply Br. at 15 (explaining that Plaintiffs' theory is that all passengers "actually paid tips (because they were labeled as such), but they were never remitted to drivers"). The fact that some drivers, but for Uber's alleged forced tipping practice, might not have been tipped by a particular rider left to his or her own devices is immaterial to Plaintiffs' claim.

Similarly, Uber's argument that some drivers receive/received cash tips from passengers (in addition to those allegedly collected by Uber) is irrelevant to either the class certification analysis or the merits of Uber's liability under section 351. Under Plaintiffs' theory of the case (and more importantly, under the language of section 351 itself) any cash tips that were paid to drivers would simply be an *additional* gratuity that the customer provided to the driver over and above the tip that Uber already charged to the rider (*i.e.*, the tip that Uber allegedly advertised was "included" in the fare). Nowhere in the language of section 351 did the Legislature provide that an employer can withhold a portion of an employee's gratuity that was paid directly to the employer as some sort of set-off against an additional gratuity that the patron paid to the employee directly. *See* Cal. Lab. Code § 351 ("No employer or agent shall collect, take, or receive any gratuity *or a part thereof* that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an

United States District Court

For the Northern District of California

1    employee on account of a gratuity, or require an employee to credit the amount, or any part thereof,

2    of a gratuity against and as part of the wages due the employee from the employer.  Every gratuity is

3    hereby declared to be the sole property of the employee or employees to whom it was paid, given, or

4    left for.") (emphasis added).

5         Uber relatedly contends that class certification is not appropriate on the Tips Claim because a

6    jury cannot determine damages without conducting a host of individualized inquires.  Specifically,

7    Uber argues that class certification is inappropriate because the precise amount of any gratuity that a

8    rider would have paid his driver varies dramatically from ride-to-ride depending on driver

9    performance and other variables.  Opp. Br. at 26.  This argument misses the mark for a few reasons.

10   First, Uber fails to recognize that it has never given riders the ability to change the amount of the

11   "included" tip that Uber allegedly charges passengers.  Rather, if one credits the Plaintiffs' evidence,

12   Uber tells riders that some unspecified tip is being unilaterally imposed by Uber, and riders have no

13   power to change this amount for any reason.  Because the tip is unilaterally set by Uber without any

14   possible input from riders, there is no reason to suspect that the "included tip" amount would vary

15   from ride-to-ride based on driver performance or any other factor.  A poor performing Uber driver

16   would receive the exact same tip as a high-performing driver because Uber has never given riders

17   the ability to actually vary the tip amount it charges them.

18        Moreover, Uber cannot defeat class certification simply because individualized damages

19   might be difficult to calculate.  *See Levya*, 716 F.3d at 513-14 (confirming that even after *Dukes* and

20   *Comcast*, "the presence of individualized damages cannot, by itself, defeat class certification under

21   Rule 23(b)(3)").  In any event, damages will be very easy to calculate on a classwide basis here.

22   Again, Plaintiffs' theory is not that Uber unlawfully stole (or prevented drivers from obtaining)

23   *additional* tips that riders would have given to drivers in unknown amounts at their individual

24   discretion.  Rather, the theory is that drivers did not receive *the* [singular] tip that Uber actually

25   "included" in the fare and which tip was unilaterally charged to riders' credit cards in some

26   unspecified amount.  Assuming for a moment that the jury finds Uber liable for violating section

27   351, it will then be tasked with determining what portion of the fares charged actually was the tip.

