SHANNON LISS-RIORDAN, *pro hac vice*
(sliss@llrlaw.com)
ADELAIDE PAGANO, *pro hac vice*
(apagano@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:     (617) 994-5801

MATTHEW CARLSON (SBN 273242)
(mcarlson@carlsonlegalservices.com)
Carlson Legal Services
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:     (415) 817-1470

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC,<br><br>Defendant. | Case No. CV  13-3826-EMC<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:   October 21, 2015<br>Hearing Time:  9:30 AM<br>Courtroom:      5<br>Judge:          Hon. Edward M. Chen |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................1

II.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ........................................4

III. ARGUMENT ....................................................................................................5

     A.    THE COURT SHOULD CERTIFY PLAINTIFFS' CAL. LABOR CODE
          § 2802 CLAIM FOR MILEAGE AND TELEPHONE EXPENSES. ....................5

          i.     The IRS reimbursement rate is a valid method for calculating for
               drivers' actual vehicle expenses.................................................7

          ii.    Drivers' expenses for cell phone use are also easily calculable
               administratively....................................................................12

     B.    THE COURT SHOULD CERTIFY A SUB-CLASS OF ALL DRIVERS
          WHO DROVE THROUGH AN INTERMEDIARY TRANSPORTATION
          COMPANY...........................................................................13

     C.    THE CLASS SHOULD NOT EXCLUDE DRIVERS WHO DROVE
          UNDER AN INCORPORATED NAME. ...........................................17

CONCLUSION.....................................................................................................25

1

## **TABLE OF AUTHORITIES**

2

3

### **Cases**

4

Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,
  247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................ 12

Amero v. Townsend Oil Co.,
  2009 WL 1574229 (Mass. Super. Ct. April 15, 2009) ........................................ 17

Anfinson v. FedEx Ground Package System, Inc.,
  244 P.3d 32 (Wash. Ct. App. 2010) .................................................................... 19

Bates v. United Parcel Serv.,
  204 F.R.D. 440 (N.D. Cal. 2001) .......................................................................... 5

Berwick v. Uber Technologies, Inc.
  No. 11-46739 EK (Cal. Labor Comm. June 3, 2015) ............................................ 6

Blackie v. Barrack,
  524 F.2d 891 (9th Cir. 1975) .............................................................................. 13

Bowerman v. Field Asset Servs., Inc.,
  2015 WL 1321883 (N.D. Cal. Mar. 24, 2015) ................................................ 5, 12

Campbell v. Gen. Dynamics Gov't Sys. Corp.,
  407 F.3d 546 (1st Cir. 2005) ............................................................................... 23

Canda v. Industrial Comm'n,
  607 P.2d 403 (Colo. App. 1980) ......................................................................... 19

Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.,
  2014 WL 183956 (C.D. Cal. Jan. 14, 2014) ....................................................... 15

Cochran v. Schwan's Home Serv., Inc.,
  228 Cal. App. 4th 1137 (Ct. App. 2014) ............................................................. 12

ConAgra Foods, Inc. v. Draper,
  276 S.W.3d 244 (Ark. 2008) ............................................................................... 17

Dalton v. Lee Publications, Inc.,
  270 F.R.D. 555 (S.D. Cal. 2010) .................................................................. 8, 9, 13

Darrow v. WKRP Mgmt., LLC,
  2011 WL 2174496 (D. Colo. June 3, 2011) .......................................................... 8

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

Edson v. State of Vermont,
    830 A.2d 671 (Vt. Sup. Ct. 2003) ............................................................ 19

Ellis v. Costco Wholesale Corp.,
    285 F.R.D. 492 (N.D. Cal. 2012) ........................................................ 5, 10

Estrada v. FedEx Ground Package Sys., Inc.,
    154 Cal. App. 4th 1, 19 (2007) .......................................................... 7, 12

Frazier v. Preferred Operators, Inc.,
    861 A.2d 1130 (Vt. 2004) ...................................................................... 17

Gattuso v. Harte-Hanks Shoppers, Inc.,
    42 Cal. 4th 554 (2007) ............................................................................. 7

Gentry v. Superior Court,
    42 Cal. 4th 443 (2007) ........................................................ 20, 21, 22, 23

Guifu Li v. A Perfect Day Franchise, Inc.,
    270 F.R.D. 509 (N.D. Cal. 2010) ........................................................... 21

Guifu Li v. A Perfect Franchise, Inc.,
    2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) ......................................... 11

Hampton Hardware, Inc. v. Cotter & Co.,
    156 F.R.D. 630 (N.D. Tex. 1994) ......................................................... 22

In re FedEx Ground Package System, Inc., Employment Practices Litigation,
    712 F. Supp. 2d 776 (N.D. Ind. 2010) .................................................. 19

In re Universal Serv. Fund Telephone Billing Practice Litigation,
    219 F.R.D. 661 (D. Kan. 2004) .............................................................. 10

Jimenez v. Allstate Ins. Co.,
    2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) ........................................ 9

Kamakahi v. Am. Soc'y for Reprod. Med.,
    305 F.R.D. 164 (N.D. Cal. 2015) ........................................................... 12

Koral v. Inflated Dough, Inc.,
    2014 WL 4904400 (D. Co. Sept. 9, 2014) .............................................. 8

Lee v. ABC Carpet & Home,
    236 F.R.D. 193 (S.D.N.Y. 2006) .......................................................... 19

Lewis v. Starbucks Corp.,
    2008 WL 4196690 (E.D. Cal. Sept. 11, 2008) ....................................... 9

iii

Leyva v. Medline Indus. Inc.,
  716 F.3d 510 (9th Cir. 2013) .................................................. 14

Marsu, B.V. v. Walt Disney Co.,
  185 F.3d 932 (9th Cir. 1999) ............................................... 9, 13

Martin v. Shelby Telecom, LLC,
  2012 WL 2476400 (N.D. Ala. June 26, 2012)........................... 18

Martinez v. Combs,
  49 Cal. 4th 35 (2010) ...................................................... 14, 15

Martins v. 3PD, Inc.,
  2013 WL 1320454 (D. Mass. Mar. 28, 2013)........................... 17

McMahan v. Heart 'N Soul Tax Servs. of Vallejo, Inc.,
  2008 WL 4292732 (Cal. Ct. App. Sept. 22, 2008) ...................... 6

Meredith v. Honeywell Inter., Inc.,
  245 Fed. Appx. 325 (4th Cir. 2007)...................................... 17

Mevorah v. Wells Fargo Home Mortgage, Inc.,
  2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) ........................... 22

Mohamed v. Uber Technologies, Inc.,
  2015 WL 3749716 (N.D. Cal. June 9, 2015).......................... passim

Moyle v. County of Contra Costa,
  2007 WL 4287315 (N.D. Cal. Dec. 5, 2007)............................ 10

NLRB v. OS Transport LLC,
  358 NLRB 117, 358 NLRB 1, 2012 WL 3839418 (NLRB 2012)........... 19

Norris-Wilson v. Delta-T Group, Inc.,
  270 F.R.D. 596 (S.D. Cal. 2010) ......................................... 11

Ochoa v. McDonald's Corp. et al,
  2015 WL 5654853 (N.D. Cal. Sept. 25, 2015) .......................... 16

O'Connor v. Uber Technologies, Inc.,
  82 F. Supp. 3d 1133 (N.D. Cal. 2015) ................................... 21

Ojeda-Sanchez v. Bland Farms,
  600 F. Supp. 2d 1373 (S.D. Ga. 2009)................................... 22

Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.
  325 F. Supp. 2d 1252 (D. Utah 2004)................................... 22

iv

Parilla v. Allcom Constr. & Install. Svcs., LLC,
    2009 WL 2868432 (M.D. Fl. 2009) ................................................................. 19

Phelps v. 3PD, Inc.,
    261 F.R.D. 548 (D. Or. 2009) .................................................................. 17, 19

Piekarski v. Amedisys Illinois, LLC,
    2013 WL 6055488 (N.D. Ill. Nov. 12, 2013) ......................................... 24

Richie v. Blue Shield of California,
    2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) ......................................... 2, 5, 9, 12

Rose v. City of Hayward,
    126 Cal. App. 3d 926 (Ct. App. 1981) .................................................. 11

Ruiz v. Affinity Logistics, Corp.,
    2009 WL 648973 (S.D. Cal. 2009) ........................................................ 19

S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations,
    48 Cal. 3d 341 (1989) ............................................................... 14, 16, 18

Sakkab v. Luxottica Retail N. America,
    No. 13–55184 (9th Cir. Sept. 28, 2015) ............................................... 20

Schramm v. JPMorgan Chase Bank, N.A.,
    2013 WL 7869379 (C.D. Cal. Dec. 13, 2013) ...................................... 12

Schulz v. QualxServ, LLC,
    2012 WL 1439066 (S.D. Cal. Apr. 26, 2012) ........................................ 9

Shankle v. B-G Maint. Mgmt. of Colorado, Inc.
    163 F.3d 1230 (10th Cir. 1999) ............................................................ 22

Sjoblom v. Charter Communications, LLC,
    2007 WL 5314916 (W.D. Wis. Dec. 26, 2007) .................................... 22

Skirchak v. Dynamics Research Corp.,
    432 F. Supp. 2d 175 (D. Mass. 2006) .................................................... 23

Villalpando v. Excel Direct Inc.,
    303 F.R.D. 588 (N.D. Cal. 2014) ........................................................... 13

Ware v. Industrial Accident Comm'n,
    318 Ill. App. 3d 1117 (Ill. Ct. App. 2000) ........................................... 19

