**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DOUGLAS O'CONNOR, et al., | Case No.  13-cv-03826-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION** |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants. | Docket No. 357 |

## I.     INTRODUCTION

Plaintiffs Douglas O'Connor, Thomas Colopy Matthew Manahan, and Elie Gurfinkel are current or former drivers who have performed services for Defendant Uber Technologies, Inc. Docket No. 330 (Second Amended Complaint) (SAC).[1]  Earlier this year, Plaintiffs moved to certify a class of approximately 160,000 other "UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009."  Docket No. 276-1.  Plaintiffs contend that they and all 160,000 putative class members are Uber's employees, as opposed to its independent contractors, and thus are eligible for various protections codified for employees in the California Labor Code.  *See* SAC at ¶ 21.  Specifically, Plaintiffs brought claims for: (1) expense reimbursement under California Labor Code section 2802 (hereafter, Expense Reimbursement Claim) and (2) converted tips under California Labor Code section 351 (hereafter, Tips Claim).

On September 1, 2015, the Court certified the following class (hereafter, September 1,

---

[1] While O'Connor remains a plaintiff in this action, he is no longer seeking to serve as a class representative.  Thus, for purposes of this motion, the Court refers to Colopy, Manahan, and Gurfinkel collectively as "Plaintiffs."

1   2015 Class) to pursue the Tips Claim only:

> All UberBlack, UberX, and UberSUV drivers who have driven for
> Uber in the state of California at any time since August 16, 2009,
> and who (1) signed up to drive directly with Uber or an Uber
> subsidiary under their individual name, and (2) are/were paid by
> Uber or an Uber subsidiary directly and in their individual name,
> and (3) did not electronically accept any contract with Uber or one
> of Uber's subsidiaries which contain the notice and opt-out
> provisions previously ordered by this Court (including those
> contracts listed in the Appendix to this Order), *unless* the driver
> timely opted-out of that contract's arbitration agreement.

Docket No. 342 (Certification Order) at 7.  The class as defined excluded all drivers who operated or drove for a distinct third-party transportation company, as well as any drivers who signed Uber's more recent contracts (*i.e.*, contracts which included the notice and opt-out provisions previously ordered by this Court) unless the driver timely opted-out of the arbitration agreement. *Id.* at 66-67.

The Court permitted Plaintiffs to file supplemental briefing with respect to: (1) certifying a class to pursue a claim for expense reimbursement under California Labor Code section 2802 (hereafter, Expense Reimbursement Claim), and (2) certifying a subclass of drivers who labored for distinct third-party transportation companies.  *Id.* at 66.  The parties subsequently filed their briefs on the instant supplemental motion for class certification.  Docket No. 359 (Class Certification Supplemental Briefing) (Cert. Supp.); Docket No. 365 (Class Certification Supplemental Briefing Opposition) (Cert. Opp.); Docket No. 370-1 (Class Certification Supplemental Reply) (Cert. Reply).

Plaintiffs' supplemental motion for class certification came on for hearing before the Court on November 24, 2015.  For the reasons explained below, the Court will certify the following subclass of drivers (December 9, 2015 Subclass):

> All UberBlack, UberX, and UberSUV drivers who have driven for
> Uber in the state of California at any time since August 16, 2009,
> and meet all the following requirements: (1) who signed up to drive
> directly with Uber or an Uber subsidiary under their individual
> name, and (2) are/were paid by Uber or an Uber subsidiary directly
> and in their individual name, and (3) electronically accepted any
> contract with Uber or one of Uber's subsidiaries which contain the

2

1    notice and opt-out provisions previously ordered by this Court, and
     did not timely opt out of that contract's arbitration agreement.[2]

2    Like the September 1, 2015 Class, this subclass may pursue the Tips Claim under Federal Rule of

3    Civil Procedure 23 (hereafter, Rule 23).  Furthermore, both the September 1, 2015 Class and

4    December 9, 2015 Subclass are certified to pursue the Expense Reimbursement Claim for vehicle-

5    related and phone expenses.

6                              II.   **DISCUSSION**

7         The Court assumes the reader's familiarity with the procedural and factual background of

8    this litigation.  *See generally O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133 (N.D. Cal.

9    2015), *O'Connor v. Uber Techs., Inc.*, No. 13-cv-3826-EMC, 2014 WL 1760314 (N.D. Cal. may

10   2, 2014); *Mohamed v. Uber Techs., Inc.*, Case No. 14-5200-EMC, No. 14-5241; 2015 WL

11   3749716 (N.D. Cal. June 9, 2015); *O'Connor v. Uber Techs., Inc.*, No. 13-cv-3826-EMC, 2015

12   WL 5138097 (N.D. Cal. Sept. 1, 2015).  Hence, the Court does not separately recount such details

13   here.  Instead, any relevant factual or procedural details are included in the body of this Order as

14   necessary to provide context for the Court's discussion of the merits of Plaintiffs' supplemental

15   motion for class certification.

16        First, the Court will discuss the legal standards under Rule 23 that are applicable to

17   Plaintiff's supplemental motion for class certification.  Second, the Court will address the

18   composition of the class, including whether Uber's more recent contracts are enforceable on a

19   class-wide basis.  Finally, the Court will determine whether Plaintiffs' Expense Reimbursement

20   Claim can be pursued by the September 1, 2015 Class and the December 9, 2015 Subclass.

21   A.   Legal Standard (Class Certification)

22        The "class action is an exception to the usual rule that litigation is conducted by and on

23   behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

24   2550 (2011) (citation omitted).  For that reason, "a class representative must be part of the class

25   and possess the same interest and suffer the same injury as [her fellow] class members."  *Id.* at

26

27   _____
     [2] This sub-class is distinct from the September 1, 2015 Class, as it only includes drivers who
     signed the contracts including the Court-ordered notice and opt out provisions and did *not* opt out

28   of the arbitration agreement.  This sub-class also does not include drivers who labored for third-
     party transportation providers, or drivers who drove under a fictitious or corporate name.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

2550 (citation omitted).  Rule 23 thus "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" by requiring affirmative compliance with the requirements of both Rule 23(a) and (b).  *Id.* at 2550.

Rule 23(a) permits Plaintiffs to sue as representatives of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  If each of these Rule 23(a) requirements is satisfied, the purported class must also satisfy one of the three prongs of Rule 23(b).  Here, Plaintiffs again seek certification under Rule 23(b)(3), which provides:

> (3) the court finds that the question of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy.

As previously explained in the Class Certification order, the only question now before the Court is whether the requirements of Rule 23 are met.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  The burden is on the "party seeking class certification [to] affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Dukes*, 131 S. Ct. at 2551. The Court must in turn conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are met, which may require "prob[ing] behind the pleadings before coming to rest on the certification question."  *Id.* (citation omitted).

B.    Class Composition

Plaintiffs request certification of the following groups: (1) drivers who drove for Uber through a distinct third-party transportation company, (2) drivers who used corporate names, *e.g.*, Mr. Mark Forester, who is a driver and part owner of a formally incorporated transportation

4

company that has hired 34 employee-drivers who all use the Uber application, and (3) drivers who signed Uber's more recent agreements, *e.g.*, the June 21, 2014 Agreement, November 10, 2014 Agreement, and April 3, 2015 Agreement, and did not timely opt out of the arbitration agreement. The Court denies Plaintiffs' request to certify a subclass of drivers who drove for Uber through a distinct third-party transportation company or who used corporate names.  However, the Court will certify a subclass of drivers who signed Uber's more recent agreements even if they did not timely opt out.

      1.    <u>Drivers Laboring for a Third-Party Transportation Company</u>

In the class certification order, the Court declined to include drivers who drove for Uber through a third-party transportation company.  Certification Order at 41-45.  Specifically, the Court was concerned that including such drivers would result in material variations that could defeat predominance as to the *Borello* secondary factor of whether the one performing services is engaged in a distinct occupation or business.  In so holding, the Court explained that it was not foreclosing class certification for such drivers, but that "further subclassing might be necessary if Plaintiffs are to demonstrate that an additional class (or classes) of such drivers can be certified under Rule 23(b)(3).  *Id.* at 43.  For instance, the Court noted that there was evidence of drivers who drove through third-party transportation companies, but whose clients were made up primarily or solely of Uber clients.  *Id.*  In contrast, other drivers derived a much smaller portion of their business from Uber.  *Id.* at 44.  Thus, while Plaintiffs could certify a subclass of drivers who, for instance, drove for Uber more than 30 hours a week, the Court concluded that:

> Plaintiffs have not met their burden to demonstrate that such a class would be certifiable.  Notably, Plaintiffs have not offered a concrete proposal regarding how the members of any such subclass (or classes) could be identified for ascertainability purposes.  For example, Plaintiffs have not submitted any proof that they could objectively identify all drivers who drove for Uber more than 30 hours per week.  Alternatively, if a subclass were to be defined by the percentage of rides given to Uber customers versus customers obtained from other sources, Plaintiffs have not shown that they could objectively determine whether a driver was more like Ezzikhe or Gebretensia (*i.e.*, drive solely for Uber) or more like Enriquez or Alshara (*i.e.*, drive for Uber about 30% of the time).

