UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>DOUGLAS O'CONNOR, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>       Defendants.</td><td>Case No. 13-cv-03826-EMC<br><br>Case No. 15-cv-00262-EMC<br><br>**ORDER DENYING PLAINTIFFS'<br>MOTION FOR PRELIMINARY<br>APPROVAL**<br><br>*O'Connor*, Docket No. 518<br>*Yucesoy*, Docket No. 206</td></tr>
<tr><td>HAKAN YUCESOY, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>       Defendants</td><td></td></tr>
</table>

## I.     **INTRODUCTION**

Plaintiffs brought the instant class action and putative class action against Defendant Uber Technologies, Inc., alleging that Uber misclassifies drivers as independent contractors rather than employees. *O'Connor v. Uber Techs., Inc.*, Case No. 13-cv-3826-EMC, Docket No. 330 (Second Amended Complaint) (SAC) at ¶ 3; *Yucesoy v. Uber Techs., Inc.*, Case No. 15-cv-262-EMC, Docket No. 198 (Fourth Amended Complaint) (FAC) at ¶ 2.  Following three years of contentious litigation, the parties entered into a Settlement Agreement shortly before the *O'Connor* trial was to

United States District Court
For the Northern District of California

1    begin.  *O'Connor*, Docket No. 518; *Yucesoy*, Docket No. 206.[1]

2            Plaintiffs' motions for preliminary approval came on for hearing before the Court on June

3    2, 2016.  The Court has also reviewed the parties' briefing and supplemental briefing, as well as

4    the many objections challenging the adequacy of the Settlement Agreement.  It also invited and

5    considered the comments of the California Labor and Workforce Development Agency (LWDA).

6    While recognizing sizeable settlement sum and policy changes proposed by the Settlement

7    Agreement and the significant risk that drivers face in pursuing this litigation, for the reasons

8    explained below, the Court concludes that the Settlement as a whole is not fair, adequate, and

9    reasonable and therefore **DENIES** Plaintiffs' motion for preliminary approval.

10                              II.       **BACKGROUND**

11   A.      Procedural History

12           The Settlement Agreement at issue covers two lawsuits pending before this Court.

13   *O'Connor v. Uber Technologies, Inc.* was brought on behalf of all individuals who worked as

14   Uber drivers in California.[2]  Docket No. 330 (*O'Connor* Second Amended Complaint) (SAC) at ¶

15   1.  *O'Connor* alleged that Uber misclassified its drivers as independent contractors rather than

16   employees.  As employees, drivers would be entitled to the protections of the California Labor

17   Code, including section 2802, which requires that employees be reimbursed for expenses such as

18   gas and use of their vehicle.  *Id.* at ¶¶ 3, 23.  Plaintiffs also contend that although Uber advertised

19   to customers that gratuity was included in the fare and that there was no need to tip drivers, drivers

20   did not receive the total proceeds of any such gratuity.  *Id.* at ¶¶ 1, 20.  By failing to remit the full

21   gratuity to drivers as required by California Labor Code section 351, Plaintiffs alleged that Uber

22   violated California's Unfair Competition Law prohibition on unlawful business practices, and they

23   sought to recover the portion of the gratuities that Uber withheld.  *Id.* at ¶ 34.  These claims, too,

24

25   _____

     [1] All subsequent docket numbers are based on the *O'Connor* docket, unless otherwise indicated.
26
     [2] The *O'Connor* suit was originally brought on behalf of all individuals who worked as Uber
27   drivers in the United States (except in Massachusetts).  *See* Docket No. 1 (Compl.) at ¶ 1.  After
     the Court found that the California laws that the *O'Connor* Plaintiffs relied on did not apply
28   extraterritorially, the *O'Connor* Plaintiffs amended their complaint to be limited to California
     drivers.  *See* Docket No. 136 (Ord. on Motion for Judgment on the Pleadings) at 21.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

are predicated on drivers being employees rather than independent contractors.

Uber has argued that because it exercises minimal control over how drivers set their own hours and work schedule, its drivers cannot be considered employees. Plaintiffs, on the other hand, contend that Uber in fact exercised considerable control and supervision over the methods and means of its drivers' provision of transportation services, making drivers employees. *See id.* at ¶ 21.

Over the course of contentious litigation, the Court has adjudicated a motion to dismiss, for judgment on the pleadings, and for summary judgment, as well as numerous motions regarding class certification, arbitration, and stays. In its order denying Uber's motion for summary judgment, the Court applied California's two-step process for determining whether a worker is an employee or independent contractor. Docket No. 251 (March 11, 2015 Summary Judgment Ord.) at 6. First, it found that drivers provide a service to Uber because Uber is ultimately a transportation company, albeit a technologically sophisticated one. *Id.* at 10-11. The fact that Uber's drivers render a service to Uber created a rebuttable presumption of employment status. *Id.* at 15. Second, the Court applied California's *Borello* multi-factor test, focusing in particular on the most significant factor the putative employer's "'right to control work details.'" *Id.* at 6 (quoting *S.G. Borello & Sons, Inc. v. Dep't of Indust. Relations*, 48 Cal. 3d 341, 350 (1989)). It concluded that the ultimate determination of employment status had to be decided by a jury because there were disputes over material questions of fact, such as whether Uber has the right to significantly control the "manner and means" of drivers' transportation services. *Id.* at 20-25. The Court also found that a jury could reasonably find that the *Borello* test's secondary factors point in opposing directions, such that the test did not yield an unambiguous result. *Id.* at 25-27.

Following its denial of Uber's summary judgment motion, the Court certified the following class:

> All UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009, and who (1) signed up to drive directly with Uber or an Uber subsidiary under their individual name, and (2) are/were paid by Uber or an Uber subsidiary directly and in their individual name, and (3) did not electronically accept any contract with Uber or one of Uber's subsidiaries which contains the notice and opt-out

> provisions previously ordered by this Court (including those contracts listed in the Appendix to this Order), *unless* the driver timely opted-out of that contract's arbitration agreement.

Docket No. 342 (September 1, 2015 Class Certification Ord.) at 7.  The primary effect of this order was to limit the class to individuals who did not sign the 2014 arbitration agreements, as the Court found that individualized inquiries would be needed to determine whether there was procedural unconscionability with respect to those later contracts.  *Id.* at 60-63.  The September 1, 2015 certified class included approximately 8,000 drivers out of the estimated 160,000 California drivers. *See* Docket No. 519 (April 21, 2016 Liss-Riordan Dec.) at ¶ 15; September 1, 2015 Class Certification Ord. at 5.  Further, the Court only permitted the class to pursue the gratuities claim; it did not certify the class to seek the expense reimbursement claim.  *See* September 1, 2015 Class Certification Ord. at 66-67.  Although Uber sought interlocutory review of this order, the Ninth Circuit denied Uber's petition for permission to appeal.  Docket No. 389.

The parties then filed extensive supplemental briefing concerning whether the class could be expanded to include other California drivers who signed the later arbitration agreements, as well as whether a class could be certified as to the claim for expense reimbursement under California Labor Code section 2802.  *See* Docket Nos. 359, 365.  During a hearing on an unrelated motion, Plaintiffs' counsel for the first time argued that, as to the arbitration agreements, no unconscionability analysis was necessary because the arbitration clauses included a non-severable waiver of claims brought under California's Private Attorneys General Act of 2004 (PAGA), which was invalid as a matter of public policy.  *See* Docket No. 379 (Nov. 4, 2015 Trans.) at 34:9-35:15.

After further briefing on this matter and oral arguments, the Court certified the following subclass of drivers:

> All UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009, and meet all the following requirements: (1) who signed up to drive directly with Uber or an Uber subsidiary under their individual name, and (2) are/were paid by Uber or an Uber subsidiary directly and in their individual name, and (3) electronically accepted any contract with Uber or one of Uber's subsidiaries which contain the notice and opt-out provisions previously ordered by this Court, and did not timely opt out of that contract's arbitration agreement.

4

Docket No. 395 (December 9, 2015 Class Certification Ord.) at 32.  This expanded the certified class to over 240,000 drivers.  *See* April 21, 2016 Liss-Riordan Dec., Exh. 1.  Both the September 1, 2015 class and December 9, 2015 subclass were certified to pursue the expense reimbursement claim, as well as the gratuities claim.  In certifying the December 9, 2015 subclass, the Court relied on *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348 (2014) and *Sakkab v. Luxottica Retail North America, Inc.*, 803 F.3d 425 (9th Cir. 2015), which had held that a waiver of PAGA claims was void as a matter of public policy.  December 9, 2015 Class Certification Ord. at 24.  The Court concluded that this PAGA waiver could not be severed from the remainder of the arbitration agreement, rendering the entire arbitration agreement void.  *Id.*  Because it relied on public policy rather than unconscionability, the Court did not engage in the procedural unconscionability analysis that defeated class certification in the original certification motion.  *Id.*[3]

Two days after the Court found that the arbitration agreement was invalid as a matter of public policy, Uber issued a new arbitration agreement (hereafter, the December 2015 Agreement) to all Uber drivers, including members of the certified subclass.  Plaintiffs in *O'Connor*, *Yucesoy*, and *In re Uber FCRA Litigation* filed separate motions to enjoin the December 2015 Agreement, arguing that it was an unauthorized communication designed to undermine or discourage participation in these and other pending cases against Uber.  *See* Docket No. 435 (Rule 23(d) Ord.)

