SHANNON LISS-RIORDAN, SBN 310719
(sliss@llrlaw.com)
ADELAIDE PAGANO, *pro hac vice*
(apagano@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:   (617) 994-5800
Facsimile:    (617) 994-5801

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, THOMAS COLOPY, MATTHEW MANAHAN, and ELIE GURFINKEL, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>UBER TECHNOLOGIES, INC.,<br>Defendant. | CASE NO.  13-cv-03826-EMC<br>CASE NO.  15-cv-00262-EMC<br><br>**RESPONSE TO COURT'S INQUIRIES REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**<br><br>Judge: Hon. Edward M. Chen |
| HAKAN YUCESOY, ABDI MAHAMMED, MOKHTAR TALHA, BRIAN MORRIS, PEDRO SANCHEZ, AARON DULLES, and ANTONIO OLIVEIRA, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>UBER TECHNOLOGIES, INC., et al.<br>Defendant. | Hearing:      March 21, 2019<br>Time:          1:30 p.m.<br>Courtroom:  5<br>Judge:         Judge Edward Chen |

**I.     INTRODUCTION**

Pursuant to the Court's Orders of March 18, 2019 (O'Connor Dkt. 924; Yucesoy Dkt. 329) (the "Order"), Plaintiffs hereby submit this response to the Court's inquiries regarding Plaintiffs' Motion for Preliminary Approval (as well as the Declaration of Shannon Liss-Riordan in support thereof). Although the Court ordered the parties to file a supplemental brief, Plaintiffs' counsel believes that this supplemental brief is more appropriately filed solely by Plaintiffs. The parties' counsel have met and conferred, and Defendants consent to the filing of this supplemental brief by Plaintiffs, but take no position as to Plaintiffs' responses to questions 1-2 and 4-7 below.

**II.    PLAINTIFFS' SUPPLEMENTAL RESPONSE**

**1.     Potential Verdict Value of the Claims**

The Court has inquired as to the potential verdict value of the claims that settlement class members would be releasing beyond the claims originally asserted in the O'Connor and Yucesoy complaints. "To evaluate adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). "Expected recovery" does not mean the amount plaintiffs would recover if they won; it means "expected recovery" in light of all the circumstances, including risks and practical realities.[1] Thus, Plaintiffs submit that, if they did not expect to recover anything on a given claim, Ninth Circuit case law does not require that they perform detailed calculations ascribing some theoretical value to those claims. See Spann v. J.C. Penney Corp., 314 F.R.D. 312, 323-24 (C.D. Cal. 2016) ("[T]he Ninth Circuit does not follow the approach of other circuits that requires district courts

---

[1]     See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965-66 (9th Cir. 2009) (rejecting the notion that "the court should have specifically weighed the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter" in evaluating proposed settlement and finding that consideration of "estimated recovery," or "likely recovery" at trial, is sufficient); In re Oracle Sec. Litig., 829 F. Supp. 1176, 1182 (N.D. Cal. 1993) ("settlement approval does not require aggregate damages to be determined with mathematical precision"); In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig., 2013 WL 3224585, *7 (C.D. Cal. June 17, 2013) ("Because absolute precision is impossible, 'ballpark valuations' are [] permissible, especially when reached after mediated negotiation among non-collusive parties.").

to specifically weigh the merits of the class's case against the settlement amount and quantify the expected value of fully litigating the matter") (internal quotation omitted).

In any case, Plaintiffs have considered the value of various released claims in great detail at ¶¶ 54-81 of the Liss-Riordan Declaration. See Dkt. 916 at ¶¶ 54-81. This Court previously considered a similar valuation in evaluating the parties' proposed settlement three years ago, and the Plaintiffs were cognizant of that fact in valuing the claims this time around, knowing that the Court had previously accepted their prior valuations and indicated that it would have approved the settlement, but for the insufficient allocation of settlement funds to the PAGA claims. See O'Connor v. Uber Techs., Inc., 201 F. Supp. 3d 1110, 1132 (N.D. Cal. 2016). For instance, the Court previously discussed the Plaintiffs' valuation of meal and rest break claims, minimum wage and overtime claims, and worker's compensation claims, see id. at 1125-26, and it noted that a number of the remaining claims such as for failure to pay wages upon termination, failure to maintain employee records, and failure to furnish accurate wage statements, all required a finding of willfulness, which would have created problems of proof. Id. at n. 12. The Court concluded "[a]s discussed above, the Court agrees with Plaintiffs that there were substantial risks as to the breaks claims, minimum wage and overtime claims, and workers' compensation claims, and **it was therefore reasonable for Plaintiffs' counsel to assign no or little value to these claims when considering the overall full-verdict value**." Id. at 1128 (emphasis added). Thus, Plaintiffs believe that for the same reasons the Court previously acknowledged, their valuation of these claims is reasonable.[2]

        a.      **The Litigation Risks Associated With the Above Claims In Light of Dynamex**