28   This the jury can likely do from its own common experience, or, perhaps, with the aid of expert

United States District Court
For the Northern District of California

1   testimony.  In any event, the jury could assess damages based on common formula or mathematic

2   approach that applies uniformly to the class.[35]  There is no indication that any individualized

3   assessments would be required to calculate damages.[36]  Thus, Rule 23(b)(3)'s predominance

4   requirement is satisfied with respect to class members' claims for violations of California's Tips

5   Law.

6   F.      Individualized Inquiries May Predominate For Drivers Who Did Not Opt-Out of Uber's

7           Most Recent Arbitration Clauses

8           Before considering the final Rule 23(b)(3) requirement, superiority, the Court notes that the

9   class as certified excludes all drivers who "electronically accepted any contract with Uber or one of

10  Uber's subsidiaries that is listed in the Appendix to this Order, *unless* the driver timely opted-out of

11  that contract's arbitration agreement."  The arbitration agreements listed in the Appendix are those

12  that include this Court's mandated opt-out notice and procedures.  *See O'Connor*, 2013 WL

13  6407583; *O'Connor*, 2014 WL 1760314.  All of these agreements contain class action waivers that

14  purport to prevent the drivers from participating in any class action lawsuit against Uber.  *See*

15  Colman Decl., Exs. K-Q.  Instead, the contracts purport to require the drivers to pursue any claims

16  they might have against Uber in individual arbitration.  *Id.*

17          As this Court has explained at length both in this case and in the related *Mohamed* litigation,

18  the Court previously exercised its power under Federal Rule of Civil Procedure 23(d) to assert

19

20          [35]  For instance, the jury could determine that the average customer (or driver, or both) would

21  expect that any advertised "included gratuity" would be 15% of the total fare charged.  Once the jury
    determined the gratuity amount that Uber actually charged (and admittedly withheld from drivers),

22  the damages calculation is mechanical.  For instance, assume that the jury does conclude that Uber
    violated the Tips Law, and uniformly withheld a customary 15% gratuity on each ride.  If a driver

23  performed a ride that cost the customer $10, then $1.50 of that fare amount would have been the
    "tip" that Uber was required to remit to the driver free and clear.  Thus, Uber would only have been

24  permitted to charge its own 20% "service fee per ride" on the remaining $8.50 of the fare.  In such a
    case, Uber's fee would have been $1.70.  If the jury determines that Uber actually took 20% of the

25  entire $10 ride amount, Uber will have received a $2.00 fee when it should have only charged the
    driver $1.70.  In this circumstance the driver would be entitled to a damages award of 30 cents.

26  There is no reason classwide damages could not easily be discerned using simple arithmetic and
    Uber's own business records.

27
            [36]  There is no reason to suspect that this damages inquiry would be different for different

28  drivers (*e.g.*, there is no evidence that drivers in San Diego would customarily receive 12% tips,
    while San Francisco drivers typically earn 25% tips).

United States District Court

For the Northern District of California

1   control over class communications in this action in order to "protect the integrity of the class and the

2   administration of justice." *O'Connor*, 2014 WL 1760314, at *3; *see also Mohamed*, 2015 WL

3   3749716, at *4 (describing the Court's prior orders in this litigation vis-á-vis arbitration).

4   Specifically, after Uber issued new contracts in 2013 to putative class members that contained

5   "inconspicuous" arbitration agreements with class action waivers, and which contracts permitted

6   drivers to opt-out of arbitration only by complying with "extremely onerous" and essentially illusory

7   opt-out protocols, this Court required Uber to send corrective notices to its drivers that were

8   intended to insure that (1) all drivers were "given clear notice of the arbitration provision" in Uber's

9   contracts, and (2) provide drivers with a reasonable means of opting out of the arbitration provision.

10  *See O'Connor*, 2013 WL 6407538, at *7.  Uber complied with the Order, and since early 2014, the

11  Court understands that all of Uber's contracts with its drivers have included the Court's approved

12  corrective notice and opt-out procedures.  *See* Colman Decl., Exs. K-Q.