Wisconsin Cheese Service, Inc. v. Dep't of Industry, Labor and H.R.,
    322 N.W.2d 495 (Wis. Ct. App. 1982) .................................................. 19

v

Zellagui v. MCD Pizza, Inc.,
    59 F. Supp. 3d 712 (E.D. Pa. 2014) ...................................................................... 8

**Statutes**

Cal. Labor Code § 2802 ...................................................................................... passim

Cal. Labor Code § 351 ................................................................................................ 4

California Unfair Competition Law,
    Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL") ...................................... 4

Code Civ. Proc., § 639 ............................................................................................. 12

**Rules**

Civ. L. R. 7-9 ........................................................................................................... 1

Fed. R. Civ. P. 23 .............................................................................................. 6, 13

**Regulations**

IRS Rev. Proc. 2010-51,
    http://www.irs.gov/pub/irs-drop/rp-10-51.pdf .................................................. 7

vi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     INTRODUCTION

On September 1, 2015, the Court entered an order [Dkt. 342] granting in part Plaintiffs' motion for class certification and inviting Plaintiffs to submit a supplemental brief addressing issues stemming from the order.  Pursuant to that order, Plaintiffs now provide this brief requesting that the Court certify under Cal. Labor Code § 2802 their expense reimbursement claim for mileage-based expenses (i.e. those encompassed within the IRS reimbursement rate, as well as phone expenses), and that the Court certify a subclass of drivers who have driven for Uber through intermediary transportation companies.  In addition, Plaintiffs respectfully submit that the Court erred in excluding from the class drivers who used a corporate name to contract with Uber and drivers who accepted Uber's 2014 arbitration agreement.  Plaintiffs thus request that the Court modify the order to include these drivers in the class.[1]

As discussed below, it is entirely appropriate for the Court to certify the expense reimbursement claim under § 2802.  Indeed, that is the primary source of damages that Plaintiffs seek in this case.  Most of the drivers' expenses—those incurred in using and maintaining their vehicles--can be calculated using the IRS mileage reimbursement rate, which is intended exactly for the purpose of making it unnecessary for individuals who use vehicles for work to maintain documentation for every expense related to the use of their vehicles.  And because the mileage reimbursement can be calculated on a ministerial basis using the IRS rate and Uber's records of the miles that class members have driven transporting passengers, it is certifiable.

To the extent the Court has expressed concern that Plaintiffs would seek to certify the §2802 claim based only upon mileage reimbursement, that is not an adequacy issue for Plaintiffs or their counsel.  It is simply a recognition by Plaintiffs and their counsel that mileage (as well as phone usage, also discussed below) is the certifiable expense that Uber drivers could recover on a

---

[1]     To the extent that the Court did not envision Plaintiffs addressing in this supplemental briefing their additional issues with the class certification order (i.e. the exclusion from the class of drivers who used corporate names, and drivers who accepted the 2014 arbitration agreement), Plaintiffs hereby request permission pursuant to Civ. L. R. 7-9, for the Court to allow them to request reconsideration of these issues.

1

classwide basis.  Simply because drivers may have incurred other expenses besides for those covered by the IRS mileage reimbursement rate does not mean that a class should not be certified to recover mileage, when denying class certification on this claim would result in the vast majority of the class not obtaining any reimbursement of expenses (even if Plaintiffs succeed in proving that they were misclassified, and thus would be entitled to reimbursement of expenses under § 2802).  As the Court has done previously (in Richie v. Blue Shield of California, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)), it can simply certify the § 2802 claim for certain expenses (here, mileage and phone charges), and not certify drivers' claims for other expenses.  With respect to other expenses that drivers have incurred, drivers would not be prevented from seeking reimbursement for those expenses; they simply would not be obtained as part of the class mechanism in this case.  Thus, Plaintiffs here are not being inadequate in not seeking other expenses on a classwide basis.[2]  They simply recognize that variability in other types of expenses that drivers may have incurred are not calculable on a common basis in the same way that mileage expenses are ministerially calculable.[3]

---

[2]   Plaintiffs submit that the issue is not one of adequacy.  At the damages phase of this case (not at the liability phase), it will be a question of superiority: namely, is it superior for a class of Uber drivers to be able to recover reimbursement for mileage expenses based on the IRS reimbursement rate, or is it preferable for no class to be certified on this claim, and thus only the drivers with the interest and wherewithal to pursue their own separate claims for reimbursement to receive any compensation for this claim?

Moreover, as discussed further below, and as Plaintiffs suggested in their class certification papers and at the hearing, if the Court wants to have drivers be given the opportunity to seek reimbursement for other expenses as part of this case, that could be done through a second damages phase mini-trial process.  Or drivers could simply be notified in the class notice what damages are being sought here, and be given the opportunity to pursue additional expense reimbursement if they wished outside of this class proceeding.

[3]   Were Plaintiffs to retain an expert (following class certification) to conduct sampling of class members' non-mileage expenses and draw extrapolations from the samples, Uber would certainly object vociferously that such sampling is improper and that it should have the opportunity to litigate each driver's individual expenses.  Following the distribution of class notice and the conducting class discovery, Plaintiffs could indeed retain an expert to attempt this type of sampling.  However, to deflect the anticipated outcry by Uber that such sampling is simply not permissible, Plaintiffs proposed an alternative to the Court that drivers could be given the opportunity, if they chose, to make such a showing of additional expenses through mini-trials in a (continued on next page)

2

1    With respect to the scope of the certified class, Plaintiffs respectfully request that the Court

2  reconsider certain exclusions it made from the class.  First, as the Court suggested, it could certify

3  a subclass of drivers who have driven for Uber through intermediary transportation companies.

4  Liability for these drivers' claims can be established on a classwide basis just the same as the

5  drivers who contracted directly with Uber, since these drivers have the common legal claim that

6  Uber was their joint employer, and they have all been subject to Uber's same rules and procedures,

7  as well as Uber's ability to terminate them at will.[4]  Second, the Court's decision to exclude from

8  the class those drivers who contracted through a corporate name contradicts a number of court

9  decisions that have recognized that validating such a distinction would simply allow employers to

10  make an end-run around misclassification laws by requiring their workers to incorporate.  And

11  finally, the Court's decision to exclude from the class those drivers who accepted Uber's 2014

12  arbitration agreement is based on the erroneous conclusion that drivers' individual circumstances

13  would need to be evaluated to determine whether that arbitration agreement is enforceable.[5]

14  These portions of the Court's ruling may well have excluded as much as 90% of the putative class

15  from this case.[6]  Plaintiffs thus urge the Court to consider the arguments made here regarding the

16

17  (footnote continued from previous page)
damages phase of the case.

18

19  [4]    Although the expense reimbursement damages for these drivers may require a different
type of calculation from the drivers who contracted directly with Uber, their gratuity claim would

20  be the same.

21  [5]    Because of page limitations, Plaintiffs (like Uber) addressed the arbitration clause only
briefly in their class certification briefing.  Based on the Court's prior order invalidating the 2014

22  arbitration agreement in Mohamed v. Uber Technologies, Inc., 2015 WL 3749716 (N.D. Cal. June
9, 2015), Plaintiffs did not expect that the Court might determine that individualized issues might

23  need to be decided to determine the arbitration clause's enforceability with respect to particular
drivers.  Likewise, this issue was not discussed at the three-hour class certification hearing, and

24  thus Plaintiffs did not have opportunity at that time to respond to the Court's concern on this issue.
Plaintiffs thus respectfully request that the Court consider the arguments presented here as to why

25  such individualized consideration is not necessary.

26

27  [6]    Although Plaintiffs have been conferring with Uber since the class certification order was
issued regarding Uber's efforts to compile a class list, Plaintiffs have not yet received a class list,

28  (continued on next page)

Court's decision to so drastically limit the scope of the class.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case was filed on August 16, 2013, on behalf of individuals who have worked as drivers for Uber, alleging that these drivers have been misclassified as independent contractors and thereby denied reimbursement of their necessary business expenses under Cal. Labor Code §2802. Plaintiffs also brought a claim under Cal. Labor Code § 351 (enforceable through the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL")), alleging that Uber has advertised to its customers that a gratuity is included in the price that it charges for its car service, but Uber does not remit any such gratuity to the drivers.

In 2013, Uber disseminated to its drivers a revised contract that drivers were required to accept if they wanted to continue driving for Uber, which included a buried arbitration provision. Plaintiffs filed an emergency motion for protective order challenging Uber's distribution of the arbitration clause, and the Court ordered Uber to temporarily cease distributing the agreements, then eventually ordered Uber to issue corrective notice and make minor modifications to the agreement's onerous and illusory opt-out provision.  See Dkt. 60, 99.  The Court later confronted the enforceability of both the 2013 and revised 2014 arbitration agreements in a related case, Mohamed v. Uber Technologies, Inc., 2015 WL 3749716 (N.D. Cal. June 9, 2015).  There, the Court ultimately concluded that both agreements were unconscionable and unenforceable.

Meanwhile, the parties in this case briefed class certification and the Court held a hearing on August 8, 2015.  See Dkt. 331.  On September 1, 2015, the Court granted in part Plaintiffs' Motion for Class Certification [Dkt. 342], certifying Plaintiffs' misclassification claim and their

(footnote continued from previous page)
or a date from Uber as to when it believes it will have the list compiled.  However, Uber has stated publicly that the Court's order resulted in a class of approximately 15,000 out of a potential 160,000 drivers.  See Ex. 1 (all exhibits cited herein are to the Liss-Riordan Declaration, filed herewith).  If these numbers are accurate, that means that, even if Plaintiffs are correct that Uber has misclassified its drivers as independent contractors across California, the vast majority of the drivers will not be able to obtain recovery from this case, should the Court's current certification order stand.