*Id.* at 44-45.

United States District Court
For the Northern District of California

1    Despite being given the opportunity, Plaintiffs again fail to meet this burden.  Instead,

2  Plaintiffs have proposed certifying a subclass of *all* drivers who drove through an intermediary

3  transportation company, regardless of the number of hours spent driving for Uber.  Cert. Supp. at

4  13.  Plaintiffs contend instead that the Court should apply the joint employment test articulated in

5  *Martinez v. Combs*, 49 Cal. 4th 35 (2010).  There, the California Supreme Court found that for

6  claims brought under California Labor Code section 1194, the court should look to the Industrial

7  Welfare Commission's (IWC) wage orders.  *Id.* at 64.  The IWC's wage order defines "employ"

8  three alternative ways: "(a) to exercise control over the wages, hours or working conditions, *or* (b)

9  to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment

10  relationship."  *Id.*  Under this broader definition, Plaintiffs contend the entire class of drivers may

11  be certified.

12    This Court rejected Plaintiff's proposal of applying the IWC test of employment "absent

13  more definitive guidance from the California Supreme Court or Ninth Circuit indicating that the

14  *Borello* [common-law employment] test should not apply here."  Certification Order at 30 n.14.

15  At present, there is a question of whether a court may use the IWC definition to determine whether

16  there is a joint employment outside of California Labor Code section 1194.  *See, e.g.*, *Futrell v.*

17  *Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1431 (2010).  With respect to claims under California

18  Labor Code Sections 351 and 2802, the state courts have not considered the applicability of the

19  IWC test of employment to tips claims, and are inconsistent as to expense reimbursement claims.

20  *Contrast Arnold v. Mutual of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 586-88 (2011) (finding that

21  *Borello's* common law test of employment applied to expense reimbursement claims) *with*

22  *Dynamex Operations W., Inc. v. Superior Court*, 230 Cal. App. 4th 718 (2014) (upholding

23  certification of a class in which the superior court adopted the IWC test of employment for

24  expense reimbursement claims), *review granted*, 182 Cal. Rptr. 3d 644 (2015).  Given this

25  uncertainty in the applicability of the IWC test of employment outside of California Labor Code

26  section 1194, the Court declines to apply the IWC test.

27    Even if the IWC's test of employment did apply, Plaintiffs provide no evidence that the

28  test could be adjudicated on a class-wide basis.  Instead, Plaintiffs simply argue that "all three sub-

6

**United States District Court**
For the Northern District of California

parts of the test are plainly capable of resolution on a common basis because all of the *Borello* factors are capable of resolution on a common basis." Cert. Supp. at 16.  However, the Court specifically found that for such drivers laboring for third party transportation companies, there are potentially significant variations – such as the number of hours that a driver drove for Uber clients versus other clients – that could cause a jury to reach different results under the *Borello* test. Certification Order at 42; *see also* Docket No. 365-13 at 28 (McCrary Dec.) (listing examples of drivers who owned or drove through a third-party transportation company, showing that the percentage of drivers' income received outside of Uber ranged from 10% to 90%).  These variations are precisely the reason why the Court declined to certify drivers who drove for third-party transportations companies, and required Plaintiffs to articulate subclasses based on the number or percentage of hours performed for Uber, and to provide information on how to ascertain such a subclass.

In their reply, after initially asserting an all or nothing approach, Plaintiffs belatedly suggest that the Court could limit this proposed subclass to drivers who drove for Uber through third-party transportation companies for more than 30 hours per week.  Cert. Reply at 11. However, Plaintiffs again submit no proof that they could define and objectively identify all drivers who drove for Uber more than 30 hours per week.  Certification Order at 44-45.[3]  In other words, Plaintiffs fail to provide the information that this Court specifically required.  *See id.* at 44-45.  Plaintiffs' request to certify a subclass of drivers who drove for a third-party transportation company is denied.

2.    Drivers Using Fictitious or Corporate Names

Next, Plaintiffs contend that the Court erred in excluding all drivers who drove for Uber under a fictitious or corporate name, and that the Court should instead only exclude drivers who had others working for them.  Cert. Supp. at 17, 18 n.22.[4]  A similar proposal was rejected in

---

[3] For instance, Plaintiffs offered no explanation as to *e.g.*, whether the hours would include only driving time or whenever the Uber application was on, and if the latter, whether that would be ascertainable.

[4] In its Certification Order, the Court did not permit supplemental briefing on the issue of whether drivers who drove for Uber under a corporate name could be certified as a subclass.  Instead,

*Narayan v. EGL, Inc.*, 285 F.R.D. 473 (2012).  There, the plaintiffs and putative class members were drivers who entered into written "independent contractor agreements" to provide pick-up and delivery services for the defendants.  *Id.* at 474.  The district court also raised concerns about whether the *Borello* factor of "whether the one performing services is engaged in a distinct occupation or business" could be adjudicated on a class-wide basis, as approximately 127 of the 396 identified putative class members had hired sub-drivers at one time or another.  *Id.* at 477-78.  With respect to a proposed subclass of drivers without sub-drivers, the district court found that individualized issues would still predominate because:

> any driver, even if he sometimes hired sub-drivers, would still be a member of that class for the period of time during which he did not have any sub-drivers.  At the hearing, defense counsel also pointed out the reverse problem, in which, for example, the solo driver who hired his brother for three months while on vacation would become a member of the Drivers with Sub-Drivers Sub-Class for that period of time.  Thus, even within the sub-classes, the court finds that common questions do not predominate.

*Id.* at 480-81.

Plaintiffs now belatedly suggest that the Court could certify a sub-class based on "the

---

Plaintiffs request reconsideration of the Court's decision pursuant to Civil Local Rule 7-9.  Cert. Supp. at 1 n.1.  In general, the Court may grant leave to file a motion for reconsideration only upon a party's showing of the following:

> (1)  That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought.  The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or
>
> (2)  The emergence of new material facts or a change of law occurring after the time of such order; or
>
> (3)  A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

Civ. L.R. 7-9(b)(1)-(3).  Plaintiffs satisfy none of these requirements, as they do not identify any material facts or dispositive legal arguments that were previously presented to the Court.  For this additional reason, the Court denies Plaintiffs' request to certify a subclass of drivers who drove for Uber through a corporate name.

**United States District Court**
For the Northern District of California

number of hours drivers spent logged into the Uber app to approximate how much of their business was derived from Uber as opposed to other possible outside sources of riders . . . ." Cert. Reply at 13. This raises the same problem facing Plaintiffs' proposal to certify drivers who drove for Uber through a third-party transportation company for more than thirty hours a week – namely that Plaintiffs provide no proof that they would define and determine who would fall into this category. Nor did Plaintiffs address whether the determination of amount of business derived from other sources would raise issues as to predominance. Thus, given Plaintiffs' belated and incomplete request, the Court denies Plaintiffs' request to certify a subclass of drivers who drove for Uber under a fictitious or corporate name.[5]

        3.   <u>Drivers Bound by the 2014 and 2015 Agreements</u>

        In the September 1, 2015 Certification Order, the Court excluded drivers who accepted a contract containing the Court's approved notice and opt-out procedures. Certification Order at 60-64. In *Mohamed*, the Court found that these contracts were procedurally unconscionable under *Gentry v. Superior Court*, 42 Cal. 4th 443 (2007). In *Gentry*, the California Supreme Court held that even a contract with a conspicuous and otherwise meaningful opt-out clause could still have procedural unconscionability where: (1) the agreement did not adequately disclose the disadvantages of arbitration, and (2) where the court had reason to suspect that the party accepting the agreement did not feel free to opt out. *See Mohamed*, 2015 WL 3749716, at *19-20 (summarizing and applying *Gentry*); Certification Order at 61-62. This Court found that a determination of whether a party felt free to opt out would likely require an individualized inquiry of the economic means of the driver and the circumstances under which he or she accepted the arbitration agreement. Certification Order at 62. In turn, these individualized issues "on the applicability of *Gentry* to a particular driver could seriously undercut predominance with respect to the arbitration question." *Id.* at 62-63.

        Since the Court's ruling in *Mohamed*, the California Supreme Court's ruling in *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899 (2015), cast doubt on the viability of the aspects of *Gentry*

---

[5] This is not to say such a showing could not be made as to a defined subclass. Here, however, Plaintiffs made no attempt to make any such showing.

on which this Court relied.  In *Sanchez*, the California Supreme Court held that the contract drafter "was under no obligation to highlight the arbitration clause of its contract, nor was it required to specifically call that clause to Sanchez's attention."  61 Cal. 4th at 914.  "Any state law imposing such an obligation would be preempted by the [Federal Arbitration Act]."  *Id.*  Thus, at the November 4, 2015 hearing on Plaintiff's motion to file a Fourth Amended Complaint, the Court informed the parties that it was taking a second look at its procedural unconscionability analysis because *Gentry*'s required disclosure of the disadvantages of arbitration was not necessarily consistent with *Sanchez*'s ruling.  Docket No. 379 at 8:13-10:23.