---

[3] In analyzing the arbitration agreement, the Court noted its earlier ruling of procedural unconscionability warranted reconsideration:

> the California Supreme Court's ruling in *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899 (2015), cast doubt on the viability of the aspects of *Gentry* on which this Court relied.  In *Sanchez*, the California Supreme Court held that the contract drafter "was under no obligation to highlight the arbitration clause of its contract, nor was it required to specifically call that clause to Sanchez's attention."  61 Cal. 4th at 914.  "Any state law imposing such an obligation would be preempted by the [Federal Arbitration Act]."  *Id.*  Thus, at the November 4, 2015 hearing on Plaintiff[s'] motion to file a Fourth Amended Complaint, the Court informed the parties that it was taking a second look at its procedural unconscionability analysis because *Gentry's* required disclosure of the disadvantages of arbitration was not necessarily consistent with *Sanchez's* ruling.  Docket No. 379 at 8:13-10:23.

December 9, 2015 Class Certification Ord. at 9-10.

United States District Court
For the Northern District of California

at 2.  The Court granted the motions pursuant to its Rule 23(d) "power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation."  *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S. Ct. 74 (2011).  The Court explained that its rulings on Uber's motion for summary judgment and Plaintiffs' motions for class certification, including the voiding of the arbitration clauses, created a "legal landscape [that] has become materially more complicated for the drivers."  Rule 23(d) Ord. at 3-4.  While the Court explicitly declined to rule on whether the December 2015 Agreement was enforceable, it did conclude that this increasingly complex legal landscape required more robust notice to drivers, and ordered that the December 2015 Agreement could not be enforced without a revised cover letter and arbitration notice with a simplified opt-out option.  *Id.* at 6-7.  Uber moved to stay the Court's order pending appeal, arguing that the Rule 23(d) Order was unwarranted and burdened its First Amendment rights.  Docket No. 439 at 2-3.  This Court denied the motion; following an appeal of the order, the Ninth Circuit also denied to motion to stay.  Docket No. 454; Case No. 16-15000, Docket No. 10.

Uber also moved to stay the case while it sought interlocutory review of the December 9, 2015 Class Certification Order, which this Court conditionally granted in part and denied in part.  Docket No. 411.  In that order, the Court ruled that the trial could proceed, but that it would not enter a final judgment as to the December 9, 2015 subclass if the appeals were still pending.  Docket No. 429 at 9.  The Ninth Circuit denied Uber's motion to stay the trial proceedings pending appeal.  Case No. 15-17420, Docket Nos. 5, 14.  However, on April 5, 2016, the Ninth Circuit granted Uber's petition for permission to appeal the December 9, 2015 Class Certification Order per Rule 23(f).  Docket No. 512 (Case No. 15-80220, Docket No. 9).  Uber immediately filed a new motion for this Court to stay the case, which remains pending.

In the meantime, *Yucesoy* was filed on behalf of all Massachusetts drivers, bringing similar claims for independent contractor misclassification, violation of the Massachusetts Tips law, tortious interference with contractual and/or advantageous relations, unjust enrichment/*quantum meruit*, breach of contract, and violation of the Massachusetts minimum wage and overtime law.  *Yucesoy*, Docket No. 27 (First Amended Complaint).  After the Court ruled on three motions to

dismiss, the remaining claims in *Yucesoy* are: (1) independent contractor misclassification (and attendant failure to pay business expenses), (2) violation of the Massachusetts tips law, and (3) tortious interference with advantageous relations. *Yucesoy*, Docket No. 198 (Fourth Amended Complaint). No motion for class certification has been brought in the *Yucesoy* case.

B.      Settlement Agreement

      1.      Monetary Terms

Shortly before the trial in *O'Connor* was scheduled to commence, the *Yucesoy* and *O'Connor* Plaintiffs entered into a Settlement Agreement with Uber. Under this Agreement, Uber has agreed to pay $84 million, plus an additional $16 million contingent on an initial public offering (IPO) reaching one-and-a-half times Uber's most recent valuation (*i.e.*, about $93.75 billion). April 21, 2016 Liss-Riordan Dec., Exh. 6 (Settlement Agreement) at ¶¶ 58, 125. Of the $84 million, $300,000 will be used for class administration, a maximum of $73,000 will be allocated for enhancement payments to the named Plaintiffs and other Settlement Class members who contributed to the litigation, and $8.7 million will be treated as wages reported on IRS Form W-2. Settlement Agreement at ¶¶ 125, 129, 133. Plaintiffs' counsel is also permitted to seek a fee and expense award of up to 25% of the Settlement Fund ($21 to $25 million), although Plaintiffs' counsel has since informed the Court that she will reduce her fee request by $10 million. Settlement Agreement at ¶ 134; Docket No. 699 at 2. The $10 million reduction is made regardless of whether the $16 million contingency is triggered, thus resulting in an additional $10 million for distribution to the class. Docket No. 699 at 2 n.1.

The remaining Settlement Fund will be separated into two funds: approximately $5.5 to 6 million for the Massachusetts drivers, and $56 to 66.9 million for the California drivers.[4] Settlement Agreement at ¶ 144. A driver must submit a claim form to receive a payment. Settlement Agreement at ¶ 138. The driver's payment is based on the number of miles driven for Uber. Settlement Agreement at ¶ 145. Drivers may also receive "double weight" for their mileage if they opted out of Uber's 2013 and 2014 arbitration agreements, and if they are

---

[4] This amount does not include the $10 million that Plaintiffs' counsel has reduced her attorney's fee request by.

United States District Court
For the Northern District of California

members of the *O'Connor* certified class.  Settlement Agreement at ¶ 144.  If a driver both opted out and is a member of the *O'Connor* certified class, he or she will receive quadruple weight for his or her mileage.  Docket No. 617 (May 20, 2016 Joint Supp. Briefing) at 4.  Assuming a 100% claim rate, Plaintiffs' counsel estimates that California certified class members will receive an average distribution of $24 to $1,950, California non-certified class members will receive an average distribution of $10 to $836, and Massachusetts drivers will receive an average distribution of $12 to $979.  April 21, 2016 Liss-Riordan Dec., Exh. 1.  For example, of the 243,320 California drivers who were part of the certified class, if all drivers filed claims, the 122,297 drivers who drove between 0-750 miles will receive an average distribution of $24, while the 42,074 drivers who drove between 750-2,000 miles would receive an average distribution of $89.  On the higher end of the scale, the 7,534 drivers who drove over 25,000 miles would receive an average distribution of $1,950.  Of the 60,047 Massachusetts drivers, the 33,040 drivers who drove between 0-750 miles would receive an average of $12, the 9,258 drivers who drove between 750-2,000 miles would receive an average of $45, and the 1,489 drivers who drove over 25,000 miles would receive an average of $979.  In sum, the vast majority of class members are slated to receive less than $100 each from the settlement.

The parties expect a 40% claim rate, which would increase the monetary amount paid to each claimant.  *See* May 20, 2016 Joint Supp. Briefing at 58.

## 2. Non-Monetary Relief

In addition to the monetary payment, Uber has agreed to implement various forms of non-monetary relief.  First, Uber has agreed to publish a comprehensive, written deactivation policy. Settlement Agreement at ¶ 135(a).  Driver deactivation will only be allowed for sufficient cause, and low passenger acceptance rates will not be grounds for deactivation (although it would subject drivers to being logged out of the app for a limited period of time).  Settlement Agreement at ¶ 135(a)(i); *see also Driver Deactivation Policy - US ONLY*, Uber, https://www.uber.com/legal/other/driver-deactivation-us-english/ (last visited August 3, 2016) (Uber Deactivation Policy).  A driver may still be deactivated for having a high rate of cancellation, *i.e.*, where the driver initially accepted the fare but then canceled it (in contrast to

8

never accepting the fare to begin with).  *See* Uber Deactivation Policy.  Uber will also provide at least two advance warnings before a driver is deactivated for reasons other than safety issues, discrimination, fraud, or illegal conduct (each, an "excluded matter").  Settlement Agreement at ¶¶ 135(a)(iii)-(iv).  If a driver is deactivated, Uber will provide the driver with an explanation for the deactivation.  Settlement Agreement at ¶ 135(a)(v).  A deactivated driver may appeal the decision to a Driver Appeal Panel, unless the deactivation resulted from certain circumstances such as low star ratings, criminal activity, physical altercations, or sexual misconduct.  Settlement Agreement at ¶ 135(a)(vi).  In addition, except for the excluded matters (*e.g.*, safety issues, discrimination, fraud, or illegal conduct), drivers whose user accounts are deactivated will have the opportunity to take a "quality improvement course" and be reactivated upon completion of the course. Settlement Agreement at ¶ 135(a)(vii).

Second, Uber will provide more information regarding star ratings.  Settlement Agreement at ¶ 135(d).  Uber will also "consider" changes such as informing drivers how they rank against their peers, providing warnings when driver ratings go below a certain threshold, and warning drivers when their user accounts are at risk of deactivation for going below a certain threshold.

Third, the parties stipulate to the enforceability of the December 2015 Agreement. Settlement Agreement at ¶ 135(e).  In exchange, Uber will pay for the filing and administrative arbitration fees in: (1) cases based on an alleged employment relationship between Uber and drivers, and (2) cases arising out of a final deactivation of a driver in the event of an excluded matter.  The parties also agree to stipulate to vacating (retrospectively) this Court's Rule 23(d) Orders, and they agree that Uber has the option of voiding the Settlement Agreement should the Court not vacate these orders.  Plaintiffs also agree to withdraw the charges filed with the National Labor Relations Board (NLRB) on behalf of John Billington and Catherine London, challenging the enforceability of the 2014 arbitration agreements as a violation of the National Labor Relations Act, and will not further cooperate with the NLRB's investigation unless compelled by subpoena or court order.  Settlement Agreement at ¶ 33.