The Court has asked what litigation risks are associated with the claims arising under Industrial Welfare Commission wage orders to which Dynamex Operations W. v. Superior Court, 4 Cal. 5th 903 (2018), clearly applies, assuming the decision is retroactive. See O'Connor, Dkt. 924 at

---

[2] In addition to the Liss-Riordan Declaration (Dkt. 916), additional detailed discussion of the Plaintiffs' prior valuation of these claims in conjunction with the previous proposed settlement is located at Dkt. 617 at pp. 32-53 and Dkt. 732 at pp. 5-15.

1. Plaintiffs submit that, as explained in their Motion for Preliminary Approval, a great deal of uncertainty continues to exist in this case, even after the Dynamex ruling.

First, there has been great ongoing controversy, including in other cases involving "gig economy" companies, regarding what claims are covered by the Dynamex decision, including whether Dynamex applies to expense reimbursement claims (the primary source of potential damages in this case). With respect to other claims, as this Court has previously recognized, there are serious obstacles of proof to those claims. Uber would vociferously argue, and the Court may well hold that only time spent transporting a passenger (*i.e.*, "on trip") is compensable[3], and because there does not appear to be evidence that drivers earn less than minimum wage while "on trip", the minimum wage claim would face serious obstacles. See Johnson v. Serenity Transport., Inc., 2015 WL 6664834, *19–21 (N.D. Cal. Nov. 2, 2015) (dismissing minimum wage claim and holding that drivers' "on-call" and "standby" time was not compensable, notwithstanding their allegation that defendant "expect[ed] drivers to be available 24 hours a day 7 days a week and to respond to dispatches within a specified timeframe") (citing Mendiola v. CPS Sec. Solutions, Inc., 60 Cal. 4th 833, 840–41 (2015); see also Del Rio v. Uber Techs. Inc., 3:15-cv-03667-EMC, Dkt. 84 (N.D. Cal.) (granting motion to dismiss overtime and minimum wage claims asserted against Uber) ("Plaintiffs do not explain how they define 'work'").[4] Plaintiffs also believe that it would be particularly difficult for the drivers to prevail on a classwide basis on their overtime claims. This Court rejected the Massachusetts drivers' attempt to bring overtime claims three times, see Yucesoy, Dkt. 69 at 12-13, Dkt. 132 at 6-7, Dkt.

---

[3] Wage Order 9 defines "hours worked" as "time during which an employee is subject to the control of an employer, [] includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. tit. 8, § 11090. "California courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control," and have relied upon the same factors employed by the Ninth Circuit when interpreting whether time is compensable under the FLSA. See Mendiola, 60 Cal. 4th at 840-41 (quoting list of seven factors from Owens v. Local No. 169, 971 F.2d 347, 351 (9th Cir. 1992)).

[4] Even if drivers' expenses were counted against their wages while "on trip", there is California case law that casts doubt on whether employees paying their own mileage expenses can recover under this type of minimum wage theory, given the availability of recovering expenses directly under Labor Code Section 2802. See Sanchez v. Aerogroup Retail Holdings, Inc., 2013 WL 1942166, *13 (N.D. Cal. May 8, 2013).

194 at 9-10. Nonetheless they attempted to value these claims in conjunction with the last settlement and arrived at an estimated value of $2.4 million for a settlement class numbering in the hundreds of thousands of drivers. See Dkt. 732 at pp. 6-7. Plaintiffs believe that the overtime claims here would have a similar value, which for the much smaller settlement class size here would total closer to $232,000. See Dkt. 916 at p. 56.

Second, the issue of whether Dynamex applies retroactively is also hotly disputed, including at the Ninth Circuit, in the case of Lawson v. Grubhub, Inc., 302 F. Supp. 3d 1071 (N.D. Cal. 2018), appeal pending, Ninth Cir. Appeal No. 18-15386, where the same counsel for the parties here are actively litigating this issue.