13      Earlier this year, the Court ruled on a motion to compel arbitration brought by Uber in a

14  related case.  *See Mohamed*, 2015 WL 3749716.  In the Court's order, it considered the

15  enforceability of certain of Uber's contracts with its drivers that contained the Court's approved

16  notice and opt-out procedures, described above.  *Id.*  The Court noted that "it would be hard to draft

17  a more visually conspicuous opt-out clause even if the Court were to aid in the drafting process,

18  which it actually did." *Id.* at *17.  The Court similarly noted that Uber's revised contracts provide

19  drivers a "reasonable means of opting out" of arbitration.  *Id.*  Nevertheless, the Court, applying

20  *Gentry v. Super. Ct.*, 42 Cal. 4th 443 (2007), found that there was a modicum of procedural

21  unconscionability under the contracts and therefore concluded that further inquiry into substantive

22  unconscionability was warranted.  Because the agreements at issue also contained a substantively

23  unconscionable and non-severable Private Attorneys General Act (PAGA) waiver, the Court

24  ultimately concluded that Uber could not compel the Plaintiffs' claims in *Mohamed* to arbitration

25  pursuant to the 2014 version of the agreements.  *See Mohamed*, 2015 WL 3479716, at *32-36.

26      As the California Supreme Court explained in *Gentry*, even a contract that contains a

27  conspicuous and otherwise meaningful opt-out clause will not be found to be entirely lacking in

28  procedural unconscionability where the agreement (1) does not adequately call attention to specific

United States District Court

For the Northern District of California

1   substantively unconscionable or otherwise unfavorable terms in the agreement, and (2) where the

2   Court has reason to suspect that the party accepting the agreement (*i.e.*, the party who did not draft

3   the agreement) would not have "felt free to opt-out." *See Mohamed*, 2015 WL 3749716, at *19-20

4   (summarizing and applying *Gentry*).  The Court found both factors present in Uber's revised

5   contracts, although the Court acknowledged that it is "an extremely close question" whether the

6   Plaintiffs in *Mohamed* were subject to the "same general economic pressures" not to opt-out of the

7   arbitration agreement "that concerned the Court in *Gentry*."  *Id.* at *20.  Because the Court

8   concluded that the specific Plaintiffs before it were "lower-level laborer[s]" without much economic

9   clout, however, the Court found that the *Gentry* test was met.  *Id.*

10          Uber argues persuasively that determining whether any individual class member may benefit

11   from this Court's ruling in *Gentry* (and thus may participate in this class action) could well require

12   an "individualized inquiry that turns on . . . the economic means of the driver and the circumstances

13   under which he or she accepted the arbitration agreement."  Opp. Br. at 39.  As noted, the plaintiffs

14   in *Mohamed* were relatively poor unskilled laborers who depended on Uber for their incomes.  *See,*

15   *e.g.*, *Mohamed* Docket No. 37-3 (Gillette Decl.) at ¶ 11 (indicating that Uber was Plaintiff's sole

16   source of income).  Uber has presented evidence, however, that some reasonably sizeable portion of

17   its drivers may not face the same "general economic pressures" to obtain employment as the

18   plaintiffs in *Mohamed*.  For instance, Christopher Armentrout is an UberX driver with a full-time job

19   who normally drives for Uber "less than five hours a week," typically on weekend evenings.  Docket

20   No. 307 at 78.  Lee Samantha Faelnar Te similarly drives for UberX only a few hours a week when

21   she is not working at her full-time job for California Credit Union.  Docket No. 307 at 397; *see also*

22   Evangelis Decl., Ex. 13.  A credible argument could be made that such drivers would not have felt

23   the same general economic pressure to assent to Uber's arbitration agreement as drivers who appear

24   more economically dependent on Uber for their livelihoods.  *See, e.g.*, Docket No. 307 at 6

25   (Abousleiman Decl.) (drives for UberX ten to twelve hours a day, six days a week, with no outside

26   employment); Docket No. 307 at 269 (Chu Decl.) (drives for UberX "between 2:00 p.m. and 2:00

27   a.m. six days a week" with no other employment).  Any substantial variation on the applicability of

28

United States District Court

For the Northern District of California

1   *Gentry* to a particular driver could seriously undercut predominance with respect to the arbitration

2   question.[37]