1    gratuities claim but not the expense reimbursement claim.  The Court excluded from the class

2    those drivers who contracted through corporate names or drove for Uber through intermediary

3    transportation companies.  The Court also excluded from the class those drivers who accepted

4    Uber's 2014 arbitration agreement (i.e. all Uber drivers in California who have driven for Uber

5    since June 2014, unless they opted out of the arbitration agreement), based on the conclusion that

6    (unlike Uber's 2013 arbitration agreement) individualized issues would be necessary to determine

7    whether the 2014 arbitration agreement was enforceable as against different drivers.

8    **III.    ARGUMENT**

9        **A.  The Court Should Certify Plaintiffs' Cal. Labor Code § 2802 Claim For Mileage And
          Telephone Expenses.**

10           In its class certification order, the Court did not certify the § 2802 claim, expressing

11   concern about the possibility of Plaintiffs waiving certain "elements of damage" in favor of the

12   IRS reimbursement rate.  Dkt. 342 at 28.   However, this concern should not preclude certification

13   of this claim with respect to drivers' vehicle-related and telephone expenses.  Plaintiffs are not

14   waiving any elements of damages.  By simply certifying certain types of expense reimbursement

15   (which are ascertainable on a classwide basis), the Court will allow the class to seek to recover

16   damages for these expenses, which are incurred by all Uber drivers.  There would be no need for

17   drivers to "waive" their claims to other expenses; they would simply not be recoverable through

18   the class mechanism.  See Richie, 2014 WL 6982943 (certifying claims for certain categories of

19   expense reimbursement).[7]

20   ────────────────────────

21   [7]      Thus, the Court could simply advise class members in the class notice that only IRS
     mileage expenses are being sought on a classwide basis in this case and that drivers are free to
22   pursue other expense reimbursement through other means.  Or, as Plaintiffs raised before, the
     Court could, if it chose, establish a procedure in this case (in a later damages phase) for mini-trials
23   for those class members who may seek to recover additional expense reimbursement damages.
     See, e.g, Bowerman v. Field Asset Servs., Inc., 2015 WL 1321883, *13 (N.D. Cal. Mar. 24, 2015)
24   (approving a trial plan in which "[i]f liability is established in this first phase, the parties will
     proceed to the second phase, in which damages will be determined" through "several possible
25   means … including through 'individual hearings' if necessary"); Ellis v. Costco Wholesale Corp.,
     285 F.R.D. 492, 538-39 (N.D. Cal. 2012) (approving use of "the Teamsters framework, in which
26   individual class members will present their claims for relief in a second phase of trial if liability is
     established"); Bates v. United Parcel Serv., 204 F.R.D. 440, 448 (N.D. Cal. 2001) (approving
27   (continued on next page)

28
                                            5
     ───────────────────────────────────────────

1    In order to transport Uber's passengers and to run Uber's application, all Uber drivers

2    necessarily incur expenses for a vehicle and a smartphone, and thus, these expenses are

3    "necessary" and common to the class.  Furthermore, these expenses are ascertainable on a

4    ministerial basis from Uber's records, because Uber's data show the miles drivers have driven

5    while transporting Uber passengers and the deductions taken for the use of Uber-issued phones.

6    See Ex. 2 through 7 (trip histories showing mileage); Ex. 8 at 8703 (pay statements showing

7    deductions for iPhone).

8    It is evident that vehicle expenses covered by the IRS rate (i.e. gas, insurance,

9    maintenance, and repairs) and telephone expenses will comprise the majority of expenses that

10   would be incurred by drivers for a car service.  The alternative--denying certification for the class

11   altogether on the § 2802 claim, and thus preventing the vast majority of Uber drivers from being

12   able to recover any reimbursement for their expenses at all--would be "throwing the baby out with

13   the bathwater" and defeat the purpose of Rule 23.  Particularly given the hurdles that class

14   members would face in seeking to recover reimbursement for all of their actual individualized

15   expenses (for which most of them will not have documentation), it is in the best interests of the

16   class to certify the § 2802 claim for mileage and telephone expenses and allow the class to seek

17   reimbursement based on the IRS mileage reimbursement rate, which is easily ascertainable from

18   Uber's records.[8]

19   ────────────────────────────────────────────

20   (footnote continued from previous page)
     plaintiffs' proposal that "the trial be bifurcated into two phases: a first phase to determine class

21   liability and equitable relief issues, and a subsequent phase to address named plaintiff and class
     damages" and noting that "[t]he district court has 'broad discretion' to order separate trials under

22   this rule").

23   [8]   As an example, the driver who recently prevailed in her expense reimbursement claim

24   against Uber before the California Labor Commissioner was awarded expenses based upon the
     IRS mileage rate rather than being required to produce receipts and documentation of her actual

25   expenses. See Berwick v. Uber Technologies, Inc. No. 11-46739 EK (Cal. Labor Comm. June 3,
     2015) (Exhibit 9), at 10 (noting that "[u]se of the Internal Revenue Service mileage allowance will

26   satisfy the expenses incurred in use of an employee's car in the absence of evidence to the
     contrary" and awarding $3,622.08 in mileage reimbursement).  See also McMahan v. Heart 'N

27   Soul Tax Servs. of Vallejo, Inc., 2008 WL 4292732, *2 (Cal. Ct. App. Sept. 22, 2008) (reversing

28   (continued on next page)

6

### i.     The IRS reimbursement rate is a valid method for calculating for drivers' actual vehicle expenses.

The IRS business mileage rate is designed to cover the following expenses: (1) depreciation or lease payments on a vehicle; (2) maintenance & repairs; (3) tires; (4) gas; (5) oil; (6) insurance; and (7) license and registration fees.[9]  The IRS reimbursement rate would provide reimbursement for the majority of drivers' vehicle-related expenses, and indeed one of the purposes of the rate is to make it unnecessary for individuals to maintain documentation for, and prove, the specific expenses they incurred in operating a vehicle for work.  See Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 566 (2007) ("The Labor Commissioner has … [determined that the] (IRS) rate of reimbursement is the acceptable level for reimbursement of mileage for an employee's use of a personal vehicle … because of the difficulty in accurately determining the precise amount an employee should be reimbursed for purposes of meeting the indemnification language contained in Section 2802") (internal citation omitted).  It is evident that vehicle expenses will be the primary work-related expenses that would be incurred by drivers for a car service.  Indeed, numerous cases involving drivers have utilized the IRS reimbursement rate as the measure of expense reimbursement damages, recognizing that it effectively compensates drivers for their main expenses – namely, vehicle-related expenses. [10]  See, e.g., Dalton v. Lee

---

(footnote continued from previous page)

judgment on § 2802 claim where trial court had required plaintiff to produce only actual expense receipts in lieu of mileage records); but see Estrada v. FedEx Ground Package Sys., Inc., 154 Cal. App. 4th 1, 19 (2007) ("[t]he trial court refused to permit proof of expenses by expert analysis and lay testimony about FedEx's estimates of the drivers' expenses, limiting the drivers' proof to receipts and records.") Thus, the reality is that, if the Court does not allow certification of the §2802 claim based upon the IRS mileage rate, most Uber drivers will not obtain any remedy for their expense reimbursement claim.  It is evident that most drivers will not have kept receipts or precise records of their expenses, and thus unless this claim can be pursued on a classwide basis, based on the IRS rate, most of these drivers will be deprived altogether of a remedy for this claim.

[9]     See IRS Rev. Proc. 2010-51, http://www.irs.gov/pub/irs-drop/rp-10-51.pdf

[10]     Attached as Exhibits 2 through 7 are declarations from a handful of class members illustrating this point.  As shown in these declarations, when asked to compare their estimated actual expenses with the IRS reimbursement rate for several months' of driving (based upon their (continued on next page)

1   Publications, Inc., 270 F.R.D. 555, 564 (S.D. Cal. 2010) (court endorsed use of IRS standard

2   mileage allowance to calculate damages for newspaper delivery drivers); Zellagui v. MCD Pizza,

3   Inc., 59 F. Supp. 3d 712, 721 (E.D. Pa. 2014) (class of pizza delivery drivers awarded damages for

4   their vehicle expenses at the IRS reimbursement rate); Koral v. Inflated Dough, Inc., 2014 WL

5   4904400, *3 (D. Co. Sept. 9, 2014) (pizza delivery driver's use of the IRS and AAA

6   reimbursement rates to demonstrate that he was being undercompensated by his employer was

7   reasonable).[11]

8   _____

9   (footnote continued from previous page)

10  records from Uber of the number of miles they drove passengers), the IRS rate was close to the
    drivers' estimate of their actual expenses. See Ex. 3 at ¶¶ 4-5 (class member Fayyaz Merchant

11  estimated his expenses for gas, oil changes, other car maintenance, and insurance at $1,710 for
    three months of driving for Uber, compared to IRS mileage reimbursement calculation of $1,579

12  for those months); Ex. 4 at ¶¶ 4-5 (class member Guy Gottlieb estimated his vehicle-related
    expenses at $2,190 for three sample months, compared to IRS mileage reimbursement rate of

13  $2,122); Ex. 7 at ¶¶ 4-5 (class member Garen Arzumanyan estimated his expenses for gas, oil
    changes, and insurance at $1,830 for three sample months, compared to IRS mileage

14  reimbursement rate of $2,669); Ex. 2 at ¶¶ 4-5 (class member Mark Meade estimated his expenses
    for gas and insurance at $1,560 for three sample months, compared to IRS mileage reimbursement

15  rate of $1,724);  Ex. 6 at ¶¶ 4- 5 (class member Craig Dunn estimated his expenses for gas,
    insurance, and car maintenance and repairs at $1,245 for three sample months, compared to IRS

16  mileage reimbursement of $1,002).  See Darrow v. WKRP Mgmt., LLC, 2011 WL 2174496, *4

17  (D. Colo. June 3, 2011) (approving the use of the IRS reimbursement rate and noting that "[t]he
    fact that Plaintiff's estimate [of his actual business mileage expenses] is consistent with IRS and

18  AAA figures . . . is sufficient for the Court to infer that the estimate is a reasonable approximation
    of the actual figure").