In response, Plaintiffs argued that the *Gentry* and procedural unconscionability issue was moot in light of the Ninth Circuit's ruling in *Sakkab v. Luxottica Retail North America, Inc.*, 803 F.3d 425 (9th Cir. 2015).  Plaintiffs contended that *Sakkab* was not an unconscionability case, but a straight question of whether a Private Attorney General Act (PAGA) waiver is unlawful and unenforceable as a violation of public policy.  Docket No. 379 at 23:10-12.  Thus, an arbitration agreement containing a non-severable PAGA waiver would be unenforceable without ever inquiring into whether there is procedural unconscionability.  *Id.* at 23:12-16.  The Court requested further supplemental briefing from the parties on this issue.[6]

Having reviewed the parties' briefing, the Court concludes that the PAGA waiver is unenforceable on public policy grounds.[7]  Furthermore, the arbitration agreement in the 2014 and

---

[6] As the Supreme Court recognized in *General Telephone Co. of Southwest v. Falcon*, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.  For such an order, particularly during the period before any notice is sent to members of the class, is inherently tentative."  457 U.S. 147, 160 (1982) (citation omitted); *see also United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010).

[7] Neither party disputes the Court's authority to determine whether the PAGA waiver is void as a matter of public policy.  The Court finds that it, and not the arbitrator, has this authority because the delegation clause is not clear and unmistakable, as is required to rebut the presumption against arbitrability of such issues.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Specifically, the governing law provision requires that "any disputes, actions, claims or causes of action *arising out of or in connection with* this Agreement or the Uber services *shall* be subject to the *exclusive* jurisdiction of the state and federal courts located in the City and County of San Francisco, California."  Docket No. 381, Exh. A (June 2014 Agreement) at § 14.1; Exh. B (November 2014 Agreement) at § 15.1; Exh. C (April 2015 Agreement) at § 15.1 (emphasis added).  As further discussed in *Mohamed*, "[t]his language is inconsistent and in considerable tension with the language of the delegation clauses, which provide that 'without limitation' arbitrability will be decided by an arbitrator."  2015 WL 3749716, at *10 (citing June 2014

2015 contracts contain a non-severable PAGA waiver, rendering the entire arbitration agreement also unenforceable.  For these reasons, the Court will certify an additional subclass of UberBlack, UberX, and UberSUV drivers who signed up to drive directly with Uber or an Uber subsidiary under their individual name and electronically accepted any contract with Uber or one of Uber's subsidiaries which contain the notice and opt-out provisions previously ordered by this Court (*e.g.*, the June 2014, November 2014, or April 2015 agreements) even if they did not timely opt out of that contract's arbitration agreement.

> a.   PAGA Waivers and Public Policy

Whether an arbitration agreement is unenforceable as a matter of public policy is a distinct question from whether an arbitration agreement is unenforceable because of unconscionability. Neither party disputes this.  *See Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 666 (2004) (separately analyzing an agreement on public policy grounds and unconscionability, and concluding that "the agreement [was] both illegal on public policy grounds and unconscionable on

---

Agreement at § 14.3(i)).  In addition, the June 2014 Agreement provides for severance if "any provision of this Agreement is held to be invalid or unenforceable."

The cases cited by Uber in its motions to compel arbitration both here and in *Yucesoy v. Uber Technologies, Inc.*, Case No. 15-cv-262, are distinguishable.  *Boghos v. Certain Underwriters at Lloyd's of London* concerned a service of suit clause that simply required the defendant to submit to the jurisdiction of the United States.  36 Cal. 4th 495, 503 (2005).  *Fallo v. High-Tech Institute* was an Eighth Circuit case which involved a choice-of-law provision that referred to "court costs." 559 F.3d 874, 879-80 (8th Cir. 2009).  *Oracle America, Inc. v. Myriad Group A.G.* simply acknowledged that some countries may require the right to seek judicial relief.  724 F.3d 1069, 1075 (9th Cir. 2013).  These cases thus concluded that a mere reference to a judicial forum was insufficient to create ambiguity because there are instances in which a party could go to court consistent with arbitration, *i.e.*, to enforce an arbitral award or to seek emergency relief.  None of their cases concerned an express *requirement* ("shall") that any claims or causes of actions arising out of or "in connection with" the agreement be brought in particular courts which are given "exclusive" jurisdiction over such claims, as is the case here.  The vesting of jurisdiction in the courts over a broad range of disputes here is express and not dependent on inference.

The closest analog tendered by Uber is *Dream Theater, Inc. v. Dream Theater*, in which the contract specified that "any action *arising out of* the agreements *may* be brought in any state or federal court in Los Angeles having jurisdiction over the dispute . . . ."  124 Cal. App. 4th 547, 556 (2004) (emphasis added).  However, even this clause is distinguishable because it is both permissive and narrower in scope than the governing law provision at issue here.  *See Simula, Inc. v. Autoliv*, 175 F.3d 716, 720 (9th Cir. 1999) (finding that "arising in connection with" is broader than "arising out of" or "arising under").  A lay person reviewing Uber's governing law provision could very well read a clause stating that any disputes in connection with the agreement *shall* be subject to the *exclusive* jurisdiction of the San Francisco courts as requiring judicial review of the enforceability of the arbitration agreement.

ordinary contractual grounds"). In *Iskanian v. CLS Transportation Los Angeles, LLC*, the California Supreme Court determined that "an arbitration agreement requiring an employee as a condition of employment to give up the right to bring representative PAGA actions in any forum is contrary to public policy." 59 Cal. 4th 348, 360 (2014). The California Supreme Court then determined that a public policy prohibiting a waiver of PAGA claims would not be preempted by the FAA. *Id.* at 384. The Ninth Circuit has since agreed that a PAGA waiver is void as a matter of public policy, and that this *Iskanian* rule is not preempted by the FAA. *Sakkab*, 803 F.3d 425, 431-40 (9th Cir. 2015).

Applying *Iskanian*, the Court of Appeal in *Securitas Security Services USA, Inc. v. Superior Court* found that an arbitration agreement with a non-severable PAGA waiver was unenforceable on public policy grounds. 234 Cal. App. 4th 1109, 1127 (2015). Notably, the arbitration agreement included a 30-day opt-out period. *Id.* at 1113. In its analysis, the Court of Appeal acknowledged that "[t]he fact [that] Edwards was given an opportunity to opt out of the agreement also may be an indication that dispute resolution agreement was not an adhesion contract; that it was free from procedural unconscionability." *Id.* at 1123. However, whether an agreement's terms are adhesive or unconscionable is "different from the determination of whether [the plaintiff] entered into a knowing and intelligent waiver of her right to bring a PAGA claim notwithstanding [her agreement] to arbitrate disputes at the inception of her employment before any dispute had arisen, or whether *Iskanian* compels a conclusion that such a waiver is unenforceable as against public policy." *Id.* Thus, because PAGA waivers are unenforceable as a matter of public policy, procedural unconscionability was not required. *Id.*

Here, Uber does not dispute that *Iskanian* and *Sakkab* determined that a PAGA waiver is unenforceable on public policy grounds rather than unconscionability, or that an unconscionability analysis is not required. It instead makes three primary arguments: (1) the arbitration agreement's non-severable PAGA waiver only bans PAGA claims in arbitration, (2) the arbitration agreement has a meaningful opt-out provision, and (3) Plaintiffs waived their argument about PAGA

1   waivers.[8]

2        b.    <u>Non-Severable PAGA Waiver</u>

3        Uber's primary argument is that *Iskanian* does not apply in the instant case because an

4   arbitration agreement is contrary to public policy only where it requires an employee to waive the

5   right to bring a PAGA claim in *any* forum.  Docket No. 381 at 3.  Uber thus contends that the non-

6   severable PAGA waiver in section 14.3(v)[9] does not in fact ban *all* PAGA claims.  *Id.* at 5.

7   Instead, Uber argues that this provision only prevents PAGA claims from being arbitrated, and

8   that the blanket PAGA waiver is contained in section 14.3(i), which *is* severable.  *Id.*

9        In relevant part, section 14.3(i) states:

10            **Except as it otherwise provides, this Arbitration Provision is**
             **intended to apply to the resolution of disputes that otherwise**
11            **would be resolved in a court of law or before a forum other than**
             **arbitration.  This Arbitration Provision requires all such**
12            **disputes to be resolved only by an arbitrator through final and**
             **binding arbitration on an individual basis only and not by way**
13            **of court or jury trial, or by way of class, collective, or**
             **representative action.**
14

15   (Emphasis in original.)