Fourth, Uber will institute an internal process for drivers to raise concerns regarding the payment of specific fares in California and Massachusetts.  Settlement Agreement at ¶ 135(f).

United States District Court
For the Northern District of California

Fifth, Uber will collaborate with Plaintiffs regarding the creation and funding of a driver association as a means of "opening a dialogue between Uber and Drivers." Settlement Agreement at ¶ 135(g). The association's leaders are to be elected by drivers, and the leaders will have the opportunity to meet quarterly with Uber management to discuss driver concerns. Settlement Agreement at ¶¶ 135(g)(iv)-(v). The driver association will not be a union, and will have no right to bargain collectively with Uber. Settlement Agreement at ¶¶ 135(g)(ii)-(iii). The parties provided little detail on how the driver association will work in practice (in part due to the expected autonomy of each driver association), including what obligations Uber will have to fund the driver association.

Finally, Uber will make good-faith efforts to clarify its messaging to riders regarding tipping, *i.e.* that tips are not included in fares (except for UberTAXI), but that they are neither expected nor required. Settlement Agreement at ¶ 135(h); May 20, 2016 Joint Supp. Briefing at 18. Drivers will be permitted to put up signs requesting tips, although the parties disagree on whether this actually constitutes a change in policy. *See* May 20, 2016 Joint Supp. Briefing at 18 n.24 ("Uber expressly disputes Plaintiffs' claim that Uber's policy with respect to tipping signage will change as a result of this settlement").

3.      Scope of the Class and Released Claims

The Settlement Agreement covers "all Drivers in California and Massachusetts who have used the Uber App at any time since August 16, 2009, up to and including the Preliminary Approval Date." Settlement Agreement at ¶ 103. Thus, the settlement class releasing claims will not only include the *O'Connor* certified class, but (1) all California drivers for Uber including California drivers who had been excluded by the class definition, *i.e.*, drivers who drove for a third-party transportation company or who used fictitious or corporate names; and (2) all Massachusetts drivers.

Furthermore, although the *O'Connor* and *Yucesoy* cases were limited to claims based on expense reimbursement and the payment of tips, the Settlement Agreement contains an expansive release provision: it will require settlement class members – *all* drivers in California and Massachusetts – to release *all* claims based on or reasonably related to the employment

10

United States District Court
For the Northern District of California

1   misclassification claim, *i.e.*, overtime, minimum wage, meal and rest breaks, and workers'

2   compensation.  Settlement Agreement at ¶ 105.[5]  The Settlement Agreement requires that the

3   Plaintiffs file amended complaints expanding the causes of action to include all claims related to

4   the alleged misclassification of drivers as independent contractors.  *See* Settlement Agreement at ¶

5   29 and Exhs. A (Proposed *Yucesoy* Fifth Amended Complaint), B (Proposed *O'Connor* Fifth

6   Amended Complaint).  As a result, the Settlement Agreement will cover claims that are brought in

7   at least fifteen other lawsuits currently pending in federal and California state courts, effectively

8   terminating those suits.[6]  Settlement Agreement at ¶ 28.  It could also affect proceedings pending

9   before various administrative bodies such as the NLRB.  *See NLRB v. Uber Techs., Inc.*, Board

10  Case Nos. 20-CA-160717, 20-CA-160720 (filed September 24, 2015) (complainants required by

11  Settlement Agreement to withdraw charges).[7]  The Settlement Agreement will also settle all civil

12  penalties potentially due under PAGA, ending in all likelihood all currently pending PAGA

13  litigation against Uber in the other lawsuits.  Settlement Agreement at ¶ 105.  Because PAGA is an

14  action on behalf of the State, the PAGA settlement included in the Settlement Agreement would

15  prohibit any other driver from bringing a PAGA claim (or obtaining relief through a PAGA

16

17  _____

18  [5] Uber also contends that the release would also apply to "claims based on or reasonably relating to the conduct alleged in the proposed settlement complaint, regardless of whether classification as an employee is technically a requirement of that claim."  Docket No. 732 (July 15, 2016 Joint

19  Supp. Briefing) at 26.  For example, Uber would argue that a claim "based on or reasonably related to an alleged entitlement to a tip, even though that driver may or may not also allege she

20  was an Uber employee" would be released by the Settlement Agreement.  *Id.* at 26-27.

21  [6] These lawsuits include: (1) *Price v. Uber Technologies, Inc.*, Case No. BC554512; (2) *Del Rio v. Uber Technologies, Inc.*, Case No. 3:15-cv-3667-EMC; (3) *Berger v. Uber Technologies, Inc.*,

22  Case No. 3:16-cv-41-MEJ; (4) *In re Uber FCRA Litigation*, Case No. 3:14-cv-5200-EMC; (5) *Ghazi v. Uber Technologies, Inc.*, Case No. CGC-15-545532; (6) *Richardson v. Uber*

23  *Technologies, Inc.*, Case No. RG15775562; (7) *Zine v. Uber Technologies, Inc.*, Case No. BC591351; (8) *Narsi v. Uber Technologies, Inc.*, Case No. CGC-16-550992; (9) *Tabola v. Uber*

24  *Technologies, Inc.*, Case No. CGC-16-550198; (11) *Aquino v. Uber Technologies, Inc.*, Case No. BC608873; (12) *Adzhemyan*

25  *v. Uber Technologies, Inc.*, Case No. BC608874; (13) *Gollnick v. Uber Technologies, Inc.*, Case No. CGC-15-547878; (14) *Mokeddas v. Uber Technologies, Inc.*, Case No. RG16807483; and (15)

26  *Berwick v. Uber Technologies, Inc.*, Case No. CGC-15-546378 (appeal of Labor Commissioner award).  *See* Settlement Agreement at ¶ 28.

27  [7] *See NLRB v. Uber Technologies, Inc.*, Case No. 16-80057-KAW (N.D. Cal.) Docket No. 31 (motion by Uber to stay NLRB's application for order enforcing subpoenas because of pendency

28  of motion for preliminary approval of settlement herein).

representative suit) for the time period up to preliminary approval, even if that driver opts out of the Settlement Agreement.  *See* Docket No. 732 (July 15, 2016 Joint Supp. Briefing) at 23; Docket No. 736 (Labor & Workforce Development Agency (LWDA) Resp.) at 2.

Finally, as noted above, the parties stipulate to the enforceability of the December 2015 Agreement, as well as to vacating the Court's December 2015 Rule 23(d) Order and January 19, 2016 Order regarding the arbitration agreement's notice provision and corrective cover letter (collectively, the Rule 23(d) Orders).  Settlement Agreement at ¶ 135(e).  The effect of such action, if agreed to by the Court, would be to retroactively strip drivers of the protections afforded by this Court's Rule 23(d) order.  If the Court does not agree to vacate these orders, Uber is permitted to void the Settlement Agreement.

## III.   DISCUSSION

A.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  As the Ninth Circuit has explained, "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).  Accordingly, before a court approves a settlement, it must conclude that the settlement is "fundamentally fair, adequate, and reasonable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015) (same).  This inquiry:

> requires the district court to balance a number of factors: the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a government participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026; *see also Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (same).  "In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery

United States District Court
For the Northern District of California

balanced against the value of the settlement offer." *Cotter v. Lyft, Inc.*, Case No. 13-cv-4065-VC, -- F. Supp. 3d --, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016) (internal quotation omitted); *see also Procedural Guidance for Class Action Settlements*, UNITED STATES DISTRICT COURT - NORTHERN DISTRICT OF CALIFORNIA, http://cand.uscourts.gov/ClassActionSettlementGuidance (last visited August 12, 2016).  While it is not necessarily unusual or improper for a class action settlement agreement to release claims not originally brought by the plaintiff, the court must consider the strength and value of those claims in deciding whether to approve the settlement.  *See Cotter*, 2016 WL 1394236, at *4.

"[W]hether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).  However, "when . . . the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness.'" *Id.*; *see also Hanlon*, 150 F.3d at 1026 ("settlement approval that takes place prior to formal class certification requires a higher standard of fairness [because t]he dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court[-]designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)").  This more "exacting review" is warranted "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819 (internal quotation omitted).

In this case, because the Settlement Agreement covers the claims of both certified class members and drivers who fall outside the class definition and thus have *not* been certified (for example, all Massachusetts drivers and the California drivers who drove for a third-party transportation company or under a corporate name), this Court must apply the more "exacting" standard in determining whether this settlement is fair, adequate, and reasonable.  Further, with respect to all of the drivers, the parties propose to release *all* claims related to misclassification, including many which had not been brought in this case.  This not only results in the addition of claims that Plaintiffs' counsel may not have fully investigated or reviewed, but would also

**United States District Court**
For the Northern District of California

1    eliminate at least fifteen other cases pending in California courts wherein the claims sought to be

2    added and waived herein are being litigated.  *See* Settlement Agreement at ¶ 28.  Thus, exacting

3    review is additionally warranted as newly added claims have not been subject to class

4    certification.  Moreover, as this Court has noted, the Court must be especially sensitive to the risk

5    of collusion or a less than full adversarial process where claims pending in other lawsuits are

6    released for minimal value, in order to induce the defendant to settle *this* case.[8]  *See* Docket No.

7    724 at 9.

8         Courts implementing Rule 23(e) have required a two-step process for the approval of class

9    action settlements: the Court first determines whether class action settlement deserves preliminary

10   approval and then, after notice is given to class members, whether final approval is warranted.  *In*

11   *re High-Tech Emp. Antitrust Litig.*, Case No. 11-CV-2509-LHK, 2014 WL 3917126, at *3 (N.D.