Third, Defendants' counsel in the Grubhub case are also hotly disputing at the Ninth Circuit whether the Dynamex "ABC" test should apply and how it should properly be applied. The parties in that case, as well as in numerous other "gig economy" cases (which counsel for both parties here are actively litigating elsewhere), are disputing what exactly is required for Plaintiffs to prevail under the Dynamex standard (if it applies). Plaintiffs recognize that this test has not actually been applied yet in California, other than in the Johnson v. VCG-IS, LLC, Case No. 30-2015-00802813 (Super. Ct. Cal.), and that uncertainties regarding how courts will apply it remain. In the past, Uber has prevailed in arbitrations by persuading arbitrators that it is not a transportation company but instead a technology platform. See, e.g., Biafore et al. v. Uber Technologies, Inc., et al., Judicate West, Case No. 455564 (Jan. 22, 2018) (McCauley, Arb.), and Dorr v. Uber Technologies, Inc., et al., JAMS, Ref. No. 1210033721 (Jan. 22, 2018) (Mayeda, Arb.). Plaintiffs vociferously disagree with those rulings, but it is clear that Uber would continue to vigorously pursue all of its arguments were this case not resolved, including at the Ninth Circuit. Arguing the impact of Dynamex would also take additional years of litigation, thus significantly delaying any recovery by settlement class members (an important consideration, particularly in light of the fact that nearly three-quarters of the settlement class has not used the Uber App in more than five years).

Fourth, Plaintiffs recognize that the California legislature is considering whether to keep the Dynamex decision in place or to roll it back (as is proposed in a widely discussed pending bill, which

5
RESPONSE TO COURT'S INQUIRIES REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
CASE NO. CV 13-03826-EMC; CASE No. CV 15-00262-EMC

is backed by many well-funded supporters, including most "gig economy" companies), and there is no certainty regarding what the ongoing fate of the decision will be.

The Court has also asked what discovery the Plaintiffs have taken and what data they have regarding these claims. Regarding the overtime and minimum wage claims, Plaintiffs obtained data in their earlier settlement discussions, which they extrapolated to the present for valuation purposes. See Dkt. 732 at pp. 6-7 (explaining previous calculations); Liss-Riordan Decl. (filed herewith) at ¶ 3. As noted, even if the Court reversed its prior rulings that cast doubt on the viability of these claims in this case, given the uncertainty of what would constitute "on-call" time here[5], it is clear that the overtime and minimum wage claims have minimal value as compared to the expense reimbursement claim.

### b. Notice of the Proposed Settlement

The Court has inquired as to whether notice of this proposed Settlement has been given to the plaintiffs in the affected pending cases listed in paragraph 29 of the Settlement Agreement. See Dkt. 923 at 1. The majority of these plaintiffs have received notice through the Court's ECF filings, as their counsel are receiving ECF notices in this case.

The only plaintiffs who have not received notice of the proposed Settlement through ECF filings are those in the case of Toyserkani, et al. v. Rasier, LLC, et al., Case No. BC660915 (Cal. Super. Ct., Los Angeles County) (which was filed in May 2017). Plaintiffs have now sent the filing to their counsel through email. See Liss-Riordan Decl. at ¶ 2.

### 2. The Data Underlying Plaintiffs' Calculations of the Verdict Value of Claims

The Court has asked to see the data (or a summary of the data) underlying Plaintiffs' calculations for the $54 million verdict value of the claims in this case.

Plaintiffs received data for the California and Massachusetts drivers respectively, showing their mileage by year through near the end of the settlement class period (February 28, 2019) and total fares through July 2017, from which they calculated their potential damages. For the expense

---

[5] See Johnson v. Serenity Transport., Inc., 2015 WL 6664834, *19–21 (N.D. Cal. Nov. 2, 2015) (citing Mendiola v. CPS Sec. Solutions, Inc., 60 Cal. 4th 833, 840–41 (2015)); see also Del Rio v. Uber Techs. Inc., 3:15-cv-03667-EMC, Dkt. 84 (N.D. Cal.).