3           The Court will not definitely decide the *Gentry* issue now, as the current class certified

4   herein only includes those drivers who are *not* bound to one of Uber's more recent contracts, unless

5   the driver timely exercised his opt-out rights.  Uber has not argued that individualized issues

6   regarding the validity or applicability of any arbitration clause will predominate with respect to

7   those drivers who are only bound to its earlier pre-2014 contracts.  Some of these contracts do not

8   even contain a class action waiver or arbitration provision.  *See, e.g.*, Colman Decl., Exs. A-B.  And

9   for those earlier contracts that do contain class action waivers and arbitration provisions (*i.e.*, certain

10  2013 agreements), but that do not contain this Court's corrective notice and opt-out procedure, the

11  Court has concluded that such arbitration provisions are unconscionable and unenforceable

12  regardless of the individual driver's economic circumstances or any other possible differences

13  between signatories.  *See Mohamed*, 2015 WL 3749716, at *21-31.  Moreover, the Court has

14  concluded that Uber's likelihood of success on appeal of this Court's determination that the

15  arbitration provisions in these contracts are unenforceable is exceedingly low.  *See Gillette*, 2015

16  WL 4481706, at *2-7.  Simply put, the Court concludes that there are no individualized issues to

17  resolve with respect to whether drivers bound to such earlier agreements may participate in this class

18  action lawsuit, and thus Rule 23(b)(3) permits all drivers who are bound only to Uber's pre-2014

19

20          [37] This Court's *Gentry* ruling could also present a superiority problem if the class were to
21  include individuals who are otherwise bound to one of the relevant arbitration provisions.  The
    Court's Order denying Uber's motion to compel arbitration pursuant to its latest agreements is
22  currently being appealed to the Ninth Circuit.  As this Court has recently recognized, "the propriety
    of its application of *Gentry*'s procedural unconscionability rule at least presents a 'serious issue' on
23  appeal" because "the proper application of *Gentry* appears to remain an issue of first impression in
    the Ninth Circuit."  *Mohamed v. Uber Techs., Inc.*, -- F. Supp. 3d --, 2015 WL 4483990, at *4 (N.D.
24  Cal. 2015).  "Moreover, the application of *Gentry* is undoubtedly important to the ultimate
    resolution of the validity of the 2014 Agreements' arbitration provisions.  If the Ninth Circuit
25  expressly refuses to follow *Gentry* . . . then this Court's procedural unconscionability finding is
    unlikely to survive appellate review, and the 2014 arbitration provisions would likely be enforced
26  under California law."  *Id.*  Given that there is a chance that the Ninth Circuit might reverse this
    Court's order with respect to *Gentry*, certifying, noticing, and litigating a class on behalf of a large
27  number of individuals who may later need to be excluded from the class does not make sense as a
    matter of judicial efficiency.  Of course, once the Ninth Circuit definitively rules on these issues,
28  depending on its ruling, it is possible that a class consisting of individuals who agreed to these
    contracts could possibly be certified.

United States District Court

For the Northern District of California

1   agreements (or those who opted-out of its later agreements listed in the Appendix) to be members of

2   the class.

3   G.      Superiority Test is Satisfied For Plaintiffs' Tips Claim

4               Finally, in addition to satisfying all four requirements of Rule 23(a) and the predominance

5   requirement of Rule 23(b)(3), the Plaintiffs must also show that "a class action is superior to other

6   available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

7   With respect to the Court's "superiority" analysis, the Federal Rules suggest that the Court should

8   consider:

9                       (A) the class members' interests in individually controlling the
                        prosecution or defense of separate actions;
10
                        (B) the extent and nature of any litigation concerning the controversy
11                      already begun by or against class members;

12                      (C) the desirability or undesirability of concentrating the litigation of
                        the claims in the particular forum; and
13
                        (D) the likely difficulties in managing a class action.
14