19          To the extent that the Court desires to see a greater sample of class members' actual

20  expenses (or wants Plaintiffs to submit an expert report analyzing them), in order to determine
    whether the IRS mileage rate is a suitable means for calculating drivers' expense reimbursement

21  claims, Plaintiffs should first be given the class list and thus have access to contacting more class
    members, in order to obtain additional samples.  (Based on the Court's current class definition,

22  Plaintiffs had only a limited group of drivers who are currently included in the class, who have
    spontaneously contacted Plaintiffs' counsel, prior to notice having been issued, from whom they

23  could attempt to gather this evidence.)  Indeed, this analysis would be an appropriate undertaking
    for a damages phase of the case; Plaintiffs do not yet have sufficient discovery (or access to class

24  members' contact information) to have completed an exhaustive analysis at this point.  The Court
    directed the parties to focus their discovery efforts to date on class certification issues, rather than

25  detailed class damages calculations, which is what the parties have done.

26          [11]     Even if the IRS rate is not a perfect proxy for drivers' actual damages, courts have noted

27  that "[t]he law requires only that some reasonable basis of computation of damages be used, and

28  (continued on next page)

As noted above, the Court could certify the § 2802 claim for IRS mileage reimbursement expenses for the class, without waiving class members' ability to seek additional expenses if they choose to pursue them.  In other cases seeking reimbursement under § 2802, plaintiffs have defined the categories of "necessary business expenses" they are seeking and confined them, for example, to mileage expenses, telephone expenses, or home office expenses.  For instance, in Richie, 2014 WL 6982943, *16, the plaintiff initially pled claims for both telephone and internet expenses but "[d]uring the hearing, Plaintiff disavowed an attempt to assert a class claim based on alleged unreimbursed internet expenses" Id., *12, n. 8. The Court in that case made no comment upon the plaintiff's decision to forgo seeking this particular category of expense on behalf of the class and ultimately certified only the claim for reimbursement of telephone expenses. The Court could do the same here and certify a class for only mileage reimbursement and/or telephone reimbursement (discussed below), and could simply exclude other categories of expenses from the certified claim.[12]

---

(footnote continued from previous page)

the damages may be computed even if the result reached is an approximation." Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 938-39 (9th Cir. 1999).  "This is especially true where ... it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss…" Id. at 939.  Thus, courts have found that "the IRS standard mileage allowance … provides a reasonable basis to calculate mileage damages." Dalton v. Lee Publications, Inc., 270 F.R.D. 555, 564 (S.D. Cal. 2010); see also Lewis v. Starbucks Corp., 2008 WL 4196690, *6 (E.D. Cal. Sept. 11, 2008) (utilizing IRS reimbursement rate to gauge reasonableness of settlement award of class claims under § 2802); Schulz v. QualxServ, LLC, 2012 WL 1439066, *6 (S.D. Cal. Apr. 26, 2012) (rejecting defendants' argument that "the reimbursement claim involves an individualized inquiry into each technician's expenses, for example, the distance driven between service calls and the particular plan selected for internet and cell phone services," because these "arguments relate to the amount of damages incurred by an individual technician" and can be deferred until a later stage where the "common question of whether Defendants' uniform reimbursement policy" violates § 2802 can be determined on a common basis).

[12]     In any event, these issues regarding how to adjudicate damages can be deferred to a later damages phase of the case.  Courts frequently certify claims for liability and defer to a later stage of the proceedings how exactly they will adjudicate damages issues. See, e.g., Jimenez v. Allstate Ins. Co., 2012 WL 1366052, *21 (C.D. Cal. Apr. 18, 2012), aff'd (Sept. 3, 2014) (noting that "the Court finds that the issues of liability are properly subject to class treatment, but has not yet determined how the damages phase of a trial might proceed" and finding that "the risk that individual damage calculations will be unmanageable is better addressed down the road, if (continued on next page)

9

1    In its order, the Court framed its concern regarding this claim as going to the "adequacy"

2  of Plaintiffs' representation of the class, <u>see</u> Dkt. 342 at 28; however, the real issue concerns

3  which expenses should be certified and which should not.  The Court need not fret over whether

4  class members might waive some portion of their expenses; the Court can simply certify the §2802

5  claim for mileage and telephone expenses, and can either decline to certify a class as to the other

6  categories of expenses, or can allow for later individualized determinations (through mini-trials)

7  for those drivers who may want to pursue reimbursement for those additional categories of

8  expenses.  However, "[t]his is not a case where the class representatives are pursuing relatively

9  insignificant claims while jeopardizing the ability of class members to pursue far more substantial,

10  meaningful claims." <u>In re Universal Serv. Fund Telephone Billing Practice Litigation</u>, 219 F.R.D.

11  661, 669 (D. Kan. 2004).  Instead, Plaintiffs are seeking the bulk of drivers' expenses (for their

12  vehicles and telephones) and are proposing two alternatives for drivers who may seek to obtain

13  reimbursement of other expenses. Thus, the Court's concern that the plaintiffs here could be

14  waiving substantial damages on behalf of the class through use of the IRS reimbursement rate is

15  unwarranted.[13]

16

17  (footnote continued from previous page)

18  necessary' by altering or amending the class, not by denying certification at the outset.") (internal
   citation omitted).

19       In short, these issues are not grounds to deny class certification, when the Court has
   concluded that the misclassification liability issue can be decided on a classwide basis, and when

20  it legally follows that, if drivers were misclassified, then they are entitled to reimbursement of
   expenses under §2802.  As this Court has recognized, in a case in which liability can be

21  established on a classwide basis, individual issues that may arise at the damages phase should not
   defeat certification.  <u>See</u> <u>Ellis v. Costco Wholesale Corp.</u>, 285 F.R.D. 492, 538-39 (N.D. Cal.

22  2012).  <u>See also</u> <u>Moyle v. County of Contra Costa</u>, 2007 WL 4287315 (N.D. Cal. Dec. 5, 2007)
   (noting that "[i]f no solution is found to resolve the damages of the class members, the court even

23  has the option of entering a judgment of liability and allowing the class members to bring separate
   actions for damages" but finding that "the possible divergence among plaintiffs in the proposed

24  classes is not sufficient to defeat class certification.").

25  [13]      Indeed, compared to vehicle-related expenses and telephone expenses, it is not entirely

26  clear that drivers would succeed in contending that these various other categories of expenses
   (such as for unreimbursed tolls, car washes, bottled water, mints, or dry cleaning) would all be

27  considered "necessary" business expenses as required under § 2802.  <u>See</u> Ex. 2 through 7 at ¶ 6
   (continued on next page)

28

10

1    In sum, the Court should certify the plaintiffs' mileage reimbursement claim using the IRS

2    reimbursement rate to cover drivers' vehicle-related expenses because this formula will allow all

3    class members to recover expense damages, even where they have not retained detailed records

4    and receipts for their actual expenses.  It is simply unrealistic to expect that many drivers will have

5    retained all of their receipts for gas, insurance, and car maintenance over the course of multiple

6    years, and requiring drivers to produce such records and prove their actual expenses would

7    severely diminish most drivers' recovery.  The IRS reimbursement rate will provide a principled

8    proxy for measuring those expenses without excluding all those drivers who failed to hold on to

9    their receipts.  For those drivers who did hold on to their receipts (or want to attempt to pursue

10   greater reimbursement through estimates of their expenses), they can be permitted to do so, either

11   outside of this proceeding, or by being permitted to seek additional reimbursements through mini-

12   trials in a second-stage damages phase of the case.[14]

---

(footnote continued from previous page)

(describing other categories of expenses drivers have incurred that are not covered by the IRS reimbursement rate).  These samples show these other types of expenses to be more minor than the vehicle-related expenses drivers have incurred.  See Ex. 3, at ¶ 6 (estimating "IRS covered" expenses at $1,710 for three months and other categories of expenses for that same time period at approximately $310); Ex. 2 ¶¶ 4, 6 (estimating "IRS covered" expenses at $1,560 for three months and his other expenses for that same time period at $327); Ex. 4 at ¶¶4, 6 (estimating "IRS covered" expenses at $2,190 and his other categories of expenses at approximately $345).

But more importantly, these non-vehicle expenses may simply be too varied and wide-ranging to warrant certification.  Indeed, other courts have criticized plaintiffs' failure to "limit the expenses for which Plaintiffs seek reimbursement to [] a definite and identifiable list." Norris-Wilson v. Delta-T Group, Inc., 270 F.R.D. 596, 610 (S.D. Cal. 2010); see also Guifu Li v. A Perfect Franchise, Inc., 2011 WL 4635198, *14 (N.D. Cal. Oct. 5, 2011).  Given that these other categories of expenses are more variable and are not as plainly "necessary" to their work as Uber drivers, Plaintiffs submit that it would be in the best interest of the class to certify the § 2802 claim based on mileage reimbursement and telephone expenses only, but permit drivers to make their own additional showing as to other categories expenses (or, alternatively, pursue this reimbursement outside of this proceeding) if they so desire.