16        Section 14.3(v) states:

17            **You and Uber agree to resolve any disputes in arbitration on an**
             **individual basis only, and not on a class, collective, or private**
18            **attorney general representative action basis.  The Arbitrator**
             **shall have no authority to consider or resolve any claim or issue**
19            **any relief on any basis other than an individual basis.  The**
             **Arbitrator shall have no authority to consider or resolve any**
20            **claim or issue any relief on a class, collective, or representative**
             **basis.**  If at any point this provision is determined to be
21            unenforceable, the parties agree that this provision shall not be
             severable, unless it is determined that the Arbitration may still
22            proceed on an individual basis only.

23   _____

24   [8] Uber also argues that *Iskanian* is preempted by the FAA, despite the Ninth Circuit's ruling in
     *Sakkab*.  Docket No. 381 at 2.  It makes the argument simply to preserve it for appeal.  *Id.* at 2 n.1.
25   Given that the Supreme Court denied review of *Iskanian*, and that *Sakkab* is binding on this Court,
     the Court declines to find that *Iskanian* is preempted by the FAA.  *See CLS Transp. L.A., LLC v.*
26   *Iskanian*, 135 S. Ct. 1155 (2015) (denying petition for writ of certiorari).

27   [9] This Order refers to section 14.3 of the June 2014 agreement, which contains the arbitration
     provision.  The arbitration provision is contained in section 15.3 of the November 2014 and April
28   2015 agreement.  The relevant portions of sections 14.3(i), 14.3(v), and 14.3(ix) are the same as
     sections 15.3(i), 15.3(v), and 15.3(ix) respectively.

**United States District Court**
For the Northern District of California

1    (Emphasis in original.)

2            Finally, section 14.3(ix) states:

3                    This Arbitration Provision is the full and complete agreement
                    relating to the formal resolution of disputes arising out of this
4                    Agreement.  Except as stated in subsection v, above, in the event
                    any portion of this Arbitration Provision is deemed unenforceable,
5                    the remainder of this Arbitration Provision will be enforceable.

6            As drafted, section 14.1(i) is indisputably a blanket PAGA waiver, stating that any claim

7    ("all disputes") must be arbitrated (unless otherwise provided) and that a representative action

8    cannot be brought in court or anywhere else.  Nonetheless, the Court also finds that section

9    14.3(v)'s non-severability clause is self-contained within section 14.3(v) because it refers to

10   "provision" (lower-case) whereas the overall arbitration agreement is referred to as "Provision"

11   (upper-case), as in section 14.3(ix)'s severance clause.  Section 14.3(ix)'s severance clause also

12   specifically excepts from its purview section 14.3(v), further evidencing that 14.3(v)'s non-

13   severability clause applies only to section 14.3(v).  Furthermore, section 14.3(v) is limited to

14   barring PAGA claims in arbitration only, which is consistent with its heading, "<u>How Arbitration</u>

15   <u>Proceedings are Conducted</u>."  Thus, to the extent that section 14.3(v) is not severable, it alone

16   does not prohibit PAGA claims in all forums, unlike section 14.3(i)'s severable provision which

17   does contain the blanket PAGA waiver.

18           However, as explained below, the Court disagrees with Uber's assertion that section

19   14.3(i)'s blanket PAGA waiver can be severed without undermining the entire arbitration

20   provision itself.

21                   i.      <u>Inability to Linguistically Sever Without Reformation</u>

22           The fundamental problem with the arbitration agreements at issue is that section 14.3(i)

23   acts as a predicate to section 14.3(v), requiring "arbitration of every claim or dispute that lawfully

24   can be arbitrated, except for those claims and disputes which by the terms of this Agreement are

25   expressly excluded from the Arbitration Provision."  June 2014 Agreement at § 14.3(i).  Thus,

26   because a PAGA claim is not expressly excluded,[10] section 14.3(i) requires that the PAGA claim

27   _____

28   [10] Because the arbitration agreement is completely silent as to explicitly permitting a PAGA claim
     from being brought in court (*see, e.g.*, § 14.3(ii) (listing types of claims that shall not be subject to

14

**United States District Court**
For the Northern District of California

must go to arbitration, at which point section 14.3(v)'s non-severable prohibition on PAGA claims in arbitration applies to bar the PAGA claim.  In other words, section 14.3(i) prevents a PAGA claim from being brought anywhere but in arbitration, and section 14.3(v) operates to prevent the PAGA claim from being brought in arbitration.  The provisions are inextricably tied – section 14.3(v) is not effective without section 14.3(i).

Because sections 14.3(i) and 14.3(v) are so inextricably linked, it is impossible to grammatically or linguistically sever the PAGA claims waiver without completely undermining arbitration itself.  If, for example, the Court was to remove the requirement that the driver is not permitted to bring representative actions, section 14.3(i) would still require that all claims (except those expressly excluded)[11] be brought in arbitration, including a PAGA claim.  The driver would then be unable to bring his or her PAGA claim in arbitration under section 14.3(v), leaving a driver with no forum to bring their PAGA claim.  Thus, the PAGA claims would be waived, and *Iskanian* would apply to find that the PAGA waiver is unenforceable as a matter of public policy, causing the entire agreement to fail.  The only way a driver would not be required to bring their PAGA claim in arbitration would be to remove the requirement that all claims must be brought in arbitration except for those claims that "are expressly excluded from the Arbitration Provision." June 2014 Agreement at § 14.3(i).  But to remove that requirement would be to remove the heart

the requirement to arbitrate)), to read such a possibility in would require reforming the contract, which the Court is not permitted to do.  *See Kolani v. Gluska*, 64 Cal. App. 4th 402, 407-08 ("Generally, courts reform contracts only where the parties have made a mistake (1 Witkin Summary of California Law (9th ed.1987), Contracts, § 382, p. 347), and not for the purpose of saving an illegal contract.  (*Id.*, § 386, p. 350).  Illegal contracts are void."); *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 124-25 (2000) ("in the case of the agreement's lack of mutuality, such permeation is indicated by the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement.  Rather, the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms.  Civil Code section 1670.5 does not authorize such reformation by augmentation . . . .  Because a court is unable to cure this unconscionability through severance or restriction, and is not permitted to cure it through reformation and augmentation, it must void the entire agreement.").

[11] Section 14.3(ii) specifically identifies the disputes and claims that "shall not be subject to arbitration and the requirement to arbitrate set forth in Section 14.3 of this Agreement."  These disputes include claims for workers' compensation, state disability insurance and unemployment insurance benefits, and intellectual property rights.  June 2014 Agreement at § 14.3(ii).

**United States District Court**
For the Northern District of California

1    of the arbitration agreement and not require any arbitration at all.

2         At the hearing, Uber provided the Court with its suggested edits to section 14.3(i) so that

3    the arbitration agreement would be enforceable.  For example, Uber suggests the following edit to

4    section 14.3(i):

5         ~~Except as it otherwise provides, this Arbitration Provision is~~
          ~~intended to apply to the resolution of disputes that otherwise would~~
6         ~~be resolved in a court of law or before a forum other than~~
          ~~arbitration.~~  This Arbitration Provision requires ~~all such~~ disputes to
7         be resolved ~~only by an arbitrator through final and binding~~
          ~~arbitration~~ on an individual basis ~~only~~ and not by way of ~~court or~~
8         ~~jury trial, or by way of~~ class, collective, ~~or representative~~ action.

9    This leaves the following sentence: "This Arbitration Provision requires disputes to be resolved on

10   an individual basis and not by way of class, collective action."  Several problems arise from this

11   suggested edit.  First, it still requires that disputes be resolved on an *individual* basis, thus

12   preventing an individual from bringing a representative action in any forum.  Nothing in the edited

13   language would authorize representative actions to be brought in court.  Second, and far more

14   significantly, this edited sentence no longer requires disputes to be resolved *in arbitration*, in short

15   eviscerating the central purpose of the arbitration agreement.  The operative predicate to § 14.3(v)

16   would be missing.

17        Granted, Uber's suggested edit does retain the later paragraph stating that, "This

18   Agreement is intended to require arbitration of every claim or dispute that lawfully can be

19   arbitrated, except for those claims and disputes which by the terms of this Agreement are

20   expressly excluded from the Arbitration Provision."  But again, while this paragraph does require

21   arbitration, it would also require arbitration of the PAGA claim (as part of "every claim"); PAGA

22   claims are not expressly excluded from the Arbitration Provision.  However, because of the non-

23   severable section 14.3(v), the PAGA claim cannot be brought in arbitration, resulting in a driver

24   having no forum in which to bring their PAGA claims.  Uber's proposed edits only highlight the

25   impossibility of linguistically severing the arbitration agreement in order to remove the blanket

26   PAGA waiver, while maintaining the arbitration process.

27        ii.    <u>Indivisible Contract</u>

28        Uber urges the Court to apply California Civil Code section 1599, which states: "Where a

**United States District Court**
For the Northern District of California

1   contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in

2   whole or in part, the contract is void as to the latter and valid as to the rest." Uber argues that

3   under this provision, even if linguistic severance is not feasible, the Court can restrict enforcement

4   of the arbitration agreement to deem part of it void while preserving the remainder of the

5   agreement, and cites the California Supreme Court's decisions in *Birbower, Montalbano, Condon*

6   *& Frank v. Superior Court*, 17 Cal. 4th 119 (1998) and *Marathon Entertainment, Inc. v. Blasi*, 42

7   Cal. 4th 974 (2008) in support. *See* Docket No. 392 at 49:21-50:17.

8        In general, section 1599 applies to what may be termed divisible contracts, or a contract

9   that "is in its nature and purpose susceptible of division and apportionment, having two or more

10  parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent

11  upon each other nor intended by the parties to be so." *Filet Menu, Inc. v. C.C.L. & G, Inc.*, 79 Cal.