12   Cal. Aug. 8, 2014).  As a general matter, "there is relatively scant appellate authority regarding the

13   standard that a district court must apply in reviewing a settlement at the preliminary approval

14   stage."  *Id.*  Some district courts "have stated that the relevant inquiry is whether the settlement

15   'falls within the range of possible approval' or 'within the range of reasonableness,'" looking at

16   factors such as whether the settlement is the product of non-collusive negotiations, has no obvious

17   deficiencies, does not improperly grant preferential treatment to class representatives or segments

18   of the class, and falls within the range of possible approval.  *Id.*; *see also  Harris v. Vector Mktng.*

19   *Corp.*, Case No. C-08-5198-EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011).  Although

20   the Ninth Circuit has not specified what standard should apply at the preliminary approval stage,

21   "district courts often state or imply that scrutiny should be more lax."  *Cotter v. Lyft*, Case No. 13-

22   cv-4065-VC, -- F. Supp. 3d --, 2016 WL 3561742, at *3 (N.D. Cal. June 23, 2016).

23        More recently, in *Cotter*, Judge Chhabria questioned this "lax review," finding that:

24             lax review makes little practical sense, from anyone's standpoint.  If
              the district court, by taking a quick look rather than a careful one,
25             misses a serious flaw in the settlement, the parties and the court will

26   _____

27   [8] This is not to suggest there is something inherently wrong with releases that are broader than the
     complaint; however, the reviewing court must examine, *inter alia*, the verdict value of all claims
28   released, not just those alleged in the complaint (and the benefit obtained by the defendant in
     averting existing litigation) in assessing the reasonableness of the suit.

waste a great deal of money and time notifying class members of the agreement, only to see it rejected in the end, requiring the parties to start over. The same is true if the district court *does* identify a potentially serious flaw at the preliminary stage but waits until final approval to conclude that it's fatal. What's worse, if a court waits until the final approval stage to thoroughly assess the fairness of the agreement, momentum could have a way of slanting the inquiry, in a manner that deprives the class members of the court protection that Rule 23 demands.

*Id.* at *4. "[B]y scrutinizing the agreement carefully at the initial stage and identifying any flaws that can be identified, the court allows the parties to decide how to respond to those flaws (whether by fixing them or opting not to settle) before they waste a great deal of time and money in the notice and opt-out process." *Id.*

The Court finds Judge Chhabria's view persuasive, particularly where, as here, the class includes nearly 400,000 individuals, and thus a great deal of expense would be incurred and substantial confusion could ensue were the Settlement Agreement preliminarily approved but ultimately disapproved on final review. And, as noted above, close review is particularly warranted where Plaintiffs seek to add new claims and drivers not previously certified, and the settlement would settle not only the instant case but claims brought in at least fifteen other pending lawsuits for relatively modest value. Further, the Settlement Agreement at issue has already been the subject of numerous objections challenging its adequacy even at the preliminary approval stage. As Judge Chhabria explained, it makes little sense to apply a lax standard at the preliminary approval stage to factors already known and amenable to analysis. Instead, the Court finds it more prudent to apply with full force the factors articulated by the Ninth Circuit in *Hanlon* and *Churchill Village*, while recognizing that some of these factors – such as the reaction of class members – are not currently known and cannot be assessed at the stage of preliminary approval and thus would have to await the stage of final approval.

B.    *Hanlon* Approval Factors

1.    Strength of the Plaintiffs' Case; the Risk, Expense, Complexity, and Likely Duration of Further Litigation; and the Risk of Maintaining Class Action Status

In considering the first three factors, the Court looks at the risks to both Plaintiffs and Uber in continuing this litigation.

a.      Risks to Drivers

The most obvious risk to Plaintiffs is, of course, that the Ninth Circuit will uphold the validity of the arbitration provision contained in the 2013 and/or 2014 agreements, which this Court found was invalid as a matter of public policy in certifying the December 9, 2015 Subclass. *See* Ben Hancock, *Uber ADR Pact May Get Green Light*, THE RECORDER, June 16, 2016 ("A panel of federal appeals judges gave clear signs Thursday that it is ready to reverse a lower court decision finding the arbitration agreements that Uber Technologies Inc. circulated to its drivers were unenforceable"); Bonnie Eslinger, *9th Cir. Leans Toward Restoring Uber Arbitration Pacts*, LAW360, June 16, 2016.  This risk is heightened by the Ninth Circuit's decision to grant Uber's petition for permission to appeal the December 9, 2015 Class Certification Order.  *See* Docket No. 512.  A finding that one or both of the arbitration clauses is valid and enforceable would substantially change the scope and course of Plaintiffs' case, as it would likely require the vast majority of the class to go to arbitration on their non-PAGA claims, thus jeopardizing the scope and potential viability of the class action at bar.  Plaintiffs face a considerable risk that they will not proceed as a class action in any court, or at least be limited to a class action greatly reduced in size.  Even if the Ninth Circuit were to limit a finding of enforceability to the more recent contracts, and hold only the 2013 arbitration agreement not to be enforceable, this could substantially decrease the class from approximately 240,000 drivers to 8,000 drivers, dramatically lowering any class monetary recovery that Plaintiffs might obtain through the class action.  *See* April 21, 2016 Liss-Riordan Dec. at ¶ 15.  Requiring the drivers to arbitrate their claims individually will likely reduce by a substantial degree overall recovery for drivers, as typically only a fraction of individuals pursue arbitration.

In addition to this risk to maintaining class action status, as this Court has previously noted, Plaintiffs face risks on the merits of the case.  The fundamental question of whether Uber drivers are employees or independent contractors is not a simple one.  As this Court held in denying Uber's motions for summary judgment, there are factors under the *Borello* analysis that support each side's position.  While the Court found that drivers performed a service for Uber and were therefore presumptively employees, it found that questions of fact existed as to the primary

16

United States District Court
For the Northern District of California

1   *Borello* inquiry of Uber's control over the drivers.  March 11, 2015 Class Certification Ord. at 15,

2   25.  For example, although drivers could choose their own days and hours or work, Uber

3   controlled certain aspects of driver performance; for instance, Uber could terminate individuals

4   with low acceptance rates.  *Id.* at 21-25.  Moreover, as to the secondary factors set forth in *Borello*,

5   the Court found that these factors cut both ways.  *Id.* at 25-26.  Several factors pointed in favor of

6   employment status, such as: (1) driving is an occupation that typically does not require close

7   supervision, (2) driving does not require a special skill, and (3) the drivers were performing a

8   regular and integral part of Uber's business.  *Id.* at 26.  On the other side, several factors favored

9   independent contractor status, including: (1) the drivers' use of their own vehicles, (2) the ability

10  of drivers to employ other drivers to drive on their own behalf, and (3) the drivers signing an

11  agreement stating no employment relationship was created.  *Id.*  As a result, should the issue of

12  employee versus independent contractor status proceed to trial, it would be up to the jury to make

13  the ultimate determination, the outcome of which cannot be predicted with any certainty.  *See id.*

14  at 27 (finding that "[t]he application of the traditional test of employment – a test which evolved

15  under an economic model very different from the new 'sharing economy' – to Uber's business

16  model creates significant challenges"); *Cotter*, 2016 WL 3561742, at *5 ("there is no straight

17  answer to the question whether those drivers must be classified as employees or independent

18  contractors under California law"); *cf. Alatraqchi v. Uber Techs., Inc.,*[9] Case No. 13-cv-3156-JSC,

19  Docket No. 9 at 6-9 (attaching California Labor Commissioner's August 1, 2012 decision, which

20  found that a driver was an independent contractor) *with Berwick v. Uber Techs., Inc.,* Case No. 11-

21  46739 EK (June 3, 2015), *available at*

22  http://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1988&context=historical (last

23  visited August 5, 2016) (performing *Borello* analysis and concluding that a driver was Uber's

24  _____

25  [9] Of note, in *Alatraqchi*, the California Labor Commissioner found that Uber's "business was
    engaged in technology and not in the transportation industry," and thus the services Alatraqchi

26  "provided were not part of the business operated by [Uber]."  *Alatraqchi v. Uber Techs., Inc.,* Case
    No. 13-cv-3156-JSC, Docket No. 9 at 8.  This Court came to the oppose conclusion, finding that

27  "it is clear that Uber is most certainly a transportation company, albeit a technologically
    sophisticated one.  In fact, as noted above, Uber's own marketing bears this out, referring to Uber

28  as 'Everyone's Private Driver,' and describing Uber as a "transportation system' and the 'best
    transportation service in San Francisco.'"  March 11, 2015 Summary Judgment Ord. at 10-11.

employee).

Moreover, even if drivers were determined at trial to be employees, Uber challenges recovery on their claims.  For instance, with respect to the expense reimbursement claim, Plaintiffs' counsel noted that Uber intended to argue that it already structured the fare to be "all-inclusive that takes into account things like expenses."  April 21, 2016 Liss-Riordan Dec. at ¶ 31 (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 559 (2007) ("We conclude that an employer may satisfy its statutory reimbursement obligation by paying employees enhanced compensation in the form of increases in base salary or increases in commission rates, or both, provided there is a means or method to apportion the enhanced compensation to determine what amount is being paid for labor performed and what amount is reimbursement for business expenses")).

Plaintiffs' counsel also notes that there is a risk as to which IRS mileage reimbursement rate would apply.  Plaintiffs have argued for use of the fixed rate while Uber would likely advocate for use of the variable rate, a potential reduction of 60%.  *Id.* at ¶¶ 33-34.  Further, as to Massachusetts drivers, Plaintiffs perceive an additional risk because Massachusetts does not have an express expense reimbursement statute, and thus recovery for expenses in Massachusetts may be less likely.  Mot. at 23 n.25; May 20, 2016 Joint Supp. Briefing at 7 ("the law is not entirely established in Massachusetts as to whether employees may recover unreimbursed business expenses from their employers").  Similarly, Plaintiffs acknowledged risks to their tips claim, should a jury find that Uber's communications indicating that "tip is included" in a fare were too variable or not widespread enough to conclude that a tip was actually included.  April 21, 2016 Liss-Riordan Dec. at ¶ 45.