6
RESPONSE TO COURT'S INQUIRIES REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
CASE NO. CV 13-03826-EMC; CASE NO. CV 15-00262-EMC

damages, Plaintiffs multiplied the mileage for each year by the IRS rate. For the tips damages, they took four percent of total fares up until mid-2017 when Uber changed its tipping policy. See infra, Part 3. The four percent figure represents 20% (the tip) of 20% (Uber's average commission), which Plaintiffs contend should have been remitted to the drivers. In response to the Court's inquiry for data underlying Plaintiffs' calculation of expense reimbursement and tips damages, the parties are submitting an *in camera* letter. Data underlying Plaintiffs' phone expenses calculation has already been presented and explained in the Motion for Preliminary Approval and accompanying Liss-Riordan Declaration. See Dkt. 915, 916.

### 3. Uber's Tipping Policy

Plaintiffs believe that their aggressive litigation of this case eventually prompted Uber to change its tipping policy, by ending its alleged practice of informing or insinuating to passengers that tips are included in the fare, and eventually—after repeated urging by Plaintiffs—adding a tip function to the App.

Since July 2017, the Uber App has provided riders with the option to tip drivers. Immediately after a rider rates their ride on the Uber App, the App presents riders with a pop-up screen providing an option to tip drivers in the App. Riders can also add tips from a rider's trip history or trip receipt, which appear in the App and via email, respectively, shortly after the trip is completed. If riders choose not to tip immediately after completing a trip, they have the option to tip drivers up to 30 days after their trip is completed. Regardless of when riders decide to tip, the App provides them with the option to select a preset amount for their tip, or to enter a custom tip for whatever amount they choose. A description of Uber's in-App tipping option is publicly available and clearly described at the following website: www.uber.com/ride/how-uber-works/in-app-tipping/.

### 4. Use of a Claims Process

The Court has asked why it is necessary for settlement class members to submit a claim form in order to receive their settlement payments and whether their payments could simply be mailed to them without a claims process. Dkt. 923 at 2. Through her experience administering numerous similar settlements, Plaintiffs' counsel prefers using a claim form (with repeated follow-up reminders) in order to confirm that class members' addresses are up to date so that they can be

7
RESPONSE TO COURT'S INQUIRIES REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
CASE NO. CV 13-03826-EMC; CASE No. CV 15-00262-EMC

ensured of receiving their settlement check.  Sending checks to class members at outdated addresses causes numerous difficulties and, based upon counsel's observations and discussions with the settlement administrator, does not necessarily lead to more class members actually receiving settlement funds.  Instead, it leads to numerous checks being sent out and never cashed, necessitating the expense of cancelling checks, as well as the risk of checks being cashed by current residents (which leads to problems when class members later inquire about their checks, only to find they were cashed by someone else).  It also leads to the problem of tax forms being sent to class members who never actually received or cashed their payment.  In one of the only cases in which Plaintiffs' counsel allowed checks to be sent to all class members, without the use of a claim form, counsel had class members for years into the future getting in touch to say that they had received a tax delinquency notice for a payment they had never received.

Courts around the country, including in California, have endorsed the use of a claim form. Indeed, this distribution process has been approved in other federal court settlements in this district involving similar misclassification claims that Plaintiffs' counsel have litigated against "gig economy" companies, including Cotter v. Lyft, 3:13-cv-04065-VC (N.D. Cal.), and Singer v. Postmates, 4:15-cv-01284-JSW (N.D. Cal.), Dkt. 98.  See also Levin v. Caviar, Civ. A. No. 3:15-cv-01285 (N.D. Cal. Dec. 21, 2017), Dkt. 59 (confirming arbitrator's award, approving class-wide settlement with use of similar claims process).

Additionally, settlement class members in "gig economy" cases such as this one typically move more frequently than workers in other industries, so the likelihood of checks being sent to outdated addresses is particularly pronounced.  Sending checks to outdated addresses results in significant administrative expenses associated with either remailing checks or stopping payments. Indeed, the issue of outdated mailing addresses is a significant one in misclassification cases in general, because defendants in these types of cases may not have or maintain workers' physical addresses.  Here, although Uber has mailing addresses on file for settlement class members, many of them are very likely outdated.  As set forth in Plaintiffs' Motion for Preliminary Approval at p. 1, n. 1, nearly 70% of the settlement class (9,461 of approximately 13,600 drivers) last drove using the Uber App before Uber implemented its arbitration agreement, meaning that their contact information

on file with Uber is <u>at least five years old</u> at this point. Thus, the use of a claim form to update addresses is all the more critical.[6]