15   Fed R. Civ. P. 23(b)(3)(A)-(D).

16              Uber does not even contest the superiority element, and it appears easily satisfied.  First, as

17   discussed above, because common issues predominate with respect to every aspect of the common-

18   law test for employment, it will "be far more efficient to resolve the question of employment status

19   on a class-wide, rather than individual, basis."  *Dalton*, 270 F.R.D. at 565; *see also Estrada v. FedEx*

20   *Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 14 (2007).  Similarly, efficiency counsels in favor

21   of litigating the merits of class members' substantive Tips Claims on a classwide basis, as both

22   liability and damages under section 351 can easily be adjudicated in one proceeding.  To the extent

23   that class members have an interest in individually controlling the prosecution of their own action

24   for conversion of gratuities, they are free to opt-out of the class.  *See id.*  In any event, there is no

25   evidence that any class members' claims are expected to be so valuable that a significant number of

26   class members would have an interest in separately prosecuting their own actions under section 351.

27   *See Breeden*, 229 F.R.D. at 630 (holding that even for "those members of the putative class who

28   could potentially submit the largest claims for damages – those who were relatively high wage

United States District Court

For the Northern District of California

earners and who are able to substantiate claims of significant [damages] . . . are nonetheless unlikely to present the court with the kinds of multi-million dollar claims frequently at issue in Rule 23 class actions").

Nor is there extensive ongoing litigation pending regarding these claims.  The Court is aware of one action pending in Los Angeles Superior Court (*Price v. Uber Techs.*, No. BC554512 (L.A. Superior Court) that involves similar California Labor Code claims to those asserted here.  A review of the docket in *Price* shows that the case has not advanced as far as this litigation.  No motion has yet been filed therein.  Hence, the parallel nature of the *Price* action does not counsel in favor of putting off class certification in this case.[38]  Nor is there any reason to suspect that this class action will become so unmanageable that it would be more efficient to litigate thousands of separate misclassification and gratuities lawsuits.  For the reasons explained above, not only are common questions likely to predominate with respect to the class claims, it appears this litigation may *only* contain common questions with common answers.  Given the extent of predominance of common questions in this litigation, the Court cannot foresee any manageability issues at trial.  Thus resolving the class members' claims through one adjudication rather than thousands of separate suits is clearly the superior method of resolving these cases for the Plaintiffs, Uber, and the Court.

H.    Plaintiffs' Counsel Will Fairly And Adequately Represent The Interests of The Class

Federal Rule of Civil Procedure 23(g) mandates that if this Court certifies a class it "must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  In making this appointment, the Court must principally evaluate the adequacy of class counsel to fairly represent the interests of the class, *see* Fed. R. Civ. P. 23(g)(4), which requires the Court to consider such factors as the work counsel has done to-date in the action, her experience handling class actions and other complex litigation, her knowledge of the applicable law, and the resources counsel will bring to bear in prosecuting the action.  *See* Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

---

[38] Notably, Uber is located in San Francisco, so as between the two actions, it appears at least minimally more convenient to litigate the class claims in this forum rather than in Los Angeles.

1   Uber hardly attempts to argue that Plaintiffs' current attorney, Ms. Shannon Liss-Riordan, is

2   inadequate to serve as class counsel in this matter.  Indeed, Uber does not even argue that Ms. Liss-

3   Riordan is unqualified to represent these Plaintiffs, and any such argument would be without merit.

4   The Court knows Ms. Liss-Riordan to be a capable advocate, and further notes that she is a leading

5   practitioner in the field of employment misclassification both in this District and nationwide.

6   Nevertheless, Uber professes concern that Ms. Liss-Riordan is inadequate to serve as class

7   counsel here because she is overextended given all of the multitude of cases she is currently

8   prosecuting against Uber and similar firms.  The Court shares Uber's concern at least in theory, and

9   advises Ms. Liss-Riordan to focus considerable time and attention on this case now that it has been

10  certified.  That said, the Court has not witnessed anything in Ms. Liss-Riordan's performance in this

11  case (or in any of the many others she is currently prosecuting before this Court) to date that would

12  cause the Court to be concerned that Ms. Liss-Riordan and her colleagues will not prosecute this

13  action vigorously and with skill on behalf of the class members. Ms. Liss-Riordan is adequate, will

14  fairly represent the interests of the class members, and is therefore appointed class counsel in this

15  matter.