[14]   The mere fact that such additional expenses may exist should not preclude class certification altogether on the § 2802 claim, and thus deprive the vast majority of the class from recovering anything on this claim. See Rose v. City of Hayward, 126 Cal. App. 3d 926, 934 (Ct. App. 1981) ("While the amount of individual claims may vary from member to member, the introduction of that variable into the equation in no way alters our decision. The law

(continued on next page)

11

ii.     **Drivers' expenses for cell phone use are also easily calculable administratively.**

In addition to vehicle expenses, another main category of expense incurred by Uber drivers is their use of phones to run the Uber application.  Many drivers have leased their phones from Uber, and thus these damages would be easily ascertainable because Uber's records reflect charges for leasing a cellphone from Uber. See Ex. 10; Ex. 8 at 8703.  As for those drivers who used their personal phones, courts have held that "when employees must use their personal cell phones for work-related calls, Labor Code section 2802 requires the employer to reimburse them." Cochran v. Schwan's Home Serv., Inc., 228 Cal. App. 4th 1137, 1140 (Ct. App. 2014); see also Richie, 2014 WL 6982943, *17 (certifying class for § 2802 claim for telephone expenses and noting that "employer was required to reimburse an employee for the reasonable expense of the mandatory use of a personal cell phone, even when the employee did not incur an 'extra expense' as a result of that call (for example, when the employee had an 'unlimited minutes' plan") (internal quotation omitted)).  Thus, the Court can and should certify the § 2802 claim for telephone expenses, in

---

(footnote continued from previous page)

unequivocally provides that each class member may establish damages independently without threatening the integrity of the class action."); Estrada v. FedEx Ground Package Sys., Inc., 154 Cal. App. 4th 1, 19 n. 18 (2007) (noting that "[o]n its own motion, the trial court appointed a referee (Code Civ. Proc., § 639) to take evidence, perform 'an accounting as to the expenses and reimbursements claimed by the individual plaintiffs and class members,' and to make recommendations to the court"); Kamakahi v. Am. Soc'y for Reprod. Med., 305 F.R.D. 164, 194 (N.D. Cal. 2015), leave to appeal denied (May 12, 2015) ("If necessary, the Court can appoint a ... special master to preside over individual damages proceedings or alternatively, decertify the class after the [violation] trial and instruct class members on how to prove damages individually."); Schramm v. JPMorgan Chase Bank, N.A., 2013 WL 7869379, *6 (C.D. Cal. Dec. 13, 2013) ("Courts have recognized and approved of conducting a trial on the issue of liability, and delegating computation of individual damages to a special master or magistrate judge post-trial"); Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P., 247 F.R.D. 156, 176 (C.D. Cal. 2007) (noting that "district courts retain numerous tools to manage individual damages issues that might arise at later stages of the litigation, including: (1) bifurcating liability and damage trials, (2) appointing a Special Master to preside over individual damages proceedings, (3) decertifying the class after the liability phase, (4) creating subclasses, or (5) altering the composition of the class"). See also Bowerman v. Field Asset Servs., Inc., 2015 WL 1321883, *13 (N.D. Cal. Mar. 24, 2015) (noting that "Plaintiffs propose several possible means of determining damages, including through 'individual hearings' if necessary" and finding that "unlike the trial plan in Dukes, under plaintiffs' proposed trial plan, damages will be considered only once liability is established, at which point [defendant] will have the opportunity to present individual defenses where appropriate").

1    addition to mileage expenses.[15]

2    **B. The Court Should Certify A Sub-Class of All Drivers Who Drove Through an Intermediary Transportation Company.**

3        In its order on class certification, the Court excluded from the class "drivers who drove for

4    third-party transportation companies" but invited further briefing on whether "an additional class

5    (or classes)" of these drivers should be certified.  Dkt. 342 at 43, 66.  The Court appeared to

6    suggest that these drivers like Plaintiff Thomas Colopy might be jointly employed by both Uber

7    and the intermediary companies that they drive through and requested that Plaintiffs address this

8    issue further.  Plaintiffs submit that, because drivers may have more than one employer, and

9    that—regardless of their relationship with the intermediary--these drivers' relationship with Uber

10   is common to one another (and indeed is the same as all drivers who contract directly with Uber),

11   the Court can and should certify a subclass of these drivers, since the joint employer analysis can

12   be performed for these drivers on a class-wide basis.[16]  Indeed, the only important difference for

13

14   [15]     The Court can use Uber's records to determine reimbursement amounts for many drivers,

15   and can estimate cell phone damages for the remainder based on the amount of time a given driver

16   was online, or by simply using the amounts paid by other drivers who leased their phones directly

17   from Uber as a reasonable estimate.  See Marsu, B.V, 185 F.3d at 938-39 ("[t]he law requires only

18   that some reasonable basis of computation of damages be used, and the damages may be computed

19   even if the result reached is an approximation").  For example, in Dalton, the court considered the

20   expense reimbursement claim of newspaper delivery drivers under § 2802 and noted that "in

21   addition to paying for their "own gas and automobile expenses, . . . [s]ome carriers buy the[ir]

22   rubber bands and bags from Defendant, [while] others purchase them elsewhere." 270 F.R.D. at

23   558.  However, the court ultimately certified a class on the plaintiffs' § 2802 claim, noting that

24   "the amount of damages is invariably an individual question and does not defeat class action

25   treatment." Id. at 564 (citing Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975)).  The same is

26   true here; that some drivers leased their phones directly "from Defendant, and others purchase[d]

27   them elsewhere," makes no difference because all drivers invariably incurred this necessary

28   expense (by running the Uber application on a phone), and, as in Dalton, the Court can rely on the

Uber's records to establish a reasonable basis for phone-related damages. See also Villalpando v.
Excel Direct Inc., 303 F.R.D. 588, 610 (N.D. Cal. 2014) (noting that while "there may be
individual issues related to [plaintiffs'] reimbursement claims because tools and supplies were
purchased outside of Excel and do not show up on weekly pay records, [] the presence of
individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)").   As in
these cases, "calculating [damages] here would not require so much individualized analysis to
defeat certification." Dalton, 270 F.R.D. at 564.

[16]     To be clear, Plaintiffs are not asking here that the Court include drivers who themselves
(continued on next page)

13

this sub-class of drivers is that their expense reimbursement damages calculations will vary because some drivers may have had certain expenses reimbursed by their intermediary transportation company, but not others, <u>see</u> Ex. 11 (Colopy Dep.) at 100:21-102:22,137:15-141:6. However, "damage calculations alone cannot defeat certification." <u>Leyva v. Medline Indus. Inc.</u>, 716 F.3d 510, 513 (9th Cir. 2013) (reversing where "district court denied certification because for each sub-class 'the damages inquiry will be highly individualized'"); <u>see also supra</u>, n. 7 (discussing methods of handling individual damages issues in a later damages phase).  Thus, the Court should certify a sub-class of drivers like Plaintiff Colopy, whose misclassification and gratuities claims can be determined on a classwide basis just like the rest of the class, and can defer an adjudication of their expense reimbursement damages to a second phase of proceedings.

Under the joint employment test articulated in <u>Martinez v. Combs</u>, 49 Cal. 4th 35 (2010), Uber is at the very least the joint employer of these drivers for purposes of their California Labor Code claims, because under <u>Martinez</u>, entities can be liable as a joint employer if they "either (1) exercise control over the employee's wages, hours or working conditions; or (2) allow him to suffer work or permit him to work; or (3) engage him, creating a common law employment relationship." <u>Guifu Li</u>, 281 F.R.D. at 401-02; <u>Martinez</u>, 49 Cal.4th at 64 ("the language of the IWC's 'employer' definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship…"). The Court has already determined that all the <u>Borello</u> factors can be decided on a common basis such that the third part of the joint-employer analysis – the existence of a common law employment relationship – has

(footnote continued from previous page)
had other drivers working under them such as Mark Forester.  Plaintiffs submit that the Court's concern about including drivers who "held themselves out as a distinct business," Dkt. 342, at 41, would be better addressed by excluding those drivers like Forester who had drivers working under them.  <u>See</u> Plaintiffs' motion for class certification, at 18, n. 24 (suggesting that Court might exclude these drivers, but that Court could create a subclass, if it deemed necessary, of drivers who, like Colopy, contracted with Uber through an intermediary transportation company).  By contrast, drivers like Colopy did *not* hold themselves out as a distinct business; on the contrary, while they may have been jointly employed by another entity in addition to Uber, there is no argument that they themselves had independent businesses.

14

already been shown to be capable of resolution on a class-wide basis.

As to the other parts of <u>Martinez</u> test, it is clear that they are common to all drivers who drove for Uber through intermediary companies because Uber uniformly exercises control over drivers' wages and working conditions, by setting the fares that are charged to Uber passengers and dictating various requirements about how they perform their work.[17]  Likewise, Uber has suffered and permitted all such drivers to work because it has to approve every driver who uses the Uber app, and has the uniform power to unilaterally veto a transportation company's hiring decision or fire a driver if that driver fails Uber's background check or fails to meet Uber's standards.[18]  Indeed, these "subcontractor" drivers have been bound by the same contracts as the rest of the Uber drivers in the certified class and are subject to the same requirements.[19]

---

[17]    Indeed, these "subcontractor" drivers are subject to all same requirements regarding star ratings, acceptance rates, and cancellation rates as any other Uber driver, meaning that Uber plainly controls how they perform their work when transporting Uber's passengers.  For example, these drivers, like all Uber drivers, receive emails directly from Uber, informing them of their star rating and acceptance rating, and the nature of any negative feedback they received from Uber's customers. <u>See</u> Ex. 12, Ex. 13. Likewise, these drivers are subject to deactivation by Uber in its discretion. <u>See</u> Ex. 14 (deactivating Douglas O'Connor for failing to submit to background check); Ex. 15 (informing Colopy's intermediary Uber partner that "We will be deactivating Uber accounts regularly of drivers who are in the bottom 5% of all Uber drivers and not performing up to the highest standards" and noting that "We will email both the driver and the partner should an account be deactivated"). Moreover, Uber controls drivers' pay by deciding what fares are charged to customers, and Uber may even unilaterally, in its discretion, change the amounts paid for a particular trip. <u>See</u> Ex. 16.