12  App. 4th 852, 860 (2000) (citation omitted); *see also Pacific Wharf & Storage Co. v. Standard*

13  *Am. Dredging Co.*, 184 Cal. 21, 25 (1920) ("The rule is well settled that, where several things are

14  to be done under a contract, if the money consideration to be paid is apportioned to each of the

15  items to be performed, the covenants are ordinarily regarded as severable and independent"). As

16  the California Supreme Court explained in *Keene v. Harling*, "[w]hether a contract is entire or

17  separable depends upon its language and subject-matter, and this question is one of construction to

18  be determined by the court according to the intention of the parties. If the contract is divisible, the

19  first part may stand, although the latter is illegal." 61 Cal. 2d 318, 320 (1964). Similarly, with

20  respect to the severability of partially illegal contracts, "a contract is severable if the court can,

21  consistent with the intent of the parties, reasonably relate the illegal consideration on one side to

22  some specified or determinable portion of the consideration on the other side." *Id.* at 321.

23  However, "[i]f the court is unable to distinguish between the lawful and unlawful parts of the

24  agreement, 'the illegality taints the entire contract, and the entire transaction is illegal and

25  unenforceable.'" *Birbower*, 17 Cal. 4th at 138 (quoting *Keene*, 61 Cal. 2d at 321)).

26        Thus, in *Birbower*, the California Supreme Court found that a fee agreement could be

27  enforced to the extent that services were legally performed by the plaintiff. *Id.* at 124. There, an

28  out-of-state law firm which was not licensed to practice law in California entered into an

agreement to perform legal services in California for a California-based client. *Id.* The California Supreme Court found that the firm could not recover fees for services provided in California, but that it could recover fees for services it performed exclusively in New York under the agreement because those services did not involve the practice of law in California. *Id.* at 137. In particular, the California Supreme Court explained that "[t]he fee agreement between [the firm] and [the client] *became* illegal when [the firm] performed legal services in violation of section 6125." *Id.* at 138 (emphasis added). But "notwithstanding an illegal consideration, courts may sever the illegal portion of the contract from the rest of the agreement." *Id.* The California Supreme Court thus found that "the portion of the fee agreement between [the firm] and [the client] that includes payment for services rendered in New York may be enforceable to the extent that the illegal compensation can be severed from the rest of the agreement," and required the trial court to determine if it could "sever the illegal portion of the consideration (the value of the California services) from the rest of the fee agreement." *Id.* at 139. In other words, it appeared possible to allocate and separate the consideration between its component parts.

Likewise, in *Marathon Entertainment, Inc.*, the plaintiff and defendant entered into an oral contract where the plaintiff was to serve as the defendant's personal manager. 42 Cal. 4th at 981. Plaintiff's services included both legal personal manager services and illegal procurement of employment for the defendant without a talent agency license. *Id.* at 982. Citing *Birbower*, the California Supreme Court explained that severance was available "to partially enforce contracts involving unlicensed services." *Id.* at 993. Thus, a court was to consider the central purpose of the contract, and "[i]f the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from contract by means of severance or restriction, then such severance and restriction are appropriate." *Id.* at 996.

In both *Birbower* and *Marathon Entertainment, Inc.*, the illegal portion of the consideration was independent of the legal consideration, and could therefore be easily severed from the remainder of the contract. In other words, although the contract itself did not distinguish between the illegal services (unlawful practice of law in California, procurement of acting jobs services without a talent agency license) and the legal services (lawful practice of law in New

**United States District Court**
For the Northern District of California

1   York, legitimate personal manager services), such services were separate from each other and the

2   consideration therefor could be apportioned to each.  *Birbower* and *Marathon Entertainment, Inc.*

3   thus involved divisible contracts where the illegal portion of the contract (performance and

4   consideration therefor) could easily be severed.

5        The same cannot be said of the arbitration agreements at issue here.  As explained above,

6   the blanket PAGA waiver is inextricably linked with the remainder of the arbitration agreement,

7   such that the operation of the arbitration agreement – including the non-severable section 14.3(v) –

8   is dependent on section 14.3(i).  This is emphasized by the inability of this Court to linguistically

9   excise the unenforceable PAGA waiver from the rest of the agreement.  Moreover, the central

10  purpose of the arbitration agreement is to funnel *all* disputes, except those expressly excluded by

11  the arbitration agreement, into arbitration, which can then only be conducted on an individual

12  basis.  This singular purpose is emphasized by the preamble, which states that "[t]his arbitration

13  provision will require you to resolve any claim that you may have against Uber on an *individual*

14  *basis*" and precludes a driver from bringing a representative action.  June 2014 Agreement at 12-

15  13.  Likewise, the non-severable section 14.3(v) prohibits representative actions in arbitration.

16  This purpose is not collateral to or distinguishable from the blanket PAGA waiver, but directly

17  dependent upon it, as the arbitration agreement is designed to prevent PAGA claims from ever

18  being brought.  Thus, unlike *Birbower* and *Marathon Entertainment, Inc.*, the arbitration

19  agreement here is not divisible, with the illegal portion being easily separable from the legal

20  portion.  The blanket PAGA waiver is instead an integral part of Uber's goal of requiring

21  individual arbitration of all claims, and therefore cannot be severed per Civil Code section 1599.

22       The instant arbitration agreement at bar is similar to cases where the courts have declined

23  to sever – where the illegal object is "[t]he very essence and mainspring of the agreement."  *Santa*

24  *Clara Valley Mill & Lumber Co. v. Hayes*, 76 Cal. 387, 393 (1888).  In *Hayes*, the parties entered

25  into a contract where the defendants agreed not to manufacture any lumber except for that to be

26  sold to the plaintiff under the contract.  *Id.* at 389.  The sole purpose of this contract was to

27  increase the price of lumber by limiting the amount to be manufactured, and give the plaintiff the

28  control of all lumber manufactured in the area.  *Id.*  When the plaintiff sued sought damages based

19

on the defendants' non-delivery of lumber under the contract, the California Supreme Court found that the contract as a whole was void as being against public policy. *Id.* at 392. The Court explained that the contract was not divisible because the illegal purpose of increasing the price of lumber was "the inducement to the agreement, and the *sole object* in view," which "cannot be separated and leave any subject-matter capable of enforcement." *Id.* at 393.

Like *Hayes*, the overarching purpose here – to require all disputes (except those expressly excluded) be resolved solely by individual arbitration to the exclusion of all PAGA representative actions – violates public policy; the encompassed waiver of PAGA claims cannot be separated. Accordingly, severance of the blanket PAGA waiver is not appropriate under Civil Code section 1599.

iii.    <u>Equity</u>

Finally, as an additional reason, the Court finds that as a matter of equity, severance is not permitted in the instant case. Generally, "severance is not mandatory and its application in an individual case must be informed by equitable considerations." *Marathon Entm't*, 42 Cal. 4th at 992. Severance is favored in order "to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement – particularly when there has been full or partial performance of the contract." *Armendariz*, 24 Cal. 4th at 123-24; *see also Marathon Entm't*, 42 Cal. 4th at 992 ("Civil Code section 1599 grants courts the power, not the duty, to sever contracts in order to avoid an inequitable windfall or preserve a contractual relationship where doing so would not condone illegality.").

Here, the equitable considerations do not favor severance. This is not a case where there has been performance, and voiding the contract will result in one party receiving an unfair windfall. *E.g.*, *Marathon Entm't, Inc.*, 42 Cal. 4th at 992. Severance would not be a tool to effectuate the equivalence of quantum meruit as it was in cases such as *Marathon Entertainment* and *Birbower*. *See also Pacific Wharf & Storage Co.*, 184 Cal. at 24 ("it would be inequitable to allow [the defendant] to retain and enjoy the dredge and successfully resist payment" on the ground that the contract also included an illegal covenant not to compete). Instead, Uber has drafted a contract that deters *ab initio* drivers from bringing representative actions. Any driver

20

**United States District Court**
For the Northern District of California

1     who reads the arbitration agreement will be misled into believing that they have no right to bring a

2     PAGA claim, as the arbitration agreement not only outright prohibits representative actions, but

3     requires that all disputes be arbitrated on an individual basis.  The preamble so states.  *See* June

4     2014 Agreement at § 14.3 ("This provision will preclude you from bringing any class, collective,

5     or representative action against Uber.").  This is misleading in light of *Iskanian* and *Sakkab*, a

6     legal subtlety that would be lost on the average lay person.  Applying principles of equity,

7     severance pursuant to Civil Code section 1599 is not warranted for this reason as well.