There are additional risks to the claims the parties seek to add to this case and for which releases are sought.  First, as to meal and rest breaks, California courts have found liability for failure to provide such breaks when the employer lacked a policy authorizing and permitting breaks.  *E.g.*, *Benton v. Telecon Network Specialists, Inc.*, 220 Cal. App. 4th 701, 725-26 (2013).  But Uber states that it has set up a system in which "drivers log in and out whenever they want, so that there can never be any circumstance in which a driver might feel pressure (even implicitly)

18

United States District Court
For the Northern District of California

1    not to take a break.  In other words, Uber's entire system can be understood to constitute a policy

2    of 'permitting' or 'authorizing' breaks whenever a driver wants."  July 15, 2016 Joint Supp.

3    Briefing at 11.  There has been little argument that Uber drivers lack the freedom to choose their

4    days and hours of work (although there has been evidence of the control Uber exercises over

5    drivers when they *do* report to work), *see* March 11, 2015 Summary Judgment Ord. at 25, creating

6    a potential risk that a jury would find that Uber had not deprived its drivers of meal and rest

7    breaks.

8            Second, with respect to minimum wage and overtime, the primary question appears to be

9    whether drivers would be entitled to compensation for time spent waiting to perform a task.  *See*

10   Docket No. 724 at 11.  This Court previously dismissed with prejudice the minimum wage and

11   overtime claims in *Yucesoy*, finding that Plaintiffs had failed to plead specific facts to support their

12   claim that waiting time should be compensable.  *Yucesoy*, Docket No. 194 at 10-11.  For example,

13   there Plaintiffs did not explain how often ride requests came in, how many requests they had to

14   accept, and the magnitude of the risk of deactivation if requests were not accepted.  *Id.*  In so

15   finding, the Court looked to the Ninth Circuit's test in Fair Labor Standards Act cases, the same

16   test applied by California courts.  *Id.*; *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 523 (looking

17   to the Ninth Circuit's test to determine whether an employee was free to engage in personal

18   activities while on call).[10]  While the Court does not conclude that drivers could not prevail on this

19   claim were sufficient allegations pleaded and evidence presented, there are significant risks.[11]

20           Finally, regarding the workers' compensation claims, the Court notes that the settlement is

21   not intended to release individual workers' compensation claims or personal injury claims against

22

23   [10] While the *Price* objectors cited the California Supreme Court's decision in *Mendiola v. CPS
     Security Solutions* for the proposition that "on-call or standby time may require compensation"

24   under California law, the California Supreme Court went on to explain that to determine whether
     on-call time constitutes compensable time requires a determination of the extent of the employer's

25   control.  60 Cal. 4th 833, 840 (2015).  To make this determination, the California Supreme Court
     applied the same FLSA factors that this Court used in *Yucesoy*.

26
     [11] On the other hand, Uber could be found liable for waiting time given their prior policy of
27   deactivating drivers for low acceptance rates, and their present policy of suspending drivers for
     low acceptance rates.  *See* Uber Deactivation Policy.  Again, the problem with the pleadings in

28   *Yucesoy* was that Plaintiffs had failed to plead sufficient facts in their complaint, despite it being
     their fourth complaint in that action.  *Yucesoy*, Docket No. 194 at 10-11.

United States District Court
For the Northern District of California

an employer who failed to carry workers' compensation insurance.  July 15, 2016 Joint Supp.

Briefing at 14.  Rather, what is at issue is a claim in which a driver challenges Uber's failure to

obtain workers' compensation insurance, and seeks to recover Uber's "savings" from not

obtaining such insurance under California's Unfair Competition Law (UCL).  *See* Docket No. 592

(Ghazi Obj.) at 1-2.  There is a risk that such a claim could not be enforced through the UCL, as

the California Supreme Court has generally found that the UCL cannot be used to recover money

in which the plaintiff does not have an ownership interest.  *Korea Supply Co. v. Lockheed Martin

Corp.*, 29 Cal. 4th 1143-53 (2003).  While the State has brought a similar claim under the UCL,

*see People ex rel. Harris v. Pac. Anchor Transp., Inc.*, 59 Cal. 4th 772, 775-76 (2014), it is not

clear that private individuals could recover under such a claim, in light of *Korea Supply Co.*[12]

        b.    <u>Risks to Uber</u>

      While Plaintiffs thus face substantial risks both in their ability to maintain class

certification and on the merits, the Court reiterates that Uber also faces substantial risks of losing

on the misclassification question.  As noted above, in its March 11, 2015 Summary Judgment

Order, this Court held, as a matter of law, "Uber's drivers render service to Uber, and thus are

Uber's presumptive employees."  March 11, 2015 Summary Judgment Ord. at 15.  Thus, the

burden is on Uber to disprove an employment relationship, both in California and in

Massachusetts.  *Id.* at 16; *see also Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 327

(2015) ("an individual performing any service is presumed to be an employee[, and t]he purported

employer may rebut the presumption of employment by establishing . . . three indicia of an

independent contractor relationship") (internal quotations omitted).  While Uber has emphasized

that drivers are free to pick and choose when they work, this Court has found that this freedom

---

[12] As for the remaining claims, some require a finding of willfulness (*e.g.*, Cal. Lab. Code § 203 ("[i]f an employer *willfully* fails to pay . . . any wages of an employee who is charged or who quits") (emphasis added); Cal. Lab. Code § 1174.5 ("Any person employing labor who *willfully* fails to main the records required . . . shall be subject to a civil penalty of five hundred dollars ($500)") (emphasis added); Cal. Lab. Code § 226.8 (concerning "willful misclassification")) or injury (*e.g.*, Cal. Lab. Code § 226(e)(1) (requiring injury for failure to furnish accurate wage statement to be entitled to recover damages or penalty), while other claims have problems of proof (*e.g.*, April 21, 2016 Liss-Riordan Dec. at ¶ 75 (no evidence that Uber delays final payment to deactivated drivers).

does not preclude a finding of an employment relationship, as the more relevant inquiry is how much control Uber exercises over drivers *while* they are on duty for Uber.  March 11, 2015 Summary Judgment Ord. at 25.   Judge Chhabria recognized in *Cotter* that:

> although a jury could be tempted to conclude that people who drove only sporadically for Lyft should be independent contractors, it seems equally likely that the jury could analogize Lyft drivers to restaurant workers who work in multiple venues, but only occasionally at each particular venue.  There is no dispute that, under California law, someone who picks up a couple of restaurant shifts here and there is an 'employee' of that restaurant (along with any other restaurant where he works").

*Cotter*, 2016 WL 1394236 at *11.  And just as Judge Chhabria found that "if the jury reached a similar conclusion about Lyft drivers, the consequences for Lyft would be enormous," the Court concludes that the consequence for Uber of an adverse jury verdict would be substantial.  *Id.*

Next, even if Uber were to prevail on its argument that the 2013 and/or 2014 arbitration agreements were enforceable, it would face substantial risks and costs absent settlement.  First, PAGA claims[13] cannot be compelled to arbitration.  *See Iskanian*, 59 Cal. 4th at 360; *Sakkab*, 803 F.3d at 431-40.[14]  Thus, the employment classification question could still be decided by this or another court in the adjudication of a PAGA claim.  *See* Docket No. 593 (Richardson Obj.).[15] Should a court conclude that Uber drivers are, in fact, employees, both Plaintiffs and the LWDA conclude the statutory penalty against Uber would exceed $1 billion. *See* LWDA Resp. at 3.

---

[13] This Court has not ruled on whether Plaintiffs may bring PAGA claims for violations of California Labor Code sections 351 and 2802; the issue remains under submission in *O'Connor*. *See* Docket No. 401 at 5.

[14] While Plaintiffs have suggested that there is a "significant risk" that the Supreme Court will determine that PAGA claims are arbitrable, *see* July 15, 2016 Joint Supp. Briefing at 27 n.26, the Supreme Court has twice denied review of *Iskanian*'s holding.  *CLS Transp. L.A., LLC v. Iskanian*, 135 S. Ct. 1155 (2015) (denying petition for writ of certiorari); *Carmax Auto Superstores Cal., LLC v. Areso*, No. 15-235, 2015 WL 5005244, at *1 (U.S. Dec. 14, 2015) (denying petition for writ of certiorari on the question of whether *Iskanian* is preempted by the FAA).

[15] There is a substantial likelihood that a PAGA suit would not be stayed pending arbitration.  If the PAGA representative has opted out of arbitration, there is no obvious basis for a stay.  Even if the representative has not opted out and thus has both nonarbitrable and arbitrable claims to prosecute, the decision to stay pending arbitration rests with the court's discretion.  *See ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394-95 (4th Cir. 2012); *United Commc'ns Hub, Inc. v. Qwest Commc'ns. Inc.*, 46 Fed. Appx 412, 415 (9th Cir. 2002).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

Further, such a PAGA judgment could have an influential and perhaps even binding effect on Uber in arbitration.  In *Arias v. Superior Court*, 46 Cal. 4th 969, 985 (2009), the defendants argued that it would be unfair not to impose class action requirements for PAGA claims because "the defendant would be a party to every lawsuit while each of the various plaintiffs would be a party in only one lawsuit, [and therefore] the defendant would in later lawsuits be bound by any adverse determination of the common issues, while none of the plaintiffs would be similarly bound by prior determinations in the defendant's favor."  The California Supreme Court concluded, however, there was no unfairness because a PAGA judgment would be "binding not only on the named employee plaintiff but also on government agencies and any aggrieved employee not a party to the proceeding."  *Id.*

Second, if one or more drivers were not bound by arbitration (*e.g.*, because like the class representatives in *O'Connor*, they opted out of arbitration), they would be free to litigate the merits of their claims, again raising the prospect that were Uber to lose on the merits of the classification question, that judgment would affect the outcome of arbitrations.  Simply put, without the benefit of the release and waiver conferred by the Settlement Agreement, Uber still faces a substantial risk of litigation.