If this settlement were to be revised to dispense with the claim form, the proposed Settlement Administrator, Epiq, estimates that this revision would add at least an additional $15,000 to its administration costs in order to account for remailing checks and stopping payment on uncashed checks. <u>See</u> Liss-Riordan Decl. at ¶ 4. However, Plaintiffs' counsel believes this number is extremely conservative given the age of the addresses that Uber has on file for the majority of the class. In addition to the costs simply of stopping payment and remailing checks, there would be significant costs (difficult to quantify in advance) communicating with settlement class members regarding checks mailed to outdated addresses, as well as handling issues involved with checks being cashed by someone other than the intended recipient and tax delinquencies triggered for settlement class members who have not received their checks. And, at the end of the day, based upon counsel's experiences with other cases, and communications with the administrator, such a process may not even result in more settlement class members actually receiving their settlement payments. The use of a very simply claim process (one that does not require input of information besides the basic information needed to mail a settlement check and perform required tax reporting)—coupled with repeated reminders--also ensures that settlement funds are directed to settlement class members who care enough about the claims and their right to recovery to push a simple button to receive their settlement payment.

As set forth above, settlements that do not use a claims process typically result in a far greater number of uncashed checks, and a process must be implemented to cancel uncashed checks, which costs money, and which can cause confusion if a settlement class member seeks to deposit a canceled

---

[6] The agreement provides that "[t]o the extent that sending the Notice of Settlement of Class Action via postal mail is necessary …before any mailing, the Settlement Administrator shall make a good-faith attempt to obtain the most-current names and postal mail addresses for all potential Settlement Class Members to receive such postal mail, including cross-checking the names and/or postal mail addresses it received from Uber, as well as any other sources, with appropriate databases (*e.g.*, the National Change of Address Database) and performing further reasonable searches (*e.g.*, through Lexis/Nexis) for more-current names and/or postal mail addresses for potential Settlement Class Members." <u>See</u> Dkt. 916-1 (Settlement Agreement) at 145.

check at some later date. This problem is minimized when a system is used in which payments are only sent to settlement class members who have submitted a claim form and thus are expecting, and want to receive, their settlement check. Additionally, when payments are sent directly to settlement class members without first requiring them to submit a claim form, checks may be cashed by individuals who are not the intended recipient (e.g., an unscrupulous roommate or new occupant of premises). This concern is minimized when a claim form is used, as the settlement class member will be expecting their payments. See Keller v. Nat'l Collegiate Athletic Ass'n (NCAA), 2015 WL 5005901, *5 (N.D. Cal. Aug. 19, 2015) (overruling objection to claims process because it minimized waste, fraud, and administrative costs, and because it was simple, straightforward, and designed to make submitting a claim as easy as possible).

Tax reporting is also potentially problematic in a settlement that does not utilize a claim form. For example, some payments to settlement class members must be reported to the IRS and/or state taxing authorities, even if the settlement class member has not actually received the payment or if it is cashed by an unintended recipient. This problem is minimized where settlement class members have submitted a claim and are expecting checks. Further, a claim form process results in maximized settlement payments to settlement class members who are invested enough in the litigation and care enough about the litigation to submit a simple claim form. See Miller v. Ghirardelli Chocolate Co., 2014 WL 4978433, *4 (N.D. Cal. Oct. 2, 2014) (reasoning that claims process was appropriate in part because it "directs available funds to those who most care about the alleged deception and thus are willing to file a claim.").

Finally, it should be emphasized that the claim submission process in this settlement is as simple as such a process can be. The online claim submission portal is accessible by simply clicking or pressing on a link at the top of the class notice. See Ex. E & Ex. G to Settlement Agreement (Dkt. 916-1). Any minimal effort associated with submitting a claim is far outweighed by the above-described advantages of using a claim form in a case like this. See In re Apple iPhone 4 Products Liab. Litig., 2012 WL 3283432, *3 (N.D. Cal. Aug. 10, 2012) (overruling objection that claims process was "overly burdensome" where class members were required to provide only their name, address and iPhone serial number, and to check a box verifying their reception problems in order to

file a claim, and could do so by mail or electronically); see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig., 2013 WL 3224585, *18 (C.D. Cal. June 17, 2013) ("The requirement that class members download a Claim Form or request in writing a Claim Form, complete the form, and mail it back to the settlement administrator is not onerous. Additionally, in lieu of a written claim, class members are given the what [sic] the Court considers the even less onerous option of submitting an online claim.").