16  I.     The Remainder of Plaintiffs' Motion is Denied Without Prejudice

17  As noted above, the Court has denied certain of Plaintiffs' requests for class certification.

18  Notably, the Court denied Plaintiffs' request to certify their substantive law claims under Labor

19  Code section 2802 principally because Plaintiffs thus far have failed to satisfy Rule 23(a)'s

20  adequacy requirement to the extent Plaintiffs seek to fulfill the tests of commonality and

21  predominance by using IRS reimbursement rates as the exclusive measure of damages for class

22  members.  The Court has also denied Plaintiffs' request to certify additional classes or subclasses of

23  drivers, such as drivers who labored for distinct third-party transportation companies.  These denials

24  are without prejudice, however, as Plaintiffs may be capable of making a sufficient showing to

25  warrant certification of certain additional claims and/or subclasses.  *See Bowerman I*, 2014 WL

26  4676611, at *1, 13 (denying class certification motion without prejudice to renewal within 45 days).

27  If Plaintiffs wish to attempt to make such a showing, they shall file an appropriate supplemental

28  brief within thirty-five (35) days of the date of this order.  Uber may file an appropriate response

within twenty-one (21) days of the date Plaintiffs serve their supplemental brief, if any.  The Court

will set further hearing if deemed necessary.  Absent further certification of any subclass(es) or

claims, the Court will proceed towards trial on the merits based on the class certified herein.

### III.   CONCLUSION

The Court hereby certifies a class action on behalf of the following individuals to pursue

their claim that Uber has violated California's Unfair Competition Law by violating Section 351 of

the Labor Code:

> All UberBlack, UberX, and UberSUV drivers who have driven for
> Uber in the state of California at any time since August 16, 2009, and
> who (1) signed up to drive directly with Uber or an Uber subsidiary
> under their individual name, and (2) are/were paid by Uber or an Uber
> subsidiary directly and in their individual name, and (3) did not
> electronically accept any contract with Uber or one of Uber's
> subsidiaries which contains the notice and opt-out provisions
> previously ordered by this Court (including those contracts listed in
> the Appendix to this Order), *unless* the driver timely opted-out of that
> contract's arbitration agreement.

The parties are ordered to meet-and-confer regarding the contents and logistics of class

notice and other relevant procedural details in advance of the next case management conference,

which is scheduled for October 22, 2015 at 10:30 a.m.  At that conference, the parties shall be

prepared to discuss any proposal regarding further class certification.

This order disposes of Docket No. 276.


IT IS SO ORDERED.


Dated:  September 1, 2015

_____
EDWARD M. CHEN
United States District Judge

**APPENDIX**

1.  June 21, 2014, Uber Software License and Online Services Agreement (Exhibit K to Colman Declaration)

2.  June 21, 2014, Driver Addendum Related to Uber Services (Exhibit L to Colman Declaration)

3.  June 21, 2014, Rasier Software Sublicense & Online Services Agreement (Exhibit M to Colman Declaration)

4.  November 10, 2014, Uber Logistik, LLC Software License and Online Services Agreement (Exhibit N to Colman Declaration)

5.  November 10, 2014 Driver Addendum to Software License And Online Services Agreement (Exhibit O to Colman Declaration)

6.  November 10, 2014 Raiser [sic], LLC/Rasier-CA, LLC/Rasier-PA, LLC Software License and Online Services Agreement (Exhibit P to Colman Declaration)

7.  April 3, 2015 Uber USA, LLC Software License And Online Services Agreement (Exhibit Q to Colman Declaration)