[18]    For example, Douglas O'Connor was deactivated by Uber for failure to comply with the background check procedures. <u>See</u> Ex. 14; <u>see also</u> Dkt. 223-47 (deactivating subcontractor driver for "unprofessional behavior and poor attitude").  Thereafter, these drivers were unable to transport any Uber customers. Thus, Uber clearly had the ultimate say over which drivers it would "suffer or permit" to work.  <u>See</u> <u>Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.</u>, 2014 WL 183956, *16 (C.D. Cal. Jan. 14, 2014) (noting that the ability to "impose[] screening requirements" on warehouse workers, such that they determined who could be hired, was relevant to joint employer analysis).

[19]    Indeed, all drivers, who have "subcontracted" through intermediary transportation companies, like Colopy, have been bound by Uber's main contracts, <u>see</u> Dkt. 302-1, 302-2, 302-4, 302-8, 302-11, 302-17, as well as Uber's "Driver Addendum." <u>See</u> Ex. 17 (Section 1 of the Driver Addendum specifically references and incorporates the main Software Licensing Agreement).  As the Court recognized in its class certification order, <u>see</u> Dkt. 342 at 39, from July 2013 through November 2014, Article 2.1 of Uber's Driver Addendum for all "subcontractor" drivers like (continued on next page)

Because "[a]ny of the three [parts of the IWC test] is sufficient to create an employment relationship," Ochoa v. McDonald's Corp. et al, 2015 WL 5654853, *2 (N.D. Cal. Sept. 25, 2015), the Court need only find that any one of these sub-parts of the joint employment test is capable of resolution on a common basis. However, here, all three sub-parts of the test are plainly capable of resolution on a common basis because all of the Borello factors are capable of resolution on a common basis, as this Court determined in its class certification order,[20] and because all "subcontractor" drivers are subject to the same requirements as any other Uber driver. All such drivers are party to the same contracts (both the UberBlack and Driver Addendum contracts), all

---

(footnote continued from previous page)

Colopy stated that: "Uber reserves the right, at all times and *at Uber's sole discretion*, to reclaim, prohibit, suspend, limit or otherwise restrict the Subcontractor from accessing or using the Driver App or the Device if …[the intermediary company or the subcontractor] fail to maintain the standards of appearance and service required by the users of the Uber Software. In the event Subcontractor's star-rating falls below the applicable minimum star-rating, Uber will notify Transportation Company by email or other written means and, in turn, Transportation Company will notify Subcontractor. In the event his/her star-rating (based on User feedback) has not increased above the minimum, Uber may deactivate Subcontractor's access to the Software and Service." Dkt. 302-5, 302-9, 302-12 (emphasis added). Thereafter, the language in the addendum changed but still stated that: "Driver may be deactivated or otherwise restricted from accessing or using the Driver App or the Uber Services in the event of a violation … act or omission that causes harm to Uber's or any of its Affiliates' brand, reputation or business *as determined by Uber in its sole discretion*, or for any other reason at the reasonable discretion of Uber." Dkt. 302-15 at § 2.3 (emphasis added).

[20]    The only factor that the Court identified as possibly giving rise to divergent results was the "distinct business" factor, which the Court found would differ between drivers like Manahan and Gurfinkel who contract directly with Uber on the one hand, and drivers like Colopy who "subcontract" (and therefore also work simultaneously for another intermediary entity). Dkt. 342 at 41-43. However, insofar as all "subcontractor" drivers like Colopy drive through an intermediary company, all drivers in this proposed sub-class will have this particular fact in common and thus, all the Borello factors (including the "distinct business" factor) should be capable of common resolution. Furthermore, differences between drivers regarding how they were treated by their respective intermediary transportation companies will be immaterial to the analysis of how much control *Uber* retained over their "wages, hours or working conditions," and their hiring and firing. The only differences will relate to the calculation of damages for the expense reimbursement claim, which can be addressed through a separate damages phase, including individual hearings (or further sub-classing at that stage) if necessary. See supra, n. 14.

16

of which give Uber the unilateral and unfettered power to terminate drivers in its discretion.[21]
Because all "subcontractor" drivers like Plaintiff Colopy are subject to the same contracts and
same levels of control by Uber, and in light of the broad IWC joint employment test under
Martinez, this Court should certify a sub-class of all Uber drivers who contracted with Uber
through intermediary transportation companies.

**C. The Class Should Not Exclude Drivers Who Have Driven For Uber Under An Incorporated Name.**

Plaintiffs submit that the Court erred in excluding drivers from the class who have driven
for Uber under corporate names. See Martins v. 3PD, Inc., 2013 WL 1320454, *16 (D. Mass. Mar.
28, 2013) (finding that defendant had misclassified drivers as independent contractors even though
some drivers contracted with defendant through a corporate name rather than individually).
Indeed, as other courts have recognized, this result simply incentivizes a defendant employer to
require its workers to incorporate without actually meaningfully changing any aspect of its
relationship with them. See, e.g., Amero v. Townsend Oil Co., 2009 WL 1574229, *5, n. 4 (Mass.
Super. Ct. April 15, 2009) ("[N]ot only does Townsend's argument ignore economic reality, but if
it were to carry the day, any employer who wanted to avoid the requirements of the Wage Act
would simply require its employees to incorporate as a condition of employment"); Phelps v. 3PD,
Inc., 261 F.R.D. 548, 556 (D. Or. 2009) ("Defendant [] informed its drivers that any who had not
already formed a corporation or a limited liability company and who desired to continue to work
with defendant, needed to form a business entity to do business with defendant").  There is no
evidence in the record that Uber has treated its drivers any differently depending on whether they

---

[21]     Indeed, numerous courts have found an employment relationship existed under similar
circumstances, where a company subcontracted some or all of its workforce through an
intermediary company.  See, e.g., Meredith v. Honeywell Inter., Inc., 245 Fed. Appx. 325, 328-29
(4th Cir. 2007) (finding delivery drivers to be defendant's employees where defendant contracted
out to trucking company, and trucking company hired the drivers); ConAgra Foods, Inc. v. Draper,
276 S.W.3d 244, 251 (Ark. 2008) (poultry processor who contracted with trucking company to
transport its poultry had an employment relationship with the delivery drivers hired by the
trucking company); Frazier v. Preferred Operators, Inc., 861 A.2d 1130, 1132-34 (Vt. 2004)
(disregarding corporate structure and analyzing plaintiff's employment status based on the nature
of the work performed by the plaintiff for the alleged employer).

1    had contracted to drive and be paid under a corporate name.

2          Plaintiffs understand that the Court may have wanted to use this criterion as a proxy to

3    exclude drivers like Mark Forester, "a driver and part owner of a formally incorporated

4    transportation company that has hired 34 employee-drivers who operate a fleet of 12 vehicles."

5    Dkt. 342 at 42.  However, again, this distinction "threw the baby out with the bathwater", as there

6    are other ways to narrow the class, apart from excluding <u>all</u> individuals who contracted with Uber

7    through an incorporated name.  Indeed, an individual driver who contracted directly with Uber,

8    generated 100% of his rides through Uber, and had no drivers working under him, but contracted

9    as "John's Limo, Inc." rather than "John Doe" is now excluded from the class under the Court's

10   current order.  It simply does not make sense to find that this single, minute difference would

11   change the outcome for such drivers under the "distinct occupation or business" <u>Borello</u> factor[22]

12   (and even if it did, it would still only be one factor out of many).  Plaintiffs urge the Court to

13   abandon this criterion, as it has been repeatedly rejected by a number of courts.[23]  These courts

14   _____

15   [22]      In its decision, the Court devotes little time to explaining the significance of contracting
     under a "a fictitious/corporate name, instead of as an individual," and simply states that such
16   drivers drive "as a distinct business." Dkt. 342 at 45, n. 26.  Plaintiffs submit that this was a leap
     on the part of the Court that is unsupported by the record.  A driver might drive under a corporate
17   or fictitious name, but if the driver contracts directly with Uber, he or she is subject to the same
     contract and all the same requirements as other drivers, and are completely indistinguishable from
18   a driver who drives under his or her own name, both to the customer and to Uber.  It seems that
     what the Court really had in mind was the question of whether or not a given driver actually runs a
19   separate business (with drivers working under him or her) that includes many other clients apart
     from Uber's customers (i.e. such that the driver only spends a fraction of his or her time with Uber
20   clients).  However, whether a driver has contracted and is paid under a fictitious/corporate name
     does not address this situation (and instead creates an obvious opportunity for abuse, in which an
21   employer can simply force its workers to incorporate).

22         A better way to address perceived differences in the "distinct business" <u>Borello</u> factor (if
     that is the Court's concern) would be to exclude drivers who had others working under them.  This
23   distinction is entirely ascertainable through Uber's records, and would effectively exclude drivers
     like Mark Forester, without excluding drivers who happened to drive for Uber using a corporate
24   name rather than their own individual name (which drivers sometimes do based on tax advice).

25   [23]      Many courts have concluded that whether a worker has incorporated is not relevant to the
     question of whether the worker has been misclassified.  <u>See</u>, <u>e.g.</u>, <u>Martin v. Shelby Telecom, LLC</u>,
26   2012 WL 2476400, *3-7 (N.D. Ala. June 26, 2012) (worker's incorporated status does not create
27   genuine issue of material fact as to employment status where evidence suggests employer

28   (continued on next page)

18

1   have recognized that placing undue weight on whether an individual has incorporated simply

2   creates incentives for employers to misclassify their workers and then require that they incorporate

3   as a condition of employment, but does not affect the underlying economic reality of the

4   relationship between the worker and the alleged employer.