8            Because the unenforceable PAGA waiver cannot be severed from the arbitration

9     agreement, the arbitration agreement as a whole is unenforceable on public policy grounds.  *See*

10    *Securitas*, 234 Cal. App. 4th at 1126-27; *Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1098 (9th

11    Cir. 2009) (finding arbitration agreement as a whole was unenforceable where an unenforceable

12    class waiver was non-severable by the terms of the agreement).

13                          c.    Opt-Out Provision

14           Uber next argues that the PAGA waiver is not mandatory because there is a meaningful

15    opportunity to opt-out.  Docket No. 381 at 10.  The Court previously rejected this argument in

16    *Mohamed*, relying on the California Court of Appeal's decision in *Securitas*.  *Mohamed*, 2015 WL

17    3749716, at *35.  In *Securitas*, the dispute resolution agreement gave employees 30 days to opt

18    out of the agreement.  234 Cal. App. 4th at 1113.  Based on this opt-out option, the defendant

19    argued that "*Iskanian* did not apply to voluntary agreements to arbitrate PAGA claims

20    individually.  It maintained that because [the plaintiff] was not compelled to agree to the dispute

21    resolution agreement but voluntarily did so by not opting out, *Iskanian* did not govern, requiring

22    enforcement of the dispute resolution agreement in its entirety."  *Id.* at 1114.  The Court of Appeal

23    disagreed, explaining that while *Iskanian* did not preclude the possibility of a PAGA waiver, a

24    valid PAGA waiver can only occur "where an employer and an employee knowingly and

25    voluntarily enter into an arbitration agreement *after a dispute has arisen*."  *Id.* at 1122 (citation

26    omitted) (original emphasis).  This is because in a case "when an employee is faced with a dispute

27    with his or her employer, employees *are free to determine what trade-offs between arbitral*

28    *efficiency and formal procedural protections best safeguard their statutory rights*."  *Id.* (citation

21

United States District Court
For the Northern District of California

1    omitted) (original emphasis).  As applied, the court:

2           decline[d] to conclude that [the plaintiff's] mere opportunity to opt
3           out of the dispute resolution agreement or obtain counsel's advice
            on it at the inception of her employment and before any dispute
4           arose, without more evidence of her knowledge, gave her a
            sufficient understanding of the relevant circumstances and likely
5           consequences of forgoing her right to bring a PAGA representative
            action.  Thus, we hold that on this record, [the plaintiff's]
6           opportunity to opt out of the agreement did not take this case outside
            of *Iskanian*.

7    *Id.*

8           In so finding, the Court of Appeal distinguished the Ninth Circuit's decision in

9    *Johnmohammadi v. Bloomingdale's, Inc.*, in which the Ninth Circuit found that a plaintiff who did

10   not opt out within the opt-out period became bound by the terms of the arbitration agreement.  *Id.*

11   (citing 755 F.3d 1072, 1074 (9th Cir. 2014)).  The Court of Appeal explained that

12   *Johnmohammadi* did not address a PAGA waiver or *Iskanian*, and that "it otherwise does not

13   convince us to change the conclusion we have reached."  *Id.* at 1123.  Thus, the Court of Appeal

14   concluded that the trial court properly declined to compel to arbitration the representative PAGA

15   claim.  *Id.*; *see also Williams v. Superior Court*, 237 Cal. App. 4th 642, 647-48 (2015) (rejecting

16   an employer's argument that a PAGA waiver in an arbitration agreement was not a condition of

17   employment because the employee could opt out without adverse consequences).  237 Cal. App.

18   4th 642, 647-48 (2015).

19          Uber does not challenge the reasoning of *Securitas*, only arguing that "there is no

20   California Supreme Court decision on point."  Docket No. 381 at 10 n.10.  Absent California

21   authority to the contrary, the Court concludes that the PAGA waiver is an unenforceable *pre-*

22   *dispute* waiver despite the opt-out provision.  While the opt-out provision may determine whether

23   there is procedural unconscionability, it does not mean that an individual entered into a "knowing

24   and intelligent waiver" of his or her right to bring a PAGA claim.  *Securitas*, 234 Cal. App. 4th at

25   1123.  As a valid waiver can only be made *after* a dispute has arisen, the PAGA waivers contained

26   in the 2014 and 2015 agreements are unenforceable against the subclass of drivers that the Court

27   will certify in this Order.

28

United States District Court
For the Northern District of California

d.      Waiver

Finally, Uber argues that Plaintiffs have waived the argument that a PAGA waiver is void on public policy grounds.  First, Uber argues that Plaintiffs never raised the argument that the arbitration agreement is unenforceable as a matter of public policy until the November 4 hearing, as Plaintiffs instead focused solely on unconscionability.  Docket No. 381 at 11.  Uber cites no authority that a party can "waive" an argument of unenforceability on public policy grounds.  Uber's citation to *GPNE Corp. v. Apple, Inc.*, which concerned the failure to raise a claim construction issue until the second week of trial, is unpersuasive.  No. 12-cv-2885-LHK, 2015 WL 3629716, at *8 (N.D. Cal. June 9, 2015).  Not only does *GPNE Corp.* not involve a public policy claim, but the district court noted that two years had passed between the court's claim construction order and the second week of trial.  *Id.*  Here, the enforceability of the 2014 and 2015 arbitration agreements was not at issue until the class certification motion earlier this year (and more reasonably the motion to compel arbitration of absent class members, filed on September 10, 2015).  Thus, even if one could waive a public policy claim, Plaintiffs did not unduly delay in raising the argument that the PAGA waiver is void as a matter of public policy.

Second, Uber contends that Plaintiffs waived this argument by not asserting a PAGA claim earlier in this case.  Docket No. 381 at 12.  Whether or not Plaintiffs bring a PAGA waiver is irrelevant to the analysis of whether the PAGA waiver is unenforceable as a matter of public policy.  This Court has already rejected this argument and found that a PAGA waiver is unenforceable regardless of whether the plaintiff brings or even *can* bring a PAGA claim. *Mohamed*, 2015 WL 3749716, at *34-35.  The Court must look at whether "the arbitration agreement *as written* is unconscionable and contrary to public policy."  *Armendariz*, 24 Cal. 4th at 125 (2000).  After all:

> the purpose of analyzing unconscionability at the time an agreement is drafted is to *deter* drafters from including such unconscionable terms in their agreements in the first instance: "An employer will not be deterred from routinely inserting such . . . illegal clause[s] into the arbitration agreement it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter."

*Mohamed*, 2015 WL 3749716, at *34 (quoting *Armendariz*, 24 Cal. 4th at 124 n.13).

United States District Court
For the Northern District of California

1          For these reasons, the Court concludes that Plaintiffs have not waived the argument that

2   the non-severable PAGA waiver is unenforceable as a matter of public policy.  Moreover,

3   Plaintiffs have sought to amend the complaint to add a PAGA claim (a request still under

4   submission).

5                          e.        Conclusion

6          The Court concludes that per *Iskanian* and *Sakkab*, section 14.3(i)'s blanket PAGA waiver

7   is unenforceable as a matter of public policy.  Although the arbitration agreement contains an opt-

8   out provision, the arbitration agreement still requires that the driver sign a pre-dispute PAGA

9   waiver, which is contrary to *Iskanian*.  *See Securitas*, 234 Cal. App. 4th at 1122-23.  Moreover,

10  the PAGA waiver cannot be severed from the remainder of the arbitration agreement, whether

11  through literal severance or under Civil Code section 1599's enforcement severance principles.

12  Because the PAGA waiver cannot be severed, the arbitration agreement as a whole is

13  unenforceable.

14         Because the arbitration agreements are unenforceable as a matter of public policy, a

15  procedural unconscionability analysis is no longer required.  Thus, the Court will not need to

16  perform an individualized inquiry to determine if a driver was subject to general economic

17  pressures per *Gentry* to find procedural unconscionability even assuming *Gentry* remains good

18  law after *Sanchez*.  An individualized inquiry will therefore not predominate for drivers who did

19  not opt out of Uber's more recent arbitration clauses.  For that reason, the Court will certify the

20  following December 9, 2015 subclass, which again includes:

21                 All UberBlack, UberX, and UberSUV drivers who have driven for
                   Uber in the state of California at any time since August 16, 2009,
22                 and meet all the following requirements: (1) who signed up to drive
                   directly with Uber or an Uber subsidiary under their individual
23                 name, and (2) are/were paid by Uber or an Uber subsidiary directly
                   and in their individual name, and (3) electronically accepted any
24                 contract with Uber or one of Uber's subsidiaries which contain the
                   notice and opt-out provisions previously ordered by this Court, and
25                 did not timely opt out of that contract's arbitration agreement.