Further, even if the class were wholly or partially decertified and hundreds of thousands of drivers were remitted to arbitration, if even a fraction of the 380,000 drivers invoked arbitration, the mere transactional costs for Uber (in the absence of the broad release effected by the Settlement Agreement) of arbitrating thousands of cases would be substantial, not to mention the risks of findings of liability and imposition of damages (which for any driver could well be ten times greater than the award scheduled under the Settlement Agreement) by the arbitrators.

      2.      The Amount Offered in Settlement

            a.      Monetary Amount

Under the Settlement Agreement, Uber has agreed to make an $84 million guaranteed payment (including a $1 million payment for PAGA), as well as a $16 million payment contingent on the success of an IPO.  As an initial matter, the Court cannot consider the $16 million contingent payment as part of the settlement amount because there is no information on the

United States District Court
For the Northern District of California

likelihood that this contingency will be triggered.  At the June 2, 2016 hearing, Uber stated that

the $16 million payment was "very likely" based on public reports about Uber's cash infusions

and analysts' reports.  *See* Docket No. 691 (June 2, 2016 Trans.) at 35:17-36:1.  However, when

the Court requested this public information, Uber stated that "it would not be proper for Uber to

provide such information."  July 15, 2016 Supp. Briefing at 25.  While Plaintiffs provide a number

of articles, none of the articles address the likelihood that an Uber IPO will yield an average

valuation of at least 1.5 times Uber's most recent valuation within 365 days from the closing of

the IPO.  *See* Docket No. 733 (July 15, 2016 Liss-Riordan Dec. at 10 n.4).  Thus, absent a

showing that there is a realistic likelihood that the additional $16 Million will be realized, the

Court will only consider the $84 million monetary amount in assessing the adequacy of the

Settlement Agreement.

By comparison, Plaintiffs have estimated that the verdict value of the non-PAGA claims

being released are:

| CLAIM: | VALUE: |
|---|---|
| Expense Reimbursement (Mileage)[16] | $700 million |
| Expense Reimbursement (Phones) | $30 million |
| Tips | $122 million |
| Overtime | $2.4 million |
| Total: | $854.4 million |

Mot. at 24; *see also* April 21, 2016 Liss-Riordan Dec. at ¶ 57.  For all other non-PAGA claims,

Plaintiffs' counsel attributes no value on the basis that "there would be a substantial risk of no

recovery on this claim."  As discussed above, the Court agrees with Plaintiffs that there were

substantial risks as to the breaks claims, minimum wage and overtime claims, and workers'

---

[16] The mileage provided for the expense reimbursement estimate were produced as a part of
discovery, prior to settlement discussions, and covered the period up to April 8, 2016.  July 15,
2016 Joint Supp. Briefing at 9; April 21, 2016 Liss-Riordan Dec. at ¶ 35.  In responding to
discovery, the parties are required to be truthful, and counsel is ethically bound to ensure truthful
responses.  July 15, 2016 Joint Supp. Briefing at 9.  Further, Plaintiffs' counsel represents that
they analyzed the total mileage recorded in the trip histories of Plaintiffs Manahan and Gurfinkel,
compared these numbers to the mileage produced by Uber, and found that the figures lined up
"almost exactly," with differences of less than .2%.  *Id.* at 9 n.13; July 15, 2016 Liss-Riordan Dec.
at ¶¶ 7-8.

**United States District Court**
For the Northern District of California

1    compensation claims, and it was therefore reasonable for Plaintiffs' counsel to assign no or little

2    value to these claims when considering the overall full-verdict value. *Compare with Cotter*, 2016

3    WL 3561742, at *5 (finding that failure to assess value of a particular gratuity claim "does not

4    automatically invalidate the settlement they reached.  If the unconsidered claims are not

5    particularly strong or valuable, such that they're not likely to have materially influenced the

6    overall settlement, counsel's failure to consider the claims would not be a basis for rejecting the

7    agreement").

8         After considering the information provided to the Court in response to the Court's order

9    for supplemental briefing, the Court concludes that the parties' assessment of the value of all the

10   non-PAGA claims is reasonably accurate.  Thus, looking solely at the monetary relief, the

11   settlement of $84 million constitutes about 10% of the full verdict value of the non-PAGA claims

12   – *i.e.* a 90% discount off the verdict value of the non-PAGA claims.  This substantial discount is

13   well illustrated by the case of Ms. Berwick, who drove 6,468 miles and was awarded $3,878.08 in

14   unreimbursed expenses by the California Labor Commissioner, would likely receive

15   approximately $455 if she was a California class member, or $195 if she was a California non-

16   class member.  *See* Liss-Riordan Dec. Exh. 1 (average distributions); *Berwick v. Uber Techs., Inc.*,

17   Case No. 11-46739 EK.

18                   b.    <u>Non-Monetary Relief</u>

19        The Settlement Agreement is, of course, not limited to the $84 million payment, but

20   includes a number of non-monetary relief that also provide benefits to the class.  However, much

21   of this non-monetary relief is not as valuable as the parties suggest, limiting their worth in

22   considering the amount being offered in settlement.

23        First, Uber has agreed to "promulgate a comprehensive written deactivation policy," which

24   will permit deactivation only for sufficient cause.  Settlement Agreement at ¶ 135(a).  Notably, a

25   driver can no longer be deactivated because of low acceptance rates.  Settlement Agreement at ¶

26   135(a)(i); *see also* Uber Deactivation Policy.  This is a significant change from prior contracts

27   which seemed to allow Uber to fire its drivers for any reason at any time.  *See* March 11, 2015

28   Summary Judgment Ord. at 20.  But while Uber will no longer deactivate drivers because of low

24

United States District Court
For the Northern District of California

acceptance rates, it will still exercise substantial control over a driver's ability to accept or decline ride requests, as the deactivation policy still permits Uber to "temporarily . . . log[ a driver] out of the app for a limited period of time" based on low acceptance rates.  Uber Deactivation Policy; *see also* Travis Kalanick, *Growing and Growing Up*, UBER NEWSROOM (Apr. 21, 2016), https://newsroom.uber.com/growing-and-growing-up/ ("As part of the settlement, Uber has agreed not to deactivate drivers who regularly decline trips when they are logged into the app. . . . [W]here drivers do have low acceptance rates . . . we will alert them to the issue.  If things don't pick up, we may log them out of the app for a limited period of time").

Moreover, although Uber has added a Driver Appeal Panel to which a deactivated driver can appeal a deactivation decision, as well as agreed to pay for the arbitration costs of a challenge to a final deactivation decision in the event of an "excluded matter," both these avenues of review leave out an important reason for deactivation – low star ratings.  Plaintiffs' counsel noted that star ratings are "a frequent reason for deactivation."  June 2, 2016 Trans. at 84:12-13.  While star ratings based on customer reviews might seem to be a relatively objective basis upon which Uber may deactivate a driver without an appeal process, but there may be value to such a process.  For instance, Uber has expressed concern about bias and subjectivity on the part of passengers with respect to tipping; deactivations based on star ratings could likewise be subject to the same bias and subjectivity.  *See* June 2, 2016 Trans. at 85:9-16.

Second, the Court is not convinced that the change to tipping policy will result in the "substantially increased income" that Plaintiffs' counsel promises.  *See* May 20, 2016 Joint Supp. Briefing at 16.  Plaintiffs' counsel suggests that if passengers tip 5% on average, Uber drivers would have earned an additional $125 million since 2009.  Docket No. 611 (Plaintiffs' Resp. at 21).  In support of this assertion, Plaintiffs cite Lyft's model, where customers have tipped drivers more than $85 million since the company's founding.  May 20, 2016 Joint Supp. Briefing at 16.  Plaintiffs' $125 million valuation suffers a number of flaws.  As an initial matter, it relies on a 100% tipping rate, which is highly unlikely given that even Lyft, which includes an *in-app* tipping function (thus making it clear to riders that tipping is not already included in the fare), only has a 70% tipping rate.  *See* Plaintiffs' Resp. at 21 n.18.  By contrast, Uber has made it clear that it will

**United States District Court**
For the Northern District of California

1  not add an in-app tipping function, thus requiring riders to tip using cash (which many riders may

2  not have readily on-hand, given Uber's emphasis on the cashless transaction).[17]  Importantly,

3  while Uber has agreed to "clarify" its tipping policy to make clear that tips are not included in the

4  fare, it has also actively *discouraged* tipping, arguing that it is inconsistent with its business

5  model, drivers' interests, and a positive rider experience.  May 20, 2016 Joint Supp. Briefing; *see*

6  *also Our Approach to Tipping*, UBER UNDER THE HOOD (Apr. 28, 2016),

7  https://medium.com/uber-under-the-hood/our-approach-to-tipping-aa0074c0fddc#.wb66dqmuq.