### 5. The Second Distribution of Unclaimed Funds

The Court has inquired how unclaimed funds from the initial distribution will be apportioned in the "second distribution" described in paragraph 142 of the Settlement Agreement. See Dkt. 923 at 2. First, the Settlement Administrator will take the total amount of unclaimed and residual funds and will divide them proportionally among all settlement class members who have submitted valid claims to date based on their total on-trip mileage. Utilizing this method and depending upon the total amount of residual funds, some shares for the second distribution are likely to be very small (perhaps only a few dollars). The Administrator will take any settlement class members' shares from the second distribution that would total less $100 and will re-distribute those funds among the remaining drivers in proportion to their total on-trip miles. See Dkt. 916-1 (Settlement Agreement) at 142. Thus, no one will receive a check in the second, residual distribution that is less than $100. This approach will keep costs down as it will avoid the necessity of cutting thousands of checks for a nominal amount of only a few dollars. Moreover, settlement class members receiving a second check of $100 or more are far more likely to cash their checks, which results in more money finding its way to settlement class members rather than to *cy pres*, which is another benefit of this approach.

### 6. Plaintiffs' Request for Attorneys' Fees and Costs

The Court has inquired as to whether Plaintiffs' counsel's request for $5 million in attorneys' fees is inclusive of costs. See Dkt. 924 at 2. Plaintiffs plan to separately request an award of costs in addition to the $5 million in fees (which is less than their estimated lodestar for the work performed over the course of this five-and-a-half-year litigation). Plaintiffs will further brief their request for attorneys' fees and costs in their Motion for Attorneys' Fees, filed prior to final approval. Their

current calculation of their costs expended in the litigation to date exceeds $300,000. See Liss-Riordan Decl. at ¶ 6.

### 7. Mailing the Settlement Notice

The Court has inquired as to whether the notice of settlement can be sent to settlement class members via U.S. mail as well as email. See Dkt. 924 at 2. The Settlement currently provides for notice to be sent via email and then to be sent via U.S. mail only to any settlement class members whose email addresses result in undeliverable emails. See Dkt. 916-1 at 147. This method of issuing notice is predicted to significantly lower costs. If the parties were to send notice by both email and U.S. mail, the proposed settlement administrator, Epiq, has informed Plaintiffs that the additional costs incurred would total more than $40,000. See Liss-Riordan Decl. at ¶ 5. Furthermore, Plaintiffs believe that any email addresses on file are more likely to be current and accurate than mailing addresses. As set forth in Plaintiffs' Motion for Preliminary Approval at p. 1, n. 1, nearly 70% of drivers in the settlement class last drove using the Uber App before Uber implemented its arbitration agreement, meaning that their contact information is likely to be outdated. To the extent that settlement class members' email addresses are no longer active, the administrator will mail the notice and will perform appropriate follow-up to attempt to ensure that the notice reaches settlement class members.[7]

---

[7] Specifically, the agreement provides that if the emailed notice is undeliverable, "[t]he Settlement Administrator shall then send the Notice of Settlement of Class Action to the potential Settlement Class Member's postal mailing address on file with Uber via first-class mail. If any Notice of Settlement of Class Action sent to any potential Settlement Class Member via first-class mail is returned to the Settlement Administrator as undeliverable…[and] [i]f the postal mailing is returned with a forwarding address, the Settlement Administrator shall forward the postal mailing to that address. For any remaining returned postal mailings, the Settlement Administrator shall make a good-faith search of an appropriate database, and postal mailings shall be forwarded to any new postal mail address obtained through such a search." See Dkt. 916-1 at ¶ 147

| | |
|---|---|
| Date: March 20, 2019 | Respectfully submitted,<br>MATTHEW MANAHAN, ELIE GURFINKEL, MOHKTAR TALHA, PEDRO SANCHEZ, AARON DULLES, and ANTONIO OLIVEIRA, individually and on behalf of all others similarly situated,<br><br>By their attorneys,<br><br>*/s/ Shannon Liss-Riordan*<br><br>Shannon Liss-Riordan, SBN 310719<br>LICHTEN & LISS-RIORDAN, P.C.<br>729 Boylston Street, Suite 2000<br>Boston, MA 02116 |