5

6   **D. The Court Should Reconsider Its Decision To Exclude From the Class Drivers Who Accepted Uber's 2014 Arbitration Agreement.**

7   Finally, Plaintiffs submit that the Court erred in excluding from the class the many

8   thousands of drivers who have driven for Uber any time since June 2014 (other than the relatively

9   miniscule number who managed to opt out of the arbitration clause) and who thus may be bound

10  by the 2014 arbitration clause.  Although the Court already held Uber's 2014 arbitration

11  agreement to be unenforceable in <u>Mohamed</u>, 2015 WL 3749716, *36, it determined here that it

12  _____

13  (footnote continued from previous page)

14  controlled means of work and opportunity for profit); <u>In re FedEx Ground Package System, Inc., Employment Practices Litigation</u>, 712 F. Supp. 2d 776, 793 (N.D. Ind. 2010) (applying 'right to control' element of independent contractor test equally to both incorporated and unincorporated

15  delivery drivers where employer treated both groups the same); <u>Phelps</u>, 261 F.R.D. at 553 (certifying wage claims for class of Oregon delivery drivers "who entered into a contract with 3PD

16  either on his or her own behalf or on behalf of an entity"); <u>Parilla v. Allcom Constr. & Install. Svcs., LLC</u>, 2009 WL 2868432 (M.D. Fl. 2009) (plaintiff who incorporated found to be

17  misclassified); <u>Ruiz v. Affinity Logistics, Corp.</u>, 2009 WL 648973, *1-2 (S.D. Cal. 2009) (disregarding the named plaintiff's separate business entity and certifying a class of delivery

18  drivers for employee misclassification claim); <u>Lee v. ABC Carpet & Home</u>, 236 F.R.D. 193, 198

19  (S.D.N.Y. 2006) (employment status of mechanics who formed their own corporations must be determined under the applicable classification test); <u>Edson v. State of Vermont</u>, 830 A.2d 671,

20  673-74 (Vt. Sup. Ct. 2003) (delivery driver hired by a private trucking company was the statutory employee of a State liquor agency that contracted with the trucking company because the driver

21  was engaged in the State's business of distributing liquor to its local agencies); <u>Anfinson v. FedEx Ground Package System, Inc.</u>, 244 P.3d 32 (Wash. Ct. App. 2010) (disregarding delivery drivers'

22  personal corporate entities and applying employee-status test directly to the drivers' relationship to

23  the defendant), aff'd, 281 P.3d 289 (Wash. 2012); <u>Ware v. Industrial Accident Comm'n</u>, 318 Ill. App. 3d 1117 (Ill. Ct. App. 2000) (same); <u>Wisconsin Cheese Service, Inc. v. Dep't of Industry,</u>

24  <u>Labor and H.R.</u>, 322 N.W.2d 495 (Wis. Ct. App. 1982) (same); <u>Canda v. Industrial Comm'n</u>, 607

25  P.2d 403 (Colo. App. 1980) (same); <u>NLRB v. OS Transport LLC</u>, 358 NLRB 117, 358 NLRB 1, 2012 WL 3839418, *17-21 (NLRB 2012) ("incorporation does not preclude a determination that

26  drivers are statutory employees" because "[e]ven after incorporation, business continued as usual and [the employer] was in control of day-to-day operations").

27

28

19

would need to make a case-by-case evaluation as to whether this agreement is enforceable with respect to each particular driver.[24]  This conclusion was erroneous for two main reasons:  First, even if the 2014 agreement contained a more "meaningful opportunity to opt out" than the 2013 agreement, the California Supreme Court's ruling in Gentry v. Superior Court, 42 Cal. 4th 443, 469 (2007), does not require an individualized analysis of drivers to determine which drivers "would not have felt free to opt-out" of the agreement. Dkt. 342 at 62.[25]  Second, the 2014 agreement did not contain a "meaningful opportunity to opt out".  The court-ordered corrective notice that led to the 2014 agreement made only the most minor, cosmetic modifications to the

---

[24]     In Mohamed, the Court found the delegation clause was not clear and unmistakable in the 2014 agreement, without regard to the sophistication of the parties.  2015 WL 3749716, *10, n. 16 (noting that "Uber's delegation clauses are not sufficiently clear and unmistakable to be enforced *even against a legally sophisticated entity*") (emphasis added).  It then went on to find that "even if the delegation clauses in the 2014 contracts were 'clear and unmistakable'—and they are not—those delegation clauses are unenforceable because they are unconscionable under California law." Id., *16.  Thus, because the clause is not clear and unmistakable in the first place, the Court did not even need to reach the unconscionability analysis it performed in Mohamed, which led the Court in this case to conclude an individualized analysis would be necessary.

But, even if it did reach this analysis of the 2014 agreement under Gentry, Plaintiffs had no reason to think that the Court would find that its holding in Mohamed did not apply with equal force to a class of drivers. See, e.g., id. at *20 ("Like any other lower-level laborer, Uber drivers likely have a fairly urgent need to obtain employment, and may feel pressure to appease their putative employer by assenting to contractual terms the laborer has reason to believe are important to the company"); id. ("Uber drivers here could reasonably assume that Uber prefers arbitration because 'arbitration was the default dispute resolution procedure from which the employee had to opt out.'") (quoting Gentry, 42 Cal.4th at 472).  Had Plaintiffs known that the Court might diverge from its ruling in Mohamed and determine the enforceability of the agreement to be a fact-specific question for each driver, Plaintiffs would have requested a separate brief, or additional pages, to address the issue.  Plaintiffs thus request that the Court consider the argument here (or in a separate motion for reconsideration, if the Court believes such a motion is necessary).

[25]     In addition, the Ninth Circuit's recent ruling in Sakkab v. Luxottica Retail N. America, No. 13–55184 (9th Cir. Sept. 28, 2015), that PAGA waivers are unenforceable under California law, further bolsters this Court's determination that Uber's 2014 arbitration agreement is unenforceable, and Plaintiffs submit that this ruling should extend with equal force to *all* Uber drivers. See Mohamed, 2015 WL 3749716, *36 (noting that "[l]ike the 2013 Agreement, the 2014 contracts expressly provide that if a court determines that the PAGA waiver is unenforceable, the PAGA waiver 'shall not be severable'" and concluding that because "Uber specifically provided that the PAGA waiver 'shall not be severable' if the Court determines it is unenforceable . . . the arbitration provisions in the 2014 contracts cannot be enforced either").

1    agreement and did not make the opt-out provision meaningful.[26]

2         The Court erred in concluding that <u>Gentry</u> requires it to conduct an individualized analysis

3    to determine whether a given driver "would not have felt free to opt-out" of the 2014 agreement.

4    Dkt. 342 at 62.   In holding that the agreement at issue in <u>Gentry</u> was procedurally unconscionable

5    notwithstanding the opt-out mechanism, the California Supreme Court stated that "it is not clear

6    that someone *in Gentry's position* would have felt free to opt out." <u>Id.</u> at 471 (emphasis added).

7    However, in making this statement, the Court did not rely on the specifics of Gentry's income,

8    education, or level of sophistication.  Instead, the Court simply noted that "*[g]iven the inequality*

9    *between employer and employee* and the economic power that the former wields over the latter …

10   it is likely that Circuit City employees felt at least some pressure not to opt out of the arbitration

11   agreement." <u>Id.</u> at 472 (internal citation omitted) (emphasis added).  Thus, the Court drew

12   conclusions for all Circuit City employees who were in the same "position" as the plaintiff.  The

13   Court can and should do the same here.

14        Here, drivers are all in the same position vis a vis Uber in that they clearly have less

15   bargaining power, and moreover Plaintiffs contend that they are all employees of Uber (and the

16   Court found this question suitable for class certification, and has also found that there is a

17   presumption that they are employees, which the burden is now on Uber to rebut, <u>see</u> <u>O'Connor v.</u>

18   <u>Uber Technologies, Inc.</u>, 82 F. Supp. 3d 1133, 1145 (N.D. Cal. 2015) ("The Court holds, as a

19   matter of law, that Uber's drivers render service to Uber, and thus are Uber's presumptive

20   employees")).[27]

---

21   [26]    Just as with the 2013 arbitration agreement, many drivers who opted out of the 2014

22   agreement were those who were in contact with Plaintiffs' counsel's firm and thus learned of their

23   ability to opt out through means separate from the notice they received from Uber.  <u>See</u> Ex. 19
     (Shuford Decl.) at ¶ 3 (approximately 186 drivers out of 383 who opted out did so using the form

24   provided by Plaintiffs' counsel).