26  C.     Expense Reimbursement Claim

27         In its Certification Order, the Court declined to certify the September 1, 2015 Class for the

28  Expense Reimbursement Claim, finding that Plaintiffs had not demonstrated that they were

24

adequate class representatives.  Certification Order at 26-29.  The Court was particularly concerned that by seeking only to recover vehicle operation expenses using the IRS standard mileage allowance, Plaintiffs were "waiv[ing] other elements of damage on behalf of the class in order to facilitate class certification . . . ." *Id.* at 28.  Specifically:

> Plaintiffs here did not make any attempt to demonstrate that the monetary value of the other types of expenses that they had previously sought to recover for absent class members in this litigation, and now would be waiving in order to obtain class certification (*e.g.*, water bottles, gum and mints for passengers, clothing, etc…), were not so substantial as to create a conflict of interest between the class representatives and class members.  That is, Plaintiffs have not demonstrated (or even tried to demonstrate) that it is in the best interests of the class members to waive their claims for reimbursement of all their actual expenses (including actual vehicle operation expenses) that are not captured by the IRS mileage rate formula.

*Id.* at 28-29.  The Court acknowledged that Plaintiffs could make such a showing by, for example, "submit[ting] an expert report or other evidence that shows that absent class members will be well served receiving the IRS mileage rate rather than receiving their actual damages." *Id.* at 29. However, on the basis of the record then before the Court, there was insufficient information for the Court "to be reasonably assured that what Plaintiffs purport to be giving up on behalf of the class members they seek to represent is not of such value to absent class members that the interests of those class members would be at odds with those of the named Plaintiffs." *Id.*

Plaintiffs now request that the Court certify the Expense Reimbursement Claim with respect to drivers' vehicle-related and telephone expenses.  Cert. Supp. at 5.  As explained below, the Court finds that Plaintiffs are not rendered inadequate by their failure to seek the recovery of "other expenses," *i.e.*, mints, water bottles, car washes, dry cleaning, etc.  The Court also concludes that Plaintiffs' proposed methodology for vehicle-related expenses and phone expenses is sufficient to permit certification under Rule 23(b), especially in light of the Ninth Circuit's repeated pronouncement that "damage calculations alone cannot defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015); *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

25

United States District Court
For the Northern District of California

1.      Adequacy

Uber contends that Plaintiffs have not addressed the Court's adequacy concerns because by seeking only vehicle-related and phone expenses, Plaintiffs are essentially splitting a single cause of action across different forms of relief.  Cert. Opp. at 7.  This raises the specter of res judicata, and the possibility that class members will never be able to recover expenses other than those certified here.  Thus, Uber argues that Plaintiffs are inadequate because they seek to "cast aside potentially valuable expense reimbursement claims."  *Id.*

In support, Uber cites *Tasion Communications, Inc. v. Ubiquiti Networks, Inc.*, in which this Court denied class certification based on the adequacy of the class representative.  308 F.R.D. 630, 643 (N.D. Cal. 2015).  There, the plaintiffs alleged that defendant falsely advertised that its product, TOUGHCable (TC), was built to withstand harsh outdoor environments.  *Id.* at 632.  In seeking class certification, the plaintiffs limited the damages sought to just one kind of damage: the direct labor costs to replace TC.  *Id.* at 641.  In short, the plaintiffs were forgoing all other possible elements of damages, including replacement cables and cable connectors, damaged radios, travel-related costs, downtime, lost connectivity, compensation to customers, lost profits, and lost customers.  There was no evidence that "the abandoned damages would be small or insignificant such that it would be fair for Plaintiffs to forego them in order to prosecute a class action;" in fact, the Court recognized that these damages were "*likely to exceed by many times* the direct replacement labor cost Plaintiffs now seek."  *Id.* at 641, 642 (emphasis added).  Because the plaintiffs were willing to abandon significant, indeed dominant, damages claims, the Court concluded that the plaintiffs were not adequate representatives.  *Id.* at 643.

Unlike *Tasion* and the other cases raised by Uber, this is not a case in which Plaintiffs seek to waive damages that are likely to "exceed by many times" the damages sought.  *See, e.g.*, *Sanchez v. Wal-Mart*, No. Civ. 2:06-CV-02573-JAM-KJM, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (finding inadequacy where the plaintiff alleged that a stroller was defective due to a dangerous pinch point, creating unreasonable potential for harm, but only sought to recover the cost of the stroller while waiving all personal injury damages); *Drimmer v. WD-40 Co.*, No. 06-CV-900 W(AJB), 2007 WL 2456003, at * (S.D. Cal. Aug. 24, 2007) (finding inadequacy where

United States District Court
For the Northern District of California

1  the plaintiff alleged the product was not safe for plumbing, but only sought to recover the

2  product's purchase price while waiving damages from replacing the tank parts, paying higher

3  water bills, or hiring a plumber).  Instead, this case is more comparable to *In re Universal Service*

4  *Fund Telephone Billing Practices Litigation*, in which the plaintiffs abandoned their common law

5  fraud claim but continued to pursue all of their other claims for compensatory damages, treble

6  damages, and injunctive relief.  219 F.R.D. 661, 669 (D. Kan. 2004).  In finding adequacy, the

7  district court explained:

8           This is not a case where the class representatives are pursuing
            relatively insignificant claims while jeopardizing the ability of class
9           members to pursue far more substantial, meaningful claims.  Rather,
            here the named plaintiffs simply decided to pursue certain claims
10          while abandoning a fraud claim that probably was not
            certifiable. . . . While the court can certainly appreciate the fact that
11          a named plaintiff's failure to assert certain claims of the absent class
            members might give rise to a conflict of interest when the named
12          plaintiff is advancing his or her own interests at the expense of the
            class, the mere fact that a named plaintiff elects not to pursue one
13          particular claim does not necessarily create such a conflict.

14  *Id.* at 669-70.

15          Here, Plaintiffs have made a reasonable judgment call to pursue vehicle-related and phone

16  expenses in this litigation, and have presented some evidence that these expenses will comprise

17  the majority of any recoverable expenses.  Specifically, Plaintiffs have provided six declarations

18  which show that the majority of expenses are vehicle-related expenses.  *See* Cert. Supp. at Exh. 2

19  ¶¶ 4, 6 (Meade Dec.); Exh. 3 ¶¶ 4, 6 (F. Merchant Dec.); Exh. 4 ¶¶ 4, 6 (Gottlieb Dec.); Exh. 5 ¶¶

20  4, 6 (J. Merchant Dec.); Exh. 6 ¶¶ 4, 6 (Dunn Dec.); Exh. 7 ¶¶ 4, 6 (Arzumanyan Dec.); *see also*

21  McCrary Dec. at 14 (Table 1A).  The declarations estimate vehicle-related and other expenses for

22  three "sample" months, and show that vehicle-related expenses encompassed 74-86.4% of all

23  expenses.  When including phone expenses, this percentage further increases.  While this is

24  admittedly a small sampling that lacks statistical significance, the Court finds that it is sufficient

25  where, as here, it seems self-evident that vehicle-related and phone expenses will likely comprise

26  the majority of any recoverable expenses from performing a transportation service and Uber has

27

28

1    presented no persuasive evidence to the contrary.[12]

2         Moreover, Plaintiffs' decision to pursue expenses that are common to all drivers, while not

3    seeking other potentially recoverable expenses, is reasonable in light of the potential difficulties of

4    proving recovery of those other expenses on a class-wide common basis (or perhaps even on an

5    individual basis given documentation issues that may arise for such items).  As recognized in *In re*

6    *Universal Service Fund*, a decision to abandon a claim that may not be certifiable does not

7    automatically render a plaintiff inadequate, particularly when they seek the majority of the claims.

8    *See* 219 F.R.D. at 669.  Thus, this case is a far cry from those in which the courts found

9    inadequacy, as Plaintiffs are not "pursuing relatively insignificant claims while jeopardizing the

10   ability of class members to pursue far more substantial, meaningful claims."  *Id.*  The claims

11   pursued here are significant, substantial, and meaningful.  The Court concludes that Plaintiffs are

12   adequate representatives, and that a conflict of interest is not created by Plaintiffs' decision to limit

13   certification to only vehicle-related and phone expenses.

14       2.    Vehicle-Related and Phone Expenses

15       The Court finds that certifying vehicle-related and phone expenses will not cause

16   individualized issues to predominate.  As an initial matter, the Ninth Circuit has recognized, "[i]n

17   calculating damages . . . California law 'requires only that some reasonable basis of computation

18   of damages be used, and the damages may be computed even if the result reached is an

19   approximation.'"  *Pulaski & Middleman, LLC*, 802 F.3d at 989 (quoting *Marsu, B.V. v. Walt*

20   *Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999)).  Thus, "'[t]he fact that the amount of damage

21   may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment

22   does not bar recovery.'"  *Id.* (quoting *Marsu*, 185 F.3d at 939)).