8  In other words, Uber may be permitting tipping, but it is also telling riders *not* to tip, further

9  decreasing the amount of tips that riders are likely to give.  Given the lack of an in-app tipping

10  function and Uber's active dissuasion of tipping, the value of this tipping policy (which Uber

11  strenuously disputes is even a change, *see* May 20, 2016 Joint Supp. Briefing at 18) is, while not

12  meaningless, not nearly as valuable as Plaintiffs suggest.  The fact that no in-app tipping function

13  will be included will also make it difficult, if not impossible, to measure the effectiveness of the

14  new tipping policy.

15        Finally, the parties have stipulated to the enforceability of the December 2015 Agreement

16  and that this Court's Rule 23(d) Orders be vacated.  Settlement Agreement at ¶ 135(e).  Although

17  included as part of the non-monetary relief, this portion of the Settlement is an additional benefit

18  to Uber, not the class, and the Settlement Agreement is voidable at Uber's option should the Court

19  not vacate its prior orders.  By stipulating to the enforceability, drivers will be prevented from

20  challenging the validity of the December 2015 Agreement, even in cases unrelated to employment

21  misclassification such as whether arbitration would violate the National Labor Relations Act or on

22  the ground that it denies a class member a contractual right to effectual relief, a claim that has

23  been brought in *Congdon v. Uber Technologies, Inc.*, Case No. 16-cv-2499-YGR.  *See* July 15,

24  2015 Joint Supp. Briefing at 27.

25        Further, as expressed at the June 2, 2016 hearing, the Court is concerned about

26

27  _____

[17] Furthermore, for safety reasons, drivers may not carry much cash with which to make change if
28  a rider decides to tip but does not have the appropriate denominations in hand.  Requiring drivers
   to handle cash (or at least the public perception thereof) could also raise safety concerns.

United States District Court
For the Northern District of California

retroactively vacating its orders and the potential impact on the due process rights of drivers who may not have opted out of the December 2015 Agreement in reliance on those orders.  *See* June 2, 2016 Trans. at 117:2-25.  This is because the Court's Rule 23(d) Order specifically held that Uber could not enforce the December 2015 Agreement until it added more robust cover letter and notice provisions, and thus a driver was not required to exercise his or her opt-out right until Uber complied with Court's directives.  Rule 23(d) Ord. at 6-7.  Uber did not comply with the order.  To retroactively revoke the protection that this Court imposed to protect the rights of drivers without affording drivers a right to now opt-out would be to put a driver in a worse position than if the Court had not issued the Rule 23(d) Orders at all.  Such retroactive elimination of protection afforded by the Court could raise due process issues.  *Cf. Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions"); *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 266 (1994) ("The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause may not suffice to warrant its retroactive application") (internal quotation omitted).  Further, vacating this Court's Rule 23(d) would effectively circumvent and nullify both this Court's and the Ninth Circuit's denial of Uber's motions to stay the Court's Rule 23(d) Orders on January 8 and January 13, 2016, respectively.

       3.      The Extent of Discovery Completed and the Stage of the Proceedings

The parties entered into the Settlement Agreement shortly before the *O'Connor* case was to go to trial, after having litigated two class certification motions and two summary judgment motions, as well as submitted their trial plans in preparation for trial.  During this time, the parties conducted a significant amount of discovery, including a combined 326 Requests for Production, 216 interrogatories, 71 requests for production, and multiple depositions, including depositions of Uber's Senior Vice President of Operations, Ryan Graves, and five named plaintiffs.  April 21, 2016 Liss-Riordan Dec. at ¶ 4.  In addition, the parties exchanged discovery prior to settlement discussions.  *Id.* at ¶ 25; *see also* July 15, 2016 Joint Supp. Briefing at 6.

United States District Court
For the Northern District of California

4.      The Experience and Views of Counsel

This Court previously found that Plaintiff's counsel is a "capable advocate" and a leading practitioner in the field of employment misclassification.  September 1, 2015 Class Certification Ord. at 66.  Plaintiff's counsel has strongly advocated for preliminary approval of the Settlement Agreement, particularly after considering the risks of this Court's arbitration orders being overturned, and even offered to reduce her fees by $10 million so that these funds could be distributed to the class, regardless of whether the $16 million contingent payment is triggered.  Docket No. 699 at 2.  However, as noted above, deference to the views of counsel must be tempered here where the Settlement Agreement at the eleventh hour folds in new claims and class members at the expense of litigation pending in other courts, while attributing almost no value to those claims, in order to induce Uber to settle the cases at bar.

5.      The Presence of a Governmental Participant

In general, there has been no governmental participant in this case.  However, as will be more fully discussed below, the California LWDA has, at the invitation of the Court, submitted a letter regarding the PAGA claim, in which it expresses serious reservation about the $1 million allocated to the newly added PAGA claim.  *See* LWDA Resp. at 3.

6.      The Reaction of the Class Members to the Proposed Settlement

Plaintiffs' counsel submits that since the announcement of the settlement, her firm has received feedback from more than 2,500 drivers; of these, 1,797 e-mails were from drivers wanting to confirm they were in the class or asking how to submit a claim.  71 class members expressed support for the Settlement Agreement, while 33 class members expressed negativity towards the Settlement Agreement.  Docket No. 613-1 (Mason Dec.) at ¶¶ 8, 12, 13, 15.  However, even at this preliminary state, this Court has received (and continues to receive) numerous objections, filed both by individuals and attorneys representing drivers in other California cases. *E.g.*, Docket No. 529, 536-540, 546-548, 551-553, 556, 559, 561, 567, 569-571, 579, 581, 582, 584, 592, 594, 599, 601-604, 626, 652, 662, 688, 675, 690, 737.  These objectives are in addition to five motions to intervene and one motion to disqualify Plaintiffs' counsel.  Docket Nos. 588, 591, 627, 637, 644, 677.

7.     Balancing the Factors

Balancing the *Hanlon* factors, the Court agrees with Plaintiffs' assessment that there is a substantial risk on the arbitration question in light of the Ninth Circuit's actions thus far, a risk that many of the objectors fail to appreciate.  This risk would have the effect of substantially altering – if not effectively terminating – the class action in this Court, as well as in pending state court cases.  These risks could well render a settlement providing for monetary relief reflecting a 90% discount off the verdict value along with limited non-monetary relief fair and adequate.  Indeed, while at the low end of reasonable recovery,[18] the Court would be inclined, after weighing the *Hanlon* factors, to find the consideration afforded by the settlement to be adequate for release of the non-PAGA claims.[19]  However, the parties' inclusion of waiver of PAGA claims as part of the settlement considerably alters the Court's assessment of the fairness and adequacy of the settlement as a whole.

C.     Private Attorneys General Act (PAGA)

In 2003, California enacted the Private Attorneys General Act of 2004.  *Arias*, 46 Cal. 4th at 980.  As explained by the LWDA:

> By creating a cause of action under which private plaintiffs may recover civil penalties otherwise recoverable by the state, PAGA benefits the public by augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance.  This furthers the state's policy to protect workers from substandard and unlawful conditions and also to protect employers "who comply with the law from those who

---

[18] *Compare Harris v. Vector Mktg. Corp.*, 2011 U.S. Dist. LEXIS 117927, at *15 (N.D. Cal. Oct. 12, 2011) (denying final approval of a settlement where the actual payout to the class was 6.56% of the maximum verdict value) and *Cotter*, 2016 WL 1394236, at *8, 11 (denying preliminary approval of a settlement where the settlement was 8.82% of the reimbursement claim, and finding that the settlement must be increased to 17% of the value of the reimbursement claim); *with Dunleavy v. Nadler (In re Mego Fi. Corp. Sec. Litig.)*, 213 F.3d 454, 458-59 (9th Cir. 2000) (finding that settlement for approximately 16.67% of the potential recovery was adequate where the district court had "properly found that the Plaintiffs' case was weak and the risk, expense, and complexity of trial weighed against them").

[19] The Court's reservations would lay primarily with the stipulation that the Court vacate retroactively its Rule 23(d) orders.  The Court also questions the parties' refusal to provide for an easier Rule 23 opt-out mechanism (*e.g.* using e-mail, opt out forms, or hyperlinks), which would not require drivers to send a written letter by traditional mail to the administrator in order to opt out.

attempt to gain a competitive advantage at the expense of their
workers by failing to comply with minimum labor standards."

LWDA Resp. at 2 (quoting Cal. Lab. Code § 90.5(a)); *see also Arias*, 46 Cal. 4th at 980

(explaining that in passing PAGA, "[t]he Legislature declared that adequate financing of labor law

enforcement was necessary to achieve maximum compliance with state labor laws, that staffing

levels for labor law enforcement agencies had declined and were unlikely to keep pace with the

future growth of the labor market, and that it was therefore in the public interest to allow

aggrieved employees, acting as private attorney generals, to recover civil penalties for Labor Code

violations"). The California Supreme Court has also recognized that "PAGA was clearly

established for a public reason," such that a prohibition of a representative PAGA action would be

contrary to public policy. *Iskanian*, 59 Cal. 4th at 383; *see also id.* at 383 (explaining that a pre-

dispute PAGA waiver "serves to disable one of the primary mechanisms for enforcing the Labor

Code").

A plaintiff who brings a PAGA claim "does so as the proxy or agent of the state's labor

law enforcement agencies." *Arias*, 46 Cal. 4th at 986. Because the "plaintiff represents the same

legal right and interest as state labor law enforcement agencies," the California Supreme Court has

found that "a judgment in an employee's action under the act binds not only that employee but

also the state labor law enforcement agencies." *Id.* In short, because the employee's PAGA

action acts as a "substitute" for a governmental action, the judgment binds all those who would be

bound by an action brought by the government, *including* nonparty employees. *Id.* Thus, in a

lawsuit which asserts a PAGA claims and seeks class certification for labor/wage claims, even

class members who opt out of the class would be bound by an adverse PAGA judgment or

settlement. For that reason, the LWDA rightly has stressed that:

> It is thus important that when a PAGA claim is settled, the relief
> provided for under the PAGA be genuine and meaningful, consistent
> with the underlying purpose of the statute to benefit the public and,
> in the context of a class action, the court evaluate whether the
> settlement meets the standards of being 'fundamentally fair,
> reasonable, and adequate' with reference to the public policies
> underlying the PAGA.