25   [27]    The California Supreme Court's decision in <u>Gentry</u> that employees, as a class, would likely
     feel pressure not to opt out of the agreement is similar to decisions other courts have reached in

26   recognizing the inherent coercion that exists in the employment relationship. <u>See</u>, <u>e.g.</u>, <u>Guifu Li v.</u>

27   <u>A Perfect Day Franchise, Inc.</u>, 270 F.R.D. 509, 517-19 (N.D. Cal. 2010) ("Courts have also
     recognized that in the context of an employer/worker relationship, there is a particularly acute risk

28   (continued on next page)

1    Thus, it was error for the Court to draw from the holding of <u>Gentry</u> that it would need to

2   make individualized inquiries into whether a given driver may have been deterred from opting out

3   of the arbitration clause.[28]   Indeed, it is unclear what standard the Court believes would apply to

4   the question of for which drivers the 2014 arbitration agreement could be enforced.[29]   Nearly 400

5   Uber drivers have already requested to be added to this case, individually if necessary [Dkt. 355];

6

7   (footnote continued from previous page)

8   of coercion and abuse . . . This is especially true when the parties are engaged in an ongoing
    employer-employee relationship"); <u>Ojeda-Sanchez v. Bland Farms</u>, 600 F. Supp. 2d 1373, 1379-

9   80 (S.D. Ga. 2009) (noting that the parties' "past as well as a potential future employment
    relationship . . . increases the risk that communications between them will have a coercive

10  effect"); <u>Sjoblom v. Charter Communications, LLC</u>, 2007 WL 5314916, *4 (W.D. Wis. Dec. 26,
    2007); <u>Mevorah v. Wells Fargo Home Mortgage, Inc.</u>, 2005 WL 4813532, *4 (N.D. Cal. Nov. 17,

11  2005) (noting "it is still reasonable to assume that an employee would feel a strong obligation to
    cooperate with his or her employer"); <u>Hampton Hardware, Inc. v. Cotter & Co.</u>, 156 F.R.D. 630,

12  633 (N.D. Tex. 1994) ("The fact that the defendant and potential class members are involved in an
    on-going business relationship, further underscores the potential for coercion").

13

14  [28]   Courts have routinely relied upon evidence of a single employee's circumstances to make
    class-wide determinations about the enforceability of arbitration agreements. <u>See, e.g.</u>, <u>Morrison v.</u>

15  <u>Circuit City Stores, Inc.</u>, 317 F.3d 646, 663 (6th Cir. 2003) (holding that "if the reviewing court
    finds that the cost-splitting provision would deter a substantial number of similarly situated

16  potential litigants, it should refuse to enforce the cost-splitting provision" and noting that the court
    should consider "the class of such similarly situated potential litigants by job description and

17  socioeconomic background" and "should take the actual plaintiff's income and resources as
    representative of this larger class's ability to shoulder the costs of arbitration"); <u>Shankle v. B-G</u>

18  <u>Maint. Mgmt. of Colorado, Inc.</u>, 163 F.3d 1230, 1234-35 (10th Cir. 1999) (noting that where an
    employee "could not afford such a fee, [] it is unlikely other similarly situated employees could

19  either"); <u>Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.</u>, 325 F. Supp. 2d 1252, 1262
    (D. Utah 2004) (holding that "Plaintiffs have met their burden and shown that in this case the

20  potential costs of arbitration are great enough to deter them and similarly situated individuals from
    seeking to vindicate their federal statutory rights in an arbitral forum").

21

22  [29]   In <u>Uber Technologies, Inc., et al. v. Berwick</u>, CGC-15-546378 (Sept. 21, 2015), a state

23  court recently held Uber's 2014 arbitration agreement to be unenforceable, roundly rejecting
    Uber's argument that the alleged sophistication of the driver in that case would make the

24  agreement enforceable.  Although Uber argued that the driver was "sophisticated" because she
    "has operated a corporation for the last 20 years", the court asked bemusedly, "What's her stock

25  selling for on the NASDAQ?" Exhibit 18, at 12:2-20.  This colloquy demonstrates the difficulty,

26  or even absurdity, of trying to determine which drivers would be bound by Uber's 2014 arbitration
    clause based upon an analysis of their alleged "sophistication."

27

28

many of these drivers were excluded from the class because of the 2014 arbitration clause.  Based on the Court's current ruling, the Court would have to make an assessment regarding which of these drivers could be bound by the 2014 arbitration agreement and which could not.  Such an assessment would not only be difficult to manage, but is unnecessary under Gentry.  The Court could avoid the need to draw such lines by reconsidering its decision to exclude these drivers *en masse* from the class.[30]

In addition, as noted above, Uber's 2014 arbitration agreement did *not* actually provide a meaningful opportunity for drivers to opt out.  The court-ordered corrective notice made only minor, cosmetic modifications to the agreement.  The only changes made were that Uber was ordered to create an email address to accept opt-outs, and a brief notice of the arbitration clause, and the existence of this case, were added to the introduction of the 17-page agreement.  The agreement was still only reviewable through a link on a tiny iPhone screen *if* a driver actually clicked on the hyperlink (which most drivers never clicked on, and which Uber did not track whether or not they did).[31]  Moreover, the agreements were still presented as agreements the drivers were required to accept on their iPhones before starting work one day (like many other

---

[30]     In its class certification order, the Court's concern that some Uber drivers may be more "sophisticated" than others appeared to rest on the point that there are some drivers like Mark Forester, who Uber showed operated a business with 34 drivers under him. Dkt. 342 at 41-42. However, these drivers have been excluded from the class in any event, since the Court excluded those drivers who contracted with Uber through corporate names.  As discussed supra n. 22, Plaintiffs submit that the place the Court should have drawn the line – if it was going to draw such a line – should have been those drivers who have drivers working under them.  Such drivers could easily be identified through Uber's records. But the mere fact that there are some Uber drivers who have had multiple drivers under them could be a basis for the Court excluding these drivers from the class should not be a reason for the Court to have excluded from the class all Uber drivers who accepted the 2014 agreement.

[31]     See Skirchak v. Dynamics Research Corp., 432 F. Supp. 2d 175, 180 (D. Mass. 2006), aff'd 508 F.3d 49 (1st Cir. 2007) (refusing to enforce provision of arbitration agreement where agreement was included in an attachment to an email sent to employees the day before Thanksgiving and defendant "did not track whether employees had opened the email about the [Dispute Resolution Program] and followed the link to the Program's website to view its contents" such that there was no evidence workers had actual knowledge of its contents); Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 548-49 (1st Cir. 2005).

emails they routinely received from Uber).[32]

Indeed, the fact that some drivers managed to opt out of the 2014 arbitration clause appears to be—not because of these minor modifications Uber made to the agreement pursuant to the Court's order—but instead largely attributable to the notice Plaintiffs' counsel disseminated to drivers through informal means and setting up a website.  As revealed in discovery, about half of the opt-outs were submitted through a form created by Plaintiffs' counsel. See supra, n. 26.  Of those who opted out through the email address that Uber set up, many likely learned about the email address (and their ability to opt out), not from the corrective notice but based upon Plaintiffs' counsel having publicized this on their website, www.uberlawsuit.com.  That such a relatively small number of drivers opted out of the agreement (and many who did appear to have learned they could and should do this due to the efforts of Plaintiffs' counsel, rather than because of the enhanced ability Uber created for them to opt out, pursuant to the Court's order) supports Plaintiffs' contention that Uber's agreement (even with the 2014 changes) was designed to minimize, if not ensure that drivers would not opt out.[33]

---

[32]     A more meaningful opportunity to opt out would have allowed drivers the option of clicking a box on their phones to opt out of the arbitration agreement, just as they were required to click a box to assent to the agreement in order to work for Uber (again, a company that claims to be a "technology" company could presumably have just as easily allowed that option).  The asymmetry between the burdensome opt-out procedure (by which drivers would still need to know to click a hyperlink to even learn of its existence, and then read a fine print 17-page legal document on their iPhone) and the procedure for assenting to arbitration (by which drivers simply had to click an acceptance box that the app is designed to encourage them to click, in order to start working that day, and indeed most drivers certainly did not even realize they had made a choice) further undermines the notion that the opt-out opportunity was meaningful.  See Piekarski v. Amedisys Illinois, LLC, 2013 WL 6055488, *3 (N.D. Ill. Nov. 12, 2013) (noting that "Defendants' proficiency at creating electronic links to documents begs the question why Defendants insisted on its employees printing out and mailing back a paper opt-out form, instead of creating a much more accessible electronic form that could be signed and submitted electronically" and found that the answer was "obvious—that Defendants intended its employees would not follow all these steps and would instead be bound to arbitrate their grievances").

[33]     As the Court noted in Mohamed, it had "significant doubts that the California Supreme Court would vindicate an opt-out clause simply because a few signatories out of thousands were able to (and did) successfully opt-out." Mohamed, 2015 WL 3749716, *13.  Thus, the exceedingly small number of drivers who did opt out (several hundred drivers out of tens of thousands in (continued on next page)

24

1    Thus, ultimately, the exceedingly minor differences between the 2014 and 2013

2    agreements do not render the opt-out procedure in the 2014 agreement meaningful.  And, even if

3    they did, the Court's determination that drivers would need to demonstrate individually that they

4    felt pressured not to opt out in order to successfully challenge the agreement's application to them

5    was erroneous.  Like the 2013 agreement, the 2014 agreement is unenforceable "regardless of the

6    individual driver's economic circumstances or any other possible differences between

7    signatories." Dkt. 342 at 63.  Thus, the Court should modify its class certification order to include

8    drivers who agreed to the 2014 arbitration agreement.

9                                              **CONCLUSION**

10    For all the reasons set forth herein, Plaintiffs urge the Court to certify their expense

11    reimbursement claim under Cal. Labor Code § 2802 and amend the class certification order to

12    include drivers who (1) have driven for Uber through intermediary transportation companies, (2)

13    have contracted with Uber through corporate names, and (3) accepted Uber's 2014 arbitration

14    agreement.

15

16

17

18

19

20

21

22

23

24

25

---

26    (footnote continued from previous page)

27    California) does not demonstrate that the arbitration clause itself created a meaningful opportunity
     to opt out.

28

---

Date: October 6, 2015

Respectfully submitted,

DOUGLAS O'CONNOR, THOMAS COLOPY,
MATTHEW MANAHAN, and ELIE GURFINKEL
individually and on behalf of all others similarly
situated,

By their attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic filing on October 6, 2015, on all counsel of record.

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.