23       In *Leyva*, the Ninth Circuit reversed a denial of class certification in part because "damages

24   could feasibly and efficiently be calculated once the common liability questions are adjudicated."

25   _____

26   [12] At the hearing, Uber argued that Plaintiffs were not seeking all vehicle-related expenses, such as
     time for when a driver is on-duty but not actually driving a passenger, *i.e.*, driving to an airport to

27   pick a passenger up or driving to a gas station.  Docket No. 392 at 16:9-16.  However, Plaintiffs
     asserted that they were not waiving these expenses.  *Id.* at 17:25-18:6.  Whether or not Plaintiffs

28   can prove these damages is a separate matter; the fact that Plaintiffs are seeking such damages also
     supports a finding of adequacy at the class certification stage.

716 F.3d at 514.  There, the plaintiff alleged that the defendant had improperly rounded its employees' start times in 29-minute increments, such that "workers who clocked-in between 7:31 a.m. and 8:00 a.m. would be paid only from 8:00 a.m. onward even though they began work beforehand."  *Id.* at 512.  The district court denied certification, finding that individual questions about the amount of pay owed would predominate over common questions.  *Id.* at 513.  The Ninth Circuit reversed, explaining that "damages determinations are individual in nearly all wage-and-hour class actions," but that "the amount of damages is invariably an individual question and does not defeat class action treatment."  *Id.* at 513, 514 (citation omitted).  The Ninth Circuit noted that the defendant had estimated its liability in the Notice of Removal by multiplying each employee's hourly rate by the number of workweeks he/she was employed by the defendant during the applicable period.  *Id.* at 514.  Based on this Notice of Removal, the Ninth Circuit found that there was a feasible and efficient method of calculating damages once liability was adjudicated.

Here, Uber challenges Plaintiffs' use of the IRS reimbursement method to calculate drivers' vehicle expenses, arguing that this method will "not come close to approximating the actual expenses they claim to have incurred."  Cert. Opp. at 14.  The IRS reimbursement method takes into account vehicle-related expenses, including fuel, maintenance, repairs, depreciation, tires, and insurance.  *See* https://www.irs.gov/Credits-&-Deductions/Individuals/Standard-Mileage-Rates-Glance (last accessed December 1, 2015).  This Court has previously certified a class action on behalf of drivers who sought reimbursement of vehicle operation expenses using the IRS reimbursement method as the common damages model.  *Stuart v. RadioShack Corp.*, No. C-07-4499 EMC, 2009 WL 281941, at *18 (N.D. Cal. Feb. 5, 2009); *see also Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555, 564 (S.D. Cal.).  Indeed, the California Supreme Court has specifically upheld the use of the IRS reimbursement method in *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 569 (2007) (explaining that the IRS reimbursement rate is considered a generally permissible measure of vehicle operation expenses for purposes of California Labor Code section 2802).  Thus, the Court finds that the IRS reimbursement method is not arbitrary but a "reasonable basis of computation" of vehicle-related expenses.  *See Pulaski & Middleman, LLC*, 802 F.3d at 989 (reversing denial of class certification in part because proposed method of

calculating damages was not arbitrary, but targeted to remedying the alleged unfair practice and harm).

Next, Uber argues that liability for phone expenses requires an individualized inquiry. For example, Uber suggests that there is no basis for the assumption that phone expenses are necessary and in direct consequence of performing a driver's duties, as required by section 2802. Cert. Opp. at 15. The Court rejects this argument. To even access the Uber app, a smart phone and data plan is required. Thus, like a vehicle, phone expenses are plainly required for every Uber driver, as it would be impossible to be an Uber driver without these items. Liability for phone expenses can thus be adjudicated on a class-wide basis.

Uber next contends that it should be able to contest any claim for reimbursement of phone expenses where an expense was not actually incurred, *i.e.*, when a driver has an unlimited data plan or where a driver received phone expenses paid by a third-party employer. Cert. Opp. at 15. This precise argument was rejected in *Cochran v. Schwan's Home Service, Inc.*, in which the Court of Appeal held that "when employees must use their personal cell phones for work-related calls, Labor Code section 2802 requires the employer to reimburse them. Whether the employees have cell phone plans with unlimited minutes or limited minutes, the reimbursement owed is a reasonable percentage of their cell phone bills." 228 Cal. App. 4th 1137, 1140 (2014). "To show liability under section 2802, an employee need only show that he or she was required to use a personal cell phone to make work-related calls, and he or she was not reimbursed." *Id.* at 1145. Thus, even if an employee does not incur an *extra* expense that he or she would not have otherwise incurred absent the job, reimbursement is still required. "Otherwise, the employer would receive a windfall because it would be passing its operating expenses on the employee." *Id.* at 1144.

To the extent that Uber argues that *Cochran* permits recovery even if there were no expenses actually incurred, Uber misreads its holding. *See* Cert. Opp. at 15. *Cochran* explained that while a driver with an unlimited data plan is not incurring an *extra* expense for use of their smart phone, he or she is still *actually* incurring a work expense because the driver is using their personal phone for work purposes. 228 Cal. App. 4th at 1143-45. If an employer is not required

30

United States District Court
For the Northern District of California

1   to pay a percentage of the bill to reflect that usage, the employer is able to shift their operating

2   costs to the employee, relying on the data plans of their employees rather than having to pay for

3   data plans on their own. *Cochran*, 228 Cal. App. 4th at 1144.  Thus, whether Uber's failure to pay

4   phone expenses creates liability under section 2802 is a common question and subject to a

5   formulaic determination.  *See Richie v. Blue Shield of Cal.*, No. C-13-2693 EMC, 2014 WL

6   6982943, at *17 (N.D. Cal. Nov. 9, 2014) (finding that the legal question of whether Blue Shield's

7   uniform policy of reimbursing work-related telephone expenses incurred by telecommuting claims

8   processors are common to the class and subject to class-wide proof).

9           Finally, Uber argues that Plaintiffs have failed to provide a reasonable method of

10  calculating phone expenses.  As recognized by *Cochran*, the calculation of damages "raises issues

11  that are more complicated." 228 Cal. App. 4th at 1145.  Plaintiffs suggest that phone expenses can

12  be reasonably calculated because "[m]any drivers have leased their phone from Uber, and thus

13  these damages would be easily ascertainable because Uber's records reflect changes for leasing a

14  cellphone from Uber."  Cert. Supp. at 12.  As for drivers who used their own personal cell phones,

15  Plaintiffs propose that the Court use Uber's records to estimate cell phone expenses "based on the

16  amount of time a given driver was online, or by simply using the amounts paid by other drivers

17  who leased their phones directly from Uber as a reasonable estimate."  *Id.* at 13 n.15.  The Court

18  finds that at this stage, there may be a number of calculation methodologies that are reasonable.

19  *Compare with Leyva*, 716 F.3d at 514.  Thus, like the vehicle expenses, the Court finds that

20  individualized issues will not predominate with respect to determining liability and damages for

21  phone expenses.  As the Ninth Circuit has long held, "damage calculations alone cannot defeat

22  certification."  *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *see*

23  *also Leyva*, 716 F.3d at 513; *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount

24  of damages is invariably an individual question and does not defeat class action treatment.").

25          Because the Court concludes that the named Plaintiffs are adequate representatives and that

26  liability for vehicle-related and phone expenses can be adjudicated on a class-wide basis, the Court

27  will certify the September 1, 2015 class and December 8, 2015 subclass to pursue their vehicle-

28  related and phone expenses.

# III.   CONCLUSION

The Court hereby certifies a subclass of the following individuals to pursue their Tips

Claim and Expense Reimbursement Claim:

> All UberBlack, UberX, and UberSUV drivers who have driven for
> Uber in the state of California at any time since August 16, 2009,
> and meet all the following requirements: (1) who signed up to drive
> directly with Uber or an Uber subsidiary under their individual
> name, and (2) are/were paid by Uber or an Uber subsidiary directly
> and in their individual name, and (3) electronically accepted any
> contract with Uber or one of Uber's subsidiaries which contain the
> notice and opt-out provisions previously ordered by this Court, and
> did not timely opt out of that contract's arbitration agreement.

The original class certified on September 1, 2015 may also pursue the Expense

Reimbursement Claim.

In view of this revised class definition, the parties are ordered to meet-and-confer

regarding the contents and logistics of class notice and other relevant procedural details in advance

of the next case management conference, which is scheduled for December 17, 2015, at 10:30 a.m.

This order disposes of Docket No. 357.


**IT IS SO ORDERED**.


Dated: December 9, 2015

_____
EDWARD M. CHEN
United States District Judge