LWDA Resp. at 2-3.

Here, Plaintiffs seek formally to add the PAGA claim to the suit and settle it for $1 million,

United States District Court

For the Northern District of California

despite having previously argued that the PAGA claim could result in penalties over $1 *billion*. April 21, 2016 Liss-Riordan Dec. at ¶ 82.  As noted above, the LWDA also concludes that the verdict value of the PAGA claim in this case exceeds $1 billion.  *See*  LWDA Resp. at 3 ("LWDA believes it is accurate to estimate the potential PAGA penalty exposure as in excess of $1 billion").  This $1 billion amount makes up more than half of the total verdict value of the case. Plaintiffs propose settling the PAGA claim for **0.1%** of its estimated full worth.  The Court is cognizant that even if a verdict were rendered for PAGA plaintiff(s), a penalty of $1 billion could well be reduced, as a court may reduce the penalty when "to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  Cal. Lab. Code § 2699(e)(2).[20] Nonetheless, as the LWDA concludes, there is "no rationale for allocating $1 million of the proposed settlement fund to the PAGA claim . . . other than that this is a 'round' number and a large figure in comparison to other PAGA settlements."  *Id.*  The parties have failed to demonstrate how the *Hanlon* factors or any other coherent analysis justifies settling the PAGA claim for such a relatively meager value.

It is important to note that where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment.  *See Iskanian*, 59 Cal. 4th at 381 ("When a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as through the person were a party").  Such a plaintiff also owes responsibility to the public at large; they act, as the statute's name suggests, as a private attorney general, and 75% of the penalties go to the LWDA "for enforcement of labor laws . . . and for education of employers and employees about their rights and responsibilities under this code."  Cal. Lab. Code § 2699(i).  This duty imposed upon the PAGA representative is especially

---

[20] *See also Cotter*, 2016 WL 3561742, at *5 (finding that "[a] significant reduction" of the PAGA claim "would be appropriate" because "[t]his is not a case where a company has deliberately evaded a clear legal obligation to provide legally required pay and benefits to its employees[, n]or does this appear to be a case where a company negligently failed to learn about its obligations under the wage and hour laws").

**United States District Court**
For the Northern District of California

1  significant given that PAGA does not require class action procedures, such as notice and opt-out

2  rights.  The Court must be cognizant of the risk that despite this responsibility, there may be a

3  temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein

4  the rights of individuals who may not even be members of the class and the public may be waived

5  for little additional consideration in order to induce the employer to agree to a settlement with the

6  class.

7         This is not to suggest that the PAGA claim must comprise a disproportionate amount of

8  class settlements which include a PAGA claim, with the majority of funds going to the State

9  simply because the PAGA penalty has the potential to be larger than the actual claims.  Such a

10  requirement would come at the expense of the workers, who might otherwise benefit from a larger

11  non-PAGA settlement.  Rather, in reviewing a settlement that includes both a Rule 23 class and a

12  PAGA claim, the Court must closely examine *both* aspects of the settlement.  While a proposed

13  settlement must be viewed as a whole, *see In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934,

14  944 (9th Cir. 2015), the Court must evaluate the adequacy of compensation to the class *as well as*

15  the adequacy of the settlement in view of the purposes and policies of PAGA.  In doing so, the

16  court may apply a sliding scale.  For example, if the settlement for the Rule 23 class is robust, the

17  purposes of PAGA may be concurrently fulfilled.  By providing fair compensation to the class

18  members as employees and substantial monetary relief, a settlement not only vindicates the rights

19  of the class members as employees, but may have a deterrent effect upon the defendant employer

20  and other employers, an objective of PAGA.  Likewise, if the settlement resolves the important

21  question of the status of workers as employees entitled to the protection of the Labor Code or

22  contained substantial injunctive relief, this would support PAGA's interest in "augmenting the

23  state's enforcement capabilities, encouraging compliance with Labor Code provisions, and

24  deterring noncompliance."  LWDA Resp. at 2.  But where, as here, the compensation to the class

25  amounts is relatively modest when compared to the verdict value, the non-monetary relief is of

26  limited benefit to the class, and the settlement does nothing to clarify the status of drivers as

27  employees versus independent contractors, the settlement of the non-PAGA claims does not

28  substantially vindicate PAGA.  In these circumstances, the adequacy of settlement as a whole

United States District Court
For the Northern District of California

1    turns in large part on whether the PAGA aspect of the settlement can stand on its own.

2         Here, the Court cannot find that the PAGA settlement is fair and adequate in view of the

3    purposes and policies of the statute.  Plaintiffs propose settling PAGA for only 0.1% of the

4    potential verdict value, a reduction that the LWDA has found has no rational basis.[21]  This 99.9%

5    reduction does not adequately reflect the parties' respective risks, particularly when the PAGA

6    claim would not be subject to the same arbitration risk that this Court has found justifies in part

7    the 90% discount in the verdict value of the non-PAGA claims.  Instead, the risks at issue rest

8    primarily on the merits of drivers' labor codes claims and the discretionary reduction of statutory

9    penalties, not on the risk of compelled arbitration.  However, as discussed above, those risks are

10   not limited to Plaintiffs; Uber also takes on a significant risk that should a representative PAGA

11   claim be litigated and adjudicated, it could lose on this question (especially given that this Court

12   has found a presumption of employee status, *see* March 11, 2015 Summary Judgment Ord. at 15),

13   and such an adverse judgment would carry not only a direct monetary penalty, but potentially

14   could affect other litigation including arbitrations.  Instead of adequately considering these risks to

15   Uber and the full value of the PAGA claim, in settling the PAGA claim herein, Plaintiffs appear to

16   treat the PAGA claim simply as a bargaining chip in obtaining a global settlement for Uber's

17   benefit, even though the PAGA claim alone is worth more than half of the full verdict value of all

18   claims being released.  The Court shares the LWDA's view that there is "no rationale for

19   allocating $1 million of the proposed settlement fund to the PAGA claim . . . other than that this is

20   a 'round' number and a large figure in comparison to other PAGA settlements," LWDA Resp. at

21   3.  Given the sweeping consequences of the proposed PAGA waiver, viewed in the context of a

22   relatively modest settlement of the non-PAGA claims, the Settlement Agreement is not as a whole

23   is fair, adequate and reasonable.

24        Even if the PAGA claim were not separately scrutinized, viewing all the claims combined

25

26   _____

27   [21] Even if the Court was to add all $10 million from Plaintiffs' counsel's proposed reduction, making the PAGA settlement $11 million, this would only represent 1.1% of the potential verdict value.  Moreover, this would effectively take away $10 million that could otherwise have been distributed to the *drivers*, putting the burden of supporting the public interest on the employee rather than the employer.

28

**United States District Court**
For the Northern District of California

1  (PAGA and non-PAGA), the Settlement Agreement yields less than 5% of the total verdict value

2  of all claims being released.  Although the litigation risks to the plaintiffs are substantial, absent

3  the sweeping releases conferred by the Settlement Agreement, Uber faces significant risks and

4  costs, regardless of the outcome of pending interlocutory appeals.  The settlement as a whole as

5  currently structured is not fair, adequate, and reasonable.

6  

IV.      <u>**CONCLUSION**</u>

7      The Court therefore **DENIES** Plaintiffs' motion for preliminary approval.

8      Although the Court denies Plaintiffs' motions for preliminary approval and thus refuses to

9  vacate its Rule 23(d) orders pursuant to the parties' stipulation, it will **TERMINATE** its Rule

10  23(d) orders.  The legal landscape no longer requires the protection afforded by the Orders.  *See*

11  Docket No. 522; Case No. 14-5200, *In re Uber FCRA Litig.*, Docket No. 175.  Thus, Uber is

12  permitted to issue the December 2015 Agreement to new drivers without satisfying the enhanced

13  notice provisions required by the Court.  Uber may also re-issue the December 2015 Agreement to

14  current drivers, with the exception of the certified *O'Connor* class and claims (which, according to

15  Uber, they did not intend the December 2015 Agreement to affect to begin with, *see* Docket No.

16  408, Exh. C; Docket No. 410 at 4; Docket No. 428 at 38:24-39:7).  The Court will not, however,

17  retroactively vacate its Rule 23(d) orders, and thus it will not deem the December 2015 Agreement

18  effective as to drivers who did not timely opt out of the arbitration agreement during the pendency

19  of the Rule 23(d) orders; the Court does not rule on the enforceability of the December 2015

20  Agreement.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    Because the Court denies Plaintiffs' motion for preliminary approval, Uber's motion to

2  stay filed on April 6, 2016 remains pending.  Docket No. 506.  The parties are ordered to meet and

3  confer to discuss how they wish to proceed with that motion, as well as the general status of this

4  case in light of the Court's ruling and the pendency of the appeals pending in the Ninth Circuit.  A

5  joint status report will be due on September 8, 2016, and a Status Conference will be held at 10:30

6  a.m. on September 15, 2016.

7    This order disposes of *O'Connor*, Docket No. 518 and *Yucesoy*, Docket No. 206.

8

9    **IT IS SO ORDERED**.

10

11  Dated: August 18, 2016

12    _____

13    EDWARD M. CHEN
      United States District Judge

35